## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

GOLTV, INC., and GLOBAL SPORTS
PARTNERS LLP,

                                        Plaintiffs,

        -against-

FOX SPORTS LATIN AMERICA, LTD., PAN
AMERICAN SPORTS ENTERPRISES
COMPANY, d/b/a FOX SPORTS LATIN
AMERICA (individually and as successor to FOX
PAN AMERICAN SPORTS LLC), FOX
INTERNATIONAL CHANNELS (US), INC.,
FOX NETWORKS GROUP, INC. (as successor to
FOX INTERNATIONAL CHANNELS (US),
INC.), CARLOS MARTINEZ, HERNAN LOPEZ,
JAMES GANLEY, T&T SPORTS MARKETING
LTD., TORNEOS Y COMPETENCIAS, S.A.,
ALEJANDRO BURZACO, FULL PLAY GROUP
S.A., HUGO JINKIS, MARIANO JINKIS,
CONFEDERACION SUDAMERICANA DE
FUTBOL, d/b/a CONMEBOL, EUGENIO
FIGUEREDO, and JUAN ANGEL NAPOUT,

                                        Defendants.

Civ. _____

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs GolTV, Inc. ("GolTV") and Global Sports Partners LLP ("Global Sports," and

together with GolTV, "Plaintiffs"), by and through their undersigned attorneys, allege as follows

for their complaint:

## I.        NATURE OF THE ACTION

1.        Plaintiff GolTV is a U.S.-based television channel that collaborates with Plaintiff

Global Sports to provide soccer telecasts.  Together, Plaintiffs are victims of a bribery scheme

described by the U.S. Department of Justice in its criminal indictments against, among others,

Defendant Alejandro Burzaco ("Burzaco"), a principal of Defendant T&T Sports Marketing Ltd. ("T&T"), Defendants Hugo Jinkis and Mariano Jinkis, principals of Defendant Full Play Group, S.A., Defendants Eugenio Figueredo and Juan Angel Napout, former presidents of Defendant Confederación Sudamericana de Futbol ("Conmebol"), and numerous other Conmebol directors. The Superseding Indictment asserts claims against these individual defendants for RICO violations, wire fraud, and money laundering. *See United States of America v. Webb et al.*, 15-cr-0252 (RJD) (E.D.N.Y.), Superseding Indictment dated November 25, 2015 (Dkt. No. 102) ("Superseding Indictment").

2.      As set forth in the Superseding Indictment, Defendant T&T paid tens of millions of dollars in bribes to corrupt Conmebol directors between 2000 and 2015 in exchange for the exclusive television rights to Conmebol's prestigious international soccer club tournaments, the Copa Libertadores de America ("Copa Libertadores"), the Copa Sudamericana, and the Recopa Sudamericana (together, the "Club Tournaments"). *See* Superseding Indictment, at ¶¶ 174-185 (describing "Conmebol Copa Libertadores Scheme # 2"). The Superseding Indictment is, in relevant part, incorporated by reference in this Complaint and attached as **Exhibit A**.

3.      To date, guilty pleas have been received from, among others, Defendant Burzaco (Dkt. Nos. 90, 263) and Jose Margulies, an individual who facilitated the payment of bribes from T&T to Conmebol directors (Dkt. Nos. 96, 262). In separate proceedings, Conmebol directors Luis Bedoya and Sergio Jadue have pled guilty to Informations filed in *United States of America v. Bedoya*, 15-cr-0569 (RJD) (E.D.N.Y.) and *United States of America v. Jadue*, 15-cr-0570 (RJD) (E.D.N.Y.), respectively, which charged them with engaging in a RICO conspiracy and wire fraud conspiracy in connection with the same bribery scheme.

4.      Burzaco and T&T did not act alone in bribing Conmebol directors for the Club Tournament television rights.  During the relevant period, T&T was a Cayman Islands shell company that was 75% owned by Fox Pan American Sports LLC ("Fox Pan American"), which did business as "Fox Sports Latin America."  After T&T was awarded the Club Tournament television rights in exchange for bribes, T&T sublicensed those rights to Defendant Fox Sports Latin America, Ltd., which aired the tournaments on Fox channels.  The remaining 25% ownership interest in T&T was held by Torneos y Competencias, S.A. ("Torneos"), which was partially owned by Burzaco.

5.      Fox Pan American and Torneos used T&T to perpetuate the bribery schemes described in the Superseding Indictment.  Other Fox units and executives, including the current President of Fox Networks Groups Latin America, Defendant Carlos Martinez, participated in T&T's payment of bribes to Conmebol directors to ensure that T&T would obtain the lucrative television rights for the Club Tournaments and sublicense them to Fox Sports Latin America. Indeed, Defendant and former Conmebol President Eugenio Figueredo asserted in Uruguayan criminal proceedings that "the FOX company was behind all the illicit negotiations," and identified "an executive surnamed Martinez as responsible for the contracts with [Defendants] Jinkis and Burzako."

6.      Plaintiffs GolTV and Global Sports were directly harmed by Fox Pan American, Torneos, and T&T's bribery of Conmebol and its directors.  On several occasions, Plaintiffs offered Conmebol substantially more for the television rights to air the Club Tournaments than the amounts T&T paid or offered to Conmebol for those rights.  Even though the Conmebol directors were obligated, pursuant to their fiduciary duties to Conmebol's member federations, to obtain the best terms for the television rights, the Conmebol directors repeatedly rejected

Plaintiffs' superior offers in favor of T&T's inferior offers because of the bribes paid to those directors by T&T.

7.      Plaintiffs now seek compensation for the harm they suffered from the loss of the rights that Plaintiffs otherwise would have been able to obtain in a fair and competitive market untainted by bribery, unreasonable restraints of trade, and other criminal and wrongful conduct. Plaintiffs accordingly bring this action asserting violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); combination in restraint of trade in violation of Section 1 of the Sherman Act; monopsonization, conspiracy to monopsonize, and attempted monopsonization in violation of Section 2 of the Sherman Act; violations of the Florida Deceptive and Unfair Trade Practices Act; tortious interference with prospective economic advantage; and civil conspiracy.

## II.      JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over Plaintiffs' federal law claims under 28 U.S.C. §§ 1331 and 1337 because the claims involve allegations of unlawful behavior arising under the laws of the United States, and additionally affecting commerce, including RICO violations under 18 U.S.C. §§ 1962(c)-(d) and antitrust violations under 15 U.S.C. §§ 1-2.

9.      Subject matter jurisdiction also exists over the RICO claims under 18 U.S.C. § 1964(c) and the antitrust claims under Section 4 of the Sherman Act, 15 U.S.C. § 4 and Section 15 of the Clayton Act, 15 U.S.C. § 15.

10.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims all arise out of the same case or controversy and common nucleus of operative facts as the federal law claims.

11.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, communications, and transactions giving rise to Plaintiffs' claims occurred in this judicial district.

12.     Venue in this district additionally is proper against those Defendants not resident in the United States under 28 U.S.C. § 1391(c)(3), and venue against the remaining Defendants is additionally proper under 28 U.S.C. § 1391(c)(2) because they are subject to the court's personal jurisdiction with respect to this civil action.

13.     In addition, venue in this district is proper under 18 U.S.C. § 1965(a) because one or more of the Defendants reside, are found, have an agent, and/or transact their affairs in this district, and as to all Defendants under 18 U.S.C. § 1965(b) because the ends of justice require that they be brought before this Court to the extent the federal RICO claims against them would not otherwise be subject to venue in this Court.

### III.     THE PARTIES

**A.     Plaintiffs**

14.     Plaintiff GolTV is a Florida corporation having its principal place of business in North Bay Village, Florida.  GolTV is U.S.-based sports channel that provides professional soccer programming in English and Spanish to viewers in the United States and abroad. GolTV's telecasts are made available in the United States through television providers such as Verizon, Charter/Time Warner, Cox, Frontier, Cablevision, and Century Link.

15.     Plaintiff Global Sports is a limited liability partnership organized under English law and having its principal place of business in Uruguay.  Global Sports provides professional sports programming and production services.  During the relevant period, Global Sports acted, among other capacities, as an agent for GolTV.

B.      **Defendants**

16.     Defendant T&T is a Cayman Islands limited company that on information and belief has no employees or physical offices.  It is 75% owned by Defendant Pan American Sports Enterprises Company ("PASEC") and 25% owned by Defendant Torneos.

17.     PASEC is a Delaware corporation having its principal place of business in New York, New York that is a wholly owned subsidiary of Fox Networks Group, Inc. ("Fox Networks Group").  PASEC is the legal successor to Fox Pan American, a Delaware limited liability company, pursuant to a merger between the two companies in June 2015.

18.     Prior to its June 2015 merger with PASEC, and at all relevant times, Fox Pan American did business as Fox Sports Latin America.  According to the SEC Form 10-K filed by Twenty-First Century Fox, Inc. for the year ending June 30, 2015, Fox Sports Latin America:

> owns and operates the Fox Sports networks in Latin America, which are comprised of Spanish-language sports networks that are distributed to subscribers in Mexico and certain Caribbean and Central and South American countries, as well as Fox Sports Brazil, a Portuguese-language sports network specifically geared to the Brazilian audience, and also owns 100% of Fox Deportes, a Spanish-language sports programming service distributed in the United States.

Fox Pan American has owned 75% of T&T since 2005.  Between 2002 and 2005, Fox Pan American owned 50% of T&T.  The remainder of T&T was owned by Torneos.

19.     Defendant Fox Sports Latin America, Ltd. ("FSLA") is a Cayman Islands limited company having its principal place of business in Coral Gables, Florida.  It was a wholly owned subsidiary of Fox Pan American to whom T&T sublicensed the Club Tournament television rights.

20.     Defendant Fox International Channels (US), Inc. ("FIC") is a Delaware corporation having its principal place of business in Beverly Hills, California.  Prior to January

2016, FIC owned and operated Fox Pan American through its business unit Fox International Channels Latin America, based in Coral Gables, Florida.

21.     Defendant Fox Networks Group is a Delaware corporation and a subsidiary of Twenty-First Century Fox, Inc.  In January 2016, a corporate reorganization was announced in which Fox Networks Group's business unit, Fox Networks Group Latin America ("FNG Latin America"), would assume operation of the Fox Sports Latin America business and FIC would be dissolved.  On information and belief, FNG will become, or has already become, the legal successor to FIC as a part of this reorganization.  The status and progress of this announced reorganization is unknown to Plaintiffs at this time.

22.     Collectively, Defendants PASEC, FSLA, FIC and FNG, including their predecessors, are referred to as "Fox" or the "Fox Defendants."

23.     Defendant Torneos is an Argentinean corporation.  Torneos has historically held various exclusive agreements to produce and distribute programs related to soccer matches between clubs in South American soccer leagues.

24.     The relationships among the Fox Defendants, T&T, and Torneos as of 2012 are depicted in the following diagram:



25.     Defendant Carlos Martinez ("Martinez") is currently President of FNG Latin America and is responsible for the operation of the Fox Sports Latin America business. Previously, Martinez was President of Fox International Channels Latin America, where he also was responsible for the operation of Fox Sports Latin America.  Martinez served on the board of T&T approximately from October 31, 2012 to December 11, 2013.  Upon information and belief, Martinez is a citizen and resident of Florida.

26.     Defendant Hernan Lopez ("Lopez") was the CEO of FIC from 2011 to January 2016, when he left the company.  Previously, Lopez was Chief Operating Officer of FIC from 2008 to 2011 and General Manager of Fox Latin American Channels from 2000 to 2008.  Lopez served on the board of directors of Defendant T&T approximately from June 1, 2010 to December 10, 2013.  Upon information and belief, Lopez is a citizen and resident of California.

