## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 16-24431-CIV-ALTONAGA/Turnoff

GOLTV, INC.; and GLOBAL SPORTS PARTNERS LLP,

     Plaintiffs,

               -v.-

CONFEDERACION SUDAMERICANA DE FUTBOL d/b/a CONMEBOL, *et al.*,

     Defendants.

### AFFIDAVIT OF FÁTIMA LORENA GONZÁLEZ TOPPI[1]

     I, FÁTIMA LORENA GONZÁLEZ TOPPI, under penalty of perjury and the laws of the United States of America, hereby affirm the following to be true:

     1.    I am a Paraguayan attorney employed as Contracts Manager in the Legal Department of the Confederación Sudamericana de Fútbol ("CONMEBOL"), one of the defendants in the above-entitled case. I make this Affidavit in support of CONMEBOL's Motion to Dismiss for Lack of Personal Jurisdiction (the "Motion to Dismiss").

     2.    As Contracts Manager for CONMEBOL, my primary responsibilities involve supervising all aspects of CONMEBOL's contracts, including numerous contracts relating to commercial rights owned by CONMEBOL, as discussed further below.

     3.    Additionally, I was designated by CONMEBOL as its corporate representative to

---

[1] In light of the Court's July 17, 2017 Order on CONMEBOL's Motion to Seal (D.E. 198), the United States' previously identified confidentiality concerns (*see* D.E. 125 at 3), and the other parties' designations as confidential or highly confidential of several of CONMEBOL's exhibits attached to the Consolidated Jurisdictional Motion to Dismiss (D.E. 193) and the Affidavit (D.E. 192), CONMEBOL has removed Exhibit 4 from the Motion (D.E. 193-4) and Exhibits A through H of the Affidavit (D.E. 192-1 through D.E. 192-8). The Motion and Affidavit are being filed into the public record; accordingly, the balance of the non-confidential exhibits attached to the Motion and this Affidavit have been renumbered as necessary. CONMEBOL reserves the right to seek the Court's consent to file the exhibits removed from the Motion (D.E. 193) and the Affidavit (D.E. 192) under seal in support of its reply memorandum. Plaintiffs have advised that they object to the actions taken by CONMEBOL as described herein.

testify in a Rule 30(b)(6) deposition noticed by the Plaintiffs herein, which was conducted on June 28-29, 2017. In preparation for my testimony in that deposition, I performed a thorough review of all documents produced by CONMEBOL in response to discovery requests issued by the Plaintiffs. I also gathered extensive information known to CONMEBOL in the various categories of information set out in the Plaintiffs' Rule 30(b)(6) deposition notice.

4.     The matters set out in this Affidavit are based upon CONMEBOL's knowledge, my preparations to testify as CONMEBOL's Rule 30(b)(6) designee, as well as upon my own knowledge and experience acquired during my tenure in the Legal Department at CONMEBOL.

5.     All exhibits attached to this Affidavit are true and correct copies of records maintained by CONMEBOL in the ordinary course of its business.

*Structure of CONMEBOL*

6.     CONMEBOL is the governing body for professional soccer in South America. CONMEBOL is a non-profit association organized under the laws of Paraguay, and is governed by Title I, Book I of the Paraguayan Civil Code and the Sports Act of Paraguay.

7.     CONMEBOL is comprised of the ten national soccer associations in South America: (a) the Argentine Soccer Association; (b) the Bolivian Soccer Federation; (c) the Brazilian Soccer Confederation; (d) the Soccer Federation of Chile; (e) the Colombian Soccer Federation; (f) the Ecuadorian Soccer Federation; (g) the Paraguayan Soccer Association; (h) the Peruvian Soccer Federation; (i) the Uruguayan Soccer Association; and (j) the Venezuelan Soccer Federation (the "Member Associations"). Each of the Member Associations is a member of the Fédération Internationale de Football Association ("FIFA").

8.     FIFA recognizes CONMEBOL as the only Confederation constituted by the Member Associations in South America, and as such CONMEBOL is authorized by FIFA exclusively to direct and control soccer in South America. CONMEBOL is bound by its interpretation of the bylaws of FIFA – including those relating to ethics – and exercises its rights as a Confederation under the aegis of those bylaws.

9.     CONMEBOL's functions include (among others): (a) promoting soccer in South America; (b) directing, organizing and resolving all issues relating to soccer in South America; (c) organizing and conducting matches, competitions and international tournaments in South America; (d) promoting integrity, ethical behavior and sportsmanship; and (e) protecting the general interests of the Member Associations.

10.     CONMEBOL is governed by a Congress, its highest authority. The Congress comprises all Member Associations, and holds a general meeting on an annual basis. It may also convene extraordinary meetings to address any matter under CONMEBOL's authority that is deemed relevant. The Congress establishes and interprets the Bylaws and Rules governing

*Declaración of Fátima Lorena González Toppi*

CONMEBOL.

11.     It is my understanding that the time period between January 1, 2009 and December 31, 2015 (the "Relevant Period") is the only timeframe relevant to the Motion to Dismiss and the issues relating to whether personal jurisdiction over CONMEBOL exists. Therefore, unless specified otherwise, the information set out below relates to the Relevant Period.

12.     During the Relevant Period, the Executive Committee was CONMEBOL's permanent authority when the Congress was not in session. The Executive Committee was comprised of: (a) a President (elected by a majority of the Member Associations); (b) three Vice-Presidents (elected by the Congress from amongst the Presidents of the Member Associations); (c) seven Directors (corresponding to the remaining seven Presidents of the Member Associations); (d) a Secretary General (appointed by the President); and (e) a Treasurer (also appointed by the President). The President, the three Vice-Presidents and the seven Directors were the only members of the Executive Committee entitled to a vote.

13.     During the Relevant Period, all of CONMEBOL's Member Associations and their respective soccer clubs were located in South America, as were all of the members of the Executive Committee.

14.     The Executive Committee was charged with managing CONMEBOL collectively, in accordance with the CONMEBOL Bylaws and Rules established by the Congress. It had broad authority to manage CONMEBOL's affairs, and any resolution adopted by a majority of its Directors was binding. Among the Executive Committee's functions was to organize all CONMEBOL matches and tournaments, and to decide all matters submitted to it by the Member Associations or the Directors, and any other matter within the competence of the Congress that required treatment before a meeting of the Congress could be convened. The Executive Committee was required to meet at least twice each year, and attendance by its Directors was mandatory. The Executive Committee was permitted to delegate the exercise of its functions, in whole or in part, to the President of CONMEBOL.

15.     Pursuant to CONMEBOL's 2016 Bylaws, the Executive Committee was renamed the Council. The position of Treasurer was eliminated, and two new positions were added, Deputy Secretary General and Chief Financial Officer, neither of which has voting power.

*CONMEBOL Tournaments*

16.     CONMEBOL organizes a broad range of soccer tournaments in South America under its auspices, both at the club level and at the national team level. In additional to traditional men's soccer, CONMEBOL's tournaments included categories for women's soccer, players under 17 and under 21 years of age, beach soccer and indoor soccer.

17.     In the traditional men's soccer category, CONMEBOL's most prestigious tournament has historically been the Copa Libertadores de América (the "Copa Libertadores"), a club-level tournament played annually. Although the format of the Copa Libertadores has evolved over the years, its current structure includes the top four soccer clubs from each of the Member Associations (with six clubs from Argentina and Brazil) and is played over eight elimination stages, beginning in February.

18.     Two other significant club-level competitions played under CONMEBOL's auspices in the traditional men's category are the Copa Sudamericana and the Recopa Sudamericana. The Copa Sudamericana involves the highest ranking soccer clubs that did not qualify for the Copa Libertadores. Like the Copa Libertadores, the Copa Sudamericana is a tournament played in multiple stages. The winner of the Copa Sudamericana is eligible to play in the following year's Copa Libertadores, and to compete in the Recopa Sudamericana, which pits the winner of the previous year's Copa Libertadores against the winner of the previous year's Copa Sudamericana, currently decided in a home and away soccer match series.

19.     It is my understanding that the Copa Libertadores, the Copa Sudamericana and the Recopa Sudamericana are the only tournaments relevant to the Plaintiffs' claims in the above-entitled action, and they are referred to collectively in this Affidavit as the "Club Tournaments."

20.     COMEBOL's most significant tournament at the national team level is the Copa América. The Copa América – which, as I mentioned, is not relevant to the above entitled action – is played once every four years, between the national teams of each of the ten Member Association countries, with other countries invited in some cases.

