EXHIBIT

41A

7-6-17

## NO WAIVER OF RIGHTS AND PAYMENT AGREEMENT

This No Waiver of Rights and Payment Agreement (this *"Agreement"*), dated as of July __, 2015, is made and entered by and among the South American Football Confederation/ Confederación Sudamericana de Fútbol (the *"CONMEBOL"*), Fox Sports Latin America Ltd. (*"FSLA"*), T&T Sports Marketing Ltd. (*"T&T"*) and Torneos y Competencias S.A. (*"TyC"*) (collectively, the "Parties").

A.      WHEREAS, the CONMEBOL and T&T signed certain agreements set forth on Attachment A (the *"T&T Agreements"*) whereby, in exchange for worldwide media rights granted by the CONMEBOL to T&T in connection with the Copa Libertadores de América, the Copa Sudamericana and the Recopa Sudamericana, T&T committed to make certain payments on a specified schedule to the CONMEBOL.

B.      WHEREAS, T&T granted to FSLA certain rights, including media rights in connection with the 2015 edition of the Copa Libertadores de América and the 2015 edition of the Copa Sudamericana within a specified territory (the *"2015 Media Rights"*), as described in certain agreements between T&T and FSLA set forth on Attachment B (the *"Media Rights Agreements"*).

C.      WHEREAS, in relation to the foregoing agreements, in calendar year 2015, CONMEBOL has been paid:

a.   $27,500,000 pursuant to the Contrato de Cesión de Derechos de Transmisión de la Copa Libertadores de América;

b.   $675,000 pursuant to the Acuerdo Definitivo de Cesión de Derechos de la Recopa Sudamericana; and

c.   $6,000,000 pursuant to el Acuerdo Complementario a los Contratos de Cesión de Derechos de Transmisión de la Copa Libertadores de América, de la Copa Sudamericana y de la Recopa Sudamericana.

D.      WHEREAS, the 2015 edition of Copa Libertadores de América semifinal matches commence on July 14, 2015, the 2015 edition of Copa Sudamericana matches are scheduled to commence on August 15, 2015, and the 2015 edition of Recopa Sudamericana match took place in February 2, 2015.

E.      WHEREAS, the U.S. Attorney's Office for the Eastern District of New York issued an indictment in May 2015 (the *"Indictment"*) alleging corruption in the acquisition of international soccer rights.

F.      WHEREAS, the Parties desire to provide a mechanism for the CONMEBOL to be paid and enable the CONMEBOL to satisfy its lawful obligations in respect of the 2015 edition of the Copa Libertadores de América and the 2015 edition of the Copa Sudamericana, all without waiving any other rights the parties may have in relation to the T&T Agreements, the Media Rights Agreements or any other basis.

G.      WHEREAS, FSLA and the CONMEBOL (but neither T&T nor TyC) have agreed that FSLA will pay to the CONMEBOL the additional amount of $8,000,000 on July 31, 2015 and $8,000,000 on August 31, 2015, in connection with the 2015 edition of the Copa Libertadores and 2015 edition of the Copa Sudamericana (the *"Additional Amount"*).



HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

H.       WHEREAS, pursuant to Argentine Media Law - Ley Federal de Servicios de Comunicación Audiovisual Nbr. 26.522 and its regulatory Decrees and Resolutions - (the "*Argentine Media Law*"), the free-to-air rights to the 2015 Copa Libertadores Semifinal Match between River Plate vs. Guaraní and Final Matches in the event River Plate gets to the final round (the "*Matches*") (the "*FTA Rights*") must be granted to a free-to-air broadcaster with national coverage in Argentina.  Under the T&T Agreements and the Media Rights Agreements, T&T would hold the FTA Rights to the Matches. Solely to the extent necessary to meet the requirements of the Argentine Media Law FSLA's subsidiary in Argentina, Fox Sports Latin America S.A. ("*FSLA Argentina*") will enter into an agreement with Radio y Televisión Argentina ("*RTA SE*"), a state owned free to air broadcaster, under which RTA SE will broadcast the Matches free to air in the territory of Argentina.  As consideration, RTA SE will assign and transfer to FSLA Argentina the right to sell the ad sales inventory in the free to air transmission of the Matches in RTA SE (the "*Ad Sales Inventory*").  FSLA Argentina will pay TyC, as agent, a 17% commission over the net ad sales revenue actually collected by FSLA Argentina from the sale of the Ad Sales Inventory.  The CONMEBOL does not give its approval, acceptance or ratification to any arrangement between FSLA Argentina and TyC.

I.       WHEREAS, each of the Parties states that it is committed to conducting business with integrity and to licensing soccer rights and broadcasting, and producing for broadcast, international soccer matches in a lawful and ethical manner.

J.       WHEREAS, each of the Parties states that it has retained its own outside counsel to assist in the implementation of enhanced controls around the licensing of soccer rights designed to ensure integrity in the process.

Accordingly, in consideration for the covenants and obligations contained in this Agreement, the Parties agree as follows:

1.       FSLA has the 2015 Media Rights.  TyC believes that FSLA has the 2015 Media Rights pursuant to the Media Rights Agreements. The CONMEBOL believes that FSLA has the 2015 Media Rights pursuant to this Agreement. FSLA shall pay to the CONMEBOL the amounts set forth on <u>Attachment C</u> to this Agreement by the dates identified for such payments on <u>Attachment C</u> by wire transfer to the CONMEBOL bank account identified on <u>Attachment C</u>. The Additional Amount is not hereby ratified by TyC.

2.       All amounts paid to the CONMEBOL pursuant to Section 1 of this Agreement, up to $25,650,000, whatever the source, will (a) be offset from any claim by the CONMEBOL for payment for amounts owed by T&T pursuant to the applicable T&T Agreements in connection with the 2015 edition of the Copa Libertadores de América and the 2015 edition of the Copa Sudamericana, and (b) be offset from any claim by T&T for payment for amounts owed by FSLA under the applicable Media Rights Agreements. The CONMEBOL agrees that it shall use such funds for legal and bona fide purposes and according to the CONMEBOL's bylaws and regulations, including, without limitation, to make payments of the CONMEBOL's commitments related to the 2015 edition of the Copa Libertadores de América and the 2015 edition of the Copa Sudamericana.

3.       The payment by FSLA of the Additional Amount shall not constitute a credit against or offset any amounts due to the CONMEBOL by T&T pursuant to the T&T Agreements or any other agreements.  Any portion of the Additional Amount paid to the CONMEBOL, however, will be offset from any claim by the CONMEBOL against FSLA in connection with the 2015 edition of the Copa Libertadores de América and the 2015 edition of the Copa Sudamericana and is not subject to the dollar limitation set forth in Section 2 of this Agreement.



HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY                    T&T00000054

4.      Other than any amounts paid to the CONMEBOL pursuant to Section 1 of this Agreement and used to offset any claim by the CONMEBOL or T&T, as described in Sections 2 or 3 of this Agreement, no party hereto has waived nor will be deemed to have waived any of its rights under the T&T Agreements or the Media Rights Agreements (including, without limitation, any rights with respect to the failure to timely pay any amounts due under the T&T Agreements or the Media Rights Agreements), or rights arising from any other basis. The payment of any amounts by FSLA to the CONMEBOL pursuant to Section 1 of this Agreement shall not be deemed to create any additional liability of FSLA or T&T to the CONMEBOL nor be interpreted as FSLA's assumption of any of T&T's obligations pursuant to the T&T Agreements or as the CONMEBOL's approval, acceptance or ratification of the T&T Agreements.

5.      All actions in relation to this Agreement have been and will be conducted in compliance with all applicable laws, rules and regulations, including but not limited to U.S. laws and CONMEBOL rules.

6.      Each Party states that, other than outside counsel and accountants retained by it or its shareholders, no agent, consultant, intermediary or other third party (a) has had any involvement in the negotiation of this Agreement; (b) has been or will be offered, promised or paid any money or anything of value in relation to this Agreement; (c) has paid, offered, promised or authorized the payment of money or anything of value, directly or indirectly to any person or entity in relation to this Agreement.

7.      If any party hereto has a dispute or claim arising directly out of or directly relating to this Agreement, the dispute shall be resolved through arbitration in New York City, New York, United States of America, pursuant to the rules of the American Arbitration Association. This Agreement and the rights and obligations of the parties under this Agreement are governed by and shall be construed in accordance with the laws of the State of New York, without regard to any conflict of laws provisions. Notwithstanding the foregoing, nothing contained in this Section 7 shall modify the governing law, choice of law, dispute resolution, forum selection, or jurisdiction provisions of any of the T&T Agreements or the Media Rights Agreements.

8.      This Agreement may be executed in counterparts, each of which is deemed an original, but all of which constitutes one and the same agreement. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement. This Agreement constitutes the sole and entire agreement of the parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

9.      All parties acknowledge and agree that this Agreement and the transactions contemplated herein have been disclosed to the U.S. Attorney's Office for the Eastern District of New York.

[Signature Page Follows]



HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

Each of the CONMEBOL, TyC, T&T and FSLA has caused this Agreement to be executed and delivered to be effective as of the date first set forth above.

**South American Football Confederation/**
**Confederación Sudamericana de Fútbol**

By: _____
Name: _____
Title: _____

**Torneos y Competencias S.A.**

By: _____
Name: _____
Title: _____

**T&T Sports Marketing Ltd.**

By: _____
Name: _Carlos E. Martinez_
Title: _Authorized Signatory_

By: _____
Name: _____
Title: _____

**Fox Sports Latin America Ltd.**

By: _____
Name: _Carlos Martinez_
Title: _President_



HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

Each of the CONMEBOL, TyC, T&T and FSLA has caused this Agreement to be executed and delivered to be effective as of the date first set forth above.

**South American Football Confederation/
Confederación Sudamericana de Fútbol**

By:
Name:
Title:

**Torneos y Competencias S.A.**

By:
Name:
Title:

**T&T Sports Marketing Ltd.**

By:
Name:
Title:

By:
Name:
Title:

**Fox Sports Latin America Ltd.**

By:
Name:
Title:

Each of the CONMEBOL, TyC, T&T and FSLA has caused this Agreement to be executed and delivered to be effective as of the date first set forth above.

**South American Football Confederation/
Confederación Sudamericana de Fútbol**

By: _____
Name: _____
Title: _____

**Torneos y Competencias S.A.**

By: _____
Name: _____
Title: _____

**T&T Sports Marketing Ltd.**

By: _____
Name: _HeNaiji   NaSinaiji_
Title: _ATTonaeY   iN FaCT_

By: _____
Name: _____
Title: _____

**Fox Sports Latin America Ltd.**

By: _____
Name: _____
Title: _____

Each of the CONMEBOL, TyC, T&T and FSLA has caused this Agreement to be executed and delivered to be effective as of the date first set forth above.

**South American Football Confederation/
Confederación Sudamericana de Fútbol**

By: _____
Name: _____
Title: _____

**Torneos y Competencias S.A.**

By: _____
Name: _____
Title: _____

**T&T Sports Marketing Ltd.**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**Fox Sports Latin America Ltd.**

By: _____
Name: _____
Title: _____



Scanned by CamScanner

**Attachment A**

**T&T Agreements**

- Contrato de Cesión de Derechos de Transmisión de la Copa Libertadores de América (*Acquisition of Broadcasting Rights Agreement for the Copa Libertadores de América*), dated March 6, 2008, as amended by that certain Adenda al Contrato de Cesión de Derechos de Transmisión de la Copa Libertadores de América (*Addendum to Acquisition of Broadcasting Rights Agreement for the Copa Libertadores de América*), dated January 2010
- Acuerdo Definitivo de Cesión de Derechos para la Nueva Copa Sudamericana (*Final Acquisition of Rights Agreement for the New Copa Sudamericana*), dated March 6, 2008, as amended by that certain Adenda al Acuerdo Definitivo de Cesión de Derechos para la Nueva Copa Sudamericana (*Addendum to Final Acquisition of Rights Agreement for the New Copa Sudamericana*), dated January 2010
- Acuerdo Definitivo de Cesión de Derechos de la Recopa Sudamericana (*Final Acquisition of Rights Agreement for the Recopa Sudamericana*), dated February 2008
- Acuerdo Complementario a los Contratos de Cesión de Derechos de Transmisión de la Copa Libertadores de América, de la Copa Sudamericana y de la Recopa Sudamericana (*Complementary Agreement to Acquisition of Broadcasting Rights Agreement for the Copa Libertadores de America, the Copa Sudamericana and the Recopa Sudamericana*), dated December 6, 2012

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

**Attachment B**

**Media Rights Agreements**

- Copa Libertadores Program Purchase Agreement (2011-2018), dated January 1, 2011
- Copa Sudamericana Program Purchase Agreement (2010-2018), dated January 1, 2010
- Recopa Sudamericana Program Purchase Agreement (2010-2018), dated January 1, 2010
- Complementary Agreement to the Copa Libertadores - Copa Sudamericana - Recopa Sudamericana Program Purchase Agreement (2011-2018), dated December 19, 2012



**Attachment C**

**Payment Schedule and Wiring Instructions**

1. Under the Contrato de Cesión de Derechos de Transmisión de la Copa Libertadores de América: $7,000,000, due within three days of signing this Agreement

2. Under the Acuerdo Definitivo de Cesión de Derechos para la Nueva Copa Sudamericana:
   a. $5,060,000, due July 31, 2015
   b. $5,060,000, due August 31, 2015
   c. $2,530,000, due October 31, 2015

3. Under the Acuerdo Complementario a los Contratos de Cesión de Derechos de Transmisión de la Copa Libertadores de América, de la Copa Sudamericana y de la Recopa Sudamericana:
   a. $2,000,000, due within three days of signing this Agreement (June and July payments)
   b. $1,0000,000, due August 7, 2015
   c. $1,000,000, due September 4, 2015
   d. $1,000,000, due October 9, 2015
   e. $1,000,000, due November 6, 2015

4. Additional Amount
   a. $8,000,000 due July 31, 2015
   b. $8,000,000 due August 31, 2015

Wiring Instructions:

    Banco Continental S.A.E.C.A.
    Asuncion – Paraguay
    BCNAPYPAXXX
    CONFEDERACION SUDAMERICANA DE FUTBOL (CONMEBOL)
    0126176484/02


HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY                    T&T00000062



COPA SUDAMERICANA

PROGRAM PURCHASE AGREEMENT

(2010 – 2018)

THIS PROGRAM PURCHASE AGREEMENT (this "Agreement"), effective as of January 1, 2010 (the "Effective Date") and is between T&T SPORTS MARKETING LTD., located at Cayman National Building, 200 Elgin Avenue, 4th Floor, P.O. Box 1790 GT, Grand Cayman, Cayman Islands, B.W.I. ("Owner"), and FOX SPORTS LATIN AMERICA LTD., whose registered office is at the offices of Maples & Calder, Attorneys-at-law, P.O. Box 309, Grand Cayman, Islands, B.W.I. ("Fox"), each a "Party" and together the "Parties".

1.     SALE OF PROGRAMS.  (a) Owner represents, warrants and covenants that (i) Owner is the sole and exclusive owner of any and all right, title and interest in and to any and all practices, events and games of the 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017 and 2018 "Copa Sudamericana", occurring or played each year during the Term (as defined below) (the "Program("s")), (ii) Owner is duly authorized to grant and sell to Fox all of the rights set forth herein on the terms and conditions contained in this Agreement and in the Standard Terms and Conditions which are attached hereto as Exhibit A and by this reference are expressly incorporated herein and (iii) Owner has not assigned or transferred such rights to any other person or entity.

