# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE No. 1:16-cv-24431-Altonaga/Turnoff

| |
|---|
| GOLTV, INC., and GLOBAL SPORTS PARTNERS LLP, |
| Plaintiffs, |
| -v.- |
| FOX SPORTS LATIN AMERICA, LTD., PAN AMERICAN SPORTS ENTERPRISES COMPANY, d/b/a FOX SPORTS LATIN AMERICA (individually and as successor to FOX PAN AMERICAN SPORTS LLC), FOX INTERNATIONAL CHANNELS (US), INC., FOX NETWORKS GROUP, INC. (as successor to FOX INTERNATIONAL CHANNELS (US), INC.), CARLOS MARTINEZ, HERNAN LOPEZ, JAMES GANLEY, T&T SPORTS MARKETING LTD., TORNEOS Y COMPETENCIAS, S.A., ALEJANDRO BURZACO, FULL PLAY GROUP S.A., HUGO JINKIS, MARIANO JINKIS, CONFEDERACION SUDAMERICANA DE FUTBOL, d/b/a CONMEBOL, EUGENIO FIGUEREDO, and JUAN ANGEL NAPOUT, |
| Defendants. |

# DEFENDANTS' MOTION TO DISMISS
# AND SUPPORTING MEMORANDUM OF LAW

# TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ...................................................................... iii

**INTRODUCTION AND SUMMARY** ......................................................... 1

**ALLEGATIONS IN THE AMENDED COMPLAINT** ................................. 4

    A.    The Parties .......................................................................... 4
    B.    The Alleged Bribery Scheme .............................................. 7
    C.    Plaintiffs' Alleged Injury ................................................... 8
    D.    Plaintiffs' Causes of Action ............................................... 9

**ARGUMENT** .......................................................................................... 9

**I.**    **PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED.** ............... 9

    A.    Plaintiffs Have Not Alleged an Injury Proximately Caused by Defendants ........... 9
        1.    Plaintiffs were not direct victims of the alleged bribery scheme ............. 11
        2.    Plaintiffs' alleged injuries are too remote. ................................. 12
    B.    Plaintiffs Have Not Alleged a Cognizable "Pattern of Racketeering Activity." ............. 17
        1.    A pattern requires "continuity" of wrongful conduct, which must be more than a single scheme with a discrete goal. ............. 17
        2.    Plaintiffs have not alleged either "closed-ended" or "open-ended" continuity. ............. 19
    C.    Plaintiffs Have Not Sufficiently Alleged Any Predicate Acts of Racketeering. ............. 21
        1.    Plaintiffs have not sufficiently alleged money laundering or monetary transactions under 18 U.S.C. §§ 1956 or 1957. ............. 21
        2.    Plaintiffs' wire fraud allegations fail. ............. 24
        3.    Plaintiffs' allegations under the New York commercial bribery statute fail. ............. 29
        4.    Plaintiffs' Travel Act allegations fail. ............. 31
    D.    Plaintiffs' RICO "Conspiracy" Claim Fails for the Same Reasons as the Substantive RICO Claim. ............. 32

**II.**    **PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE DISMISSED.** ............. 33

    A.    Plaintiffs Cannot Transform Allegations of Bribery into an Antitrust Claim. ............. 33
    B.    Plaintiffs Allege No Harm to Competition or Consumers. ............. 36
        1.    Substituting one competitor for another does not harm competition. ............. 37
        2.    Plaintiffs do not otherwise allege harm to competition. ............. 38
        3.    The Complaint establishes that consumers could not have been harmed by Defendants' alleged conduct. ............. 40

      C.     Plaintiffs Do Not Adequately Plead Causation.....................................................41

      D.     Plaintiffs Do Not Allege a Plausible Antitrust Market. ........................................42

            1.     Plaintiffs must plausibly allege the contours of an antitrust market.........42

            2.     Plaintiffs' gerrymandered market definitions are insufficient as a matter of law. ............................................................................................46

      E.     The Foreign Trade Antitrust Improvement Act Bars Plaintiffs' Claims. ..............51

            1.     The alleged conduct concerns commerce with foreign nations other than U.S. import commerce. ......................................................................52

            2.     The alleged conduct did not have a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce that "gives rise to" Plaintiffs' claims. ...................................................................................54

**III.**    **GOLTV LACKS STANDING TO BRING ANTITRUST AND RICO CLAIMS, AND FOREIGN PLAINTIFF GLOBAL SPORTS MAY NOT RECOVER ON U.S. CLAIMS FOR ITS FOREIGN INJURY.**...............................58

      A.     GolTV Is Not a Proper Plaintiff.............................................................................58

            1.     The indirect-purchaser doctrine bars GolTV's claims...............................58

            2.     GolTV lacks antitrust standing. .................................................................60

      B.     Global Sports Is a Foreign Plaintiff Without Recourse to U.S. Claims.................63

**IV.**    **PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED.** ........................64

      A.     Plaintiffs Do Not Plead a Cognizable Claim under the FDUTPA........................64

            1.     Plaintiffs do not plead a valid antitrust claim. ..........................................64

             2.     Plaintiffs have not adequately pled "actual damages."..............................65

            3.     Plaintiffs' injuries were not caused by Defendants....................................66

            4.     FDUTPA does not apply to acts committed outside Florida. ....................66

      B.     Plaintiffs Do Not Plead Cognizable Claims for Tortious Interference or Conspiracy To Interfere. ......................................................................................68

**V.**    **THE AMENDED COMPLAINT FAILS TO STATE ANY CLAIM AGAINST BURZACO.** .........................................................................................70

      A.     The RICO Claims Fail Because the Underlying Conduct Did Not Proximately Cause Injury to These Particular Plaintiffs' Businesses...................70

      B.     The RICO Claims Based on the Rejected March 2010 Offer Are Time-Barred......................................................................................................................71

**VI.**    **THE AMENDED COMPLAINT FAILS TO STATE ANY CLAIM AGAINST NAPOUT.** ............................................................................................73

      A.     The Generalized Allegations in the Amended Complaint Regarding "Conmebol officials" Cannot be Construed Against Napout. .............................75

      B.     The Few Specific Factual Allegations Against Napout Fall Short of Stating Any Actionable Claim. ............................................................................77

**CONCLUSION** ............................................................................................................................78

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Absolute Activist Value Master Fund Ltd. v. Devine*, No. 2:15-cv-328-FTM-29MRM, 2017 WL 519066 (M.D. Fla. Feb. 8, 2017) ............................................................63

*Adidas Am., Inc. v. Nat'l Collegiate Athletic Ass'n*, 64 F. Supp. 2d 1097 (D. Kan. 1999) ...................................................................................................................................47

*Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm.*, 953 F.2d 587 (11th Cir. 1992) ...........................................................................................................................20

*Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569 (11th Cir. 1985)...........................................36

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011).......................52

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)....................................................... passim

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..................................................................................67, 77

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983).............................................................................................39, 42, 61, 62

*Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342 (5th Cir. 1980)................34–35

*Belfiore v. N.Y. Times Co.*, 826 F.2d 177 (2d Cir. 1987).............................................................51

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).....................................................41, 42, 75, 77

*Bergamini v. Deutsche Bank Nat'l Tr. Co.*, No. 12-62411-CIV, 2013 WL 12091091 (S.D. Fla. Jan. 28, 2013) .................................................................................72, 73

*Black Diamond Land Mgmt., LLC v. Twin Pines Coal Co.*, No. 2:14-cv-02333, 2016 WL 3617974 (N.D. Ala. July 6, 2016) ..................................................................22, 32

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008)...................................................12

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)....................33–34

*Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364 (11th Cir. 1997) ...................................................................................................................................77

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ......................................36, 60

*Bryan v. Countrywide Home Loans*, No. 8:08-cv-794-T-23EAJ, 2008 WL 4790660 (M.D. Fla. Oct. 27, 2008)...........................................................................................23

*Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272 (7th Cir. 1983) .........................34

*Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559 (11th Cir. 1987) .....................41

*Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674 (9th Cir. 1976) .................................34

*Campfield v. State Farm Mut. Auto. Ins.*, 532 F.3d 1111 (10th Cir. 2008) .................................45

*Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008)...........................................45

*City of Miami v. JPMorgan Chase & Co.*, 171 F. Supp. 3d 1309 (S.D. Fla. 2016) ...............75, 76

*Collegenet, Inc. v. Common Application, Inc.*, 104 F. Supp. 3d 1137 (D. Or. 2015)...................36

*Daedalus Capital LLC v. Vinecombe*, 625 F. App'x 973 (11th Cir. 2015) ............................18, 19

*Day v. Taylor*, 400 F.3d 1272 (11th Cir. 2005) ...............................................................................5

*Den Norske Stats Oljeselskap AS v. HeereMac v.o.f.*, 241 F.3d 420 (5th Cir. 2001) ..................52

*Discon Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154 (W.D.N.Y. 2000) ...........................................35

*Diversified Mgmt. Sols., Inc. v. Control Sys. Research, Inc.*, No. 15-81062-CIV,
   2016 WL 4256916 (S.D. Fla. May 16, 2016) ...........................................................................65

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir. 1984) .........................45

*Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248 (11th Cir. 2015)..........................42, 61

*Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334
   (S.D. Fla. 1999)..........................................................................................................................65

*Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12 (1st Cir. 2000)...............................................18

*Ellis v. Warner*, No. 15-10134-CIV, 2017 WL 634287 (S.D. Fla. Feb. 16, 2017).......................22

*Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768 (S.D.N.Y. 2016) ........................................26, 27

*European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014)......................................25, 26

*Expert Masonry, Inc. v. Boone County*, 440 F.3d 336 (6th Cir. 2006).........................................37

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) ....................................52, 63

*Fed. Paper Bd. Co. v. Amata*, 693 F. Supp. 1376 (D. Conn. 1988)..............................................34

*Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333 (11th Cir. 2017) ............................................... passim

*Ferrell v. Durbin*, 311 F. App'x 253 (11th Cir. 2009) ....................................................18, 19, 20

iv

*Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276 (11th Cir. 2007) .........................................4

*Five for Entm't S.A. v. Rodriguez*, 877 F. Supp. 2d 1321 (S.D. Fla. 2012) ............................65, 66

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 Civ. 5263 (AKH), 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ...........................................................26

*G&G TIC, LLC v. Ala. Controls, Inc.*, 324 F. App'x 795 (11th Cir. 2009) ..................................11

*Gregoris Motors v. Nissan Motor Corp. in USA*, 630 F. Supp. 902 (E.D.N.Y. 1986) ............................................................................................................................................34

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989) .......................................................................18

*Halpin v. Crist*, 405 F. App'x 403 (11th Cir. 2010) ......................................................................11

*Harris v. Orange S.A.*, 636 F. App'x 476 (11th Cir. 2015) .............................................12, 13, 17

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010) ..................................................... passim

*Hennegan Co. v. Arriola*, 855 F. Supp. 2d 1354 (S.D. Fla. 2012) ................................................66

*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992) ....................................................10, 12, 16

*Hope for Families & Community Service, Inc. v. Warren*, 721 F. Supp. 2d 1079 (M.D. Ala. 2010) ...........................................................................................................................12

*Horace-Manasse v. Wells Fargo Bank, N.A.*, No. 10-81623-CV, 2012 WL 1232016 (S.D. Fla. Apr. 12, 2012) ..................................................................................................20

*Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977) .......................................................................58, 59

*In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151 (2d Cir. 2016) ...............................60

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-JST, 2016 WL 7805628 (N.D. Cal. Aug. 4, 2016) ................................................................................................63

*In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996) ....................59, 60

*Jackson v. BellSouth Telecomms.*, 372 F.3d 1250 (11th Cir. 2004) ............................18, 19, 21, 32

*Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327 (11th Cir. 2010) ..........................36, 43, 44, 50

*JES Props., Inc. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273 (M.D. Fla. 2003) ..........44–45, 48

*JES Props., Inc. v. USA Equestrian, Inc.*, No. 802CV1585T24MAP, 2005 WL 1126665 (M.D. Fla. May 9, 2005) ................................................................................................65

*JetAway Aviation, LLC v. Bd. of Cty. Comm'rs*, 754 F.3d 824 (10th Cir. 2014) (per curiam) (Holmes, J., concurring)......................................................................37

*Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enters., Inc.*, 628 F.2d 971 (6th Cir. 1980) ................................................................................60

*Joseph v. Bernstein*, No. 13-24355-CIV, 2014 WL 4101392 (S.D. Fla. Aug. 19, 2014) ...................................................................................................... passim

*Jus Punjabi, LLC v. Get Punjabi Inc.*, No. 1:14-cv-3318-GHW, 2015 WL 2400182 (S.D.N.Y. May 20, 2015)....................................................................23

*Justice v. United States*, 6 F.3d 1474 (11th Cir. 1993) .................................................71

*Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108 (2013)...............................................30

*Koch v. Royal Wine Merchants*, Ltd., 847 F. Supp. 2d 1370 (S.D. Fla. 2012)........................67–68

*L.H. Equity Investments LLC v. Wade*, No. 09-80607-CIV, 2010 WL 11505176 (S.D. Fla. Mar. 29, 2010) ........................................................................45

*La Grasta v. First Union Securities, Inc.*, 358 F.3d 840 (11th Cir. 2004)....................................71

*Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*, 763 F.3d 1280 (11th Cir. 2014) ................................................................................................58–59

*Lane v. Capital Acquisitions & Mgmt. Co.*, No. 04-60602 CIV, 2006 WL 4590705 (S.D. Fla. Apr. 14, 2006) ..............................................................75, 76–77

*Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419 (GBD), 2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015) ..........................................................................27

*Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538 (11th Cir. 1996) ....................................43

*Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339 (11th Cir. 2008)........................................................................................9

*Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395 (2d Cir. 2014)..............................55, 64

*Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001)....................................................67

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 ................................................57

*McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842 (3d Cir. 1996) ....................................................59

*Mfg. Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037 (11th Cir. 1982) ..............................37

*Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F. Supp. 2d 1241 (M.D. Fla. 2012) .............................................................................69

*Moorer v. Hartz Seed Co.*, 120 F. Supp. 2d 1283 (M.D. Ala. 2000)..............................................63

*Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004)..............................43

*Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010)...............................................................30

*Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816 (7th Cir. 2015) ...............53, 54, 63

*Mr. Furniture Warehouse, Inc. v. Barclays Am./Commercial Inc.*, 919 F.2d 1517
   (11th Cir. 1990)...............................................................................................................................36

*Municipality of Anchorage v. Hitachi Cable, Ltd.*, 547 F. Supp. 633 (D. Alaska
   1982) .................................................................................................................................................34

*NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007)......................................................37, 39–40

*Norris v. Hearst Tr.*, 500 F.3d 454 (5th Cir. 2007)......................................................................60

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998).......................................................................35

*Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358 (3d Cir. 1996) ................................................43

*Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246 (11th Cir. 2001) ................71, 72

*Parmelee Transp. Co. v. Keeshin*, 292 F.2d 794 (7th Cir. 1961) ...................................................34

*Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, 572 F. App'x 60 (2d Cir. 2014).....................26

*PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412 (5th Cir. 2010) ............45, 49, 51

*PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, No. CV 2:03CV107(TJW),
   2009 WL 938561 (E.D. Tex. Apr. 6, 2009)..................................................................................51

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ........................44, 45

*Rambus Inc. v. F.T.C.*, 522 F.3d 456 (D.C. Cir. 2008)...................................................................41

*Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340 (11th Cir. 2016)............................................................9

*RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016)..................................25, 26, 29, 63

*Rotella v. Wood*, 528 U.S. 549 (2000) ...........................................................................71, 72–73

*Scranton Constr. Co. v. Litton Indus. Leasing Corp.*, 494 F.2d 778 (5th Cir. 1974) ...................33

*Sinaltrainal v. Coca-cola Co.*, 578 F. 3d 1252 (11th Cir. 2009) ...................................................77

*Smart Sci. Labs., Inc. v. Promotional Mktg. Servs., Inc.*, No. 8:07-cv-1554, 2008
   WL 2790219 (M.D. Fla. July 18, 2008) ...................................................................................20–21

*Sonterra Capital Mater Fund Ltd. v. Credit Suisse Grp. AG*, No. 15-cv-871(SHS), 2017 WL 4250480 (S.D.N.Y. Sept. 25, 2017) .......................................................................... 26

*Southway Theatres, Inc. v. Ga. Theatre Co.*, 672 F.2d 485 (5th Cir. Unit B 1982) ..................... 36

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065 (11th Cir. 2004) ......................................................................................................................... 37, 43

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) .......................................................... 43

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3d Cir. 1999) ................................................................................................................... 62

*Stein v. Marquis Yachts, LLC*, No. 14-24756-CIV, 2015 WL 1288146 (S.D. Fla. Mar. 20, 2015) ....................................................................................................................... 66

*Strates Shows, Inc. v. Amusements of America, Inc.*, 379 F. Supp. 2d 817 (E.D.N.C. 2005) ....................................................................................................................... 13

*Sundance Apartments I, Inc. v. Gen. Elec. Capital Corp.*, 581 F. Supp. 2d 1215 (S.D. Fla. 2008) ........................................................................................................................ 73

*Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC) 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ........................................................................................................................ 26

*Sunbeam T.V. Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264 (11th Cir. 2013) ............................................................................................................................................. 60

*Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059 (9th Cir. 2001) ......................................................... 45

*Theatre Party Assocs., Inc. v. Shubert Org., Inc.*, 695 F. Supp. 150 (S.D.N.Y. 1988) ............................................................................................................................................. 47

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468 (3d Cir. 1992) ...................................................................................................................................... 46

*Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293 (3d Cir. 2002) .............................................. 52

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ............................................................ 43, 51

*United States v. Hawit*, No. 15-cr-252 (PKC), 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ....................................................................................................................... 27

*United States v. Heaps*, 39 F.3d 479 (4th Cir. 1994), *abrogated on other grounds by United States v. Cabrales*, 524 U.S. 1 (1998) ................................................................... 24

*United States v. Langford*, 647 F.3d 1309 (11th Cir. 2011) ...................................................... 28

*United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004) ........................................ 55

*United States v. Prevezon Holdings LTD.*, 122 F. Supp. 3d 57 (S.D.N.Y. 2015) ..................26–27

*United States v. Santos*, 553 U.S. 507 (2008) ..........................................................................22, 24

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) ......................................................................28

*United States v. Sidorenko*, 102 F. Supp. 3d 1124 (N.D. Cal. 2015) ..............................................25

*United States v. Silvestri*, 409 F.3d 1311 (11th Cir. 2005) ............................................................22

*United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) ...........................................................28

*United States v. Trejo*, 610 F.3d 308 (5th Cir. 2010) .....................................................................24

*United States v. Zauber*, 857 F.2d 137 (3d Cir. 1988) ...................................................................31

*Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329 (11th Cir. 2012) .......................................................65

*Viridis Corp. v. TCA Global Credit Master Fund, LP*, 155 F. Supp. 3d 1344 (S.D. Fla. 2015) ......................................................................................................................................10

*Ward v. Nierlich*, 617 F. Supp. 2d 1226 (S.D. Fla. 2008) .............................................................19

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) ....................43

*White v. Greenpoint Mortg. Funding Inc.*, No. 14-80452-CIV, 2014 WL 11370418 (S.D. Fla. June 26, 2014) ......................................................................................71

## STATE CASES

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812 (Fla. 1994) ............................68, 69

*People v. Wolf*, 772 N.E.2d 1124 (N.Y. 2002) ...............................................................................31

*Yusuf Mohamad Excavation, Inc. v. Ringhaver Equip., Co.*, 793 So. 2d 1127 (Fla. Dist. Ct. App. 2001) ......................................................................................................73

## FEDERAL STATUTES

15 U.S.C. § 1 ....................................................................................................................... passim

15 U.S.C. § 2 ....................................................................................................................... passim

15 U.S.C. § 6a ..................................................................................................................... passim

18 U.S.C. § 1343 ...............................................................................................................21, 24

18 U.S.C. § 1346 ...............................................................................................................24, 28

18 U.S.C. § 1952 .................................................................................................21, 32

18 U.S.C. § 1956 .......................................................................................21, 23, 24, 32

18 U.S.C. § 1957 .......................................................................................21, 22, 23, 32

18 U.S.C. § 1961 ...........................................................................................21, 23

18 U.S.C. § 1962 ........................................................................................9, 21, 32, 70

18 U.S.C. § 1964 ...............................................................................................9, 32

## STATE STATUTES

Fla. Stat. § 95.11(3) .............................................................................................73

Fla. Stat. § 501.201 ....................................................................................... passim

N.Y. Crim. Proc. Law § 20.20 .............................................................................30

N.Y. Penal Law § 180.03 .....................................................................................29

## OTHER

Antitrust Enforcement Guidelines for International Operations, DOJ (Apr. 5, 1994) ...............................................................................................................53

Art. 300 of Law 1160/90 (Paraguayan Criminal Code) ......................................14

RESTATEMENT (SECOND) OF AGENCY § 374(2) (1958) .................................................63

## INTRODUCTION AND SUMMARY

Plaintiffs GolTV, Inc. and Global Sports Partners LLP have brought this action in a U.S. court based on allegations of foreign commercial bribery.  They claim that a Cayman Islands entity bribed foreign officials of Conmebol, a Paraguayan soccer federation responsible for organizing and selling the broadcast rights to South American soccer tournaments.  These alleged bribes supposedly thwarted offers to Conmebol by Plaintiff Global Sports, a Uruguay-based partnership organized under English law, which bid for the broadcast rights at times when they were under contract.  The Court has already dismissed Conmebol—the only party that suffered a direct injury under the facts alleged—for lack of personal jurisdiction.  Plaintiffs struggle in vain to construct derivative legal claims against the remaining Defendants that plead over, under, and around the alleged direct injury to Conmebol.