27.     Defendant James Ganley ("Ganley") was Chief Operating Officer of Fox Pan American and served on the board of directors of Defendant T&T approximately from April 28, 2005 to October 31, 2012.  Upon information and belief, Ganley was also an employee of Defendant FSLA and is a citizen and resident of Florida.

28.     Defendant Alejandro Burzaco is a citizen of Argentina.  Burzaco has an ownership share in Defendant Torneos and was a principal of Defendant T&T.

29.     Defendant Full Play Group S.A. ("Full Play") is a sports media and marketing business with its principal offices in Argentina.

30.     Defendant Hugo Jinkis and his son, Defendant Mariano Jinkis, are both citizens of Argentina.  Hugo Jinkis and Mariano Jinkis are the controlling principals of Defendant Full Play.

31.     Defendant Conmebol is one of the oldest and most prestigious soccer confederations in the world and "is exclusively authorized by FIFA to direct and control football

in the region." Conmebol Bylaws, Art. 3, ¶ 1. Conmebol is organized under Paraguayan law as a non-profit and non-governmental association of ten national soccer federations from Argentina, Bolivia, Brazil, Chile, Columbia, Ecuador, Paraguay, Peru, Uruguay, and Venezuela. Its principal place of business is at Autopista Aeropuerto Internacional - Km 12, Luque, Gran Asunción, Paraguay.

32.     Defendant Eugenio Figueredo is a citizen of both the United States and Uruguay. Between April 2013 and August 2014, Figueredo served as the president of Conmebol; prior to that, he had served as one of Conmebol's vice presidents from 1993 to 2013. *See* Superseding Indictment ¶ 48.

33.     Defendant Juan Angel Napout is a citizen of Paraguay. From about August 2014 to December 11, 2015, Napout was the president of Conmebol; prior to that, he was one of Conmebol's vice presidents from 2007 to 2014. *See* Superseding Indictment ¶ 41.

### IV.     FACTUAL ALLEGATIONS

### A.     THE CONMEBOL CLUB TOURNAMENTS

34.     Conmebol sponsors the Copa Libertadores, one of the most important soccer club tournaments in the world. The Copa Libertadores was first held in 1960. Over the following decades, the tournament evolved into a major competition featuring 38 club teams from approximately 10 countries throughout South America and Mexico. According to Conmebol, the Copa Libertadores has been among the most widely watched sporting events in the world. The Copa Libertadores has been telecast in more than 135 countries and, in 2009 and 2010, drew more than one billion viewers. By one estimate, the United States accounted for 16% of its audience share in 2010, behind only Brazil, Mexico, and Argentina. *See* Superseding Indictment ¶ 174.

35.     Conmebol also sponsors a soccer tournament called the Copa Sudamericana and a competition between the Copa Libertadores and Copa Sudamericana winners called the Recopa Sudamericana.  The Copa Sudamericana was first hosted in 2002, with 34 teams from the Conmebol member countries participating.  Since 2005, Conmebol has relied, in part, on the growing U.S. market for soccer to promote these tournaments.  For example, in 2005 and again in 2007, a club team from Major League Soccer in the United States participated in the Copa Sudamericana.  The Recopa Sudamericana has been played in the United States on several occasions, including in Los Angeles, California in 2003, and in Fort Lauderdale, Florida in 2004. *See* Superseding Indictment ¶ 175.

36.     These Club Tournaments offer viewers a unique opportunity to see the best South American soccer teams compete in a championship tournament format.  In the United States, such tournaments attract a niche audience and represent a valuable opportunity for advertisers and producers of telecasts ("telecasters") to reach unique and economically valuable segments of the viewing public that would otherwise be difficult to reach.

37.     The popularity of these soccer tournaments, combined with Conmebol's unique monopoly on the television rights to telecast television programming featuring the Club Tournaments, ensures that telecasters who obtain the Club Tournament television rights are guaranteed demand for their sports programming, which they, in turn, can use to develop their channels, increase their market share, and derive significant revenue, including advertising revenue.  For the same reason, preventing competitors from acquiring the Club Tournament television rights and preventing new competitors from emerging can protect a sports telecaster from losing market share to competitors.  As a result, the television rights for the Club Tournaments are highly valuable.

38.     Only Conmebol has the right to award the television rights for the Club

Tournaments.  *See* Conmebol Bylaws, Art. 62.

**B.     DEFENDANTS SET UP CONDUITS FOR PAYING BRIBES
        TO CONMEBOL DIRECTORS TO ENSURE ONLY T&T
        ACQUIRED THE CLUB TOURNAMENT TELEVISION RIGHTS**

39.     Beginning in 1999 and continuing through 2015, T&T acquired the exclusive

television rights to the Copa Libertadores.  T&T also acquired the exclusive television rights to

the Copa Sudamericana beginning in or about 2002 and continuing through 2015.  The rights

were awarded through a series of contracts covering multi-year periods.

40.     As revealed in the Superseding Indictment, T&T acquired these rights through

bribery.  Beginning in 2000, one of the founders of Torneos, Luis Nofal, unlawfully agreed to

pay, and did pay, annual bribes of $1 million to Conmebol President Nicolas Leoz, and $600,000

each to Conmebol directors Eugenio Figueredo, Eduardo Deluca, and Romer Osuna for

approximately the next 10 years.  In return, Leoz, Figueredo, Deluca, and Osuna unlawfully

agreed to cause Conmebol to award the Club Tournament television rights exclusively to T&T,

and to refuse to sell those rights to T&T's competitors, such as GolTV.  *See* Superseding

Indictment ¶ 178.

**1.     Fox Agrees with T&T to Bribe
        Conmebol's Directors for Fox's Benefit**

41.     In 2002, Fox Pan American, doing business as Fox Sports Latin America,

acquired 50% of T&T.  In 2005, Fox Pan American acquired an additional 25% share of T&T

previously owned by Defendant Torneos, increasing Fox Pan American's stake in T&T to 75%.

42.     Fox employees subsequently assumed important roles with T&T.  Defendant

Ganley, Chief Operating Officer of Fox Pan American, was a director of T&T from April 28,

2005 to October 31, 2012.  Defendant Lopez, President and CEO of FIC, served as a director of

T&T approximately from June 1, 2010 to December 10, 2013.  Defendant Martinez, President of

FIC Latin America, also served on the board of T&T approximately from October 31, 2012 to

December 10, 2013.  Fox employees not only served as directors of T&T but were also involved

in its operations.

43.     Upon information and belief, in and around 2005, soon after Fox Pan American

increased its interest in T&T to 75%, Fox knowingly and intentionally entered into an unlawful

agreement with T&T and Conmebol.  Fox Pan American, FIC, FIC officers Martinez and Lopez,

and Fox Pan American Chief Operating Officer Ganley agreed with T&T, T&T principal

Burzaco, Conmebol, Conmebol President Leoz, and Conmebol directors Figueredo, Deluca, and

Osuna that Fox Pan American and Torneos would fund and help arrange T&T's payment of

bribes to Conmebol's directors.  In exchange, Conmebol would sell the Club Tournament

television rights to T&T, with the understanding that the rights would be sublicensed to Fox, and

Conmebol would refuse to sell the rights to the competitors of T&T or Fox.

44.     Plaintiffs' allegations concerning Fox's agreement with T&T and Conmebol are

based, in part, on the personal involvement of high-level Fox executives, including Defendants

Martinez, Lopez, and Ganley, in the bribery scheme, as detailed below, and on allegations made

by participants in the scheme, including those of Conmebol director Figueredo.  *See, e.g., infra*

¶¶  52-54, 58, 65.

45.     In 2005, Burzaco began to manage the day-to-day operations of Torneos and

learned from Luis Nofal of the annual bribe payments to Leoz, Figueredo, Deluca and Osuna.

Burzaco helped to continue the practice by arranging for Leoz to receive $1 million bribe

payments each year from in or about 2004 through in or about 2012, the year before Leoz

resigned the presidency of Conmebol.  Burzaco also continued to arrange for annual six-figure

bribe payments to Deluca until in or about 2011, to Osuna until in or about 2012, and to Figueredo, whose payments increased to $1 million in or about 2012, until in or about 2014. *See* Superseding Indictment ¶ 179.

46.     As described in more detail below, Conmebol and T&T entered into a number of contracts after 2005, through which T&T retained the television rights to subsequent years of the Club Tournaments.  Each of those contracts required the support of Conmebol officials who were receiving bribes from Burzaco and other co-conspirators affiliated with T&T. *See* Superseding Indictment ¶ 180.

47.     Beginning in 2009, a group of six presidents of the traditionally less-powerful member associations of Conmebol demanded that they, too, receive annual bribe payments in exchange for their support of T&T as the holder of television rights to the Copa Libertadores, among other tournaments.  In response to these demands, Burzaco agreed to pay and did pay annual six-figure bribe payments to Juan Angel Napout, Manual Burga, Carlos Chavez, Luis Chiriboga, and Rafael Esquivel.  Bribes were also paid to Luis Bedoya starting in or about 2010, and also to Sergio Jadue, starting in or about 2012, to secure their support. *See* Superseding Indictment ¶ 182.

48.     At various times, T&T also paid bribes to Conmebol directors Marco Polo del Nero, Jose Maria Marin, Josel Luis Meiszner and Ricardo Teixeira bribes in exchange for their support of T&T as holder of the rights to the Copa Libertadores, among other tournaments. *See* Superseding Indictment ¶ 183.

49.     To disguise its bribe payments to Conmebol's directors in connection with the Copa Libertadores and other tournaments, T&T and Fox agreed that T&T would enter into "consulting" contracts with various financial intermediaries, such as companies owned by Jose

13

Margulies, Hugo Jinkis, and Mariano Jinkis.  *See* Superseding Indictment ¶ 184.  T&T did not receive any legitimate services from these financial intermediaries.  Rather, the purported "consulting" contracts were shams and were used to disguise the payments from T&T to the financial intermediaries.

50.     In the course of paying bribes in exchange for the television rights to the Club Tournaments, T&T and other defendants used wire facilities and financial institutions located in the United States, among other countries, to make and receive bribe payments and to transfer payments related to contracts secured through bribery.  Defendants also relied on the growing U.S. market for soccer to generate profits from the scheme, and, on information and belief, conducted meetings in the United States in furtherance of their schemes.  *See* Superseding Indictment ¶ 185.

51.     T&T, Torneos, Fox Pan American, FIC, Conmebol, and the financial intermediaries all knew that the payments from T&T to the intermediaries, and from the intermediaries to Conmebol, did and were intended to serve as bribes to obtain the Club Tournament television rights for the benefit of Fox.  In fact, the terms of the license agreements between Conmebol and T&T expressly contemplate their sublicensing of those rights to "Fox Sports."

52.     Fox employees not only knew of the bribes paid to Conmebol to secure the Club Tournament television rights for Fox Sports Latin America, they were personally involved in authorizing and facilitating the payment of those bribes.  For example, Fox Pan American Chief Operating Officer Ganley signed many of the sham "consulting" agreements between T&T and the Margulies Intermediaries that channeled bribes to Conmebol's directors, as discussed below.

Likewise, Defendant Carlos Martinez signed an agreement on behalf of T&T restructuring the payment of bribes through the Margulies Intermediaries.