21.     In 2016, CONMEBOL celebrated the 100th Anniversary of the Copa América. CONMEBOL USA, a separately incorporated subsidiary in Dallas, Texas, was created specifically and exclusively for this occasion. In conjunction with the Confederation of North, Central America and Caribbean Association Football ("CONCACAF"), the FIFA-recognized governing body for soccer in the North American hemisphere, CONMEBOL USA organized a single off-cycle edition of the tournament, the Copa América Centenario (the "Copa Centenario"). The Copa Centenario was played in the United States, and CONMEBOL USA held all commercial rights and received all payments in consideration of those rights.

22.     It is my understanding that the claims alleged by the Plaintiffs in the above-entitled matter relate only to the worldwide broadcast rights for the Club Tournaments, and are unrelated to the Copa Centenario or the Copa América generally.

*The Broadcast Rights for the Club Tournaments*

23.     CONMEBOL and its Member Associations are the exclusive owners in perpetuity of all of the media broadcast rights relating to the tournaments it organizes, including the Club

*Declaración of Fátima Lorena González Toppi*

Tournaments. From time to time, CONMEBOL monetizes those rights – in whole or in part, and only on a temporary basis – by (among other ways) contractually assigning the rights to others in exchange for remuneration.

24.     The ultimate beneficiaries from the monetization of CONMEBOL's broadcast rights are the soccer clubs participating in the Club Tournaments through the Member Associations. As a non-profit entity, CONMEBOL retains only such funds as are necessary to pay its operational and other expenses, and the remainder is paid to the clubs, through the Member Associations, as participation fees and prizes.

25.     During the Relevant Period, the Executive Committee was vested with the authority to determine whether and to whom to assign some or all of its broadcast rights, including the worldwide broadcast rights relating to the Club Tournaments. Pursuant to the CONMEBOL Bylaws in effect during the Relevant Period, assignment of the worldwide broadcast rights to the Club Tournaments required the signature of the President of CONMEBOL (and, since 2013, the signature of the Secretary General), and approval by a majority of the 11 voting members of the Executive Committee.

26.     Beginning in 2002, CONMEBOL assigned all of the worldwide broadcast rights to the Club Tournaments (the "Broadcast Rights") exclusively to defendant T&T Sports Marketing Ltd. ("T&T"), in exchange for consideration. Pursuant to various subsequent agreements, T&T's rights in the Broadcast Rights were extended through the 2018 editions of the Club Tournaments.

27.     The Broadcast Rights assigned to T&T gave T&T the unlimited, worldwide right to commercialize the sounds and images of the Club Tournaments, including, in whole or in part, through third parties. CONMEBOL retained no control over where the Club Tournaments were to be broadcast or disseminated throughout the world. Similarly, CONMEBOL retained no control over any broadcast rights that T&T might elect to assign to third parties, nor was CONMEBOL consulted as to whom those rights might have been sold.

28.     The Broadcast Rights included the right to record, produce, transmit, re-transmit and distribute the images and sounds of the Club Tournaments by any method, without limitation, including by television, cable, satellite, pay-per-view, internet and mobile device (among other specified methods), taking into consideration existing technology or any technology to be developed in the future.

29.     The agreements under which T&T acquired the Broadcast Rights also gave T&T priority rights for renewal of the Broadcast Rights after the 2018 editions of the Club Tournaments, along with a right of first refusal if, alternatively, the post-2018 Broadcast Rights were offered to third parties through a bidding process.

30.     During the Relevant Period, there were a total of five agreements in effect

5

(collectively the "T&T Agreement(s)") relating to the assignment of the worldwide Broadcast Rights to T&T, as follows:

    a. Contract dated March 6, 2008, relating to 2008-2018 editions of the Copa Libertadores;

    b. Contract dated March 6, 2008, relating to the 2008-2018 editions of the Copa Sudamericana;

    c. Contract dated January 2010, relating to the 2010-2018 editions of the Copa Libertadores;

    d. Contract dated January 2010, relating to the 2010-2018 editions of the Copa Sudamericana; and

    e. Contract dated December 6, 2012, relating to the 2013-2018 editions of all of the Club Tournaments.[2]

31.    In May 2015, CONMEBOL learned that various individuals and entities, including some former CONMEBOL officials, had been indicted in the Eastern District of New York ("EDNY"), based on allegations of corruption in the acquisition of commercial rights owned by CONMEBOL, including the Broadcast Rights. In order to provide a mechanism for CONMEBOL to be paid remaining sums owed to it for the Broadcast Rights to the 2015 editions of the Copa Libertadores and the Copa Sudamericana, and to enable CONMEBOL to perform its pending contractual obligations relating to 2015 editions of those tournaments, CONMEBOL entered into an agreement dated as of July 2015 entitled No Waiver of Rights And Payment Agreement (the "No Waiver Agreement").

32.    Pursuant to the No Waiver Agreement, Fox Sports Latin America Ltd. ("FSLA") – which had acquired, from T&T, media rights for the 2015 editions of the Copa Libertadores and the Copa Sudamericana within a specified territory – agreed to pay the sums owed to CONMEBOL. T&T was a party to the No Waiver Agreement, but did not waive any of its rights under the existing T&T Agreement with CONMEBOL, or any other rights. The No Waiver Agreement and the transactions contemplated under it were fully disclosed to the U.S. Attorney's Office for the Eastern District of New York.

33.    In November 2015, CONMEBOL assigned the worldwide Broadcast Rights, in their entirety, to defendant Fox International Channels (US), Inc. ("FIC"). As with the T&T Agreements, CONMEBOL retained no control over where the Club Tournaments were to be

---

[2] During the Relevant Period, CONMEBOL also signed two agreements (one in 2009 and the other in 2012) relating to the Broadcast Rights to which defendant Torneos y Competencias ("T&C") was a party. Pursuant to those agreements, T&C guaranteed T&T's payment obligations for the Broadcast Rights. Neither of those agreements materially impacted T&T's interest in the Broadcast Rights.

broadcast or disseminated by FIC throughout the world. A true and correct copy of the contract assigning the Broadcast Rights to FIC (the "Fox Agreement").

34.     Prior to its finalization, the Fox Agreement was disclosed to and approved by the U.S. Attorney's Office for the EDNY. The proposed agreement was discussed in detail on October 16, 2015 at a meeting of the Executive Committee in Santiago, Chile. The Executive Committee did not delegate its authority to the President to approve the Fox Agreement. Rather, the entire Executive Committee, after consulting with legal counsel, approved it unanimously. In all respects, the Executive Committee's approval of the Fox Agreement complied with CONMEBOL's Bylaws.

35.     Concurrently with the finalization of the Fox Agreement, T&T agreed to terminate the T&T Agreements and relinquished all rights to the worldwide Broadcast Rights, including its priority rights and its rights of first refusal.

36.     The Broadcast Rights assigned pursuant to the T&T Agreements and, subsequently, the Fox Agreement, were assigned outright. The Broadcast Rights were global in scope, without any geographic limitation or restriction (other than certain live-television local blackout restrictions). CONMEBOL retained no control over where the Club Tournaments would be broadcast or disseminated throughout the world, and neither T&T nor FIC (or any entity affiliated with T&T or FIC) was at any time acting as agents of CONMEBOL in connection with broadcasting the Club Tournaments. Rather, T&T, and subsequently FIC, made their own decisions about how and where to exploit the Broadcast Rights, including whether to assign all or part of the Broadcast Rights to third parties. During the Relevant Period, all revenue from the broadcast of any Club Tournament matches, including any that may have been broadcast in the United States, were paid to the broadcasters, not to CONMEBOL. In any case, CONMEBOL has no information (except through recent discovery in this case) about where the Club Tournaments were broadcast, or about the amounts FIC might have received from third parties who subsequently paid FIC for the right to broadcast the Club Tournaments.

37.     At all times during the Relevant Period, CONMEBOL's assignment of the Broadcast Rights has been exclusive and worldwide in scope, and never directed at the United States or the State of Florida. Further, because the Broadcast Rights were always worldwide in scope, they were necessarily made in a single agreement for any given period of time.

*Location of CONMEBOL's Activities Relating to the Club Tournaments*

38.     From its formation in 1916 through the present, CONMEBOL has been located in South America. Since 1998, its permanent headquarters have been in Luque (Greater Asunción), Paraguay. All of CONMEBOL's employees and staff (aside from independent professionals contracted to provide services) are located in South America, as are all of CONMEBOL's Member Associations.