(b)  Subject always to the restrictions, limitations and obligations set out in this Agreement and applicable laws of the Territory (as defined below) from time to time in force, Owner hereby grants and sells to Fox (i) the unlimited, exclusive and irrevocable right to record, produce, transmit, exhibit, retransmit and distribute the images and sound of all of the Programs by television, by any other transmission media of images and sound whether now existing or hereafter developed, and by audiocast, internet and mobile phones, and to otherwise use the Programs, in whole or in part, with unlimited replay and highlight rights on a live and/or delayed basis, in any and all languages, throughout the Territory (as defined below) with respect to Copa Sudamericana, in accordance with the provisions set forth herein; (ii) the limited and non-exclusive right to transmit the audio feed all of the Programs by radio (for intelligible reception in the Territory by means of conventional home and personal radio receivers only) and by audiocast (the audio content broadcast over internet). Owner shall provide all production services for the Programs.

(c)  Fox acknowledges, agrees and undertakes to Owner that Confederación Sudamericana de Fútbol –CONMEBOL ("CONMEBOL") shall be entitled to transmit in simulcast, in the Territory, and by means of CONMEBOL's institutional website only (www.conmebol.com), the Programs in its entirety on live basis and the Programs and highlights of the Programs on a delay basis.

2.     THE MINIMUM NUMBER OF PROGRAMS.  Owner represents, warrants and covenants to Fox that in 2010 the Copa Sudamericana shall have no fewer than 60 matches (as Programs) to be played between the member clubs of CONMEBOL (or tournaments thereof, created by or associated with CONMEBOL).

3.     DELIVERY OF ANNUAL SUMMARY.  For each year of the Term, Owner shall provide to Fox a tournament summary for the Copa Sudamericana to be played during such calendar year (the "Annual Summary") within ten (10) days from the date CONMEBOL sets the final schedule, but no later than thirty (30) days prior to the scheduled start of each such season.   The Annual Summary shall contain all material terms relating to the tournaments, including (i) the tournament format and schedule, and (ii) the number of teams participating. . To the extent there are any subsequent changes to the terms described in the Annual Summary, Owner shall promptly notify Fox in writing of such changes.

1

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY            T&T00000008

Notwithstanding the foregoing, Owner shall provide Fox with all details of the matches/Programs (i.e. team match-ups, game time, etc.) within seventy-two (72) hours after the CONMEBOL has set such schedules.

4.    FORMAT OF COPA SUDAMERICANA.   Owner represents, warrants and covenants the following to Fox for the Copa Sudamericana for each year of the Term:

(a)    The Copa Sudamericana will be played in the second half of the year, commencing and concluding on the dates set forth on each Annual Summary.

(b)    The qualification and the participation of the clubs in the Copa Sudamericana will be based on merit, taking into account the performance of the clubs in their respective countries' division one local tournaments.

(c)    The Copa Sudamericana will consist of five rounds (the first round, the round of 16 (sixteen), the quarter finals, the semi-finals and the final, each a "Round").

(d)    Each one of the clubs that participates in the Copa Sudamericana shall have a minimum of 7 Principal Players on its team. "Principal Player" shall mean a player that (i) has participated in no less than 10 division one championship games played by such club in the season immediately prior to the Copa Sudamericana or (ii) in the event that the division one group of such club has incurred important player changes, new players to such group will also be considered "Principal Players" if they are of international renown or they have participated in a minimum of 10 division one championship games in the country where they played during the first half of the year.

(f)    The clubs are obligated to play with their Principal Players a minimum of 70% of the games in the Copa Sudamericana with at least 7 Principal Players per game and the clubs shall play each of such Principal Players for at least one complete half ("tiempo completo") of the game. In the event that a club does not comply with this obligation, Owner shall, at the direction of Fox, fine such club up to the maximum amount allowable, currently 50% of what such club would have received for its participation in the tournament (the "Fine"). The Fine shall be deducted from the amount of the Fee that Fox shall pay to Owner under this Agreement.

(g)    The players lists of the clubs shall not in good faith exceed more than 26 players.

(h)    Owner will cause the organizer of the Copa Sudamericana to use its best efforts (i) to prevent matches from being played simultaneously and (ii) to cause matches to be played on Tuesdays, Wednesdays and Thursdays in the evening hours.

(i)    CONMEBOL is obligated to consult in good faith with Owner when creating the calendar for each edition of Copa Sudamericana, such calendars to set the date, time and place of each match to be played. Owner shall consult in good faith with Fox in connection with the creation of each such calendar, and in Owner's consultation with CONMEBOL Owner shall attempt to procure the calendar proposals made by Fox.

(j)    The Copa Sudamericana and any further refinements to the format or organization of such tournaments will be governed by the regulations adopted by CONMEBOL.

2

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY          T&T00000009

(k)     The Parties acknowledge that CONMEBOL is responsible for all payment obligations to the participating clubs, but to the extent CONMEBOL does not make such payments, Fox can cause Owner to exercise Owner's right to pay directly such unpaid participating clubs.

(l)     Owner shall in good faith make all commercially reasonable efforts to ensure that CONMEBOL fulfils all of CONMEBOL's contractual obligations to Owner with respect to the Copa Sudamericana.

5.     **THE TERRITORY.**   The term "Territory" shall mean the United States of America, Canada, Mexico, Central and South America (including Brazil), and the Caribbean (including all territories, possessions, commonwealths and trusteeships of the countries contained therein).

6.     **THE TERM.**   Unless sooner terminated in accordance with the terms and conditions hereof, the Term shall commence on January 1, 2010 and shall terminate sixty (60) days following the last match of the 2018 Copa Sudamericana (the "Term"). Notwithstanding the foregoing, the license period shall terminate one (1) year following the delivery of the last match of the 2018 Copa Sudamericana.

7.     **CONSIDERATION.**

(a)     **Fee.**   In consideration of the rights granted and/or conferred hereunder, subject to the strict performance by Owner of this Agreement, in reliance on Owner's representations, warranties and covenants set forth herein, and upon programming and technical receipt of the Programs by Fox, Fox agrees to pay Owner (i) for each of the 2010-2014 for each of the calendar years of the Term an amount equal to Eleven Million Three Hundred Sixty Thousand U.S. Dollars (US$ 11,360,000) and (ii) for each of the 2015-2018 for each of the calendar years of the Term an amount equal to Thirteen Million Sixty four Hundred Thousand U.S. Dollars (US$ 13,064,000).  Such amounts shall include any and all license fees and any and all production, delivery and technical costs, subject to Section 13 uplink costs and shall be net of any tax, retention or deduction costs (the "Fee"), and such Fee shall be paid to Owner in U.S. Dollars only in the following installments (a payment shall be deemed made when the wire transfer is initiated):

(i)     For 2010 calendar year:

(1)     Two Million U.S. Dollars (US$2,000,000) on or before July 10,

(2)     One Million Five Hundred Thousand U.S. Dollars (US$1,500,000) on or before July 31,

(3)     One Million U.S. Dollars (US$1,000,000) on or before August 15,

(4)     Two Million U.S. Dollars (US$2,000,000) on or before August 31,

(5)     Two Million Five Hundred Thousand U.S. Dollars (US$2,500,000) on or before September 30,

(6)     One Million Five Hundred Thousand U.S. Dollars (US$1,500,000) on or before October 30, and

(7)     Eight Hundred Sixty Thousand U.S. Dollars ($860,000) on or before November 30.

(ii)     For each of the 2011-2014 calendar year(s):

3

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY                    T&T00000010

(1).   Two Million Five Hundred Thousand U.S. Dollars (US$2,500,000) on or before fifteen days prior to the date of the first match;

(2)   Two Million U.S. Dollars (US$2,000,000) on July 31;

(3)   Two Million U.S. Dollars (US$2,000,000) on August 31;

(4)   Two Million U.S. Dollars (US$2,000,000) on September 30;

(5)   Two Million U.S. Dollars (US$2,000,000) on October 31; and

(6)   Eight Hundred Sixty Thousand U.S. Dollars (US$860,000) on November 30.

(ii)   For each of the 2015-2018 calendar year(s):

(1)   Two Million Five Hundred Ninety Thousand U.S. Dollars (US$2,590,000) on or before fifteen days prior to the date of the first match;

(2)   Two Million Five Hundred Ninety Thousand U.S. Dollars (US$2,590,000) on July 31;

(3)   Two Million Three Hundred Fifteen Thousand U.S. Dollars (US$2,315,000) on August 31;

(4)   Two Million Three Hundred Fifteen Thousand U.S. Dollars (US$2,315,000) on September 30;

(5)   Two Million Three Hundred Fifteen Thousand U.S. Dollars (US$2,315,000) on October 31; and

(6)   Nine Hundred Thirty Nine Thousand U.S. Dollars (US$939,000) on November 30.

Fox shall make payments on the later of (a) the due date set forth above or (b) within 60 days of Fox's receipt of invoice. Further, the Parties hereto agree to negotiate, in good faith, the distribution of any new taxes (directly related to this Agreement) which may arise throughout the Term of the Agreement (i.e. in the event that new taxes arise, the Parties shall meet and mutually determine what allocation of taxes for which each party shall be liable for).

(b)   Argentine or Brazilian Teams – Finals Bonus. For each of the 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017 and 2018 editions of the Copa Sudamericana, Fox agrees to pay Owner with respect to each edition a bonus of Two Hundred Thousand U.S. Dollars (US$200,000) if and only if any team from Brazil or Argentina reaches the finals of such editions. This amount shall be paid 5 days before the final game is played.

8.   MATERIAL CHANGES. The parties acknowledge that CONMEBOL and/or Owner might in the future attempt to renegotiate or alter the Copa Sudamericana. The parties hereby agree that to the extent CONMEBOL and Owner agree to Material Changes to the Copa Sudamericana, Fox shall have the right to approve of such Material Changes prior to being obligated under this Agreement; provided, however, that the prior written approval of the Material Changes by Fox Pan American Sports LLC ("FPAS") shall be deemed the approval of Fox for as long as FPAS and Fox remain affiliates. "Material Changes" shall mean any change or effect that would be material and adverse to the value of this Agreement to Fox or to the business or the business prospects of Fox, and shall include material and adverse changes to the number of teams participating, the qualification system for the participating teams, the start, length or format of the tournament, the payment amounts, the

4

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

payment schedule, and the tournament schedule such that the payment schedule is significantly altered.

9. **POTENTIAL SALE OF BRAZILIAN TELECAST RIGHTS OF SUDAMERICANA.** Fox and Owner acknowledge that pursuant to the terms of this Agreement, Fox holds all rights and interests to telecast the Programs in Brazil (the "Brazilian Rights") during the Term. Fox agrees that Owner, on behalf of Fox and during the Term, may negotiate with any Brazilian client for the sale of the Brazilian Rights to such Brazilian client. Owner agrees to keep Fox updated and informed of the terms and the documents under negotiations with any Brazilian client, to regularly consult in good faith with Fox regarding such terms and documents under negotiation, and to use its best efforts to procure such terms and conditions as instructed by Fox.

10. **NOTICE.** Any notice, consent or other communication to a party required or contemplated hereby shall be in writing and shall be either hand-delivered or sent by registered or certified mail, return receipt requested, adequate postage prepaid, addressed to the party at its address set forth below. Either party shall have the right to change its address for notice purposes by giving notice to the other party in accordance with the provisions hereof. Each notice shall be deemed effective on the date of personal delivery thereof or as of the seventh business day after mailing by registered or certified mail.

If to Owner:     T&T Sports Marketing Ltd.
                 200 Elgin Avenue, Fourth Floor,
                 P.O. Box 1790 GT,
                 Grand Cayman,
                 Cayman Islands,
                 B.W.I.
                 Attn: Ignacio Martinelli

with a copy to: Torneos y Competencias S.A.
                 Balcarce 510
                 C1064AAL Buenos Aires
                 Argentina
                 Attn: Juan M. Ripoll

If to Fox:       Fox Sports Latin America Ltd.
                 c/o Fox Pan American Sports LLC
                 11575 Heron Bay Blvd., Ste 300
                 Coral Springs, FL 33076
                 Attn: James R. Ganley

with a copy to: Business and Legal Affairs Department

11. **USE OF LIKENESSES.** Subject to current CONMEBOL restrictions (which Owner has informed Fox of), Owner grants to Fox, and its assignees and licensees, the right in the Territory to use in Fox's telecast of the Programs, the names and logos of CONMEBOL and any players participating in the Programs; *provided however*, that Owner shall use its best efforts to obtain the participation of such players, and the names, photographs, likenesses, biographical information, acts, poses, voices and other sound effects, as well as recordings, transcriptions, films and other reproductions thereof, of all athletes, contestants, players, coaches, mascots, managers, and any other persons or entities connected with or appearing in the Programs in accordance with this Agreement, in any and all media for the purposes of promoting, advertising or publicizing the Programs and/or Fox, or otherwise (but not including any merchandising rights with regard thereto).

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY          T&T00000012

12.   **PROMOTION.**   To the extent that Owner has such footage in its custody or control, Owner shall assist Fox in the promotion of the exhibition of the Programs, including without limitation, by furnishing Fox at its request with promotional materials (including still photographs of the participants in the Programs) and twenty minutes (00:20:00) of clean footage (on Beta SP, Beta SX or Digital Beta) at least thirty (30) days prior to the telecast of the Programs for the making of on-air promotional spots by Fox and also by furnishing Fox with any on-air promotional spots already made for the Territory.  When providing spots that have already been made, Owner shall provide split track audio versions only.  Further, at no additional cost to Fox, Owner shall provide Fox with access to the stadium (and any and all other locations where the Programs may take place): (a) for marketing purposes and (b) and accommodations and accreditation for reporters, commentators, technical personal, etc.

13.   **DELIVERY.**   Owner shall make the fully produced Programs available to Fox live via Intelsat (C-Band or Ku-Band) or any other satellite as Fox may designate in its sole discretion, in NTSC or PAL format, so long as the signal from such satellite can be accessible for downlink in the United States and Latin America (including Brazil).  The parties hereto acknowledge and agree that Owner shall make its best efforts to provide Fox with a feed accessible for downlink in the United States in the event that Fox decides to take a second concurrent match/Program (in which case, Fox would pay Owner a pro-rata fee for such up-link costs).  At Fox's request, Owner shall deliver the Programs F.O.B. Fox Sports Latin America Ltd., c/o Torneos y Competencias S.A., Balcarce 510, C1064AAL Buenos Aires, Argentina or such other location as Fox shall specify from time to time on Betacam SP videotape in NTSC format at Owner's expense or in a digital video file. With each Program Owner shall deliver the format and available background information relating to the programming contained therein.  Unless otherwise specified by Fox: (a) Owner shall include international soundtracks of each Program (with complete program mix with Spanish commentary on Audio Channel 1 and international sound on Audio Channel 2); (b) the Program shall contain either generic graphics (i.e., no network or channel logos, names, symbols, etc.) or no graphics, as directed by Fox; (c) the Programs shall not contain any commercial content (a title sponsor, ending credits, on-site signage and sponsored clock and billboards are acceptable, but electronic billboards, graphically or orally sponsored segments, on air mentions and product placements are not acceptable).  Subject to current FIFA and CONMEBOL regulations, Owner acknowledges and agrees that Fox shall be permitted to insert virtual advertising into the Program(s).  The Programs shall be of U.S. broadcast quality and shall be subject to Fox's approval in its sole discretion.  The parties acknowledge and agree that time is of the essence regarding delivery of each Program, which shall be made on or before the delivery date specified in this Agreement.