Even before the Court held that the party at the heart of this matter was not properly before it, the substantive flaws in the Amended Complaint were plain to see.  The lengthy Amended Complaint attempts to jam foreign commercial bribery allegations into shoes that don't fit: federal RICO, federal antitrust, and Florida consumer protection law claims.  But under settled law, Plaintiffs' unhappiness with Conmebol's decision not to award them the broadcast rights that were already under contract does not translate into federal or state causes of action.

The pleading defects in the Amended Complaint ("Complaint") are legion and incurable:[1]

---

[1] Unless otherwise noted in the Argument section headings, the arguments presented herein are made on behalf of all Defendants, with the exception of Mr. Burzaco, whose joinder and separate statement are set forth in Part V, *infra*, and Mr. Figueredo, who to date has not appeared in this case.  Mindful of this Court's instruction to include Mr. Figueredo's arguments in this consolidated motion to dismiss, counsel for Defendants contacted Mr. Figueredo through counsel that appeared on his behalf in the Eastern District of New York proceedings, in order to include any arguments or position Mr. Figueredo wished to assert, but counsel indicated he was not authorized to make an appearance on Mr. Figueredo's behalf.

I.      Plaintiffs do not state civil RICO claims for multiple reasons.

*First*, the Complaint does not satisfy the RICO statute's proximate causation requirement under the high pleading bar established by the Supreme Court and Eleventh Circuit.  A plaintiff must allege that it was the "intended target" of the alleged racketeering activity, and that it suffered an injury caused ***directly*** by that activity, rather than by the intervening actions of third parties.  The Complaint and the Government's criminal indictment that it incorporates acknowledge that now-absent Conmebol was the direct "victim" of the alleged bribery scheme to defraud Comnebol of its agents' "honest services."  To connect Plaintiffs' alleged injury with Defendants' alleged actions requires multiple intermediate steps, by multiple third parties, including Conmebol's refusal to award the broadcast rights to Plaintiffs when those rights were under contract and, later, even after the alleged bribery ended.

*Second*, the Complaint does not satisfy RICO's requirement of a "pattern of racketeering activity."  Plaintiffs allege a single bribery scheme designed to defraud a single entity, Conmebol, of its representatives' honest services.  It is settled law in this Circuit that a "pattern" requires more than a single scheme directed at a single entity.

*Third*, RICO requires underlying acts of "racketeering."  Commercial bribery is not a federal offense and does not typically fall within the statutory definition of racketeering.  Plaintiffs seek to characterize the alleged bribery as offenses covered under RICO: wire fraud, money laundering, state-law bribery, and violation of the Travel Act.  But the facts alleged either do not fit the elements of these RICO predicates, or the predicates do not apply extraterritorially to the alleged non-U.S. conduct, or both.

II.     Plaintiffs' attempt to concoct an antitrust claim from alleged commercial bribery is equally meritless.

2

*First*, commercial bribery of the kind Plaintiffs allege does not give rise to claims under the Sherman Act.

*Second,* few antitrust rules are as well settled as the principle that an antitrust plaintiff must allege harm to **competition** and not merely to **competitors**.  The Complaint is the blackletter definition of a deficient antitrust claim: it alleges harm to GolTV as a disappointed competing broadcaster, but no harm to customers.  In Plaintiffs' but-for world, all that would have changed is that one exclusive broadcaster (GolTV) would have replaced another (Fox).

*Third*, as with their RICO claims, Plaintiffs cannot show that the alleged bribery was the direct cause of their alleged injuries.

*Fourth*, Plaintiffs' antitrust claims require them to define a plausible "relevant market"— one that includes all substitutable products and geographic areas such that a monopolist in that "market" could profitably raise prices to an anticompetitive level.  All of the "markets" the Complaint proffers are implausible on their face.  They merely describe the particular Conmebol tournaments at issue in this case as though they comprised distinct antitrust markets—markets that, by definition, the Defendants supposedly "monopolized."  Plaintiffs allege no facts to suggest that consumers or advertisers had no available substitutes or that monopoly/monopsony pricing was possible in those markets.  The law in this Circuit and elsewhere decries such imaginary, gerrymandered "markets."

*Fifth*, not only are Plaintiffs unable to secure personal jurisdiction over Conmebol, but their claims are based on extraterritorial conduct and injury, in violation of a federal statute that restricts antitrust liability to effects on U.S. commerce.  Injury resulting from an alleged scheme to bribe officials of a Paraguay-based soccer federation to sell its intellectual property to a Cayman entity is not redressable under the U.S. antitrust laws.

III.     To the extent either Plaintiff could state cognizable claims (and neither can), such claims would belong to the entity that actually made offers for the rights (Global Sports), not to any putative downstream licensee (GolTV).  Plaintiffs included GolTV to cure another legal deficiency: the only other Plaintiff (Global Sports) is a foreign entity that is not alleged to have suffered any injury in the U.S. that could be redressed under either RICO or the Sherman Act.

IV.     Plaintiffs' efforts to invoke Florida law also fail.  Unsurprisingly, neither Florida's legislature nor its courts have tried to regulate commercial bribery in Paraguay.  Plaintiffs' tortured interpretation of the State's consumer protection statute and common law in an attempt to reach the alleged conduct is unpersuasive.

For all of these reasons, as discussed in detail below, the Complaint should be dismissed in its entirety and with prejudice, as any attempt to amend a second time would be futile.

## ALLEGATIONS IN THE AMENDED COMPLAINT

### A.     The Parties

Plaintiff GolTV is a television network that broadcasts soccer matches around the world.  Compl. ¶ 14.  Plaintiff Global Sports is a partnership organized under English law and based in Uruguay that allegedly "was formed to obtain the television and marketing rights to international soccer matches" and allegedly acted as an "agent" for GolTV.  *Id.* ¶ 16.  While Plaintiffs refer to GolTV and Global Sports collectively as "GolTV" throughout their Complaint, there is a significant distinction between the two entities: the rejected offers for the broadcast rights that form the basis for Plaintiffs' claims (referenced repeatedly in the Complaint[2]) show that the

---

[2] While a motion to dismiss is typically limited to the four corners of the complaint, there is "an exception . . . in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss."  *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284–85 (11th Cir. 2007) (per curiam).  The offers, specified by date, are referenced throughout the Complaint, *see* Compl. ¶¶ 117, 122, 126, and central to Plaintiffs' causation and damages theories.  The contents

4

offeror was **Global Sports**.  Vigen Aff. Exs. 1–3.  The offers make no mention whatsoever of GolTV.  *Id.*  Nonetheless, GolTV and Global Sports **both** claim injury from Defendants' alleged scheme to procure those broadcasting rights through bribery.

Former defendant Conmebol[3] is a Paraguay-based association of South American soccer federations.  Compl. ¶ 32.  Defendants Eugenio Figueredo and Juan Angel Napout are former presidents and vice presidents of Conmebol, respectively.  *Id.* ¶¶ 33–34.  Conmebol sponsors tournaments among South American club soccer teams, including the three tournaments at issue in this case: the Copa Libertadores, Copa Sudamericana, and Recopa Sudamericana (collectively, the "Copas" or "Club Tournaments").  *Id.* ¶¶ 55–56.  Conmebol has exclusive authority "to award the television rights for the Club Tournaments."  *Id.* ¶ 59.  According to the Complaint and the Government's criminal indictment attached to it,[4] Defendants' alleged bribery scheme "defrauded CONMEBOL."  *Id.* ¶ 200; *see* Ex. A to Compl. ¶ 375 ("[T]he defendants . . . did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL.").

Defendant T&T Sports Marketing Limited ("T&T") is a Cayman Islands company that contracted with Conmebol for the Club Tournaments television rights beginning in 1999.

---

are not in dispute; the same offers were submitted to the Court in the jurisdictional-discovery phase (*see* ECF No. 204), and Plaintiffs did not challenge their authenticity.  *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (A document is "undisputed" if "the authenticity of the document is not challenged.").

[3] On September 19, 2017, the Court granted Conmebol's motion to dismiss for lack of personal jurisdiction.  *See* Sept. 19 Order (ECF No. 238).

[4] In May 2015, the United States Attorney's Office for the Eastern District of New York unsealed an indictment in *United States v. Webb*, No. 15-cr-252 (E.D.N.Y.) (the "Indictment"), charging fourteen soccer officials, including Figueredo and Napout, and sports marketing executives, including Alejandro Burzaco, then-General Manager of Torneos y Competencias, S.A., for their participation in bribery and money laundering schemes,  *See* Compl., Ex. A.

Compl. ¶¶ 17, 61.  Plaintiffs allege that T&T procured the rights by bribing Conmebol's directors, including defendants Figueredo and Napout.  *Id.* ¶¶ 62, 69.  Defendant Alejandro Burzaco, an Argentinian national, allegedly caused the bribes to be paid as a principal of T&T.  *Id.* ¶¶ 2, 29–30, 66–67.  Burzaco was, at that time, a part-owner of Defendant Torneos y Competencias, S.A. ("Torneos"), which held a minority economic interest in T&T and allegedly participated in the bribery scheme.[5]  *Id.* ¶¶ 25, 66.  According to the Complaint, the bribes to Conmebol directors were funneled from T&T through foreign "[i]ntermediaries" using "sham" contracts.  *Id.* ¶ 71.  These alleged intermediaries included "affiliate[s]" of former defendant Full Play Group S.A., a Uruguayan company.[6]  *Id.* ¶¶ 31, 76, 101–02, 105.

Plaintiffs also allege that Fox International Channels (US), Inc. ("FIC"), FIC's successor Fox Networks Group ("FNG"), FNG's subsidiary Pan American Sports Enterprises ("PASEC"), and Fox Sports Latin America, Ltd. (a subsidiary of PASEC's predecessor Fox Pan American Sports LLC), participated in the bribery scheme.  Compl. ¶¶ 18–22, 64–65.  The Complaint refers to these Defendants and their predecessors collectively as "Fox" or "Fox Defendants."  *Id.*

---

[5] Immediately following the unsealing of the Indictment, Torneos took "extensive remedial measures."  Compl., Ex. B ¶ 7.  As described in its December 13, 2016 Deferred Prosecution Agreement ("DPA") with the EDNY, Torneos made a "prompt decision, upon learning of its potential involvement in corrupt conduct, to (i) conduct a diligent, thorough, and swift internal investigation, . . .[and] (ii) fully cooperate with the [DOJ]".  *Id.* ¶ 6(c).  Torneos promptly terminated its "entire senior management team," including Mr. Burzaco.  *Id.* ¶ 7.  Since then, Torneos has hired a new senior management team that has already, as of December 2016, "established a new 'tone at the top' and ensured that a culture of compliance has taken hold at the Company," as well as implemented a new compliance program.  *Id.*  According to the DPA, Torneos "has committed to operating with integrity, transparency, and in compliance with all applicable laws in its business dealings, including business with . . . CONMEBOL."  *Id.* ¶ 7(j).  Torneos has accepted responsibility for a single count of wire fraud conspiracy under Title 18, United States Code, Section 1349.  *Id.* ¶ 1–2.

[6] In its September 19, 2017 Order, the Court dismissed all claims against Full Play Group S.A. for lack of personal jurisdiction.  *See* Sept. 19 Order (ECF No. 238).

¶ 23.  Fox Pan American Sports owns a portion of T&T, *id.* ¶ 63, and broadcast some of the Club Tournaments pursuant to sublicenses from T&T, *id.* ¶ 7.  Plaintiffs allege "upon information and belief" that the funds T&T used to pay the bribes originated with Fox.  *Id.* ¶¶ 64, 88.  Fox did not own a majority share in Fox Pan American Sports, and by extension T&T, until December 2011.  *See* Twenty-First Century Fox, Inc., *Annual Report (Form 10-K)*, at 96 (August 14, 2014); Compl. ¶ 18 (quoting, citing, and incorporating into Complaint Twenty-First Century Fox, Inc., *Annual Report (Form 10-K)*, at 96 (August 13, 2015)).  The Club Tournament rights were already under contract with T&T prior to Fox's acquisition of that majority share.  *See* Compl. ¶ 111.

Also named as Defendants are Hernan Lopez, former CEO and COO of FIC; James Ganley, former COO of Fox Pan American Sports; and Carlos Martinez, current President of FNG Latin America and former president of FIC Latin America.  Compl. ¶¶ 26–28.  All three individuals also served as board members of T&T.  *Id.*

### B.      The Alleged Bribery Scheme

The Complaint alleges that T&T first acquired exclusive television rights to the Copa Libertadores tournament by bribing Conmebol officials in 1999.  Compl. ¶¶ 61–62.  It further alleges that by 2000 an agreement was in place through which T&T was to receive exclusive rights to all three Club Tournaments in exchange for bribe payments to Figueredo and a few other Conmebol directors.  *Id.* ¶ 62.  Burzaco allegedly assumed control over T&T's bribe payments in 2004 or 2005.  *Id.* ¶ 67.  T&T, through Burzaco, allegedly made the bribe payments by transferring funds to the bank accounts of foreign "intermediary" entities.  *Id.* ¶¶ 71–73.  These intermediaries then "funneled" payments to Conmebol directors in South America.  *E.g., id.* ¶ 100.

### C.     Plaintiffs' Alleged Injury

Plaintiffs do not allege that they sought out, bid on, or otherwise endeavored to obtain the Club Tournaments broadcast rights in 1999, 2005, or at any other time when the rights were actually available during the period of alleged bribery.  Instead, Plaintiffs allege Global Sports made unsolicited offers for the rights on three occasions—in 2010, 2012, and 2013—***when the rights were already under contract to T&T***.  Compl. ¶¶ 111, 116, 120, 122.  Nevertheless, Plaintiffs allege that they were harmed because, on each such occasion, Conmebol opted not to breach its contracts with T&T and reallocate the rights to Global Sports, which allegedly offered more money.  *E.g.*, *id.* ¶ 114.  Plaintiffs further allege that because T&T retained exclusive rights to broadcast the Club Tournaments, Global Sports could not sublicense the rights to GolTV to broadcast the Club Tournaments in the U.S.  *Id.* ¶¶ 138, 141.  This, in turn, purportedly caused fewer television viewers to watch GolTV programming and made GolTV's programming less attractive to potential television advertisers.  *Id.* ¶¶ 179, 268.

Plaintiffs allege only one occasion on which they made offers for the Club Tournaments rights at a time when those rights were not under contract: in ***May 2015***, ***after*** any alleged bribery was over.  Compl. ¶¶ 128–30.  Even in the conceded absence of any alleged bribery, Conmebol awarded the broadcast rights not to Plaintiffs, but to FIC.  *Id.* ¶¶ 131–32.  Plaintiffs allege that the 2015 agreement was "negotiated in secret and violated Conmebol's procedures," *id.* ¶ 133, but they do not and cannot allege that it was procured by bribery.  These undisputed historical facts undermine all of Plaintiffs' claims: even in the absence of any bribes and after the alleged scheme was revealed and wrongdoers arrested, Conmebol exercised its discretion not to accept Plaintiff's bid.

D.      **Plaintiffs' Causes of Action**

Based on the above allegations, Plaintiffs claim that Defendants (1) conducted or participated in the conduct of an enterprise's affairs through a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c) (count one); (2) conspired to violate RICO, 18 U.S.C. § 1962(d) (count two); (3) conspired to restrain trade and to "monopsonize" in violation of the federal antitrust laws, 15 U.S.C. §§ 1–2 (counts three, four, five, and eight); (4) violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 (count nine); and (5) conspired to tortiously interfere with Plaintiffs' economic advantage (count eleven). Plaintiffs further allege that defendants Fox, Torneos, and T&T tortiously interfered with Plaintiffs' prospective economic advantage (count ten).  Finally, the Complaint alleges that T&T engaged in monopsonization and attempted monopsonization of the "Americas Television Rights Market" (counts six and seven).

## ARGUMENT

## I.      PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED.

To state a civil RICO claim under 18 U.S.C. §§ 1962(c) and 1964(c), a plaintiff must sufficiently allege that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that (5) caused injury to plaintiff's business or property.  *See Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016).   Plaintiffs' RICO claim fails in numerous respects.

### A.      **Plaintiffs Have Not Alleged an Injury Proximately Caused by Defendants.**

A civil plaintiff has standing to sue under RICO only if he has been "injured in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  The phrase "by reason of" gives rise to  RICO's "heightened proximate causation standard," *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1350 n.14 (11th Cir. 2008);

9

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010).  The "central question" of causation in the RICO context is "whether the alleged violation led ***directly*** to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added).  It is not enough for a plaintiff to allege it was injured as a result of an act by a third party, which, in turn, was the foreseeable result of the defendant's conduct.  *See Viridis Corp. v. TCA Global Credit Master Fund, LP*, 155 F. Supp. 3d 1344, 1355–58 (S.D. Fla. 2015).  The Supreme Court has consistently rejected claims of RICO causation that depend in whole or in part on actions of third parties, even when those actions may have foreseeably resulted from a defendant's wrongful acts.  *Hemi Grp.*, 559 U.S. at 11; *Anza*, 547 U.S. at 458–461; *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 271–73 (1992).  RICO's demanding causation standard is applied strictly and rigorously.  "[C]ourts should scrutinize proximate causation ***at the pleading stage*** and carefully evaluate whether the injury pled was proximately caused by the claimed RICO violations."  *Joseph v. Bernstein*, No. 13-24355-CIV, 2014 WL 4101392, at *7 (S.D. Fla. Aug. 19, 2014) (Altonaga, J.) (quotations omitted) (emphasis added).

Here, the alleged direct victim is Conmebol: Defendants allegedly participated in a "bribery scheme [that] defrauded Conmebol and Conmebol's member associations."  Compl. ¶ 200.  Plaintiffs allege injury to themselves only through a complex and circuitous route: Plaintiffs allege that T&T and other Defendants paid bribes to Conmebol officials, which led Conmebol to license the Club Tournaments television rights to T&T beginning in 2000.  *Id.* ¶¶ 62–63.  Plaintiffs claim no injury in 2000 because they did not seek the rights at that time. Ten years later, however, Global Sports allegedly decided to "present a formal offer" for the rights.  *Id.* ¶ 111.  Conmebol, having awarded the rights to T&T many years before Global Sports ever sought to obtain them, declined to breach its existing contracts and grant Global

Sports the opportunity to obtain the rights. *Id.* ¶¶ 114, 138. Plaintiffs allege that they were injured because, without the rights, Plaintiffs could not broadcast the Club Tournaments, which in turn meant that fewer television viewers watched GolTV's programming and that GolTV's programming was less attractive to potential television advertisers, ultimately resulting in GolTV earning less revenue. *Id.* ¶¶ 179, 268.

This theory of RICO injury and causation fails as a matter of law, for at least two related reasons: (1) Plaintiffs were not the direct victims of the alleged bribery scheme—Conmebol was; and (2) Plaintiffs' injuries are too remote from Defendants' alleged actions and depend on the intervening acts of third parties.

### 1. Plaintiffs were not direct victims of the alleged bribery scheme.

It is well established that RICO claims predicated on bribery or wire fraud may only be brought by the direct victim of those acts—the entity victimized and/or defrauded by the bribery. *See Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1343 (11th Cir. 2017) (rejecting RICO allegations based on predicate act of wire fraud because "the complaint made clear that the alleged wire fraud targeted [a separate entity], not [the plaintiff]"), *petition for cert. filed*, No. 17-172 (July 31, 2017); *Halpin v. Crist*, 405 F. App'x 403, 406 (11th Cir. 2010) (per curiam) (concluding that alleged predicate acts of wire and mail fraud involving "bribes [paid to State officials that] purportedly led to artificially high canteen prices, which [Plaintiffs] paid," were "too tenuous and indirect to survive a motion to dismiss" because, among other things, the State of Florida "was the intended target of the fraudulent scheme"); *G&G TIC, LLC v. Ala. Controls, Inc.*, 324 F. App'x 795, 797 (11th Cir. 2009) (per curiam) (recognizing that "the Supreme Court [has] held that one company's fraud on [a separate entity] does not proximately cause the injury a competitor sustains by being at a competitive disadvantage due to the fraud"). This requirement stems from the Supreme Court's admonition that "directly injured victims can

11

generally be counted on to vindicate the law . . . without any of the problems attendant upon suits by plaintiffs injured more remotely." *Holmes*, 503 U.S. at 269–70.