53.     As described by Defendant and former Conmebol President Eugenio Figueredo in a cooperation agreement with Uruguayan prosecutors in February 2016, Fox was understood to be behind all of the illegal bribery:

> [Figueredo] references T&T, Torneos y Competencias and Full Play as the companies that contracted with Conmebol, for amounts very inferior to those of the market, and which later assigned the rights to the FOX company, as well as GLOBO of Brazil, obtaining the profits that the payments permitted them, which he acknowledges having received and indicating that, in his opinion, the FOX company was behind all the illicit negotiations and indicating an executive surnamed Martinez as responsible for the contracts with [Defendants] Jinkis and Burzako.

54.     On information and belief, the "Martinez" referred to in Figueredo's cooperation agreement is Defendant Carlos Martinez, currently President of Fox Networks Group Latin America.

55.     Two of the main conduits that T&T used to pay these bribes are described below.

**2.      T&T Pays Bribes to Conmebol's Directors
          via the Margulies Intermediaries**

56.     Beginning in 2005, T&T executed "consulting" contracts with a number of shell companies controlled by an individual named Jose Margulies.  These shell companies included Somerton Ltd. ("Somerton"), registered in Panama; Valente Corp. ("Valente"), registered in Turks and Caicos; and Spoart S.A. ("Spoart"), registered in Brazil (collectively, the "Margulies Intermediaries").  These were not real consulting agreements.

57.     Margulies was indicted and has entered a guilty plea in connection with, among other things, his role facilitating the payment of bribes from T&T to Conmebol's directors.  *See United States of America v. Webb et al.*, 15-cr-0252 (RJD) (E.D.N.Y.) (Dkt. No. 96, 262); *see also* Superseding Indictment ¶ 184.

58.    T&T's first sham contracts with the Margulies Intermediaries were signed on May 5, 2005 by Defendant Ganley, who was both a T&T director and Fox Pan American's Chief Operating Officer.  T&T's contract with Valente provided that T&T would pay Valente $360,000 annually, but was subsequently amended to provide for payments of $660,000 annually from 2006 through 2014.  T&T's contract with Somerton, which was subsequently modified in November 2006, provided that T&T would pay Somerton $1 million annually from 2005 through 2014.  Several years later, on or around January 1, 2010, T&T executed another sham contract, this time with Spoart, in which it agreed to pay Spoart $600,000 annually.

59.    Although the sham contracts provided for "intermediary" and "consulting" services by Valente, Somerton and Spoart to T&T, no legitimate services were in fact provided.  Rather, the monies paid were used to make bribe payments to Conmebol directors who then awarded the Club Tournament television rights to T&T, who then sublicensed those rights to FSLA.

60.    On information and belief, T&T made the payments provided for under these sham contracts on or about the dates when they were due and made certain additional one-time payments to the intermediaries as well.  In total, T&T either paid or agreed to pay the Margulies Intermediaries, directly and indirectly, approximately $23 million from 2005 through 2014.

61.    On information and belief, Fox Pan American provided T&T with the funds to pay bribes to Conmebol via the Margulies intermediaries.

62.    Many of these bribes were paid by wire transfer by T&T from its account at Lloyds Bank in Miami, Florida, and later Clariden Leu in Switzerland, to the bank accounts of Somerton and Valente at JP Morgan Chase Bank in New York.  As an example, these bribe payments included the following wire transfers:

| Wire Transfers from T&T to the Margulies Intermediaries | | | |
|---|---|---|---|
| Date | From | To | Amount |
| July 14, 2011 | T&T: Clariden Leu (Acct. No. XXXX-XXXXXX3-32) | Somerton: J.P. Morgan New York (Acct. No. XXX-X-XXX157) | $500,000 |
| December 7, 2011 | T&T: Clariden Leu (Acct. No. XXXX-XXXXXX3-32) | Valente: J.P. Morgan-New York (Acct. No. XXX-X-XXXX332) | $100,000 |
| March 14, 2012 | T&T: Clariden Leu (Acct. No. XXXX-XXXXXX3-32) | Valente: J.P. Morgan-New York (Acct. No. XXX-X-XXXX332) | $500,000 |
| April 19, 2012 | T&T: Clariden Leu (Acct. No. XXXX-XXXXXX3-32) | Spoart: Banco Industrial e Comercial, S.A., Sao Paolo-Brazil (Acct. No. XXX13-3 Ag.0007) | $50,000 |

63.     In or around December 19, 2012, T&T restructured how it paid bribes to the

Conmebol directors through the Margulies Intermediaries.  Instead of paying bribes directly to

the Margulies Intermediaries, T&T arranged for all amounts called for under the consulting

contracts with the Margulies Intermediaries to be paid by Torneos & Traffic Sports Marketing

B.V. ("Torneos Holland"), which on information and belief is an affiliate of Torneos.

64.     In exchange for Torneos Holland's agreement to assume these payment

obligations, T&T agreed to give Torneos Holland certain television and marketing rights that

Conmebol had previously granted to T&T.  Notwithstanding this modification in the manner by

which the bribes were paid, the Margulies Intermediaries continued to channel the bribes to

Conmebol's directors for the benefit of T&T, and ultimately Fox.

65.     On information and belief, T&T implemented this restructuring of its bribe

payments at the instruction of Fox Pan American and FIC.  This belief is based, in part, on

Defendant Martinez's involvement signing the documents providing for continued payments to

the Margulies Intermediaries on behalf of T&T.

### 3.    T&T Pays Bribes to Conmebol's
### Directors via Torneos Holland and Arco

66.    In addition to making payments through the Margulies Intermediaries, T&T also arranged with Torneos Holland to pay additional bribes to the Conmebol directors through a different payment conduit.

67.    Prior to 2004, T&T had sold the Club Tournament television rights for Brazil to a leading Brazilian media company, Globo Comunicação e Participações S.A. ("Globo"), for approximately $6 million per year, which reflected the approximate market value for the rights at that time.

68.    Beginning in 2005, T&T agreed to sell the Club Tournament television rights for Brazil to Torneos Holland for the dramatically lower price of $900,000 per year..

69.    The drop in price was due to bribery, not to any decrease in the value of the rights.  In fact, after obtaining a lower price for the Club Tournament television rights for Brazil in 2005, Torneos Holland sold those rights to Globo for at least the same price ($6 million) at which T&T had previously sold the rights to Globo directly.  Torneos Holland then took the over $5 million difference between T&T's acquisition price and Torneos Holland's resale price and paid it to Arco Business and Developments Ltd. ("Arco"), or other intermediary entities controlled by T&T's principal Burzaco, which, in turn, transferred the funds to corrupt Conmebol directors as bribes.

70.    In 2010, the price Globo paid Torneos Holland for the rights rose to $8 million, and in 2011 and 2012, the price rose again to $11.1 million.  For 2013, the price rose yet again to $16.1 million.  T&T concurrently increased its corresponding bribe payments to Conmebol through Arco, from $5.2 million in 2009, to $6.2 million in 2010, to $9.1 million in 2011 and

2012, and finally to $12.5 million in 2013.  Upon information and belief, these bribery payments reflected new agreements between Fox, T&T, and Conmebol.

71.     Upon information and belief, approximately $57 million dollars in bribes were paid in this manner from 2005 through 2013.

72.     The flow of bribes from Fox to Conmebol in exchange for exclusive television rights to the Club Tournaments is depicted in the following chart:

## The Fox Bribes-for-Rights Scheme



**C.     CONMEBOL REJECTS PLAINTIFFS' SUPERIOR OFFERS FOR
        THE CLUB TOURNAMENT TELEVISION RIGHTS IN FAVOR
        OF T&T'S INFERIOR OFFERS AND ADDITIONAL BRIBES**

73.     T&T's unlawful agreement with Conmebol and its payment of tens of millions of

dollars in bribes to Conmebol directors had their intended effect.  Conmebol repeatedly rejected

Plaintiffs' superior offers for the Club Tournament television rights in favor of inferior terms

from T&T.

74.     Plaintiffs are among the major soccer telecasting groups in the Americas, with

extensive experience telecasting major tournament and league soccer matches.  As sports

telecasters focused on soccer, Plaintiffs are especially capable of delivering high-quality soccer

telecasts to viewers who wish to see the Club Tournaments and promoting the Club Tournaments

throughout the Americas in order to increase the visibility, viewership, market share, revenue,

and value associated with the Club Tournaments, both for Plaintiffs' own benefit and the benefit

of Conmebol and its member federations.

**1.     Conmebol Rejects Plaintiffs' Superior Offer in
        March 2010 to Purchase Rights to 2011-2014
        Copa Libertadores and Copa Sudamericana**

75.     In 2010, GolTV attempted to purchase certain television rights from Conmebol.

On March 3, 2010, GolTV met with Nicolas Leoz, then President of Conmebol, to present a

formal offer for the television rights for the Copa Libertadores and the Copa Sudamericana for

the years 2011 to 2014, which Conmebol had previously awarded to T&T.

76.     GolTV offered Conmebol a total of U.S. $270 million for the rights, as reflected

in a letter dated March 3, 2010 and summarized in the table below.  On information and belief,

this offer represented nearly a 70% increase over the $164 million paid by T&T for the same

years:

| Television Rights for Copa Libertadores/Copa Sudamericana (2011-2014) | | | |
|---|---|---|---|
| Year | GolTV Offer (USD $ millions) | T&T Price (USD $ millions) | Difference (USD $ millions) |
| 2011 | 60 | 41 | -19 |
| 2012 | 65 | 41 | -24 |
| 2013 | 70 | 41 | -29 |
| 2014 | 75 | 41 | -34 |
| TOTAL | 270 | 164 | -106 |

77.     On information and belief, Conmebol disclosed to T&T, Fox Pan American, and FIC that GolTV had in March 2010 submitted an offer to purchase the television rights for the tournaments.  Further, on information and belief, T&T – with Fox's knowledge and consent – urged Conmebol to reject GolTV's offer.

78.     Although GolTV's offer was superior to what T&T had agreed to pay, Conmebol did not accept GolTV's offer.

79.     Conmebol could have revoked, and was in fact legally obligated to revoke, its wrongful sale of the Club Tournament rights to T&T in favor of GolTV's superior offer.  Under Paraguayan law, Conmebol's directors owed fiduciary duties to Conmebol that required them to license the rights on the terms most favorable to Conmebol and its member organizations.

80.     At all times relevant hereto, Plaintiffs had the experience and expertise and all other qualifications and capabilities necessary to telecast and promote the Club Tournaments and provide all other associated benefits to Conmebol as well as, if not better than, Fox Sports Latin America.  There were no legitimate business or other factors that would have warranted licensing the Club Tournament television rights to T&T for sublicense to FSLA in preference to Plaintiffs' higher bids, and in any event Conmebol's licensing decisions for the Club Tournament television

rights were not in fact motivated by any legitimate factors.  The only reason Plaintiffs' superior

offers were not accepted by Conmebol was that T&T, at Fox's instruction and through Fox's

participation, paid illegal bribes to Conmebol's directors.

### 2. Conmebol's Directors Solicit and Receive Additional Bribes from T&T via Hugo and Mariano Jinkis

81.     Conmebol's president Leoz and the other corrupt Conmebol directors had no

intention of entertaining in good faith any offer from GolTV.  Instead, they requested that T&T

pay additional amounts to Conmebol's directors through yet another intermediary conduit.  T&T

agreed to this new bribery arrangement.

82.     By letters dated March 16, 2011 and March 20, 2012, Leoz instructed T&T to pay

up to $2,400,000 per year of the amounts that T&T owed to Conmebol for the Club Tournament

television rights for 2011 and 2012 directly to the Swiss bank account of Defendant Full Play's

affiliate Yorkfields S.A. ("Yorkfields").  T&T made these payments from its accounts at Lloyds

Bank in Miami, Florida and Clariden Leu in Switzerland, respectively.