*Declaración of Fátima Lorena González Toppi*

39.     During the Relevant Period, CONMEBOL owned no real estate in the United States and had no offices or other facilities in the United States.

40.     During the Relevant Period, CONMEBOL had no offices, employees or business activities in Florida or the United States, or any employees or staff in the United States who were assigned to work on matters relating to any of the Club Tournaments (other than attorneys and accountants retained to provide professional services).

41.     During the Relevant Period, neither CONMEBOL's Executive Committee nor its Congress held any meetings in the United States.

42.     During the Relevant Period, all of CONMEBOL's organizational activities and other functions relating to the Club Tournaments were carried out in South America.

43.     During the Relevant Period, all of the Club Tournaments were played in their entirety in South America.

44.     CONMEBOL has no evidence that any CONMEBOL representative traveled to the United States on CONMEBOL business relating to the Club Tournaments at any time during the Relevant Period, with one isolated exception. Based on the evidence CONMEBOL has, together with interrogatory responses provided in this case by the Fox Defendants, the sole exception appears to have been one informal lunch meeting in Miami, Florida in September 2014, involving former CONMEBOL President Juan Angel Napout, Luis Bedoya, Alejandro Burzaco, Hernán López and Carlos Martínez, during which they discussed a fee adjustment for the existing T&T Contracts, and a possible extension of the T&T Contracts through 2022. To the extent any other employees of CONMEBOL visited Florida or the United States during the Relevant Period, they were beyond CONMEBOL's knowledge or control, by personal choice and at their own expense, not at the expense or direction of CONMEBOL.

45.     In the course of entering into the series of T&T Agreements, CONMEBOL took no purposeful action directed at the United States. The T&T Agreements were negotiated and executed in South America by South Americans and a British Virgin Islands entity. Aside from the single lunch meeting described above, there were no contacts of any kind directed at the United States in connection with the Broadcast Rights during the Relevant Period. If any other meetings or contacts relating to the Club Tournaments were located inside the United States, they were beyond CONMEBOL's knowledge and control.

46.     All of CONMEBOL's obligations under the T&T Agreements were performed in Paraguay or in other South American countries. Similarly, CONMEBOL executed the Fox Agreement in South America, and all of CONMEBOL's obligations under the Fox Agreement to date have been performed in Paraguay or elsewhere in South America. Although CONMEBOL has evidence of telephone and e-mail discussions with FIC representatives in connection with the Fox Contract, CONMEBOL has no evidence of any in-person meetings in the United States with

*Declaración of Fátima Lorena González Toppi*

FIC representatives in connection with Fox Contract.

47.     During the Relevant Period, CONMEBOL caused no funds to move through Florida or the United States for any purpose relating to the Club Tournaments. All payments received by CONMEBOL in consideration of the Broadcast Rights assigned to T&T during the Relevant Period were received by CONMEBOL into a Banco do Brasil account in Paraguay, or an account at Banco Itaú Paraguay S.A. in Paraguay. Based on my review of various documents, it is possible that such funds passed through one or more correspondent or intermediary banks located within the United States, but only because of circumstances internal to those financial institutions (*i.e.,* associated with the transfers in U.S. dollars) that were outside of CONMEBOL's control. To this end, CONMEBOL at no time directed that any such payments flow through U.S.-based correspondent or intermediary banks, nor were the selections, identities, locations or actions of the originating or correspondent or intermediary banks within CONMEBOL's control.

48.     In connection with the No Waiver Agreement, CONMEBOL received a total of three payments from Fox Sports Latin America Ltd. during the Relevant Period. Those payments may have originated from the United States, but, as mentioned, CONMEBOL had no control over their origination. CONMEBOL is unable to conclude that any other payments relating to the Club Tournaments originated from the United States during the Relevant Period.

49.     Beginning in December 2014, CONMEBOL maintained an investment account at the Miami, Florida branch of Banco do Brasil. Neither that account nor any income generated thereon was used for any purpose relating to the Club Tournaments. The account was closed in August 2015. CONMEBOL maintained no other bank accounts in the United States during the Relevant Period.

50.     During the Relevant Period, CONMEBOL has only once availed itself of any judicial assistance in the United States, in a 2016 lawsuit filed in state court in New York to remedy fraud in connection with a tournament sponsorship (not broadcast rights) agreement, specifically *Confederación Sudamericana de Fútbol v. Zorana Danis*, No. 655619/2016 (Sup. Ct. N.Y. County 2016). That case involves parties and matters unrelated to the above-entitled action or the Broadcast Rights for the Club Tournaments.

51.     During the Relevant Period, CONMEBOL was sued once in the United States, to wit: *Traffic Sports International, Inc. v. Full Play International, et al*., No. 11-38881 (11th Jud. Cir. Fla., Miami-Dade County 2011). In July 2012, CONMEBOL filed a motion to dismiss for lack of personal jurisdiction; however, in June 2013 the case was dismissed with prejudice, by stipulation of the parties, before the court was called upon to rule on the motion.

*Proposals by Global Sports Partners LLP to Acquire the Broadcast Rights*

52.     Plaintiff Global Sports Partners LLP ("Global Sports") submitted numerous

*Declaración of Fátima Lorena González Toppi*

written proposals to CONMEBOL during the Relevant Period, seeking to acquire the Broadcast Rights to the Club Tournaments. Those proposals were sent via letters, attached to this Affidavit as follows:

      a.  Letter dated October 21, 2012, on Global Sports letterhead (attached as Exhibit A);

      b.  Letter dated November 5, 2012, on Global Sports letterhead (attached as Exhibit B);

      c.  Letter dated November 18, 2013, on Global Sports letterhead (attached as Exhibit C);

      d.  Letter dated May 7, 2015, on Global Sports letterhead (attached as Exhibit D);

      e.  Letter dated October 16, 2015, on GolTV letterhead (attached as Exhibit E); and

      f.  Letter dated November 26, 2015, on GolTV letterhead (attached as Exhibit F).

53.    CONMEBOL has done business in the past with Global Sports. In 2015, CONMEBOL assigned static advertising and sponsorship rights (not broadcast rights) to Global Sports for the 2015 through 2017 editions of the Copa Sudamericana tournament, one of the three Club Tournaments. CONMEBOL's experience with Global Sports was utterly unsatisfactory in that Global Sports refused to pay sums contractually due to CONMEBOL. Consequently, CONMEBOL brought legal action against Global Sports in Paraguay, which was initially resolved through a settlement agreement. However, Global Sports subsequently refused to pay under that agreement, ostensibly on the ground that the indictments in the EDNY materially diminished the value of those rights. As a result of Global Sports' failure to pay, CONMEBOL commenced arbitration proceedings against Global Sports in the Court of Arbitration for Sport in Lausanne, Switzerland, which are still pending.

54.    At no time, either during the course of its business relationship with Global Sports or during the subsequent arbitration proceedings, has CONMEBOL understood Global Sports to act as an agent for GolTV.

55.    At no time did GolTV, either acting on behalf of itself or through an agent, propose to acquire any of the Broadcast Rights to the Club Tournaments. All such proposals were made through Global Sports, or through GolTV acting as an agent for Global Sports.

*Illegal Conduct by CONMEBOL Officials*

56.    In 2015, numerous officials under the auspices of FIFA were indicted by the U.S. Attorney for the EDNY in connection with an alleged scheme of bribes and kickbacks relating to the sale of commercial rights to soccer tournaments around the world. Several former

*Declaración of Fátima Lorena González Toppi*

CONMEBOL officials – including three former Presidents of CONMEBOL, Nicolas Leoz, Eugenio Figueredo and Juan Angel Napout – were included in those indictments. The alleged fraudulent scheme was said to involve, among other things, the Broadcast Rights. At the time of those indictments, Juan Angel Napout was the President of CONMEBOL.

57.    As a consequence of the EDNY's indictments, Juan Angel Napout resigned his position as President of CONMEBOL in December 2015. In January 2016, a new President and new management were installed at CONMEBOL.

58.    For purposes of the Motion to Dismiss, CONMEBOL assumes that the EDNY's indictments are meritorious, and that those former members of its Executive Committee that have been indicted in the EDNY engaged in the alleged illegal activity adverse to CONMEBOL.