14.   **CHANGE OF CIRCUMSTANCES.** If Owner hereafter becomes aware that any of the rights granted to Fox under this Agreement are encumbered, diminished or impaired in any way, or if CONMEBOL hereafter adopts any new or amended rule/regulation or agreement or applies any existing CONMEBOL rule/regulation or agreement, and the result thereof, individually or in the aggregate, diminishes or impairs, or otherwise has any adverse effect on any rights granted to Fox hereunder or on the exercise or exploitation of such rights by Fox (including, without limitation, a reduction in number of games, loss of any Territory, or any loss or modification of exclusivity) (any, a "Changed Circumstance"), Owner shall give Fox written notice upon learning of such Changed Circumstance.  In the event of any Changed Circumstance, in addition to any and all other rights and remedies available to Fox under this Agreement, at law, in equity or otherwise, Fox shall be entitled to an appropriate and equitable amendment to this Agreement and its obligations hereunder. During the period of sixty (60) days following notice (or following the date that Fox becomes aware) of any Changed Circumstance, Fox and Owner shall negotiate, in good faith, an appropriate amendment to this Agreement, or renegotiate the provisions hereof and/or the fees and the Fee payable hereunder, or otherwise modify or supplement this Agreement, to the extent appropriate to reflect the Changed Circumstance with the intent that Fox shall be entitled to the full benefit of its bargain and to be made whole.

6

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

T&T00000013

In the event the parties hereto, after such good faith negotiations, are unable to agree on an appropriate amendment to reflect such Changed Circumstance, Fox shall have the right, in addition to any other rights and remedies available hereunder, at law, in equity or otherwise, to have the matter resolved by binding arbitration in the United States conducted in accordance with the Commercial Rules of the American Arbitration Association before a single arbitrator experienced in the sports media industry.

Notwithstanding the above, if as a consequence of any macroeconomic change in the Territory during the years 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017 and 2018, CONMEBOL and Owner renegotiate the economic conditions or amend any provision of the agreement entered into by and between Owner and CONMEBOL in relation to "Copa Sudamericana", Owner and Fox shall negotiate, in good faith, an appropriate amendment to this Agreement, or renegotiate the provisions hereof and/or the Fees payable hereunder, or otherwise modify or supplement this Agreement, to the extent appropriate to reflect the changed economic conditions of the Agreement entered into by and between Owner and CONMEBOL in relation to the "Copa Sudamericana".

15.   **ASSIGNABILITY.** Other than with respect to the Brazilian Rights which shall be freely assignable to any affiliate of Fox and any third party, Fox may not assign this Agreement, or all or any part of the Programs or Fox's other rights and obligations hereunder, to any person or entity, without the prior written consent of Owner. Owner may not assign this Agreement without the prior written consent of Fox. This Agreement shall inure to the benefit of the parties hereto and their respective successors, transferees and permitted assigns.

[signatures begin on next page]

7

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers effective as of the day and year first above written.

**T&T SPORTS MARKETING LTD.**          **FOX SPORTS LATIN AMERICA LTD.**

By: _____          By: _____

James Robert Ganley                   James Robert Ganley
Group A Representative                 Chief Operating Officer


By: _____

Juan Miguel Ripoll
Group B Representative

8

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY          T&T00000015

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers effective as of the day and year first above written.

**T&T SPORTS MARKETING LTD.**                **FOX SPORTS LATIN AMERICA LTD.**

By: _____                By: _____

James Robert Ganley                         James Robert Ganley
Group A Representative                       Chief Operating Officer


By: _____

Juan Miguel Ripoll
Group B Representative

8

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY          T&T00000016

<u>EXHIBIT A</u>
### Standard Terms and Conditions

These Standard Terms and Conditions ("<u>Standard Terms</u>") are an integral part of, and are incorporated into, the Program Purchase Agreement (the "<u>Main Agreement</u>") to which these Standard Terms are attached. These Standard Terms and the Main Agreement shall hereinafter be collectively referred to as the "<u>Agreement</u>." All terms used in these Standard Terms shall, unless expressly provided to the contrary herein, have the same respective meanings set forth in the Main Agreement. To the extent that any provision of these Standard Terms conflicts with any provision of the Main Agreement, the Main Agreement shall control.

1.   <u>SALE OF PROGRAMS</u>. Owner hereby sells to Fox the unlimited, exclusive and irrevocable right to tape, produce, transmit, exhibit, retransmit and distribute the images and sound of all of the Programs by television or by any other method of capture, fixation and transmission of images and sound whether now existing or hereafter developed, and to otherwise use and exploit the Programs, and to sell all or part of the Programs, in and throughout the Territory on a live and/or delayed basis by any and all audio and visual transmission media, technologies or means, whether digital, analog or modified (including without limitation by film distribution, videocassette, video disc, Video Home, closed circuit television, in-flight distribution and display on airplanes, internet and other computer-based and on-line distribution, all types of broadcast, CD-ROM, pay per view, open and closed television, DHT, UHF, DES, DSS, satellite, free over-the-air television and any type of cable technology, whether CATV, MDS, MMDS, LMDS, DBS, STV, TVRO, SMATV, fiber optic or otherwise), and whether now existing or hereafter developed, in any and all languages. Without in any way limiting the generality of the foregoing, Fox shall have the right to: exploit, sell and otherwise generally deal with the Programs and the revenues therefrom and properties thereof as Fox may in its sole discretion deem advisable; make, cause to be made and authorize others to make foreign language versions of the Programs by insertion of sound tracks, dubbing or subtitling; announce on the Programs and elsewhere that the Programs are presented by Fox, use Fox tradenames and trademarks on the Programs and authorize others to use and attach their own tradenames and trademarks in connection therewith; issue and authorize publicity in any and all media in connection with the Programs, including the names, photographs, likenesses, biographical information, acts, poses, voices and other sound effects, as well as recordings, transcriptions, films and other reproductions thereof of the Program participants and their coaches, managers, teams and leagues, if any, and of all other persons rendering services in connection with the Programs; create and use excerpts and highlights from the Programs, as well as recordings, transcriptions, films and other reproductions thereof, for any other purpose as Fox deems appropriate; and make or authorize such editing, changes (including changes in the titles of the Programs), additions, insertions, cuts, interpolations and eliminations as may be required by any duly authorized governmental or regulatory authority or organization or as are deemed desirable by Fox or its assignees in their sole discretion in connection with the distribution of the Programs; and (g) exhibit up to 3 minutes of footage from the Program(s)/Event(s) via the internet or other broadband distribution for promotional purpose or otherwise.

2.   <u>OWNER'S WARRANTIES</u>. Owner hereby represents and warrants to Fox that:

(a)   <u>Authority of Owner</u>: Owner has all requisite rights and authority to enter into and perform this Agreement and to sell to Fox all of the rights and interests herein granted and sold to Fox. Owner is duly organized under the laws of its jurisdiction of formation, has taken all necessary

1

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY          T&T00000017

action to authorize the execution, delivery and performance of this Agreement and this Agreement does not and will not violate any provision of Owner's constituent or governing documents or applicable law or regulation or any contract or other agreement to which Owner is a party or by which it is bound.

(b)   **No Encumbrances Against the Programs:** There are, and will be, no claims, liens, encumbrances or third party rights of any nature in, on or to the Programs or any part thereof.

(c)   **Trademark, Copyright, Slander Violations:** The Programs, including the sound and music synchronized therewith, and the exercise and exploitation by Fox or its assignees of any right herein granted to Fox, will not violate or infringe upon the trademark, tradename, copyright, patent, literary, dramatic, music, artistic, persona, private, civil or property right, right of privacy, right of publicity, or any other right of any person or entity or constitute a libel or slander of any person or entity, and the Programs will not contain any unlawful or censorable material. Owner shall be solely responsible for obtaining all licenses, consents and permissions necessary for Fox's use of the Programs, including the performance and use hereunder of any music included in the Programs.

(d)   **Exclusiveness of Rights:** Owner has not sold, assigned, transferred, conveyed or hypothecated, and shall not sell, assign, transfer, convey or hypothecate, to any person or entity any right, title or interest in or to the Programs or any of the other rights sold to Fox under this Agreement. Fox acknowledges and agrees that Owner reserves the right to authorize third parties to transmit the Programs for reception outside the Territory or for reception in those parts of the Territory where the designated rights are non-exclusive. Fox further acknowledges that such transmission may be capable of reception within the Territory including those parts of the Territory where the designated rights granted hereunder are exclusive due to the inherent capability of satellites to beam down signals which

are not confined to territorial boundaries ("Overspill"). Fox agrees that the occurrence of such Overspill shall not constitute a breach of this Agreement. Owner shall not authorize the exhibition of any of the Programs outside of the Territory in a place or way that would interfere with the exploitation of any of Fox's rights hereunder in the Territory or allow any other telecasting or broadcasting of any of the Programs into the Territory by any means.

(e)   **Quiet and Peaceful Enjoyment:** Fox shall quietly and peacefully enjoy and possess, during the entire Term, all of the rights herein sold and agreed to be sold by Owner to Fox.

3.   **INDEMNIFICATION.** Owner shall indemnify, defend and hold harmless Fox (and its affiliates, parent companies, subsidiaries, partners, exhibitors, assignees, licensees, and their respective officers, directors and employees) from and against any liability, damage, cost or expense (including reasonable attorneys' fees, judgments and settlement costs) resulting from or arising out of the exploitation, sale and distribution by Fox and its assignees of the Programs or any breach of any agreement, representation, grant or warranty of Owner under this Agreement. The obligations of Owner under this Section 3 shall survive the expiration or termination of this Agreement. Fox shall give Owner notice of any action brought by a third party to which the foregoing indemnity applies and Owner may participate in the defense of same, at Owner's expense, through counsel of Owner's choosing that is acceptable to Fox; however, the final control and disposition of any such action (by settlement, compromise or otherwise) shall remain with Fox. Owner shall pay to Fox on demand any amounts for which Owner may be responsible under the foregoing indemnity or, if Fox so elects, Fox may offset any such amount from any sum otherwise due Owner from Fox. Without limiting any of its other rights or remedies, upon the making or filing of any action, claim or demand that is subject hereto, Fox shall be entitled to withhold sums payable under this or any other

2

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY                    T&T00000018

agreement between the parties in an amount reasonably related to the potential indemnification liability of Owner, including costs and attorneys' fees. Without limiting any of its rights or remedies, Fox shall have the right to assert any claim that Owner may have against CONMEBOL in connection with this Agreement, and shall provide Owner reasonable notice of such assertion. In the event that Owner collects any damages as a result of such action against CONMEBOL, Fox shall be entitled to collect from Owner, and Owner shall remit to Fox, such portion of the damages, together with all reasonable expenses and attorney's fees, that would compensate Fox for any losses or damages it suffered from the conduct of CONMEBOL forming the basis of such action.

4.    FOX'S    RIGHTS    AND OBLIGATIONS.

(a)    Fox's Authority: Fox shall have complete and exclusive authority to produce distribute, exhibit and exploit the Programs and the other rights herein granted in the Territory, and to sell such Programs and rights to others, in accordance with such methods, policies and terms as it may determine in its sole discretion. In the exercise of its rights hereunder Fox may enter into sale and license agreements with third parties and distribute the Programs to its affiliated networks with or without charge. Any such sale or license shall be valid and binding upon Owner, and Owner agrees to treat such purchaser or licensee as a purchaser of Programs under this Agreement.

(b)    Right of First Negotiation. For the 60-day period beginning 90 days before the expiration of this Agreement (the "RFN Period"), Owner shall negotiate exclusively and in good faith with Fox with respect to the terms and conditions for the sale of rights to Programs that will be similar in all material respects to those sold to Fox in this Agreement, and shall use its best efforts to reach an agreement with Fox as soon as is practicable.

(c)    Right of First Refusal.  If Fox and Owner have not agreed with respect to the sale of such rights within the RFN Period,

then Owner shall not, and shall not agree to, sell, license or otherwise convey such rights to any other Person without giving Fox the first opportunity, by notice to Fox, to enter into an agreement with Owner on terms and conditions at least as favorable to Fox as those offered to or by Owner to any such other Person. Fox will have 10 days from the date of receipt of notice from Owner of any such offer in which to accept the opportunity to negotiate an agreement with Owner on those terms and conditions. If Fox accepts the opportunity, Owner and Fox will negotiate in good faith to finalize any agreement on those terms and conditions within 30 days.    The provisions of this paragraph shall apply to each offer for rights received by or made to Owner.  Owner shall not accept, and Fox shall not be required to meet the provisions of, any such offer unless it has been reduced to writing, signed by the offeror and delivered to Fox with Owner's notice to Fox as provided above, together with Owner's written acknowledgment of its desire to accept same. Fox's failure to accept shall not constitute a waiver of first refusal with respect to subsequent offers. The obligations of Owner under this paragraph (c) shall survive any expiration or termination of this Agreement.

5.    TERMINATION.   In addition to other rights at law, in equity or pursuant to other provisions of this Agreement, (a) if the "Copa Sudamericana" is not played for any reason, Fox may by notice to Owner terminate this Agreement immediately without any continuing obligations, and (b) either party may by notice to the other party terminate this Agreement:  (i) immediately if such other party is in material breach of this Agreement, provided however, that if such breach is not a failure to deliver any Program when it is required to be delivered and is curable, then such party shall not exercise its termination or other rights unless it has, by notice to the other party, given such other party five days from the time such notice is given to fully cure such material breach to the non-breaching party's satisfaction; (ii) immediately if such other party has filed a petition in bankruptcy, is insolvent or has sought relief under any law related to its financial condition or its ability to meet its

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

T&T00000019

payment obligations; or (iii) if any involuntary petition in bankruptcy or insolvency has been filed against such other party, or any relief under any such law has been sought by any creditor of such other party, unless such involuntary petition is dismissed or such relief is denied within 60 days after it has been filed or sought. The parties shall cease to have any obligations under this Agreement from the date of any such termination, except for liabilities or obligations which arose prior to such termination.

6.   MISCELLANEOUS.

(a)   Force Majeure:   Notwithstanding anything herein contained to the contrary, neither party shall be liable to the other in damages because of any failure to perform hereunder to the extent such failure is caused by any cause beyond its control, including but not limited to fire, earthquake, flood, epidemic, accident, explosion, casualty, labor controversy, riot, civil disturbance, act of a public enemy, embargo, war, act of God, any governmental ordinance or law, the issuance of any executive or judicial order, any failure or delay of any transportation agency, any failure or delay in respect to any electrical or sound equipment or apparatus, any failure, without such party's fault, to obtain material, transportation, power or any other essential thing required for its performance of this Agreement or any similar cause (an "Event of Force Majeure").   Any and all payment obligations of Fox and its assigns (including requirements of barter) shall be suspended during the continuance of an Event of Force Majeure affecting Owner's performance.   If an Event of Force Majeure affecting Owner continues for 30 or more consecutive days or 90 days in the aggregate, Fox shall have the right to terminate this Agreement in its sole discretion upon notice to Owner.

(b)   Communications Act Disclosure.   In accordance with Section 507 of the Federal Communications Act, Owner agrees to disclose to Fox any information of which it has or acquires knowledge, or which has been or is disclosed to it, as to any money, service or other valuable consideration which any Person has paid or accepted, or agreed to pay or accept, for the inclusion of any program matter in any Program material to be furnished to Fox hereunder. The term "service or other valuable consideration" as used herein will not include any service or property furnished without charge or at a nominal charge for use on, or in connection with, a Program, unless it is furnished in consideration for an identification of any person, product, service, trademark or brand name beyond an identification that is reasonably related to the use of such service or property in such Program. The inclusion of an appropriate announcement in a Program will constitute the disclosure required by this Section.

(c)   No Partnership; No Third Party Beneficiaries:   Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto or constitute either party the agent of the other. Neither party shall hold itself out as having authority contrary to the terms of this paragraph, and neither party shall be or become liable by any representation, act or omission of the other contrary to the provisions hereof. This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any such party whether referred to herein or not.

(d)   No Continuing Waiver:   No waiver by either party of any breach hereof shall be deemed a waiver of any preceding, continuing or succeeding breach of the same or any other provision hereof. Any waiver must be in writing and executed by the party whose rights are waived.