Thus, in *Hope for Families & Community Service, Inc. v. Warren*, 721 F. Supp. 2d 1079, 1129, 1131 (M.D. Ala. 2010), the court rejected a RICO claim based on bribes to county officials that, in turn, allegedly caused those officials to promulgate rules under which the county sheriff denied plaintiffs' application for a gaming license. The court concluded that proximate cause was lacking because "[t]he ***direct victims*** of [the bribers'] alleged misconduct were the citizens of Macon County and Sheriff Warren—not Plaintiffs." *Id.* at 1129.[7]

Here, the Complaint unmistakably alleges that the "immediate victim[]," *Anza*, 547 U.S. at 460, of the alleged RICO acts is Conmebol, not Plaintiffs, Compl. ¶ 200; *see also* Sept. 19, 2017 Order (ECF No. 238) at 11, 13 (recognizing Conmebol's position that it is a "victim" and noting that alleged tortious activity was "directly contrary to the interests" of Conmebol). Thus if anyone is properly positioned to "vindicate" the interests protected by the laws Plaintiffs rely on, it would be Conmebol, not Plaintiffs. *See Harris v. Orange S.A.*, 636 F. App'x 476, 483 (11th Cir. 2015) ("[T]o the extent that the defendants' conduct has harmed [the direct victim's] value, [the direct victim] can be counted on to vindicate that interest.").

### 2. Plaintiffs' alleged injuries are too remote.

Plaintiffs' theory of causation also fails because the alleged injuries depend on intervening factors and are speculative. The "motivating principles animating the injury

---

[7] The *Hope for Families* court recognized that the Supreme Court's decision in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), is not to the contrary. *Bridge* held that a RICO plaintiff need not have personally relied on the defendant's misrepresentations, but it reaffirmed the established requirement that the plaintiff's injury be direct. In *Bridge*, (1) "proximate cause was neither in doubt nor at issue," and (2) it was undisputed that the plaintiff was the "primary" victim. *Hope for Families*, 721 F. Supp. 2d at 1131 (quotations omitted); *see also id.* at 1130 (indicating that *Bridge* "did not disturb *Anza*'s and *Holmes*'s holdings").

requirements in RICO cases," *Harris*, 636 F. App'x at 483, include: (1) whether "the immediate victims of [the] alleged RICO violation can be expected to vindicate the laws by pursuing their own claims"; (2) "the speculative nature of the proceedings that would follow if [the plaintiff] were permitted to maintain its claim"; (3) whether the alleged injury "could have resulted from factors other than [the defendant's] alleged acts of fraud"; and (4) "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action." *Anza*, 547 U.S. at 458–61. In this case, each of these motivating principles weighs in favor of dismissal.

*Conmebol is the immediate victim:* As discussed above, the immediate victim of the wrongdoing alleged in the Complaint is Conmebol, not Plaintiffs. Therefore, to the extent the alleged wrongdoing resulted in harm, Plaintiffs are not the proper party to seek redress. *See* Part I.A.1, *supra*.

*Plaintiffs' claims of injury are speculative:* Courts evaluating indirect bribery-based RICO claims similar to Plaintiffs' have rejected them as too speculative. In *Strates Shows, Inc. v. Amusements of America, Inc.*, 379 F. Supp. 2d 817, 829–30 (E.D.N.C. 2005), the plaintiff alleged that it was deprived of the opportunity to obtain contracts for the state fair because the defendants, Strates's competitors, had bribed and unlawfully influenced the state officials who ultimately decided where the contracts would go. The plaintiff specifically identified instances where it had submitted proposals that were "considerably more favorable" to the state than those of the defendants who obtained the contracts. *Id.* at 823. The court rejected the plaintiff's theory of direct injury, recognizing that permitting the plaintiff's claim to proceed would result in a "trial within a trial" involving a speculative, "after-the-fact reconstruction" of a bidding process that, if conducted on a level playing field, might or might not have resulted in plaintiff obtaining the contracts. *Id.* at 828–30.

As with the rejected claims in *Strates Shows*, Plaintiffs here allege that they were injured because bribes paid to Conmebol directors led Conmebol to award broadcasting rights to T&T that otherwise would have been available to Plaintiffs and other "potential competitors."  Compl. ¶ 138.  But here, the already tenuous connection between bribery and injury that was deemed too speculative in *Strates Shows* is utterly foreclosed, in at least two respects:

*First,* the Complaint alleges that on the occasions when Global Sports submitted so-called "bids" (that is, unsolicited offers) to Conmebol for the rights, those rights were ***already under contract*** with T&T.  *See* Compl. ¶ 111 (making offer for rights "which Conmebol had previously awarded to T&T"), ¶ 116 ("GolTV offered Conmebol far more than it was receiving from T&T and Fox"), ¶ 123 (offering more than the price "paid by T&T and TyC International for the same period").  It would be rank speculation to argue that, in the absence of bribes, Conmebol would have breached its contracts with T&T and re-opened the rights process to allow others to bid.  Equally speculative is Plaintiffs's claim that Global Sports, as opposed to T&T or a third party, would have won the rights in a reopened bidding process.[8]

*Second*, the Complaint, if anything, establishes that Plaintiffs would ***not*** have won the rights absent the alleged bribery—because it alleges that is in fact what happened ***after the bribery stopped***.  *Id.* ¶¶ 128, 131–32.  No bribery is alleged after May of 2015, when the

---

[8] Plaintiffs make the conclusory assertion that under Paraguayan law Conmebol was "legally obligated to revoke[] its wrongful sale of the Club Tournament rights to T&T in favor of GolTV's superior offer."  Compl. ¶ 115.  The Complaint does not supply the basis for this assertion, which is wrong in all events.  Only bribery of public servants is illegal in Paraguay. *See, e.g.*, Art. 300 of Law 1160/90 (Paraguayan Criminal Code).  Commercial bribery is not.  *See Paraguay: Overview of Corruption & Anti-Corruption*, Transparency International (Feb. 9, 2016) at 7 (attached at Vigen Aff. Ex. 4) ("Prosecutor Federico Espinoza noted to US authorities in a press conference in early 2016 . . . that not even private sector bribery is a punishable offence.").  Regardless, Plaintiffs' allegations of obligations imposed on ***Conmebol*** only highlight that Plaintiffs' asserted injuries stem from the intervening decisions of a third party.

Department of Justice unsealed its original indictment "describ[ing] some of the bribery." *Id.* ¶ 127. Yet the Complaint alleges that, in October 2015, when Plaintiffs again offered to purchase the rights for the years 2016–2018, Conmebol did not accept the offer and instead chose to award the rights for 2016–2018 to Fox. *Id.* ¶¶ 130–32. There is no allegation that Conmebol's decision was influenced by bribery. (Indeed, exhibits attached to the Complaint and the unrebutted evidence recently submitted to the Court in connection with Conmebol's motion to dismiss for lack of jurisdiction show that the bidding was conducted in an open and transparent manner, under the watchful eye of the United States Department of Justice,[9] and that, at that time, Torneos was already cooperating with the Government.) *See* Compl., Ex. B ¶ 6(c). Thus, even in the absence of alleged bribery, Conmebol chose not to award the rights to Plaintiffs in 2015. Under these circumstances, it is beyond speculative to conclude that the result would have been different if there had been no bribery in earlier years.

*The alleged injury resulted from independent factors:* Before Plaintiffs could suffer damages, multiple intervening events, by multiple intervening actors, had to occur. First and foremost, Conmebol had to decline to breach its existing contracts with T&T, and then to reject Global Sports's competing offers. And quite apart from the fact that the rights were not obtained by Plaintiffs, other events had to take place involving independent actors and that have nothing to do with any of the misconduct alleged. Television viewers had to choose not to tune in to GolTV's competing programming. Advertisers then had to choose not to place their ads on the

---

[9] *See* Conmebol Mot. Dismiss (ECF No. 203) at 20–21 ("[T]he Fox Agreement was entered well after issuance of the original indictment . . . and was understood by all, including the DOJ, as a path for CONMEBOL to make a clean break and a fresh start. . . . The DOJ reviewed and gave its blessing to the Fox Agreement . . ., which was then duly approved by the CONMEBOL Executive Committee . . . ." (citing Gonzalez Aff. (ECF No. 204) ¶¶ 33–35)).

GolTV network.  And Plaintiffs' profits had to suffer in comparison, despite the high cost structure Global Sports allegedly offered to pay Conmebol.

This theory of injury relies on precisely the type of attenuated, "purely contingent" harm, *Holmes*, 503 U.S. at 271, that the Supreme Court repeatedly has rejected in civil RICO cases.  As the Court has made clear, an injury is too remote when "the conduct directly causing the harm [is] distinct from the conduct giving rise to the fraud," *Hemi Group*, 559 U.S. at 11, and an "even sharper" disconnect between asserted injury and alleged fraud exists when the plaintiff's "theory of liability rests not just on separate *actions*, but separate actions carried out by separate *parties*." *Id.*  Thus in *Holmes*, the Court held that an insurer was not directly harmed by stock manipulation that ultimately forced the insurer to reimburse customers of broker-dealers who were unable to meet their financial obligations: the insurer's injury was contingent on the broker-dealers' failure to pay customers, not the underlying stock manipulation.  503 U.S. at 261–63, 271.  Similarly, in *Anza*, the Court found the plaintiff did not suffer a sufficiently direct injury because the cause of the plaintiff's harm was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)," even though the fraud on the state allowed the violator to offer lower prices and harm the plaintiff.  547 U.S. at 454–55, 458.  In *Hemi Group*, the City of New York's injury was insufficiently direct because "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes[,] [while] the conduct constituting the alleged fraud was [the company's] failure to file [the required] reports"—even though the failure to file the reports prevented the City from collecting the tax payments.  559 U.S. at 4–6, 11.

Just as in those cases, Plaintiffs' alleged injuries are "entirely distinct" from the alleged RICO conduct: *First*, the alleged fraud was perpetrated on **Conmebol**, not on Plaintiffs, and the

16

alleged injuries stem from *Conmebol's* subsequent refusal to breach its contracts and steer the rights to Global Sports and not to some other company.  *Second*, any alleged losses of revenue, profits, market share, and profile claimed by Plaintiffs resulted from the independent decisions of *TV viewers* (to tune in to competing programming in lower numbers) and *advertisers* (to place their ads elsewhere).  Plaintiffs' theory of liability therefore "rests not just [on] separate *actions*, but on separate actions carried out by separate *parties*."  *Hemi Grp.*, 559 U.S. at 11.  Under controlling Supreme Court precedent, these allegations are categorically insufficient to establish any injury "directly" caused by Defendants.

      ***Ascertaining damages would be extremely difficult:*** It would be an insurmountable challenge "to ascertain the damages caused by [Defendants' alleged] remote action[s]."  *Anza*, 547 U.S. at 458.  Plaintiffs' chain of causation relies on numerous intervening decisions by Conmebol, TV viewers, and advertisers that were undoubtedly informed by various, difficult-to-quantify factors like Plaintiffs' business practices and consumer taste.  As in *Harris*, "it would be difficult, if not impossible, to determine accurately the proportionate reduction in . . . value attributable to the defendants' conduct as opposed to factors like market conditions, poor business practices, or failure to anticipate developments in the financial markets."  636 F. App'x at 483.  What is not difficult to determine, however, is what is admitted in the Complaint: the rights were already under contract when Plaintiffs made their bid, and Plaintiffs' bid failed even after the bribery scheme stopped.

      **B.**     **Plaintiffs Have Not Alleged a Cognizable "Pattern of Racketeering Activity."**

          **1.**     **A pattern requires "continuity" of wrongful conduct, which must be more than a single scheme with a discrete goal.**

      "To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the

predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a ***continuing*** nature." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004).  The third element, referred to as the "continuity" requirement, "is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address." *Id.* at 1265.  A plaintiff must allege and prove either closed-ended continuity or open-ended continuity.  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989).  Closed-ended continuity requires "a series of related predicates extending over a substantial period of time." *Id.* at 242.  Open-ended continuity requires "either that 'the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future,' or that 'the predicate acts or offenses are part of an ongoing entity's regular way of doing business.'" *Jackson*, 372 F.3d at 1265 (quoting *H.J.*, 492 U.S. at 242).

Consistent with its origins as a weapon to combat organized crime, RICO is "aimed" at "broad or ongoing criminal behavior" rather than discrete or isolated criminality.  *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 18 (1st Cir. 2000).  Thus, the Eleventh Circuit has emphasized repeatedly that alleging multiple RICO acts in furtherance of a "single scheme with a discrete goal" and a defined group of victims is insufficient to plead either closed-ended or open-ended continuity.  *See Daedalus Capital LLC v. Vinecombe*, 625 F. App'x 973, 976 (11th Cir. 2015) (per curiam) (quotations omitted); *Ferrell v. Durbin*, 311 F. App'x 253, 256 (11th Cir. 2009) (per curiam); *Jackson*, 372 F.3d at 1267.  Yet, that is precisely what Plaintiffs have alleged: one kind of conduct (bribing Conmebol directors), Compl. ¶ 62, in furtherance of one scheme with a single goal (obtaining the Club Tournaments rights), *id.*, and causing harm to—at most—a small and discrete group of victims (Conmebol and its members), *id.* ¶ 200.

2.      **Plaintiffs have not alleged either "closed-ended" or "open-ended" continuity.**

Under Eleventh Circuit precedent, the allegations in the Complaint are insufficient to demonstrate either "close-ended" or "open-ended" continuity.

***"Closed-ended" continuity:*** "[W]here the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over" an extended period of time. *Jackson*, 372 F.3d at 1267. In short, "one scheme, causing harm to a few victims, and causing one injury does not create closed-ended continuity," even if the scheme lasted for several years and "the injury took multiple steps to inflict." *Ward v. Nierlich*, 617 F. Supp. 2d 1226, 1238 (S.D. Fla. 2008) (finding multiple acts of mail and wire fraud as part of scheme to "wrest control of [a] partnership from [the plaintiff] for the purpose of controlling" a residential development insufficient to establish continuity); *see also Ferrell*, 311 F. App'x at 256 n.6 (favorably citing cases where allegations of limited schemes extending over "several years" were insufficient to plead closed-ended continuity).

In *Daedalus*, for example, the plaintiffs alleged a multi-year scheme to divert a company's proceeds and bleed the company of assets. 625 F. App'x at 975–76. The Eleventh Circuit held that the plaintiff "[could] not show closed-ended continuity because there is only one victim, [the company], and 'only a single scheme with a discrete goal' connecting the predicate acts—i.e., [defendants'] alleged scheme to divert business proceeds from [the company] to . . . themselves." *Id.* at 976 (quoting *Jackson*, 372 F.3d at 1267). That aptly describes the allegations in this case, which describe only a single bribery scheme directed at discrete group of victims (Conmebol and its members).

*"Open-ended" continuity:* Plaintiffs' allegations fail the test for "open-ended" continuity for much the same reason: "single schemes with a specific objective and a natural ending point can **almost never** present a threat of continuing racketeering activity." *Ferrell*, 311 F. App'x at 257 (emphasis added). When a plaintiff cannot plead a continuous pattern of racketeering activity that has already occurred—"closed-ended" continuity—"the concept of open-ended continuity was fashioned to allow plaintiffs to . . . show[] that the criminal activity alleged would likely continue and that **eventually** the plaintiff would have been able to show related, continuous predicate acts sufficient for closed-ended continuity." *Horace-Manasse v. Wells Fargo Bank, N.A.*, No. 10-81623-CV, 2012 WL 1232016, at *4 (S.D. Fla. Apr. 12, 2012), *aff'd per curiam*, 521 F. App'x 782 (11th Cir. 2013). But when the allegations charge only a single, discrete scheme, the conduct would not amount to a pattern even if it were to extend into the future. *See Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm.*, 953 F.2d 587, 593 (11th Cir. 1992) (recognizing that single scheme to deprive employees of a year's vacation benefits could not constitute open-ended continuity despite allegation that employer "continued to use the mails [for years] . . . to misrepresent the status of the vacation benefits" (quotations omitted)).

Even setting aside the narrow focus of the alleged scheme and its discrete victims, the Complaint confirms that the alleged bribery scheme poses no threat of future harm: the government's indictment of some of the individual defendants brought the alleged scheme to an end. Thus "it is impossible that the alleged illegal acts could have continued indefinitely into the future." *Smart Sci. Labs., Inc. v. Promotional Mktg. Servs., Inc.*, No. 8:07-cv-1554, 2008 WL 2790219, at *10 (M.D. Fla. July 18, 2008) (finding insufficient allegation of future threat because plaintiff "stopped doing all business" with defendant "when [the plaintiff] discovered

20

the alleged fraud"); *see also Jackson*, 372 F.3d at 1268–69 ("[I]n spite of the plaintiffs' bald

suggestion that the defendants might have continued their fraud in the future had they not been

uncovered, this is not sufficient to allege open-ended continuity.  Indeed, since the investigation

did reveal and ultimately sanction the defendants' activities, it is virtually certain that they will

*not* engage in similar conduct in the future").

> **C.   Plaintiffs Have Not Sufficiently Alleged Any Predicate Acts of Racketeering.**

To state a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege that the

defendants engaged in underlying "racketeering activity."  The statute defines "racketeering

activity" to include a list of specific acts ("predicate acts") that violate federal or state law.  *Id.*

§ 1961(1).  Plaintiffs allege that Defendants violated five separate laws that are RICO predicates:

(1) 18 U.S.C. § 1956 (money laundering); (2) 18 U.S.C. § 1957 (monetary transactions in

property derived from specified unlawful activity); (3) 18 U.S.C. § 1343 (wire fraud); (4) 18

U.S.C. § 1952 (the Travel Act); and (5) bribery under New York state law.  *See* Compl. ¶¶ 193–

253.[10]  For the reasons explained below, Plaintiffs do not sufficiently allege any of these RICO

predicate acts.

> **1.   Plaintiffs have not sufficiently alleged money laundering or monetary
> transactions under 18 U.S.C. §§ 1956 or 1957.**

Plaintiffs contend that the alleged bribery scheme amounted to money laundering under

18 U.S.C. § 1956 and "monetary transactions in criminally derived property" under 18 U.S.C.

§ 1957.  Compl. ¶¶ 210, 218, 225, 233.  Section 1956 requires (among other elements)

transacting in the "proceeds" of separate unlawful activity or transacting "with the intent to

promote" separate unlawful activity.  18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i), (a)(2)(A), and

---

[10] Antitrust violations are not RICO predicate acts, and the Complaint does not allege that they
are.

(a)(2)(B)(i).  Section 1957 prohibits knowingly engaging in "monetary transactions in criminally derived property"—property "derived from specified unlawful activity"—"of a value greater than $10,000."  18 U.S.C. § 1957(a).  Both statutes therefore require either promoting, or transacting in the proceeds of, *separate predicate crimes*.  *See United States v. Silvestri*, 409 F.3d 1311, 1333 (11th Cir. 2005) (defining "proceeds" as "what is produced by" something else (quotations omitted)); *United States v. Santos*, 553 U.S. 507, 517–18 (2008) (defining "promotion" as "[t]o contribute to the . . . prosperity of something, or to further something" (quotations omitted)).  Plaintiffs do not adequately allege a separate predicate offense, nor do they allege promotion or use of proceeds derived from unlawful activity.

   a.    **Plaintiffs do not adequately allege a separate predicate offense.**

   As a threshold matter, the money laundering and monetary transaction predicates are redundant of Plaintiffs' other alleged predicate offenses and fall if they do.  That is because the only alleged criminal offenses that could be predicates for money laundering are also the alleged predicates for RICO: namely wire fraud, the Travel Act, and bribery under New York state law.  Because, as discussed elsewhere in this brief, Plaintiffs have not alleged a violation of those separate offenses, they also have not alleged money laundering.  *See Ellis v. Warner*, No. 15-10134-CIV, 2017 WL 634287, at *9–*10 (S.D. Fla. Feb. 16, 2017) (holding plaintiff failed to adequately plead money laundering based on wire and mail fraud, because plaintiff did "not sufficiently ple[a]d the predicate acts of wire and mail fraud"); *Black Diamond Land Mgmt., LLC v. Twin Pines Coal Co.*, No. 2:14-cv-02333, 2016 WL 3617974, at *11 (N.D. Ala. July 6, 2016) (holding where plaintiff inadequately pled other RICO predicates, "the line of definition-dominoes required to prove" a § 1957 claim relying on those same predicates as specified unlawful activity "collapse[d]"), *aff'd per curiam*, No. 16-15240, --- F. App'x ----, 2017 WL 3635178 (11th Cir. Aug. 24, 2017).

22

### b.      Plaintiffs do not adequately allege "proceeds."

Even assuming arguendo that Plaintiffs had sufficiently alleged a predicate offense based on the alleged bribes, the Complaint does not adequately allege facts showing that Defendants transacted in the "proceeds" of such an offense, as Sections 1956(a)(1)(A)(i), (a)(1)(B)(i), (a)(2)(B)(i), and 1957 require.  Plaintiffs baldly assert that Defendants "deposit[ed revenues generated from the bribery scheme] in financial institutions and us[ed] such proceeds in financial institutions to wire the payment of bribes on an ongoing basis."  Compl. ¶ 213.  But they plead no facts from which one can plausibly infer that any of the alleged bribe payments was made with funds allegedly "derived" from the ill-gotten Copas rights.  Plaintiffs' unsupported contention that Defendants used proceeds from unlawful activity to pay bribes is thus insufficient to plead a violation of § 1956 or § 1957.  *See Bryan v. Countrywide Home Loans*, No. 8:08-cv-794-T-23EAJ, 2008 WL 4790660, at *6 (M.D. Fla. Oct. 27, 2008) (finding allegations of money laundering "insufficient because they fail[ed] to articulate specific facts that satisfy the essential elements of § 1956" and were "little more than restatements of the statutory text"); *Jus Punjabi, LLC v. Get Punjabi Inc.*, No. 1:14-cv-3318-GHW, 2015 WL 2400182, at * (S.D.N.Y. May 20, 2015) (dismissing money laundering claims because, among other things, "[t]he complaint's bare-bones allegation does not support the inference that [Defendant's] money was involved in unlawful activity"), *aff'd*, 640 F. App'x 56 (2d Cir. 2016).