83.     In 2013, T&T made a similar payment in connection with the Club Tournament

television rights for 2013 of $3,600,000 to the Swiss bank account of another Full Play affiliate,

Cross Trading S.A. ("Cross Trading"), from T&T's bank account at UBS in Stamford,

Connecticut.

84.     Upon information and belief, Yorkfields and Cross Trading served as

intermediaries to funnel bribes from T&T to Conmebol's directors.  Yorkfields and Cross

Trading are companies controlled by Defendants Hugo Jinkis and his son Mariano Jinkis, two

Argentinean citizens.  The Superseding Indictment charges that Hugo and Mariano Jinkis

facilitated T&T's bribe payments in exchange for continued support of T&T's retention of the

Club Tournament television rights.  Superseding Indictment ¶¶ 55, 184.

22

85.     In addition, Conmebol officials at times directed T&T to make payments of amounts due to the Conmebol directors directly to Arco accounts.  For example, on March 12, 2013 Conmebol sent T&T a letter requesting that T&T make a payment of $1,400,000 to Arco's JP Morgan Chase Bank account in New York in connection with the Broadcasting Rights Agreement for the Copa Libertadores dated March 6, 2012.  On information and belief, this amount was subsequently funneled by Arco to Conmebol directors.

### 3. Conmebol Rejects Plaintiffs' Superior Offer in October 2012 to Purchase Rights to 2015-2020 Copa Libertadores and Copa Sudamericana

86.     In 2012, GolTV offered to purchase from Conmebol tournament television rights for 2015 through 2020, a different span of years from the period at issue in GolTV's March 2010 offer.  Again, GolTV offered Conmebol far more than it was receiving from T&T and Fox.  Conmebol President Leoz promised GolTV that Conmebol's Executive Committee, which was comprised of Conmebol directors, would formally consider GolTV's proposal at an October 24, 2012 Executive Committee meeting.

87.     Accordingly, on October 21, 2012, GolTV submitted a sealed proposal to purchase television rights to the Copa Libertadores and Copa Sudamericana for the years 2015 to 2020, to be considered at Conmebol's October 24, 2012 Executive Committee meeting.  GolTV offered to purchase the rights for a total price of $805 million, reflecting escalating prices of $125 to $140 million for each year of the 2015-2020 period.

88.     On information and belief, Conmebol, without informing GolTV, disclosed to T&T, Fox Pan American, and FIC that GolTV had submitted an offer to purchase the television rights for the tournaments.  As they had done before, T&T and Conmebol agreed that Conmebol would reject GolTV's offer and instead accept a competing offer from T&T.

89.     To provide a veneer of justification for the refusal, Conmebol invited Defendant Burzaco to attend its October 24, 2012 Executive Committee meeting on behalf of T&T and offer reasons why the GolTV offer should not be accepted and to promote T&T's offer. Conmebol neither informed GolTV that Burzaco would be present at the meeting nor invited a representative of GolTV to present its superior competing offer.

90.     Conmebol ultimately rejected GolTV's offer, and in December 2012 it amended its agreement with T&T to increase the price for the rights to the Copa Libertadores and Copa Sudamericana for 2015 through 2018.  Conmebol also agreed to award Torneos's affiliate, TyC International B.V. ("TyC International"), the Americas television rights for those tournaments for 2019 through 2022, and to designate TyC International and Defendant Full Play as the exclusive commercial agents for the negotiation and commercialization of the worldwide rights for those tournaments excluding the Americas.

91.     As reflected in the chart below, the price that Conmebol accepted from T&T and TyC International for the 2015-2020 rights was only $416 million – approximately *half* of GolTV's competing $805 million offer:

| Television Rights for Copa Libertadores/Copa Sudamericana (2015-2020) | | | |
|---|---|---|---|
| Year | GolTV Offer (USD $ millions) | Prices from T&T (2015-2018) and TyC Int'l (2019-2022) (USD $ millions) | Difference (USD $ millions) |
| 2015 | 125 | 65 | -60 |
| 2016 | 130 | 67 | -63 |
| 2017 | 130 | 69 | -61 |
| 2018 | 135 | 71 | -64 |
| 2019 | 140 | Higher of 72 or the 2018 combined price + 15% | -68 |
| 2020 | 145 | Higher of 72 or the 2018 combined price + 15% | -73 |
| TOTAL | 805 | 416 | -389 |

### 4.   Conmebol Rejects Plaintiffs' Superior Offer in November 2013 to Purchase Rights to 2015-2024 Club Tournaments

92.     On or about November 18, 2013, GolTV made a new offer to purchase rights to all three Club Tournaments – the Copa Libertadores, the Copa Sudamericana, and the Recopa – for the years 2015 through 2024.

93.     GolTV offered Conmebol U.S. $2.1 billion for the television rights to the three tournaments – including a $360 million annual price starting in 2019 – for a total price almost *four times higher* than the $560 million paid by T&T and TyC International for the same period.

94.     The following chart illustrates the difference between GolTV's higher offer and the price that Conmebol was to obtain from T&T and TyC International for the corresponding years:

| Television Rights for Club Tournaments (2015-2022) | | | |
|---|---|---|---|
| Years | GolTV Offer (USD $ millions) | Price from T&T (2015-2018) and TyC Int'l (2019-2022) (USD $ millions) | Difference (USD $ millions) |
| 2015 | 170 | 65 | -105 |
| 2016 | 170 | 67 | -103 |
| 2017 | 170 | 69 | -101 |
| 2018 | 170 | 71 | -99 |
| 2019 | 360 | Higher of 72 or the 2018 combined price + 15% | -288 |
| 2020 | 360 | Higher of 72 or the 2018 combined price + 15% | -288 |
| 2021 | 360 | Higher of 72 or the 2018 combined price + 15% | -288 |
| 2022 | 360 | Higher of 72 or the 2018 combined price + 15% | -288 |
| **TOTAL** | **2,120** | **560** | **-1,560** |

95.     On information and belief, Conmebol again disclosed to T&T, Fox Pan American, and FIC that GolTV had offered to buy tournament rights, and T&T and Conmebol agreed that Conmebol would reject GolTV's November 2013 offer.  Conmebol rejected GolTV's offer.

### 5.     T&T Pays Additional Bribes in 2013 to Conmebol's Directors Through Productora de Eventos S.A.

96.     Conmebol's directors continued to receive additional bribes from T&T while they were rejecting Plaintiffs' dramatically higher, and otherwise superior, offers for the Club Tournament television rights for 2015 through 2024 in favor of T&T's inferior offers.

97.     For example, in September 2013, T&T agreed to pay $1.5 million in bribes to Conmebol's directors through a new intermediary named Productora de Eventos, S.A. ("Productora").  The payments were unrelated to any services provided by Productora. Productora, in turn, executed a mirror contract on December 15, 2013 to pay FPT Sports S.A. ("FPT") $1.5 million, purportedly in exchange for "consulting, supervision and logistics" services.

98.     On information and belief, no such services were provided.  As stated in the Superseding Indictment, FPT was a financial intermediary that funneled bribes to the Conmebol directors.  Superseding Indictment ¶ 311.  The $1.5 million paid by T&T to Productora, and then by Productora to FPT, was, on information and belief, ultimately delivered to Conmebol directors in exchange for their continued support of Conmebol's award of the Club Tournament television rights to T&T and Conmebol's exclusion of GolTV, despite its manifestly superior offers.

**6.     Conmebol Rejects Plaintiffs' Superior Offers
in May and October 2015 to Purchase Rights
to the 2016-2022 Club Tournaments**

99.     In a letter to Conmebol dated May 7, 2015, GolTV renewed its November 2013 offer to pay $360 million per year for the 2019-2022 Club Tournament television rights.

100.     Shortly thereafter, on May 27, 2015, the DOJ unsealed its original indictment, which described some of the bribery and fraud by which Conmebol awarded rights associated with soccer tournaments to various sports marketing companies.  *See United States of America v. Webb et al.*, 15-cr-0252 (RJD) (E.D.N.Y.), Indictment dated May 20, 2015 (Dkt. No. 1) ("Original Indictment").  Among those arrested pursuant to the charges in the Indictment of receiving bribes and taking actions accordingly were Defendant T&T's principal Defendant Burzaco and Conmebol's then-President, Defendant Figueredo.

101.     After release of the Original Indictment, on July 29, 2015, Conmebol issued Circular 6/2015, which stated that Conmebol would reevaluate its commercial relationships with entities implicated in the wrongdoing and refuse to enter into any contract with an entity charged by a competent governmental entity.

102.     Initially encouraged by Conmebol's representations that it was seeking to reform the process by which it awarded the Club Tournament television rights, GolTV engaged in a series of meetings with Conmebol officials, including with Conmebol's interim and then-permanent president Defendant Napout, to propose acquiring the Club Tournament television rights on terms that were superior to the terms for which Conmebol had awarded the rights to T&T and Torneos.

103.     As 2015 progressed without Conmebol accepting GolTV's superior offers, GolTV on October 16, 2015 formally renewed the offer it had made in May 2015 for the 2019-2022

Club Tournament television rights.  In addition, GolTV proposed acquiring the 2016-2018 Club Tournament television rights for $170 million per year, the price it had first offered in 2013.

104.     Conmebol did not accept GolTV's proposals of May and October 2015.

105.     Instead, in November 2015, Defendants Martinez and Lopez, on behalf of FIC, negotiated an agreement with Defendant Napout, on behalf of Conmebol, under which Conmebol would award directly to FIC the 2016-2018 Club Tournament television rights that Conmebol had previously licensed to T&T, and which T&T had in turn sublicensed to FSLA. The price paid for these rights from FIC was $135–$155 million per year, almost $100 million more than the $50 million per year that T&T had previously agreed to pay.  The almost 300% increase in the price of the rights dramatically illustrated how far below market value Conmebol had previously awarded the rights to T&T, and in turn, Fox.

106.     Defendant Napout's November 2015 unlawful agreement with FIC was negotiated in secret and violated Conmebol's procedures.  Prior to its signing, the agreement was neither disclosed to the presidents of the ten national member organizations that constitute Conmebol nor voted on by Conmebol's executive committee.

107.     GolTV was not informed of the negotiations or invited to submit a competing bid. Nevertheless, even with the dramatic increase in the price paid for the rights from $50 million to $150 million per year, FIC's contract price was still significantly below the $170 million per year that GolTV had offered Conmebol only a month before.  Napout did not offer any reason why he had rejected GolTV's offer in favor of a lower price offered by FIC, and there was in fact no legitimate reason for doing so.

108.    Tellingly, Napout was subsequently indicted and arrested in connection with allegations in the Superseding Indictment that he had accepted bribes in exchange for awarding the Club Tournament television rights to T&T.

109.    Prior to the release of the Original Indictment in May 2015, Plaintiffs exercised due diligence in attempting to discover the reasons for Conmebol's rejection of their numerous offers but, due to Defendants' concealment of their unlawful agreements and transactions, were unable to obtain information sufficient to assert a claim for Defendants' wrongdoing.  Defendants' concealment of their bribery scheme, including their use of sham consulting agreements and other artifices to hide the scheme, constituted an extraordinary circumstance preventing Plaintiffs from bringing suit previously.

110.    Upon learning of the Original Indictment, and again upon learning of the Superseding Indictment, which was unsealed December 3, 2015, GolTV exercised due diligence in investigating the relationships between the conduct alleged in the indictments and Conmebol's repeated rejections of GolTV's offers.  In the course of their investigation, Plaintiffs ultimately discovered information to support the allegations of Defendants' unlawful conduct herein and exercised diligence in filing suit thereafter.