59.    CONMEBOL, however, has no evidence of any wrongdoing by numerous other members of its Executive Committee who may have voted to approve the T&T Agreements and, subsequently, the Fox Agreement, including: (a) Ricardo Abumohor (Chile); (b) Francisco Acosta (Ecuador); (c) Alfredo Asfura (Chile); (d) Reinaldo Bastos (Brazil); (e) Nicolás Delfino (Peru); (f) Alejandro Domínquez (Paraguay); (g) Laureano González (Venezuela); (h) Ramón Jesurún (Colombia); (i) Edwin Oviedo (Peru); (j) Luis Segura (Argentina); (k) Carlos Villacís (Ecuador); and (l) Wilmer Valdez (Uruguay). Further, none of those individuals have been indicted in the EDNY.

60.    To the extent any member of CONMEBOL's Executive Committee(s) took or agreed to take illicit payments in connection with the assignment of any of CONMEBOL's commercial rights, including without limitation the Broadcast Rights, such actions were done without CONMEBOL's knowledge or approval and were adverse to CONMEBOL itself and to its Member Associations, in that said actions caused serious injury to CONMEBOL and its Member Associations by depriving them of substantial revenues from the true value of the rights. In so doing, said wrongdoers were acting outside the course and/or scope of their authority as members of the CONMEBOL Executive Committee. Indeed, to the extent any member of CONMEBOL's Executive Committee(s) took illicit payments in connection with the assignment of any of CONMEBOL's commercial rights, including without limitation the Broadcast Rights, CONMEBOL did not receive any benefit from those actions.

61.    Further, to the extent former CONMEBOL officials conducted meetings in the United States in furtherance of any illegal scheme involving bribery or illicit payments in connection with the Broadcast Rights to the Club Tournaments, those trips were at the personal choice and expense of the wrongdoers. CONMEBOL has no record of directing, approving or reimbursing expenses for such trips. If such activities occurred, they were outside the scope of the officials' authority, and without CONMEBOL's knowledge or approval.

62.    All members of CONMEBOL's Executive Committee are bound by FIFA's Ethics Code and its Disciplinary Code, which prohibit conflicts of interest, bribery and other

corrupt activity, and were in force during the Relevant Period. A true and correct copy of FIFA's Ethics Code and its Disciplinary Code are attached to this Affidavit as Exhibits G and H, respectively.

63.     Further, in 2013 and 2014, respectively, CONMEBOL adopted its own Code of Ethics and Disciplinary Regulations, which apply to all members of the Executive Committee. Those governing rules prohibit accepting bribes and other unlawful gifts, conflicts of interest and self-dealing. True and correct copies of CONMEBOL's Code of Ethics and its Disciplinary Regulations are attached to this Affidavit as Exhibits I and J, respectively.

64.     Thus, to the extent any member of CONMEBOL's Executive Committee(s) took illicit payments in connection with the assignment of any of the Broadcast Rights during the Relevant Period, such actions violated the ethical and disciplinary rules and regulations applicable to them, and were done without CONMEBOL's knowledge or approval.

65.     Finally, I have reviewed the Plaintiffs' allegations in the Amended Complaint, and at no time did CONMEBOL engage in any wrongdoing. Similarly, at no time was CONMEBOL part of the conspiracy alleged in the Amended Complaint.


FURTHER AFFIANT SAYETH NAUGHT.

Pursuant to Section 1746 of Title 28 of the United States Code, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:     July 20, 2017


_____

FÁTIMA LORENA GONZÁLEZ TOPPI
Contracts Manager, Legal Department, CONMEBOL



City of New York, State of New York, County of New York

I, Angela Lo, hereby certify that the document "**AFFIDAVIT OF FÁTIMA LORENA GONZÁLEZ TOPPI**" is, to the best of my knowledge and belief, a true and accurate translation from English into Spanish (International).

Angela Lo

Sworn to before me this
July 24, 2017

Signature, Notary Public

NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

**CORTE DEL DISTRITO DE LOS ESTADOS UNIDOS
DISTRITO SUR DE LA FLORIDA**

**CASE NO. 16-24431-CIV-ALTONAGA/Turnoff**

GOLTV, INC.; and GLOBAL SPORTS
PARTNERS LLP,

        Demandantes,

                -v.-

CONFEDERACION SUDAMERICANA DE
FUTBOL d/b/a CONMEBOL, *et al.*,

        Demandados.

## DECLARACIÓN JURADA DE FÁTIMA LORENA GONZÁLEZ TOPPI[1]

Yo, FÁTIMA LORENA GONZÁLEZ TOPPI, bajo la pena de perjurio y las leyes de los Estados Unidos de América, por medio del presente afirmo lo siguiente como verdadero:

1.      Yo soy una abogada de Paraguay que trabajo como Coordinadora de Contratos en el Departamento Jurídico de la Confederación Sudamericana de Fútbol ("CONMEBOL"), uno de los demandados en el caso arriba referenciado. Esta Declaración Jurada la realizo para apoyar la Moción para Desestimar de la CONMEBOL por Falta de Competencia en Razón a la Persona (la "Moción para Desestimar").

---

[1] En vista de la orden del Tribunal del 17 de julio de 2017 sobre la Moción para sellar un expediente, presentada por la CONMEBOL (D.E. 198), las inquietudes sobre confidencialidad que los Estados Unidos identificó previamente (*ver* D. E. 125 en la página 3), y las designaciones de otras partes sobre el carácter confidencial o altamente confidencial de varios anexos de la CONMEBOL que se adjuntan a la Moción para Desestimar Jurisdiccional Consolidada (Consolidated Jurisdictional Motion to Dismiss) (D.E. 193) y la Declaración Jurada (D.E. 192), la CONMEBOL ha eliminado el Anexo 4 de la Moción (D. E. 193-4) y los Anexos A a H de la Declaración Jurada (D.E. 192-1 a D.E. 192-8). La Moción y la Declaración Jurada se archivaron en el registro público; en consecuencia, se ha modificado la numeración del resultado de los anexos no confidenciales que se adjuntan a la Moción y de la presente Declaración Jurada, según se consideró necesario. La CONMEBOL se reserva el derecho de proceder a obtener el consentimiento del Tribunal para presentar los anexos eliminados de la Moción (D.E. 193) y de la Declaración Jurada (D.E. 192) bajo sello en respaldo de su memorando de respuesta. Los Demandantes han recomendado que se presenten objeciones a las medidas tomadas por la CONMEBOL que se describen en el presente.

*Declaración of Fátima Lorena González Toppi*

2.      Como Coordinadora de Contratos de la CONMEBOL, mis principales responsabilidades son la supervisión de todos los aspectos de los contratos de la CONMEBOL, incluyendo varios contratos relacionados con los derechos comerciales de propiedad de la CONMEBOL, como se discute más adelante.

3.      Además, fui designada por la CONMEBOL como su representante corporativa para testificar en una declaración de testigos de conformidad con la Norma 30(b)(6) según lo señalado por los Demandantes en la presente. Dicha declaración de testigos se realizó entre el 28 y 29 de junio de 2017. Para la preparación de mi testimonio en dicha declaración, realicé una revisión detallada de todos los documentos producidos por la CONMEBOL en respuesta a las solicitudes de pruebas emitidas por los Demandantes. También obtuve amplia información de conocimiento de la CONMEBOL en las diferentes categorías de información indicadas en la notificación de la declaración de testigo según la Norma 30(b)(6) de los Demandantes.

4.      Los asuntos de que trata esta Declaración Jurada están basados en el conocimiento de la CONMEBOL, en mis preparaciones para testificar como designada de la CONMEBOL según la Norma 30(b)(6), así como en mi propio conocimiento y experiencia obtenida durante el desempeño de mi cargo en el Departamento Jurídico de la CONMEBOL.

5.      Todos los anexos que se adjuntan a esta Declaración Jurada son copias fieles y exactas de los registros que mantiene la CONMEBOL en el curso ordinario de sus negocios.

*Estructura de la CONMEBOL*

6.      La CONMEBOL es el órgano rector del fútbol profesional en Sudamérica. La CONMEBOL es una organización sin fines de lucro constituida bajo las leyes de Paraguay y está regida por el Título I, Libro I del Código Civil de Paraguay y la Ley de Deportes de Paraguay.

7.      La CONMEBOL está conformada por diez asociaciones nacionales de fútbol en Sudamérica: (a) la Asociación del Fútbol Argentino; (b) la Federación Boliviana de Fútbol; (c) la Confederación Brasileña de Fútbol; (d) la Federación de Fútbol de Chile; (e) la Federación Colombiana de Fútbol; (f) la Federación Ecuatoriana de Fútbol; (g) la Asociación Paraguaya de Fútbol; (h) la Federación Deportiva Nacional Peruana de Fútbol; (i) la Asociación Uruguaya de Fútbol; y (j) la Federación Venezolana de Fútbol (las "Asociaciones Miembros"). Cada una de las Asociaciones Miembros es un miembro de la Fédération Internationale de Football Association ("FIFA").