(e)   Governing Law; Jurisdiction:   This Agreement and all matters collateral hereto shall be governed by the laws of the State of New York, U.S.A. applicable to contracts made and fully performed therein, without giving effect to principles of conflict of laws. Any legal proceeding relating to this Agreement shall be instituted and prosecuted solely in, and each party hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York or the Supreme Court

4

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY   T&T00000020

of the State of New York; County of New York, and any appellate court from any thereof, unless such an action or proceeding is required to be brought in another court to obtain subject matter jurisdiction over the matter in controversy. Owner and Fox hereby irrevocably designate, constitute and appoint the Secretary of State of New York as their agent in the State of New York upon whom all summons, notices, pleadings, and processes in any action or proceedings against Owner or Fox may be served, with copies thereof to Owner or Fox at the address in the preamble hereof. Each of the parties hereby irrevocably waives any objection that it may have now or hereafter to the laying of the venue of any such action or proceeding in the manner provided in this subparagraph.

(f)   Entire Agreement: This Agreement supersedes and cancels all prior negotiations and understandings whether written or oral between the parties and contains all of the terms agreed to by the parties with respect to the subject matter hereof. No amendment shall be valid unless in writing and executed by both parties. No officer, employee or representative of Fox has any authority to make any representation or promise not contained in this Agreement, and Owner has not executed this Agreement in reliance on any such representation or promise.

(g)   Limitation of Liability: In no event shall Fox be liable to Owner for any lost profits or special or consequential damages of any type, whether foreseeable or unforeseeable.

(h)   Currency Restrictions: If approval or clearance of any exchange control authorities or any other currency or fiscal agencies in the Territory is required for payments to be made by Fox and such approval is not granted within a reasonable period of time, then Fox's failure to make payment shall not be considered a breach of the Agreement.

(i)   Construction: The terms and provisions of this Agreement represent the results of negotiations between the

parties, each of which has been represented by counsel of its own choosing, and none of which have acted under duress or compulsion, whether legal, economic or otherwise. Consequently, the terms and provisions of this Agreement shall be interpreted and construed in accordance with their usual and customary meanings, and the parties hereby waive the application of any rule of law to the effect that ambiguous or conflicting terms or provisions contained in the executed draft of this Agreement shall be interpreted or construed against the party whose attorney prepared the executed draft or any earlier draft of this Agreement.

(j)   Confidentiality: Each of the parties hereto will regard and preserve as confidential all information related to (i) this Agreement, and (ii) the business of the other party as such information may be obtained by either party from any source as a result of this Agreement (collectively,

"Confidential Information"). Notwithstanding the foregoing, no party hereto shall have an obligation of confidentiality with respect to information which: is already known to such party at the time; is obtained from a third party without breach of this Agreement; is in the public domain; is independently developed by such party; is disclosed to a party's shareholders, indirect owners or possible investors and their advisors, or is subject to compelled disclosure (provided that the disclosing party shall notify the other party or parties of any such requirement prior to disclosure in order to prevent or limit disclosure).

(k)   Hardship: If, after this Agreement is entered into, any rule, law or judicial or administrative order in effect in the Territory or the USA imposes limitations or restrictions relating to distribution of the Programs which, in Fox's reasonable opinion, makes it illegal, inherently unprofitable or otherwise undesirable to continue its performance under this Agreement, Fox may terminate this Agreement upon 30 days' notice to Owner specifying such order, rule, law or decision

5

and the effect of such termination shall be as provided in Section 5 above.

(l)    Censorship: If Fox cannot telecast a Program by reason of the action of a censorship authority and a Program cannot reasonably be edited to comply with censorship requirements, Fox shall so notify Owner and provide Owner with appropriate documents evidencing such action, whereupon Owner shall, at Fox's request, either: deliver other reasonably equivalent programming which has been mutually agreed upon by Fox and Owner or refund to Fox the purchase price for that Program in accordance with the termination provisions of Section 5 above.

6

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

T&T00000022



RECOPA SUDAMERICANA

PROGRAM PURCHASE AGREEMENT

(2010-2018)

THIS PROGRAM PURCHASE AGREEMENT (this "Agreement") is made as of January 1, 2010 by and between **T&T SPORTS MARKETING LTD.**, located at 200 Elgin Avenue, Fourth Floor, P.O. Box 1790 GT, Grand Cayman, Cayman Islands, B.W.I. ("Owner"), and **FOX SPORTS LATIN AMERICA LTD.**, whose registered office is the offices of Maples & Calder, Attorneys-at-law, P.O. Box 309, Grand Cayman, Islands, B.W.I. ("Fox").

1.     SALE OF PROGRAMS. Owner represents, warrants and covenants that (a) Owner is the sole and exclusive owner of any and all right, title and interest in and to any and all practices, events and games of the 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017 and 2018 "Recopa Sudamericana", occurring or played each year during the Term (as defined below) (the "Program("s")), (b) Owner is duly authorized to grant and sell to Fox all of the rights set forth herein on the terms and conditions contained in this Agreement and in the Standard Terms and Conditions which are attached hereto as **Exhibit A** and by this reference are expressly incorporated herein and (c) Owner has not assigned or transferred such rights to any other person or entity.

Owner hereby grants and sells to Fox the unlimited, exclusive and irrevocable right to record, produce, transmit, exhibit, retransmit and distribute the images and sound of all of the Programs by television, by cybercast, by any other transmission media of images and sound whether now existing or hereafter developed, and by audiocast, Internet and mobile phones and to otherwise use the Programs, in whole or in part, with unlimited replay and highlight rights on a live and/or delayed basis, in any and all languages, worldwide, in accordance with the provisions set forth herein. Owner shall provide all production services for the Programs.

Fox acknowledges, agrees and undertakes to Owner that Confederación Sudamericana de Fútbol -CONMEBOL ("CONMEBOL") shall be entitled to transmit in simulcast, in the Territory, and by means of CONMEBOL's institutional website only (www.conmebol.com), the Programs in its entirety on live basis and the Programs and highlights of the Programs on a delay basis.

2.     THE PROGRAMS. Owner represents, warrants and covenants to Fox that:

(a) The programs will consist of two championship games to be played annually between the previous year's winner of the Copa Libertadores de América and the previous year's winner of the Copa Sudamericana, and that such two championship games shall be an official event of the CONMEBOL.

(b) Each of the clubs that participates in the Recopa Sudamericana shall have a minimum of 7 Principal Players on its team. "Principal Player" shall mean a player that (i) has participated in no less than 10 division one championship games played by such club in the season immediately prior to the Recopa Sudamericana or (ii) in the event that the division one group of such club has incurred important players changes, new players to such group will also be considered Principal Players if they are of international renown or they have participated in a minimum of 10 division one championship games in the country where they played during the season immediately prior to the Recopa Sudamericana. In the event that a club does not comply with this obligation, Owner shall, at the direction of Fox, fine such club up to the maximum amount allowable, currently 50% of what such club would have received for its participation in the tournament (the "Fine"). The Fine shall be deducted from the amount of Consideration that Fox shall pay to Owner under this Agreement.

1

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

(c) The players lists of the clubs shall not in good faith exceed more than 25 players.

(d) CONMEBOL is obligated to consult in good faith with Owner when setting the date, time and place of each Recopa Sudamericana to be played. Owner shall consult in good faith with Fox in connection with setting such date, time and place, and in Owner's consultation with COMEBOL Owner shall attempt to procure the proposals made by Fox.

(e) The Recopa Sudamericana and any further refinements to the format or organization of such tournaments will be governed by the regulations adopted by CONMEBOL.

(f) CONMEBOL is responsible for all payment obligations to the participating clubs, but to the extent CONMEBOL does not make such payments, Fox can cause Owner to exercise Owner's right to pay directly such unpaid participating clubs.

(g) Owner shall in good faith make all commercially reasonable efforts to ensure that CONMEBOL fulfils all of CONMEBOL's contractual obligations to Owner with respect to the Recopa Sudamericana.

(h) Owner will work with CONMEBOL so that Fox representatives can have free access to the stadiums where the Programs are to be played in order to fulfil the terms of this Agreement.

3.      **DELIVERY OF ANNUAL SUMMARY.**  For each year of the Term, Owner shall provide to Fox a summary for the Recopa Sudamericana to be played during such calendar year, and if available during the upcoming calendar year, (the "Annual Summary") within ten (10) days from the date CONMEBOL sets the final schedule, but no later than thirty (30) days prior to the scheduled start of the Recopa Sudamericana. The Annual Summary shall contain all material terms relating to the programs, including the tournament format and schedule and the teams participating. To the extent there are any subsequent changes to the terms described in the Annual Summary, Owner shall promptly notify Fox in writing of such changes. Notwithstanding the foregoing, Owner shall provide Fox with all details of the Programs (i.e. team match-ups, game time, etc.) within seventy-two (72) hours after the CONMEBOL has set such schedules.

4.      **THE TERRITORY.** The "Territory" shall mean worldwide. Notwithstanding Section 1 and the foregoing, during the Term, Owner shall retain only the none exclusive free-over-the-air television rights in America.

5.      **THE TERM.** Unless sooner terminated in accordance with the terms and conditions hereof, the Term shall commence on the date hereof and shall terminate sixty (60) days following the last match of the 2018 Recopa Sudamericana between the 2017 winner the of the Copa Liberadores de America and the 2017 winner of the Copa Sudamericana (the "Term"). Notwithstanding the foregoing, the license period shall terminate one (1) year following the delivery of the last match of the 2018 Recopa Sudamericana.

6.      **CONSIDERATION.** In consideration of the rights granted herein, all rights conferred hereunder, subject to the strict performance by Owner of this Agreement, in reliance on Owner's representations, warranties and covenants set forth herein, and upon programming and technical receipt of the Programs by Fox, Fox agrees to pay Owner for the Recopa Sudamericana (i) for each of the 2010-2011 for each of the calendar years of the Term an amount equal to Five Hundred Fifty Thousand U.S. Dollars (U$S 550,000); (ii) for each of the 2012-2015 for each of the calendar years of the Term an amount equal to Five Hundred Seventy Five Thousand U.S. Dollars (U$S 575,000); and (iii) for each of the 2016-2018 for each of the calendar years of the Term an amount equal to Six Hundred Thousand U.S. Dollars (U$S 600,000). This amount includes the cost of productions services (which shall

2

T&T00000024

be agreed upon between the parties) per year of the Term (which amount shall include any and all license fees and any an all production, delivery and technical costs, subject to Section 11- uplink costs and shall be net of any tax, retention or deduction costs) (the "Considerations"), and shall be paid to Owner in US Dollars only in the following instalments:

(a)   For each of the 2010-2011 calendar year(s):

    (i)   Two Hundred Seventy Five Thousand U.S. Dollars (U$S 275,000) 15 days prior to the commencement of each 2010-2011 edition(s), and

    (ii)  Two Hundred Seventy Thousand U.S. Dollars (U$S 275,000) 5 days following the end of each 2010-2011 edition(s).

(b)   For each of the 2012-2015 calendar year(s):

    (i)   Two Hundred Eighty Seven Thousand and Fifty U.S. Dollars (U$S 287,500) 15 days prior to the commencement of each 2012-2015 edition(s), and

    (ii)  Two Hundred Eighty Seven Thousand and Fifty U.S. Dollars (U$S 287,500) 5 days following the end of each 2012-2015 edition(s).

(c)   For each of the 2016-2018 calendar year(s):

    (i)   Three Hundred Thousand U.S. Dollars (U$S 300,000) 15 days prior to the commencement of each 2016-2018 edition(s), and

    (iii) Three Hundred Thousand U.S. Dollars (U$S 300,000) 5 days following the end of each 2016-2018 edition(s).

Further, the parties hereto agree to negotiate, in good faith, the distribution of any new taxes (directly related to this Agreement) which may arise throughout the Term of the Agreement (i.e. in the event that new taxes arise, the parties shall meet and mutually determine what allocation of taxes each party shall be liable for).

7.      **MATERIAL CHANGES.**  The parties acknowledge that CONMEBOL and/or Owner might in the future attempt to renegotiate or alter the Recopa Sudamericana. The parties hereby agree that to the extent CONMEBOL and Owner agree to Material Changes to the Recopa Sudamericana, Fox shall have the right to approve of such Material Changes prior to being obligated under this Agreement; *provided, however*, that the prior written approval of the Material Changes by Fox Pan American Sports LLC ("FPAS") shall be deemed the approval of Fox for as long as FPAS and Fox remain affiliates. "Material Changes" shall mean any change or effect that would be material and adverse to the value of this Agreement to Fox or to the business or the business prospects of Fox, and shall include material and adverse changes to the Recopa Sudamericana in the payment amounts, the payment scheduled and the qualification system for the participating teams.

To the extent the Recopa Sudamericana is played in Europe, jointly with the European Super Cup or any new similar Tournament played annually between the previous year's winner of the UEFA Champions' League and the previous year's winner of the UEFA Cup, the parties agree to negotiate in good faith the new terms and conditions of this Agreement.

8.      **NOTICE.**  Any notice, consent or other communication to a party required or contemplated hereby shall be in writing and shall be either hand-delivered or sent by registered or certified mail, return receipt requested, adequate postage prepaid, addressed to the party at its address set forth below. Either party shall have the right to change its address for notice purposes by giving notice to the other party in accordance with the provisions

3

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY     T&T00000025

hereof. Each notice shall be deemed effective on the date of personal delivery thereof or as of the seventh business day after mailing by registered or certified mail.

If to Owner: T&T Sports Marketing Ltd.
      200 Elgin Avenue, Fourth Floor,
      P.O. Box 1790 GT,
      Grand Cayman, Cayman Islands, B.W.I.
      Attn: Ignacio Martinelli

with a copy to: Torneos y Competencias S.A.
      Balcarce 510
      C1064AAL Buenos Aires
      Argentina
      Attn: Juan M. Ripoll

If to Fox:  Fox Sports Latin America Ltd.
      c/o Fox Pan American Sports LLC
      11575 Heron Bay Blvd., Ste 300
      Coral Springs, FL 33076
      Attn: James R. Ganley

with a copy to: Business and Legal Affairs Department

9. **USE OF LIKENESSES.**  Subject to current CONMEBOL restrictions (of which Owner has informed Fox), Owner grants to Fox, and its assignees and its licensees, the right in the Territory to use in Fox's telecast of the Programs, the names and logos of CONMEBOL and any players participating in the Programs; *provided however*, that Owner shall use its best efforts to obtain the participation of such players, and the names, photographs, likenesses, biographical information, acts, poses, voices and other sound effects, as well as recordings, transcriptions, films and other reproductions thereof, of all athletes, contestants, players, coaches, mascots, managers, and any other persons or entities connected with or appearing in the Programs in accordance with this Agreement, in any and all media for the purposes of promoting, advertising or publicizing the Programs and/or Fox, or otherwise (but not including any merchandising rights with regard thereto).

10. **PROMOTION.**  To the extent that Owner has such footage in its custody or control, Owner shall assist Fox in the promotion of the exhibition of the Programs, including without limitation, by furnishing Fox at its request with promotional materials (including still photographs of the participants in the Programs) and twenty minutes (00:20:00) of clean footage (on Beta SP, Beta SX or Digital Beta) at least thirty (30) days prior to the telecast of the Programs for the making of on-air promotional spots by Fox and also by furnishing Fox with any on-air promotional spots already made for the Territory. When providing spots that have already been made, Owner shall provide split track audio versions only. Further, at no additional cost to Fox, Owner shall provide Fox with access to the stadium (and any and all other locations where the Programs may take place): (a) for marketing purposes; and (b) and accommodations and accreditation for reporters, commentators, technical personal, etc.