### c.      Plaintiffs do not adequately allege "promotion."

Plaintiffs further claim that Defendants' alleged bribery violated the "promotion" element of Section 1956(a)(1)(A)(i) and (a)(2)(A).  Compl. ¶¶ 205, 218.  Those subsections prohibit only "transfers" of funds made "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A) (emphasis added).  "[S]pecified unlawful activity" includes "any act or activity constituting an offense listed in section 1961(1)," i.e., any RICO predicate

act. *Id.* § 1956(c)(7)(A). In other words, similar to the "proceeds" requirement described above, there must be some ***distinct*** unlawful activity that the monetary "transfer" was intended to "promote." *See Santos*, 553 U.S. at 517–18. Courts have rejected repeatedly the notion that the same "transfer" or transaction can be both the "unlawful activity" ***and*** money laundering intended to promote that activity. Such a result would "run afoul of Congressional intent to create an offense distinct from the underlying crime." *United States v. Trejo*, 610 F.3d 308, 318 (5th Cir. 2010). "Were [an unlawful] payment . . . itself held to be a transaction that promoted the unlawful activity of that same transaction virtually every [unlawful] sale . . . would be an automatic money laundering violation as soon as the money changed hands." *United States v. Heaps*, 39 F.3d 479, 486 (4th Cir. 1994), *abrogated on other grounds by United States v. Cabrales*, 524 U.S. 1 (1998).

Plaintiffs allege that the same underlying transactions amounted to wire fraud, bribery, and Travel Act violations ***and*** money laundering "promoting" wire fraud, bribery, and Travel Act violations. This does not state a claim.

### 2.    Plaintiffs' wire fraud allegations fail.

Plaintiffs allege that the claimed "bribe payments" were wire fraud: "a scheme or artifice to defraud (including a scheme or artifice to deprive another of the intangible right of honest services) or for obtaining money or property by means of false or fraudulent pretenses" under 18 U.S.C. §§ 1343 and 1346. Compl. ¶¶ 193, 199. Plaintiffs further allege that this "scheme defrauded Conmebol and Conmebol's member associations." *Id.* ¶ 200. The wire fraud allegations fail both because they rely on extraterritorial conduct outside the scope of the statute and because they do not sufficiently allege a causal connection between conduct and harm.

24

### a. Plaintiffs have alleged an impermissible extraterritorial application of the wire fraud statutes.

The Supreme Court recently explained that RICO applies to foreign racketeering activity "only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2102 (2016). Thus, when a plaintiff alleges international wire fraud as a predicate act in a RICO case, the question is whether the wire fraud statutes would extend to the defendants' alleged conduct. This analysis requires the court to consider (i) whether Congress intended the wire fraud statutes to apply extraterritorially and, if not, (ii) whether the complaint sufficiently alleges a domestic wire fraud offense. *Id.* at 2101. The answer to each of (i) and (ii) is "no."

(i) Federal statutes apply extraterritorially only if they evince "clearly expressed congressional intent" to reach foreign conduct. *Id.* at 2100. The wire fraud statutes contain no such clear statement of intent. *See United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1129 (N.D. Cal. 2015) ("Congress did not include in the wire fraud statute any language indicating that it applies extraterritorially."); *see also European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014), *rev'd and remanded on other grounds*, 136 S. Ct. 2090 (2016).

(ii) Under the Supreme Court's *Nabisco* decision, then, only **domestic** violations of the wire fraud statutes may serve as the basis for a RICO claim. 136 S. Ct. at 2102. To "determine whether the case involves a domestic application of the statute," one must "look[] to the statute's 'focus.'" *Id.* at 2101. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application"; but if "the conduct relevant to

the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*[11]

The "focus" of the wire fraud statutes is on the "particular class of frauds" prohibited— that is, use of U.S. wires in furtherance of schemes to defraud others of money or property. *Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768, 783–84 & n.4 (S.D.N.Y. 2016) (considering similar language in the mail fraud statute). But notably, an allegation of some use of U.S. wires is not enough. To satisfy the second prong of the *Nabisco* test, there must be an allegation of a "substantial amount of conduct in the United States" that is "integral to the commission of [the] fraud." *Id.* at 784. Mere "use of the U.S. mails [or wires], without more, can[not] be considered conduct relevant to the 'focus' of the mail fraud statute." *Id.* at 783 n.4; *see also Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (rejecting application of wire fraud statute despite transmission of invoices and payments through New York where "[t]he activities involved in the alleged scheme—falsifying the invoices, the bribes, the approval of the false invoices—took place outside of the United States"); *United States v. Prevezon*

---

[11] Torneos' acceptance of responsibility for one count of conspiracy to commit wire fraud in the Eastern District of New York does not change the extraterritoriality analysis. As several courts have held, criminal prosecutions under the RICO and wire fraud statutes are not determinative of extraterritoriality in a civil RICO case. *See Sonterra Capital Mater Fund Ltd. v. Credit Suisse Grp. AG*, No. 15-cv-871(SHS), 2017 WL 4250480, at *41 (S.D.N.Y. Sept. 25, 2017) (finding extraterritoriality analysis in a criminal wire fraud prosecution inapplicable to civil RICO claims); *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 Civ. 5263 (AKH), 2017 WL 3600425, at *15 (S.D.N.Y. Aug. 18, 2017) ("Plaintiffs' reliance on criminal RICO cases is unfounded, for extraterritorial application of RICO in civil cases presents distinct considerations absent in the criminal context."). Among other reasons, this is because "[a] private plaintiff seeking extraterritorial application of RICO is subject to considerations that do not apply to criminal prosecutions under the statute, and must specifically allege a domestic injury." *Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *32 (S.D.N.Y. Feb. 21, 2017); *see RJR Nabisco*, 136 S. Ct. at 2107 ("Allowing recovery for foreign injuries in a civil RICO action, including treble damages, presents [a] danger of international friction."). As discussed below, Plaintiffs have not alleged that a substantial amount of wire fraud conduct occurred in the United States, and certainly have not alleged a "domestic injury" to themselves.

*Holdings LTD.*, 122 F. Supp. 3d 57, 71 (S.D.N.Y. 2015) (finding insufficient an allegation of a wire transfer "routed through New York" where "the Government [did] not plead that the wire fraud scheme here was formed in the United States, let alone that all of the elements of wire fraud were completed in the United States"); *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419 (GBD), 2015 WL 1515487, at *8 (S.D.N.Y. Mar. 31, 2015) (rejecting application of wire fraud statute where allegations were "far too attenuated to sufficiently plead that the scheme to defraud came about in the U.S.").

In this case, it is indisputable that most of the conduct integral to the alleged scheme took place overseas.  Plaintiffs allege wire fraud in the form of bribes (1) paid from T&T, a Cayman Islands company, (2) to foreign directors of a Paraguayan non-profit organization, (3) for the purpose of "defrauding" that Paraguayan non-profit (4) into licensing broadcasting rights to foreign soccer tournaments.  Compl. ¶¶ 17, 32–34, 55–56, 61–62, 200.  Plaintiffs also allege (5) that defendants operated through foreign "intermediaries" registered in Panama, Turks and Caicos, and Brazil.  *Id.* ¶¶ 82, 86.

The primary domestic component of the alleged bribes is that some of the payments allegedly were wired through United States bank accounts.  Compl. ¶¶ 194–96.  But there is nothing pled to suggest that a "substantial amount of conduct" relevant to the "focus" of the wire fraud statutes occurred within the United States.[12]  *Elsevier*, 199 F. Supp. 3d at 784.  Indeed, this Court recently determined that it does not have personal jurisdiction over the foreign defendant that Plaintiffs allege was defrauded by the foreign-focused conduct of mostly foreign entities.

---

[12] To the extent the court in the related criminal matter reached a different conclusion based on the indictment's allegations, *United States v. Hawit*, No. 15-cr-252 (PKC), 2017 WL 663542, at *6–*7 (E.D.N.Y. Feb. 17, 2017), we respectfully disagree, as applied to the Complaint's allegations, for the reasons explained above.  It is also distinguishable for the reasons explained in note 11, *supra* at p. 26.

*See* Sept. 19, 2017 Order (ECF No. 238) at 14–15.  Plaintiffs' claim of "racketeering" based on a wire fraud predicate therefore does not state a claim.

**b.      Plaintiffs have not sufficiently alleged wire fraud as a RICO predicate act.**

In addition to extraterritoriality, the Complaint's allegations are insufficient to support a claim for wire fraud as a RICO predicate act.  Plaintiffs have not alleged any fraud concerning "the nature of the bargain" by which Conmebol sold the television rights to T&T.  *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016).[13]  Plaintiffs therefore must be alleging that Defendants' bribery scheme deprived Conmebol of "the intangible right of honest services" of its bribed representatives.  18 U.S.C. § 1346.

"Honest services" wire fraud may include bribes or kickbacks to induce someone who owes a fiduciary duty to another to take action contrary to that duty.  *See, e.g.*, *United States v. Langford*, 647 F.3d 1309, 1320 (11th Cir. 2011).  Plaintiffs allege that Defendants defrauded Conmebol by causing Conmebol officials to breach their fiduciary duties to the organization.  Noticeably absent from the "wire fraud" section of the Complaint, however, is ***even a single mention*** of Plaintiffs themselves or any alleged harm ***they*** have ostensibly suffered.  *See* Compl. ¶¶ 193–204.  As explained in Part I.A., *supra*, the civil RICO provision requires a ***direct*** connection between a wire fraud predicate act and the plaintiff's claimed injury.  *Anza*, 547 U.S. at 461.  Thus, an allegation that the defendant has deprived some non-plaintiff entity of a

---

[13] The court in *Takhalov* concluded that it would not be wire fraud to pay women to pose as tourists in order to lure businessmen into bars and nightclubs, where the men then spent money.  827 F.3d at 1310, 1315–16.  As *Takhalov* makes clear, the Eleventh Circuit has drawn a "line between schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain— which do violate the mail and wire fraud statutes."  *Id.* at 1314 (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)).

fiduciary's honest services and thereby caused harm to the plaintiff—who was not itself owed or deprived of any duty— is insufficient to state a claim.  *See Feldman*, 849 F.3d at 1343 (rejecting wire fraud allegations because "the complaint made clear that the alleged wire fraud targeted [a separate entity], not [the plaintiff]").

### 3.    Plaintiffs' allegations under the New York commercial bribery statute fail.

Plaintiffs next allege that Defendants violated New York Penal Law Section 180.03 (commercial bribery in the first degree), and that such state law "brib[es]" are RICO predicate acts.  Compl. ¶ 243.  Section 180.03 prohibits "confer[ring] . . . any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal," where the benefit conferred "causes economic harm to the employer or principal in an amount exceeding two hundred fifty dollars."  N.Y. Penal Law § 180.03 (McKinney 2017).[14]  Plaintiffs' allegations fail both because they are extraterritorial and because they do not sufficiently describe conduct that violates the New York statute.

### a.    Plaintiffs have alleged an impermissible extraterritorial application of the New York commercial bribery statute.

As discussed above, RICO applies extraterritorially only to the extent its predicate offenses do.  *RJR Nabisco*, 136 S. Ct. at 2100.  It follows that a state law offense cannot be a RICO predicate act when the applicable state statute does not apply to extraterritorial conduct. Although *RJR Nabisco* addressed a RICO claim predicated on violations of federal law, RICO's extraterritorial scope must be equally, if not more, constrained when the predicates are based on **state** law.  After all, the reason why courts presume that U.S. law applies only to domestic

---

[14] Plaintiffs also allege violations of Section 180.08, which is a parallel prohibition on receiving benefits.

conduct is to avoid "unintended clashes between our laws and those of other nations which could result in international discord."  *Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 115 (2013) (quotations omitted).

New York Penal Law Section 180.03 contains no language indicating an extraterritorial application and, accordingly, it has none.  *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none."). A person may be convicted of a New York offense when, among other things, "[c]onduct occurred within [the] state sufficient to establish . . . [a]n element of [the] offense."  N.Y. Crim. Proc. Law § 20.20.[15]  Thus, New York's commercial bribery statute does not apply extraterritorially, and Plaintiffs must allege a domestic violation of that statute to plead a RICO predicate act.

Plaintiffs have not alleged a domestic violation.  They allege that T&T, a foreign entity, made payments through foreign intermediaries to bribe Conmebol officials overseas.  While some of the payments allegedly were made from New York bank accounts, this does not comprise an element of the offense under Section 180.03.  The commercial bribery statute prohibits "confer[ring]" an improper benefit, and according to the Complaint, any benefits were "conferred" on the Conmebol officials overseas.  And, as discussed above, any injury resulting

---

[15] Jurisdiction also exists under section 20.20 when (2) conduct sufficient to establish an attempt to commit the offense occurred within the state; (3) conduct sufficient to establish a conspiracy or criminal solicitation to commit the offense occurred within the state; (4) the offense committed was a result offense and the result occurred within the state; (5) the statute defining the offense prohibits a particular effect in the state and the conduct constituting the offense was intended to produce that effect in the state; (6) the offense committed was an attempt to commit a crime in the state; (7) the offense committed was conspiracy to commit a crime within the state and an overt act occurred within the state; or (8) the offense committed was an omission to perform a duty in the state imposed by the laws of the state.  N.Y. Crim. Proc. Law § 20.20. None of these apply to the present case.

from the alleged bribery scheme was felt primarily and proximately by ***Conmebol*** in Paraguay, not in New York, where neither Conmebol nor either Plaintiff resides.

**b.**       **Plaintiffs have not sufficiently alleged the elements of New York commercial bribery.**

Extraterritoriality aside, Plaintiffs' commercial bribery allegations fail because Plaintiffs have not adequately alleged that Conmebol suffered economic harm as a result of the alleged bribes.  The Complaint makes clear that Defendants' alleged bribery resulted in contracts through which Conmebol ***received*** hundreds of millions of dollars for licensing the television rights to T&T.  *See* Compl. ¶¶ 112, 121.  Nevertheless, Plaintiffs theorize that Conmebol and its member organizations suffered economic loss because Global Sports would have paid more money for the rights.  *Id.* ¶ 242.  Assuming arguendo that a profitable transaction can be "economic harm" under the New York statute, the Complaint does not plead facts that support this theory.  Rather, as noted above, Global Sports's "bids" were submitted, on every occasion, when the Copas rights were already under contract.  Accordingly, had Conmebol "accepted" Global Sports's offers, it would have been subject to suit for breach of contract and stood to lose more than it could have gained.  *See People v. Wolf*, 772 N.E.2d 1124, 1129 (N.Y. 2002) (requiring a showing that the victim "in fact would have achieved better terms," and noting economic harm is not established where "the record . . . does not show that a better deal was available when the [parties] made the [agreement]." (quoting *United States v. Zauber*, 857 F.2d 137, 146 (3d Cir. 1988)).

**4.**       **Plaintiffs' Travel Act allegations fail.**

Finally, Plaintiffs allege that Defendants violated the Travel Act, which (in relevant part) prohibits travelling or using "any facility" in "interstate or foreign commerce" with the intent to "(1) distribute the proceeds of any unlawful activity; or . . . (3) otherwise promote, manage,

establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity"—and then actually doing or attempting to do one of the above acts.  18 U.S.C. § 1952(a).  "Unlawful activity" includes "bribery . . . in violation of the laws of the State in which committed," money laundering, and engaging in monetary transactions in violation of 18 U.S.C. §§ 1956 or 1957.  *Id.* § 1952(b).

The alleged "unlawful activit[ies]" are the same allegations of New York commercial bribery and violations of 18 U.S.C. § 1956 and § 1957 that are discussed above.  Compl. ¶ 248.  Plaintiffs' Travel Act violations therefore fail because they have not sufficiently alleged those predicate offenses.  *See generally Black Diamond*, 2016 WL 3617974, at *10–11 (holding plaintiff could not plead violation of Travel Act "as a matter of law" because the alleged Travel Act predicate was based on allegations of "unlawful activity" that constituted other inadequately pled RICO predicate acts).

### D.   Plaintiffs' RICO "Conspiracy" Claim Fails for the Same Reasons as the Substantive RICO Claim.

When a complaint fails to state a substantive RICO claim, "the RICO conspiracy adds nothing," as "[i]t simply concludes that the defendants 'conspired and confederated' to commit conduct which in itself does not constitute a RICO violation."  *Jackson*, 372 F.3d at 1269; *see also Feldman*, 849 F.3d at 1343 (concluding that RICO conspiracy claim "necessarily fails because the complaint fails to allege an underlying violation of the racketeering acts").  In addition, a RICO conspiracy under 18 U.S.C. § 1962(d) carries the same, stringent causation requirement as a substantive RICO violation under § 1962(c).  *See* 18 U.S.C. § 1964(c) (providing that RICO injury must be "by reason of a violation of section 1962").  Plaintiffs' RICO conspiracy claim therefore falls with their substantive RICO claim.

## II.     PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE DISMISSED.

In another effort to drag this case into a U.S. forum, Plaintiffs seek to convert their allegations of foreign commercial bribery into a treble-damages antitrust claim under the Sherman Act.  This effort fails as a matter of law, for multiple reasons.

*First*, Plaintiffs' claims allege only commercial bribery, which by itself is neither exclusionary conduct cognizable under Section 2 of the Sherman Act nor an agreement in restraint of trade in violation of Section 1 of the Act.

*Second*, it is axiomatic that the Sherman Act provides a remedy only for those acts that harm ***consumers and competition***, not for alleged wrongdoing that merely harms ***competitors***.  The Complaint alleges only harm to Plaintiffs as purported competitors.

*Third*, Plaintiffs have not pled—and cannot plead—a viable theory of causation.

*Fourth*, Plaintiffs have not alleged remotely plausible geographic and product markets.  Plaintiffs simply draw a line precisely around Defendants' businesses and label them a "market."  Such gerrymandered market definitions fail as a matter of law.

*Finally*, Plaintiffs' antitrust claims are barred by the territorial restrictions of the Foreign Trade Antitrust Improvement Act because they are predicated on foreign conduct that does not have a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce that "gives rise" to Plaintiffs' antitrust claims.  15 U.S.C. § 6a.

### A.     Plaintiffs Cannot Transform Allegations of Bribery into an Antitrust Claim.

The government's 92-count indictment—the basis for Plaintiffs' allegations—did not charge any antitrust violations.  *See* Compl. Ex. A.  For good reason: "The Sherman Act is neither a lowest-responsible-bidder statute nor a panacea for all business affronts which seem to fit nowhere else."  *Scranton Constr. Co. v. Litton Indus. Leasing Corp.*, 494 F.2d 778, 783 (5th Cir. 1974).  As the Supreme Court has cautioned, "[e]ven an act of pure malice by one business

33

competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) (quotations omitted).

Consistent with these admonitions, courts recognize that a "claim of commercial bribery, standing alone, does not constitute a violation of the Sherman Act," *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 687 (9th Cir. 1976) (per curiam), because "[a]lthough . . . bribes may [be] illegal and unfair methods of competition, their illegality and unfairness does not support an inference that the bribes restrained competition. On the contrary, bribery could have been consistent with intense competition among the suppliers—some of which resorted to illegal measures to gain an advantage," *Fed. Paper Bd. Co. v. Amata*, 693 F. Supp. 1376, 1383 (D. Conn. 1988).[16]

In the rare instances where courts have allowed bribery-related claims to proceed under the Sherman Act, the alleged bribes were part of a larger course of conduct that included anticompetitive acts *other* than bribery. *See, e.g.*, *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1346–48, 1356 (5th Cir. 1980) ("Probably no one of the instances of improper conduct [including bribery but also trade-secret theft, sham litigation, and other

---

[16] *See also, e.g.*, *Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1284–85 (7th Cir. 1983) (holding allegation that supplier bribed plaintiff's employee to pay false invoices failed to state claim because "Plaintiff has not alleged any anticompetitive effect arising from the defendants' conduct"); *Parmelee Transp. Co. v. Keeshin*, 292 F.2d 794, 804 (7th Cir. 1961) (recognizing "that the victory of the successful bidder was made easier by the wrongful conduct of a public official" does not create antitrust liability); *Gregoris Motors v. Nissan Motor Corp. in USA*, 630 F. Supp. 902, 906–07 (E.D.N.Y. 1986) (holding commercial bribery allegations did not state claim because complaint lacked sufficient allegations of harm to competition); *Municipality of Anchorage v. Hitachi Cable, Ltd.*, 547 F. Supp. 633, 645 (D. Alaska 1982) ("Commercial bribery does not in itself constitute a violation of the Sherman Act.").

conduct], standing alone, would lead to section 2 liability.  Taken together, however, they show a pattern of exclusionary behavior sufficient to support the jury's verdict.").  Here, bribery is the **only** conduct alleged to have violated the antitrust laws.  As a matter of law, that is insufficient.