**D.    DEFENDANTS' BRIBERY SCHEME DEPRIVED PLAINTIFFS OF CLUB TOURNAMENT TELEVISION RIGHTS THEY OTHERWISE WOULD HAVE OBTAINED**

111.    Defendants devised their bribery scheme with the intent that T&T and Fox retain television rights to the Club Tournaments, thereby harming Plaintiffs, and any other potential competitors, by depriving them of the opportunity to fairly compete for and obtain those rights. Defendants' actions achieved these results.

112.    Among other things, Conmebol and the other Defendants unlawfully agreed to prevent Plaintiffs from obtaining the Club Tournament television rights by misleading Plaintiffs

about when proposals for the rights would be considered; by licensing the Club Tournament television rights in advance of expected offers from Plaintiffs, then using the existence of such agreements as an excuse to reject Plaintiffs' more favorable proposals; and by refusing to revoke rights wrongfully awarded to T&T at below-market prices, as a result of T&T's bribery, in favor of the more favorable proposals from Plaintiffs, even though Conmebol was legally permitted and, indeed, obligated to do so.

113.    During the period relevant to Plaintiffs' claims, Plaintiffs were the only party actively making offers to acquire the rights other than T&T.  As discussed above, Conmebol's directors' fiduciary duties required them to accept Plaintiffs' offers because they were significantly superior offers to those T&T's offers, and there was no legitimate reason to justify licensing the club tournament rights for the Club Tournaments to T&T.  Accordingly, if not for Conmebol's agreement with Fox and T&T that Conmebol would refuse to deal with T&T's competitors, Conmebol would have accepted Plaintiffs' superior proposals for the Club Tournament television rights and, to the extent that such rights had already been awarded to T&T as a result of T&T's bribe payments, Conmebol would have revoked such rights from T&T and awarded them to Plaintiffs in exchange for Plaintiffs' more favorable terms.

114.    Plaintiffs were not the only entities injured by Defendants' actions.  Defendants' conduct also injured soccer clubs and soccer federations, which obtained less revenue from the Club Tournaments than they otherwise would have because Conmebol accepted lower television rights payments due to Defendants' bribery of its directors.

## E.    DEFENDANTS INJURED COMPETITION IN VARIOUS MARKETS IN VIOLATION OF THE ANTITRUST LAWS

115.    In addition to constituting RICO violations, as set forth herein, Defendants' bribery and other crimes harmed competition in various markets in violation of the antitrust laws.

They were part of a series of conspiracies in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and reflected monopsonization, attempted monopsonization, and a conspiracy to monopsonize in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

### 1.  The Relevant Markets

116.    Defendants' unlawful conduct affected at least three markets, which are among the relevant markets for purposes of these antitrust claims:  (1) the market for the purchase of rights to televise South American international soccer club tournaments (and in particular the Club Tournaments) in the Americas, including the United States (the "Americas Television Rights Market"); (2) the market for the sale of television programming featuring South American international soccer club tournaments by telecasters to cable and satellite television providers in the United States (the "U.S. Television Programming Market"); and (3) the market for the sale by telecasters of advertising airtime on television programming in the United States featuring South American international soccer club tournaments (the "U.S. Television Advertising Airtime Market").

### a.  The Americas Television Rights Market

117.    Conmebol's Club Tournaments are recognized by soccer viewers as the premium standard in South American international soccer and as the only source for high-level international play among South American soccer clubs.  As a result, Conmebol is effectively the only seller in the Americas Television Rights Market.

118.    The purchasers and potential purchasers in the Americas Television Rights Market include both (1) new or existing telecasters that purchase or would purchase the rights to telecast South American international soccer club tournaments for the purpose of creating television programming featuring such tournaments, and (2) intermediaries that purchase the rights for the purpose of reselling them to telecasters.

119.    At all times relevant to this Complaint, rights in the Americas Television Rights Market were bought and sold in transactions concerning the television rights for South American international soccer club tournaments for all countries in the Americas over a given period of time.  Purchasers and prospective purchasers in the Americas Television Rights Market did not purchase or seek to purchase such rights on a country-by-country basis, nor did the seller (Conmebol) offer rights for sale on a country-by-country basis.

120.    Television rights for South American international soccer club tournaments are not reasonably interchangeable with television rights for other types of sports or soccer-oriented programming due to the significantly different size, demographic profile, and growth potential of the viewing audience for these tournaments.  As a result, the supply of South American international soccer club tournament television rights is limited to Conmebol's Club Tournaments.

121.    Purchasers in the Americas Television Rights Market cannot satisfy their demand for television rights for South American international soccer club tournaments by purchasing rights for other forms of sports- or soccer-related programming.  Price and competition activity in the Americas Television Rights Market does not affect price and competition activity in the markets for other such rights, and price and competition activity in the markets for other rights does not affect price and competition activity in the Americas Television Rights Market.

**b.  The U.S. Television Programming Market**

122.    The purchasers and potential purchasers in the U.S. Television Programming Market are cable and satellite television providers that seek or might seek to purchase programming featuring South American international soccer club tournaments for telecast to viewers in the United States.

123.    Because of the conduct of Defendants described herein, in effect, the only sellers in the U.S. Television Programming Market are currently the Fox Defendants, who maneuvered themselves into being the sole providers in the United States of television programming featuring South American international soccer club tournaments.

124.    Television programming featuring South American international soccer club tournaments is not reasonably interchangeable with other forms of sports- or soccer-oriented programming due to the significantly different size, demographic profile, and growth potential of the viewing audience for South American international soccer club tournaments.

125.    Cable and satellite television providers cannot satisfy their demand for programming featuring South American international soccer club tournaments by purchasing other forms of sports- or soccer-related programming.  Price and competition activity in the U.S. Television Programming Market does not affect price and competition activity in markets for other sports- or soccer-related programming, and price and competition activity in the markets for other such programming does not affect price and competition activity in the U.S. Television Programming Market.

### c.   The U.S. Television Advertising Airtime Market

126.    The purchasers and potential purchasers in the U.S. Television Advertising Airtime Market are advertisers that seek or might seek to purchase airtime on television programming featuring South American international soccer club tournaments that is telecast to television viewers in the United States.

127.    Because of the conduct of Defendants described herein, in effect, the only sellers in the U.S. Television Advertising Airtime Market are the Fox Defendants, who maneuvered themselves into being the sole providers in the United States of television programming featuring

South American international soccer club tournaments, and therefore the sole sellers of advertising airtime on such programming.

128.    Advertising airtime on programming featuring South American international soccer club tournaments is not reasonably interchangeable with advertising airtime on other forms of sports- or soccer-oriented programming due to the significantly different size, demographic profile, and growth potential of the viewing audience for South American international soccer club tournaments.

129.    Advertisers cannot satisfy their demand for airtime on television programming featuring South American international soccer club tournaments by purchasing airtime on other forms of sports- or soccer-related programming.  Price and competition activity in the U.S. Television Advertising Airtime Market does not affect price and competition activity in markets for advertising airtime on other sports- or soccer-related programming, and price and competition activity in the markets for other airtime does not affect price and competition activity in the U.S. Television Advertising Airtime Market.

**2.    Defendants Engaged in Conspiracies in Restraint of Trade in Multiple Markets in Violation of Section One of the Sherman Act**

130.    Fox Pan American, FIC, T&T, Torneos, Martinez, Lopez, Ganley, and Conmebol knowingly and intentionally agreed that in exchange for T&T's payment of bribes to Conmebol's directors, Conmebol would sell television rights to the Club Tournaments only to T&T and would refuse to deal with T&T's or Fox's competitors, such as GolTV.

131.    As a result, pursuant to Defendants' agreements, T&T would be the only purchaser in the Americas Television Rights Market, and the Fox Defendants would be the exclusive sellers of telecasts of South American international soccer club tournaments in the U.S.

Television Programming Market and the exclusive sellers of airtime in the U.S Television Advertising Airtime Market.

132.     These agreements imposed unreasonable restraints on trade and constituted unlawful contracts, combinations, or conspiracies in restraint of trade or commerce among the several States and with foreign nations in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

133.     Defendants' activities, founded on bribery and the improper elimination of competition, lacked any pro-competitive justification and in fact were not pro-competitive.

### 3.     T&T Engaged in Monopsonization and Attempted Monopsonization in the Americas Television Rights Market in Violation of Section 2 of the Sherman Act

134.     T&T created and maintained an unlawful monopsony – that is, a market in which there is effectively only one buyer – within the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

135.     As a general matter, in a free and competitive market for television rights, a seller of rights considers bids from multiple, competing potential purchasers and sells the rights to the highest bidder.  T&T prevented such a free and competitive market from occurring in the Americas Television Rights Market.

136.     By bribing Conmebol and causing Conmebol to enter into exclusive agreements with T&T and refuse to deal with T&T's competitors, such as GolTV, T&T prevented T&T's competitors from entering the Americas Television Rights Market.

137.     Because T&T was the sole purchaser of television rights for the Club Tournaments, it was the sole purchaser in the Americas Television Rights Market.  T&T caused the creation of barriers that prevented its competitors or potential competitors, including GolTV,

from purchasing rights in the Americas Television Rights Market even when able and willing to pay prices higher than those paid by T&T.

138.    As a result, T&T willfully acquired and maintained market power, and indeed monopsony power, within the Americas Television Rights Market.  T&T had the ability to control prices and purchase television rights from Conmebol at prices lower than those that would be paid for such rights in a free and competitive market.  Indeed, the price offered by GolTV for the purchase of television rights to the Club Tournaments was higher than the sum of the stated price paid by T&T for such rights and the cost of the bribes T&T paid to Conmebol's directors.

139.    T&T's market and monopsony power did not result from a superior product, business acumen, or historical acumen.

140.    T&T's predatory and anticompetitive conduct also constituted an attempt to create and maintain a monopsony in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  T&T specifically intended to create and maintain a monopsony in the Americas Television Rights Market, and that market, to the extent not already monopsonized, reflected a dangerous probability of being monopsonized as a result of T&T's conduct.

### 4.    Defendants Conspired to Create a Monopsony for T&T in the Americas Television Rights Market

141.    As set forth above, Conmebol, T&T, Torneos, the Fox Defendants, Martinez, Lopez, and Ganley knowingly and intentionally agreed that in exchange for T&T's payment of bribes to Conmebol and its directors, Conmebol would sell television rights to the Club Tournaments only to T&T and would refuse to deal with T&T's competitors.

142.     This agreement among the Defendants constituted an unlawful conspiracy to monopsonize the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**5.     Defendants' Conduct Has Caused**
**Anticompetitive Effects and Harmed Competition**

143.     As stated in the Superseding Indictment, Defendants' activities "had powerful anti-competitive effects, distorting the market for the commercial rights associated with soccer and undermining the ability of other sports marketing companies to compete for such rights on terms more favorable to the rights-holders."  Superseding Indictment ¶ 97.

144.     Defendants' unlawful exclusionary and monopsonistic conduct has materially and substantially harmed competition and injured the welfare of purchasers, suppliers, and consumers.