8.      La FIFA reconoce a la CONMEBOL como la única Confederación constituida por las Asociaciones Miembros en Sudamérica y como tal, la CONMEBOL está autorizada por la FIFA exclusivamente para dirigir y controlar el fútbol en Sudamérica. La CONMEBOL está obligada por su interpretación de los estatutos de la FIFA -incluyendo lo relacionado con la ética -y ejerce sus derechos como una Confederación bajo la tutela de dichos estatutos.

2

9.    Las funciones de la CONMEBOL incluyen (entre otros): (a) promover el fútbol en Sudamérica; (b) dirigir, organizar y resolver todos los asuntos relacionados con el fútbol en Sudamérica; (c) organizar y realizar partidos, competencias y torneos internacionales en Sudamérica; (d) promover la integridad, comportamiento ético y espíritu deportivo en Sudamérica; y (e) proteger los intereses generales de las Asociaciones Miembros.

10.    La CONMEBOL está gobernado por un Congreso, su máxima autoridad. El Congreso está conformado por todas las Asociaciones Miembros y se reúne ordinariamente una vez al año. También puede convocar reuniones extraordinarias cuando la autoridad de la CONMEBOL lo considere relevante. El Congreso establece e interpreta los Estatutos y las Normas que rigen a la CONMEBOL.

11.    Tengo entendido que el periodo entre el 1 de enero de 2009 y el 31 de diciembre de 2015 (los "Periodos Relevantes") es el único periodo de tiempo relevante para la Moción para Desestimar y los asuntos relacionados sobre si existe competencia en razón a la persona sobre la CONMEBOL. Por lo tanto, salvo que se especifique lo contrario, la información que se incluye a continuación se refiere al Periodo Relevante.

12.    Durante el Periodo Relevante, el Comité Ejecutivo era la autoridad permanente de la CONMEBOL cuando el Congreso no estaba reunido. El Comité Ejecutivo estaba conformado por: (a) un Presidente (elegido por la mayoría de las Asociaciones Miembros); (b) tres Vicepresidentes (elegidos por el Congreso de entre los Presidentes de las Asociaciones Miembros); (c) siete Directores (correspondientes a los siete Presidentes restantes de las Asociaciones Miembros); (d) un Secretario General (designado por el Presidente); y (e) un Tesorero (también designado por el Presidente). El Presidente, los tres Vicepresidentes y los siete Directores eran los únicos miembros del Comité Ejecutivo con derecho a voto.

13.    Durante el Periodo Relevante, todas las Asociaciones Miembros de la CONMEBOL y sus correspondientes clubes de fútbol estaban ubicados en Sudamérica, al igual de que todos los miembros del Comité Ejecutivo.

14.    La función principal del Comité Ejecutivo era dirigir de manera colectiva a la CONMEBOL, de conformidad con los Estatutos y Normas de la CONMEBOL establecidos por el Congreso. Tenía amplia autoridad para dirigir los asuntos de la CONMEBOL y cualquier resolución adoptada por la mayoría de sus Directores era obligatoria. Entre las funciones del Comité Ejecutivo estaban organizar todos los partidos y torneos de la CONMEBOL y decidir todos los asuntos que le eran remitidos por las Asociaciones Miembros o los Directores y cualquier otro asunto dentro de la competencia del Congreso que debiera ser tratado antes de que se pudiera convocar a una reunión del Congreso. El Comité Ejecutivo debía reunirse por lo menos dos veces al año y la asistencia de sus Directores era obligatoria. El Comité Ejecutivo podía delegar el ejercicio de sus funciones, en su totalidad o en parte, al Presidente de la CONMEBOL.

15. De conformidad con los Estatutos de la CONMEBOL del 2016, el Comité Ejecutivo fue renombrado como el Consejo. El rol del Tesorero fue eliminado y dos nuevos roles fueron adicionados, el de Secretario General Adjunto y un Director Financiero, ninguno de los cuales tiene poder de voto.

*Torneos de la CONMEBOL*

16. La CONMEBOL organiza una gran variedad de torneos de fútbol en Sudamérica bajo su auspicio, tanto a nivel de clubes como a nivel de equipos nacionales. Además del fútbol tradicional masculino, los torneos de la CONMEBOL incluían categorías de fútbol femenino, jugadores menores de 17 años y menores de 21 años, fútbol de playa y futsal.

17. En la categoría tradicional de fútbol masculino, el torneo más prestigioso de la CONMEBOL históricamente ha sido la Copa Libertadores de América (la "Copa Libertadores"), un torneo a nivel de clubes que se juega todos los años. Aunque el formato de la Copa Libertadores ha evolucionado a lo largo de los años, su estructura actual incluye los primeros cuatro clubes de fútbol de cada una de las Asociaciones Miembros (con seis clubes de Argentina y Brasil) y se juega en ocho etapas de eliminatorias, comenzando en febrero.

18. Otras competencias importantes a nivel de clubes que se juegan bajo la tutela de la CONMEBOL en la categoría tradicional masculina son la Copa Sudamericana y la Recopa Sudamericana. La Copa Sudamericana se juega con los clubes de fútbol de más alto nivel que no clasificaron a la Copa Libertadores. Al igual que la Copa Libertadores, la Copa Sudamericana es un torneo que se juega en varias etapas. El ganador de la Copa Sudamericana clasifica para jugar en la Copa Libertadores del siguiente año y para competir en la Recopa Sudamericana, en la que figura el ganador de un solo partido de fútbol que se juega entre el ganador de la Copa Libertadores del año anterior y el ganador de la Copa Sudamericana del año anterior, que actualmente se decide en una serie de partidos de fútbol locales y de visitantes.

19. Tengo entendido que la Copa Libertadores, la Copa Sudamericana y la Recopa Sudamericana son los únicos torneos que son relevantes para las reclamaciones de los Demandantes en la demanda arriba referenciada y que en esta Declaración Jurada se refieren en conjunto como los "Torneos de Clubes".

20. El torneo más importante de la CONMEBOL a nivel de equipos nacionales es la Copa América. La Copa América -la cual, como lo mencioné antes, no es relevante para la demanda arriba referenciada -se juega cada cuatro años, entre los equipos nacionales de cada uno de las diez países de las Asociaciones Miembros, con otros países invitados en algunos casos.

21. En el 2016, la CONMEBOL celebró los 100 años de la Copa América. CONMEBOL USA, una filial independiente constituida en Dallas, Texas, fue creada específica y exclusivamente para este evento. En conjunto con la Confederación de Norteamérica, Centroamérica y el Caribe de Fútbol ("CONCACAF"), el ente rector reconocido por la FIFA

*Declaración of Fátima Lorena González Toppi*

para el hemisferio Norteamericano, la CONMEBOL USA organizó una edición de único ciclo del torneo, la Copa América Centenario (la "Copa Centenario"). La Copa Centenario se jugó en los Estados Unidos y la CONMEBOL USA tuvo los derechos comerciales y recibió todos los pagos como contraprestación por dichos derechos.

22.     Tengo entendido que las reclamaciones alegadas por los Demandantes en el asunto arriba referenciado están relacionadas únicamente con los derechos de transmisión a nivel mundial para los Torneos de Clubes y no están relacionados con la Copa Centenario o la Copa América en general.

*Los Derechos de Transmisión para los Torneos de Clubes*

23.     La CONMEBOL y sus Asociaciones Miembros son los propietarios absolutos a perpetuidad de todos los derechos de transmisión de medios relacionados con los torneos que organiza, incluyendo los Torneos de Clubes. De tiempo en tiempo, la CONMEBOL monetiza esos derechos -en su totalidad o en parte y únicamente de manera temporal -por medio de (entre otras maneras) una cesión contractual de los derechos a otros a cambio de una remuneración.

24.     Los beneficiarios finales de la monetización de los derechos de transmisión de la CONMEBOL son los clubes de fútbol que participan en los Torneos de Clubes por medio de las Asociaciones Miembros. Como entidad sin fines de lucro, la CONMEBOL se queda únicamente con los fondos que sean necesarios para pagar sus gastos operacionales y otros, y la parte de las ganancias restantes se paga a los clubes, por medio de la las Asociaciones Miembros, como participación en honorarios y premios.