11. **DELIVERY.**  Owner shall make the fully produced Programs available to Fox live via Intelsat (C-Band or Ku-Band) or any other satellite as Fox may designate in its sole discretion, in NTSC or PAL format, so long as the signal from such satellite can be accessible for downlink in the United States and Latin America (including Brazil). The parties hereto acknowledge and agree that Owner shall make its best efforts to provide Fox with a feed accessible for downlink in the United States in the event that Fox decides to take a second concurrent match/Program (in which case, Fox would pay Owner a pro-rata fee for such up-link costs). At Fox's request, Owner shall deliver the Programs F.O.B. Fox Sports Latin America Ltd., c/o Torneos y Competencias S.A., Balcarce 510, C1064AAL Buenos

4

Aires, Argentina or such other location as Fox shall specify from time to time on Betacam SP videotape in NTSC format at Owner's expense or in a digital video file. With each Program Owner shall deliver the format and available background information relating to the programming contained therein. Unless otherwise specified by Fox: (a) Owner shall include international soundtracks of each Program (with complete program mix with Spanish commentary on Audio Channel 1 and international sound on Audio Channel 2); (b) the Program shall contain either generic graphics (i.e., no network or channel logos, names, symbols, etc.) or no graphics, as directed by Fox; (c) the Programs shall not contain any commercial content (a title sponsor, ending credits, on-site signage and sponsored clock and billboards are acceptable, but electronic billboards, graphically or orally sponsored segments, on air mentions and product placements are not acceptable). Subject to current FIFA and CONMEBOL regulations, Owner acknowledges and agrees that Fox shall be permitted to insert virtual advertising into the Program(s). The Programs shall be of U.S. broadcast quality and shall be subject to Fox's approval in its sole discretion. The parties acknowledge and agree that time is of the essence regarding delivery of each Program, which shall be made on or before the delivery date specified in this Agreement.

12. **CHANGE OF CIRCUMSTANCES.** If Owner hereafter becomes aware that any of the rights granted to Fox under this Agreement are encumbered, diminished or impaired in any way, or if CONMEBOL hereafter adopts any new or amended rule/regulation or agreement or applies any existing CONMEBOL rule/regulation or agreement, and the result thereof, individually or in the aggregate, diminishes or impairs, or otherwise has any adverse effect on any rights granted to Fox hereunder or on the exercise or exploitation of such rights by Fox (including, without limitation, a reduction in number of games, loss of any Territory, or any loss or modification of exclusivity) (any, a "Changed Circumstance"), Owner shall give Fox written notice upon learning of such Changed Circumstance. In the event of any Changed Circumstance, in addition to any and all other rights and remedies available to Fox under this Agreement, at law, in equity or otherwise, Fox shall be entitled to an appropriate and equitable amendment to this Agreement and its obligations hereunder. During the period of sixty (60) days following notice (or following the date that Fox becomes aware) of any Changed Circumstance, Fox and Owner shall negotiate, in good faith, an appropriate amendment to this Agreement, and/or renegotiate the provisions hereof and/or the fees and Consideration payable hereunder, or otherwise modify or supplement this Agreement, to the extent appropriate to reflect the Changed Circumstance with the intent that Fox shall be entitled to the full benefit of its bargain and to be made whole.

In the event the parties hereto, after such good faith negotiations, are unable to agree on an appropriate amendment to reflect such Changed Circumstance, Fox shall have the right, in addition to any other rights and remedies available hereunder, at law, in equity or otherwise, to have the matter resolved by binding arbitration in the United States conducted in accordance with the Commercial Rules of the American Arbitration Association before a single arbitrator experienced in the sports media industry.

13. **ASSIGNABILITY.** Fox may not assign this Agreement, or all or any part of the Programs or Fox's other rights and obligations hereunder, to any person or entity, without the prior written consent of Owner. Owner may not assign this Agreement without the prior written consent of Fox. This Agreement shall inure to the benefit of the parties hereto and their respective successors, transferees and permitted assigns.

**[signatures begin on next page]**

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY        T&T00000027

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their duly authorized officers effective as of the day and year first above written.

**T&T SPORTS MARKETING LTD.**

By: _James R Ganley_ _____

Name: James R. Ganley
Title: Group A Representative

**FOX SPORTS LATIN AMERICA LTD.**

By: _James R Ganley_ _____

Name: James R. Ganley
Title:

By: _____

Name:  Juan M. Ripoll
Title: Group B Representative

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY                    T&T00000028

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers effective as of the day and year first above written.

**T&T SPORTS MARKETING LTD.**     **FOX SPORTS LATIN AMERICA LTD.**

By: _____

                                   By: _____

Name: James R. Ganley           Name: James R. Ganley
Title: Group A Representative     Title:

By: _____

Name: Juan M. Ripoll
Title: Group B Representative

7

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY     T&T00000029

**EXHIBIT A**
**Standard Terms and Conditions**

These Standard Terms and Conditions ("Standard Terms") are an integral part of, and are incorporated into, the Amended and Restated Program Purchase Agreement (the "Main Agreement") to which these Standard Terms are attached. These Standard Terms and the Main Agreement shall hereinafter be collectively referred to as the "Agreement." All terms used in these Standard Terms shall, unless expressly provided to the contrary herein, have the same respective meanings set forth in the Main Agreement. To the extent that any provision of these Standard Terms conflicts with any provision of the Main Agreement, the Main Agreement shall control.

1.    SALE OF PROGRAMS.   Owner hereby sells to Fox the unlimited, exclusive and irrevocable right to tape, produce, transmit, exhibit, retransmit and distribute the images and sound of all of the Programs by television or by any other method of capture, fixation and transmission of images and sound whether now existing or hereafter developed, and to otherwise use and exploit the Programs, and to sell all or part of the Programs, in and throughout the Territory on a live and/or delayed basis by any and all audio and visual transmission media, technologies or means, whether digital, analog or modified (including without limitation by film distribution, videocassette, video disc, Video Home, closed circuit television, in-flight distribution and display on airplanes, internet and other computer-based and on-line distribution, all types of broadcast, CD-ROM, pay per view, open and closed television, DHT, UHF, DES, DSS, satellite, free over-the-air television and any type of cable technology, whether CATV, MDS, MMDS, LMDS, DBS, STV, TVRO, SMATV, fiber optic or otherwise), and whether now existing or hereafter developed, in any and all languages. Without in any way limiting the generality of the foregoing, Fox shall have the right to: exploit, sell and otherwise generally deal with the Programs and the revenues therefrom and properties thereof as Fox may in its sole discretion deem advisable; make, cause to be made and authorize others to make foreign language versions of the Programs by insertion of sound tracks, dubbing or subtitling; announce on the Programs and elsewhere that the Programs are presented by Fox, use Fox tradenames and trademarks on the Programs and authorize others to use and attach their own tradenames and trademarks in connection therewith; issue and authorize publicly in any and all media in connection with the Programs, including the names, photographs, likenesses, biographical information, acts, poses, voices and other sound effects, as well as recordings, transcriptions, films and other reproductions thereof of the Program participants and their coaches, managers, teams and leagues, if any, and of all other persons rendering services in connection with the Programs; create and use excerpts and highlights from the Programs, as well as recordings, transcriptions, films and other reproductions thereof, for any other purpose as Fox deems appropriate; and make or authorize such editing, changes (including changes in the titles of the Programs), additions, insertions, cuts, interpolations and eliminations as may be required by any duly authorized governmental or regulatory authority or organization or as are deemed desirable by Fox or its assignees in their sole discretion in connection with the distribution of the Programs; and (g) exhibit up to 3 minutes   of   footage   from   the Program(s)/Event(s) via the internet or other broadband distribution for promotional purpose or otherwise.

2.    OWNER'S WARRANTIES.   Owner hereby represents and warrants to Fox that:

(a)    Authority of Owner: Owner has all requisite rights and authority to enter into and perform this Agreement and to sell to Fox all of the rights and interests herein granted and sold to Fox. Owner is duly organized under the laws of its jurisdiction of formation, has taken all necessary action to authorize the execution, delivery and performance of this Agreement and this Agreement does not and will not violate any provision of Owner's constituent or

7

governing documents or applicable law or regulation or any contract or other agreement to which Owner is a party or by which it is bound.

(b)  No  Encumbrances  Against  the Programs: There are, and will be, no claims, liens, encumbrances or third party rights of any nature in, on or to the Programs or any part thereof.

(c)  Trademark,  Copyright,  Slander Violations: The Programs, including the sound and music synchronized therewith, and the exercise by Fox or its assignees of any right herein granted to Fox, will not violate or infringe upon the trademark, tradename, copyright, patent, literary, dramatic, music, artistic, persona, private, civil or property right, right of privacy, or any other right of any person or entity or constitute a libel or slander of any person or entity, and the Programs will not contain any unlawful or censorable material. Owner shall be solely responsible for obtaining all licenses,   consents   and   permissions necessary for Fox's use of the Programs, including  the  performance  and  use hereunder of any music included in the Programs.

(d)  Exclusiveness of Rights: Owner has not sold, assigned, transferred, conveyed or hypothecated, and shall not sell, assign, transfer, convey or hypothecate, to any person or entity any right, title or interest in or to the Programs or any of the other rights sold to Fox under this Agreement.  Fox acknowledges and agrees that Owner reserves the right to authorize third parties to transmit the Programs for reception outside the Territory or for reception in those parts of the Territory where the designated rights are non-exclusive.  Fox further acknowledges that such transmission may be capable of reception within the Territory including those parts of the Territory where the designated rights granted hereunder are exclusive due to the inherent capability of satellites to beam down signals which are not confined to territorial boundaries ("Overspill").  Fox agrees that the occurrence of such Overspill shall not constitute a breach of this Agreement.  Owner shall not authorize the exhibition of any of the Programs outside of the Territory in a place or way that would

interfere with the exploitation of any of Fox's rights hereunder in the Territory or allow any other telecasting of any of the Programs into the Territory by any means.

(e)  Quiet and Peaceful Enjoyment: Fox shall quietly and peacefully enjoy and possess, during the entire Term, all of the rights herein sold and agreed to be sold by Owner to Fox.

3.  INDEMNIFICATION.  Owner shall indemnify, defend and hold harmless Fox (and  its  affiliates,  parent  companies, subsidiaries, partners, exhibitors, assignees, licensees, and their respective officers, directors and employees) from and against any liability, damage, cost or expense (including  reasonable  attorneys'  fees, judgments and settlement costs) resulting from or arising out of the exploitation, sale and distribution by Fox and its assignees of the Programs or any breach of any agreement, representation, grant or warranty of Owner under this Agreement.    The obligations of Owner under this Section 5 shall survive the expiration or termination of this Agreement. Fox shall give Owner notice of any action brought by a third party to which the foregoing indemnity applies and Owner may participate in the defense of same, at Owner's expense, through counsel of Owner's choosing that is acceptable to Fox; however, the final control and disposition of any such action (by settlement, compromise or otherwise) shall remain with Fox. Owner shall pay to Fox on demand any amounts for which Owner may be responsible under the foregoing indemnity or, if Fox so elects, Fox may offset any such amount from any sum otherwise due Owner from Fox.  Without limiting any of its other rights or remedies, upon the making or filing of any action, claim or demand that is subject hereto, Fox shall be entitled to withhold sums payable under this or any other agreement between the parties in an amount reasonably related to the potential indemnification liability of Owner, including costs and attorneys' fees.  Without limiting any of its rights or remedies, Fox shall have the right to assert any claim that Owner may have against CONMEBOL in connection with this Agreement, and shall provide Owner reasonable notice of such assertion.  In the event that Owner collects any damages as a

8

result of such action against CONMEBOL, Fox shall be entitled to collect from Owner, and Owner shall remit to Fox, such portion of the damages, together with all reasonable expenses and attorney's fees, that would compensate Fox for any losses or damages it suffered from the conduct of CONMEBOL forming the basis of such action.

4.     FOX'S     RIGHTS     AND OBLIGATIONS.

(a)    Fox's Authority: Fox shall have complete and exclusive authority to distribute, exhibit and exploit the Programs and the other rights herein granted in the Territory, and to sell such Programs and rights to others, in accordance with such methods, policies and terms as it may determine in its sole discretion. In the exercise of its rights hereunder Fox may enter into sale and license agreements with third parties and distribute the Programs to its affiliated networks with or without charge. Any such sale or license shall be valid and binding upon Owner, and Owner agrees to treat such purchaser or licensee as a purchaser of Programs under this Agreement.

(b)    Right of First Negotiation.   For the 60-day period beginning 90 days before the expiration of this Agreement (the "RFN Period"), Owner shall negotiate exclusively and in good faith with Fox with respect to the terms and conditions for the sale of rights to Programs that will be similar in all material respects to those sold to Fox in this Agreement, and shall use its best efforts to reach an agreement with Fox as soon as is practicable.

(c)    Right of First Refusal.  If Fox and Owner have not agreed with respect to the sale of such rights within the RFN Period, then Owner shall not, and shall not agree to, sell, license or otherwise convey such rights to any other Person without giving Fox the first opportunity, by notice to Fox, to enter into an agreement with Owner on terms and conditions at least as favorable to Fox as those offered to or by Owner to any such other Person. Fox will have 10 days from the date of receipt of notice from Owner of any such offer in which to accept the opportunity to negotiate an agreement with

Owner on those terms and conditions. If Fox accepts the opportunity, Owner and Fox will negotiate in good faith to finalize any agreement on those terms and conditions within 30 days.  The provisions of this paragraph shall apply to each offer for rights received by or made to Owner. Owner shall not accept, and Fox shall not be required to meet the provisions of, any such offer unless it has been reduced to writing, signed by the offeror and delivered to Fox with Owner's notice to Fox as provided above, together with Owner's written acknowledgment of its desire to accept same.  Fox's failure to accept shall not constitute a waiver of first refusal with respect to subsequent offers. The obligations of Owner under this paragraph (c) shall survive any expiration or termination of this Agreement.

5.    TERMINATION. In addition to other rights at law, in equity or pursuant to other provisions of this Agreement, (a) if the Recopa Sudamericana is not played for any reason, Fox may by notice to Owner terminate this Agreement immediately without any continuing obligations, and (b) either party may by notice to the other party terminate this Agreement: (i) immediately if such other party is in material breach of this Agreement, *provided however*, that if such breach is not a failure to deliver any Program when it is required to be delivered and is curable, then such party shall not exercise its termination or other rights unless it has, by notice to the other party, given such other party five days from the time such notice is given to fully cure such material breach to the non-breaching party's satisfaction; (ii) immediately if such other party has filed a petition in bankruptcy, is insolvent or has sought relief under any law related to its financial condition or its ability to meet its payment obligations; or (iii) if any involuntary petition in bankruptcy or insolvency has been filed against such other party, or any relief under any such law has been sought by any creditor of such other party, unless such involuntary petition is dismissed or such relief is denied within 60 days after it has been filed or sought. The parties shall cease to have any obligations under this Agreement from the date of any such termination, except for liabilities or obligations which arose prior to such termination.

9

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY          T&T00000032

## 6.   MISCELLANEOUS.

(a)   _Force Majeure_: Notwithstanding anything herein contained to the contrary, neither party shall be liable to the other in damages because of any failure to perform hereunder to the extent such failure is caused by any cause beyond its control, including but not limited to fire, earthquake, flood, epidemic, accident, explosion, casualty, labor controversy, riot, civil disturbance, act of a public enemy, embargo, war, act of God, any governmental ordinance or law, the issuance of any executive or judicial order, any failure or delay of any transportation agency, any failure or delay in respect to any electrical or sound equipment or apparatus, any failure, without such party's fault, to obtain material, transportation, power or any other essential thing required for its performance of this Agreement or any similar cause (an "_Event of Force Majeure_"). Any and all payment obligations of Fox and its assigns (including requirements of barter) shall be suspended during the continuance of an Event of Force Majeure affecting Owner's performance. If an Event of Force Majeure affecting Owner continues for 30 or more consecutive days or 90 days in the aggregate, Fox shall have the right to terminate this Agreement in its sole discretion upon notice to Owner.