Plaintiffs' claims are similar to those rejected in *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998).  There, the plaintiff (Discon) alleged that as part of a scheme to commit regulatory fraud, one of the defendants (Materiel) chose Discon's competitor (AT&T) over Discon even though Discon would have charged less to Materiel.  *Id.* at 132.  Discon alleged that AT&T promised a kickback, or "special rebate," to Materiel at the end of the year, and argued that this agreement violated the Sherman Act.  *Id.*  The Supreme Court disagreed, warning, "[t]o apply the *per se* rule here—where the buyer's decision, though not made for competitive reasons, composes part of a regulatory fraud—would transform cases involving business behavior that is improper for various reasons, say, cases involving nepotism or personal pique, into treble-damages antitrust cases."  *Id.* at 136–37.  Thus, the Court held that the alleged kickback scheme was not *per se* illegal, and that "plaintiff here must allege and prove harm, not just to a single competitor, but to the competitive process, i.e., to competition itself."  *Id.* at 135.  On remand, the district court held that Discon could not show such harm based on the kickback scheme alleged.  *Discon Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154, 165 (W.D.N.Y. 2000) ("In short, not every bad act committed in business gives rise to an antitrust claim, even if harm to consumers ultimately results.").

Plaintiffs' claims here are far weaker.  In *NYNEX*, there was an allegation that consumers were harmed by the alleged kickback scheme due to artificially **high** prices.  Here, Plaintiffs allege that Conmebol sold the rights at ***below market value***.  *See, e.g.*, Compl. ¶ 132.  Thus, in Plaintiffs' but-for world (one in which no alleged bribery had occurred), consumers would have

been saddled with *higher* prices than they in fact paid, because according to Plaintiffs' theory, their cost of obtaining the rights in question would have been roughly *double* the actual cost paid by T&T. *Id.* ¶¶ 112, 121.

### B. Plaintiffs Allege No Harm to Competition or Consumers.

An antitrust plaintiff must allege injury to consumers and competition, not merely to the plaintiff as a competitor. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977); *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579 n.8 (11th Cir. 1985). To prove actual harm to competition, Plaintiffs must "point to the specific damage done to consumers in the market." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010) (quotations omitted); *see also Collegenet, Inc. v. Common Application, Inc.*, 104 F. Supp. 3d 1137, 1148 (D. Or. 2015) (rejecting plaintiffs' attempt "to translate its individual harm into harm to competition" without "sufficient factual allegations of harm to . . . consumers"). Because the focus of the Sherman Act is on remedying harm to *consumers*, exclusive dealing is only illegal if it forecloses competition in a way that harms consumers. *Mr. Furniture Warehouse, Inc. v. Barclays Am./Commercial Inc.*, 919 F.2d 1517, 1522 (11th Cir. 1990); *Southway Theatres, Inc. v. Ga. Theatre Co.*, 672 F.2d 485, 500 (5th Cir. Unit B 1982). Plaintiffs' allegations fail to clear this hurdle.

Plaintiffs' claim that an alleged bribery scheme caused Conmebol to award the Club Tournaments broadcast rights to T&T rather than to Plaintiffs. *See* Compl. ¶¶ 12, 108. This, they assert, harmed "competition" because Plaintiffs allegedly offered to pay more to Conmebol than T&T, yet did not win the rights. *See id.* ¶¶ 110, 112, 120–21, 124–25. But there is no allegation that without this bribery there would be more competition in their imagined markets. To the contrary, as Plaintiffs readily concede, no matter who won the Club Tournaments rights—

T&T, Global Sports, or anyone else—that entity would possess those rights exclusively.  Compl.

¶¶ 59, 61.  These allegations do not suffice.

### 1.    Substituting one competitor for another does not harm competition.

Mere substitution of one competitor for another does not harm competition or consumers,

even when "unfair means" are used to effectuate that substitution.  *See, e.g.*, *JetAway Aviation,*

*LLC v. Bd. of Cty. Comm'rs*, 754 F.3d 824, 839 (10th Cir. 2014) (per curiam) (Holmes, J.,

concurring) ("[T]here can be no anticompetitive conduct—that is, harm to competition—in

situations where the *sole* act in question is the replacement of one monopolist by another, as

either monopolist can equally exploit a monopoly." (alterations and quotations omitted));

*NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 456 (6th Cir. 2007) ("When one exclusive dealer is

replaced by another exclusive dealer, the victim of the competition does not state an antitrust

injury."); *Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 348 (6th Cir. 2006) ("The parties

may break a host of state or federal laws and regulations in making a side deal or in otherwise

circumventing the bidding process in reaching a final arrangement, but they do not

breach Section 1 of the Sherman Act where the alleged vertical agreements involve only one

buyer and one seller."); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376

F.3d 1065, 1076 (11th Cir. 2004) (Even "specific practices [that may be] unsavory, or even

illegal under other laws, . . . do not give rise to a federal antitrust claim without factual

allegations specifically addressing how these practices have harmed competition."); *Mfg.*

*Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1043 (11th Cir. 1982) ("The use of unfair

means resulting in the substitution of one competitor for another without more does not violate

the antitrust laws.").

**2.**     **Plaintiffs do not otherwise allege harm to competition.**

Plaintiffs do not plausibly allege that *consumers* (as opposed to *Plaintiffs*) were harmed by the alleged bribery in this case.  Plaintiffs baldly assert that the alleged bribery "[d]ecreas[ed] the quantity, quality, and diversity of television programming catering to viewers of South American international club soccer tournaments . . . [and of] advertising opportunities for companies seeking to advertise to viewers of South American international club soccer tournaments," and "increase[ed] the prices charged to such advertisers."  Compl. ¶¶ 178(h) & (i). These allegations are not only conclusory, they are implausible.  Plaintiffs never explain— because they cannot—how T&T winning the package of television rights instead of Global Sports could conceivably have had these effects on consumers.  After it acquired the television rights, T&T had the same economic incentives as Global Sports would have had to "cater[] to viewers of South American international club soccer tournaments" and provide "advertising opportunities," *id.*, and Plaintiffs allege nothing to suggest the act of the alleged bribery had any impact at all on that economic reality.  Indeed, as discussed in Part II.A above, if consumers were affected at all by this alleged conduct, they likely paid *less* than they would have if Conmebol had accepted the Global Sports offers because, as Plaintiffs proudly assert, Global Sports's cost of obtaining the rights in question would have been roughly double the actual cost paid by T&T.  Compl. ¶¶ 112, 121.

Plaintiffs identify a series of other purported "anticompetitive effects," Compl. ¶¶ 178(a)–(g), but each such allegation either is wholly conclusory or is not actually an allegation of harm to competition:

- Plaintiffs provide no support for their assertion that the alleged bribery "[l]imit[ed] the quantity of rights available for sale to purchasers in the Americas Television Rights

Market," or "[d]ecreas[ed] demand within the Americas Television Rights Market." *Id.* ¶¶ 178(f) & (g).

- Their claim that the conduct alleged "[e]nabl[ed] T&T to create and maintain a monopsony in the Americas Television Rights Market," *id.* ¶ 178(d), is simply a restatement of their argument that they, rather than T&T, should have held that monopsony.

- The allegation that Conmebol's revenue was decreased along with that of its constituent federations, soccer clubs, soccer players, and club employees, *id.* ¶ 178(e), merely repeats a typical feature of commercial bribery—harm to the company whose agent was bribed. Plaintiffs provide nothing more than rank speculation about reduced resources for recruitment and training of soccer players and, ultimately, a lower quality of soccer, that supposedly resulted from decreased revenue. These conclusory allegations regarding tertiary effects on end consumers are far too removed from Defendants' actions to support an antitrust claim. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983) (rejecting allegations of injury where "the chain of causation between the [plaintiff's] injury and the alleged restraint in the market . . . contains several somewhat vaguely defined links").

- Finally, the "barriers to entry for potential purchasers in the Americas Television Rights Market, . . . potential sellers in the U.S. Television Programming Market, . . . [and] potential sellers in the U.S. Television Advertising Airtime Market" that Plaintiffs claim were "[c]reat[ed]" by Defendants, Compl. ¶¶ 178(a)–(c), result instead from the fact that, as Plaintiffs concede, *id.* ¶ 59, 148, the rights at issue were sold exclusively. *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 454 (6th Cir. 2007) ("NicSand has not sued 3M

because it wants to share shelf space with its competitor; it sued 3M because it wants that shelf space all to itself . . . .  This is just the kind of all-for-one-and-all-for-one competitor claim that the antitrust laws do not protect.").

### 3. The Complaint establishes that consumers could not have been harmed by Defendants' alleged conduct.

Contrary to Plaintiffs' *ipse dixit*, it is entirely clear that consumers could suffer *no* harm from the scheme as alleged in the Complaint, because the television and advertising rights at issue were sold as a unitary and exclusive contract that only one competitor (Global Sports or T&T) could obtain.  *See* Compl. ¶¶ 59, 61, 111, 148.  Had Global Sports's allegedly higher offers been accepted by Conmebol, it would have held the same exclusive rights that T&T instead awarded.

While the Complaint now alleges that "[a]bsent Defendants' unlawful conduct, multiple parties could have obtained and provided programming in the U.S. Television Programming Market" and "multiple parties could have obtained and provided advertising airtime in the U.S. Television Advertising Airtime Market," Compl. ¶¶ 153, 158, it provides no factual support for this conclusory statement, and Plaintiffs' specific allegations directly contradict it.  Tellingly, Plaintiffs do not make even this conclusory allegation with regard to the most relevant market, the Americas Television Rights Market, nor could they.  *See id.* ¶¶ 146–50.  They readily acknowledge that this market was winner-take-all.  *Id.* ¶¶ 59, 148.

Plaintiffs do not allege that anyone other than T&T and Global Sports made offers on Conmebol's rights.  This is no mere oversight: essential to Plaintiffs' theory of causation and damages is their allegation that Conmebol was required to accept ***Global Sports's, and only Global Sports's*** offers for the tournament rights.  Compl. ¶ 140.  Plaintiffs admit that had Global Sports's offers been accepted, GolTV alone would have held the U.S. Television rights.  *E.g.*, *id.*

¶ 111.  Thus, as to the U.S. Television Programming Market and the U.S. Television Advertising Airtime Market, in Plaintiffs' imagined but-for world, GolTV would have stood in precisely the same position as Fox: it alone would have held the U.S. Television rights to the Club Tournaments.

### C.      Plaintiffs Do Not Adequately Plead Causation.

Plaintiffs have the burden to plead antitrust causation in a manner "plausibly suggesting (not merely consistent with)" their assertion that it was Defendants' alleged anticompetitive conduct that caused Conmebol to award the rights to T&T and not to Global Sports.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  "This causal relationship is a mandatory part of a plaintiff's case.  To recover under the antitrust laws, a plaintiff must prove that a defendant's illegal conduct materially contributed to his injury.  Proof of a violation of the Sherman Act standing alone does not establish civil liability." *Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1561–62 (11th Cir. 1987).  This stringent causation requirement requires an antitrust plaintiff to establish both "but for" and proximate causation, and in virtually every antitrust case the most critical first layer of analysis is determining the "but for" world—i.e., whether the plaintiff would have suffered antitrust injury but for the alleged anticompetitive activity, or whether the plaintiff's claimed injury would be the same even in the absence of the alleged illegal activity.  *See, e.g.*, *Rambus Inc. v. F.T.C.*, 522 F.3d 456, 466–67 (D.C. Cir. 2008) (explaining alleged conduct "cannot be said to have had an effect on competition in violation of the antitrust laws" if the same outcome "would have existed but for" the alleged conduct).

In addition, Plaintiffs must meet the heightened causation requirements to have standing under the Sherman Act.  In determining whether an antitrust plaintiff has standing, the Court must look at, among other things, "the directness or indirectness of the asserted injury," "the tenuous and speculative character of the relationship between the alleged antitrust violation and

the [Plaintiffs'] alleged injury," whether "the alleged effects on the [Plaintiffs] may have been produced by independent factors," and "the potential for duplicative recovery or complex apportionment of damages." *Associated Gen. Contractors*, 459 U.S. at 538–45; *see also Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1273 n.5 (11th Cir. 2015).

Plaintiffs have failed to meet this burden for the same reasons they have failed adequately to plead RICO causation. *Cf. Hemi Grp.*, 559 U.S. at 11 (relying on antitrust case law, specifically *Associated General Contractors*, in holding that plaintiffs failed to plead causation under RICO); *Anza*, 547 U.S. at 457 (same). Any damages to Plaintiffs' businesses are remote, speculative, and require the intervening acts of multiple actors. *See Associated Gen. Contractors*, 459 U.S. at 542 ("Partly because it is indirect, and partly because the alleged effects on the [plaintiff] may have been produced by independent factors, the [plaintiff's] damages claim is also highly speculative."). Plaintiffs concede that when Global Sports made offers for the rights in 2010, 2012, and 2013, the rights *already were under contract*, and that Conmebol refused to award it the rights *even after the alleged bribery scheme ended*. Compl. ¶¶ 129–132, 140. And, again, this non-award occurred after the bids for the broadcast rights were opened up to a transparent, open, and bribe-free process conducted under the watchful eye of the Department of Justice. *See supra* at p. 15 n.9. These concessions render implausible any suggestion that the alleged bribery scheme was the cause of Plaintiffs' failure to obtain the rights. Plaintiffs' allegations do not meet the pleading requirements of *Twombly*, let alone the Sherman Act's heightened causation requirements, and they should be dismissed.

**D.**   **Plaintiffs Do Not Allege a Plausible Antitrust Market.**

**1.**   **Plaintiffs must plausibly allege the contours of an antitrust market.**

As Plaintiffs acknowledge, each of their antitrust claims requires them to define a relevant market. Compl. ¶¶ 144–60. Plaintiffs' Sherman Act Section 1 claims proceed under the

rule of reason—as they must, because the *per se* rule could not apply to this alleged vertical conspiracy between a licensor and licensee of television rights. *See Jacobs*, 626 F.3d at 1335 (all vertical agreements subject to rule of reason).[17]  Plaintiffs alleging a rule-of-reason claim must define a relevant market that allegedly suffered from lack of competition. *Id.* at 1336.  Similarly, Plaintiffs' Section 2 monopolization/monopsonization and attempt claims require that they identify the relevant market within which they are alleging the defendant's monopoly/monopsony power (or, in an attempt claim, the defendant's dangerous probability of obtaining such power). *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) (attempted monopolization); *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966) (monopolization); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293 (11th Cir. 2004); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 322 (2007) ("The kinship between monopoly and monopsony suggests that similar legal standards should apply to claims of monopolization and to claims of monopsonization.").

Plaintiffs acknowledge they must define a market, Compl. ¶¶ 144–60, but their alleged "markets" do not meet the straight-face test, much less the Rule 12(b)(6) plausibility standard.

"To define a market is to identify producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services.  The market is composed of products that have reasonable interchangeability." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1552 (11th Cir. 1996) (citations and quotations omitted).  In other words, a "market" exists when a competitor or competitors with control over substantially all of

---

[17] "[A]greements between businesses operating at different levels of the same product's production chain or distribution chain, [are] known as 'vertical' agreements." *Spanish Broad. Sys.*, 376 F.3d at 1071; *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1368 (3d Cir. 1996) (exclusive license to show films is vertical restraint and therefore subject to rule of reason).

that product and geographic area could raise prices to an anticompetitive level without attracting

competition from substitute products or sellers in other areas that would drive the price down to a

competitive level.  Antitrust plaintiffs "must present enough information in their complaint to

plausibly suggest the contours of the relevant geographic and product markets."  *Jacobs*, 626

F.3d at 1336.  Conclusory allegations do not suffice.  *Id.* at 1338.  Where an alleged market very

obviously leaves out potential substitutes for the product in question, Plaintiffs face a heightened

burden at the pleading stage, including the need to plead cross-elasticity of demand, practical

indicia of a submarket, and the infeasibility, from consumers' perspective, of substituting other

products for the ones that constitute the alleged market.  *See id.* at 1337–38; *Queen City Pizza,

Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–39 (3d Cir. 1997).

        In *Jacobs*, the plaintiff had defined the market as "visco-elastic foam mattresses."  *See*

626 F.3d at 1338.  The district court granted a motion to dismiss, "holding that because visco-

elastic foam mattresses and traditional innerspring mattresses are both products on which people

sleep, the two products are interchangeable parts of the larger mattress market, a market as to

which Jacobs did not allege any anticompetitive effects."  *Id.* (alteration and quotations omitted).

The Eleventh Circuit affirmed because the complaint failed to provide "factual allegations of the

cross-elasticity of demand or other indications of price sensitivity that would indicate whether

consumers treat visco-elastic foam mattresses differently than they do mattresses in general."  *Id.*

The court rejected the plaintiff's request to allow it to develop such facts in discovery; that

"would absolve [plaintiffs] of the responsibility under *Twombly* to plead facts 'plausibly

suggesting' the relevant submarket's composition."  *Id.*; *see also, e.g.*, *JES Props., Inc. v. USA

Equestrian, Inc.*, 253 F. Supp. 2d 1273, 1281–82 (M.D. Fla. 2003) (rejecting attempt to narrow

relevant market to "'A' rated hunter and jumper Recognized Horse Shows" because plaintiffs

44

failed "to allege that 'A' rated hunter and jumper Recognized Horse Shows are unique or explain *why* 'A' rated hunter and jumper Recognized Horse Shows are not part of the larger market for horse competitions" (emphasis added)).[18]

Allegations of single-brand markets—like all three of the markets Plaintiffs allege here—are particularly disfavored. *See L.H. Equity Investments LLC v. Wade*, No. 09-80607-CIV, 2010 WL 11505176, at *3 (S.D. Fla. Mar. 29, 2010) ("Cases in which dismissal on the pleadings is appropriate frequently involve failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes."). Plaintiffs in antitrust cases frequently attempt to limit a market to only the defendant's products—because, by definition, a defendant would have monopoly power in such a market. Courts routinely reject such claims, holding that single-brand markets are inappropriate in all but the rarest of cases. *See, e.g.*, *PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984) ("[A]bsent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market."). Therefore, when a single-brand market is alleged, it must be accompanied with *sufficiently detailed* factual allegations to permit a finder of fact to conclude a single brand is in fact a market for antitrust purposes. *See, e.g.*, *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063–64 (9th Cir. 2001) (affirming dismissal because plaintiff's "conclusory

---

[18] *See also, e.g.*, *Campfield v. State Farm Mut. Auto. Ins.*, 532 F.3d 1111, 1118–19 (10th Cir. 2008) (affirming dismissal of § 2 claim because "State Farm insured windshield repair[s]" is not relevant market); *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 239 (2d Cir. 2008) (affirming dismissal of § 2 claim for failure to include substitutes in market definition); *Queen City Pizza*, 124 F.3d at 436–39 (upholding dismissal because complaint failed to address potential substitutes, from other suppliers, for "products currently approved by Domino's Pizza, Inc. for use by Domino's franchisees").

assertion that the 'UCLA women's soccer program' is 'unique' and hence 'not interchangeable with any other program in Los Angeles'" did not suffice).

### 2. Plaintiffs' gerrymandered market definitions are insufficient as a matter of law.

Plaintiffs' allegations are textbook violations of the plausibility standard.  The Complaint simply draws lines around Defendants' business practices and calls them "markets."  It adds conclusory references to antitrust concepts, such as cross-elasticity of demand, without any factual allegations to back them up.  Most notably, Plaintiffs provide no plausible explanation for excluding obvious substitutes.  Plaintiffs thus do exactly what the case law in the Eleventh Circuit and elsewhere says they cannot do.

### a. "Americas Television Rights Market."

Plaintiffs label their first market the "Americas Television Rights Market."  But as actually defined, it is far narrower than that title suggests: "the market for the purchase of rights to televise South American international soccer club tournaments (and in particular the Club Tournaments) in the Americas, including the United States and Florida."  Compl. ¶ 145.  In other words, Plaintiffs define this market to encapsulate the rights to the three tournaments at issue in this case, and *only* those three tournaments, all of which are hosted by Conmebol.  Small wonder, then, that "Conmebol is effectively the only seller in the Americas Television Rights Market."  *Id.* ¶ 146.

This is not what "market definition" means.  *See Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479–80 (3d Cir. 1992) ("[N]ew Chrysler cars manufactured for sale in the United States" is not a relevant market: "If the market were so defined, of course Chrysler would have market power, being the sole seller.  But such a narrow definition makes no sense in terms of real world economics, and as a matter of law we cannot

adopt it."); *Adidas Am., Inc. v. Nat'l Collegiate Athletic Ass'n*, 64 F. Supp. 2d 1097, 1102 (D. Kan. 1999) ("However, an antitrust plaintiff may not define a market so as to cover only the practice complained of, this would be circular or at least result-oriented reasoning." (quotations omitted)); *Theatre Party Assocs., Inc. v. Shubert Org., Inc.*, 695 F. Supp. 150, 154 (S.D.N.Y. 1988) (rejecting plaintiff's market of "advanced sales of selected tickets to 'theater party hits'" where defendant's show, *Phantom of the Opera*, was only product that fell within that definition).