145.     Defendants' unlawful exclusionary and monopolistic conduct has caused the following anticompetitive effects, *inter alia*:

> a.   Creating substantial, if not insurmountable, barriers to entry for potential purchasers in the Americas Television Rights Market, depriving potential purchasers of the opportunity to profit therefrom;

> b.   Creating substantial, if not insurmountable, barriers to entry for potential sellers in the U.S. Television Programming Market, depriving potential sellers of the opportunity to profit therefrom;

> c.   Creating substantial, if not insurmountable, barriers to entry for potential sellers in the U.S. Television Advertising Airtime Market, depriving potential sellers of the opportunity to profit therefrom;

d.  Enabling T&T to create and maintain a monopsony in the Americas Television Rights Market;

e.  Reducing the prices paid to Conmebol for television rights to the Club Tournament, and consequently reducing Conmebol's revenues and the revenues passed on by Conmebol to its member soccer federations and, indirectly, to soccer clubs, their players, and their employees;

f.  Limiting the quantity of rights available for sale to purchasers in the Americas Television Rights Market;

g.  Decreasing demand within the Americas Television Rights Market;

h.  Decreasing the quantity, quality, and diversity of television programming catering to viewers of South American international club soccer tournaments, due in part to the Fox Defendants' decision not to air all games of the Club Tournaments, but instead to fill its airtime with other content; and

i.  Decreasing the quantity, quality, and diversity of advertising opportunities for companies seeking to advertise to viewers of South American international club soccer tournaments and, on information and belief, increasing the prices charged to such advertisers.

## F.   DEFENDANTS' CONDUCT HAS PROXIMATELY AND DIRECTLY CAUSED PLAINTIFFS TO SUFFER SUBSTANTIAL INJURIES

146.   Defendants' unlawful conduct, as set forth above, has directly and proximately caused the following effects, *inter alia*, on Plaintiffs' businesses and property:

a.  Preventing Plaintiffs from purchasing rights in the Americas Television Rights Market, and deriving profit therefrom;

b.   Preventing Plaintiffs from selling programming in the U.S. Television Programming Market, and deriving profit therefrom;

c.   Preventing Plaintiffs from selling airtime in the U.S. Television Advertising Airtime Market, and deriving profit therefrom;

d.   Preventing GolTV's television programming from being included by cable providers in premium cable packages;

e.   Denying Plaintiffs the opportunity to enter into valuable partnerships with other telecasters based on the provision by Plaintiffs of televised telecasts of the Club Tournaments;

f.   Decreasing the viewership of GolTV programming;

g.   Decreasing the value and desirability of television advertising airtime on GolTV, thereby decreasing the value and quantity of advertising sold by Plaintiffs on GolTV;

h.   Preventing Plaintiffs from obtaining valuable rights to telecast additional content that would have been available if the GolTV channel had been included by cable providers in premium cable packages; and

i.   Substantially decreasing the value of Plaintiffs' companies.

147.    Plaintiffs' exclusion from the Americas Television Rights Market, the U.S. Television Advertising Airtime Market, and the U.S. Television Programming Market, together with other effects of Defendants' unlawful conduct, both individually and collectively, constituted antitrust injury to Plaintiffs.

148.    On information and belief, the financial impact of these injuries upon Plaintiffs amounts to at least hundreds of millions of dollars.

G.    **BASES OF CORPORATE DEFENDANTS' VICARIOUS LIABILITY**

149.    In addition to their personal liability, the corporate Defendants also are liable for the conduct of other persons and parties alleged herein on the following bases of vicarious liability, among others:

    a.    T&T is vicariously liable as a member of the conspiracies alleged herein;

    b.    Torneos is vicariously liable as a member of the conspiracies alleged herein and as the employer of Alejandro Burzaco;

    c.    Conmebol is vicariously liable as a member of the conspiracies alleged herein;

    d.    FIC is vicariously liable as a member of the conspiracies alleged herein and as the employer of Defendants Martinez and Lopez;

    e.    Fox Pan American is vicariously liable as a member of the conspiracies alleged herein and as the employer of Defendant Ganley;

    f.    FSLA is vicariously liable as a member of the conspiracies alleged herein and as the employer of Defendant Ganley;

    g.    PASEC is vicariously liable as a successor to Fox Pan American;

    h.    Fox Networks Group, Inc. is vicariously liable as a successor to FIC; and

    i.    Full Play is vicariously liable as a member of the conspiracies alleged herein and through the acts of Hugo and Mariano Jinkis.

# V.     CAUSES OF ACTION

## Count One

## Civil RICO, 18 U.S.C. § 1962(c)

### (Against all Defendants)

150.    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 149 as if fully set forth in this paragraph.

## A.     Predicate Acts

151.    Upon information and belief, based in part on the payments provided for in T&T's sham consulting agreements described above, Defendants made and/or caused to be made the following payments from T&T to financial intermediaries, and ultimately to Conmebol directors, in whole or in part in exchange for the Club Tournament television rights:

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| May 5, 2005 | Valente | $200,000 |
| Aug. 18, 2005 | Somerton | $200,000 |
| Aug. 30, 2005 | Valente | $80,000 |
| Sept. 29, 2005 | Somerton | $200,000 |
| Sept. 30, 2005 | Valente | $80,000 |
| Nov. 4, 2005 | Somerton | $200,000 |
| Dec. 6, 2005 | Somerton | $200,000 |
| Dec. 15, 2005 | Somerton | $200,000 |
| July 13, 2006 | Somerton | $100,000 |
| Sept. 30, 2006 | Valente | $260,000 |

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| Oct. 31, 2006 | Valente | $400,000 |
| Nov. 17, 2006 | Somerton | $300,000 |
| Dec. 14, 2006 | Somerton | $300,000 |
| Dec. 21, 2006 | Somerton | $200,000 |
| Dec. 21, 2006 | Somerton | $100,000 |
| March 15, 2007 | Somerton | $200,000 |
| May 15, 2007 | Somerton | $200,000 |
| May 31, 2007 | Valente | $200,000 |
| July 15, 2007 | Somerton | $200,000 |
| Aug. 31, 2007 | Valente | $260,000 |
| Oct. 15, 2007 | Somerton | $200,000 |
| Oct. 31, 2007 | Valente | $200,000 |
| Dec. 15, 2007 | Somerton | $200,000 |
| March 15, 2008 | Somerton | $200,000 |
| March 8, 2008 | Somerton | $3,300,000 |
| May 15, 2008 | Somerton | $200,000 |
| May 15, 2008 | Somerton | $400,000 |
| May 31, 2008 | Valente | $200,000 |
| July 15, 2008 | Somerton | $200,000 |
| Aug. 31, 2008 | Valente | $260,000 |
| Oct. 15, 2008 | Somerton | $200,000 |
| Oct. 31, 2008 | Valente | $200,000 |

| Bribe Payments from T&T to Intermediaries | | |
| --- | --- | --- |
| Approx. Date | Immediate Recipient | Amount |
| Dec. 15, 2008 | Somerton | $200,000 |
| March 15, 2009 | Somerton | $200,000 |
| May 15, 2009 | Somerton | $200,000 |
| May 31, 2009 | Valente | $200,000 |
| July 15, 2009 | Somerton | $200,000 |
| Aug. 31, 2009 | Valente | $260,000 |
| Oct. 15, 2009 | Somerton | $200,000 |
| Oct. 31, 2009 | Valente | $200,000 |
| Dec. 15, 2009 | Somerton | $200,000 |
| Jan. 15, 2010 | Spoart | $50,000 |
| Feb. 15, 2010 | Spoart | $50,000 |
| March 15, 2010 | Spoart | $50,000 |
| March 15, 2010 | Somerton | $200,000 |
| April 15, 2010 | Spoart | $50,000 |
| May 15, 2010 | Spoart | $50,000 |
| May 15, 2010 | Somerton | $200,000 |
| May 31, 2010 | Valente | $200,000 |
| June 15, 2010 | Spoart | $50,000 |
| July 15, 2010 | Spoart | $50,000 |
| July 15, 2010 | Somerton | $200,000 |
| Aug. 15, 2010 | Spoart | $50,000 |
| Aug. 31, 2010 | Valente | $260,000 |

| Bribe Payments from T&T to Intermediaries | | |
| --- | --- | --- |
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| Sept. 15, 2010 | Spoart | $50,000 |
| Oct. 15, 2010 | Spoart | $50,000 |
| Oct. 15, 2010 | Somerton | $200,000 |
| Oct. 31, 2010 | Valente | $200,000 |
| Nov. 15, 2010 | Spoart | $50,000 |
| Dec. 15, 2010 | Spoart | $50,000 |
| Dec. 15, 2010 | Somerton | $200,000 |
| Jan. 15, 2011 | Spoart | $50,000 |
| Feb. 15, 2011 | Spoart | $50,000 |
| March 15, 2011 | Spoart | $50,000 |
| March 15, 2011 | Somerton | $200,000 |
| April 2011 | Arco | $2,400,000 |
| April 15, 2011 | Spoart | $50,000 |
| May 15, 2011 | Spoart | $50,000 |
| May 15, 2011 | Somerton | $200,000 |
| May 31, 2011 | Valente | $200,000 |
| June 15, 2011 | Spoart | $50,000 |
| July 15, 2011 | Spoart | $50,000 |
| July 14, 2011 | Somerton | $500,000 |
| Aug. 15, 2011 | Spoart | $50,000 |
| Aug. 31, 2011 | Valente | $260,000 |
| Sept. 15, 2011 | Spoart | $50,000 |

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| Oct. 15, 2011 | Spoart | $50,000 |
| Oct. 31, 2011 | Valente | $200,000 |
| Nov. 15, 2011 | Spoart | $50,000 |
| Dec. 15, 2011 | Spoart | $50,000 |
| Dec. 7, 2011 | Valente | $100,000 |
| Jan. 15, 2012 | Spoart | $50,000 |
| Feb. 15, 2012 | Spoart | $50,000 |
| March 15, 2012 | Spoart | $50,000 |
| March 14, 2012 | Valente | $500,000 |
| April 3, 2012 | Arco | $2,000,000 |
| April 19, 2012 | Spoart | $50,000 |
| May 3, 2012 | Arco | $400,000 |
| May 15, 2012 | Spoart | $50,000 |
| May 31, 2012 | Valente | $200,000 |
| June 15, 2012 | Spoart | $50,000 |
| July 15, 2012 | Spoart | $50,000 |
| July 15, 2012 | Valente | $200,000 |
| Aug. 15, 2012 | Spoart | $50,000 |
| Aug. 31, 2012 | Valente | $260,000 |
| Sept. 15, 2012 | Spoart | $50,000 |
| Oct. 15, 2012 | Spoart | $50,000 |
| Oct. 15, 2012 | Valente | $200,000 |

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| Oct. 31, 2012 | Valente | $200,000 |
| Nov. 15, 2012 | Spoart | $50,000 |
| Dec. 15, 2012 | Spoart | $50,000 |
| Dec. 7, 2012 | Valente | $100,000 |
| March 20, 2013 | Arco | $3,600,000 |
| Sept. 2013 | Productora | $1,500,000 |

152.    Upon information and belief, Defendants made and/or caused to be made the following payments from Torneos Holland to financial intermediaries, and ultimately to Conmebol directors, in whole or in part in exchange for the Club Tournament television rights:

| Bribe Payments from Torneos Holland to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| 2005 | Arco | $5,300,000 |
| 2006 | Arco | $5,300,000 |
| 2007 | Arco | $5,300,000 |
| 2008 | Arco | $5,300,000 |
| 2009 | Arco | $5,300,000 |
| 2010 | Arco | $6,200,000 |
| 2011 | Arco | $9,100,000 |
| 2012 | Arco | $9,100,000 |

| Bribe Payments from Torneos Holland to Intermediaries | | |
| --- | --- | --- |
| Approx. Date | Immediate Recipient | Amount |
| 2013 | Arco | $12,500,000 |
| 2013 | Valente | $660,000 |
| 2013 | Valente | $1,000,000 |
| 2013 | Spoart | $600,000 |
| 2014 | Valente | $660,000 |
| 2014 | Valente | $1,000,000 |
| 2014 | Spoart | $600,000 |

1.    **Wire Fraud**

153.    The payments set forth in paragraphs 151 through 152 above were transmitted by Defendants, or were caused to be transmitted by Defendants, by means of wire and/or radio communication in interstate and/or foreign commerce.