25.     Durante el Periodo Relevante, el Comité Ejecutivo tenía la facultad para determinar si y a quién se le cedían algunos o todos sus derechos de transmisión, incluyendo los derechos de transmisión a nivel mundial relacionados con los Torneos de Clubes. De conformidad con los Estatutos de la CONMEBOL vigentes durante el Periodo Relevante, la cesión de los derechos de transmisión a nivel mundial de los Torneos de Clubes requería la firma del Presidente de la CONMEBOL (y, a partir del 2013, la firma del Secretario General), y la aprobación de la mayoría de los 11 miembros con derecho a voto del Comité Ejecutivo.

26.     A comienzos del año 2002, la CONMEBOL cedió todos sus derechos de transmisión a nivel mundial de los Torneos de Clubes (los "Derechos de Transmisión") de manera exclusiva al demandado T&T Sports Marketing Ltd. ("T&T"), a cambio de una contraprestación. En virtud de varios contratos posteriores, los derechos de T&T sobre los Derechos de Transmisión fueron prorrogados hasta los Torneos de Clubes de las ediciones del 2018.

27.     Los Derechos de Transmisión cedidos a T&T le daban a T&T el derecho ilimitado, y a nivel mundial, para comercializar los sonidos y las imágenes de los Torneos de Clubes, incluyendo, en su totalidad o en parte, por medio de terceros. La CONMEBOL no retuvo

*Declaración of Fátima Lorena González Toppi*

ningún control sobre en dónde se realizaría o difundiría la transmisión de los Torneos de Clubes en el mundo. De forma similar, la CONMEBOL no retuvo ningún control sobre los derechos de transmisión que T&T pudiera optar por ceder a terceros, ni se le consultó a la CONMEBOL respecto de a quién se le pudieran vender esos derechos.

28.     Los Derechos de Transmisión incluían el derecho a grabar, producir, transmitir, retransmitir y distribuir las imágenes y sonidos de los Torneos de Clubes por cualquier método, sin limitación, incluyendo por televisión, cable, satélite, pague por ver, internet y dispositivos móviles (entre otros métodos especificados), teniendo en cuenta la tecnología existente o cualquier tecnología que pudiera ser desarrollada en el futuro.

29.     Los contratos bajo los cuales T&T adquirió los Derechos de Transmisión también le otorgaron a T&T derechos de prioridad para prorrogar los Derechos de Transmisión después de las ediciones del 2018 del Torneo de Clubes, junto con los derechos de preferencia si, alternativamente, los Derechos de Transmisión después del 2018 eran ofrecidos a terceros mediante procesos licitatorios.

30.     Durante el Periodo Relevante, había un total de cinco contratos vigentes (en conjunto, los "Contratos de T&T") relacionados con la cesión de los Derechos de Transmisión a nivel mundial a T&T, como sigue:

a.  Contrato de fecha 6 de marzo de 2008, relacionado con las ediciones de 2008 a 2018 de la Copa Libertadores;

b.  Contrato de fecha 6 de marzo de 2008, relacionado con las ediciones de 2008 a 2018 de la Copa Sudamericana;

c.  Contrato de fecha enero de 2010, relacionado con las ediciones de 2010 a 2018 de la Copa Libertadores;

d.  Contrato de fecha enero de 2010, relacionado con las ediciones de 2010 a 2018 de la Copa Sudamericana; y

e.  Contrato de fecha 6 de diciembre de 2012, relacionado con las ediciones de 2013 a 2018 de todos los Torneos de Clubes.[2]

31.     En mayo de 2015, la CONMEBOL tuvo conocimiento de que varios individuos y entidades, incluyendo algunos funcionarios antiguos de la CONMEBOL, habían sido acusados

---

[2] Durante el Periodo Relevante, la CONMEBOL también firmó dos contratos (uno en el 2009 y otro en el 2012) relacionados con los Derechos de Transmisión en los que el demandado Torneos y Competencias ("T&C") eran una parte. En virtud de dichos contratos, T&C garantizó el pago de las obligaciones de T&T para los Derechos de Transmisión. Ninguno de dichos contratos impactó sustancialmente los intereses de T&T en los Derechos de Transmisión.

*Declaración of Fátima Lorena González Toppi*

en el Distrito Este de Nueva York ("EDNY"), con base en denuncias de corrupción en la adquisición de derechos comerciales de propiedad de la CONMEBOL, incluyendo los Derechos de Transmisión. Para poder proporcionar a la CONMEBOL un mecanismo de pago de las sumas restantes adeudadas a esta por los Derechos de Transmisión para las ediciones de 2015 de la Copa Libertadores y la Copa Sudamericana y para permitir a la CONMEBOL cumplir con sus obligaciones contractuales relacionadas con las ediciones de 2015 de dichos torneos, la CONMEBOL suscribió un acuerdo de fecha julio de 2015 denominado Acuerdo de No Renuncia de Derechos y Pago (el "Acuerdo de No Renuncia").

32.     En virtud de este Acuerdo de No Renuncia, Fox Sports Latin America Ltd. ("FSLA") – quien había adquirido, de T&T, los derechos de medios para las ediciones de 2015 de la Copa Libertadores y la Copa Sudamericana dentro del territorio especificado -acordó pagar las sumas adeudadas a CONMEBOL. T&T era una parte del Acuerdo de No Renuncia, pero no renunció a ninguno de sus derechos bajo los Contratos T&T existentes con CONMEBOL, o ningún otro derecho. El Acuerdo de No Renuncia y las transacciones contempladas bajo el mismo fueron totalmente divulgadas a la Oficina del Fiscal General de EE.UU. para el Distrito Este de Nueva York.

33.     En Noviembre de 2015, la CONMEBOL cedió los Derechos de Transmisión a nivel mundial, en su totalidad, al demandado Fox International Channels (US), Inc. ("FIC") (el "Contrato Fox"). Al igual que con los Contratos T&T, la CONMEBOL no retuvo ningún control sobre en dónde serían transmitidos o difundidos los Torneos de Clubes por FIC a nivel mundial.

34.     Antes de su terminación, el Contrato Fox fue divulgado a y aprobado por la Oficina del Fiscal General de EE.UU. para el EDNY. El acuerdo propuesto fue discutido en detalle el 16 de octubre de 2015 en una reunión del Comité Ejecutivo en Santiago, Chile. El Comité Ejecutivo no delegó su autoridad al Presidente para aprobar el Contrato Fox. Por el contrario, el Comité Ejecutivo, luego de consultar con los abogados, lo aprobaron de forma unánime. La aprobación del Comité Ejecutivo del Contrato Fox cumplió en todos sus aspectos con los Estatutos de la CONMEBOL.

35.     Simultáneamente con la terminación del Contrato Fox, T&T acordó terminar los Contratos T&T y renunció a todos los derechos sobre los Derechos de Transmisión a nivel mundial, incluyendo sus derechos de prioridad y derechos de preferencia.

36.     Los Derechos de Transmisión cedidos en virtud de los Contratos T&T y, posteriormente, el Contrato Fox, fueron cedidos por completo. Los Derechos de Transmisión tenían alcance global, sin ninguna limitación o restricción geográfica (diferente de ciertas restricciones de suspensión locales de televisión en vivo). La CONMEBOL no retuvo ningún control sobre en dónde serían transmitidos o difundidos los Torneos de Clubes en el mundo y ni T&T ni FIC (ni ninguna entidad afiliada con T&T o FIC) estaban en ningún momento actuando como agentes de la CONMEBOL en relación con la transmisión de los Torneos de Clubes. Por el contrario, T&T, y posteriormente FIC, tomaron sus propias decisiones sobre cómo y en dónde

7

*Declaración of Fátima Lorena González Toppi*

explotar los Derechos de Transmisión, incluyendo si ceder todos o partes de los Derechos de Transmisión a terceros. Durante el Periodo Relevante, todas las ganancias de las transmisiones de cualquier partido de los Torneos de Clubes, incluyendo cualquiera que hubiera podido ser transmitido en Estados Unidos, fueron pagadas a los difusores, no a la CONMEBOL. En cualquier caso, la CONMEBOL no tiene ninguna información (excepto por medio de la más reciente etapa probatoria en este caso) sobre en dónde fue transmitido el Torneo de Clubes, o sobre las sumas que FIC hubiera podido recibir de terceros que posteriormente pagaron a FIC por el derecho de transmitir los Torneos de Clubes.