(b)   _Communications Act Disclosure_. In accordance with Section 507 of the Federal Communications Act, Owner agrees to disclose to Fox any information of which it has or acquires knowledge, or which has been or is disclosed to it, as to any money, service or other valuable consideration which any Person has paid or accepted, or agreed to pay or accept, for the inclusion of any program matter in any Program material to be furnished to Fox hereunder. The term "service or other valuable consideration" as used herein will not include any service or property furnished without charge or at a nominal charge for use on, or in connection with, a Program, unless it is furnished in consideration for an identification of any person, product, service, trademark or brand name beyond an identification that is reasonably related to the use of such service or property in such Program. The inclusion of an appropriate announcement in a Program will constitute the disclosure required by this Section 6(b).

(c)   _No Partnership; No Third Party Beneficiaries_:   Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto or constitute either party the agent of the other. Neither party shall hold itself out as having authority contrary to the terms of this paragraph, and neither party shall be or become liable by any representation, act or omission of the other contrary to the provisions hereof. This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any such party whether referred to herein or not.

(d)   _No Continuing Waiver_: No waiver by either party of any breach hereof shall be deemed a waiver of any preceding, continuing or succeeding breach of the same or any other provision hereof. Any waiver must be in writing and executed by the party whose rights are waived.

(e)   _Governing Law; Jurisdiction_: This Agreement and all matters collateral hereto shall be governed by the laws of the State of New York, U.S.A. applicable to contracts made and fully performed therein, without giving effect to principles of conflict of laws. Any legal proceeding relating to this Agreement shall be instituted and prosecuted solely in, and each party hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York or the Supreme Court of the State of New York, County of New York, and any appellate court from any thereof, unless such an action or proceeding is required to be brought in another court to obtain subject matter jurisdiction over the matter in controversy. Owner and Fox hereby irrevocably designate, constitute and appoint the Secretary of State of New York as their agent in the State of New York upon whom all summons, notices, pleadings, and processes in any action or proceedings against Owner or Fox may be served, with copies thereof to Owner or Fox at the address in the preamble hereof. Each of the parties hereby irrevocably waives any objection that it may have now or hereafter to the laying of the venue of any such action or

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY                T&T00000033

proceeding in the manner provided in this subparagraph.

(f)  Entire Agreement: This Agreement supersedes and cancels all prior negotiations and understandings between the parties and contains all of the terms agreed to by the parties with respect to the subject matter hereof. No amendment shall be valid unless in writing and executed by both parties. No officer, employee or representative of Fox has any authority to make any representation or promise not contained in this Agreement, and Owner has not executed this Agreement in reliance on any such representation or promise.

(g)  Limitation of Liability: In no event shall Fox be liable to Owner for any lost profits or special or consequential damages of any type, whether foreseeable or unforeseeable.

(h)  Currency Restrictions: If approval or clearance of any exchange control authorities or any other currency or fiscal agencies in the Territory is required for payments to be made by Fox and such approval is not granted within a reasonable period of time, then Fox's failure to make payment shall not be considered a breach of the Agreement.

(i)  Construction: The terms and provisions of this Agreement represent the results of negotiations between the parties, each of which has been represented by counsel of its own choosing, and none of which have acted under duress or compulsion, whether legal, economic or otherwise. Consequently, the terms and provisions of this Agreement shall be interpreted and construed in accordance with their usual and customary meanings, and the parties hereby waive the application of any rule of law to the effect that ambiguous or conflicting terms or provisions contained in the executed draft of this Agreement shall be interpreted or construed against the party whose attorney prepared the executed draft or any earlier draft of this Agreement.

(j)  Confidentiality: Each of the parties hereto will regard and preserve as confidential all information related to (i) this Agreement, and (ii) the business of the other party as such information may be obtained by either party from any source as a result of this Agreement (collectively, "Confidential Information"). Notwithstanding the foregoing, no party hereto shall have an obligation of confidentiality with respect to information which: is already known to such party at the time; is obtained from a third party without breach of this Agreement; is in the public domain; is independently developed by such party; is disclosed to a party's shareholders, indirect owners or possible investors and their advisors, or is subject to compelled disclosure (provided that the disclosing party shall notify the other party or parties of any such requirement prior to disclosure in order to prevent or limit disclosure).

(k)  Hardship: If, after this Agreement is entered into, any rule, law or judicial or administrative order in effect in the Territory or the USA imposes limitations or restrictions relating to distribution of the Programs which, in Fox's reasonable opinion, makes it illegal, inherently unprofitable or otherwise undesirable to continue its performance under this Agreement, Fox may terminate this Agreement upon 30 days' notice to Owner specifying such order, rule, law or decision and the effect of such termination shall be as provided in Section 8 above.

(l)  Censorship: If Fox cannot telecast a Program by reason of the action of a censorship authority and a Program cannot reasonably be edited to comply with censorship requirements, Fox shall so notify Owner and provide Owner with appropriate documents evidencing such action, whereupon Owner shall, at Fox's request, either: deliver other reasonably equivalent programming which has been mutually agreed upon by Fox and Owner or refund to Fox the purchase price for that Program in accordance with the termination provisions of Section 8 above.

11

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY



**EXHIBIT**

**50**

**7-6-17**

# FILE COPY

**COPA LIBERTADORES**

**PROGRAM PURCHASE AGREEMENT**

**(2011 – 2018)**

THIS PROGRAM PURCHASE AGREEMENT (this "Agreement") is effective as of January 1, 2011and between T&T SPORTS MARKETING LTD., located at Cayman National Building, 200 Elgin Avenue, 4th Floor, P.O. Box 1790 GT, Grand Cayman, Cayman Islands, B.W.I. ("Owner"), and FOX SPORTS LATIN AMERICA LTD., whose registered office is at the offices of Maples & Calder, Attorneys-at-law, P.O. Box 309, Grand Cayman, Islands, B.W.I. ("Fox"), each a "Party" and together the "Parties".

I.  The PROGRAMS. (a) Owner represents, warrants and covenants that it is the sole and exclusive owner of any and all right, title and interest in and to any and all games of the 2011, 2012, 2013, 2014, 2015, 2016, 2017 and 2018 "Copa Libertadores de America", (the "Program("s")), within the Territory during the Term (as defined below) and is duly authorized to grant and sell to Fox all of the rights set forth herein on the terms and conditions contained in this Agreement and in the Standard Terms and Conditions which are attached hereto as Exhibit A and by this reference are expressly incorporated herein.

(b)  Subject always to the restrictions, limitations and obligations set out in this Agreement and applicable laws of the Territory from time to time in force, Owner hereby grants and sells to Fox (i) the unlimited, exclusive and irrevocable right to record, produce, transmit, exhibit, retransmit and distribute the images and sound of all of the Programs by television, by any other transmission media of images and sound whether now existing or hereafter developed, and by audiocast, Internet and mobile phones, and to otherwise use the Programs, in whole or in part, with unlimited replay and highlight rights on a live and/or delayed basis, in any and all languages, throughout the Territory (as defined below) with respect to "Copa Libertadores de America". In accordance with the provisions set forth herein; (ii) the limited and non-exclusive right to transmit the audio feed all of the Programs by radio (for intelligible reception in the Territory by means of conventional home and personal radio receivers only) and by audiocast (the audio content broadcast over Internet). Owner shall provide all production services for the Programs.

(c)  Fox acknowledges, agrees and undertakes to Owner that:

(i)  Confederación Sudamericana de Fútbol -CONMEBOL ("CONMEBOL") shall be entitled to transmit in simulcast, in the Territory, and by means of CONMEBOL's institutional website only (www.conmebol.com), the Programs in its entirety on live basis and the Programs and highlights of the Programs on a delay basis.

(ii)  With respect to the territory of Brazil:

(1)  Fox shall not (x) exploit the Programs by means of Internet and mobile rights in its entirety on a live basis; and (xx) exploit the Programs in any domestic public transportation system, including buses, subway, aircraft; and

(2)  If any Brazilian team wins any of the edition of the "Copa Libertadores de America" during the Term, the right to exploit images and sound of the Programs of such edition by means of videocassette, video disc, CD-ROM, VHS, pen-drive, Blue-Ray or any other format of media exchange is retained by Owner and shall be exploited by Owner or any third party selected by Owner.

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY



2.    <u>THE MINIMUM NUMBER OF PROGRAMS</u>. Owner represents, warrants and covenants to Fox that, in each year of the Term, there will be no fewer than 98 matches/Programs, to be played between the member clubs of CONMEBOL (or any tournaments thereof, created by or associated with CONMEBOL)

3.    <u>THE TERRITORY</u>. The territory in which Fox shall have such the exclusive rights shall consist of the United States of America, Canada, Mexico, Central and South America (including Brazil), and the Caribbean (including all territories, possessions, commonwealths and trusteeships of the countries contained therein) (the "Territory"). Notwithstanding Section 1 and the foregoing, during the Term, Owner shall have the following limited rights within the Territory or portions thereof as described herein and as further described on <u>Annex A</u> attached hereto.

4.    <u>THE TERM</u>. Unless sooner terminated in accordance with the terms and conditions hereof, the Term shall commence on the date hereof and shall terminate sixty (60) days following the last match of the 2018 "Copa Libertadores de America" (the "Term"). Notwithstanding the foregoing, the license period shall terminate one (1) year following the delivery of the last match of the 2018 "Copa Libertadores de America".

5.    <u>CONSIDERATION</u>. In consideration of the rights granted herein, all rights conferred hereunder, subject to the strict performance by Owner of this Agreement, in reliance on Owner's representations, warranties and covenants set forth herein, and upon programming and technical receipt of the Programs by Fox, Fox agrees to pay Owner (i) for each of the 2011-2014 calendar year(s) of the Term Thirty Three Million Four Hundred Thousand U.S. Dollars (US$ 33,400,000); and (ii) for each of the 2015-2018 calendar year(s) of the Term Thirty Eight Million Four Hundred Ten Thousand U.S. Dollars (US$ 38,410,000). Such amounts shall include any and all license fees and any and all production, delivery and technical costs, subject to Section 9 uplink costs and shall be net of any tax, retention or deduction costs (the "Fee"), and such Fee shall be paid to Owner in U.S. Dollars only in the following installments (a payment shall be deemed made when the wire transfer is initiated);

(a)    For each of the 2011-2014 calendar year(s):

    (i)    US$ 9,000,000 on January 10 of the applicable year;

    (ii)    US$ 7,000,000 on February 10 of the applicable year;

    (iii)    US$ 7,000,000 on March 10 of the applicable year;

    (iv)    US$ 5,000,000 on April 10 of the applicable year; and

    (v)    US$ 5,400,000 on May 10 of the applicable year.

(b)    For each of the 2015-2018 calendar year(s):

    (i)    US$ 10,350,000 on January 10 of the applicable year;

    (ii)    US$ 8,050,000 on February 10 of the applicable year;

    (iii)    US$ 8,050,000 on March 10 of the applicable year;

    (iv)    US$ 5,750,000 on April 10 of the applicable year; and

    (v)    US$ 6,210,000 on May 10 of the applicable year.

Fox shall make payments on the later of (a) the due date or (b) within 60 days of Fox's receipt of invoice. Further, the Parties hereto agree to negotiate, in good faith, the distribution of any new taxes (directly related to this Agreement) which may arise throughout

the Term of the Agreement (i.e. in the event that new taxes arise, the Parties shall meet and mutually determine what allocation of taxes for which each party shall be liable for).

6. **NOTICE.** Any notice, consent or other communication to a party required or contemplated hereby shall be in writing and shall be either hand-delivered or sent by registered or certified mail, return receipt requested, adequate postage prepaid, addressed to the party at its address set forth below. Either party shall have the right to change its address for notice purposes by giving notice to the other party in accordance with the provisions hereof. Each notice shall be deemed effective on the date of personal delivery thereof or as of the seventh business day after mailing by registered or certified mail.

If to Owner:   T&T Sports Marketing Ltd.
200 Elgin Avenue, Fourth Floor,
P.O. Box 1790 GT,
Grand Cayman,
Cayman Islands,
B.W.I.
Attn: Ignacio Martinelli

with a copy to: Torneos y Competencias S.A.
Balcarce 510
C1064AAL Buenos Aires
Argentina
Attn: Juan M. Ripoll

If to Fox:   Fox Sports Latin America Ltd.
11575 Heron Bay Blvd., Ste 300
Coral Springs, FL 33076
Attn: James R. Ganley

with a copy to: Business & Legal Affairs Department

7. **USE OF LIKENESSES.** Subject to current CONMEBOL restrictions (which Owner has informed Fox of), Owner grants to Fox, and its assignees and licensees, the right in the Territory to use in Fox's telecast of the Programs, the names and logos of CONMEBOL and any players participating in the Programs; *provided however,* that Owner shall use its best efforts to obtain the participation of such players, and the names, photographs, likenesses, biographical information, acts, poses, voices and other sound effects, as well as recordings, transcriptions, films and other reproductions thereof, of all athletes, contestants, players, coaches, mascots, managers, and any other persons or entities connected with or appearing in the Programs in accordance with this Agreement, in any and all media for the purposes of promoting, advertising or publicizing the Programs and/or Fox, or otherwise (but not including any merchandising rights with regard thereto).



rule of 3
3 players

8. **PROMOTION.** To the extent that Owner has such footage in its custody or control, Owner shall assist Fox in the promotion of the exhibition of the Programs, including without limitation, by furnishing Fox at its request with promotional materials (including still photographs of the participants in the Programs) and twenty minutes (00:20:00) of clean footage (on Beta SP, Beta SX or Digital Beta) at least thirty (30) days prior to the telecast of the Programs for the making of on-air promotional spots by Fox and also by furnishing Fox with any on-air promotional spots already made for the Territory. When providing spots that have already been made, Owner shall provide split track audio versions only. Further, at no additional cost to Fox, Owner shall ensure Fox free and full access to (a) the stadium, ground or place at which each game is to be played or staged and all other reasonable areas in and around the stadium grounds or places and (b) ancillary broadcast facilities and services (including, but not limited to, studios, commentary positions, observer seats, space for

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY    T&T00000037

broadcast vehicles, space for operation of cameras, microphones, space for other equipment necessary for broadcasting transmissions, and supplying electricity for the operation of such equipment and adequate stadium lighting) and access for marketing purposes.

9.    **DELIVERY.**  Owner shall make the fully produced Programs available to Fox live via Intelsat (C-Band or Ku-Band) or any other satellite as Fox may designate in its sole discretion, in NTSC or PAL format, so long as the signal from such satellite can be accessible for downlink in the United States and Latin America (including Brazil). The parties hereto acknowledge and agree that Owner shall make its best efforts to provide Fox with a feed accessible for downlink in the United States in the event that Fox decides to take a second concurrent match/Program (in which case, Fox would pay Owner a pro-rata fee for such up-link costs).  At Fox's request, Owner shall deliver the Programs to Torneos y Competencias S.A., Balcarce 510, C1064AAL Buenos Aires, Argentina or such other location as Fox shall specify from time to time on Betacam SP videotape in NTSC format at Owner's expense or in a digital video file. With each Program Owner shall deliver the format and available background information relating to the programming contained therein.  Unless otherwise specified by Fox: (a) Owner shall include international soundtracks of each Program (with complete program mix with Spanish commentary on Audio Channel 1 and international sound on Audio Channel 2); (b) the Program shall contain either generic graphics (i.e., no network or channel logos, names, symbols, etc.) or no graphics, as directed by Fox; (c) the Programs shall not contain any commercial content (a title sponsor, ending credits, on-site signage and sponsored clock and billboards are acceptable, but electronic billboards, graphically or orally sponsored segments, on air mentions and product placements are not acceptable).   Subject to current FIFA and CONMEBOL regulations, Owner acknowledges and agrees that Fox shall be permitted to insert virtual advertising into the Program(s).   The Programs shall be of U.S. broadcast quality and shall be subject to Fox's approval in its sole discretion.  The parties acknowledge and agree that time is of the essence regarding delivery of each Program, which shall be made on or before the delivery date specified in this Agreement.