An examination of each modifier in Plaintiffs' definition demonstrates why it is not a plausible market.  Plaintiffs must allege facts to explain why rights to ***South American*** international soccer club tournaments are not interchangeable with those to World, African, Asian, European, North American, Oceanian or any other subset of international soccer club tournaments that are aired to U.S. audiences.  They must explain why rights to ***international*** soccer club tournaments are not interchangeable with those to national soccer club tournaments. They must explain why rights to ***soccer*** tournaments are not interchangeable with those to tournaments of any other sport.  They must explain why rights to ***club*** tournaments are not interchangeable with those to tournaments between national teams.  And they must explain why rights to ***tournament*** games are not interchangeable with those to league play or other games. Plaintiffs' allegations do not come close.[19]

Plaintiffs make three specific allegations in support of this supposed "market."

---

[19] In addition to being implausible, Plaintiffs' alleged "***Americas*** Television Rights Market" is contradicted by their own allegations.  Plaintiffs' defined market is limited to television rights for the "Americas," but the Complaint's allegations make clear that the rights at issue were the "***worldwide*** television rights."  Compl. ¶ 61 (emphasis added).

*First*, they assert: "Conmebol's Club Tournaments are recognized by soccer viewers as the premium standard in South American international soccer and as the only source for high-level international play among South American soccer clubs."  Compl. ¶ 146.  But just as the plaintiffs in *JES Properties* failed to allege *why* "A" rated horse shows were not part of the larger market for horse competitions, 253 F. Supp. 2d at 1281–82, Plaintiffs have done nothing to allege why rights to "high-level" South American international club soccer tournaments are not part of the larger soccer- or sports-rights market.

*Second*, Plaintiffs allege: "Television rights of South American international soccer club tournaments are not reasonably interchangeable with television rights for other types of sports or soccer-oriented programming due to the significantly different size, demographic profile, and growth potential of the viewing audience for these tournaments."  Compl. ¶ 149.  But these entirely generic descriptions—"different size, demographic profile, and growth potential"— provide no reason why the highly specific category of "television rights of South American international soccer club tournaments" is "not reasonably interchangeable" with *any* other kinds of sports programming.  For example, how is the "demographic profile" and "growth potential" for U.S. viewers of South American international soccer club tournaments somehow different than that for those of national Latin American soccer tournaments?  Plaintiffs' bare allegations provide no basis to exclude potential substitutes.

*Third*, Plaintiffs allege: "Purchasers in the Americas Television Rights Market cannot satisfy their demand for television rights for South American international soccer club tournaments by purchasing rights for other forms of sports- or soccer-related programming.  Price and competition activity in the Americas Television Rights Market does not affect price and competition activity in the market for other such rights [and vice versa]."  Compl. ¶ 150.

48

Again, Plaintiffs merely recite the language of antitrust law while providing no reason to conclude this is the case.  *Cf. Leegin*, 615 F.3d at 418.

In short, Plaintiffs provide no reason why telecasters or intermediaries would limit their options only to "South American international soccer club tournaments" instead of a broader soccer, sports, or entertainment rights market.  In fact, Plaintiffs allege that "GolTV has extensive experience telecasting major tournaments and league soccer matches, including the Spanish La Liga and the Italian Serie A," Compl. ¶ 109, and currently "GolTV broadcasts live matches of the German Bundesliga and the Brazilian, Uruguayan and Venezuelan soccer leagues, along with various cups and tournaments," *id.* ¶ 15.  But Plaintiffs have not alleged why these other "major tournaments," "league soccer matches," and "various cups" are not substitutes for rights buyers like themselves.  Having failed to explain why obvious substitutes should not be included in the "Americas Television Rights Market," Plaintiffs cannot contend this single brand is the relevant antitrust market.

### b.       "U.S. Television Programing Market."

Plaintiffs define the "U.S. Television Programing Market" as: "the market for the sale of television programming featuring South American international soccer club tournaments by telecasters to cable and satellite television providers in the United States, including Florida." Compl. ¶ 145.  Again, limiting the market to "South American international soccer club tournaments" is baseless.  Plaintiffs readily admit they have limited this putative market to one in which "Fox" is the only seller of the rights.  *Id.* ¶ 152.

Plaintiffs again make no effort to exclude the many alternatives to "programming featuring South American international soccer club tournaments" in which cable and satellite television providers might be interested.  Compl. ¶ 151.  They make precisely the same conclusory claims about reasonable interchangeability and cross-elasticity of demand as they do

in alleging the rights market.  *Compare id.* ¶¶ 154 & 155 *with id.* ¶¶ 149 & 150.  That Plaintiffs merely repeat the exact same allegations in connection with each of their purported markets further demonstrates that the allegations are purely conclusory and result-driven.

### c.      "U.S. Television Advertising Airtime Market."

Plaintiffs define their final market as: "the market for the sale by telecasters of advertising airtime on television programming in the United States (including Florida) featuring South American international soccer club tournaments."  Compl. ¶ 145.  Plaintiffs provide no reason to believe advertisers regard airtime during South American international soccer club tournaments as somehow unique and not reasonably interchangeable with advertising during South American non-club tournaments, during Latin American national tournaments, during other sports programming, during non-sports programming, or even in media other than television.  In support of their definition, Plaintiffs again make precisely the same generic and implausible allegations of interchangeability and cross-elasticity of demand as for the other two markets.  *Id.* ¶¶ 159–160.  Those allegations fail for the same reasons.

Presumably recognizing the profound weakness of their market definitions, Plaintiffs added to the Complaint a new allegation, pled "in the alternative," that Plaintiffs would still have an antitrust claim "[e]ven if . . . the U.S. Television Programming Market and/or the U.S. Television Advertising Airtime Market were deemed to encompass programming or advertising airtime relating beyond South American international soccer club tournaments to some or all additional kinds of soccer programming in the United States."  Compl. ¶ 166.  But Plaintiffs do not delineate the boundaries of any purported "alternative" market definitions, much less do they provide any allegations regarding the preferences of consumers in such "markets," cross-elasticity of demand, or any of the other factors that plaintiffs must allege to render such a market plausible.  *See Jacobs*, 626 F.3d at 1336.

*     *     *

Plaintiffs' market-definition allegations—for all three putative markets—are strikingly similar to those the Fifth Circuit rejected in *Leegin*. There, the plaintiff, PSKS, alleged a "retail market for Brighton's women's accessories." 615 F.3d at 418. It asserted that "Brighton-brand products are unique" and "[m]any customers do not consider other accessories suitable substitutes for their use of Brighton-brand products, nor would they substitute other accessories for Brighton-brand products, nor would they do so even in response to a significant, non-transitory increase in the price of Brighton-brand products." 2d Am. Compl. ¶ 25, *PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, No. CV 2:03CV107(TJW), 2009 WL 938561 (E.D. Tex. Apr. 6, 2009) (ECF No. 147). It continued, "Brighton-brand products are distinct products characterized by an inelasticity in demand, and little cross-elasticity of demand between Brighton-brand products and demand for competing products." *Id.* ¶ 26. The Fifth Circuit found these allegations insufficient as a matter of law. While rare circumstances may permit a single product to define its own relevant market, PSKS failed to allege any "structural barrier to the interchangeability of Brighton products with goods produced by competing manufacturers." *Leegin*, 615 F.3d at 418.

Plaintiffs have done precisely what *Leegin* rejected and what many other courts have decried: Plaintiffs' "narrow [market] definition is an awkward attempt to conform their theory to the facts they allege." *Belfiore v. N.Y. Times Co.*, 826 F.2d 177, 180 (2d Cir. 1987) (citing *Grinnell*, 384 U.S. at 590–91 (Fortas, J., dissenting)).

### E.     The Foreign Trade Antitrust Improvement Act Bars Plaintiffs' Claims.

Plaintiffs' allegations not only fail to articulate a Sherman Act violation, they also seek impermissibly to recover for conduct outside the antitrust law's territorial reach. The Foreign Trade Antitrust Improvement Act, 15 U.S.C. § 6a ("FTAIA"), "clarif[ies] the application of

51

United States antitrust laws to foreign conduct" and "limits the application of such laws when non-import foreign commerce is involved." *Den Norske Stats Oljeselskap AS v. HeereMac v.o.f.*, 241 F.3d 420, 421 (5th Cir. 2001).

The Supreme Court has explained that the FTAIA "initially lays down a general rule placing ***all*** (non-import) activity involving foreign commerce outside the Sherman Act's reach." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004).  The statute then "brings such conduct back within the Sherman Act's reach ***provided that*** the conduct ***both*** (1) sufficiently affects American commerce, i.e., it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, ***and*** (2) has an effect of a kind that antitrust law considers harmful, i.e., the 'effect' must 'giv[e] rise to a [Sherman Act] claim.'" *Id.* (alterations in original) (quoting the FTAIA).

The FTAIA bars Plaintiffs' claims because, *first*, the alleged conduct concerns foreign commerce that is not U.S. import commerce, and *second*, Plaintiffs allege no conduct that both has a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce and also "gives rise to" their Sherman Act claims.

### 1.    The alleged conduct concerns commerce with foreign nations other than U.S. import commerce.

The FTAIA limits antitrust claims arising from conduct involving "trade or commerce (other than import trade or import commerce) with foreign nations."  15 U.S.C. § 6a.  Whether the trade or commerce at issue fits this definition "focuses on defendants' conduct." *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 300–01 (3d Cir. 2002).  The "other than import trade or import commerce" exception to the FTAIA applies only when "the ***defendants' conduct*** target[s] import goods or services." *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 470 (3d Cir. 2011) (emphasis added).

The purportedly anticompetitive conduct alleged here indisputably concerns foreign commerce.  Plaintiffs' claims are based entirely on the allegation that T&T, a Cayman Islands entity, Compl. ¶¶ 5, 16, engaged in bribery to procure a license from Conmebol, a Paraguayan entity, *id.* ¶ 32, for Conmebol's intellectual property rights to televise its soccer tournaments, *id.* ¶¶ 55–56.  That the intellectual property rights to the Club Tournaments happened to include the right to broadcast into the U.S. (along with the rest of the world) is not enough to bring the alleged conduct within the purview of the FTAIA's "import commerce" exception.

*First*, the transaction at issue is Conmebol's sale of its non-U.S. intellectual property to another non-U.S. entity; no goods or services are ever imported into the U.S. in these transactions.  While undersigned counsel are aware of no case applying the "import commerce" clause of the FTAIA in these circumstances, the Department of Justice has opined that the import commerce exception does not apply "in cases in which . . . a foreign monopolist[] reaches the U.S. market through any mechanism that goes beyond direct sales, such as . . . in cases in which . . . intellectual property licensing arrangements have an anticompetitive effect on U.S. commerce."  Antitrust Enforcement Guidelines for International Operations, DOJ (Apr. 5, 1994), at § 3.121.  That is exactly what Plaintiffs allege here.

*Second*, even assuming that the ultimate sale of foreign intellectual property into the U.S. could be considered U.S. import commerce, it would not (yet) be import commerce when that sale occurs between two foreign entities, which is the basis for the alleged antitrust violation in this case.[20]  For example, in *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816 (7th

---

[20] The Court recognized this in its ruling on Conmebol's motion to dismiss based on personal jurisdiction, finding that Conmebol's "licensing of worldwide broadcasting rights entailed a relinquishment of Conmebol's control over where broadcasts would be made, and therefore cannot support a finding Conmebol directed any conduct at Florida residents."  Sept. 19, 2017 Order (ECF No. 238) at 14.  The same is true for the entire United States.

Cir. 2015), Motorola Mobility LLC, a U.S. entity, and its foreign subsidiaries claimed harm as a result of the foreign defendants' scheme to fix the price of goods plaintiffs purchased with the intent to sell them in the United States.  *Id.* at 817.  The Seventh Circuit held that, while the import exception applied to goods "bought by, and delivered to, Motorola in the United States," *id.*, the exception did not apply to the same goods at the time they were purchased by Motorola's foreign subsidiaries from the foreign defendants because the goods were not yet imported into the U.S.  That was so even though both the foreign defendants and Motorola's foreign-subsidiary plaintiffs knew the goods were destined for U.S. importation.  *Id.* at 819, 822–23.

As in *Motorola*, the alleged anticompetitive conduct here only affected the sale of intellectual property outside the U.S. between two foreign entities (Conmebol and T&T); that the property allegedly was intended to be resold for U.S. broadcasts does not alter its treatment under the FTAIA.  Because the alleged bribery scheme "involv[es] trade or commerce (other than import trade or import commerce) with foreign nations," the FTAIA bars Plaintiffs' antitrust claims unless they can show that the alleged conduct that "gives rise to" their claims has a sufficient effect on U.S. commerce.  As discussed below, Plaintiffs' allegations do not (and cannot) make such a showing.

> **2.  The alleged conduct did not have a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce that "gives rise to" Plaintiffs' claims.**

"It is essential to understand that" the FTAIA imposes "two requirements.  There must be a direct, substantial, and reasonably foreseeable effect on U.S. domestic commerce—the domestic American economy, in other words—***and*** the effect must give rise to a federal antitrust claim.  The first requirement, if proved, establishes that there is an antitrust violation; the second determines who may bring a suit based on it." *Motorola Mobility LLC*, 775 F.3d at 818.  The requirements go hand-in-hand: the same effect on U.S. commerce must also give rise to

54

Plaintiffs' alleged Sherman Act claim.  *E.g.*, *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 414 (2d Cir. 2014).

The majority of circuit courts to have considered the issue have held "that foreign anticompetitive conduct can have a statutorily required 'direct, substantial, and reasonably foreseeable effect' on U.S. domestic or import commerce . . . so long as there is a reasonably proximate causal nexus between the conduct and the effect."  *Lotes*, 753 F.3d at 398.[21]  To determine whether this U.S. effect then "gives rise to" a Sherman Act claim, all circuit courts to have considered the issue have "held that the domestic effect must proximately cause the plaintiff's injury."  *Id.* at 414 (quotations omitted).

Plaintiffs claim that the alleged bribery scheme affected U.S. commerce in multiple ways.  *See* Compl. ¶¶ 165, 173, 178.  None of these alleged effects satisfies the FTAIA's requirements because none of them is both (a) proximately caused by the alleged bribery scheme and also (b) the proximate cause of Plaintiffs' alleged injury.

1. ***Creating a "monopsony" and "barriers to entry" in the "Americas Television Rights Market,"*** Compl. ¶¶ 178(a) & (d): Plaintiffs define the "Americas Television Rights Market" as "the market for the purchase of rights to televise South American international soccer club tournaments (and in particular the Club Tournaments) in the Americas, including the United States and Florida."  *Id.* ¶ 145.  But as explained in Part II.E.1, *supra*, the sale by a foreign entity (Conmebol) of its intellectual property rights is foreign commerce, not U.S. import commerce.  It follows that there can be no effect on U.S. commerce—far less a "proximate" effect—by

---

[21] The Ninth Circuit is the outlier, holding that to be "direct" the effect must follow as an "immediate consequence of defendant's activity."  *United States v. LSL Biotechnologies*, 379 F.3d 672, 680 (9th Cir. 2004) (quotations omitted).  This standard would be harder for Plaintiffs to meet, but we assume for purposes of this motion that the Eleventh Circuit would adopt the majority position.

"monposonizing" that foreign market or creating "barriers to entry" to purchasers of Conmebol's foreign-market sale of its intellectual property.

      2.    ***Creating "barriers to entry" in the "U.S. Television Programming Market" and the "U.S. Television Advertising Airtime Market,"*** Compl. ¶¶ 178(b) & (c); *see also id.* ¶¶ 165, 173: The alleged bribery could not have proximately caused "barriers to entry" in a market for broadcasting or advertising Club Tournaments programming in the United States.  By definition, the right to sell programming featuring the Club Tournaments to cable networks and to sell associated advertising can only belong to the rights-holder.  The exclusion of other sellers from this market is a function of intellectual property law, not the alleged bribery to obtain the rights in the first place.  And as discussed above, *see* Part II.B., *supra*, the alleged injury associated with this alleged U.S. effect—"the opportunity to profit" from the sale to cable networks of channels featuring the Club Tournaments and to sell the associated advertising, Compl. ¶¶ 178(b) & (c)—is an alleged injury to a competitor, not competition, and therefore cannot "give rise to" a Sherman Act claim.

      3.    ***Reducing Conmebol's revenues and the revenues passed on to Conmebol's constituents,*** Compl. ¶ 178(e): Conmebol and its constituent organizations are foreign entities. *Id.* ¶ 32.  An impact on their revenues would have no direct effect on U.S. commerce.  Any alleged "decreas[e] [in] the quality and quantity of soccer entertainment available to end consumers, both television viewers and game attendees," *id.* ¶ 178(e), suffers two fatal flaws. First, the allegedly "passed on" effects of decreased revenue are too attenuated to proximately cause an effect on U.S. commerce.  Second, the alleged effects are to Conmebol, its constituent organizations, and "end consumers," and therefore do not "give rise to" ***Plaintiffs'*** alleged Sherman Act injury.

4.      ***"Limiting the quantity of rights available for sale to purchasers in the Americas Television Rights Market" and "Decreasing demand within the Americas Television Rights Market,"*** Compl. ¶¶ 178(f) & (g): As explained above, the "Americas Television Rights Market" is a foreign market; limiting rights or decreasing demand in that market would therefore have no effect on U.S. commerce.  In addition, the Complaint alleges no facts showing that, but for the alleged bribery, more rights somehow would have been available for sale, or demand somehow would have been greater.  Finally, as a matter of law, these Plaintiffs cannot claim injury resulting from any alleged decrease in demand for the purchase of rights.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 ("Such conduct would indeed violate the Sherman Act, but it could not injure [Plaintiffs]: as [Defendants'] competitors, [Plaintiffs] stand to gain from any conspiracy to" decrease demand for purchase of rights.).

5.      ***Decreasing the quantity, quality, and diversity of "television programming catering to viewers of South American international club soccer tournaments" and of "advertising opportunities for companies seeking to advertise to viewers of South American international club soccer tournaments," and "increasing the prices charged to such advertisers,"*** Compl. ¶¶ 178(h) & (i): None of these effects could give rise to ***Plaintiffs'*** Sherman Act claims, because Plaintiffs are not "viewers of South American international club soccer tournaments," nor are they "companies seeking to advertise" to such viewers.  *Id.*

6.      ***Harm to GolTV in Florida***, *see* Compl. ¶ 41: That GolTV is a Florida entity and has alleged injury here is not sufficient to demonstrate a "direct effect" on U.S. commerce.  As discussed below, GolTV did not suffer any direct injury because it would have participated, if at all, as an indirect purchaser from Global Sports.  *See* Part III.A.1., *infra*.  Even if that could be considered a "direct effect," that effect could not "give rise" to a Sherman Act claim for GolTV

57

because (i) indirect purchasers have no claim under the indirect-purchaser doctrine, *id.*, and

(ii) GolTV did not suffer "antitrust injury," *see* Part III.A.2, *infra.*

## III.   GOLTV LACKS STANDING TO BRING ANTITRUST AND RICO CLAIMS, AND FOREIGN PLAINTIFF GLOBAL SPORTS MAY NOT RECOVER ON U.S. CLAIMS FOR ITS FOREIGN INJURY.

Global Sports, a Uruguay-based partnership, is the entity that made the offers to

Conmebol.  Recognizing that Global Sports lacks a U.S. nexus, its owners assert claims on

behalf of their U.S. company, GolTV.  But GolTV is not a proper plaintiff because it did not bid

for the Club Tournaments rights; it was at most a potential licensee from Global Sports.

GolTV's claims are barred under the longstanding antitrust indirect-purchaser and standing

doctrines, which are routinely applied to RICO and antitrust claims alike.  That leaves Global

Sports, which, as an English partnership doing business in Uruguay, may not recover on U.S.

claims for its extraterritorial injury.

### A.   GolTV Is Not a Proper Plaintiff.

#### 1.   The indirect-purchaser doctrine bars GolTV's claims.

GolTV is, at best, a would-be indirect purchaser of the Club Tournaments rights.  The

offers referenced in the Complaint make clear that Global Sports was the offeror and make no

mention of GolTV.  Vigen Aff. Exs. 1–3.  Nonetheless, Plaintiffs allege that Global Sports

suffered injury from its lost "opportunity to license [the] broadcasting rights to GolTV."  *See*

Plfs.' Resp. to Juris. Mot. to Dismiss at 33 (citing Compl. ¶¶ 12, 141–42).  In other words,

Plaintiffs allege that, had Conmebol awarded Global Sports the Club Tournaments rights, GolTV

would have sublicensed a portion of those rights from Global Sports.  This is a quintessential

indirect-purchaser allegation.

Indirect purchasers like GolTV cannot bring suit under the Sherman Act.  *See Ill. Brick*

*Co. v. Illinois*, 431 U.S. 720, 729 (1977).  "Under the direct purchaser rule, only the customer

58

who purchased the goods or services at issue *directly* from the alleged antitrust violator can

recover damages." *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*, 763 F.3d 1280, 1285

(11th Cir. 2014) (citing *Illinois Brick*).