154.    On information and belief, all of the payments made by T&T before March 31, 2011 were made by wire transfer from its account at Lloyds Bank in Miami, Florida, account number 11031883.  All payments made after March 31, 2011 were made from T&T's account at Clariden Leu in Switzerland, account number XXXX-XXXXXX3-32.

155.    On information and belief, all payments made to Somerton were made to its account at J.P. Morgan Chase in New York, New York, account number XXX-X-XX917.

156.    On information and belief, all payments made to Valente were made to its account at J.P. Morgan Chase in New York, New York, account number XXX-X-XXXX332.

157.    More specific details on four particular wire transfer payments out of those set forth in paragraphs 151 through 152 are enumerated in paragraph 62 above.

158.    For each Defendant herein, where any payment set forth in paragraphs 151 through 152 originated from a person other than such Defendant, such payment was reasonably foreseeable to, and caused by, such Defendant.

159.    Defendants' above-alleged activities constituted, in addition to a bribery scheme, a scheme or artifice to defraud (including a scheme or artifice to deprive another of the intangible right of honest services) or for obtaining money or property by means of false or fraudulent pretenses, representations or promises within the meanings of 18 U.S.C. § 1343 and 1346, in which Defendants each conducted or participated knowingly and with the intent to defraud.

160.    The Defendants participated in a scheme in which the Fox Defendants and T&T paid and/or caused to be paid bribes to Conmebol directors in exchange for Defendant Conmebol's licensing of the Club Tournament television rights to T&T, and indirectly to Fox Sports Latin America, at below-market rates.  This bribery scheme defrauded Conmebol and Conmebol's member associations of hundreds of millions of dollars in revenue, breached the Conmebol directors' fiduciary duties to Conmebol and its member associations, and violated Conmebol's bylaws.

161.    The payments set forth in paragraphs 151 through 152 were all in furtherance and execution of Defendants' above-described scheme to defraud.

162.    Each of the wire transfer payments set forth in paragraphs 151 through 152 is individually indictable as an act of wire fraud under 18 U.S.C. § 1343.  As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### 2.   Money Laundering

163.   By their foregoing conduct, Defendants knowingly and intentionally transported, transmitted, and transferred monetary instruments and funds from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of their unlawful activity, contrary to 18 U.S.C. § 1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, all in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

164.   The making of each of the payments set forth in paragraphs 151 through 152 is individually indictable as an act of laundering of monetary instruments under 18 U.S.C. § 1956. As such each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### 3.   Monetary Transactions in Property
### Derived from Unlawful Activity

165.   Defendants, by participating in the bribery scheme and payments described above, knowingly engaged in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity under 18 U.S.C § 1956 and that took place in the United States or in the special maritime and territorial jurisdiction of the United States, and/or, in the case of those Defendants who are United States persons, outside the United States.

166.    Participating in each monetary transaction set forth in paragraphs 151 through 152 is thus individually indictable as an act of engaging in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957.  As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### 4.    Bribery under State Law

167.    For each Defendant herein, where any payment set forth in paragraphs 151 through 152 originated from a person other than such Defendant, such payment was reasonably foreseeable to, and caused by, such Defendant.

168.    The payments set forth in paragraphs 151 through 152 were all in furtherance and execution of Defendants' above-described bribery scheme.

169.    Each individual payment set forth in paragraphs 151 through 152 was an act involving bribery that is chargeable under State law and punishable by imprisonment for more than one year, specifically under N.Y. Penal L. §§ 180.03 and 180.08, as a result of Defendants' use of accounts at financial institutions located in New York for the transmission of the payments alleged above.  Each such payment constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### B.    Pattern of Racketeering Activity

170.    The above-described acts of racketeering activity consist of more than two acts of racketeering activity, all of which occurred after the effective date of the RICO statute, and the last of which (identified above as being in 2014) was within 10 years after the commission of any prior above-described act of racketeering activity (the earliest of which is identified above as having been on May 5, 2005).

171.    The above-described racketeering activity constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The above-described racketeering activity

was a series of acts that amounted to and posed a threat of continued criminal activity, that were

neither isolated nor sporadic, and that were related to each other by virtue of common

participants, common victims, common method of commission, and the common purpose and

result of effectuating the bribery scheme and the scheme to defraud alleged above.

**C.**    **Enterprises**

172.    Moreover, each of PASEC, FSLA, FIC, FNG, T&T, Torneos, Full Play, and

Conmebol is a "partnership, corporation, association, or other legal entity," and as such

constitutes an "enterprise" as defined in 18 U.S.C. § 1961(4).  Fox Pan American likewise was,

prior to its merger into PASEC, a "partnership, corporation, association, or other legal entity,"

and as such constituted an "enterprise" as defined in 18 U.S.C. § 1961(4).

173.    At all times relevant to the Complaint, each of the enterprises Fox Pan American,

PASEC, FSLA, FIC, FNG, T&T, Torneos, Full Play, and Conmebol was engaged in, and its

activities affected, United States interstate and foreign commerce.  Among other things,

Conmebol awarded the television rights for the Club Tournaments, including the television rights

for the United States, which is one of the principal markets for such rights.  Among the acquirers

and would-be acquirers of such rights were U.S.-based and Florida-based businesses, such as the

Fox Defendants and Plaintiff GolTV.  Moreover, Plaintiff GolTV, Fox Sports Latin America,

FIC and FNG, Full Play, and Conmebol itself, frequently engaged in banking and investment

activities with United States persons and used United States financial institutions.

174.    Defendants PASEC (individually and as successor to Fox Pan American), FSLA,

FIC, FNG (to the extent it is the successor to FIC), T&T, Full Play and Conmebol also

comprised an association-in-fact, the "Bribery Enterprise," which constituted an "enterprise" as

defined in 18 U.S.C. § 1961(4).  The Bribery Enterprise functioned with the purpose of

obstructing fair competition with respect to television rights for the Club Tournaments through

bribery.  PASEC, FSLA, FIC, FNG, and T&T benefited from the Bribery enterprise by ensuring they would retain exclusive rights to the Club Tournaments at artificially low prices, while Conmebol's directors benefited by pocketing bribes.  Torneos benefited from this enterprise, on information and belief, by receiving a share of T&T's profits.

175.    The Bribery Enterprise retained an ongoing informal organization in which Fox's role was to fund bribes and receive Club Tournament rights, Conmebol's role was to provide rights in return for bribes to its directors, T&T was the primary intermediary responsible for acquiring rights from Conmebol and facilitating bribes from Fox to Conmebol's directors, and Torneos provided additional funding for bribes and assisted in facilitating their payment.

176.    The longevity of the Bribery Enterprise was determined by the period of years provided for in each new agreement between T&T and Conmebol, and the enterprise existed continually at least until the unsealing of the Superseding Indictment on December 3, 2015.

177.    In addition, the Superseding Indictment charged that "[FIFA] and its six constituent continental confederations - [CONCACAF], [Defendant Conmebol], the Union des Associations Européennes de Football ('UEFA'), the Confédération Africaine de Football ('CAF'), the Asian Football Confederation ('AFC'), and the Oceania Football Confederation ('OFC') - together with affiliated regional federations, national member associations, and sports marketing companies, collectively constituted an 'enterprise,' as defined in Title 18, United States Code, Section 1961(4), that is, a group of legal entities associated in fact . . . " (Superseding Indictment ¶ 1.)  The Superseding Indictment further charged that this enterprise (referred to hereinafter as the "Indictment Enterprise") "constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise" (*id.*), and this enterprise has had the longevity sufficient to permit its

members to pursue that common purpose.  The Superseding Indictment described that common purpose as being "to regulate and promote the sport of soccer worldwide," and stated that the members of this enterprise "carried out this purpose by using a variety of methods and means, including creating and enforcing uniform standards and rules, organizing international competitions, and commercializing the media and marketing rights associated with the sport." The Superseding Indictment further charged that the Indictment Enterprise "was engaged in, and its activities affected, interstate and foreign commerce" (*id.* ¶ 1), and that "[its] members . . . as well as individuals and entities employed by and associated with the enterprise, frequently engaged in banking and investment activities with United States financial institutions" (*id.* ¶ 2).

**D.    Violations of 18 U.S.C. § 1962(c)**

178.    As set forth more particularly above, Defendants PASEC (individually and as successor to Fox Pan American), FSLA, FIC, FNG (to the extent it is the successor to FIC), T&T, Torneos, Full Play, Martinez, Lopez, Ganley, Burzaco, Hugo Jinkis, Mariano Jinkis, Figueredo, and Napout were associated with and conducted and participated, directly and indirectly, in the conduct, management or operation of the affairs of Conmebol through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C.§ 1962(c).

179.    As set forth more particularly above, Defendants Conmebol, Martinez, Lopez, Ganley, Burzaco, Hugo Jinkis, Mariano Jinkis, Figueredo, and Napout were associated with and conducted and participated, directly and indirectly, in the conduct, management or operation of the affairs of Fox Pan American, PASEC, FSLA, FIC, FNG (to the extent it is the successor to FIC) and T&T through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C.§ 1962(c).

180.    As set forth more particularly above, Defendant T&T was associated with and conducted and participated, directly and indirectly, in the conduct, management or operation of the affairs of Fox Pan American, PASEC, FSLA, FIC, FNG (to the extent it is the successor to FIC), and Full Play through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

181.    As set forth more particularly above, Defendants PASEC (individually and as successor to Fox Pan American), FSLA, FIC, FNG (to the extent it is the successor to FIC), T&T, Full Play and Conmebol were associated with and conducted and participated, directly and indirectly, in the conduct, management or operation of the affairs of the Bribery Enterprise through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C.§ 1962(c).

182.    As set forth more particularly above, Defendants PASEC (individually and as successor to Fox Pan American), FSLA, FIC, FNG (to the extent it is the successor to FIC), T&T, Martinez, Lopez, Ganley, Burzaco, Hugo Jinkis, Mariano Jinkis, Full Play, Figueredo, Napout, and Conmebol were associated with and conducted and participated, directly and indirectly, in the conduct, management or operation of the affairs of the Indictment Enterprise through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C.§ 1962(c).

## E.    Injury to Plaintiffs' Business and Property

183.    By reason and as a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), and for no reason other than Defendants' violation of law, Plaintiffs were not awarded the Club Tournament television rights and accordingly suffered substantial injury to their business and property, including without limitation loss of revenues, loss of profits, lower

market share and lessened profile in the sports telecasting marketplace, in an amount to be determined at trial but not less than hundreds of millions of dollars.

184.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants threefold the damages Plaintiffs sustained from Defendants' violations of 18 U.S.C. § 1962(c) and the cost of this action, including a reasonable attorney's fee.

**Count Two**

**Civil RICO Conspiracy, 18 U.S.C. §1962(d)**

**(Against all Defendants)**

185.    Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 184 as if fully set forth in this paragraph.

186.    The Defendants each conspired with each other to commit the violations of 18 U.S.C. § 1962(c) alleged above.  Each Defendant also agreed, and objectively manifested their agreement through words or actions, that at least one conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprises alleged above, the last of which would occur within 10 years of a prior act of racketeering activity.

187.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including, but not limited to, the transfers of money identified above in Paragraphs 151 through 152, Defendants' creation and use of intermediary entities and payment mechanisms to facilitate bribes to Conmebol's directors, and T&T's and Fox's acquisition of rights from Conmebol.