37.     En todo momento durante el Periodo Relevante, la cesión de la CONMEBOL de los Derechos de Transmisión ha tenido un alcance exclusivo y mundial, y nunca ha sido dirigido a Estados Unidos ni al Estado de la Florida. Además, teniendo en cuenta que los Derechos de Transmisión siempre tuvieron alcance mundial, necesariamente hubo que incluirlos en un solo contrato para cualquier periodo de tiempo dado.

*Ubicación de las Actividades de la CONMEBOL Relacionadas con los Torneos de Clubes*

38.     Desde su creación en 1916 hasta el presente, la CONMEBOL ha estado ubicada en Sudamérica. Desde 1998, su sede principal permanente es Luque (Gran Asunción), Paraguay. Todos los empleados y el personal de la CONMEBOL (a parte de los profesionales independientes contratados para prestar servicios) están ubicados en Sudamérica, así como lo están todas las Asociaciones Miembros de la CONMEBOL.

39.     Durante el Periodo Relevante, la CONMEBOL no era propietaria de ningún inmueble en los Estados Unidos y no tenía ni oficinas ni otras instalaciones en los Estados Unidos.

40.     Durante el Periodo Relevante, la CONMEBOL no tenía oficinas, ni empleados ni actividades comerciales en la Florida ni en los Estados Unidos, ni ningún empleado o personal en los Estados Unidos que tuvieran a su cargo realizar trabajos sobre asuntos relacionados con cualquiera de los Torneos de Clubes (diferente de los abogados y contadores contratados para prestar servicios profesionales).

41.     Durante el Periodo Relevante, ni el Comité Ejecutivo de la CONMEBOL ni su Congreso realizaron ninguna reunión en Estados Unidos.

42.     Durante el Periodo Relevante, todas las actividades organizacionales y otras funciones de la CONMEBOL relacionadas con los Torneos de Clubes fueron realizadas en Sudamérica.

43.     Durante el Periodo Relevante, todos los Torneos de Clubes fueron jugados en su totalidad en Sudamérica.

*Declaración of Fátima Lorena González Toppi*

44.     La CONMEBOL no tiene evidencia de que ninguno de los representantes de la CONMEBOL hayan viajado a los Estados Unidos por asuntos de la CONMEBOL relacionados con los Torneos de Clubes en ningún momento durante el Periodo Relevante, con una sola excepción aislada. Con base en la evidencia que la CONMEBOL tiene, junto con las respuestas en declaraciones suministradas en este caso por los Demandantes Fox, la única excepción parece ser una reunión informal de almuerzo en Miami, Florida en septiembre de 2014, en la que participaron el antiguo Presidente de la CONMEBOL Juan Angel Napout, Luis Bedoya, Alejandro Burzaco, Hernán López y Carlos Martínez, durante la cual se discutió el ajuste de los honorarios por los Contratos T&T existentes y la posible prórroga de los Contratos T&T hasta el 2022. En la medida en que cualesquiera otros empleados de la CONMEBOL hubieran visitado la Florida o los Estados Unidos durante el Periodo Relevante, esto fue sin el conocimiento o control de la CONMEBOL, y fue por motivos personales y bajo su propia cuenta, y no por cuenta o por instrucciones de la CONMEBOL.

45.     Durante el curso de las suscripciones de la serie de Contratos T&T, la CONMEBOL no realizó ningún acto intencional dirigido a los Estados Unidos. Los Contratos T&T fueron negociados y ejecutados en Sudamérica por entidades Sudamericanas y una de las Islas Vírgenes. A parte de la única reunión de almuerzo que se describió arriba, no hubo ningún otro contacto de ninguna naturaleza en los Estados Unidos en relación con los Derechos de Transmisión durante el Periodo Relevante. Si se realizaron otras reuniones o contactos relacionados con el Torneo de Clubes dentro de los Estados Unidos, estas fueron sin el conocimiento y control de la CONMEBOL.

46.     Todas las obligaciones de la CONMEBOL bajo los Contratos T&T fueron cumplidas en Paraguay o en otros países Sudamericanos. Asimismo, la CONMEBOL ejecutó el Contrato Fox en Sudamérica, y todas las obligaciones de la CONMEBOL bajo el Contrato Fox a la fecha han sido cumplidas en Paraguay o en otros lugares en Sudamérica. Aunque la CONMEBOL tiene evidencia de discusiones vía telefónica o por correo electrónico con los representantes de FIC en relación con el Contrato Fox, la CONMEBOL no tiene evidencia de ninguna reunión en persona en los Estados Unidos con representantes de FIC en relación con el Contrato Fox.

47.     Durante el Periodo Relevante, la CONMEBOL no causó que ningún recurso económico fuera movidos a través de la Florida o Estados Unidos para ningún fin relacionado con los Torneos de Clubes. Todos los pagos recibidos por la CONMEBOL como contraprestación por los Derechos de Transmisión cedidos a T&T durante el Periodo Relevante fueron recibidos por la CONMEBOL en una cuenta del Banco do Brasil en Paraguay o en una cuenta en el Banco Itaú Paraguay S.A. en Paraguay. Con base en la revisión que yo hice de varios documentos, es posible que dichos fondos hubieran pasado por uno o más corresponsales o bancos intermediarios localizados dentro de Estados Unidos, pero únicamente por circunstancias internas de dichas instituciones financieras (*es decir,* relacionadas con las transferencias en dólares de EE.UU.) que no estaban bajo el control de la CONMEBOL. En este

*Declaración of Fátima Lorena González Toppi*

sentido, la CONMEBOL en ningún momento dio instrucciones de que dichos pagos fluyeran por medio de corresponsales o bancos intermediarios en EE.UU, ni las selecciones, identidades, ubicaciones o acciones de los bancos originarios o corresponsales o bancos intermediarios estaban bajo el control de la CONMEBOL.

48.     En relación con el Acuerdo de No Renuncia, la CONMEBOL recibió un total de tres pagos de Fox Sports Latin America Ltd. durante el Periodo Relevante. Dichos pagos pudieron haber tenido origen en los Estados Unidos, pero, como se mencionó, la CONMEBOL no tenía ningún control sobre su origen. La CONMEBOL no está en capacidad de concluir que cualquier otro pago relacionado con los Torneos de Clubes hubiera tenido origen en los Estados Unidos durante el Periodo Relevante.

49.     A comienzos de diciembre de 2014, la CONMEBOL mantenía una cuenta de inversiones en la sucursal del Banco do Brasil en Miami, Florida. Ni dicha cuenta ni ningún otro ingreso generado en la misma fue utilizado para ningún fin relacionado con el Torneo de Clubes. La cuenta fue cerrada en agosto de 2015. La CONMEBOL no mantuvo ninguna otra cuenta bancaria en los Estados Unidos durante el Periodo Relevante.

50.     Durante el Periodo Relevante, la CONMEBOL ha requerido únicamente una vez asistencia legal en Estados Unidos, en relación con una demanda entablada en el 2016 en una corte estatal de Nueva York respecto de la reparación de un fraude en relación con un contrato de patrocinio de un torneo (no derechos de transmisión), específicamente *Confederación Sudamericana de Fútbol v. Zorana Danis*, No. 655619/2016 (Sup. Ct. Condado N.Y. 2016). Ese caso involucra partes y asuntos no relacionadas con la acción arriba referenciada ni con los Derechos de Transmisión para los Torneos de Clubes.

51.     Durante el Periodo Relevante, la CONMEBOL fue demandada una vez en los Estados Unidos, es decir: *Traffic Sports International, Inc. v. Full Play International*, *et al.*, No. 11-38881 (11th Jud. Cir. Fla., Condado de Miami-Dade 2011). En julio de 2012, la CONMEBOL presentó una moción para desestimar por falta de competencia en razón de la persona; sin embargo, en junio de 2013 el caso fue desestimado con perjuicio, por estipulación de las partes, antes de que la corte fuera a resolver la moción.