10.    **PROGRAM SCHEDULE.**  Owner shall make its best efforts to provide Fox with a schedule for the 2011 season as soon as possible, but in no event less than thirty (30) days prior to the commencement of the 2011 season, and for the subsequent seasons within ten (10) days from the date it sets the final schedule, but not later than thirty (30) days prior to the scheduled start of each such season. Notwithstanding the foregoing, Owner shall provide Fox with all details of the matches/Programs (i.e. team match-ups, games time, etc.) within seventy-two (72) hours after the CONMEBOL has set such schedules.

11.    **CHANGE OF CIRCUMSTANCES.**  If Owner hereafter becomes aware that any of the rights granted to Fox under this Agreement are encumbered, diminished or impaired in any way, or if CONMEBOL (together with any other league, association or entity, "CONMEBOL") hereafter adopts any new or amended rule/regulation or agreement or applies any existing CONMEBOL rule/regulation or agreement, and the result thereof, individually or in the aggregate, diminishes or impairs, or otherwise has any adverse effect on any rights granted to Fox hereunder or on the exercise or exploitation of such rights by Fox (including, without limitation, a reduction in number of games, loss of any Territory, or any loss or modification of exclusivity) (any, a "Changed Circumstance"), Owner shall give Fox written notice upon learning of such Changed Circumstance.  In the event of any Changed Circumstance, in addition to any and all other rights and remedies available to Fox under this Agreement, at law, in equity or otherwise, Fox shall be entitled to an appropriate and equitable amendment to this Agreement and its obligations hereunder.  During the period of sixty (60) days following notice (or following the date that Fox becomes aware) of any Changed Circumstance, Fox and Owner shall negotiate, in good faith, an appropriate amendment to this Agreement, or renegotiate the provisions hereof and/or the fees and the Fee payable hereunder, or otherwise modify or supplement this Agreement, to the extent

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

appropriate to reflect the Changed Circumstance with the intent that Fox shall be entitled to the full benefit of its bargain and to be made whole.

In the event the parties hereto, after such good faith negotiations, are unable to agree on an appropriate amendment to reflect such Changed Circumstance, Fox shall have the right, in addition to any other rights and remedies available hereunder, at law, in equity or otherwise, to have the matter resolved by binding arbitration in the United States conducted in accordance with the Commercial Rules of the American Arbitration Association before a single arbitrator experienced in the sports media industry.

Notwithstanding the above, if as a consequence of any macroeconomic change in the Territory, during the years 2011, 2012, 2013, 2014, 2015, 2016, 2017 and 2018, CONMEBOL and Owner renegotiate the economic conditions or amend any provision of the agreement entered into by and between Owner and CONMEBOL in relation to "Copa Libertadores de America", Owner and Fox shall negotiate, in good faith, an appropriate amendment to this Agreement, or renegotiate the provisions hereof and/or the Fees and consideration payable hereunder, or otherwise modify or supplement this Agreement, to the extent appropriate to reflect the changed economic conditions of the Agreement entered into by and between Owner and CONMEBOL in relation to the "Copa Libertadores de America".

12.   **ASSIGNABILITY.** Fox may not assign this Agreement, or all or any part of the Programs or Fox's other rights and obligations hereunder, to any person or entity, without the prior written consent of Owner. Owner may not assign this Agreement without the prior written consent of Fox. This Agreement shall inure to the benefit of the parties hereto and their respective successors, transferees and permitted assigns.

[signatures begin on next page]

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

T&T00000039

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers effective as of the day and year first above written.

T&T SPORTS MARKETING LTD.

By: _____

Name: James R. Ganley
Title: Group A Representative

By: _____

Name:  Juan Miguel Ripoll
Title:  Group B Representative

FOX SPORTS LATIN AMERICA LTD.

By: _____

James R. Ganley
Chief Operating Officer

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers effective as of the day and year first above written.

T&T SPORTS MARKETING LTD.

By: _____

Name: James R. Ganley
Title: Group A Representative

FOX SPORTS LATIN AMERICA LTD.

By: _____

James R. Ganley
Chief Operating Officer

By: _____

Name:  Juan Miguel Ripoll
Title:  Group B Representative

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

T&T00000041

## ANNEX A

1.      Owner shall retain only the exclusive free-over-the-air television rights, solely to exhibit the following:

(i)      One (1) live regular season game per week in the territory of Capital Federal and Greater Buenos Aires area;

(ii)     Two (2) live regular season games per week in the territory of Brazil;

(iii)    Final games in the territory of Colombia; and

(iv)     For any team competing in the post-season (i.e. finals) (each a "Post-Season Game") of the Copa Libertadores, Owner shall retain only the live exclusive, free-over-the-air television rights solely to exhibit such Post-Season Game in the country of such team.

Notwithstanding Section 1(iv) above, Fox shall have the right of first refusal ("ROFR") with respect to any Post-Season Game in the territories of Bolivia, Chile, Ecuador, Paraguay, Peru, Venezuela and Uruguay ("ROFR Territories") for free-over-the-air television except to the extent Owner is required to grant such right to any third party pursuant to fulfil an order or request of any Governmental Authority whether formal or informal and whether or not binding, to which the Owner reasonably deems to be necessary or advisable to comply. "Governmental Authority" means any government or any agency, bureau, board, commission, court, department, official, political subdivision or other instrumentality of any government, whether federal, state or local, domestic or foreign, or any quasi-governmental or private body exercising any regulatory or other governmental or quasi-governmental authority whether or not has jurisdiction over the matter in question. The ROFR is granted to Fox in order to assure the exclusivity of Fox transmissions by pay television, thus if Fox exercises its ROFR, it shall not be allow to commercialize or exhibit such right in the ROFR Territories by free-over-the-air television.

Owner shall not sell, license, or otherwise convey rights to a Post-Season Game in the ROFR Territories to any other person without first giving Fox the first opportunity, by notice to Fox, to enter into an agreement with Owner on terms and conditions at least as favourable to Fox as those offered to or by Owner to any such other person. Fox will have three (3) days from the date of receipt of notice from Owner of any such offer in which to accept the opportunity to purchase or otherwise receive rights to such Post-Season Game. The provisions of this paragraph shall apply to each offer for rights received by or made by Owner with respect to any Post-Season Game in the ROFR Territories. Owner will not accept, and Fox will not be required to meet the provisions of any such offer unless it is (1) a bona fide firm offer or agreement and (2) for a cash price of valuable consideration and such offer is delivered to Fox with Owner's written acknowledgement of its desire to accept the same and the offeror's written acknowledgement to have been informed of the Fox's ROFR right under this Agreement Fox's failure to accept will not constitute a waiver of first refusal with respect to subsequent offers.

This subsection (iv) shall be subject to the Section 4 of this Annex A.

In addition Fox shall not have right to exploit, resell, license, or otherwise convey any Program to free-over-the-air television rights in the territory of Brazil and Colombia.

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

Owner shall make best effort to provide Fox with the best matches/Programs from each respective round of the "Copa Libertadores de America".

2.      The Parties hereto acknowledge and agree that:

    (a)      Owner's live rights as stated in Section 3 of the Agreement shall be exclusive against all media solely with respect the territory restrictions provided in each Section (i)-(iii) above respectively. As an example, and for the purpose of clarification, the territory restrictions in Section (i) with respect to the matches/Programs referred therein shall solely apply to the territory of Capital Federal and Greater Buenos Aires area; and

    (b)      Fox shall be permitted to exhibit the matches/Programs referred in Section 3 of the Agreement, on a delayed basis, in the applicable territory except for the territory of Brazil where Fox shall not be entitled to exhibit such specific match at all (as set forth in paragraphs (i) (ii) and (iii) above), commencing on the later of: (x) one (1) hour after the completion of the respective match/Program; or (xx) at 12:00 (Buenos Aires time) midnight the day after the respective match takes place (i.e. if a match/Program ends Monday at 4pm (Buenos Aires time), Fox shall be entitled to exhibit that respective match/Program on Tuesday at 12:00 am Buenos Aires time).

3.      Fox acknowledges and agrees that for any team competing in the post-season (i.e. semi-finals and/or finals) of the "Copa Libertadores de America", Owner shall retain only the live exclusive, free-over-the-air television rights, solely to exhibit the semi-finals and the finals of the Program(s) in the country of such team.

4.      The Parties hereto acknowledge and agree that rights granted under this Agreement shall not include the right to exhibit live and by means of free-over-the-air television the games of the "Copa Libertadores de America" in those cities where the applicable game is being played (the "Host City"), other than in the territories of Argentina, Brazil, Colombia and Mexico. Notwithstanding the foregoing, if at any time during the Term of this Agreement, Owner is allowed by CONMEBOL to exhibit live and by means of free-over-the-air television the games of the "Copa Libertadores de America" in the Host City, this restriction shall not apply to Fox. For this purpose Owner shall promptly notify Fox of such right to exhibit such games in the Host City.

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY              T&T00000043

EXHIBIT A
## Standard Terms and Conditions

These Standard Terms and Conditions ("Standard Terms") are an integral part of, and are incorporated into, the Program Purchase Agreement (the "Main Agreement") to which these Standard Terms are attached. These Standard Terms and the Main Agreement shall hereinafter be collectively referred to as the "Agreement." All terms used in these Standard Terms shall, unless expressly provided to the contrary herein, have the same respective meanings set forth in the Main Agreement. To the extent that any provision of these Standard Terms conflicts with any provision of the Main Agreement, the Main Agreement shall control.

1. SALE OF PROGRAMS. Owner hereby sells to Fox the unlimited, exclusive and irrevocable right to tape, produce, transmit, exhibit, retransmit and distribute the images and sound of all of the Programs by television or by any other method of capture, fixation and transmission of images and sound whether now existing or hereafter developed, and to otherwise use and exploit the Programs, and to sell all or part of the Programs, in and throughout the Territory on a live and/or delayed basis by any and all audio and visual transmission media, technologies or means, whether digital, analog or modified (including without limitation by film distribution, videocassette, video disc, Video Home, closed circuit television, in-flight distribution and display on airplanes, internet and other computer-based and on-line distribution, all types of broadcast, CD-ROM, pay per view, open and closed television, DHT, UHF, DES, DSS, satellite, free over-the-air television and any type of cable technology, whether CATV, MDS, MMDS, LMDS, DBS, STV, TVRO, SMATV, fiber optic or otherwise), and whether now existing or hereafter developed, in any and all languages. Without in any way limiting the generality of the foregoing, Fox shall have the right to: exploit, sell and otherwise generally deal with the Programs and the revenues therefrom and properties thereof as Fox may in its sole discretion deem advisable; make, cause to be made and authorize others to make foreign language versions of the Programs by insertion of sound tracks, dubbing or subtitling; announce on the Programs and elsewhere that the Programs are presented by Fox, use Fox tradenames and trademarks on the Programs and authorize others to use and attach their own tradenames and trademarks in connection therewith; issue and authorize publicity in any and all media in connection with the Programs, including the names, photographs, likenesses, biographical information, acts, poses, voices and other sound effects, as well as recordings, transcriptions, films and other reproductions thereof of the Program participants and their coaches, managers, teams and leagues, if any, and of all other persons rendering services in connection with the Programs; create and use excerpts and highlights from the Programs, as well as recordings, transcriptions, films and other reproductions thereof, for any other purpose as Fox deems appropriate; and make or authorize such editing, changes (including changes in the titles of the Programs), additions, insertions, cuts, interpolations and eliminations as may be required by any duly authorized governmental or regulatory authority or organization or as are deemed desirable by Fox or its assignees in their sole discretion in connection with the distribution of the Programs; and (g) exhibit up to 3 minutes of footage from the Program(s)/Event(s) via the internet or other broadband distribution for promotional purpose or otherwise.

2. OWNER'S WARRANTIES. Owner hereby represents and warrants to Fox that:

(a) Authority of Owner: Owner has all requisite rights and authority to enter into and perform this Agreement and to sell to Fox all of the rights and interests herein granted and sold to Fox. Owner is duly organized under the laws of its jurisdiction of formation, has taken all necessary action to authorize the execution, delivery and performance of this Agreement and this Agreement does not and will not violate any provision of Owner's constituent or

9

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

governing documents or applicable law or regulation or any contract or other agreement to which Owner is a party or by which it is bound.

(b)   No Encumbrances Against the Programs: There are, and will be, no claims, liens, encumbrances or third party rights of any nature in, on or to the Programs or any part thereof.

(c)   Trademark, Copyright, Slander Violations: The Programs and the exercise by Fox or its assignees of any right herein granted to Fox, will not violate or infringe upon the trademark, tradename, copyright, patent, literary, dramatic, music, artistic, persona, private, civil or property right, right of privacy, or any other right of any person or entity or constitute a libel or slander of any person or entity, and the Programs will not contain any unlawful or censorable material. Owner shall be solely responsible for obtaining all licenses, consents and permissions necessary for Fox's use of the Programs, including the performance and use hereunder of any music included in the Programs.

(d)   Exclusiveness of Rights: Owner has not sold, assigned, transferred, conveyed or hypothecated, and shall not sell, assign, transfer, convey or hypothecate, to any person or entity any right, title or interest in or to the Programs or any of the other rights sold to Fox under this Agreement. Fox acknowledges and agrees that Owner reserves the right to authorize third parties to transmit the Programs for reception outside the Territory or for reception in those parts of the Territory where the designated rights are non-exclusive.   Fox further acknowledges that such transmission may be capable of reception within the Territory including those parts of the Territory where the designated rights granted hereunder are exclusive due to the inherent capability of satellites to beam down signals which are not confined to territorial boundaries ("Overspill").   Fox agrees that the occurrence of such Overspill shall not constitute a breach of this Agreement.   Owner shall not authorize the exhibition of any of the Programs outside of the Territory in a place or way that would interfere with the exploitation of any of Fox's rights hereunder in the Territory or allow any

other telecasting of any of the Programs into the Territory by any means.

(e)   Quiet and Peaceful Enjoyment: Fox shall quietly and peacefully enjoy and possess, during the entire Term, all of the rights herein sold and agreed to be sold by Owner to Fox.

3.   INDEMNIFICATION.   Owner shall indemnify, defend and hold harmless Fox (and its affiliates, parent companies, subsidiaries, partners, exhibitors, assignees, licensees, and their respective officers, directors and employees) from and against any liability, damage, cost or expense (including reasonable attorneys' fees, judgments and settlement costs) resulting from or arising out of the exploitation, sale and distribution by Fox and its assignees of the Programs or any breach of any agreement, representation, grant or warranty of Owner under this Agreement.   The obligations of Owner under this Section 3 shall survive the expiration or termination of this Agreement. Fox shall give Owner notice of any action brought by a third party to which the foregoing indemnity applies and Owner may participate in the defense of same, at Owner's expense, through counsel of Owner's choosing that is acceptable to Fox; however, the final control and disposition of any such action (by settlement, compromise or otherwise) shall remain with Fox.   Owner shall pay to Fox on demand any amounts for which Owner may be responsible under the foregoing indemnity or, if Fox so elects, Fox may offset any such amount from any sum otherwise due Owner from Fox.   Without limiting any of its other rights or remedies, upon the making or filing of any action, claim or demand that is subject hereto, Fox shall be entitled to withhold sums payable under this or any other agreement between the parties in an amount reasonably related to the potential indemnification liability of Owner, including costs and attorneys' fees. Without limiting any of its rights or remedies, Fox shall have the right to assert any claim that Owner may have against CONMEBOL in connection with this Agreement, and shall provide Owner reasonable notice of such assertion.   In the event that Owner collects any damages as a result of such action against CONMEBOL, Fox shall be entitled to collect from Owner,

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

and Owner shall remit to Fox, such portion of the damages, together with all reasonable expenses and attorney's fees, that would compensate Fox for any losses or damages it suffered from the conduct of CONMEBOL forming the basis of such action.