   The same rule applies to RICO and likewise forecloses GolTV's claims under that federal

statute. *See, e.g.*, *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) ("The

precepts taught by *Illinois Brick* . . . apply to RICO claims, thereby denying RICO standing to

indirect victims.").

   Plaintiffs allege in conclusory fashion that Global Sports made its offers "as agent for,

and on behalf of, GolTV." Compl. ¶ 12. But Plaintiffs allege no facts to support this "agency"

relationship, nor do they provide any allegations that would rebut the clear documentary

evidence that the offers were made by Global Sports without reference to GolTV. *See* Vigen

Aff. Exs. 1–3. Indeed, the Global Sports offers referenced in the Complaint contain no reference

to any agency relationship. *Id.* And even pleading simple agency is not enough to survive the

*Illinois Brick* doctrine. Rather, GolTV must allege facts showing that the "principal-agent

relationship between the indirect and direct purchasers [was] ***such that the two are not distinct***

***economic entities*** in the purchase chain." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169

F.R.D. 493, 505 (S.D.N.Y. 1996) (emphasis added).

   Plaintiffs' allegations foreclose this *Illinois Brick* "control exception." Conmebol sold

"the worldwide or Americas rights" to broadcast the Club Tournaments. Compl. ¶ 111.

Plaintiffs allege that Global Sports made offers on these rights, *id.* ¶ 12, "with the understanding

that GolTV would pay for and acquire the ***U.S. portion*** of those rights," *id.* ¶ 111 (emphasis

added). The import is that Global Sports was not a mere pass-through entity whose existence

can be disregarded for purposes of assessing antitrust and RICO standing. *See also* Plfs.' Resp.

59

to Juris. Mot. to Dismiss at 33 (claiming injury from Global Sports's lost "opportunity to license such [U.S.] broadcasting rights to GolTV") (citing Compl. ¶¶ 12, 141–42).  Thus, there is no way that Global Sports and GolTV can be considered the same "economic entit[y] in the purchase chain," *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. at 505, such "that there effectively [would have] been only one sale" of the U.S rights, *Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enters., Inc.*, 628 F.2d 971, 975 (6th Cir. 1980).

### 2.    GolTV lacks antitrust standing.

GolTV is not an appropriate plaintiff under the separate antitrust standing doctrine.  "[A] private plaintiff who seeks damages under the antitrust laws . . .  must establish 'antitrust standing.'"  *Feldman*, 849 F.3d at 1340 (quoting *Sunbeam T.V. Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1270 (11th Cir. 2013)).  To do so, Plaintiffs must plausibly allege (1) that they suffered "antitrust injury" and (2) that they are "efficient enforcer[s]" of the antitrust laws. *Id.*  "An antitrust injury is the kind of injury that 'the antitrust laws were intended to prevent and that flows from [the conduct that] makes [the] acts [of a defendant] unlawful.'"  *Id.* (quoting *Brunswick Corp.*, 429 U.S. at 489).  Plaintiff GolTV cannot meet either requirement.

*First*, GolTV did not suffer any antitrust injury because it was not a "participant in the very market that [was] directly restrained."  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016); *see also Norris v. Hearst Tr.*, 500 F.3d 454, 467 (5th Cir. 2007) (finding no antitrust injury because "plaintiffs here are neither consumers nor competitors in the market attempted to be restrained").  Plaintiffs allege only *one* restraint in *one* market: a conspiracy to bribe Conmebol officials so that those officials would grant T&T—rather than Global Sports—the worldwide rights to broadcast the Club Tournaments.  The alleged bribes thus occurred in the upstream "Americas Television Rights Market"; and Plaintiffs do not allege any ***additional*** restraint in the downstream "U.S. Television Programming Market" or "U.S.

60

Television Advertising Airtime Market" ("Downstream Markets") in which GolTV allegedly participated.

GolTV's alleged injury in the Downstream Markets is not sufficient to create antitrust injury because GolTV's alleged inability to sell "programming" and "advertising" in the Downstream Markets is ***merely an effect*** of Global Sports' inability to obtain the rights in the upstream rights market.  *See Feldman v. American Dawn, Inc.*, 849 F.3d 1333, 1341–42 (11th Cir. Mar. 3, 2017) ("Feldman did not suffer an antitrust injury because his complaint alleges . . . that he suffered injury in the form of lost employment as an ***effect*** of the conspiracy to harm the market for restaurant linens.").  Its inability to sell programming and advertising for the Club Tournaments is entirely derivative of the alleged restraint in the upstream market for worldwide television rights.

*Second*, GolTV is not an efficient enforcer of the antitrust laws because its injury, if any, is attenuated, any damages will be entirely speculative, and there are more direct victims of the alleged antitrust violation.  Courts in this circuit consider "six factors in determining whether a plaintiff would be an efficient enforcer of the antitrust laws: (1) whether the plaintiff has suffered a direct injury; (2) whether its injury is remote; (3) whether other plaintiffs are better suited to bring the suit; (4) whether the plaintiff's injuries are speculative; (5) whether the calculation of damages would be complex and run the risk of duplicative recoveries; and (6) whether the plaintiff could enforce the court's judgment."  *Duty Free Ams., Inc.*, 797 F.3d at 1273 n.5.

Here, GolTV's injury (if any) is indirect and there are more direct victims of the alleged antitrust violation—namely, Conmebol and Global Sports.  *See Associated Gen. Contractors*, 459 U.S. at 545 ("[T]he existence of more direct victims of the alleged conspiracy . . . weigh[s] heavily against judicial enforcement of the [plaintiff's] antitrust claim.").  As the Court implicitly

61

recognized in its jurisdictional Order, only Conmebol could be a direct victim of any alleged self-dealing by Conmebol officials. *See* Sept. 19, 2017 Order (ECF No. 238) at 12–13. After Conmebol, the next closest (though still indirect) victim would be Global Sports, whose offers were rejected allegedly because of the challenged conduct. Thus, GolTV—the alleged would-be sublicensee—cannot claim to have felt the primary or even secondary effects of the alleged anticompetitive scheme. *See* Plfs.' Resp. to Juris. Mot. to Dismiss at 33 (citing Compl. ¶¶ 12, 141–142). It follows that allowing GolTV to remain in the case would create "the potential for duplicative recovery or complex apportionment of damages" among these primary, secondary, and tertiary putative victims. *Associated Gen. Contractors*, 459 U.S. at 545.

Finally, any calculation of damages in the Downstream Markets would be entirely speculative, as it would require a complex computation to ascertain whether GolTV could still make any profit in light of the price Global Sports would have paid for the rights (which would have been almost double the price paid by T&T, *see* Compl. ¶¶ 112, 121). This would require consideration of multiple intermediate acts and decisions, taken by multiple third parties, including whether Conmebol would have awarded the rights to Global Sports but for the alleged bribery, whether and at what price Global Sports would sublicense the rights to GolTV, and whether and at what price premium cable providers, advertisers, and consumers would patronize GolTV.

GolTV thus lacks standing to bring any antitrust claim. As with the indirect-purchaser doctrine, the same analysis means GolTV is not a proper RICO plaintiff. *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 932 (3d Cir. 1999) (noting Supreme Court application of *Associated General Contractors* to analyze RICO claims meant

that "much (if not all) of what we have said . . . in our discussion of antitrust standing applies to the [plaintiffs'] RICO claims).

### B. Global Sports Is a Foreign Plaintiff Without Recourse to U.S. Claims.

Plaintiffs are left to assert their claims on behalf of Global Sports, the would-be direct purchaser.[22]  But if Global Sports suffered any harm at all, the Complaint alleges it suffered that harm in Uruguay, where it does business.  Compl. ¶ 16.  Global Sports therefore may not bring its extraterritorial claims in U.S. court.

"A private RICO plaintiff . . . must allege and prove a ***domestic*** injury to its business or property."  *RJR Nabisco*, 136 S. Ct. at 2106.  Global Sports does not even attempt to allege it was harmed in the U.S.  Global Sports therefore has no RICO claim.  *See Absolute Activist Value Master Fund Ltd. v. Devine*, No. 2:15-cv-328-FTM-29MRM, 2017 WL 519066, at *20 (M.D. Fla. Feb. 8, 2017) (concluding that "injuries were suffered by the plaintiffs in the only location where the plaintiffs were located—in the Cayman Islands").

Global Sports likewise has no redress under the Sherman Act and the FTAIA.  The FTAIA does not "bring independently caused foreign injury within the Sherman Act's reach."  *F. Hoffman-La Roche Ltd.*, 542 U.S. at 173; *see also Motorola Mobility*, 775 F.3d at 820 ("U.S. antitrust laws are not to be used for injury to foreign customers." (quotations omitted)).  If Global

---

[22] If Global Sports really were an agent then ***its*** claims would have to be dismissed.  "[I]f an agent is not a distinct economic entity in the chain of distribution, then it cannot sue as the direct purchaser . . . because the agent lacks antitrust standing."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-JST, 2016 WL 7805628, at *15 (N.D. Cal. Aug. 4, 2016).  More generally, an "agent has no action of tort because another has tortiously harmed the principal or destroyed his business, unless the other acted for the purpose of harming the agent's interests."  RESTATEMENT (SECOND) OF AGENCY § 374(2) (1958); *see also Moorer v. Hartz Seed Co.*, 120 F. Supp. 2d 1283, 1288–89 (M.D. Ala. 2000) ("The general rule . . . is that an agent has no standing to sue, in his own name, a third party who has allegedly perpetrated some actionable wrong against the principal.").

Sports was harmed at all, it was harmed when Conmebol did not breach its contracts with T&T to accept Global Sports's unsolicited offers in foreign commerce. Its alleged foreign injury occurred ***prior*** to any effect on U.S. commerce, and therefore any U.S. effect cannot "give rise" to a Sherman Act claim for Global Sports. *See Lotes*, 753 F.3d at 414 (dismissing foreign plaintiff claims of exclusion from foreign market based on effect of raised prices for U.S. consumers because plaintiff's "injury . . . ***precedes*** any domestic effect").

Put simply, GolTV is not a proper plaintiff, and Global Sports cannot recover by alleging foreign injury caused by foreign conduct antecedent to any U.S. effect.

## IV.    PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED.

### A.    Plaintiffs Do Not Plead a Cognizable Claim under the FDUTPA.

Plaintiffs' claim under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. §§ 501.201, *et seq.*, fails for several reasons. First, Plaintiffs' FDUTPA claim is predicated on violations of the federal antitrust laws, and it should be dismissed for the same reasons as those claims. Second, the only injury Plaintiffs claim to have suffered is alleged lost profits, which cannot be recovered under FDUTPA. Third, Plaintiffs do not allege facts showing that any injuries they suffered were proximately caused by the allegedly deceptive or unfair acts. Finally, FDUTPA does not apply to extraterritorial conduct, and Plaintiffs do not plausibly allege that Defendants committed any injurious acts within the State of Florida.

#### 1.    Plaintiffs do not plead a valid antitrust claim.

Plaintiffs concede that their FDUTPA claim is entirely derivative of their federal antitrust claims. *See* Compl. ¶ 144 ("Defendants' antitrust violations also violate [FDUTPA]."); Plfs.' Opp. to Juris. Mot. to Dismiss, ECF No. 218 at 37 & 50–51 (acknowledging their Sherman Act and FDUTPA claims both arise from alleged "anticompetitive conduct and restraint of trade"). Thus, should the Court dismiss the Sherman Act claims, it should dismiss the FDUTPA claim for

the same reasons.  *See JES Props., Inc. v. USA Equestrian, Inc.*, No. 802CV1585T24MAP, 2005 WL 1126665, at *19 (M.D. Fla. May 9, 2005) ("Plaintiffs' FDUTPA claim is based on the same allegations as their antitrust claims. . . .  Therefore, for the same reasons this Court has found no violation of the Federal antitrust laws, this Court finds that Plaintiffs have failed to establish the elements of a violation of [FDUTPA]."), *aff'd*, 458 F.3d 1224 (11th Cir. 2006).

### 2.        Plaintiffs have not adequately pled "actual damages."

"A consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) ***actual damages***."  *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1338 n.25 (11th Cir. 2012) (emphasis added) (quotations omitted).  "Florida courts consider actual damages, the third element of a FDUTPA claim, to be a 'term of art,'" and have consistently held that "FDUTPA 'actual damages' do not include consequential damages." *Diversified Mgmt. Sols., Inc. v. Control Sys. Research, Inc.*, No. 15-81062-CIV, 2016 WL 4256916, at *5 (S.D. Fla. May 16, 2016) (citations and quotations omitted); *see also Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1357 (S.D. Fla. 1999) ("Florida courts specifically reject the recovery of consequential damages under FDUTPA.").

Although Plaintiffs steer clear of the language of consequential damages in the FDUTPA portion of their Complaint, it is apparent from the overall pleading that their alleged injury rests on just such a forbidden theory—specifically, "loss of revenues, loss of profits, lower market share, and lessened profile in the sports telecasting marketplace."  Compl. ¶ 268.  "[L]ost profits may indeed be the quintessential example of consequential damages" and therefore are not recoverable under FDUTPA.  *Eclipse Med.*, 262 F. Supp. 2d at 1357 (quotations omitted); *see also Diversified Mgmt. Sols.*, 2016 WL 4256916, at *6 ("The substantive law of Florida, as it currently stands, leads to the conclusion that lost profits are consequential damages, and, thus, not recoverable under FDUTPA."); *Five for Entm't S.A. v. Rodriguez*, 877 F. Supp. 2d 1321,

1331 (S.D. Fla. 2012) ("It remains well-settled in Florida that consequential damages in the form of lost profits are not recoverable under FDUTPA.").

### 3.     Plaintiffs' injuries were not caused by Defendants.

As set forth in detail above, Plaintiffs have not plausibly alleged facts showing that their injuries were proximately caused by Defendants' allegedly unfair actions.  Like the federal RICO and antitrust statutes, under FDUPTA, "causation must be direct, rather than remote or speculative." *Hennegan Co. v. Arriola*, 855 F. Supp. 2d 1354, 1360–61 (S.D. Fla. 2012).  Again, the "direct" victim of the alleged bribery scheme was Conmebol, not Plaintiffs.  The tortuous chain of causation Plaintiffs attempt to construct not only is speculative, it is implausible given that (i) the rights at issue already were under contract when Global Sports submitted its offers, Compl. ¶ 140, and (ii) even after the alleged bribery ceased, Plaintiffs were not awarded the rights, *id.* ¶¶ 129–32.

### 4.     FDUTPA does not apply to acts committed outside Florida.

Plaintiffs do not adequately allege any deceptive or unfair acts by Defendants occurring within the state of Florida.  That is fatal to their claim because "FDUTPA applies only to actions that occurred within the state of Florida."  *Five for Entm't*, 877 F. Supp. 2d at 1330; *see also Stein v. Marquis Yachts, LLC*, No. 14-24756-CIV, 2015 WL 1288146, at *6 (S.D. Fla. Mar. 20, 2015) (dismissing FDUTPA claim despite allegations of "numerous bad acts in Florida" because claim was based on false representations that occurred in Canada).

At its core, this is a case about alleged bribes paid by a ***foreign*** company (T&T) to directors of a ***foreign*** non-profit (Conmebol) regarding rights to ***foreign*** soccer games.  As would be expected, then, Plaintiffs make no plausible allegations that would trigger the application of Florida's unfair competition law.  Aside from generic, conclusory allegations

about "in-person and telephone meetings" that are not pled with any particularity,[23] the only allegations about specific actions in Florida either are irrelevant to the alleged conspiracy or facially insufficient.

The only allegation about a meeting in Florida that is pled with any specificity is an alleged meeting between the owners of a now-dismissed defendant (Full Play), Hugo and Mariano Jinkis, and Defendant Burzaco.  *See* Compl. ¶ 44.  The Court already has recognized that this meeting addressed tournament rights not at issue in this case.  Sept. 19, 2017 Order (ECF No. 238) at 18.

Plaintiffs allege that Defendants Martinez and Lopez negotiated with Defendant Napout for the Conmebol rights in November 2015 on behalf of FIC, and that "the agreement was negotiated in part by phone and in-person meetings in Florida."  Compl. ¶ 132.  These conclusory allegations are insufficient to survive a Rule 12(b)(6) motion.  And there are no allegations that the 2015 agreement was procured through bribery.  Meetings in connection with the 2015 agreement therefore cannot provide the territorial hook Plaintiffs need to bring a FDUTPA claim against Defendants.[24]

---

[23] Compl. ¶ 43; *see Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009) (Courts need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.").

[24] Separately, all of Plaintiffs' allegations as to Defendants Martinez, Lopez, and Ganley are wholly insufficient to satisfy the pleading requirements of Rules 8, 9, and 10 because they impermissibly lump these Defendants together, without identifying each one's alleged conduct, knowledge, or participation.  *See Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (affirming dismissal when complaint made no distinction among individual defendants' alleged actions, because it was "a quintessential 'shotgun' pleading" prohibited by Federal Rules of Civil Procedure 8(a)(2) and 10(b)); *Joseph v. Bernstein*, No. 13-24355-CIV, 2014 WL 4101392, at *6 (S.D. Fla. Aug. 19, 2014), *aff'd*, 612 F. App'x 551 (11th Cir. 2015) (Altonaga, J.) ("Counts I and II do not satisfy Rule 8 because Plaintiff's allegations indiscriminately lump all five Defendants together."); *Koch v. Royal Wine Merchants*, Ltd., 847 F. Supp. 2d 1370, 1376 (S.D. Fla. 2012) ("Weasel words such as … 'probably knew' have no place in a RICO pleader's vocabulary for

That leaves Plaintiffs with allegations about a handful of payments from T&T to supposed "intermediaries."  That alone does not create a strong enough nexus to Florida to justify applying this state's unfair trade practices act to commercial bribery in Paraguay.  It is apparent that the focus of this alleged foreign bribery conspiracy was not Florida, or even the United States.  *See* Sept. 19, 2017 Order (ECF No. 228) at 14 (holding that the licensing of worldwide broadcasting rights was insufficient to bring Conmebol within the purview of Florida's long-arm statute).  It is not reasonable to conclude that the Florida legislature intended to regulate foreign commercial bribery when it enacted FDUTPA.  Undersigned counsel are aware of no instance in which the statute has been applied under facts analogous to those alleged. This case should not be the first.

### B.   Plaintiffs Do Not Plead Cognizable Claims for Tortious Interference or Conspiracy To Interfere.

Tortious interference with prospective economic advantage (and, by extension, conspiracy to interfere with prospective economic advantage) requires the plaintiff to plead four elements: "(1) the existence of a business relationship . . . ; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (quotations omitted). While the business relationship does not need to be solidified in a contract, *id.*, merely soliciting business will not do.  "As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable

---

the plaintiff must demonstrate that the defendants acted with scienter, i.e., a specific intent to defraud.").

understanding or agreement *which in all probability would have been completed if the defendant had not interfered*." *Id.* at 815 (emphasis added).

Plaintiffs' allegations do not plausibly state a claim under this standard. They allege only an offer to Conmebol to purchase the Club Tournaments rights. But "[a] mere offer . . . does not, by itself, give rise to sufficient legal rights to support a claim of intentional interference with a business relationship." *Ethan Allen*, 647 So. 2d at 814 (quotations omitted); *see also Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F. Supp. 2d 1241, 1258–59 (M.D. Fla. 2012) ("[A] solicitation is not a contract. It is the prelude; a request for offers from all interested parties; an advertisement of the needs of the U.S. government. The solicitation is a request for offers, nothing more. It is not evidence a contract or 'relationship' . . . ."), *aff'd per curiam*, 505 F. App'x 928 (11th Cir. 2013).

Global Sports's offers to Conmebol for the Club Tournaments rights were just that— offers.[25] There are no allegations that "negotiations had progressed beyond the stage of a mere offer." *Ethan Allen*, 647 So. 2d at 815 (quotations omitted). Indeed, Plaintiffs' claims are even weaker than the typical "mere offer" case. When Global Sports submitted its offers, the rights were not up for sale. They were already under contract to T&T. And even after the alleged interference had stopped, FIC—not Plaintiffs—won the rights. Thus, Plaintiff cannot show any "actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Id.*

Finally, as to the fourth element of tortious interference, Plaintiffs' cannot plead damage "as a result of the breach of the relationship" because of the same implausible and speculative

---

[25] Plaintiffs' allegations of *other* contracts that it had with Conmebol—such as contracts for "Static Advertising Rights," Compl. ¶ 320—are immaterial because Plaintiffs never allege that Defendants interfered with *those* contracts.

causation assertions that undergird their other claims. Their failure to plead causation thus provides an independent basis to dismiss this claim.

## V.   THE AMENDED COMPLAINT FAILS TO STATE ANY CLAIM AGAINST BURZACO.

Defendant Alejandro Burzaco ("Mr. Burzaco"), pursuant to Federal Rule of Civil Procedure 12(b)(6), respectfully moves the Court to dismiss Counts 1–5, 8, 9, and 11 of the Amended Complaint filed by Plaintiffs GolTV, Inc. ("GolTV") and Global Sports Partners LLP ("Global") (together, "Plaintiffs") for failure to state a claim.  In support of the relief requested, Mr. Burzaco adopts and joins Sections I(A), I(D) (only to the extent it relies on Section I(A)), II(A)–(E), III(A), III(B), IV(A), and IV(B) of this Consolidated Motion to Dismiss, and also writes separately to address Counts 1 and 2 (together, the "RICO Claims").