188.    By reason and as a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), and for no reason other than Defendants' violation of law, Plaintiffs were not awarded the Club Tournament television rights, and accordingly suffered substantial injury to their business and property, including without limitation loss of revenues, loss of profits, lower

market share and lessened profile in the sports telecasting marketplace, in an amount to be determined at trial but not less than hundreds of millions of dollars.

## Count Three

### Conspiracy in Restraint of Trade in the Americas Television Rights Market in Violation of Section 1 of the Sherman Act

### (Against all Defendants)

189.    Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 188 as if fully set forth in this paragraph.

190.    Fox Pan American, FIC, FSLA, T&T, Torneos, Full Play, Martinez, Lopez, Ganley, Burzaco, Hugo Jinkis, Mariano Jinkis, Figueredo, Napout, and Conmebol knowingly and voluntarily entered into a series of contracts, combinations, or conspiracies in restraint of trade or commerce among the several States and with foreign nations, which substantially lessened or eliminated competition in the Americas Television Rights Market in violation of 15 U.S.C. § 1.

191.    Defendants' activities caused unreasonable restraints of trade and anticompetitive effects and lacked any pro-competitive benefit or justification.

192.    Defendants' wrongful conduct substantially affected interstate and foreign commerce and occurred within the flow of interstate and foreign commerce.

193.    To the extent Defendants' activities concerned trade outside the United States, they had direct, substantial, and reasonably foreseeable effects on U.S. commerce.

194.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of Defendants' aforementioned Sherman Act violations with respect to the Americas Television Rights Market and accordingly are entitled to

recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

## Count Four

**Conspiracy in Restraint of Trade in the U.S. Television Programming Market in Violation of Section 1 of the Sherman Act**

**(Against all Defendants)**

195.    Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 194 as if fully set forth in this paragraph.

196.    Fox Pan American, FIC, FSLA, T&T, Torneos, Full Play, Martinez, Lopez, Ganley, Burzaco, Hugo Jinkis, Mariano Jinkis, Figueredo, Napout, and Conmebol knowingly and voluntarily entered into a series of contracts, combinations, or conspiracies in restraint of trade or commerce among the several States and with foreign nations, which substantially lessened or eliminated competition in the U.S. Television Programming Market in violation of 15 U.S.C. § 1.

197.    Defendants' activities caused unreasonable restraints of trade and anticompetitive effects and lacked any pro-competitive benefit or justification.

198.    Defendants' wrongful conduct substantially affected interstate and foreign commerce and occurred within the flow of interstate and foreign commerce.

199.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of Defendants' aforementioned Sherman Act violations with respect to the U.S. Television Programming Market, and accordingly, Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

## Count Five

**Conspiracy in Restraint of Trade in the U.S. Television Advertising Airtime Market in Violation of Section 1 of the Sherman Act**

**(Against all Defendants)**

200.    Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 199 as if fully set forth in this paragraph.

201.    Fox Pan American, FIC, FSLA, T&T, Torneos, Full Play, Martinez, Lopez, Ganley, Burzaco, Hugo Jinkis, Mariano Jinkis, Figueredo, Napout, and Conmebol knowingly and voluntarily entered into a series of contracts, combinations, or conspiracies in restraint of trade or commerce among the several States and with foreign nations, which substantially lessened or eliminated competition in the U.S. Television Advertising Airtime Market in violation of 15 U.S.C. § 1.

202.    Defendants' activities caused unreasonable restraints of trade and anticompetitive effects and lacked any pro-competitive benefit or justification.

203.    Defendants' wrongful conduct substantially affected interstate and foreign commerce and occurred within the flow of interstate and foreign commerce.

204.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of Defendants' aforementioned Sherman Act violations with respect to the U.S. Television Advertising Airtime Market, and accordingly Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

## Count Six

**Monopsonization of the Americas Television Rights Market in Violation of Section 2 of the Sherman Act**

**(Against Defendant T&T)**

205.    Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 204 as if fully set forth in this paragraph.

206.    T&T engaged in monopsonization of the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

207.    T&T had market power and monopsony power in the Americas Television Rights Market, engaged in anticompetitive conduct, and monopsonized the Americas Television Rights Market.

208.    The intent and effect of T&T's monopsonization was to substantially weaken and/or drive T&T's competitors, including GolTV, out of the Americas Television Rights Market, and/or prevent T&T's competitors from entering that market.

209.    T&T's wrongful conduct materially and substantially harmed competition, injured the welfare of purchasers, suppliers, and consumers, and monopsonized a part of the trade or commerce among the several States and with foreign nations.

210.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of T&T's aforementioned monopsonization of the Americas Television Rights Market, and accordingly Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

## **Count Seven**

**Attempted Monopsonization of the Americas Television Rights Market in Violation of Section 2 of the Sherman Act**

**(Against Defendant T&T)**

211.    Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 210 as if fully set forth in this paragraph.

212.    T&T engaged in attempted monopsonization of the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

213.    T&T engaged in predatory and anticompetitive conduct with the specific intent, purpose, and plan to monopsonize, and in furtherance of monopsonizing, the Americas Television Rights Market, and there was and continues to be a dangerous probability that T&T would obtain monopsony power and succeed in monopsonizing that market.

214.    T&T's wrongful conduct materially and substantially harmed competition and injured the welfare of purchasers, suppliers, and consumers.

215.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of T&T's conduct, and accordingly Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

## **Count Eight**

**Conspiracy to Monopsonize the Americas Television Rights Market in Violation of Section 2 of the Sherman Act**

**(Against all Defendants)**

216.    Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 215 as if fully set forth in this paragraph.

217.    Fox Pan American, FIC, FSLA, T&T, Torneos, Full Play, Martinez, Lopez, Ganley, Burzaco, Hugo Jinkis, Mariano Jinkis, Figueredo, Napout, and Conmebol engaged in a conspiracy to monopsonize the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

218.    Fox Pan American, FIC, FSLA, T&T, Torneos, Full Play, Martinez, Lopez, Ganley, Burzaco, Hugo Jinkis, Mariano Jinkis, Figueredo, Napout, and Conmebol formed an agreement in restraint of trade in the Americas Television Rights Market.

219.    Fox Pan American, FIC, FSLA, T&T, Torneos, Full Play, Martinez, Lopez, Ganley, Burzaco, Hugo Jinkis, Mariano Jinkis, Figueredo, Napout, and Conmebol knowingly and voluntarily conspired with the mutual understanding and specific intent that T&T would unlawfully obtain and maintain a monopsony in the Americas Television Rights Market.

220.    Fox Pan American, FIC, FSLA, T&T, Torneos, Full Play, Martinez, Lopez, Ganley, Burzaco, Hugo Jinkis, Mariano Jinkis, Figueredo, Napout, and Conmebol engaged in overt acts in furtherance of the conspiracy.

221.    Defendants conspired to monopsonize a part of the trade or commerce among the several States and with foreign nations.

222.    Defendants' wrongful conduct caused and threatened to cause anticompetitive effects.

223.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of Defendants' aforementioned conduct, and accordingly Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

## Count Nine

**Violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et al.**

**(Against all Defendants)**

224.    Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 223 as if fully set forth in this paragraph. Defendants' illegal and wrongful actions herein alleged violated the Florida Deceptive and Unfair Trade Practices Act.

225.    Specifically, as set forth above, the Defendants have engaged in unfair acts and deceptive practices in the course of trade or commerce in that they have conspired to engage in and have engaged in bribery, fraud, and money laundering in violation of federal RICO laws, and have conspired to and have actually restrained trade in violation of the Sherman Act.

226.    Defendants' conduct was designed to preclude Plaintiffs and any other competitors of T&T and Fox from obtaining or fairly competing for the Club Tournament television rights.

227.    Such unfair trade practices as bribery, fraud, money laundering, and unreasonable restraint of trade are immoral, unethical, oppressive, unscrupulous, offensive to well-established public policy, and materially and substantially injurious to the welfare of purchasers, suppliers, and consumers..

228.    Plaintiffs, each a legitimate business enterprise, have suffered actual damages as a direct and proximate result of Defendants' wrongful, deceptive, and unfair trade practices.

229.    Plaintiffs are entitled to recover their actual damages and reasonable attorney's fees.

## Count Ten

### Tortious Interference with Prospective Economic Advantage

### (Against Defendant T&T)

230.     Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 229 as if fully set forth in this paragraph.

231.     T&T tortiously interfered with Plaintiffs' prospective economic advantage.

232.     Plaintiffs had a prior and ongoing business relationship with Conmebol based on their repeated negotiations regarding the purchase of television rights for the Club Tournaments and on GolTV's agreement with Conmebol to purchase from Conmebol the rights to sell so-called "static" advertising and publicity, including on-field billboards, at the Club Tournaments ("Static Advertising Rights").  GolTV entered into an agreement with Conmebol to purchase the Static Advertising Rights for the year 2010 and, in or around April 2011, entered into a new agreement with Conmebol to purchase Static Advertising Rights for the 2011–2014 period.

233.     On information and belief, T&T was aware of GolTV's business relationship with Conmebol because Conmebol's directors informed T&T of GolTV's attempts to acquire television rights to the Club Tournaments and GolTV's agreement with Conmebol to purchase Static Advertising Rights.

234.     T&T was aware that Plaintiffs' opportunity to obtain television rights for the Club Tournaments from Conmebol represented a prospective economic advantage for Plaintiffs.

235.     By bribing Conmebol's directors and causing Conmebol to refuse to deal with GolTV, T&T acted with the intent to interfere with Plaintiffs' prospective economic advantage and without a legitimate business justification.

236.     Plaintiffs have suffered actual damages as a direct and proximate result of Defendants' wrongful conduct.

**<u>Count Eleven</u>**

**Civil Conspiracy**

**(Against all Defendants)**

237.     Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 236 as if fully set forth in this paragraph.

238.     T&T tortiously interfered with Plaintiffs' prospective economic advantage.

239.     Fox Pan American, FIC, FSLA, T&T, Torneos, Full Play, Martinez, Lopez, Ganley, Burzaco, Hugo Jinkis, Mariano Jinkis, Figueredo, Napout, and Conmebol agreed to participate in a common scheme in which T&T would tortiously interfere with Plaintiffs' prospective economic advantage.

240.     Defendants intentionally participated in the common scheme and committed overt and unlawful acts in furtherance of it.

241.     Plaintiffs have been damaged in their business and property as a direct and proximate result of Defendants' conspiracy and the overt acts committed in furtherance of it.

## VI.     <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment awarding:

A.     Compensatory damages in an amount to be determined at trial;

B.     Trebling of those compensatory damages awarded under Plaintiffs' federal RICO and Sherman Act claims;

C.     Punitive damages;

D.     The cost of this action, including a reasonable attorney's fee; and

E.     Interest, costs and such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
          October 20, 2016

CHADBOURNE & PARKE LLP

By:  */s/ Thomas J. McCormack*
     Thomas J. McCormack*
     tmccormack@chadbourne.com
     Julissa Reynoso*
     jreynoso@chadbourne.com
1301 Avenue of the Americas
New York, NY 10019-6022
Tel:  (212) 408-5100
Fax:  (212) 541-5369

*Of Counsel to Plaintiffs*
* *Pro hac vice* applications pending


SHUTTS & BOWEN LLP

By:  */s/ Peter H. Levitt*
     Peter H. Levitt
     plevitt@shutts.com
     200 South Biscayne Boulevard
Suite 4100
Miami, FL 33131
Tel:  (305) 358-6300
Fax:  (305) 381-9982

*Attorneys for Plaintiffs*