*Propuestas de Global Sports Partners LLP para Adquirir los Derechos de Transmisión*

52.     El Demandante Global Sports Partners LLP ("Global Sports") envío varias propuestas escritas a la CONMEBOL durante el Periodo Relevante, buscando adquirir los Derechos de Propiedad de los Torneos de Clubes. Estas propuestas fueron enviadas mediante cartas, las cuales se adjuntan a esta Declaración Jurada como se indica a continuación:

> a.  Carta de fecha octubre 21 de 2012, en papel membrete de Global Sports (adjunta como Anexo A);

*Declaración of Fátima Lorena González Toppi*

    b.   Carta de fecha noviembre 5 de 2012, en papel membrete de Global Sports (adjunta como Anexo B);

    c.   Carta de fecha noviembre 18 de 2013, en papel membrete de Global Sports (adjunta como Anexo C);

    d.   Carta de fecha mayo 7 de 2015, en papel membrete de Global Sports (adjunta como Anexo D);

    e.   Carta de fecha octubre 16 de 2015, en papel membrete de GolTV (adjunta como Anexo E); y

    f.   Carta de fecha noviembre 26 de 2015, en papel membrete de GolTV (adjunta como Anexo F).

53.    La CONMEBOL ha realizado negocios anteriormente con Global Sports. En 2015, la CONMEBOL cedió los derechos de publicidad estáticos y patrocinio (no derechos de transmisión) a Global Sports para las ediciones de 2015 a 2017 del torneo de la Copa Sudamericana, uno de los tres Torneos de Clubes. La experiencia de la CONMEBOL con Global Sports fue completamente insatisfactoria en el sentido de que Global Sports se negó a pagar las sumas que contractualmente adeudaba a CONMEBOL. En consecuencia, la CONMEBOL entabló una demanda legal en contra de Global Sports en Paraguay, la cual fue inicialmente resuelta mediante un acuerdo entre las partes. Sin embargo, Global Sports posteriormente se negó a pagar en virtud de ese acuerdo, aparentemente basándose en que las acusaciones en la EDNY materialmente disminuyeron el valor de dichos derechos. Como consecuencia de la falta de pago de Global Sports, la CONMEBOL inició procedimientos de arbitraje en contra de Global Sports en la Corte de Arbitraje de Deportes en Lausana, Suiza, los cuales aún están pendientes.

54.    En ningún momento, ni durante el curso de sus relaciones comerciales con Global Sports ni durante los procedimientos de arbitraje posteriores, ha entendido la CONMEBOL que Global Sports actúa como agente de GolTV.

55.    En ningún momento, GolTV actuando por sí mismo o mediante un agente, propuso adquirir ninguno de los Derechos de Transmisión de los Torneos de Clubes. Todas las mencionadas propuestas fueron realizadas por medio de Global Sports o GolTV actuando como agente de Global Sports.

*Conducta Ilegal por Funcionarios de la CONMEBOL*

56.    En el 2015, varios funcionarios bajo los auspicios de la FIFA fueron acusados por el Fiscal General de EE.UU. para la EDNY en relación con un presunto esquema de sobornos y coimas relacionados con la venta de los derechos comerciales de torneos de fútbol al rededor del mundo. Varios antiguos funcionarios de la CONMEBOL – incluyendo tres Presidentes antiguos

de la CONMEBOL, Nicolas Leoz, Eugenio Figueredo y Juan Angel Napout – fueron incluidos en esas acusaciones. El presunto esquema fraudulento se decía que involucraba, entre otras cosas, los Derechos de Transmisión. Para la época de dichas acusaciones, Juan Angel Napout era el Presidente de la CONMEBOL.

57.     Como consecuencia de las acusaciones de la EDNY, Juan Angel Napout renunció a su cargo como Presidente de la CONMEBOL en diciembre de 2015. En enero de 2016, un nuevo Presidente y nueva administración fue instalada en la CONMEBOL.

58.     Para los efectos de la Moción para Desestimar, la CONMEBOL asume que las acusaciones de la EDNY tienen fundamento, y que dichos miembros antiguos de su Comité Ejecutivo que han sido acusados en la EDNY participaron en las presuntas actividades ilícitas que son adversas a la CONMEBOL.

59.     La CONMEBOL, sin embargo, no tiene ninguna evidencia de ningún acto indebido por otros muchos miembros de su Comité Ejecutivo que hubieran votado para aprobar los Contratos T&T y, posteriormente, el Contrato Fox, incluyendo: (a) Ricardo Abumohor (Chile); (b) Francisco Acosta (Ecuador); (c) Alfredo Asfura (Chile); (d) Reinaldo Bastos (Brasil); (e) Nicolás Delfino (Perú); (f) Alejandro Domínquez (Paraguay); (g) Laureano González (Venezuela); (h) Ramón Jesurún (Colombia); (i) Edwin Oviedo (Peru); (j) Luis Segura (Argentina); (k) Carlos Villacís (Ecuador); y (l) Wilmer Valdez (Uruguay). Además, ninguno de dichos individuos ha sido acusado en la EDNY.

60.     En la medida en que cualquier miembro del Comité Ejecutivo de la CONMEBOL tomó o acordó tomar pagos ilegales en relación con la cesión de cualquiera de los derechos comerciales de la CONMEBOL, incluyendo sin limitación los Derechos de Transmisión, dichos actos fueron realizados sin el consentimiento o aprobación de la CONMEBOL y fueron adversos a la CONMEBOL en sí misma y a sus Asociaciones Miembros, ya que dichos actos causaron graves perjuicios a la CONMEBOL y a sus Asociaciones Miembros impidiéndoles obtener ingresos sustanciales del valor verdadero de los derechos. Al hacer esto, las personas que realizaron actos indebidos actuaron por fuera del curso y/o alcance de su autoridad como miembros del Comité Ejecutivo de la CONMEBOL. De hecho, en la medida en que cualquier miembro del Comité Ejecutivo de la CONMEBOL hubiera tomado pagos ilegales en relación con la cesión de cualquiera de los derechos comerciales de la CONMEBOL, incluyendo sin limitación de los Derechos de Transmisión, la CONMEBOL no recibió ningún beneficio de dichos actos.

61.     Además, en la medida en que los antiguos funcionarios de la CONMEBOL realizaron reuniones en los Estados Unidos en relación con cualquier esquema ilegal que involucrara pagos ilegales o de sobornos en relación con los Derechos de Transmisión a los Torneos de Clubes, dichos viajes fueron por cuenta personal y a cuenta propia de las personas que realizaron los actos indebidos. La CONMEBOL no tiene ningún registro dando instrucciones, aprobando o reembolsando cualquier gasto por dichos viajes. Si dichas actividades

*Declaración of Fátima Lorena González Toppi*

ocurrieron, fueron por fuera del alcance de la autoridad de dichos funcionarios y sin el consentimiento o aprobación de la CONMEBOL.

62.     Todos los miembros del Comité Ejecutivo de la CONMEBOL están obligados a observar el Código de Ética y el Código Disciplinario de la CONMEBOL, que prohíben los conflictos de intereses, sobornos y otras actividades de corrupción y dichos códigos estaban vigentes en el Periodo Relevante. Una copia fiel y correcta del Código de Ética y el Código Disciplinario de la FIFA se adjunta a esta Declaración Jurada como Anexos G y H, respectivamente.

63.     Además, en el 2013 y el 2014, respectivamente, la CONMEBOL adoptó su propio Código de Ética y Regulaciones Disciplinarias, el cual aplica a todos los miembros del Comité Ejecutivo. Dichas normas regulatorias prohíben aceptar sobornos y otros regalos, conflictos de intereses o actos de interés propio ilegales. Se adjuntan copias fieles y correctas del Código de Ética y Regulaciones Disciplinarias de la CONMEBOL a esta Declaración Jurada como Anexos I y J, respectivamente.

64.     Por lo tanto, en la medida en que cualquier miembro del Comité Ejecutivo de la CONMEBOL tomó pagos ilegales en relación con la cesión de cualquiera de los Derechos de Transmisión durante el Periodo Relevante, dichos actos violaron las normas y regulaciones éticas y disciplinarias que les aplicaban y fueron realizados sin el conocimiento o aprobación de la CONMEBOL.

65.     Finalmente, yo revisé los alegatos de los Demandantes en la Demanda Enmendada y en ningún momento la CONMEBOL participó en cualquier acto indebido. De manera similar, en ningún momento la CONMEBOL participó en la supuesta conspiración en la Demanda Enmendada.

DECLARANTE ADICIONAL SAYETH NAUGHT.

De conformidad con la Sección 1746 del Título 28 del Código de Estados Unidos, yo declaro bajo pena de perjurio bajo las leyes de los Estados Unidos de América que lo anterior es verdadero y correcto.

Firmado:       20 de julio de 2017

_____

FÁTIMA LORENA GONZÁLEZ TOPPI
Coordinadora de Contratos, Departamento Jurídico, CONMEBOL