**4.     FOX'S        RIGHTS        AND OBLIGATIONS.**

(a)     Fox's Authority: Fox shall have complete and exclusive authority to produce distribute, exhibit and exploit the Programs and the other rights herein granted in the Territory, and to sell such Programs and rights to others, in accordance with such methods, policies and terms as it may determine in its sole discretion.   In the exercise of its rights hereunder Fox may enter into sale and license agreements with third parties and distribute the Programs to its affiliated networks with or without charge. Any such sale or license shall be valid and binding upon Owner, and Owner agrees to treat such purchaser or licensee as a purchaser   of   Programs   under   this Agreement.

(b)     Right of First Negotiation.   For the 60-day period beginning 90 days before the expiration of this Agreement (the "RFN Period"), Owner shall negotiate exclusively and in good faith with Fox with respect to the terms and conditions for the sale of rights to Programs that will be similar in all material respects to those sold to Fox in this Agreement, and shall use its best efforts to reach an agreement with Fox as soon as is practicable.

(c)     Right of First Refusal.   If Fox and Owner have not agreed with respect to the sale of such rights within the RFN Period, then Owner shall not, and shall not agree to, sell, license or otherwise convey such rights to any other Person without giving Fox the first opportunity, by notice to Fox, to enter into an agreement with Owner on terms and conditions at least as favorable to Fox as those offered to or by Owner to any such other Person.   Fox will have 10 days from the date of receipt of notice from Owner of any such offer in which to accept the opportunity to negotiate an agreement with Owner on those terms and conditions.   If Fox accepts the opportunity, Owner and Fox will

negotiate in good faith to finalize any agreement on those terms and conditions within 30 days.     The provisions of this paragraph shall apply to each offer for rights received by or made to Owner.   Owner shall not accept, and Fox shall not be required to meet the provisions of; any such offer unless it has been reduced to writing, signed by the offeror, and delivered to Fox with Owner's notice to Fox as provided above, together with Owner's written acknowledgment of its desire to accept same.   Fox's failure to accept shall not constitute a waiver of first refusal with respect to subsequent offers. The obligations of Owner under this paragraph (c) shall survive any expiration or termination of this Agreement.

5.     TERMINATION.   In addition to other rights at law, in equity or pursuant to other provisions of this Agreement, (a) if the "Copa Libertadores de América" is not played for any reason, Fox may by notice to Owner terminate this Agreement immediately without any continuing obligations, and (b) either party may by notice to the other party terminate this Agreement: (i) immediately if such other party is in material breach of this Agreement, provided however, that if such breach is not a failure to deliver any Program when it is required to be delivered and is curable, then such party shall not exercise its termination or other rights unless it has, by notice to the other party, given such other party five days from the time such notice is given to fully cure such material breach to the non-breaching party's satisfaction; (ii) immediately if such other party has filed a petition in bankruptcy, is insolvent or has sought relief under any law related to its financial condition or its ability to meet its payment obligations; or (iii) if any involuntary petition in bankruptcy or insolvency has been filed against such other party, or any relief under any such law has been sought by any creditor of such other party, unless such involuntary petition is dismissed or such relief is denied within 60 days after it has been filed or sought.   The parties shall cease to   have   any   obligations   under   this Agreement from the date of any such termination,   except   for   liabilities   or obligations which arose prior to such termination.

6.     MISCELLANEOUS.

11

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY               T&T00000046

(a)   Force Majeure:   Notwithstanding anything herein contained to the contrary, neither party shall be liable to the other in damages because of any failure to perform hereunder to the extent such failure is caused by any cause beyond its control, including but not limited to fire, earthquake, flood, epidemic, accident, explosion, casualty, labor controversy, riot, civil disturbance, act of a public enemy, embargo, war, act of God, any governmental ordinance or law, the issuance of any executive or judicial order, any failure or delay of any transportation agency, any failure or delay in respect to any electrical or sound equipment or apparatus, any failure, without such party's fault, to obtain material, transportation, power or any other essential thing required for its performance of this Agreement or any similar cause (an "Event of Force Majeure"). Any and all payment obligations of Fox and its assigns (including requirements of barter) shall be suspended during the continuance of an Event of Force Majeure affecting Owner's performance. If an Event of Force Majeure affecting Owner continues for 30 or more consecutive days or 90 days in the aggregate, Fox shall have the right to terminate this Agreement in its sole discretion upon notice to Owner.

(b)   Communications Act Disclosure.   In accordance with Section 507 of the Federal Communications Act, Owner agrees to disclose to Fox any information of which it has or acquires knowledge, or which has been or is disclosed to it, as to any money, service or other valuable consideration which any Person has paid or accepted, or agreed to pay or accept, for the inclusion of any program matter in any Program material to be furnished to Fox hereunder. The term "service or other valuable consideration" as used herein will not include any service or property furnished without charge or at a nominal charge for use on, or in connection with, a Program, unless it is furnished in consideration for an identification of any person, product, service, trademark or brand name beyond an identification that is reasonably related to the use of such service or property in such Program. The inclusion of an appropriate announcement in a Program will constitute the disclosure required by this Section.

(c)   No Partnership; No Third Party Beneficiaries:   Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto or constitute either party the agent of the other. Neither party shall hold itself out as having authority contrary to the terms of this paragraph, and neither party shall be or become liable by any representation, act or omission of the other contrary to the provisions hereof. This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any such party whether referred to herein or not.

(d)   No Continuing Waiver:   No waiver by either party of any breach hereof shall be deemed a waiver of any preceding, continuing or succeeding breach of the same or any other provision hereof. Any waiver must be in writing and executed by the party whose rights are waived.

(e)   Governing Law; Jurisdiction:   This Agreement and all matters collateral hereto shall be governed by the laws of the State of New York, U.S.A. applicable to contracts made and fully performed therein, without giving effect to principles of conflict of laws. Any legal proceeding relating to this Agreement shall be instituted and prosecuted solely in, and each party hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York or the Supreme Court of the State of New York, County of New York, and any appellate court from any thereof, unless such an action or proceeding is required to be brought in another court to obtain subject matter jurisdiction over the matter in controversy. Owner and Fox hereby irrevocably designate, constitute and appoint the Secretary of State of New York as their agent in the State of New York upon whom all summons, notices, pleadings, and processes in any action or proceedings against Owner or Fox may be served, with copies thereof to Owner or Fox at the address in the preamble hereof. Each of the parties hereby irrevocably waives any objection that it may have now or hereafter to the laying of the venue of any such action or proceeding in the manner provided in this subparagraph.

12

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

T&T00000047

(f) **Entire Agreement:** This Agreement supersedes and cancels all prior negotiations and understandings between the parties and contains all of the terms agreed to by the parties with respect to the subject matter hereof. No amendment shall be valid unless in writing and executed by both parties. No officer, employee or representative of Fox has any authority to make any representation or promise not contained in this Agreement, and Owner has not executed this Agreement in reliance on any such representation or promise.

(g) **Limitation of Liability:** In no event shall Fox be liable to Owner for any lost profits or special or consequential damages of any type, whether foreseeable or unforeseeable.

(h) **Currency Restrictions:** If approval or clearance of any exchange control authorities or any other currency or fiscal agencies in the Territory is required for payments to be made by Fox and such approval is not granted within a reasonable period of time, then Fox's failure to make payment shall not be considered a breach of the Agreement.

(i) **Construction:** The terms and provisions of this Agreement represent the results of negotiations between the parties, each of which has been represented by counsel of its own choosing, and none of which have acted under duress or compulsion, whether legal, economic or otherwise. Consequently, the terms and provisions of this Agreement shall be interpreted and construed in accordance with their usual and customary meanings, and the parties hereby waive the application of any rule of law to the effect that ambiguous or conflicting terms or provisions contained in the executed draft of this Agreement shall be interpreted or construed against the party whose attorney prepared the executed draft or any earlier draft of this Agreement.

(j) **Confidentiality:** Each of the parties hereto will regard and preserve as confidential all information related to (i) this Agreement, and (ii) the business of the other party as such information may be obtained by either party from any source as a result of this Agreement (collectively, "Confidential Information"). Notwithstanding the foregoing, no party hereto shall have an obligation of confidentiality with respect to information which: is already known to such party at the time; is obtained from a third party without breach of this Agreement; is in the public domain; is independently developed by such party; is disclosed to a party's shareholders, indirect owners or possible investors and their advisors, or is subject to compelled disclosure (provided that the disclosing party shall notify the other party or parties of any such requirement prior to disclosure in order to prevent or limit disclosure).

(k) **Hardship:** If, after this Agreement is entered into, any rule, law or judicial or administrative order in effect in the Territory or the USA imposes limitations or restrictions relating to distribution of the Programs which, in Fox's reasonable opinion, makes it illegal, inherently unprofitable or otherwise undesirable to continue its performance under this Agreement, Fox may terminate this Agreement upon 30 days' notice to Owner specifying such order, rule, law or decision and the effect of such termination shall be as provided in Section 5 above.

(l) **Censorship:** If Fox cannot telecast a Program by reason of the action of a censorship authority and a Program cannot reasonably be edited to comply with censorship requirements, Fox shall so notify Owner and provide Owner with appropriate documents evidencing such action, whereupon Owner shall, at Fox's request, either: deliver other reasonably equivalent programming which has been mutually agreed upon by Fox and Owner or refund to Fox the purchase price for that Program in accordance with the termination provisions of Section 5 above.

3

T&T00000048



EXHIBIT
51
7-6-17

## COMPLEMENTARY AGREEMENT TO THE

## COPA LIBERTADORES – COPA SUDAMERICANA – RECOPA SUDAMERICANA

## PROGRAM PURCHASE AGREEMENT

## (2011 – 2018)

THIS COMPLEMENTARY AGREEMENT is effective as of December 19, 2012 and between **T&T SPORTS MARKETING LTD.,** located at Cayman National Building, 200 Elgin Avenue, 4ᵗʰ Floor, P.O. Box 1790 GT, Grand Cayman, Cayman Islands, B.W.I. ("Owner"), and **FOX SPORTS LATIN AMERICA LTD.,** whose registered office is at the offices of Maples & Calder, Attorneys-at-law, P.O. Box 309, Grand Cayman, Islands, B.W.I. ("Fox"), each a "Party" and together the "Parties".

WHEREAS:

(A)     The Parties entered into a (i) Program Purchase Agreement dated January 1, 2010, pursuant to which Owner sold to Fox the unlimited and irrevocable right to telecast, exhibit and otherwise use, exploit and sell any and all of the games of the 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017 and 2018 "Copa Sudamericana" (the "Copa Sudamericana Agreement"); (ii) Program Purchase Agreement dated January 1, 2010, pursuant to which Owner sold to Fox the unlimited and irrevocable right to telecast, exhibit and otherwise use, exploit and sell any and all of the games of the 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017 and 2018 "Recopa Sudamericana" (the "Recopa Agreement"); and (iii) Program Purchase Agreement dated January 1, 2011, pursuant to which Owner sold to Fox the unlimited and irrevocable right to telecast, exhibit and otherwise use, exploit and sell any and all of the games of the 2011, 2012, 2013, 2014, 2015, 2016, 2017 and 2018 "Copa Libertadores de América" (the "Copa Libertadores Agreement" collectively with the Copa Sudamericana Agreement and the Recopa Agreement, the "Agreements").

(B)     As a consequence of macroeconomic changes in the region, Owner and CONMEBOL have renegotiated the economic conditions of the agreements entered into by and between Owner and CONMEBOL in relation to "Copa Libertadores de America", "Copa Sudamericana" and "Recopa Sudamericana".

(C)     The Parties have agreed upon the appropriate amendment to the Agreements taking into consideration the regulations of the Agreements and the renegotiation of the economic conditions between Owner and CONMEBOL mentioned above.

NOW, THEREFORE, the Parties agree as follows:



1.     In accordance with Section 11 of the Copa Libertadores Agreement and Section 14 of the Copa Sudamericana Agreement, Fox hereby agrees to increase the amounts to pay Owner under the Agreements for the seasons 2013-2018 for an additional amount of Seventy Five Million U.S. Dollars **U$S 75,000,000** (the "Additional Amount") and shall be net of any tax, retention or deduction costs. For the avoidance of doubt such Additional Amount shall be paid by Fox to Owner in addition to the amounts currently paid by Fox under the Agreements.

The Additional Amount shall be paid to Owner in U.S. Dollars only as follows:



(a)     Season 2013, U$S **10,000,000**, in 10 equal installments of U$S 1,000,000 since January to October of 2013.

1

(b)    Season 2014, U$S 11,000,000, in one installment of U$S 2,000,0000 in January 2014 and 9 equal installments of U$S 1,000,000 since February to October of 2014.

(c)    Season 2015, U$S 12,000,000, This amount shall be paid in one installment of U$S 3,000,0000 in January 2015 and 9 equal installments of U$S 1,000,000 since February to October of 2015.

(d)    Season 2016, U$S 13,000,000, This amount shall be paid in one installment of U$S 4,000,0000 in January 2016 and 9 equal installments of U$S 1,000,000 since February to October of 2016

(e)    Season 2017, U$S 14,000,000, This amount shall be paid in one installment of U$S 5,000,0000 in January 2017 and 9 equal installments of U$S 1,000,000 since February to October of 2017

(f)    Season 2018, U$S 15,000,000, This amount shall be paid in one installment of U$S 6,000,0000 in January 2018 and 9 equal installments of U$S 1,000,000 since February to October of 2018.

Fox shall make the first payment on or before January 15 and in the same day of the following month of each year subject to the terms of Section 2 below.

2.    The Parties hereby agree that compliance by Fox with the Additional Amounts' payment obligations set forth in Section 1 hereinabove, shall be subject to the precedent condition that Owner enters into an agreement in writing with CONMEBOL setting forth the payment of such Additional Amounts by Owner to CONMEBOL and that Owner shall apply such Additional Amounts to the payment to CONMEBOL of the additional amounts as provided for in such agreement. For the avoidance of any doubt, the Parties hereby agree that Fox shall not make any payment of the Additional Amounts to Owner pursuant to the terms hereof until Owner submits to Fox copy of the agreement with CONMEBOL setting forth the payment of the Additional Amounts.

3.    Any notice to Fox under the Agreements shall be delivered to the following address:

Fox Sports Latin American Sports Ltd.
1407 North Maple Drive,
Beverly Hills,
Los Angeles,
California 90210,
USA
Attn: Carlos Martinez
Facsimile: 305-567 2661

With a copy to:
Business & Legal Affairs
2121 Ponce De Leon Boulevard, Suite 1020
Coral Gables, Florida 33134
Email: flac.notices@fox.com

2

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY

4.      Except as expressly modified by this agreement, the Agreements shall remain unchanged and in full force and effect in accordance with its terms and provisions.


[signatures begin on next page]

3

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their duly authorized officers effective as of the day and year first above written.


T&T SPORTS MARKETING LTD.

By: _____
Name: Carlos Martinez
Title: Group A Representative

By: _____
Name:  Juan Miguel Ripoll
Title:  Group B Representative


FOX SPORTS LATIN AMERICA LTD.

By: _____
Name: Marcela Martin
Title: EVP & Assistant Secretary


4

HIGHLY CONFIDENTIAL – COUNSEL'S EYES ONLY