### A.   The RICO Claims Fail Because the Underlying Conduct Did Not Proximately Cause Injury to These Particular Plaintiffs' Businesses.

Unlike the criminal RICO charges as to which Mr. Burzaco has accepted responsibility, civil RICO claims require a plaintiff to plead and prove that a violation of 18 U.S.C. § 1962 proximately caused injury to the plaintiff's business or property. *See Joseph v. Bernstein*, No. 13–24355–CIV, 2014 WL 4101392, at *8 (S.D. Fla. Aug. 19, 2014) (Altonaga, J.) ("A plaintiff fails to state a valid RICO claim in its pleading when it cannot show proximate cause." (citing *Hemi Group, LLC v. City of N.Y., N.Y.,* 559 U.S. 1, 8–12 (2010))).  For this reason, Mr. Burzaco joins in Section I(A) to the extent it argues for the dismissal of the RICO Claims for failure to adequately plead that the alleged RICO scheme proximately caused injury to these particular Plaintiffs' businesses.

**B.     The RICO Claims Based on the Rejected March 2010 Offer Are Time-Barred.**

If claims are time-barred on the face of the complaint, a court may dismiss those claims at the motion to dismiss stage.  *See White v. Greenpoint Mortg. Funding Inc.*, No. 14-80452-CIV, 2014 WL 11370418, at *2 (S.D. Fla. June 26, 2014) ("A Rule 12(b)(6) dismissal based on the statute of limitations is proper only if it is 'apparent from the face of the complaint' that the claim is time-barred." (quoting *La Grasta v. First Union Securities, Inc.*, 358 F.3d 840, 845 (11th Cir. 2004))), *aff'd sub nom.*, *White v. Bank of Am. Nat. Ass'n*, 599 F. App'x 379 (11th Cir. 2015).

The statute of limitations for civil RICO claims is four years, and it begins to run when the plaintiff discovers or should have discovered its injury.  *See Rotella v. Wood*, 528 U.S. 549, 555 (2000) ("[W]e have been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock.").  Although in exceptional circumstances a court may equitably toll the civil RICO statute of limitations, "the occurrence of fraud in RICO patterns," or the fact that a "pattern of predicate acts may well be complex [or] concealed" do not constitute "good reason[s] to put off the running of the statute."  *Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1251–52 (11th Cir. 2001) (quoting *Rotella*, 528 U.S. at 556–60).  The plaintiff has the burden to establish that equitable tolling is warranted.  *See Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993).

Here, Plaintiffs allege they were injured when they "were not awarded the Club Tournament[26] television rights despite Plaintiffs' superior offers."  *See* Compl. ¶ 268.  According to the Complaint, Plaintiffs suffered the first of those injuries when an offer to purchase the rights to the 2011 to 2014 Copa Libertadores de America and Copa Sudamericana on March 3,

---

[26] The "Club Tournaments" refer to the Copa Libertadores de America, the Copa Sudamericana, and the Recopa Sudamericana.  *See* Compl. ¶ 3.

2010, was rejected.  *See id.* ¶¶ 111–14.  That happened in March 2010.  Plaintiffs waited more than six years, until October 20, 2016, to commence this action, asserting, among other things, the RICO Claims.  *See* Compl., ECF No. 1.  It is therefore apparent on the face of the Complaint that the statute of limitations as to Plaintiffs' RICO Claims based on the rejected March 2010 offer had run by March 2014.  *See Rotella*, 528 U.S. at 555.

Plaintiffs assert that during some undisclosed time period prior to May 2015 they purportedly "exercised due diligence in attempting to discover the reasons for Conmebol's rejection of their numerous offers but, due to Defendants' concealment of their unlawful agreements and transactions, were unable to obtain information sufficient to assert a claim for Defendants' wrongdoing."  *See* Compl. ¶ 136.  But that does not make their RICO Claims any less time-barred.  *See Pac. Harbor Capital, Inc.*, 252 F.3d at 1252 (noting that "[t]he protection of the non-diligent plaintiff is not the rule in RICO cases" even where fraudulent concealment may have occurred); *see, e.g.*, *Bergamini v. Deutsche Bank Nat'l Tr. Co.*, No. 12-62411-CIV, 2013 WL 12091091, at *4 (S.D. Fla. Jan. 28, 2013) (dismissing RICO claims as time-barred and declining to toll statute of limitations where "the record does not support the conclusion that Plaintiffs exercised diligence in seeking to identify whether Defendant committed fraud or participated in a pattern of alleged racketeering activity").  Under Supreme Court precedent, such fraud and concealment are not "extraordinary circumstance[s]" in the RICO context to justify equitable tolling. *See Pac. Harbor Capital, Inc.*, 252 F.3d at 1251–52.

Treble RICO damages are an incentive and reward to a private plaintiff who takes on the role of a prosecutor to diligently investigate racketeering activity. *See Rotella*, 528 U.S. at 557–58 ("The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors . . . .  The provision for treble damages is accordingly justified by the expected

benefit of suppressing racketeering activity, an object pursued the sooner the better." (internal citations omitted)).  Here, Plaintiffs waited more than two years after the statute of limitations had run on the rejected March 2010 offer—and seventeen months after actual prosecutors made public the facts allegedly supportive of Plaintiffs' RICO Claims—to then essentially copy and paste the indictment's allegations into a civil RICO complaint.  *See* Compl. ¶ 2 ("Plaintiffs are victims of a bribery scheme described by the U.S. Department of Justice ('DOJ') in its criminal indictments against, among others, Defendant Alejandro Burzaco . . . ."); *id.* ¶ 136 (conceding knowledge of the original indictment as far back as May 2015). That quality of effort hardly justifies the tolling of any statute of limitations.  *See, e.g.*, *Bergamini*, 2013 WL 12091091, at *4 (declining to toll RICO statute of limitations).  Accordingly, the Court should find that the RICO Claims based on the rejected March 2010 offer are time-barred, and dismiss them with prejudice. *See, e.g.*, *id.* (dismissing time-barred RICO claims with prejudice).[27]

For these reasons, the Court should dismiss Counts 1–5, 8, 9, and 11 of the Amended Complaint with prejudice.

## VI.   THE AMENDED COMPLAINT FAILS TO STATE ANY CLAIM AGAINST NAPOUT.[28]

Despite Plaintiffs being afforded two opportunities to plead their claims, the causes of action set forth in their Amended Complaint for Civil RICO and Civil RICO Conspiracy (Counts

---

[27] This argument applies to claims against all Defendants.  It applies with equal force to bar Plaintiffs' state law claims based on conduct outside of the applicable four-year limitations period prescribed by Florida Statutes § 95.11(3).  *See Sundance Apartments I, Inc. v. Gen. Elec. Capital Corp.*, 581 F. Supp. 2d 1215, 1223 (S.D. Fla. 2008) (Altonaga, J.) (cause of action accrues when last element occurs); *Yusuf Mohamad Excavation, Inc. v. Ringhaver Equip., Co.*, 793 So. 2d 1127, 1127 (Fla. Dist. Ct. App. 2001) (noting that "delayed discovery doctrine is not applicable to causes of action for tortious interference and unfair and deceptive trade practices").

[28] Napout also incorporates and joins the arguments advanced by the other Defendants in support of dismissal of Counts I, II, III, IV, V, VIII, IX and XI of the Amended Complaint.

I and II); Conspiracy in Restraint of Trade in the Americas Television Rights Market, the U.S. Television Programming Market and the U.S. Television Advertising Airtime Market (Counts, III, IV and V); Conspiracy to Monopsonize the Americas Television Rights Market (Count VIII); Violation of FDUTPA (Count IX); and Civil Conspiracy to Commit Tortious Interference (Count XI) still fall short of stating any actionable cause of action against Napout.

Napout's name appears in only 34 paragraphs of Plaintiffs' 329-paragraph and 98-page Complaint.  Of those 34 paragraphs, all but a handful simply lump Napout in with other "Conmebol officials" – an undefined term found numerous times in the Complaint that admittedly includes a host of other individuals – without attributing any conduct or activities to him specifically.  As further explained below, these general, guilty-by-association allegations cannot be construed against Napout solely on the basis of his connection to Conmebol.

The ***only*** factual allegations in the Complaint specifically directed at Napout are that, allegedly:

a)   "[f]rom about August 2014 to December 11, 2015, Napout was the president of Conmebol," and "from 2007 to 2014, he was one of Conmebol's vice presidents" and that "[i]n both capacities, [he] was a member of the Executive Committee of Conmebol" (Compl. ¶ 34);

b)   Napout received annual bribe payments of at least $400,000 from 2011 to 2015 for supporting T&T as the holder of the television rights to the Copa Libertadores and Copa America Centenario tournaments (*id.* ¶¶ 69, 76); and

c)   Napout negotiated a "secret" and "unlawful" agreement on behalf of Conmebol with FIC for the 2016-2018 Club Tournament television rights in November 2015 (*id.* ¶¶ 132–34).

These allegations, taken as true for purposes of this motion, fail to state any actionable claim against Napout.  Because the pleading deficiencies with respect to Napout are incurable, the Complaint should be dismissed, in its entirety and with prejudice, as to him.

### A.   The Generalized Allegations in the Amended Complaint Regarding "Conmebol officials" Cannot be Construed Against Napout.

The factual allegations in the Complaint referencing conduct and activities engaged in by "Conmebol officials" cannot be construed against Napout and thus are insufficient to state any claims against him.  "Rule 8(a)(2) of the Federal Rules requires that a complaint contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Twombly*, 550 U.S. at 573.  While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need "detailed factual allegations," a plaintiff's obligation to provide the grounds of his entitlement to relief requires "more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do."  *Joseph v. Bernstein*, Case No. 13-24355-CIV, 2014 WL 4101392, at *3 (S.D. Fla. Aug. 19, 2014) (quoting *Twombly*, 550 U.S. at 555).

Complaints against multiple defendants must contain "factual allegations [that] give each defendant 'fair notice' of the nature of the claim and the 'grounds' upon which each claim rests."  *Joseph*, 2014 WL 4101392, at *3.  A complaint that lumps all defendants together and provides no factual basis to distinguish their conduct fails to satisfy the minimum standard required by Rule 8.  *Lane v. Capital Acquisitions & Mgmt. Co.*, No. 04-60602 CIV, 2006 WL 4590705, at *5 (S.D. Fla. Apr. 14, 2006); *Joseph*, 2014 WL 4101392, at *3 ("When a complaint indiscriminately lumps all defendants together, it fails to comply with Rule 8."); *City of Miami v. JPMorgan Chase & Co.*, 171 F. Supp. 3d 1309, 1314 (S.D. Fla. 2016) (holding that plaintiff's failure to allege specific facts as to each defendant violated Rule 8).

The allegations in the complaint at issue in *Lane* failed to specifically "differentiate among the defendants, [and instead simply] alleged violations by a 'collective defendant'" even though there were five defendants.  2006 WL 4590705, at *5.  Similarly, the allegations in the complaint in *City of Miami* impermissibly lumped together "four separate corporate defendants

under the fictional name 'JP Morgan.'" 171 F. Supp. 3d at 1314.  In *Joseph*, the allegations of the complaint simply lumped all of the defendants together without giving them fair notice of each claim and the grounds upon which it was based.  2014 WL 4101392, at *6.

Similar to the plaintiffs in *Lane*, *City of Miami*, and *Joseph*, Plaintiffs lumped Napout with Co-Defendant Figueredo and various other individuals *who are not even defendants in this case*, under the collective and undefined term "Conmebol official" without specifically setting forth the basis for Napout's alleged liability.  According to Plaintiffs' own allegations, the term "Conmebol officials" includes *as many as 16 individuals* (Compl. ¶ 66).  Throughout the Complaint, there are various instances where "Conmebol officials" refers to particular individuals other than Napout (*id.* ¶¶ 62, 64, 66, 70, 116), other instances where "Conmebol officials" refers to an unspecified and general set of individuals (*id.* ¶¶ 3, 4, 5, 11, 12, 71, 78), and yet other times where "Conmebol officials" refers collectively to, among others, Napout and Figueredo (*id.* ¶¶ 129, 139, 168, 186, 189, 190, 191, 238, 258, 274).  Casting Napout within the general and undefined term "Conmebol officials," which admittedly includes multiple other individuals, has the same practical effect as lumping the defendants under the "collective defendant" in *Lane*, the "fictional name" in *City of Miami* and the "indiscriminately lumped" allegations in *Joseph*, and makes it virtually impossible to identify the alleged conduct attributable to Napout.  *Lane*, 2006 WL 4590705, at *5; *City of Miami*, 171 F. Supp. 3d at 1314; *Joseph*, 2014 WL 4101392, at *6.  Accordingly, Plaintiffs' generalized allegations imputing to Napout the alleged wrongdoing of multiple other individuals under the undefined "Conmebol officials" are insufficient to state a claim against him.[29]  *Id.*

---

[29] In addition to satisfying Rule 8(a), Plaintiffs' claims for Civil RICO (Count I) and Civil RICO Conspiracy (Count II) must satisfy the heightened pleading requirement of Rule 9(b).  *Joseph*, 2014 WL 4101392, at *3 ("Plaintiff's RICO claims must comply with Federal Rule of Civil

### B.   The Few Specific Factual Allegations Against Napout Fall Short of Stating Any Actionable Claim.

Other than the all-inclusive and deficient allegations involving "Conmebol officials," the only two substantive allegations against Napout in the Complaint are that he received bribes of at least $400,000 from 2011 through 2015 for supporting T&T as the holder of the television rights to the Copa Libertadores and Copa America Centenario tournaments (Compl. ¶¶ 69, 76) and negotiated the agreement between Conmebol and FIC for the 2016-2018 Club Tournament television rights in November 2015 (*Id.* ¶¶ 132–34).  These allegations, even if true, fail to state any actionable claim against Napout.

To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter that, accepted as true, states a claim for relief that is plausible on its face. *Joseph*, 2014 WL 4101392, at *3 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 570).  "To meet this plausibility standard, a plaintiff must 'plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Joseph*, 2014 WL 4101392, at *3 (quoting *Ashcroft*, 556 U.S. at 678).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."  *Joseph*, 2014 WL 4101392, at *3 (quoting *Sinaltrainal v. Coca-cola Co.*, 578 F. 3d 1252, 1261 (11th Cir. 2009)).

---

Procedure 8, and, because civil RICO claims 'are essentially a certain breed of fraud claims,' Counts I and II must also comply with the heightened pleading standard of Rule 9(b).").  To comply with Rule 9(b), a plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and the person responsible for the statement; (3) the content and the manner in which these statements misled the plaintiff; and (4) what the defendants gained by the alleged fraud.  *Id*; *see also Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997).  Plaintiffs' generalized lumping in of Napout with the undefined and all-inclusive term "Conmebol officials" falls well below the heightened pleading burden required for their RICO-based claims.

The allegations in the Complaint are that the broadcast rights to the Club Tournaments were under contract on each occasion that Plaintiffs bid on them (Compl. ¶¶ 111, 116, 120, 122–23) and that when the supposed bribes ceased and the rights were open for bidding, the rights were awarded to FIC, not Plaintiffs (*id.* ¶¶ 128–31).  There are no allegations in the Complaint regarding any bribes in connection with the agreement entered into between Conmebol and FIC in November 2015.  Plaintiffs, therefore, acknowledge that: a) they could not have successfully bid for the Club Tournament broadcast rights because the rights were under contract each time that Plaintiffs bid on them; and b) they were unsuccessful in bidding for the broadcast rights even after the alleged bribery scheme ended (which entailed a bribe-free process overseen by the U.S. Department of Justice).  Based on Plaintiffs' own allegations, it was implausible for the alleged bribes to Napout to have caused Plaintiffs to not win the Club Tournament broadcast rights.

As explained above, Plaintiffs' inability to state a plausible claim against Napout is an incurable pleading deficiency, and the Amended Complaint should therefore be dismissed with respect to Napout, in its entirety and with prejudice.

## CONCLUSION

For these reasons, the Court should dismiss each of the claims asserted in the Amended Complaint with prejudice.

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully request oral argument on their consolidated motion to dismiss should the Court believe it would be helpful.  Defendants believe oral argument would be of assistance given the number of arguments presented to dismiss the Amended Complaint.

Respectfully submitted,

Dated:  October 9, 2017

*/s/ Jay Shapiro*
Jay B. Shapiro
Florida Bar No. 776361
jshapiro@stearnsweaver.com
Morgan McDonough
Florida Bar No. 106104
mmcdonough@stearnsweaver.com
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, Florida 33130-1545
(305) 789-3200 (*telephone*)
(305) 789-3395 (*fax*)

*/s/ Curtis J. Mahoney*
Tobin J. Romero (*pro hac vice*)
tromero@wc.com
Jonathan B. Pitt (*pro hac vice*)
jpitt@wc.com
Craig D. Singer (*pro hac vice*)
csinger@wc.com
Curtis J. Mahoney (*pro hac vice*)
CMahoney@wc.com
William J. Vigen (*pro hac vice*)
wvigen@wc.com
Carol Joan Pruski (*pro hac vice*)
CPruski@wc.com
Williams & Connolly LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000 (*telephone*)

*Attorneys for Fox Sports Latin America,*
*Ltd., Pan American Sports Enterprises*
*Company, Fox International Channels,*
*Inc., and Fox Networks Group, Inc.*

79

RICHARDS KIBBE & ORBE LLP

*/s/ H. Rowan Gaither*
H. Rowan Gaither IV
David Massey
Maria Lapetina
T. Jakob Sebrow
Richards Kibbe & Orbe LLP
200 Liberty Street
New York, NY 10281
rgaither@rkollp.com
dmassey@rkollp.com
mlapetina@rkollp.com
jsebrow@rkollp.com

GELBER SCHACHTER &
GREENBERG, P.A.
Adam Michael Schachter
Freddy Funes
Gerald Edward Greenberg
1221 Brickell Avenue, Suite 2010
Miami, FL 33131
aschachter@gsgpa.com
ffunes@gsgpa.com
ggreenberg@gsgpa.com

*Attorneys for Defendant Torneos y*
*Competencias, S.A.*

COLSON HICKS EIDSON

*/s/ Stephanie Anne Casey*
Roberto Martinez
Stephanie Anne Casey
255 Alhambra Circle, PH
Coral Gables, FL 33134
bob@colson.com
scasey@colson.com

*Attorneys for Defendant T&T Sports*
*Marketing Ltd.*

SPERTUS, LANDES & UMHOFER LLP

*/s/ Samuel Josephs*
Jennifer E. LaGrange
Matthew Donald Umhofer
Samuel Josephs
1990 S. Bundy Drive, Suite 705
Los Angeles, CA 90025
jennifer@spertuslaw.com
matthew@spertuslaw.com
sam@spertuslaw.com

STUMPHAUZER & SLOMAN, PLLC
Ryan K. Stumphauzer
Christopher Ellis Gottfried
Stumphauzer & Sloman, PLLC
One SE Third Avenue, Suite 1820
Miami, FL 33131
rstumphauzer@sslawyers.com
cgottfried@sslawyers.com

*Attorneys for Defendant Hernan Lopez*


SHARP & ASSOCIATES, PLLC

*/s/ Stephen Grafman*
James E. Sharp
Stephen W. Grafman
1215 19th Street, N.W.
Washington, DC 20036
jsharp@sharp-assoc.com
sgrafman@sharp-assoc.com

SEDGWICK LLP
Ramon A. Abadin
One Biscayne Tower, Suite 1500
Two South Biscayne Boulevard
Miami, FL 33131-1822
ramon.abadin@sedgwicklaw.com

*Attorneys for Defendant Carlos Martinez*

KUEHNE DAVIS LAW, P.A.

*/s/ Benedict P. Kuehne*
Benedict P. Kuehne
Michael T. Davis
Miami Tower, Suite 3550
100 SE 2nd Street
Miami, FL 33131-2154
ben.kuehne@kuehnelaw.com
mdavis@kuehnelaw.com

*Attorneys for Defendant James Ganley*

KOBRE & KIM, LLP

*/s/ John Daniel Couriel*
John Daniel Couriel
Laura Maria Gonzalez-Marques
Stephanie Hauser
201 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
John.couriel@kobrekim.com
Laura.gonzalez@kobrekim.com
Stephanie.Hauser@kobrekim.com

Walden Macht & Haran LLP
One Battery Park Plaza
New York, NY 10004
212 335 2964
scasey@wmhlaw.com

*Attorneys for Defendant Alejandro Burzaco*

GREENBERG TRAURIG, P.A.

*/s/ Francisco Oscar Sanchez*
Francisco Oscar Sanchez
Jacqueline Becerra
333 Avenue of the Americas
Miami, FL 33131
sanchezfo@gtlaw.com
becerraj@gtlaw.com

*Attorneys for Defendant Juan Angel Napout*

82

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 9, 2017, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF. I also certify that the foregoing documents

are being served this day on all counsel of record via transmission of Notices of Electronic Filing

generated by CM/ECF.

*/s/ Jay B. Shapiro*
Jay B. Shapiro
