UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 16-cv-24431-CMA

GOLTV, INC., et al.,                    Miami, Florida

          Plaintiff,                    December 15, 2017

     vs.                                1:11 p.m. to 3:29 p.m.

FOX SPORTS LATIN AMERICA                Courtroom 12-2
LTD, et al.,
                                        (Pages 1 to 96)
          Defendants.
_____

MOTION HEARING
BEFORE THE HONORABLE CECILIA M. ALTONAGA,
UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFF:    STEPHEN B. GILLMAN, ESQ.
                      Shutts & Bowen, LLP
                      200 South Biscayne Boulevard
                      Suite 4100
                      Miami, FL  33131
                      (305) 347-7311
                      sgillman@shutts.com

                      SETH C. FARBER, ESQ.
                      GEORGE E. MASTORIS, ESQ.
                      MARCELO M. BLACKBURN, ESQ.
                      Winston & Strawn, LLP
                      200 Park Avenue
                      New York, NY  10166
                      (212) 294-4611
                      sfarber@winston.com
                      gmastoris@winston.com
                      mblackburn@winston.com

```
 1    APPEARANCES CONTINUED:

 2

 3      FOR THE FOX           JAY BRIAN SHAPIRO, ESQ.
        DEFENDANTS:           Stearns Weaver Miller Weissler
                              Alhadeff & Sitterson
 4                            150 West Flagler Street, Suite 2200
                              Miami, FL  33130
 5                            (305) 789-3229
                              jshapiro@stearnsweaver.com
 6
                              TOBIN J. ROMERO, ESQ.
 7                            JONATHAN B. PITT, ESQ.
                              CURTIS J. MAHONEY, ESQ.
 8                            Williams & Connolly, LLP
                              725 Twelfth Street, NW
 9                            Washington, D.C.  20005
                              (204) 434-5000
10                            TRomero@wc.com
                              JPitt@wc.com
11                            CMahoney@wc.com

12
        FOR THE DEFENDANT     BENEDICT P. KUEHNE, ESQ.
13      JAMES GANLEY:         MICHAEL T. DAVIS, ESQ.
                              Kuehne Davis Law, P.A.
14                            100 Southeast Second Street
                              Miami Tower, Suite 3550
15                            Miami, FL  33131-2154
                              (305) 789-5989
16                            ben.kuehne@kuehnelaw.com
                              mdavis@kuehnelaw.com
17

18      FOR THE DEFENDANTS    ADAM M. SCHACHTER, ESQ.
        TORNEOS y             Gelber Schachter & Greenberg, P.A.
19      COMPETENCIAS, S.A.:   1221 Brickell Avenue, Suite 2010
                              Miami, FL  33131
20                            (305) 728-0950
                              aschachter@gsgpa.com
21
                              H. ROWAN GAITHER IV, ESQ.
22                            T. JAKOB SEBROW, ESQ.
                              Richards Kibbe & Orbe, LLP
23                            200 Liberty Street
                              New York, NY  10281
24                            (212) 530-1800
                              rgaither@rkollp.com
25                            jsebrow@rkollp.com
```

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR THE DEFENDANT        JOHN D. COURIEL, ESQ.
      ALEJANDRO BURZACO:       LAURA MARIA GONZALEZ-MARQUES, ESQ.
 4                             Kobre & Kim, LLP
                              201 South Biscayne Boulevard
                              Suite 1900
 5                             Miami, FL  33131
                              (305) 967-6115
 6                             john.couriel@kobrekim.com
                              laura.gonzalez@kobrekim.com
 7

 8    FOR THE DEFENDANT        FRANCISCO O. SANCHEZ, ESQ.
      JUAN ANGEL NAPOUT:       Greenberg Traurig, P.A.
 9                             333 Avenue of the Americas
                              Miami, FL  33131
10                             (305) 579-0610
                              sanchezfo@gtlaw.com
11

12    FOR THE DEFENDANT        RYAN K. STUMPHAUZER, ESQ.
      HERNAN LOPEZ:            Stumphauzer & Sloman, PLLC
13                             One Southeast Third Avenue, Suite 1820
                              Miami, FL  33131
14                             (305) 371-9686
                              rstumphauzer@sslawyers.com
15
                              SAMUEL JOSEPHS, ESQ.
16                             Spertus, Landes & Umhofer, LLP
                              1990 South Bundy Drive, Suite 705
17                             Los Angeles, CA  90025
                              (310) 826-4700
18                             sam@spertuslaw.com

19
      FOR THE DEFENDANTS       LINDSEY LAZOPOULOS FRIEDMAN, ESQ.
20    T&T SPORTS               Colson Hicks Eidson
      MARKETING LTD:           255 Alhambra Circle, Penthouse
21                             Coral Gables, FL  33134
                              (305) 476-7400
22                             lindsey@colson.com

23

24

25
```

```
 1    APPEARANCES CONTINUED:

 2

 3     FOR THE DEFENDANT        RAMON A. ABADIN, ESQ.
       CARLOS MARTINEZ:         Sedgwick, LLP
                                2 South Biscayne Boulevard
 4                              One Biscayne Tower, Suite 1500
                                Miami, FL  33131
 5                              (305) 671-2124
                                ramon.abadin@sedgwicklaw.com
 6

 7     REPORTED BY:             STEPHANIE A. McCARN, RPR
                                Official Court Reporter
 8                              400 North Miami Avenue
                                Twelfth Floor
 9                              Miami, Florida 33128
                                (305) 523-5518
10                              Stephanie_McCarn@flsd.uscourts.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2                        WITNESSES

 3
     WITNESSES FOR THE PLAINTIFF:                    Page
 4                                                    --

 5


 6
     WITNESSES FOR THE DEFENDANTS:                   Page
 7                                                    --

 8

 9   EXHIBITS IN EVIDENCE          PRE    MARKED    ADMITTED

10   Plaintiffs' Exhibit No.       --      --          --

11   Defendants' Exhibit No.       --      --          --

12

13

14

15

16

17                        MISCELLANEOUS

18                                                  Page
19   Proceedings.......................................  6
     Court Reporter's Certificate.....................  82
20

21

22

23

24

25
```

```
 1          (The following proceedings were held at 1:11 p.m.)

 2              THE COURT:  Good afternoon in GolTV and Global Sports

 3      Partners, LLP, v. Fox Sports Latin America and the several

 4      other named defendants.

 5              Counsel for Plaintiffs, please state your appearances.

 6              MR. GILLMAN:  May it please the Court, for the

 7      Plaintiffs, Steve Gillman, Shutts & Bowen --

 8              THE COURT:  I'm sorry?

 9              MR. GILLMAN:  Steve Gillman, Shutts & Bowen.  And from

10      Winston & Strawn, Seth Farber, who's at the end of the table.

11      George Mastoris --

12              MR. FARBER:  Good afternoon, Your Honor.

13              THE COURT:  I missed -- what's the next name?

14              MR. GILLMAN:  Seth Farber, George Mastoris.

15              THE COURT:  Spell the last name, please.

16              MR. GILLMAN:  M-A-S-T-O-R-I-S.

17              And Marcelo Blackburn, B-L-A-C-K-B-U-R-N.

18              MR. BLACKBURN:  Good afternoon, Your Honor.

19              THE COURT:  Good afternoon.

20              Did you get all four, Stephanie?  All right.

21              Counsel for Defendants, one by one if you would,

22      please.

23              MR. SHAPIRO:  Good afternoon, Your Honor, Jay Shapiro

24      from the Stearns Weaver firm on behalf of the Fox Defendants.

25              With me from the Williams & Connolly firm are
```

```
 1    Mr. Tobin Romero, Mr. Jon -- Mr. Jonathan Pitt --

 2              MR. PITT:  Good afternoon, Your Honor.

 3              THE COURT:  Good afternoon.

 4              MR. SHAPIRO:  -- and Mr. C.J. Mahoney to my left.

 5              THE COURT:  I missed C.J.  I got C.J., but I missed

 6    the last part.

 7              MR. SHAPIRO:  Mahoney.

 8              THE COURT:  Spell that, please.

 9              MR. SHAPIRO:  M-A-H-O-N-E-Y.

10              THE COURT:  Mahoney?

11              MR. SHAPIRO:  Yes.

12              THE COURT:  You pronounce it differently?  No?

13              MR. MAHONEY:  No, that's -- that's just right.

14              THE COURT:  All right.  Thank you.

15              MR. MAHONEY:  Thank you.

16              THE COURT:  All right.

17              MR. KUEHNE:  Good afternoon, Your Honor.  For

18    Defendant Ganley, Ben Kuehne and Michael Davis.

19              THE COURT:  Nice to see you again.

20              MR. DAVIS:  Good morning, Your Honor.

21              MR. SCHACHTER:  Good afternoon, Your Honor.  For

22    Defendant Torneos y Competencias, I am Adam Schachter, with

23    Gelber Schachter & Greenberg.  And with me is Rowan Gaither,

24    with the Richards Kibbe & Orbe firm.

25              THE COURT:  I missed that second name.  I got yours,
```

```
1    Mr. Schachter, but I missed the other one.

2            MR. SCHACHTER:  Rowan Gaither.

3            THE COURT:  Spell, please.

4            MR. SCHACHTER:  R-O-W-A-N, G-A-I-T-H-E-R.

5            THE COURT:  I'm challenging you.  All right.

6            The third name?

7            MR. GAITHER:  And Jakob Sebrow is also here.

8            THE COURT:  Spell the last name, if you would, please.

9            MR. SCHACHTER:  S-E-B-R-O-W.

10           THE COURT:  Thank you.

11           MR. SCHACHTER:  Thank you, Your Honor.

12           MR. COURIEL:  Good afternoon, Your Honor, John Couriel

13  and Laura Maria Gonzalez for Alejandro Burzaco.

14           THE COURT:  Nice to have you.

15           MR. SANCHEZ:  Good afternoon, Your Honor.

16  Francisco Sanchez, Greenburg Traurig, on behalf of Mr. Napout.

17           MR. STUMPHAUZER:  Good afternoon, Your Honor,

18  Ryan Stumphauzer and Samuel Josephs here on behalf of Defendant

19  Hernan Lopez.

20           MS. FRIEDMAN:  Good afternoon, Your Honor.  For

21  Defendant T&T Sports Marketing, Lindsey Lazopoulos Friedman,

22  that's L-A-Z-O --

23           THE COURT:  Hold on.  Hold on.  L-A-Z-O?

24           MS. FRIEDMAN:  -- P-O-U-L-O-S, Friedman,

25  F-R-I-E-D-M-A-N, from Colson Hicks.
```

```
 1              THE COURT:  Glad to see somebody with a harder name
 2    than mine.
 3              MS. FRIEDMAN:  Thank you, Your Honor.
 4              THE COURT:  All right.
 5              MR. ABADIN:  Good afternoon, Your Honor, Ramon Abadin
 6    for Defendant Carlos Martinez.
 7              THE COURT:  Good afternoon.  Good to have you.
 8              Well, good to have everyone, this is like one big
 9    party that the Defendants would like to bring to an end and
10    Plaintiffs want to continue.
11              All right.  So we have a number of issues.  I assume
12    the Defense has divided up the issues, or there's one brave
13    soul who's going to take up the bulk of them?
14              MR. ROMERO:  I'm not brave enough, Your Honor, so --
15    this is Toby Romero, on behalf of the Fox Defendants.  I was
16    planning to address the RICO and the state law issues, if
17    that's okay with the Court?
18              THE COURT:  Okay.
19              MR. ROMERO:  And my colleague, Jonathan Pitt, was
20    going to address the antitrust and standing issues.
21              THE COURT:  Oh, I see that.
22              MR. ROMERO:  Does that work for the Court?
23              THE COURT:  That does, except I don't want to get to
24    the state issues until we first have dealt with the federal
25    questions.
```

```
 1            MR. ROMERO:  That's fine.  Then what I'll do --
 2            THE COURT:  And I'll give you a nice and very much
 3   needed break, I assume, anyway.
 4            MR. ROMERO:  That sounds good.  And actually,
 5   obviously, I want to answer any questions that the Court has,
 6   but on the -- on the RICO issues, I really only have two issues
 7   that I want to speak on because, obviously, the issues have
 8   been briefed pretty thoroughly by the parties.
 9            THE COURT:  Exhaustively.
10            MR. ROMERO:  Exhaustively.
11            THE COURT:  That's the problem when you don't give
12   lawyers page limits.
13            MR. ROMERO:  And when there's this many lawyers in the
14   courtroom.
15            THE COURT:  Right.  All right.
16            MR. ROMERO:  So I'll do my best to keep it brief,
17   Your Honor.
18            THE COURT:  Quite brave.  The first one.
19            I'd love to know the inner workings and the secret
20   workings of how that -- that selection was made, Mr. Romero.
21   Someday you'll tell me.
22            MR. ROMERO:  So there is a lot in the brief, and there
23   are really two issues that I want to speak to on RICO and then
24   answer any of the Court's questions.  And, obviously, please
25   feel free to jump in as I'm going.
```

```
 1            The two issues that I want to address are first on the
 2   question of proximate cause, the direct relationship test as
 3   it's been announced by the Supreme Court and how we believe it
 4   applies in this case.
 5            The second thing I'd like to spend some time talking
 6   about because, although it's briefed, we didn't go spend a lot
 7   of time in the brief talking about the Court's decision in the
 8   Eastern District of New York.  And so this really relates to
 9   the question of extraterritoriality in the context of the wire
10   fraud claims.  And I would like to explain to the Court why
11   that statute does not apply extraterritorially, and why there's
12   not a domestic violation alleged here.
13            THE COURT:  An issue you pretty much dropped in a
14   footnote your disagreement with the Eastern District of
15   New York.
16            MR. ROMERO:  Which, you know, when you sit -- when you
17   read the brief, and you get ready for the argument, you realize
18   there may be --
19            THE COURT:  Why was it in a footnote?
20            MR. ROMERO:  -- there would be additional things you
21   could -- you could --
22            THE COURT:  All right.
23            MR. ROMERO:  -- be prepared to address.  And my
24   thought was, well, the Court might say, What about that case in
25   the footnote?
```

1          THE COURT:  Mm-hmm.

2          MR. ROMERO:  If the Court would like, I can start with

3   that and then move on to --

4          THE COURT:  Go in your sequence.

5          MR. ROMERO:  Okay.

6          THE COURT:  However you're more comfortable.

7          MR. ROMERO:  Okay.  The direct relationship test.

8   It's a pretty stringent test.  It applies on a motion to

9   dismiss.  It's an essential element of a RICO claim.  It has

10  not been pleaded in this case.

11         How does the test work?  I believe when the Court

12  looks at the cases, the way the test applies is you start by

13  looking at the predicate acts that are alleged.  That involves

14  two things, looking both at the statute, and number two, also

15  looking at the facts as they are pled in the complaint to

16  determine whether or not there is a direct relationship between

17  the RICO predicate alleged and the alleged injury.

18         In this case, and I'll start with the wire fraud

19  claims, it's honest -- sometimes it feels pretty easy to me

20  because it's honest services wire fraud.  What is honest

21  services wire fraud?  Honest services wire fraud is where an

22  employee or an agent breaches a duty to a principal or an

23  employer, and that's what it is.  That's what -- that's what

24  the fraud is.  And in this case, the fraud, as alleged, are

25  South American agents breaching a duty under Paraguayan law to

a Paraguayan principal.  Okay.  The victim under that alleged
scheme of honest services fraud is the party to which the
honest services were owed, that's Conmebol.

So in some sense, it's very simple when you look at
the -- the predicate that is charged, or that is alleged in
this case, who is the victim?  It's Conmebol.  It's kind of
easy.

That, I think, really should end the inquiry, but look
at the facts alleged.  The facts alleged are that there was
bribery, as a result of the -- the bribery is what constituted
the breach.  And what happened was a party, T&T, offered to pay
X as a contractual payment and Y as an extracontractual payment
in the form of a bribe.  And so what is alleged is not only was
there this breach of a duty to Conmebol, there is also an
economic harm because T&T would have paid X plus Y.  That could
have gone to Conmebol instead of the Y allegedly going into the
pocket of a corrupt official.

So when you look at the -- at the facts alleged, when
you look at the predicate, which is honest services wire fraud,
the most direct and immediate victim is Conmebol, and the
injury is the deprivation of honest services to Conmebol
because there is no duty owed to the Plaintiff.  There is no
fiduciary duty owed to the Plaintiff by these Conmebol
officials.  So it's the breach of the duty that is owed to
Conmebol.

1    There is also, which isn't actually required under

2    honest services fraud, but which is alleged here is there's

3    also a financial injury to Conmebol.  So it is the most direct

4    and immediate victim.

5    And that's the test, and I think just by a straight

6    application of the test, we win.

7    But that's not where the Court's supposed to stop.  I

8    think if the Court reads the case law, the Court is supposed to

9    look at the principles that sort of underlie this direct

10   relationship test and say, Do they line up with the -- the

11   result that it looks like I should reach?  And I think the

12   answer is yes.

13   The first question is, are there more immediate

14   victims?  That's the first policy question, and it kind of

15   makes sense that that would be the policy questions because

16   you're trying to figure out where's the direct injury and who

17   is the direct victim of this offense.  And if there's lots of

18   other people who are more immediate and direct victims, then

19   maybe the test isn't working right.  But it does work right

20   here because we know who the most immediate and direct alleged

21   victim is.  It's Conmebol.

22   One of the other principles the Court is supposed to

23   look at is, are there intervening factors?  Because if there's

24   one, that's enough.  But are there intervening factors that

25   could account for the Plaintiffs' alleged injury, which isn't

```
 1   you deprived me of honest services because nobody owed them a
 2   duty.  Their claim is, if that breach over there hadn't
 3   happened, Conmebol wouldn't have sold the rights to T&T.
 4   Conmebol wouldn't have sold the rights to anyone else in the
 5   world.  Conmebol would have sold the rights to me.  That's
 6   secondary.  That really, truly is secondary.
 7          And when you look at the intervening steps that exist,
 8   particularly in this case as it's pled, as the facts are
 9   alleged, these rights were under contract back in 2000.
10          THE COURT:  Voidable contracts according to the
11   Plaintiffs --
12          MR. ROMERO:  Voidable --
13          THE COURT:  -- because procured by -- by bribe.
14          MR. ROMERO:  Absolutely.  But the -- but they were
15   under contract.  And so if they are voidable, Conmebol would
16   have to exercise its discretion to say, We're going to void,
17   and we're going to take on the risk that someone is going to
18   challenge whether or not we have legal authority to void or
19   dispute the facts as to whether or not there is bribery, which
20   could result, right, in the rights being tied up, the games not
21   being played and lots of uncertainty.
22          Now, it's possible Conmebol could have done that, but
23   that's an intervening step that would have happened, that would
24   have had to have happened.  And then they would have had to
25   say, All right, how are we going to market these rights now
```

1    that we've decided that we're going to terminate the contract?

2            And now we have to go to the next step, and let's

3    assume that T&T says, Okay, we're not going to dispute it.

4    You're out of the contract.  We're not going to come into court

5    here in Miami or probably more appropriate in -- appropriately

6    in the Cayman Islands or somewhere in Latin America, we're not

7    going to contest it.  Then Conmebol has to say, Okay, well,

8    what are we going to do?  Are we going to put them out for

9    auction?  Are we going to go solicit bids from people?  Are we

10   going to hire an agent to go out and drum up interest in the

11   rights?

12           All of those things could have happened; those are all

13   intervening steps.  And in the words -- in Plaintiffs' own

14   words because it's in their brief, the rights would not have

15   necessarily gone to Plaintiffs because there's at least one

16   other bidder that we know is out there.  T&T could have said,

17   Okay, that Y over there that was going into the pockets of

18   officials, allegedly, I'm going to take the Y, and I'm going to

19   add it to the X, and I'm going to add some more, and what do

20   you know, maybe my bid looks more attractive.

21           So this all sounds like, well, this is all speculative

22   who would have had -- that's the point.  The point is on a

23   motion to dismiss, in this context, if that type of speculation

24   is required, a civil RICO plaintiff doesn't get to come into

25   court.

```
 1            And then lastly, even if Conmebol ultimately exercised
 2   its discretion -- and it does have discretion, as Plaintiffs
 3   cite to the articles of Conmebol in terms of what -- what is
 4   its authority, if the Court reads it, which we've appended to
 5   our reply, it's cited in the complaint, Conmebol can basically
 6   do whatever it wants in deciding how -- how and whether to
 7   award these rights.
 8            So let's assume Conmebol then awards the rights.
 9   Plaintiffs still have to show that they somehow would have made
10   a profit because that's the injury that they are alleging here.
11   It's not just we wanted to buy the Mona Lisa and hang it up on
12   our wall and look at it; we wanted to buy these rights to
13   commercialize them.  And so they then would have had to make a
14   profit.  There's just too many intervening steps.
15            But again, all of this, this is just sort of look at
16   the policies, and do the policies line up with where we
17   started?  And where we started is the easy part.  It's honest
18   services fraud.  It is depriving Conmebol of its right to
19   honest services.  There is one victim of that, and it's not the
20   Plaintiffs.
21            I suspect they're going to stand up and talk about the
22   Bridge case, so I want to talk a little bit more about that
23   case, which is a Supreme Court case, that was most directly
24   answering the question of whether or not there has to be
25   first-party reliance in the context of wire fraud, and the
```

```
 1    Court's answer to that question was no.

 2            Let's do the same analysis.  Let's look at what the

 3    predicate offense was and what was alleged in that case.  And

 4    again, this was on a motion to dismiss.

 5            The predicate offense there was not honest services

 6    wire fraud.  It was classic wire fraud.  Okay.  A lie to obtain

 7    money or property.  And here's how the lie worked.  In that

 8    case, it involved an auction for tax liens.  And so the county

 9    held an auction, and tax liens were awarded to the lowest

10    bidder.  Well, it just so happened that everybody made the

11    lowest bid.  And so the county said, Well, we have to set up a

12    system.  How are we going to award bids if everybody comes and

13    offers the same thing?  And so they came up with this system

14    that was an allocation, so that it would just rotate.  So on

15    day one, Bidder No. 1 would get the lien, on day two, Bidder

16    No. 2 would get the lien, and etc.

17            And to make sure that the bidders weren't cheating

18    each other, the bidders had to come in and submit a declaration

19    saying, I'm bidding on my own account, so that I, Toby Romero,

20    couldn't come in with my brother, Andy Romero, we both make --

21    we both make bids, and I take them for myself.  Okay.  So there

22    is a rule set up to protect the other bidders, submit this

23    declaration basically saying I'm bidding on my own account.

24    The allegation was the lie, I'm bidding on my own account,

25    when, in fact -- when, in fact, it was a -- a collusive bid,
```

okay.

The injury, not to the county, because the county, it was the same amount of money; it was the lowest bid.  The financial injury was to the other bidder who, necessarily, under that regime, would have gotten the next contract because they were next in line.  So it would have gone from number one to number two.

So in part because there are different factual allegations, but in part because it's a different offense, it's wire fraud, but it's classic wire fraud; it's a lie for money or property.

And the Court there said, It doesn't have to be direct-party reliant.  So it doesn't have to be a lie from me to the Court.  I can lie to somebody over here in the gallery and injure the Court.  And that's what was alleged here.  It was a lie to the county to injure the other bidder.

And again, when you look at the policies in that case, the Court did that.  The Supreme Court did that.  So this is what the Supreme Court said.  Not me.  The Supreme Court said, There's no other victims.  The county wasn't injured because the county didn't lose any money.  That's what the Court said. And the Court said, There are no intervening steps.  Why are there no intervening steps, because it's a rotational system, the next person in line automatically wins the contract.

And so I think when the Court focuses on the statute

```
 1    and focuses on what is alleged, I think it's pretty clear the
 2    direct relationship test is not satisfied.
 3              Now, there is one other -- there are actually four
 4    predicates, honest services wire fraud is not the only one.
 5    There is also New York state commercial bribery, which I will
 6    talk about, and then money -- a bunch of different money
 7    laundering counts, and Travel Act.  Travel Act and money
 8    laundering, in some sense, don't matter because they depend on
 9    the underlying validity of the wire fraud and the New York
10    state commercial bribery predicates.
11              Okay.  So New York state commercial bribery, what does
12    the statute require, what is alleged.  The statute in some ways
13    is very much like the honest services statute.  It is an agent
14    or an employee accepting a bribe, okay, breaching a duty to the
15    principal or to the employer by not saying, I just took this
16    money, and -- this is required under the New York state
17    commercial bribery -- causing a financial injury of more than,
18    I forget what the number is, $250 -- 250,000 -- $250, I
19    believe, to the principal, in this case Conmebol.
20              So what does that -- who is the victim of that
21    offense, who is the direct victim?  Again, it's not telling
22    Conmebol about the alleged side payment, and it's causing a
23    financial injury to Conmebol.  So the analysis for the New York
24    state commercial bribery statute is exactly the same as honest
25    services.
```

1          Okay.  Extraterritoriality.  I will look at the sign

2     to speak slowly because that word is a mouthful, and I may

3     botch it a couple times.  But in the *RJR Nabisco* case, the

4     Supreme Court announced a two-part test.  Step one is there is

5     a presumption against extraterritoriality, so you have to look

6     at the statute and determine whether or not there is a

7     statement of clear congressional intent that the statute

8     applies outside of our jurisdiction.

9          Once you've looked at that analysis and determined

10    whether or not the statute is supposed to apply outside the

11    U.S., if it does not, there's still another step, and that is,

12    did the conduct relevant to the focus of the statute occur

13    abroad?  As to the first step, there's a Circuit split.  We

14    cited the cases, I believe that the most persuasive authority

15    is the authority from the 2nd Circuit because that case relies

16    on a Supreme Court precedent that's addressed very similar

17    statutory language.

18          Now, there is a reference in the wire fraud statute to

19    use of the wires in interstate or foreign commerce.  And the

20    reason for that is, I think reasonably obvious, which is that

21    is a demonstration of Congress's authority to legislate in the

22    area.  It's commerce clause legislation.  And so that's what

23    gives them authority to legislate.

24          And the Supreme Court in *Morrison* looked at similar

25    language in the securities fraud statute and said, A mere

1    reference to foreign commerce does not evince a clear intent

2    for the -- for the statute to apply outside of our borders.

3            And that is the analysis that the 2nd Circuit

4    followed, and I think that that's the correct analysis.

5            The other courts, to the extent they've cited any

6    justification, and it's -- really there's not much analysis in

7    the other decisions.  There was a decision to the Supreme

8    Court's -- a citation to the Supreme Court's decision in

9    *Pasquantino*.  *Pasquantino* predated *Morrison* by several years,

10   and, in dicta, did suggest that the wire fraud statute might

11   apply outside of our borders.  And the reason it was dicta is

12   because the conduct in that case all occurred in the United

13   States.  That's actually *Morrison*, the later Supreme Court case

14   I cited, *Morrison* talks about *Pasquantino* and says, in

15   *Pasquantino*, the conduct all happened in the United States.

16           So -- and by the way, so the Court in the Eastern

17   District of New York was with me on that argument because the

18   Court had to be, obviously, because the 2nd Circuit has ruled.

19   And so the Court did say, Wire fraud statute does not apply

20   outside of our borders.  And so the Court then moved to the

21   second step.

22           And so I'm not going to just urge the Court to

23   disagree with a court from another jurisdiction; I want to

24   first mention why there are some differences.

25           The first difference -- and I am mainly showing up,

```
1    Your Honor, in criminal cases, so I'm used to this, and I'm

2    sure the Court is aware that on a motion to dismiss in a

3    criminal case, the Government stands up and says, We've just

4    got to allege the elements and give notice.  Indictment is

5    presumed to be -- returned by a valid grand jury is presumed to

6    be sufficient.

7            The standards on a motion to dismiss in a civil case

8    are a little bit different.  The 12(b)(6) standard is

9    different.  It's more than just alleging the elements.  The

10   Supreme Court has made clear that you have to meet the

11   plausibility standard, which is something that is higher than

12   what the Government has to meet in a criminal case.

13           The other thing that's different is there were a lot

14   more schemes, alleged schemes involved in the trial that's

15   going on in the Eastern District.  It wasn't just the Copa

16   Libertadores, the Copa -- Rey Copa Sudamericana, and the -- the

17   three club tournaments.  There were other tournaments at issue,

18   other conduct that was allegedly at issue.

19           Let me explain why I think the Court got it wrong.

20           The Court got it wrong for two reasons.  First, under

21   *RJR*, the question, Did the conduct relevant to the focus of the

22   statute occur domestically or abroad?  And the Court in the

23   Eastern District said, Well, the conduct relevant to the

24   statute is the use of the wires.

25           I think that's incorrect.
```

```
 1              I think when you're looking at the wire fraud statute,
 2    and particularly the honest services wire fraud -- actually, I
 3    don't think it matters.  It's the wire fraud statute generally.
 4    What is being criminalized is not the use of the wires.  What's
 5    being criminalized is the fraud; it's the scheme to defraud.
 6    And so I think the focus of the statute is where did the scheme
 7    to defraud occur, not was there an incidental use of the U.S.
 8    wires, which, after all, is only required so that Congress has
 9    authority to legislate in this area.
10              So I think the Court did get it wrong there.  I think
11    the focus, you have to look at where did the scheme happen.
12    But I think the Court also got it wrong when the Court looked
13    at some of the paragraphs in the superseding indictment there
14    that are actually the paragraphs that are relevant to the
15    alleged schemes here.
16              And does the Court have a copy of the complaint and
17    the indictment?  If not, I can hand out --
18              THE COURT:  I have a copy of the complaint.  I didn't
19    copy the indictment on paper.  I have it on -- I had it on my
20    screen, though.
21              MR. ROMERO:  Okay.  If the Court looks at -- the
22    paragraphs are 174, 175 and 185.  So if the Court were to look
23    at -- it looks like it is Document 78-1 and Page 79.  And if
24    it's easier, I can hand up a hard copy for the Court.
25              THE COURT:  Or you can put it up on the ELMO, if you
```

```
1    want, so we can all look on.
2            MR. ROMERO:  I can do that.
3            THE COURT:  We've talked about visuals in oral
4    argument, so.
5            MR. ROMERO:  And what button -- there we go.  All
6    right.
7            THE COURT:  All right.  You can minimize it.
8            Mr. Kuehne, Mr. Davis.  Oh, there we go.
9            MR. ROMERO:  It's actually almost idiot-proof.
10           THE COURT:  All right.
11           MR. ROMERO:  174 is the first paragraph.  And most
12   specifically what the Court relied on was the sentence
13   beginning here, By one estimate, the United States accounted
14   for 16 percent of the audience share in 2010.
15           So I'll say two things about that.  Number one, that
16   has nothing to do with the conduct that is the focus of the
17   statute.  Right.  The wire fraud statute doesn't have -- a
18   scheme to defraud clearly doesn't have anything to do as where
19   are people watching it.  That doesn't even have anything to do
20   with the use of the wires.
21           More importantly, I guess if I were arguing, you're
22   trying to figure where is the locus of the crime, is it
23   domestic or abroad, if 16 percent was in the U.S., I would have
24   fallen on the other end of the fence, which is 84 percent seems
25   a lot more significant to me.
```

```
 1              The next paragraph is 175, and it continues on to the
 2     next page.  And this is an example of the conduct that happened
 3     in the U.S.  In 2005 and again in 2007, a club from Major
 4     League Soccer, that's the U.S. professional soccer league,
 5     another division, along with the NASL, the United States Men's
 6     Club Soccer sanctioned by the USSF participated in the Copa
 7     Sudamericana.  Okay.  So that's two club teams from the U.S. in
 8     two years played in one tournament.
 9              Again, number one, that has nothing to do with the
10     focus of the statute.  The statute is either -- I mean, I think
11     it's the fraud, that has nothing to do with the alleged fraud.
12     Even if it's the wires, that has nothing to do with the alleged
13     wires.  And that case was different because it was broader in
14     its scope.  In this case --
15              THE COURT:  By that case, the Eastern District --
16              MR. ROMERO:  Eastern District case, yeah.
17              In this case, the Plaintiffs didn't even make their
18     first offer for the rights until 2010.  So three years and five
19     years after these teams went and played in the Rey Copa -- I'm
20     sorry, in the Copa Sudamericana.
21              And then the next paragraph and the next sentence, you
22     know, the Court also relied on in this paragraph is, The Rey
23     Copa has been played in the U.S. on several occasions,
24     including in L.A., in 2003, and in Fort Lauderdale in 2004.
25     It's the same point that I've been making over and over again.
```

```
 1    Has nothing to do with use of the wires, has nothing to do with
 2    an alleged scheme to defraud and -- and again, in this case,
 3    happened before the Plaintiffs' alleged cause of action arose.
 4    So it can't have anything to do with whether or not the wire
 5    fraud statute was somehow violated domestically in the
 6    complaint alleged here.
 7            So all we have left, and it's going to be vague
 8    because it is -- and the Government can get away with it in a
 9    criminal case -- it's paragraph 185.  This is the last
10    boilerplate paragraph that in the course of the scheme, various
11    of the defendants and their coconspirators used wire
12    facilities, financial institutions located in the U.S., among
13    other countries, to make and receive bribe payments and to
14    transfer payments related to contracts secured through bribery,
15    relied on the growing U.S. market, and conducted some meetings
16    in furtherance of the scheme.
17            So ultimately what we have here is some alleged
18    incidental use of the wires and some meetings in the U.S.
19    Some.  And what the question is, where did the conduct that is
20    the focus of the statute occur, I think the answer here is
21    pretty clear, it occurred abroad.  Particularly where what
22    we're talking about is honest services fraud.  So it's a
23    South American soccer official sitting in his home country in
24    Latin -- in South America breaching a duty under Paraguayan law
25    owed to a Paraguayan principal.  They may have a claim
```

```
 1    somewhere in Paraguay.  They do not have a claim in this court.

 2          So those were the only points that I wanted to -- I

 3    guess one other thing about the Court's decision -- this is

 4    mentioned in our footnote -- I mean the Court does acknowledge,

 5    look, the gravity of this scheme may well have occurred

 6    somewhere else.  That's the question I think that -- that the

 7    Court is supposed to be addressing, where was the gravity of

 8    the alleged scheme, and in this case, it -- it was not the

 9    United States.

10          That's all I have, but I'm happy to address any

11    questions the Court has.

12          THE COURT:  I'll let you take a break and give you

13    some time for rebuttal and hear from Plaintiffs' counsel on

14    this one issue involving the RICO claim.

15          MR. FARBER:  Your Honor, Seth Farber for the

16    Plaintiffs.  And with the Court's permission, we're going to

17    divide what we're doing somewhat similarly to the way that the

18    Defendants are.  I'm going to address the RICO issues and the

19    state law issues when we get to them, and Mr. Blackburn is

20    going to address the antitrust issues.

21          THE COURT:  Very well.

22          MR. FARBER:  If I could just have a moment to get my

23    stuff.

24          Judge, I thought I'd take these issues in reverse

25    order that the Plaintiffs did and start with what we were just
```

discussing since it's fresh in our minds, and that's the
extraterritoriality issue.  And there are two pieces to that,
which is whether there's the extraterritorial application
statute, which I think we've addressed in our papers; they're
cases that we referred to.  There's a different -- there's a
split on the issue.  It's ultimately a question that the Court
is going to have to decide on whether to follow the route that
the 1st and 3rd Circuit has taken, or the 2nd Circuit has
taken.

But the -- I think where we do have a real dispute
that needs some further discussion is on the question of what's
alleged in the complaint, and whether what's alleged there is a
domestic injury.

And you know, as I was listening to the argument
before, and where we started, and this was in the discussion of
proximate cause, was discussion of how really what's alleged
here is bribery.  And we agree with that.  I mean, the essence
of the honest services fraud charges and commercial bribery,
obviously, is a bribery charge, and if you look at what's the
essence of the conduct that occurred, the payment of bribes.

And I think that the -- my adversary's argument sort
of glossed over a little bit that part of Judge Chen's opinion
in paragraph, I think it was 185, when, you know, she was
explaining her reasoning, and the portion of the indictment
that we were looking at is a portion that specifically alleges

making and receiving of bribe payments in the U.S.  I think
that was characterized as sort of the incidental use of the
wires, but that's not what the judge was referring to in that
opinion, and it's not what we've alleged in our complaint
either.

        And I think that the short answer to whether there's
domestic injury alleged here is we go through in rather
exhaustive detail and lay out specific payments that are made
from the United States and delivered into the United States,
from bank accounts in the United States to bank accounts in the
United States.

        Those payments may be by wire, but functionally it's
the same thing as my standing in New York, taking a bag of
cash, walking across the street to somebody else and handing
them that bag of cash as a bribe payment.  And that kind of
activity, I don't think there'd be any dispute, is covered by
the commercial bribery statute in -- in New York state.  And
when it involves wire payments, as was the case here, it's --
it's wire fraud.

        The -- it's the very sort of essence of what the
wrongdoing is.  We've also alleged specific meetings in the
United States, that's in paragraph 43 of our complaint as well.
So I mean, it's -- I think at some level, it's true that
perhaps, you know, motions to dismiss in criminal cases, there
is a more forgiving standard for what you have to allege in an

```
 1      indictment than what you have to allege in a complaint, but the
 2      question that the judge was deciding wasn't just based on that
 3      standard.  I mean it went and looked at actually what's the
 4      specific conduct there.  And this isn't an issue, and I don't
 5      think the Plaintiffs argued that we haven't been specific
 6      enough about what the nature of these payments are.  What
 7      that -- what Judge Chen's decision turned on is what was the
 8      actual conduct.  And the conduct was bribe payments in the
 9      United States.  And that's the -- that's the essence of that
10      case.  It's the essence of this case.
11             Turning back now to the question of proximate cause,
12      um, you know, at the end we heard some discussion of the *Bridge*
13      case, and that it's a different type of fraud.  I think that's
14      a distinction without a difference.  And, um, you know, my
15      adversary was describing how you have to look at the predicate
16      acts, and the test is whether or not someone is the most direct
17      victim.  Well, that's not exactly the way the courts have
18      articulated the standard.  The question is whether you are
19      directly harmed.  And certainly in *Bridge*, okay, the county was
20      harmed.
21             The same thing is true, as in a number of other bribe
22      cases, that bidders similarly situated to GolTV have been in
23      where courts have upheld RICO claims, including one that we
24      cited in our brief *Corcel Corp.*, which is from the 11th
25      Circuit.  And, you know, there's really no meaningful
```

```
 1    distinction between these cases and ours.
 2             And to say that, you know, the county in either of
 3    those cases --
 4             THE COURT:  I'm sorry.  Which 11th Circuit case are
 5    you referring to?
 6             MR. FARBER:  So this is Corcel Corp., Inc. v. Ferguson
 7    Enterprises.
 8             THE COURT:  You referred to Morning Star and
 9    Willie McCormick in your discussion of Bridge and the 11th
10    Circuit cases.
11             MR. FARBER:  If you give me a moment, Your Honor, I
12    can tell you where we cite that as well.
13             Just give me one second.
14             Page 21 of our brief, Your Honor.  It's the second --
15    excuse me, it's an 11th Circuit case.
16             THE COURT:  Oh, Corcel, the -- the Fed. Appx.
17    decision?
18             MR. FARBER:  Yes.
19             THE COURT:  All right.
20             MR. FARBER:  And you know, the facts in that case was
21    you had a situation where Corcel, who's the disappointed
22    bidder, was a small -- a legitimate small business enterprise,
23    and the defendant was falsely claiming that they were a small
24    business enterprise.  And the consequence of being a small
25    business enterprise is essentially you get a 10 percent credit
```

1    on your bid for work from the Government.  And because the

2    defendant sort of wrongfully claimed this, they were able to

3    get awarded all sorts of projects that would have gone to

4    Corcel but for this wrongdoing.

5           And the 11th Circuit in that case makes clear that the

6    county is also a victim there and is harmed insofar as their

7    policies in -- in trying to encourage small business

8    enterprises have been thwarted by doing this.  And they were

9    the ones most -- they were the ones directly harmed by that in

10   the first instance, but that does not mean that Corcel was not

11   also injured.

12          And really the test, and this is what comes out of

13   *Bridge* and out of *Corcel* and every other cases that we

14   referenced, is whether the harm is derivative, whether there is

15   going to be a duplicative recovery.  And there's not.  And

16   there's not in our case either because the type of harm that,

17   in our case, Conmebol suffers and, in those cases, that the

18   county suffers is different from the harm that we've suffered.

19   They are both -- both we and they have been injured, but it's

20   different types of injuries.  What's relevant --

21          THE COURT:  By we and they, you mean you and Conmebol?

22          MR. FARBER:  We and Conmebol.  Yes.  I mean, Conmebol

23   is obviously a victim, but the fact that they were a victim

24   doesn't mean that we are not also a victim.  That's implicit in

25   all of these bribery cases that have upheld RICO claims against

```
 1    proximate cause challenges.

 2            And really the issue is whether, you know, there's a

 3    second step, whether our harm is one that's also visited on

 4    somebody else, and there's a question that there can be two

 5    people who will be recovering for the same damages.  Well,

 6    that's not the case.  We are -- and at this point, you know,

 7    you start to get into factual disputes they have with us and

 8    saying, Well, you weren't necessarily going to recover --

 9    excuse me, you weren't necessarily going to win these bids if

10    we had not paid these bribes.

11            Well, in making that argument, they're disputing the

12    facts that we've alleged in the complaint.  And for these

13    purposes, we have to take the facts that are alleged in the

14    complaint as true.  That dispute can get hashed out as this

15    case moves forward.  But except --

16            THE COURT:  You allege that but for the bribes, you

17    would have received the awards?

18            MR. FARBER:  Yes.

19            THE COURT:  The contract?

20            MR. FARBER:  Yes.  Because our bids were plainly

21    higher and --

22            THE COURT:  And let's be clear, and we'll get to

23    standing in a moment, but who is our?  Who is we?  When you

24    speak in plural.

25            MR. FARBER:  GolTV.  Well, I mean, not to jump forward
```

1   to the standing issue --

2           THE COURT:  Right.

3           MR. FARBER:  -- but that, too, is just a factual

4   quibble that they have with us, that they're trying to raise at

5   a motion to dismiss stage --

6           THE COURT:  Standing?

7           MR. FARBER:  -- where we've alleged clearly is that

8   GolTV is the one who was bidding for these rights.  We did it,

9   you know, through Global Sports, but that doesn't mean that,

10  you know, we -- the fact that we used an agent to do the

11  bidding doesn't mean that we don't have standing.

12          Now, they say Global Sports doesn't -- isn't truly an

13  agent.  They dispute whether or not the facts will bear that

14  out.  But, you know, what we've alleged in the complaint in

15  talking about those bids is that we're the ones who was making

16  those offers and doing it through them, so we're the ones who

17  would have received the business.

18          And there's -- their -- what they did in their

19  opposition is they attached certain offer letters and said,

20  Well, because these are written on Global Sports letterhead,

21  that means that Global Sports is acting on its own behalf.

22  Well, that's an inference that they're drawing from those

23  materials that's contrary to what we've alleged in the

24  complaint.  Our position is when we go through discovery, that

25  will not turn out to be the case, but that's, you know, that's

1    why you have discovery and why you have trials so those factual

2    issues can get resolved.

3         But turning back to the -- the proximate cause

4    question, the, you know, the standard in *Corcel*, what the 11th

5    Circuit said is critically, and this is from -- excuse me, I

6    believe it's 5 -- Page 576, plaintiff *Corcel* alleges that if

7    the county had not relied on the defendant's false and

8    fraudulent documents and actions, the county would have awarded

9    plaintiff *Corcel* the supply and construction contract at issue

10   because plaintiff *Corcel* was the next lowest SPE bidder, which

11   is exactly our situation.  And the Court upholds the claims

12   there because they say *Corcel* has alleged a direct relation

13   between its claimed injury and defendant's federal civil RICO

14   violations sufficient to constitute proximate causation.

15   There's no requirement that it be the most direct.

16        And the concluding sentence is, simply put, The

17   Defendant's alleged fraud directly caused Plaintiff *Corcel* to

18   lose multiple county contracts.  And there can't be any dispute

19   that that's the result, just like there can't be any dispute

20   here that the bribery that turned what would have been an

21   honest bidding process into a corrupt one is what caused us to

22   lose these contracts.

23        Now, I recognize they can dispute that factually as

24   the case goes forward, but our complaint plainly alleges that

25   that was the direct cause of what our injury is.

1          So you know, I think, ultimately, what this boils down

2    to is that the Defendants just sort of don't like the series of

3    bid cases that have come starting with *Bridge* and have followed

4    after that, but there's no meaningful distinction between the

5    facts that we have here and -- and what -- and what was present

6    in those cases.

7          And when you start mentioning, you know, again,

8    factual issues that, you know, Conmebol under their articles

9    has discretion about what -- what bids to award, things like

10   that, well, I mean, that's true in every one of these other

11   cases.  You know, the counties set up procedures.  They make

12   decisions -- parties make decisions about who to employ for

13   things.  And, yes, it's presumably they could -- they could

14   make other decisions, but that's not -- that type of discretion

15   does not change one iota the fact that the decision has been

16   made based on the criminal activity, in this case the wire

17   fraud and commercial bribery predicates that's alleged here.

18   That's not the sort of intervening step that would change --

19   that would make an injury speculative or derivative of somebody

20   else.

21          I mean, if -- if you were to accept their position

22   that, you know, we were not really the purchasers of these

23   rights, well, then there might be an argument that it was

24   derivative.  But that's, again, not what we have alleged here.

25   And taking our allegations as true, which you have to in a

```
 1   motion to dismiss, this was a direct harm.

 2            And as to the injuries being speculative because, you

 3   know, assuming we prevail at trial, there's a question of,

 4   well, what are -- what would those rights have been worth to

 5   us, well, that's the same issue in every one of those other

 6   cases.  I mean, you know, the question that the plaintiff in

 7   the Bridge case would have to prove is, well, what would that

 8   lien have been worth to me after I got it?  That's the same

 9   question in Corcel, what would those contracts have been worth

10   to me had I gotten them?

11            You know, the fact that you've got to go through an

12   exercise of quantifying what your lost profits were, for

13   example, does not mean that you were not injured, and it's not

14   a basis for, um, ah, dismissing a RICO claim.

15            So I'm happy to answer any questions the Court has on

16   either of those issues, but that's --

17            THE COURT:  You didn't differentiate among the

18   predicate acts, obviously, in your remarks the same way

19   Mr. Romero did.

20            MR. FARBER:  Well, I mean, I agree that we're

21   essentially talking that the wire fraud and the commercial

22   bribery are basically -- I mean, you're talking about bribery

23   in both cases.  I think the -- when we were talking about the

24   predicate acts, that it's in the context of talking about

25   whether there's a domestic injury and in the context of the
```

```
 1    New York statute, whether there's a violation of New York law.
 2            Again, there are bribe payments that are alleged to
 3    have been made in New York, and there -- there's money taken
 4    from one bank account in New York and wired to another bank
 5    account in New York.  This is not the incidental use of the
 6    wires.  I mean, it's one thing to say we're going to bring a
 7    wire fraud charge, and we're going to bring it in the Eastern
 8    District of New York, or perhaps, more appropriately, the
 9    Southern District of New York because all these payments get
10    cleared through the Fed and there's some incidental use of the
11    wires.  That's an incidental use of the wires.  This is taking
12    money that you have located in one spot in New York and moving
13    it to pay a bribe to another spot in New York.
14            And I mean, I didn't differentiate among the two
15    because in many ways the argument is the same; it's really just
16    an electronic version of taking a bag of cash from my office in
17    Midtown Manhattan and getting on the subway and delivering it
18    to someone else in their office in another part of town.
19            THE COURT:  Thank you.
20            MR. FARBER:  Okay.  Thank you, Your Honor.
21            MR. ROMERO:  So let's talk about the bribe that we
22    supposedly paid in New York.
23            Okay.  So this is the allegation in the brief, there
24    was a bunch of stuff going on, including bribes being paid.
25    And we see the citation there.  We've got -- paragraph 42 is
```

```
 1   Burzaco took trips.  That's not what they're talking about.
 2          Paragraph 84, Alleging that Defendants used accounts
 3   in New York branches of major U.S. financial institutions to
 4   move millions of dollars among the Sports Marketing companies
 5   to Conmebol officials, and then we've got something about a
 6   choice of law provision.  So we're talking about paragraph 84
 7   is the paragraph they cite.
 8          So they do allege that New York bank accounts were
 9   used.  I think, I'm sure the Court knows that when a
10   transaction is made in U.S. dollars, it's got to float through
11   a U.S. bank account.  But it was not delivering a bag of money
12   in New York to a Conmebol official.  What it says right here in
13   their complaint, paragraph 84, the one they relied on, where
14   did the money go to the officials?  Oh, it went to people like
15   Napout and Figueredo, including to their accounts at financial
16   institutions in Europe and South America.  That's the paragraph
17   they rely on in their brief.
18          So you know, they're stuck with a long complaint, and
19   it's got a lot in it, and it's easy to stand up and say,
20   There's lots of stuff that happened in New York, and there's
21   bags of money being delivered in New York.  But that's not
22   actually alleged in the complaint.  What's alleged in the
23   complaint, and it is definitely alleged in the complaint, is
24   that money flowed through New York bank accounts and ultimately
25   wound up, the bribe being conferred on the official in
```

```
 1    South America.  So commercial bribery says -- what's the
 2    commercial bribery statute, Your Honor?  It's basically
 3    conferring a bribe on somebody who breaches a duty to their --
 4    their principal and causes harm to the principal.  The bribe
 5    got conferred to South America.  It did -- at some point it's
 6    clear, it did flow through the United States at some point in
 7    time, according to the complaint, but it landed in the pocket
 8    of the officials in South America, they breached their duty
 9    there, under the law there, to an entity that is there.
10            So this is -- if you're looking, again, where is the
11    focus, not where some -- some contact, they have alleged some
12    contact with the United States, but where is the focus?  It's
13    in South America.
14            Okay.  As to the arguments on extraterritoriality, I
15    think I heard counsel say that it's all about duplicative
16    recovery.  Well, thankfully, we have the Supreme Court to look
17    at because the Supreme Court in *Anza* said, Notwithstanding that
18    there was zero risk of duplicative recovery in that case on a
19    motion to dismiss, the Court found that proximate cause was
20    lacking.  Why?  Because of the two policy reasons we're relying
21    on:  There was a more direct and immediate victim, number one;
22    and, number two, there were intervening circumstances.
23            Counsel conceded that Conmebol had discretion.  That
24    is what distinguishes this case from *Bridge*.  *Bridge* was a
25    rotational allocation system.  There was no discretion.  It is
```

```
 1    what number were you in line?  That makes it different.

 2            And I think counsel said, Well, he's talking about,

 3    you know, he's using the word "necessarily," and this is

 4    factual.  "Necessarily" is the word used in their brief at

 5    Page 18.  There's a reason they use that word because it's the

 6    same word that the Supreme Court used in Hemi.  The injury was

 7    not necessarily -- it was not necessarily going to happen,

 8    right?  It wasn't sort of the "necessary but-for" situation.

 9            Corcel Corp. is a lot like Bridge.  It's not an honest

10    services case.  It's a case where there wasn't some -- some --

11    some duty, you know, that was breached.  It was allegedly,

12    again, conduct relating to bidding and lies to the county about

13    SPE status, okay, that had an impact on another bidder.  And

14    again, in that case, it's just like Bridge.  The Court says, By

15    operation of law, the way that it worked there was the lowest

16    bidder wins.

17            That's not the case here, under Conmebol's own

18    articles.  So it's different in that necessarily in Corcel,

19    there were no intervening factors.  That's what the Court held

20    because necessarily they would have gotten the contract.

21            And the other thing the Court said is it did say,

22    Yeah, theoretically, theoretically the county is also a victim,

23    except here's what the Court said, Well, actually the county

24    ended up paying -- I'm sorry -- less money, less money as a

25    result of the fraud.  Because what happened was the bidders
```

1    there were getting information and then under -- underbidding,

2    you know, the Plaintiff.  So the Plaintiff didn't bid less

3    there; they bid more.

4         And so when the Court looked at the policy, rationales

5    which you're supposed to look at, who is the victim?  And the

6    Court said, Well, the only victim was the person who's suing

7    you.  The county wasn't really a victim.  Yeah, they're a

8    theoretical victim because somebody lied to them, but they

9    didn't suffer any harm.

10        The other things that will distinguish --

11        THE COURT:  Here -- here Conmebol was -- the only

12   other bidder involved at all were the Plaintiffs, or one of the

13   two Plaintiffs.  And Conmebol officials were letting T&T know

14   so then they could, you know, bring up -- get more money, give

15   us more money, and we'll make sure not to -- not to even

16   consider Plaintiffs' bid.  Here there's only one other bidder

17   in the picture, as alleged.

18        MR. ROMERO:  No, actually, as alleged, there was more

19   than one.  So it's --

20        THE COURT:  Only the highest, according to the

21   allegation.

22        MR. ROMERO:  They -- they say -- they say they were

23   the highest, but there were other bidders, right?

24        THE COURT:  But being the highest, they're really the

25   only real one.  At the end of the day, the allegation is we're

1      the ones forking over the biggest -- biggest quantity of money,

2      the largest quantity.  And then you folks on Conmebol's end,

3      you folks are gathering together and saying, Okay, T&T, let's

4      make sure you get it and just give us the money under the

5      table.

6                  MR. ROMERO:  So the reason that's not exactly correct,

7      Your Honor, is because the question you're supposed to be

8      looking at when addressing those intervening factors is a

9      but-for world without bribery, which is a case -- which is

10     what's made clear by some of the other cases we cite which

11     they've never addressed, like *Straits*, for example.  *Straits* is

12     the best case that lays it out better than we could lay it out

13     in our brief.  Okay.

14                  You then have to look at what would happen in the

15     but-for world.  Well, in the but-for world, we know T&T was

16     there, and we know T&T was willing to pay more, according to

17     their allegations, because they did pay more.  They just didn't

18     pay it to Conmebol.

19                  THE COURT:  Right.  They paid it to folks --

20                  MR. ROMERO:  Right.  But see, in the but-for world

21     without bribery, right, T&T might have paid more money than

22     Conmebol.  Also, there were other bidders, according to their

23     own allegations.

24                  THE COURT:  But not as high.  Not as high.  That

25     weren't bidding quite as much money.

1          MR. ROMERO:  Again, but without -- in a world without

2     alleged bribery, they may have -- they may have bid more as

3     well.  The other alleged bidders were TyC International, which

4     was an entity that was affiliated with Torneos, not affiliated

5     with T&T and Full Play, which was, again, an entity that was

6     alleged to have been involved in bribery.

7          So in looking at what would have happened in the

8     but-for world, it's impossible to tell, number one.

9          Number two, in some circumstances, Your Honor, such as

10    in *Corcel*, the contract was going to go to the -- in that case,

11    you know, either the lowest or the highest bidder, right?

12    That's not what Conmebol's regulations say.  So just because

13    somebody offers a high bid, that doesn't necessarily mean that

14    they would get the contract; for example, if they don't have

15    the financing to make good on that bid.

16          THE COURT:  But these are all matters -- I mean,

17    again, looking at the complaint in the light most favorable to

18    the Plaintiff -- Plaintiffs.

19          MR. ROMERO:  Right.

20          THE COURT:  These are all matters we can speculate

21    about, and you can all probe in discovery, but do they -- do

22    they get -- do they get to the discovery phase is the question.

23          MR. ROMERO:  I hear what the Court is saying, and

24    that's kind of what it would normally feel like on a motion to

25    dismiss, except in some sense this is flipped.  They're the

1     ones that have to show that there's no speculation involved,

2     right?  I'm showing that there could be some speculation

3     involved.  They're saying, Well, we get to resolve it all.  No,

4     no.  If there's speculation involved, they don't get by a

5     motion to dismiss.  That's what the Court said.  Because

6     there's no question here, they stood up, they conceded it.

7     They can't even argue it.  There is clearly a more immediate

8     direct alleged victim.

9          And so what -- what the Supreme Court has said, Well,

10    that's basically enough under RICO, and what we're going to go

11    look at to make sure that we're comfortable that that's the

12    right decision is to say -- give it the direct relationship

13    test, and then you say, Well, are there more immediate victims?

14    Answer to that question is no.  That's easy.

15         And then the next question they look at, are there

16    possibly intervening steps?  And that sounds like it involves

17    speculation.  That's the whole point.  If it involves

18    speculation, they haven't met the test.  And that's why they

19    don't get into court.

20         And it may be a little bit different than it is in

21    some other claims, but the Court has set a pretty high bar for

22    RICO claims.  It's set a pretty high bar for antitrust claims.

23    And there's a reason for it, like there's treble damages.

24    There's other people who could enforce -- enforce these.  It

25    doesn't have to be this Plaintiff.

1           All right.  Who was injured?  Conmebol was injured.

2    That's what the Supreme Court says, that's basically enough.

3           I'm sorry.  Did the Court have -- there is one other

4    thing I wanted to add because we are talking about the but-for

5    world, and there's something where there is no speculation

6    involved because it's in their complaint.

7           2015, 2015 is the but-for world with no bribery.  And

8    not just that, there's two different offers, okay?  There were

9    two time periods that they say they made offers for.  2016

10   through 2018, they didn't get those.  Those went to FIC.  They

11   didn't go to T&T, they went to another bidder altogether, FIC.

12          Then there's another tranche that they say they were

13   bidding for, and that was the next set of years on into the

14   future, 2019 through 2022.  And guess what?  Didn't get those

15   ones either.  That doesn't require any speculation.  Those

16   ones, they -- they could stand up about the other ones and say,

17   Oh, those ones went to, you know, Fox, and Napout had some

18   incentives and -- well, first of all, you know, they say Napout

19   was indicted.  Well, he wasn't indicted for any bribery in

20   connection with that deal, and there's no bribery alleged to be

21   in connection with that deal.

22          But forget about that.  Look at the next tranche of

23   rights, 19 through 22.  According to their complaint, they were

24   the only party who bid for them.  And guess what?  Because

25   Conmebol has discretion under its articles, it did not give

them to Paco Casal and GolTV and Global Sports.

And so we don't have to speculate about that at all. That's alleged in their complaint, and that distinguishes this case from any case they could ever cite.

THE COURT:  Thank you.

We'll be taking a break shortly.  But let me -- let me allow Mr. Farber to address these last few points you made, Mr.  Romero, with regard to these other more recent bids that Plaintiffs were unsuccessful in obtaining as a showing that the allegations are not plausible.

MR. FARBER:  Well, I can address that, but let me just start by pointing out what we're getting into now is a factual dispute.  Because what you've heard is their interpretation of that set of circumstances, which is different than ours, you know.  The reason, in our view, that those bids were awarded the way they were is they were done by Mr. Napout, who was the recipient of the bribes.  Okay.  They say that this scheme had ended, he'd not yet been arrested, not, I think, then indicted yet at the time.  And, you know, there's an incentive to continue with the same course of conduct, both, because of the huge amounts of money that he'd received in the past to buy his favor, and, frankly, so that they could make arguments such as that they're making right now.  That, well, you know, regardless of the fact that the -- these allegations are being made by the Justice Department, we're still doing -- we're

```
1    still proceeding in the same way.  It's a combination of his

2    interest in both concealing his past misconduct and of his

3    giving the quo for the quid that he got in earlier bribes over

4    an extended period of time.

5           Now, they disagree with that, but, I mean, I've never

6    heard of a situation where a motion to dismiss for resolving

7    the factual question based on whether the Court accepts our

8    version of events or their version of events.  I -- I would

9    like briefly, while I'm up here, to address just a couple of

10   other things.

11          THE COURT:  Sure.

12          MR. FARBER:  That came up.  You know, the other point

13   that they -- that they were making is that, well, it's possible

14   that if, you know, in a but-for-world, if you didn't have the

15   bribes, that T&T would have been more.  And, you know, there're

16   two problems with that.  Number one, you know, factually, that

17   the delta between the bribes and the bids is huge.  In other

18   words, you could add into the bids the amount of the bribes,

19   and you'd still fall well short of the difference between the

20   bids.

21          But second, and there's a legal problem with that, you

22   could have made that same argument in the Corcel case too.  I

23   mean, presumably, if they had not been falsely presenting

24   themselves as having -- as being a small business enterprise

25   and deserving of a 10 percent credit on their bid, well,
```

 1    perhaps they might have bid more as well.  But that's not --

 2    those weren't the facts, and it's not what's alleged here, and

 3    that didn't prevent the 11th Circuit from saying that *Corcel*

 4    had a valid RICO claim and that there was proximate causation,

 5    and it's exactly the same situation in this case.

 6              In terms of -- if I could just spend one moment on the

 7    question about where these bribes were paid, and Mr. Romero was

 8    referring to some paragraphs in our complaint, but I don't

 9    think he focused on the ones that are really most important,

10    which is, you know, at page -- excuse me -- starting at

11    Paragraph 185 of the complaint, where we list all the bribe

12    payments as part of the predicate acts.  We then go to

13    Paragraphs 194 through 197, where we talk about the payments in

14    those paragraphs; so in 194, what we allege is on information

15    and belief, all of the payments in Paragraphs 185 to 86 made by

16    T&T, before March 2011, were made by wire transfers from its

17    account at Lloyds Bank in Miami, Florida.  Beginning in

18    March 31, 2011, certain payments were made from an account in

19    Switzerland.  Beginning on July 18, 2013, payments were made

20    from T&T's account at Interaudi Bank in Miami, Florida.  And

21    195, we say all payments made in 185 to 86 to Somerton were

22    made to its account at JP Morgan Chase in New York.

23              The next paragraph, we say the same thing about

24    payments made to Valente.  In 97, we say that payments made to

25    Productura were made to its account at Interaudi Bank in Miami,

1    Florida.  So these were going from one account in New York or

2    one account in Florida to other accounts in New York.  That's

3    not just, sort of, incidental clearing that's required; that's

4    a necessary function of any dollar transaction.

5              THE COURT:  Thank you.

6              MR. FARBER:  Thank you, Your Honor.

7              THE COURT:  And, Mr. Romero, anything additional on

8    RICO before we take your recess?

9              MR. ROMERO:  Yes, yes.  Could I try to do it from

10   here, Your Honor?  It's very brief.

11             THE COURT:  Absolutely.

12             MR. ROMERO:  Yeah.  So just as to those last

13   paragraphs, those are again, those are alleged payments through

14   the intermediaries.  Those are not payments to the alleged

15   bribe recipients.  So again the only paragraph that I'm aware

16   of and the only one they cited showing where the alleged bribe

17   recipients received the bribes, it says to accounts in

18   South America and Europe.  So this is money, again, clearly

19   flowing through New York accounts and through different alleged

20   intermediaries, but not bribe payments that are allegedly

21   making it into the pocket of the Conmebol officials.

22             THE COURT:  Thank you.

23             MR. GAITHER:  Your Honor, Rowan Gaither for Torneos.

24   May I?  I just want to add -- Torneos obviously joins the

25   Defendant's arguments.  I just want to make one additional

1    point on the question of extraterritoriality.  There are policy

2    considerations which have been set forth by the Supreme Court

3    in *RJR Nabisco* that compel an analysis of where the focus of

4    the alleged RICO conspiracy was.  Because the issue is whether

5    or not a U.S. court is going to permit a non-U.S. plaintiff to

6    avail itself of the treble damages remedies that are available

7    under RICO and that may not in fact be available in their home

8    country.  Now what's happening here is that Plaintiffs are

9    making every effort to collapse Global Sports and GolTV into

10   the same entity, or what we're now hearing is it's a fact

11   issue.

12        But the -- and I don't want to get ahead of the

13   issues.  We will deal with standing after the break.  But I

14   want to point out that Global Sports is a British entity,

15   headquartered in Uruguay that submitted bids that we have put

16   before the Court, that have an address in the UK, and the bid

17   amounts that are in the complaint are the all-in bids for the

18   Americas rights.  What that means is that to the -- that Global

19   Sports can't show a domestic injury.  And you have to look when

20   you're considering whether a civil RICO claim is available to

21   Global Sports to where the focus was.  It's, frankly, a

22   different analysis than is undertaken in the context of a

23   determination of whether a criminal indictment is sufficient.

24        Now, the way that Plaintiffs are trying to get around

25   that is they're trying to bring GolTV up into the rights

1    market, and we're going to talk about that after the break.   I

2    think Mr. Pitt is going to address it.   But that's the move.

3    Because if there's no U.S. entity that's present in the rights

4    market that's actually bidding, there's no domestic injury, and

5    the Court has to go through that analysis.   And we think it's

6    very clear that Global Sports, both on domestic injury as well

7    as all the proximate cause reasons we've laid out, doesn't have

8    a RICO claim here.   And GolTV, which we will talk about later,

9    has an *Illinois Brick* problem because they're down, they're

10   down a link in the chain of distribution.   So I just wanted to

11   add that before the break.   Thank you.

12           THE COURT:   Thank you very much.

13           All right.   We'll take a 10-minute recess, and then

14   we'll continue.

15           ALL PARTIES:   Thank you, Your Honor.

16           COURT SECURITY OFFICER:   All rise.

17       (A recess was taken from 2:23 p.m. to 2:39 p.m.)

18           COURT SECURITY OFFICER:   All rise.

19           THE COURT:   Please be seated.

20           Mr. Pitt.

21           MR. PITT:   Thank you, Your Honor.   So obviously we've

22   raised a number of points having to do with antitrust and with

23   standing in our papers.   We did have the opportunity to brief

24   them in full, for which we thank you.

25           I'm just going to focus on a few of the points, and

1    I'm going to -- I guess, what I'll start out by saying is that,

2    for the most part, the kinds of issues that plagued their

3    antitrust claims all sort of fall out from the fact that what

4    they're trying to do is fit a kind of square peg into a round

5    hole.  The square peg is the allegations of foreign bribery,

6    and the round whole is domestic U.S. treble damages antitrust

7    law, and they really don't fit.

8            So I'd like to explain just a couple of reasons why

9    that is.  And obviously I am happy to answer any question at

10   any time as well.

11           At this point, I think there's no real disagreement

12   between the parties that allegations of commercial bribery

13   without more don't create an antitrust cause of action.  The

14   issue is, well, what else do you have to do and did they do it?

15   So they say, well, we haven't just alleged bribery.  We've also

16   alleged exclusive dealing, and we've alleged a concerted

17   refusal to deal.  And so it's not really just a case about

18   bribery, but, in fact, what they are alleging is all variants

19   of as a result of bribery, they got the contract, we didn't.

20   Again, facets of any commercial bribery case.

21           That's not what the case law says you have to do.  In

22   the very few cases in which bribery is allowed as kind of a

23   predicate for an antitrust claim, there is -- it's part of a

24   course of conduct.  There are other kinds of behavior that are

25   properly characterized as anticompetitive, like price fixing,

```
 1    horizontal agreement to rig bids, horizontal market allocation,

 2    customer allocation, and that sort of thing.  And so simply

 3    alleging, well, we -- we were excluded from the market as a

 4    result of the bribery, that's an effect of the bribery, but the

 5    conduct at issue is still bribery or alleged bribery.

 6            On the concerted refusal to deal, again, that really

 7    doesn't describe this situation.  A concerted refusal to deal

 8    is a boycott.  It's a situation where a bunch of horizontal

 9    competitors get together and agree to keep out either one of

10    their competitors or one of their customers or suppliers.

11    That's not what's going on here.

12            So they say, well, we've harmed -- we've alleged that

13    competition has been harmed.  But, again, each of those

14    allegations about how competition allegedly was harmed redounds

15    to these were exclusive contracts, and they got it, and we

16    didn't.  And there is case law that we've cited in our papers

17    that say that doesn't spell out an antitrust violation because

18    the antitrust laws are indifferent as to which party has the

19    exclusive rights.  These were broadcasting rights.  Each of the

20    bids that they submitted were bids for the worldwide or

21    Americas rights.  That's what they were after, and that's what

22    was awarded to T&T.  There really isn't any dispute about that.

23            And so on that point, we think this case fits squarely

24    into the case law saying commercial bribery or a situation

25    where one party is awarded an exclusive contract or exclusive
```

1    set of rights instead of another, that's not -- that's not an

2    antitrust concern because either party who won the contract

3    would have the same economic incentives, in this case, economic

4    incentives for how they might exploit those rights, as the

5    other party would, and the fact that allegedly the way one

6    party got the contract and the other didn't was through some

7    misconduct or illegality.  Again from the perspective of the

8    competition laws, the federal competition laws, is a matter of

9    indifference.

10            So the next point that we raise is the point about

11    markets.  And here, you know, market definition usually, very

12    frequently, is characterized as a fact issue, but we cited this

13    line of cases primarily in the 11th Circuit, the *Jacobs* case,

14    that basically say, well, yes, market definition generally

15    speaking is a factual issue.  But when you allege a market that

16    is so highly specific as to include just the practices that are

17    at issue in this particular case, you have to do much, much

18    more at the pleading stage than these Plaintiffs have done.  So

19    you have to explain in detail why it is that -- and in this

20    case we'll take the -- some of the examples of things that

21    they've excluded.  Why aren't any of the other confederations

22    included in their market definition?  Why aren't all Conmebol

23    games or tournaments included?  Why aren't even all

24    international Conmebol tournaments included in their market

25    definition?

1              The kinds of market definitions that they've offered

2     here are the classic, sort of, draw a line around what it is

3     that the Defendant does or draw a line around what it is that

4     you are challenging in this lawsuit, and simply call it a

5     market.  They were under an obligation, are under an

6     obligation, to specify why it is that none of these obvious

7     substitutes was included in their market.  Why it is that

8     either by reference to cross elasticity of demand or by some

9     other recognized way of delineating an antitrust market, why it

10    is that all of these very obvious substitutes were kept out of

11    their market definition.

12             And the answer can't be, well, what's at issue in this

13    case is those three tournaments.  And I don't think that that

14    is a set of questions that there has been an answer to, other

15    than in the most conclusory terms.  So I think under the *Jacobs*

16    case, again, they were required to do more.

17             So -- so they say, well, but there have been cases in

18    which the NFL has been deemed to be a market for antitrust

19    purposes or the NHL or the NBA.  There are cases like that, and

20    we're not suggesting that it could never be the case that you

21    could have a market limited to a sport or under extraordinary

22    circumstances a league.

23             But under the precedent in this circuit, again, if

24    you're going to allege that kind of market, you have to explain

25    why it makes sense.  The other -- the other point about those

1    cases is, again, it's one thing to say the NFL, that should be

2    its own market and viewers think of NFL football as different

3    from other sports or what have you.  But they didn't say the

4    market is FIFA soccer.  They didn't say the market is Conmebol

5    soccer.  They said the market is very specifically three

6    tournaments that Conmebol offers.

7            And their efforts to defend those markets really are

8    all about the downstream programming market; that is, what is

9    it that a viewer might want to watch?  Not really at all about

10    the right to acquisition upstream market where their own

11    allegations are contrary to the market definition they're

12    offering because they admit in their complaint that they, as a

13    rights acquirer, have obtained all kinds of other rights

14    including, by the way, other Conmebol rights.  They made

15    allegations that they had gotten rights for games or

16    tournaments in, I believe, Venezuela, Brazil, and Uruguay.  And

17    so they -- but they haven't said, okay, well -- well, we're fit

18    to have the rights we were bidding for because we have these

19    other rights, but they haven't said, and here's why those

20    rights are properly kept out of our market definition.  So we

21    think on the market definition point as well that they have

22    failed to meet their -- their obligation there.

23            Moving for a moment to the standing issue.  So there's

24    been a little bit of discussion about this already, of course.

25    I think where we are on that is, as to GolTV, GolTV is an

indirect purchaser unless they meet the one exception that courts have recognized to the *Illinois Brick* rule.  Courts apply *Illinois Brick* as a bright-line rule, don't make new exceptions, it's a fairly rigidly applied test.

And so they say, well -- well, we meet the agency exception.  In essence, all Global Sports was was a mere purchasing agent.  There are a number of problems with that argument.  First, they say they alleged it.  They have alleged a legal conclusion of agency, but the particular allegations elsewhere in their complaint are contrary to that broad, legal, conclusory allegation.

So for example, they allege that Global Sports was bidding, and the bids that they incorporate by reference into their complaints show it, that Global Sports was bidding on the whole pie, they were bidding on everything, on the Americas rights or the international rights.  But they actually say in their complaint that the idea was GolTV was going to buy just the U.S. rights.  GolTV would have had to sublicense those rights from Global Sports.  Global Sports clearly is the entity that made the bid; clearly is the entity that, had it won the bid, would've gotten the rights and then would have been in a position to sublicense them to GolTV.  That break in the chain is enough under the case law, under the cases that they cite the *In Re: CRT (Cathode Ray Tube) Antitrust Litigation* case.  Again, that additional step means that they don't qualify for

1    the agency exception, and it is an exception to the rule, which

2    is, as a direct purchaser, GolTV doesn't get to claim under the

3    Federal Antitrust Laws.

4         Also we're pointing out, of course, that GolTV didn't

5    participate in the rights acquisition market, the upstream

6    market.  They didn't participate in the market in which there

7    is an alleged restraint and in which the allegedly restraining

8    conduct occurred.  That means that they can't satisfy the test

9    for antitrust injury either, because they didn't participate in

10   those markets.

11        To be sure, there are some allegations about what then

12   allegedly happened in the downstream program and advertising

13   markets.  Those are allegations about effects and not about

14   conduct that is being challenged as putatively anticompetitive

15   conduct, which is what they're trying to do with the bribery

16   allegations.  This is a case about alleged bribery.

17        As for Global Sports -- and this gets a little bit

18   into the extraterritoriality part of the case and the FTAIA,

19   but as to Global Sports, Global Sports only participated in the

20   rights acquisition market, the upstream market.  So they did

21   participate in the market that allegedly has the restraint.

22        The problem is that, as that market is defined, it is

23   the market for purchase of certain rights from Conmebol, a

24   foreign entity, and as has already been discussed, Global

25   Sports was itself a foreign entity that doesn't even allege to

```
 1    have suffered any harm domestically in the United States.

 2            So there are a host of standing problems that we've

 3    tried to lay out in our brief, but I don't think they can skate

 4    past them by just saying, well, we said agency, when there

 5    isn't -- not only are there not actual factual allegations in

 6    their complaint that would support that conclusion, but there

 7    are actually contradictory allegations that would undermine it.

 8            Finally, just maybe a brief word on the FTAIA.  I know

 9    it is a fairly knotty statute, but the long and short of it

10    really is that there -- sort of, there are two major inquiries.

11    The first is, does the conduct regard foreign commerce that is

12    not U.S. import commerce, is the first question.  We've laid

13    out why it is, in our papers, that this is not import commerce.

14    The right to broadcast is both a permission and a right to

15    exclude.  And when those rights were transferred from Conmebol

16    to Global Sports, nothing was imported into the United States.

17    Nothing would be unless and until those rights are exploited by

18    broadcasting them in the United States.

19            So we think it's pretty clear, and we've also cited

20    the DOJ guidance as well, but we think it's pretty clear that

21    this is not a candidate for U.S. import commerce.  And we -- we

22    also -- the *Motorola* case, I think, spells out pretty clearly

23    that it doesn't matter whether the intent was to take some

24    portion of those rights and transfer them to an entity that

25    could then have exploited them in the U.S.  That's not what the
```

test is.  You have to look at the -- at that transaction where
they claimed the restraint occurred, and they claimed the
restraint was bribery; that is, that first sale from Conmebol
to either T&T, as happened, or in their imagined but-for world,
from Conmebol to Global Sports.

        So the next question is, well, was there a direct,
substantial, and reasonably foreseeable effect on U.S. commerce
that gives rise to the Plaintiffs' claims.  And here, as I
mentioned a moment ago, when you're talking about the upstream
market, the rights acquisition market, that market is defined
in a way that makes quite clear that any harm that occurred in
that market was extraterritorial harm.  It was what Conmebol
was selling, and in under every scenario they've alleged, it
was what Conmebol was selling to another foreign entity.

        As to the downstream programming and advertising
markets, I think we -- again, our reply brief lays this out in
some detail, but the long and short of it is, those aren't --
what they have identified as allegedly anticompetitive harm
are -- as a general matter, they are all further consequences
of the fact that one party got the contract and the other did
not, which again, under the 11th Circuit case law that we cited
is -- does not create an antitrust cause of action, does not
count as harm to competition.  It's also not a direct harm.  It
requires this extra step.  And then finally the effects that
they're actually pointing to are really centered around the

```
 1    purchasers; that is, those who would view the programs and

 2    programming market and those who would purchase advertising in

 3    the advertising market.  And they can't sue for harms done to

 4    those, the purchasers in those markets.  They would have to sue

 5    for harms done to themselves because those don't, quote, give

 6    rise to their antitrust claims.

 7            So I'm glad to answer any questions Your Honor has,

 8    but those were the points I wanted to make on those topics.

 9            THE COURT:  I do not have any.  Thank you, Mr. Pitt.

10            MR. PITT:  Thank you.

11            MR. BLACKBURN:  Good afternoon, Your Honor.

12            THE COURT:  Good afternoon.  Is it Mr. Mastoris?

13            MR. BLACKBURN:  It is Marcelo Blackburn.  He's the

14    good-looking one over there.

15            THE COURT:  Oh.  Okay.

16            MR. BLACKBURN:  I will try to brief because I have the

17    enviable task of being last on a Friday afternoon.

18            THE COURT:  Oh.  You're not last.  We haven't even

19    touched on the state claim.

20            MR. BLACKBURN:  Oh.  That's right, that's right.

21            THE COURT:  Right.

22            MR. BLACKBURN:  I was being, perhaps, too optimistic.

23            THE COURT:  Right.

24            MR. BLACKBURN:  But I do want to, with your

25    permission, begin with the review of the markets that are the
```

```
 1    subject of our antitrust claims because I think that, you know,

 2    we've heard a lot about whether or not there's actually any

 3    anticompetitive conduct here, square peg, round hole, and all

 4    the rest.  And I think if we begin with a clear view of what

 5    those markets are and what the effect is on that market, it

 6    begins to make a little more sense.

 7            So we have in Counts 3 through 8, our antitrust

 8    claims.  The first three of those are all Section 1, Sherman

 9    Act violations, conspiracies and restraint of trade in each of

10    three markets respectively.  We have the first one, which is --

11    they refer to as the upstream market.  That's the market to

12    purchase the rights from Conmebol.  Then we have two other

13    markets, which are almost a flip side of that.  You take those

14    and you sell them in television programming in the U.S. and

15    selling the third market advertising airtime associated with

16    those -- that television programming involving the club

17    tournament right.  We then have three additional claims under

18    Section 2 of the Sherman Act, monopinization monopolization,

19    attempted monopolization, and conspiracy to monopolize.  Those

20    all deal with the upstream Americas rights market.

21            So with that background, let's turn to what we are

22    alleging in our complaint happened here as a result of

23    Defendants' conduct.  For the first three antitrust claims, the

24    Section 1 Sherman Act claims, it's the same conduct.

25    Defendants all agreed that they would exclude GolTV from this
```

1    market and deal exclusively with T&T.  But although that

2    conduct is the same in all, it has an effect, a different

3    effect in each of the markets, and that different effect

4    matters, as we'll see in a second.  For the Americas television

5    rights market, what that means is that you're essentially

6    putting T&T as -- in the position as the only purchaser.  So

7    now it has the ability to pay much less than it would otherwise

8    have to pay for these rights.  You're excluding it.  There, the

9    harm to the market is the harm to Conmebol as the victim.  They

10   are the consumers, if you want to flip it, in this market.  We

11   have not heard -- and the briefing is pretty clear -- they're

12   not making an argument that there wasn't harm to that market.

13   And that market is the basis for four of the six antitrust

14   claims, and it's very clear.  It's a deprivation of hundreds of

15   millions of dollars to the sellers and to all the constituent

16   members to Conmebol.

17          Looking now to the downstream markets, the harm there

18   is slightly different.  We allege in our complaint, I think

19   it's Paragraph 178 and 179, that the harm there consists of

20   two -- there's two kinds of harms.  One is a decrease in the

21   quantity and quality of television programming and advertising

22   airtime associated with these club tournaments.  This happens

23   in two ways.  One, Conmebol not having hundreds of millions of

24   dollars they would have otherwise had, can't put on and produce

25   the same product.  So you don't get to keep your best players,

```
1    you don't get convince the best teams to participate, and that

2    has an effect, we allege, on the product that is being

3    produced.

4              The other thing that happens is because you have this

5    agreement to exclude GolTV from the market, Fox, when it has,

6    say, two matches in the club tournaments, rather than

7    sublicensing them to T&T or to another competitor, sits on

8    them.  And so in this way essentially it buries the rights and

9    deprives the purchasers of television programming and

10   advertising airtime of the ability to advertise based on those

11   club tournament rights.

12             So that I think is the general overview of what we've

13   alleged in our complaint.  If you'll bear with me for a second,

14   now I'm going to turn to the arguments that they have asserted

15   as to why these don't actually constitute antitrust harm.  They

16   begin by saying this is a commercial bribery case.  It is.

17   It's about commercial bribery.  But it's almost like the

18   briefing is two ships passing in the night.  We agree with them

19   on that.  We agree that bribery is not enough.  We agree that

20   you have to show some sort of anticompetitive conduct.  It's

21   not harm to the competitor.  It's harm -- but we have alleged

22   that.  We have alleged an exclusive dealing arrangement by

23   which T&T -- I'm sorry -- GolTV is excluded from that market.

24   And there's no dispute that that effect is significant,

25   certainly in Americas television rights market.  We allege also
```

```
 1   in -- and they don't even dispute that -- where there is some

 2   dispute is on markets two and three.

 3          THE COURT:  Where you exclude one bidder in favor of

 4   another, that's not antitrust.

 5          MR. BLACKBURN:  So let me address that exactly.  So

 6   they come back on their reply and raise the exact point that

 7   you just did, which is, look at this case *Nick Sands v. 3M*.  We

 8   have a situation where you have an exclusive dealing

 9   arrangement and the court says, that's fine.

10          But that situation is 180 degrees different from the

11   situation we have.  Exclusive dealing is not a *per se* violation

12   of the Antitrust Act.  If we had just alleged exclusive dealing

13   by itself, that would not have been enough.

14          Exclusive dealing is looked at under the rule of

15   reason, and courts evaluating that look to whether or not there

16   is some sort of procompetitive basis for the exclusive dealing

17   relationship.  And there might be.  So in *Nick Sands*, for

18   example, the court said, well, what are you talking about?  The

19   reason they got those exclusive dealing arrangements is because

20   they offered a much better price.  They gave you a much better

21   deal.  That is classic procompetitive price competition.  We're

22   not going to be discouraging that.  That's perfectly fine.

23          But if then you take that and then you look at our

24   situation, we have a situation where T&T is not offering a

25   better deal, there is absolutely no procompetitive basis by
```

1   which they can justify this exclusive dealing relationship, and

2   there's a reason why, I think, it's not addressed in their

3   briefs.  If you look at the effect of the exclusive dealing

4   relationship on the upstream market and also on markets two and

5   three under rule of reason and weigh the procompetitive versus

6   the anticompetitive effects, the result is clear:  This is

7   clearly anticompetitive conduct that harms the consumers to the

8   tune of hundreds of millions of dollars.

9        So I think that's how we would distinguish the

10  exclusive dealings from -- in *Nick Sands* that is not *per se*

11  wrong from the exclusive dealing that happens here.  Now you

12  take that and then you look downstream at the markets for

13  television programming and the markets for advertising airtime.

14  And the situation, as I just discussed previously, is very

15  similar.  You have an effect by decreasing quality and output.

16  You have an effect also because you decrease the choice and the

17  price of the purchasers in those markets.  And this happens --

18  you're both affecting -- well, let me back up -- this happens

19  in a couple different ways.  We already discussed the fact that

20  you would decrease the price and -- I'm sorry -- the quantity

21  and quality.

22       The other thing that happens is that you end up in a

23  situation where, as I said before, Fox has buried the rights

24  and doesn't want to essentially sublicense.  Now they have in

25  their briefings said, well, really all you're doing is

substituting one monopolist for another.  But that's not, as I
said, what's happening here, there's a number of different
reasons why that doesn't work.

So with that, I think, unless Your Honor has further
questions, I want to turn to the market definitions, which I
think are critical.

For the market definitions, they have put a lot of
reliance on the 11th Circuit's *Jacobs* case.  The 11th Circuit's
*Jacobs* case notes right up front, this is a fact issue and it
says, what you need is to, quote, plausibly suggest the
concourse of that market.  Now, in *Jacobs*, the court found that
the plaintiff had failed to do that.

But the *Jacobs* case is very different.  There you're
looking at one type of mattress versus another type of
mattress.  Here you are talking about a sports -- sports event,
sports broadcasting, which we've cited in our brief, a number
of courts have recognized as having some sort of distinct
non-substitutable attraction.  And this goes beyond just it's
football, it's NFL, it's baseball.  There's particular
distinctions the courts have permitted when you're talking
about subdivisions within those markets.  So, for example, we
cite a case, *Metropolitan Basketball Association v. NCAA.*  In
that case, the court finds a market which consists of
postseason Division 1, men's basketball tournaments.  We're not
just talking basketball.  We are talking NCAA Division 1, men's

basketball postseason tournaments.

We have alleged on the basis of the demographic profile of South America, on the attraction and the significance that soccer plays in that region, the hold it has on the viewers here in the U.S., both Spanish-speaking people who have that interest, who are ex-patriots from South America and fans of South American soccer in particular, that that forms a basis for that.

Now, whether or not there might be some sort of tournament or something that should be included that wasn't, is not really, at this stage, what we need to determine.  What we have alleged more than satisfied the *Jacobs* definition of plausibly suggest the contours of that market.  We've alleged why that should be, based on demographic profile, and we believe that that is all that is necessary under the *Jacobs* standard at this stage.

So unless, again, I'll stop there unless Your Honor has any questions there, I'll move on to standing.

The standing issue here I heard Mr. Pitts [*sic*] argue is one of just legal conclusions.  We allege Global Sports was GolTV's agent.  That's just not true.  The complaint Paragraph 111, specifically describes the nature of that relationship.  In 111 -- just bear with me, I'll turn to -- we note that GolTV partnered with its agent Global Sports to make offers on the worldwide or Americas rights from Conmebol with

the understanding that GolTV, GolTV now, would pay for and

acquire the U.S. portion of those rights.

Now, they've made a couple of arguments.  One is,

well, that's just not true, but as Mr. Farber has pointed out,

that's a fact question, and they're entitled in discovery to

contest that.

But our factual allegation's very clear.  These are

two companies; they're both owned by Paco Casal.  And the

intent from the very beginning was that GolTV would acquire,

would pay for, and would commercialize these rights in the U.S.

And we -- I want to add one point because they put a lot of

weight on this, which is that there would necessarily have been

a sublicensing of those rights.  That's not alleged in our

complaint.  It's not clear that that would have been the case.

It did not occur, for example, in 2012, where we allege in our

complaint that what happened there was that Conmebol awarded

Americas rights one way and rights outside of Americas to Full

Play.  And had we been able to succeed, absent the bribery, it

is entirely possible that there would have been two contracts.

Now I say that just because -- we don't personally -- we are

not basing our argument on that, but given that they have put a

lot of weight, I just wanted to flag that.

The second part of that, though, is that, in the end,

that is all irrelevant, because there is a standard for whether

Global Sports is acting as GolTV's agent.  That standard is set

1    forth in our brief, and that's the standard that they are not

2    addressing.  We believe that the factual allegations here are

3    quite clear that Global Sports was not adding value, was not,

4    you know, packaging these rights in some sort of different

5    format.  There's no employees for Global Sports.  This is an

6    entity, and we reference this in our brief, that is simply

7    acting as a broker, as a purchasing agent.

8            THE COURT:  Where in the complaint do you allege that?

9            MR. BLACKBURN:  Allege?

10           THE COURT:  Where in the complaint do you allege that

11   which you've just described?

12           MR. BLACKBURN:  That it was a -- I'm sorry.  What did

13   I just describe?  I apologize.

14           THE COURT:  That there were no employees for Global

15   Sports.

16           MR. BLACKBURN:  That is actually --

17           THE COURT:  And it was simply acting as a broker, as a

18   purchasing agent.

19           MR. BLACKBURN:  It's acting as a purchasing agent is

20   alleged -- there's a couple different things in your question,

21   so the agent part -- if you will bear with me one moment.

22           THE COURT:  Well, that it had no employees, let's

23   start with that.

24           MR. BLACKBURN:  The employees part is not in our

25   complaint.  It is referred to in the brief and the supporting

```
 1    declaration.

 2              THE COURT:  Which I don't look at.

 3              MR. BLACKBURN:  Understood.

 4              THE COURT:  All right.

 5              MR. BLACKBURN:  But the essence -- we don't think that

 6    this case is going to turn on that.

 7              THE COURT:  Well, then I shouldn't be --

 8              MR. BLACKBURN:  We think --

 9              THE COURT:   I shouldn't have those matters brought up

10    to confuse the analysis that I'm going to be engaging in, in my

11    written opinion.  So what are the allegations about the true

12    nature of this entity?  That it was merely a broker and

13    purchasing agent for the Coplaintiff.

14              MR. BLACKBURN:  It's in Paragraph 16 of the complaint.

15    And I'll read that with your permission, Plaintiff, Global

16    Sports is a limited liability partnership organized by GolTV's

17    owners, Casal and Gutierrez, under English law with its

18    principal place of business in Montevideo, Uruguay.  Global

19    Sports was formed to obtain the television and marketing rights

20    to international soccer matches for GolTV.  During the relevant

21    period, Global Sports acted, among other capacities, as an

22    agent for GolTV to attempt to acquire television broadcasting

23    rights to the club tournaments.  To that end, GolTV controlled

24    and coordinated the actions that Global Sports took on behalf

25    of GolTV, and Global Sports served the corporate interest of
```

GolTV in seeking to acquire the television rights to the club

tournaments.

That paragraph, we respectfully submit, satisfies the

standards set forth in the cases on the indirect purchaser

agreement -- I'm sorry -- the indirect purchaser exception.

Now, one point that has been raised is, well, there

would have been two sales.  There would have been the licensing

and then a sublicense.  That's not fatal.  That occurred in a

number of those cases where the court has to weigh whether or

not, based on various factors, an entity is actually acting as

the purchasing agent.  And the fact that there has been a

two-step transaction is not at all fatal.  It occurs in a

number of those cases because the court recognizes, yes, you're

acting as a agent.  That may mean that you end up with title

and then immediately turn around and sublicensing them.  But

that's not really what our standard is based on, and so we

think that this Paragraph 16 is what gets us through that

exception.

Unless Your Honor has any other questions.

THE COURT:  I do not.  Thank you.

MR. BLACKBURN:  Thank you.

THE COURT:  Mr. Pitt.

MR. PITT:  Thank you.  Thank you, Your Honor.  Just

very briefly, just a few points in response.  First, on the

point of was there harm to competition issue.  So they say this

```
 1     is about harm to Conmebol, again, harm that they don't have

 2     standing to sue over.  So set in the point about -- well,

 3     effects from the downstream markets, the quality of the player

 4     will ultimately be decreased because of the amount paid.  The

 5     number of causal steps that have to be taken from allegedly

 6     less money being paid to Conmebol, Conmebol then passing less

 7     money on to each of the federations, the federations passing

 8     less money on to the teams, the teams having less money to

 9     spend on player retention and recruitment, all of those steps

10     under associated general contractors and other cases applying

11     it are far too remote and speculative in the causal chain to

12     present any sort of actionable antitrust harm.

13            The point about Fox allegedly sitting on the rights, I

14     think is quite contrary to a case law like Manufacturing

15     Research Corporation that lays out pretty clearly, no, we --

16     that the presumption is that if one party, instead of another

17     party, has it -- and that is quintessentially what they're

18     complaining about.  They're saying we would have done a better

19     job than Fox, the ultimate sublicensee, did in terms of

20     exploiting the rights.  Again, a matter of indifference to the

21     antitrust laws because any winning -- whichever party won and

22     became the monopolist is presumed to have the same economic

23     incentives, and once one has a monopoly, behaving even in a --

24     using that monopoly power by pricing too high or by pushing

25     output too low is not actionable under the antitrust laws.
```

1           As to the exclusive dealing point and the point that

2    this is different from *Nick Sand*, I don't think the aspect of

3    *Nick Sand* that we were citing relies on the notion that there

4    were procompetitive justifications for what they did, the

5    aspect of it, and the same is true of the *Manufacturing*

6    *Research Corporation* case in the 11th Circuit.  The aspect of

7    the case that we were relying on is, again, this point about if

8    a seller is offering an exclusive contract, the fact that one

9    purchaser rather than the other got it, doesn't make this an

10   exclusive dealing case, doesn't make it actionable under the

11   antitrust laws.

12           They don't -- they don't actually allege that the

13   conduct at issue here, alleged bribery, is what caused the

14   exclusivity, and that's one of the critical missing pieces

15   among others.

16           A couple of the other just brief points.  The -- they

17   raised the *Metro Intercollegiate* case, which is the case in

18   which the court made a ruling about certain post-season

19   tournaments being a market.  The problem with that case is,

20   that actually isn't what the court was set to decide.  The

21   court wasn't saying it was appropriate to narrow the market to

22   just those two tournaments.  Rather, the defendant in that case

23   was saying -- was arguing for a narrow market, saying you can't

24   consider the NCAA tournament and the NIT to be in the same

25   market because they're -- they're not really substitutable, and

the court said, no, they are substitutable and we will put them in the same market, agreeing with the plaintiff, who in that case was arguing for a broader market than the defendant.

So I actually think that that case aids us here and not them.  It doesn't stand for the proposition that that kind of narrowing is appropriate.

On the standing point, the bids, again, which they incorporated by reference into their complaint, don't make any of those points.  They have no -- they really don't have the specific allegations necessary to rebut the -- the notion that what was going on here was Global Sports was making a bid, and whatever happened after that was going to happen in a separate transaction.  The -- even in some of the paragraphs they quote or that they just quoted, you know, the one that was supposed to have pointed out that all Global Sports was, was just a broker or purchasing agent, it has the phrase "among other capacities."  Again, what is required for the exception is a complete identity of economic interest.  There can't be any economic interest that the one has that the other doesn't, and they really have not alleged that.

And then just lastly, the *CRT* case most certainly does have as one of its criteria the notion that there cannot be an extra step in the vertical distribution chain in order for it to meet the definition of a purchasing agent such that it would qualify for the *Illinois Brick* exception.

1          So those were all the points I wanted to make, Your

2     Honor.

3          THE COURT:  Thank you.

4          MR. PITT:  Thank you.

5          MR. BLACKBURN:  Your Honor, if I may, very quickly?

6          THE COURT:  Yes.  Of course.

7          MR. BLACKBURN:  I'll do it from here because it is

8     very short.  First, as to the exclusive dealing point, I think

9     the point we are making is that when you exclude all

10    competition from a market in the way that they did with the

11    Americas rights market, you by definition have that market

12    harmed in a way that didn't apply to the other commercial

13    bribery cases.  This was a monopsony created by that exclusion.

14         With respect to the *Metro Basketball Association v.*

15    *NCAA* case, the point remains, the court there found a market

16    based on Division 1, men's basketball postseason tournaments.

17    And we cite another case where the courts have recognized that

18    when you have some sort of postseason, marquee,

19    championship-type events, that can constitute separate markets.

20         And third, we've heard, both in the reply and just

21    now, this argument that, well, in their complaint they say that

22    Global Sports could have done other things, but that just means

23    other things besides bidding for these rights.  That test that

24    is laid out for the purchasing agent exception refers to the

25    economic interest with respect to that transaction, not can you

```
1    do other things, such as acquire rights outside of the US.

2    Those were just the three points I wanted to make.

3              THE COURT:  Thank you.

4              Mr. Romero.

5              MR. ROMERO:  Your Honor, I don't think I have anything

6    separate to add on the state law claims except just very

7    briefly to say that, you know, the primary cases that we rely

8    upon, in our reply, were cases that were decided on a motion to

9    dismiss.  So these are issues that are appropriate for motion

10   to dismiss, just like the proximate cause cases we relied upon.

11             But I'm happy -- if the Court has questions, I am

12   happy to take the podium and answer them.

13             THE COURT:  Well, you would agree if I -- if I agree

14   with the Defendants that the Plaintiffs don't state any RICO or

15   antitrust claims that I should just dismiss the state law

16   claims; is that right?

17             MR. ROMERO:  I agree with that, Your Honor.

18             THE COURT:  Thank you.  Plaintiffs?

19             MR. FARBER:  Thank you.  Perhaps I misunderstood the

20   question Your Honor was asking Mr. Romero.  But if the question

21   is does it necessarily flow from the fact that you might

22   dismiss the RICO and antitrust claims, that you would dismiss

23   the tortious interference claims and the FDUTPA claims.

24             THE COURT:  Right.  I wouldn't retain jurisdiction

25   over strictly state law matters.
```

1           MR. FARBER:  Oh.  I understand.

2           THE COURT:  Right.

3           MR. FARBER:  I thought you were asking question of

4   whether it floated --

5           THE COURT:  No.

6           MR. FARBER:  -- instead of --

7           THE COURT:  No.

8           MR. FARBER:  Okay.  I'm happy to address any questions

9   Your Honor has about those claims.  But if not, we rest.

10          THE COURT:  I do not.  Thoroughly briefed.

11          MR. FARBER:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          Any other issues or any other attorneys who would like

14   to add anything?

15          MR. GAITHER:  I just -- Rowan Gaither for Torneos.  I

16   thought I would just make one very commonsensical point here.

17   On the issue of agency, they -- and it's clear to me the Court

18   is not going to consider what they said about the lack of

19   employees, but in Paragraph 17, of the complaint, Plaintiffs

20   have alleged that T&T has no employees or physical offices.

21   Not having employees or physical offices was no bar in this

22   market from an entity being able to bid on and acquire the

23   rights -- the rights from Conmebol.  And the way you can think

24   of Global Sports is analogous to TYT and then TYT sublicensed

25   the rights down as actually is laid out graphically elsewhere

1     in the complaint and we'll have it in real time.

2           So their effort to minimize Global Sports, in fact, is

3     counter to the way that they've actually laid out the way these

4     markets or this rights market worked.  Thank you, Your Honor.

5           THE COURT:  Thank you.

6           Anything else?

7           MR. FARBER:  Nothing, Your Honor.  Thank you.

8           THE COURT:  Well, if there's nothing else, then I

9     thank you for fine written briefing, equally superb oral

10    arguments presented here today.  And you've given me quite a

11    bit of work to do.  And I hope to get you my decision within

12    the next few weeks.

13       (Pause in proceedings.)

14          THE COURT:  Well, I wish you all very happy holidays,

15    merry Christmas, and hope to get you my decision soon.  Thank

16    you.

17          ALL PARTIES:  Happy holidays, Your Honor.  Thank you.

18       (The proceedings concluded at 3:29 p.m.)

19

20

21

22

23

24

25

1                       **C E R T I F I C A T E**

2

3        I hereby certify that the foregoing is an

    accurate transcription of the proceedings in the
4
    above-entitled matter.
5

6

7    _01/02/18_
        DATE          STEPHANIE A. McCARN, RPR
8                     Official United States Court Reporter
                      400 North Miami Avenue, Twelfth Floor
9                     Miami, Florida 33128
                      (305) 523-5518
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$250** [2] - 20:18

**0**

**01/02/18** [1] - 82:7

**1**

**1** [7] - 1:8, 18:15, 64:8, 64:24, 69:24, 69:25, 78:16
**10** [2] - 32:25, 49:25
**10-minute** [1] - 53:13
**100** [1] - 2:14
**10166** [1] - 1:20
**10281** [1] - 2:23
**111** [2] - 70:22, 70:23
**11th** [12] - 31:24, 32:4, 32:9, 32:15, 33:5, 36:4, 50:3, 56:13, 62:21, 69:8, 76:6
**12(b)(6** [1] - 23:8
**12-2** [1] - 1:7
**1221** [1] - 2:19
**15** [1] - 1:5
**150** [1] - 2:4
**1500** [1] - 4:4
**16** [4] - 25:14, 25:23, 73:14, 74:17
**16-cv-24431-CMA** [1] - 1:2
**17** [1] - 80:19
**174** [2] - 24:22, 25:11
**175** [2] - 24:22, 26:1
**178** [1] - 65:19
**179** [1] - 65:19
**18** [2] - 42:5, 50:19
**180** [1] - 67:10
**1820** [1] - 3:13
**185** [6] - 24:22, 27:9, 29:23, 50:11, 50:15, 50:21
**19** [1] - 47:23
**1900** [1] - 3:4
**194** [2] - 50:13, 50:14
**195** [1] - 50:21
**197** [1] - 50:13
**1990** [1] - 3:16
**1:11** [2] - 1:6, 6:1
**1st** [1] - 29:8

**2**

**2** [3] - 4:3, 18:16, 64:18
**200** [3] - 1:15, 1:20, 2:23
**2000** [1] - 15:9

**20005** [1] - 2:9
**2003** [1] - 26:24
**2004** [1] - 26:24
**2005** [1] - 26:3
**2007** [1] - 26:3
**201** [1] - 3:4
**2010** [3] - 2:19, 25:14, 26:18
**2011** [2] - 50:16, 50:18
**2012** [1] - 71:15
**2013** [1] - 50:19
**2015** [2] - 47:7
**2016** [1] - 47:9
**2017** [1] - 1:5
**2018** [1] - 47:10
**2019** [1] - 47:14
**2022** [1] - 47:14
**204** [1] - 2:9
**21** [1] - 32:14
**212** [2] - 1:21, 2:24
**22** [1] - 47:23
**2200** [1] - 2:4
**250,000** [1] - 20:18
**255** [1] - 3:20
**294-4611** [1] - 1:21
**2:23** [1] - 53:17
**2:39** [1] - 53:17
**2nd** [4] - 21:15, 22:3, 22:18, 29:8

**3**

**3** [1] - 64:7
**305** [11] - 1:16, 2:5, 2:15, 2:20, 3:5, 3:10, 3:14, 3:21, 4:5, 4:9, 82:9
**31** [1] - 50:18
**310** [1] - 3:17
**33128** [2] - 4:9, 82:9
**33130** [1] - 2:4
**33131** [6] - 1:16, 2:19, 3:5, 3:9, 3:13, 4:4
**33131-2154** [1] - 2:15
**33134** [1] - 3:21
**333** [1] - 3:9
**347-7311** [1] - 1:16
**3550** [1] - 2:14
**371-9686** [1] - 3:14
**3:29** [2] - 1:6, 81:18
**3M** [1] - 67:7
**3rd** [1] - 29:8

**4**

**400** [2] - 4:8, 82:8
**4100** [1] - 1:15
**42** [1] - 39:25
**43** [1] - 30:22

**434-5000** [1] - 2:9
**476-7400** [1] - 3:21

**5**

**5** [1] - 36:6
**523-5518** [2] - 4:9, 82:9
**530-1800** [1] - 2:24
**576** [1] - 36:6
**579-0610** [1] - 3:10

**6**

**6** [1] - 5:19
**671-2124** [1] - 4:5

**7**

**705** [1] - 3:16
**725** [1] - 2:8
**728-0950** [1] - 2:20
**78-1** [1] - 24:23
**789-3229** [1] - 2:5
**789-5989** [1] - 2:15
**79** [1] - 24:23

**8**

**8** [1] - 64:7
**82** [2] - 1:8, 5:19
**826-4700** [1] - 3:17
**84** [4] - 25:24, 40:2, 40:6, 40:13
**86** [2] - 50:15, 50:21

**9**

**90025** [1] - 3:17
**967-6115** [1] - 3:5
**97** [1] - 50:24

**A**

**Abadin** [1] - 9:5
**ABADIN** [2] - 4:2, 9:5
**ability** [2] - 65:7, 66:10
**able** [3] - 33:2, 71:18, 80:22
**above-entitled** [1] - 82:4
**abroad** [4] - 21:13, 23:22, 25:23, 27:21
**absent** [1] - 71:18
**absolutely** [3] - 15:14, 51:11, 67:25
**accept** [1] - 37:21
**accepting** [1] - 20:14
**accepts** [1] - 49:7
**according** [6] - 15:10,

**account** [14] - 14:25, 18:19, 18:23, 18:24, 39:4, 39:5, 40:11, 50:17, 50:18, 50:20, 50:22, 50:25, 51:1, 51:2
**accounted** [1] - 25:13
**accounts** [9] - 30:10, 40:2, 40:8, 40:15, 40:24, 51:2, 51:17, 51:19
**accurate** [1] - 82:3
**acknowledge** [1] - 28:4
**acquire** [6] - 71:2, 71:9, 73:22, 74:1, 79:1, 80:22
**acquirer** [1] - 58:13
**acquisition** [4] - 58:10, 60:5, 60:20, 61:20
**Act** [6] - 20:7, 64:9, 64:18, 64:24, 67:12
**acted** [1] - 73:21
**acting** [7] - 35:21, 71:25, 72:7, 72:17, 72:19, 74:10, 74:14
**action** [3] - 27:3, 54:13, 62:22
**actionable** [3] - 75:12, 75:25, 76:10
**actions** [2] - 36:8, 73:24
**activity** [2] - 30:16, 37:16
**acts** [5] - 12:13, 31:16, 38:18, 38:24, 50:12
**actual** [2] - 31:8, 61:5
**ADAM** [1] - 2:18
**Adam** [1] - 7:22
**add** [9] - 16:19, 47:4, 49:18, 51:24, 53:11, 71:11, 79:6, 80:14
**adding** [1] - 72:3
**additional** [5] - 11:20, 51:7, 51:25, 59:25, 64:17
**address** [14] - 9:16, 9:20, 11:1, 11:23, 28:10, 28:18, 28:20, 48:7, 48:11, 49:9, 52:16, 53:2, 67:5, 80:8
**addressed** [4] - 21:16, 29:4, 44:11, 68:2
**addressing** [3] - 28:7, 44:8, 72:2
**admit** [1] - 58:12

**ADMITTED** [1] - 5:9
**adversary** [1] - 31:15
**adversary's** [1] - 29:21
**advertise** [1] - 66:10
**advertising** [8] - 60:12, 62:15, 63:2, 63:3, 64:15, 65:21, 66:10, 68:13
**affecting** [1] - 68:18
**affiliated** [2] - 45:4
**afternoon** [18] - 6:2, 6:12, 6:18, 6:19, 6:23, 7:2, 7:3, 7:17, 7:21, 8:12, 8:15, 8:17, 8:20, 9:5, 9:7, 63:11, 63:12, 63:17
**agency** [5] - 59:5, 59:9, 60:1, 61:4, 80:17
**agent** [20] - 12:22, 16:10, 20:13, 35:10, 35:13, 59:7, 70:21, 70:24, 71:25, 72:7, 72:18, 72:19, 72:21, 73:13, 73:22, 74:11, 74:14, 77:16, 77:24, 78:24
**agents** [1] - 12:25
**ago** [1] - 62:9
**agree** [9] - 29:17, 38:20, 55:9, 66:18, 66:19, 79:13, 79:17
**agreed** [1] - 64:25
**agreeing** [1] - 77:2
**agreement** [3] - 55:1, 66:5, 74:5
**ahead** [1] - 52:12
**aids** [1] - 77:4
**airtime** [4] - 64:15, 65:22, 66:10, 68:13
**al** [2] - 1:4, 1:7
**ALEJANDRO** [1] - 3:3
**Alejandro** [1] - 8:13
**Alhadeff** [1] - 2:3
**Alhambra** [1] - 3:20
**ALL** [2] - 53:15, 81:17
**all-in** [1] - 52:17
**allegation** [5] - 18:24, 39:23, 43:21, 43:25, 59:11
**allegation's** [1] - 71:7
**allegations** [20] - 19:9, 37:25, 44:17, 44:23, 48:10, 48:24, 54:5, 54:12, 55:14, 58:11, 58:15, 59:9, 60:11, 60:13, 60:16, 61:5, 61:7, 72:2, 73:11, 77:10

**allege** [19] - 23:4, 30:25, 31:1, 34:16, 40:8, 50:14, 56:15, 57:24, 59:12, 60:25, 65:18, 66:2, 66:25, 70:20, 71:15, 72:8, 72:9, 72:10, 76:12
**alleged** [85] - 11:12, 12:13, 12:17, 12:24, 13:1, 13:5, 13:9, 13:13, 13:18, 14:2, 14:20, 14:25, 15:9, 18:3, 19:15, 20:1, 20:12, 20:22, 23:14, 24:15, 26:11, 26:12, 27:2, 27:3, 27:6, 27:17, 28:8, 29:12, 29:16, 30:4, 30:7, 30:21, 34:12, 34:13, 35:7, 35:14, 35:23, 36:12, 36:17, 37:17, 37:24, 39:2, 40:22, 40:23, 41:11, 43:17, 43:18, 45:2, 45:3, 45:6, 46:8, 47:20, 48:3, 50:2, 51:13, 51:14, 51:16, 51:19, 52:4, 54:15, 54:16, 55:5, 55:12, 59:8, 60:7, 60:16, 62:13, 66:13, 66:21, 66:22, 67:12, 70:2, 70:12, 70:13, 71:13, 72:20, 76:13, 77:20, 80:20
**allegedly** [13] - 13:16, 16:18, 23:18, 42:11, 51:20, 55:14, 56:5, 60:7, 60:12, 60:21, 62:18, 75:5, 75:13
**alleges** [3] - 29:25, 36:6, 36:24
**Alleging** [1] - 40:2
**alleging** [5] - 17:10, 23:9, 54:18, 55:3, 64:22
**allocation** [4] - 18:14, 41:25, 55:1, 55:2
**allow** [1] - 48:7
**allowed** [1] - 54:22
**almost** [3] - 25:9, 64:13, 66:17
**altogether** [1] - 47:11
**ALTONAGA** [1] - 1:10
**America** [11] - 6:3, 16:6, 27:24, 40:16, 41:1, 41:5, 41:8, 41:13, 51:18, 70:3, 70:6
**AMERICA** [1] - 1:7
**American** [3] - 12:25,

27:23, 70:7
**Americas** [11] - 3:9, 52:18, 55:21, 59:15, 64:20, 65:4, 66:25, 70:25, 71:17, 78:11
**amount** [3] - 19:3, 49:18, 75:4
**amounts** [2] - 48:21, 52:17
**analogous** [1] - 80:24
**analysis** [10] - 18:2, 20:23, 21:9, 22:3, 22:4, 22:6, 52:3, 52:22, 53:5, 73:10
**Andy** [1] - 18:20
**ANGEL** [1] - 3:8
**Angeles** [1] - 3:17
**announced** [2] - 11:3, 21:4
**answer** [13] - 10:5, 10:24, 14:12, 18:1, 27:20, 30:6, 38:15, 46:14, 54:9, 57:12, 57:14, 63:7, 79:12
**answering** [1] - 17:24
**anticompetitive** [7] - 54:25, 60:14, 62:18, 64:3, 66:20, 68:6, 68:7
**Antitrust** [3] - 59:24, 60:3, 67:12
**antitrust** [28] - 9:20, 28:20, 46:22, 53:22, 54:3, 54:6, 54:13, 54:23, 55:17, 55:18, 56:2, 57:9, 57:18, 60:9, 62:22, 63:6, 64:1, 64:7, 64:23, 65:13, 66:15, 67:4, 75:12, 75:21, 75:25, 76:11, 79:15, 79:22
**anyway** [1] - 10:3
**Anza** [1] - 41:17
**apologize** [1] - 72:13
**APPEARANCES** [4] - 1:12, 2:1, 3:1, 4:1
**appearances** [1] - 6:5
**appended** [1] - 17:4
**application** [2] - 14:6, 29:3
**applied** [1] - 59:4
**applies** [4] - 11:4, 12:8, 12:12, 21:8
**apply** [7] - 11:11, 21:10, 22:2, 22:11, 22:19, 59:3, 78:12
**applying** [1] - 75:10
**appropriate** [4] - 16:5, 76:21, 77:6, 79:9
**appropriately** [2] -

16:5, 39:8
**Appx** [1] - 32:16
**area** [2] - 21:22, 24:9
**argue** [2] - 46:7, 70:19
**argued** [1] - 31:5
**arguing** [3] - 25:21, 76:23, 77:3
**argument** [13] - 11:17, 22:17, 25:4, 29:14, 29:21, 34:11, 37:23, 39:15, 49:22, 59:8, 65:12, 71:21, 78:21
**arguments** [6] - 41:14, 48:22, 51:25, 66:14, 71:3, 81:10
**arose** [1] - 27:3
**arrangement** [2] - 66:22, 67:9
**arrangements** [1] - 67:19
**arrested** [1] - 48:18
**articles** [4] - 17:3, 37:8, 42:18, 47:25
**articulated** [1] - 31:18
**aschachter@gsgpa. com** [1] - 2:20
**aspect** [3] - 76:2, 76:5, 76:6
**asserted** [1] - 66:14
**associated** [3] - 64:15, 65:22, 75:10
**Association** [2] - 69:22, 78:14
**assume** [4] - 9:11, 10:3, 16:3, 17:8
**assuming** [1] - 38:3
**attached** [1] - 35:19
**attempt** [1] - 73:22
**attempted** [1] - 64:19
**attorneys** [1] - 80:13
**attraction** [2] - 69:18, 70:3
**attractive** [1] - 16:20
**auction** [3] - 16:9, 18:8, 18:9
**audience** [1] - 25:14
**authority** [7] - 15:18, 17:4, 21:14, 21:15, 21:21, 21:23, 24:9
**automatically** [1] - 19:24
**avail** [1] - 52:6
**available** [3] - 52:6, 52:7, 52:20
**Avenue** [6] - 1:20, 2:19, 3:9, 3:13, 4:8, 82:8
**award** [3] - 17:7, 18:12, 37:9
**awarded** [7] - 18:9,

33:3, 36:8, 48:15, 55:22, 55:25, 71:16
**awards** [2] - 17:8, 34:17
**aware** [2] - 23:2, 51:15

### B

**B-L-A-C-K-B-U-R-N** [1] - 6:17
**background** [1] - 64:21
**bag** [4] - 30:13, 30:15, 39:16, 40:11
**bags** [1] - 40:21
**bank** [7] - 30:10, 39:4, 40:8, 40:11, 40:24
**Bank** [5] - 50:17, 50:20, 50:25
**bar** [3] - 46:21, 46:22, 80:21
**baseball** [1] - 69:19
**based** [8] - 31:2, 37:16, 49:7, 66:10, 70:14, 74:10, 74:16, 78:16
**basing** [1] - 71:21
**basis** [6] - 38:14, 65:13, 67:16, 67:25, 70:2, 70:8
**Basketball** [2] - 69:22, 78:14
**basketball** [4] - 69:24, 69:25, 70:1, 78:16
**bear** [4] - 35:13, 66:13, 70:23, 72:21
**became** [1] - 75:22
**BEFORE** [1] - 1:10
**begin** [3] - 63:25, 64:4, 66:16
**beginning** [4] - 25:13, 50:17, 50:19, 71:9
**begins** [1] - 64:6
**behalf** [6] - 6:24, 8:16, 8:18, 9:15, 35:21, 73:24
**behaving** [1] - 75:23
**behavior** [1] - 54:24
**belief** [1] - 50:15
**Ben** [1] - 7:18
**ben.kuehne@ kuehnelaw.com** [1] - 2:16
**BENEDICT** [1] - 2:12
**best** [4] - 10:16, 44:12, 65:25, 66:11
**better** [5] - 44:12, 67:20, 67:25, 75:18
**between** [7] - 12:16, 32:1, 36:13, 37:4,

49:17, 49:19, 54:12
**beyond** [1] - 69:18
**bid** [20] - 16:20, 18:11, 18:25, 19:3, 33:1, 37:3, 43:2, 43:3, 43:16, 45:2, 45:13, 45:15, 47:24, 49:25, 50:1, 52:16, 59:20, 59:21, 77:11, 80:22
**Bidder** [2] - 18:15
**bidder** [13] - 16:16, 18:10, 19:4, 19:16, 32:22, 36:10, 42:13, 42:16, 43:12, 43:16, 45:11, 47:11, 67:3
**bidders** [8] - 18:17, 18:18, 18:22, 31:22, 42:25, 43:23, 44:22, 45:3
**bidding** [15] - 18:19, 18:23, 18:24, 35:8, 35:11, 36:21, 42:12, 44:25, 47:13, 53:4, 58:18, 59:13, 59:14, 59:15, 78:23
**bids** [19] - 16:9, 18:12, 18:21, 34:9, 34:20, 35:15, 37:9, 48:8, 48:15, 49:17, 49:18, 49:20, 52:15, 52:17, 55:1, 55:20, 59:13, 77:7
**big** [1] - 9:8
**biggest** [2] - 44:1
**Biscayne** [4] - 1:15, 3:4, 4:3, 4:4
**bit** [7] - 17:22, 23:8, 29:22, 46:20, 58:24, 60:17, 81:11
**BLACKBURN** [21] - 1:19, 6:18, 63:11, 63:13, 63:16, 63:20, 63:22, 63:24, 67:5, 72:9, 72:12, 72:16, 72:19, 72:24, 73:3, 73:5, 73:8, 73:14, 74:21, 78:5, 78:7
**Blackburn** [3] - 6:17, 28:19, 63:13
**boilerplate** [1] - 27:10
**boils** [1] - 37:1
**borders** [3] - 22:2, 22:11, 22:20
**botch** [1] - 21:3
**Boulevard** [3] - 1:15, 3:4, 4:3
**Bowen** [3] - 1:14, 6:7, 6:9
**boycott** [1] - 55:8
**branches** [1] - 40:3

**brave** [3] - 9:12, 9:14, 10:18
**Brazil** [1] - 58:16
**breach** [4] - 13:11, 13:14, 13:24, 15:2
**breached** [2] - 41:8, 42:11
**breaches** [2] - 12:22, 41:3
**breaching** [3] - 12:25, 20:14, 27:24
**break** [7] - 10:3, 28:12, 48:6, 52:13, 53:1, 53:11, 59:22
**BRIAN** [1] - 2:2
**bribe** [18] - 13:13, 15:13, 20:14, 27:13, 30:1, 30:15, 31:8, 31:21, 39:2, 39:13, 39:21, 40:25, 41:3, 41:4, 50:11, 51:15, 51:16, 51:20
**bribery** [48] - 13:10, 15:19, 20:5, 20:10, 20:11, 20:17, 20:24, 27:14, 29:17, 29:18, 29:19, 30:17, 33:25, 36:20, 37:17, 38:22, 41:1, 41:2, 44:9, 44:21, 45:2, 45:6, 47:7, 47:19, 47:20, 54:5, 54:12, 54:15, 54:18, 54:19, 54:20, 54:22, 55:4, 55:5, 55:24, 60:15, 60:16, 62:3, 66:16, 66:17, 66:19, 71:18, 76:13, 78:13
**bribes** [11] - 29:20, 34:10, 34:16, 39:24, 48:17, 49:3, 49:15, 49:17, 49:18, 50:7, 51:17
**Brick** [4] - 53:9, 59:2, 59:3, 77:25
**Brickell** [1] - 2:19
**Bridge** [10] - 17:22, 31:12, 31:19, 32:9, 33:13, 37:3, 38:7, 41:24, 42:9, 42:14
**bridge** [1] - 41:24
**brief** [22] - 10:16, 10:22, 11:7, 11:17, 16:14, 31:24, 32:14, 39:23, 40:17, 42:4, 44:13, 51:10, 53:23, 61:3, 61:8, 62:16, 63:16, 69:16, 72:1, 72:6, 72:25, 76:16
**briefed** [3] - 10:8,

11:6, 80:10
**briefing** [3] - 65:11, 66:18, 81:9
**briefings** [1] - 68:25
**briefly** [3] - 49:9, 74:24, 79:7
**briefs** [1] - 68:3
**bright** [1] - 59:3
**bright-line** [1] - 59:3
**bring** [5] - 9:9, 39:6, 39:7, 43:14, 52:25
**British** [1] - 52:14
**broad** [1] - 59:10
**broadcast** [1] - 61:14
**broadcasting** [4] - 55:19, 61:18, 69:16, 73:22
**broader** [2] - 26:13, 77:3
**broker** [4] - 72:7, 72:17, 73:12, 77:16
**brother** [1] - 18:20
**brought** [1] - 73:9
**bulk** [1] - 9:13
**bunch** [3] - 20:6, 39:24, 55:8
**Bundy** [1] - 3:16
**buried** [1] - 68:23
**buries** [1] - 66:8
**Burzaco** [2] - 8:13, 40:1
**BURZACO** [1] - 3:3
**business** [7] - 32:22, 32:24, 32:25, 33:7, 35:17, 49:24, 73:18
**but-for** [9] - 42:8, 44:9, 44:15, 44:20, 45:8, 47:4, 47:7, 62:4
**but-for-world** [1] - 49:14
**button** [1] - 25:5
**buy** [4] - 17:11, 17:12, 48:21, 59:17
**BY** [1] - 4:7

---

**C**

**C.J** [3] - 7:4, 7:5
**CA** [1] - 3:17
**candidate** [1] - 61:21
**cannot** [1] - 77:22
**capacities** [2] - 73:21, 77:17
**Carlos** [1] - 9:6
**CARLOS** [1] - 4:3
**Casal** [3] - 48:1, 71:8, 73:17
**case** [100] - 11:4, 11:24, 12:10, 12:18,

12:24, 13:6, 14:8, 15:8, 17:22, 17:23, 18:3, 18:8, 19:17, 20:19, 21:3, 21:15, 22:12, 22:13, 23:3, 23:7, 23:12, 26:13, 26:14, 26:15, 26:16, 26:17, 27:2, 27:9, 28:8, 30:18, 31:10, 31:13, 32:4, 32:15, 32:20, 33:5, 33:16, 33:17, 34:6, 34:15, 35:25, 36:24, 37:16, 38:7, 41:18, 41:24, 42:10, 42:14, 42:17, 44:9, 44:12, 45:10, 48:4, 49:22, 50:5, 54:17, 54:20, 54:21, 55:16, 55:23, 55:24, 56:3, 56:13, 56:17, 56:20, 57:13, 57:16, 57:20, 59:23, 59:24, 60:16, 60:18, 61:22, 62:21, 66:16, 67:7, 69:8, 69:9, 69:13, 69:22, 69:23, 71:14, 73:6, 75:14, 76:6, 76:7, 76:10, 76:17, 76:19, 76:22, 77:3, 77:4, 77:21, 78:15, 78:17
**CASE** [1] - 1:2
**cases** [32] - 12:12, 21:14, 23:1, 29:5, 30:24, 31:22, 32:1, 32:3, 32:10, 33:13, 33:17, 33:25, 37:3, 37:6, 37:11, 38:6, 38:23, 44:10, 54:22, 56:13, 57:17, 57:19, 58:1, 59:23, 74:4, 74:9, 74:13, 75:10, 78:13, 79:7, 79:8, 79:10
**cash** [3] - 30:14, 30:15, 39:16
**Cathode** [1] - 59:24
**causal** [2] - 75:5, 75:11
**causation** [2] - 36:14, 50:4
**caused** [3] - 36:17, 36:21, 76:13
**causes** [1] - 41:4
**causing** [2] - 20:17, 20:22
**Cayman** [1] - 16:6
**CECILIA** [1] - 1:10
**centered** [1] - 62:25
**certain** [4] - 35:19,

50:18, 60:23, 76:18
**certainly** [3] - 31:19, 66:25, 77:21
**Certificate................ ....** [1] - 5:19
**certify** [1] - 82:2
**chain** [4] - 53:10, 59:22, 75:11, 77:23
**challenge** [1] - 15:18
**challenged** [1] - 60:14
**challenges** [1] - 34:1
**challenging** [2] - 8:5, 57:4
**championship** [1] - 78:19
**championship-type** [1] - 78:19
**change** [2] - 37:15, 37:18
**characterized** [3] - 30:2, 54:25, 56:12
**charge** [2] - 29:19, 39:7
**charged** [1] - 13:5
**charges** [1] - 29:18
**Chase** [1] - 50:22
**cheating** [1] - 18:17
**Chen's** [2] - 29:22, 31:7
**choice** [2] - 40:6, 68:16
**Christmas** [1] - 81:15
**Circle** [1] - 3:20
**Circuit** [16] - 21:13, 21:15, 22:3, 22:18, 29:8, 31:25, 32:4, 32:10, 32:15, 33:5, 36:5, 50:3, 56:13, 62:21, 76:6
**circuit** [1] - 57:23
**Circuit's** [2] - 69:8
**circumstances** [4] - 41:22, 45:9, 48:14, 57:22
**citation** [2] - 22:8, 39:25
**cite** [8] - 17:3, 32:12, 40:7, 44:10, 48:4, 59:23, 69:22, 78:17
**cited** [11] - 17:5, 21:14, 22:5, 22:14, 31:24, 51:16, 55:16, 56:12, 61:19, 62:21, 69:16
**citing** [1] - 76:3
**civil** [4] - 16:24, 23:7, 36:13, 52:20
**claim** [12] - 12:9, 15:2, 27:25, 28:1, 28:14, 38:14, 50:4, 52:20,

53:8, 54:23, 60:2, 63:19
**claimed** [4] - 33:2, 36:13, 62:2
**claiming** [1] - 32:23
**claims** [24] - 11:10, 12:19, 31:23, 33:25, 36:11, 46:21, 46:22, 54:3, 62:8, 63:6, 64:1, 64:8, 64:17, 64:23, 64:24, 65:14, 79:6, 79:15, 79:16, 79:22, 79:23, 80:9
**classic** [4] - 18:6, 19:10, 57:2, 67:21
**clause** [1] - 21:22
**clear** [21] - 20:1, 21:7, 22:1, 23:10, 27:21, 33:5, 34:22, 41:6, 44:10, 53:6, 61:19, 61:20, 62:11, 64:4, 65:11, 65:14, 68:6, 71:7, 71:14, 72:3, 80:17
**cleared** [1] - 39:10
**clearing** [1] - 51:3
**clearly** [9] - 25:18, 35:7, 46:7, 51:18, 59:19, 59:20, 61:22, 68:7, 75:15
**club** [9] - 23:17, 26:3, 26:7, 64:16, 65:22, 66:6, 66:11, 73:23, 74:1
**Club** [1] - 26:6
**cMahoney@wc.com** [1] - 2:11
**coconspirators** [1] - 27:11
**collapse** [1] - 52:9
**colleague** [1] - 9:19
**collusive** [1] - 18:25
**Colson** [2] - 3:20, 8:25
**combination** [1] - 49:1
**comfortable** [2] - 12:6, 46:11
**commerce** [8] - 21:19, 21:22, 22:1, 61:11, 61:12, 61:13, 61:21, 62:7
**commercial** [17] - 20:5, 20:10, 20:11, 20:17, 20:24, 29:18, 30:17, 37:17, 38:21, 41:1, 41:2, 54:12, 54:20, 55:24, 66:16, 66:17, 78:12
**commercialize** [2] - 17:13, 71:10
**commonsensical** [1] -

80:16
**companies** [2] - 40:4, 71:8
**compel** [1] - 52:3
**Competencias** [1] - 7:22
**COMPETENCIAS** [1] - 2:19
**competition** [8] - 55:13, 55:14, 56:8, 62:23, 67:21, 74:25, 78:10
**competitor** [2] - 66:7, 66:21
**competitors** [2] - 55:9, 55:10
**complaining** [1] - 75:18
**complaint** [45] - 12:15, 17:5, 24:16, 24:18, 27:6, 29:12, 30:4, 30:22, 31:1, 34:12, 34:14, 35:14, 35:24, 36:24, 40:13, 40:18, 40:22, 40:23, 41:7, 45:17, 47:6, 47:23, 48:3, 50:8, 50:11, 52:17, 58:12, 59:10, 59:17, 61:6, 64:22, 65:18, 66:13, 70:21, 71:14, 71:16, 72:8, 72:10, 72:25, 73:14, 77:8, 78:21, 80:19, 81:1
**complaints** [1] - 59:14
**complete** [1] - 77:18
**concealing** [1] - 49:2
**conceded** [2] - 41:23, 46:6
**concern** [1] - 56:2
**concerted** [3] - 54:16, 55:6, 55:7
**concluded** [1] - 81:18
**concluding** [1] - 36:16
**conclusion** [2] - 59:9, 61:6
**conclusions** [1] - 70:20
**conclusory** [2] - 57:15, 59:11
**concourse** [1] - 69:11
**conduct** [28] - 21:12, 22:12, 22:15, 23:18, 23:21, 23:23, 25:16, 26:2, 27:19, 29:20, 31:4, 31:8, 42:12, 48:20, 54:24, 55:5, 60:8, 60:14, 60:15, 61:11, 64:3, 64:23, 64:24, 65:2, 66:20,

68:7, 76:13
**conducted** [1] - 27:15
**confederations** [1] - 56:21
**conferred** [2] - 40:25, 41:5
**conferring** [1] - 41:3
**confuse** [1] - 73:10
**Congress** [1] - 24:8
**Congress's** [1] - 21:21
**congressional** [1] - 21:7
**Conmebol** [60] - 13:3, 13:6, 13:14, 13:16, 13:20, 13:21, 13:23, 13:25, 14:3, 14:21, 15:3, 15:4, 15:5, 15:15, 15:22, 16:7, 17:1, 17:3, 17:5, 17:8, 17:18, 20:19, 20:22, 20:23, 33:17, 33:21, 33:22, 37:8, 40:5, 40:12, 41:23, 43:11, 43:13, 44:18, 44:22, 47:1, 47:25, 51:21, 56:22, 56:24, 58:4, 58:6, 58:14, 60:23, 61:15, 62:3, 62:5, 62:12, 62:14, 64:12, 65:9, 65:16, 65:23, 70:25, 71:16, 75:1, 75:6, 80:23
**Conmebol's** [3] - 42:17, 44:2, 45:12
**connection** [2] - 47:20, 47:21
**Connolly** [2] - 2:8, 6:25
**consequence** [1] - 32:24
**consequences** [1] - 62:19
**consider** [3] - 43:16, 76:24, 80:18
**considerations** [1] - 52:2
**considering** [1] - 52:20
**consists** [2] - 65:19, 69:23
**conspiracies** [1] - 64:9
**conspiracy** [2] - 52:4, 64:19
**constituent** [1] - 65:15
**constitute** [3] - 36:14, 66:15, 78:19
**constituted** [1] - 13:10
**construction** [1] - 36:9

**consumers** [2] - 65:10, 68:7
**contact** [2] - 41:11, 41:12
**contest** [2] - 16:7, 71:6
**context** [6] - 11:9, 16:23, 17:25, 38:24, 38:25, 52:22
**continue** [3] - 9:10, 48:20, 53:14
**CONTINUED** [3] - 2:1, 3:1, 4:1
**continues** [1] - 26:1
**contours** [1] - 70:13
**contract** [17] - 15:9, 15:15, 16:1, 16:4, 19:5, 19:24, 34:19, 36:9, 42:20, 45:10, 45:14, 54:19, 55:25, 56:2, 56:6, 62:20, 76:8
**contractors** [1] - 75:10
**contracts** [7] - 15:10, 27:14, 36:18, 36:22, 38:9, 55:15, 71:19
**contractual** [1] - 13:12
**contradictory** [1] - 61:7
**contrary** [4] - 35:23, 58:11, 59:10, 75:14
**controlled** [1] - 73:23
**convince** [1] - 66:1
**coordinated** [1] - 73:24
**Copa** [7] - 23:15, 23:16, 26:6, 26:19, 26:20, 26:23
**Coplaintiff** [1] - 73:13
**copy** [4] - 24:16, 24:18, 24:19, 24:24
**Coral** [1] - 3:21
**Corcel** [19] - 31:24, 32:6, 32:16, 32:21, 33:4, 33:10, 33:13, 36:4, 36:6, 36:9, 36:10, 36:12, 36:17, 38:9, 42:9, 42:18, 45:10, 49:22, 50:3
**Corp** [3] - 31:24, 32:6, 42:9
**corporate** [1] - 73:25
**Corporation** [2] - 75:15, 76:6
**correct** [2] - 22:4, 44:6
**corrupt** [2] - 13:17, 36:21
**counsel** [6] - 6:5, 6:21, 28:13, 41:15,

41:23, 42:2
**count** [1] - 62:23
**counter** [1] - 81:3
**counties** [1] - 37:11
**countries** [1] - 27:13
**country** [2] - 27:23, 52:8
**counts** [1] - 20:7
**Counts** [1] - 64:7
**county** [18] - 18:8, 18:11, 19:2, 19:16, 19:20, 19:21, 31:19, 32:2, 33:6, 33:18, 36:7, 36:8, 36:18, 42:12, 42:22, 42:23, 43:7
**couple** [7] - 21:3, 49:9, 54:8, 68:19, 71:3, 72:20, 76:16
**COURIEL** [2] - 3:2, 8:12
**Couriel** [1] - 8:12
**course** [6] - 27:10, 48:20, 54:24, 58:24, 60:4, 78:6
**Court** [79] - 4:7, 5:19, 6:6, 9:17, 9:22, 10:5, 11:3, 11:10, 11:24, 12:2, 12:11, 14:8, 14:22, 17:4, 17:23, 19:12, 19:14, 19:15, 19:18, 19:19, 19:21, 19:22, 19:25, 21:4, 21:16, 21:24, 22:13, 22:16, 22:18, 22:19, 22:20, 22:22, 23:2, 23:10, 23:19, 23:20, 23:22, 24:10, 24:12, 24:16, 24:21, 24:22, 24:24, 25:12, 26:22, 28:4, 28:7, 28:11, 29:6, 36:11, 38:15, 40:9, 41:16, 41:17, 41:19, 42:6, 42:14, 42:19, 42:21, 42:23, 43:4, 43:6, 45:23, 46:5, 46:9, 46:21, 47:2, 47:3, 49:7, 52:2, 52:16, 53:5, 79:11, 80:17, 82:8
**COURT** [109] - 1:1, 6:2, 6:8, 6:13, 6:15, 6:19, 7:3, 7:5, 7:8, 7:10, 7:12, 7:14, 7:16, 7:19, 7:25, 8:3, 8:5, 8:8, 8:10, 8:14, 8:23, 9:1, 9:4, 9:7, 9:18, 9:21, 9:23, 10:2, 10:9, 10:11, 10:15, 10:18, 11:13,

11:19, 11:22, 12:1, 12:4, 12:6, 15:10, 15:13, 24:18, 24:25, 25:3, 25:7, 25:10, 26:15, 28:12, 28:21, 32:4, 32:8, 32:16, 32:19, 33:21, 34:16, 34:19, 34:22, 35:2, 35:6, 38:17, 39:19, 43:11, 43:20, 43:24, 44:19, 44:24, 45:16, 45:20, 48:5, 49:11, 51:5, 51:7, 51:11, 51:22, 53:12, 53:16, 53:18, 53:19, 63:9, 63:12, 63:15, 63:18, 63:21, 63:23, 67:3, 72:8, 72:10, 72:14, 72:17, 72:22, 73:2, 73:4, 73:7, 73:9, 74:20, 74:22, 78:3, 78:6, 79:3, 79:13, 79:18, 79:24, 80:2, 80:5, 80:7, 80:10, 80:12, 81:5, 81:8, 81:14
**court** [17] - 16:4, 16:25, 22:23, 28:1, 46:19, 52:5, 67:9, 67:18, 69:11, 69:23, 74:9, 74:13, 76:18, 76:20, 76:21, 77:1, 78:15
**Court's** [8] - 10:24, 11:7, 14:7, 18:1, 22:8, 28:3, 28:16
**Courtroom** [1] - 1:7
**courtroom** [1] - 10:14
**Courts** [1] - 59:2
**courts** [8] - 22:5, 31:17, 31:23, 59:2, 67:15, 69:17, 69:20, 78:17
**covered** [1] - 30:16
**create** [2] - 54:13, 62:22
**created** [1] - 78:13
**credit** [2] - 32:25, 49:25
**crime** [1] - 25:22
**criminal** [7] - 23:1, 23:3, 23:12, 27:9, 30:24, 37:16, 52:23
**criminalized** [2] - 24:4, 24:5
**criteria** [1] - 77:22
**critical** [2] - 69:6, 76:14
**critically** [1] - 36:5
**cross** [1] - 57:8

**CRT** [2] - 59:24, 77:21
**CURTIS** [1] - 2:7
**customer** [1] - 55:2
**customers** [1] - 55:10

# D

**D.C** [1] - 2:9
**damages** [4] - 34:5, 46:23, 52:6, 54:6
**DATE** [1] - 82:7
**DAVIS** [2] - 2:13, 7:20
**Davis** [3] - 2:13, 7:18, 25:8
**deal** [10] - 47:20, 47:21, 52:13, 54:17, 55:6, 55:7, 64:20, 65:1, 67:21, 67:25
**dealing** [14] - 54:16, 66:22, 67:8, 67:11, 67:12, 67:14, 67:16, 67:19, 68:1, 68:3, 68:11, 76:1, 76:10, 78:8
**dealings** [1] - 68:10
**dealt** [1] - 9:24
**December** [1] - 1:5
**decide** [2] - 29:7, 76:20
**decided** [2] - 16:1, 79:8
**deciding** [2] - 17:6, 31:2
**decision** [10] - 11:7, 22:7, 22:8, 28:3, 31:7, 32:17, 37:15, 46:12, 81:11, 81:15
**decisions** [2] - 22:7, 37:12, 37:14
**declaration** [3] - 18:18, 18:23, 73:1
**decrease** [3] - 65:20, 68:16, 68:20
**decreased** [1] - 75:4
**decreasing** [1] - 68:15
**deemed** [1] - 57:18
**defend** [1] - 58:7
**Defendant** [6] - 7:18, 7:22, 8:18, 8:21, 9:6, 57:3
**DEFENDANT** [5] - 2:12, 3:2, 3:8, 3:12, 4:2
**defendant** [4] - 32:23, 33:2, 76:22, 77:3
**Defendant's** [2] - 36:17, 51:25
**defendant's** [2] - 36:7, 36:13
**Defendants** [9] - 1:8,

6:21, 6:24, 9:9, 9:15, 28:18, 37:2, 40:2, 79:14
**defendants** [3] - 6:4, 27:11, 64:25
**DEFENDANTS** [4] - 2:3, 2:18, 3:19, 5:6
**Defendants'** [2] - 5:11, 64:23
**Defense** [1] - 9:12
**defined** [2] - 60:22, 62:10
**definitely** [1] - 40:23
**definition** [11] - 56:11, 56:14, 56:22, 56:25, 57:11, 58:11, 58:20, 58:21, 70:12, 77:24, 78:11
**definitions** [3] - 57:1, 69:5, 69:7
**defraud** [4] - 24:5, 24:7, 25:18, 27:2
**degrees** [1] - 67:10
**delineating** [1] - 57:9
**delivered** [2] - 30:9, 40:21
**delivering** [2] - 39:17, 40:11
**delta** [1] - 49:17
**demand** [1] - 57:8
**demographic** [2] - 70:2, 70:14
**demonstration** [1] - 21:21
**Department** [1] - 48:25
**deprivation** [2] - 13:21, 65:14
**deprived** [1] - 15:1
**deprives** [1] - 66:9
**depriving** [1] - 17:18
**derivative** [3] - 33:14, 37:19, 37:24
**describe** [2] - 55:7, 72:13
**described** [1] - 72:11
**describes** [1] - 70:22
**describing** [1] - 31:15
**deserving** [1] - 49:25
**detail** [3] - 30:8, 56:19, 62:17
**determination** [1] - 52:23
**determine** [3] - 12:16, 21:6, 70:11
**determined** [1] - 21:9
**dicta** [2] - 22:10, 22:11
**difference** [3] - 22:25, 31:14, 49:19
**differences** [1] - 22:24

**different** [29] - 19:8, 19:9, 20:6, 23:8, 23:9, 23:13, 26:13, 29:5, 31:13, 33:18, 33:20, 42:1, 42:18, 46:20, 47:8, 48:14, 51:19, 52:22, 58:2, 65:2, 65:3, 65:18, 67:10, 68:19, 69:2, 69:13, 72:4, 72:20, 76:2
**differentiate** [2] - 38:17, 39:14
**differently** [1] - 7:12
**direct** [24] - 11:2, 12:7, 12:16, 13:20, 14:3, 14:9, 14:16, 14:17, 14:18, 14:20, 19:13, 20:2, 20:21, 31:16, 36:12, 36:15, 36:25, 38:1, 41:21, 46:8, 46:12, 60:2, 62:6, 62:23
**direct-party** [1] - 19:13
**directly** [4] - 17:23, 31:19, 33:9, 36:17
**disagree** [2] - 22:23, 49:5
**disagreement** [2] - 11:14, 54:11
**disappointed** [1] - 32:21
**discouraging** [1] - 67:22
**discovery** [5] - 35:24, 36:1, 45:21, 45:22, 71:5
**discretion** [8] - 15:16, 17:2, 37:9, 37:14, 41:23, 41:25, 47:25
**discussed** [3] - 60:24, 68:14, 68:19
**discussing** [1] - 29:1
**discussion** [6] - 29:11, 29:15, 29:16, 31:12, 32:9, 58:24
**dismiss** [17] - 12:9, 16:23, 18:4, 23:2, 23:7, 30:24, 35:5, 38:1, 41:19, 45:25, 46:5, 49:6, 79:9, 79:10, 79:15, 79:22
**dismissing** [1] - 38:14
**dispute** [14] - 15:19, 16:3, 29:10, 30:16, 34:14, 35:13, 36:18, 36:19, 36:23, 48:13, 55:22, 66:24, 67:1, 67:2

**disputes** [1] - 34:7
**disputing** [1] - 34:11
**distinct** [1] - 69:17
**distinction** [3] - 31:14, 32:1, 37:4
**distinctions** [1] - 69:20
**distinguish** [2] - 43:10, 68:9
**distinguishes** [2] - 41:24, 48:3
**distribution** [2] - 53:10, 77:23
**District** [9] - 11:8, 11:14, 22:17, 23:15, 23:23, 26:15, 26:16, 39:8, 39:9
**DISTRICT** [3] - 1:1, 1:1, 1:11
**divide** [1] - 28:17
**divided** [1] - 9:12
**division** [1] - 26:5
**Division** [3] - 69:24, 69:25, 78:16
**DIVISION** [1] - 1:2
**Document** [1] - 24:23
**documents** [1] - 36:8
**DOJ** [1] - 61:20
**dollar** [1] - 51:4
**dollars** [5] - 40:4, 40:10, 65:15, 65:24, 68:8
**domestic** [9] - 11:12, 25:23, 29:13, 30:7, 38:25, 52:19, 53:4, 53:6, 54:6
**domestically** [3] - 23:22, 27:5, 61:1
**done** [7] - 15:22, 48:16, 56:18, 63:3, 63:5, 75:18, 78:22
**down** [4] - 37:1, 53:9, 53:10, 80:25
**downstream** [6] - 58:8, 60:12, 62:15, 65:17, 68:12, 75:3
**draw** [2] - 57:2, 57:3
**drawing** [1] - 35:22
**Drive** [1] - 3:16
**dropped** [1] - 11:13
**drum** [1] - 16:10
**duplicative** [3] - 33:15, 41:15, 41:18
**during** [1] - 73:20
**duty** [12] - 12:22, 12:25, 13:14, 13:22, 13:23, 13:24, 15:2, 20:14, 27:24, 41:3, 41:8, 42:11

**disputes** — see above

# E

**easier** [1] - 24:24
**Eastern** [8] - 11:8, 11:14, 22:16, 23:15, 23:23, 26:15, 26:16, 39:7
**easy** [5] - 12:19, 13:7, 17:17, 40:19, 46:14
**economic** [7] - 13:15, 56:3, 75:22, 77:18, 77:19, 78:25
**effect** [11] - 55:4, 62:7, 64:5, 65:2, 65:3, 66:2, 66:24, 68:3, 68:15, 68:16
**effects** [4] - 60:13, 62:24, 68:6, 75:3
**effort** [2] - 52:9, 81:2
**efforts** [1] - 58:7
**Eidson** [1] - 3:20
**either** [12] - 26:10, 30:5, 32:2, 33:16, 38:16, 45:11, 47:15, 55:9, 56:2, 57:8, 60:9, 62:4
**elasticity** [1] - 57:8
**electronic** [1] - 39:16
**element** [1] - 12:9
**elements** [2] - 23:4, 23:9
**ELMO** [1] - 24:25
**elsewhere** [2] - 59:10, 80:25
**employ** [1] - 37:12
**employee** [2] - 12:22, 20:14
**employees** [7] - 72:5, 72:14, 72:22, 72:24, 80:19, 80:20, 80:21
**employer** [2] - 12:23, 20:15
**encourage** [1] - 33:7
**end** [11] - 6:10, 9:9, 13:8, 25:24, 31:12, 43:25, 44:2, 68:22, 71:23, 73:23, 74:14
**ended** [2] - 42:24, 48:18
**enforce** [2] - 46:24
**engaging** [1] - 73:10
**English** [1] - 73:17
**enterprise** [4] - 32:22, 32:24, 32:25, 49:24
**enterprises** [1] - 33:8
**Enterprises** [2] - 32:7
**entirely** [1] - 71:19
**entitled** [2] - 71:5, 62:12
**entity** [16] - 41:9, 45:4,

6

45:5, 52:10, 52:14,
53:3, 59:19, 59:20,
60:24, 60:25, 61:24,
62:14, 72:6, 73:12,
74:10, 80:22
**enviable** [1] - 63:17
**equally** [1] - 81:9
**ESQ** [20] - 1:14, 1:18,
1:18, 1:19, 2:2, 2:6,
2:7, 2:7, 2:12, 2:13,
2:18, 2:21, 2:22, 3:2,
3:3, 3:8, 3:12, 3:15,
3:19, 4:2
**essence** [7] - 29:17,
29:20, 30:20, 31:9,
31:10, 59:6, 73:5
**essential** [1] - 12:9
**essentially** [5] - 32:25,
38:21, 65:5, 66:8,
68:24
**estimate** [1] - 25:13
**et** [2] - 1:4, 1:7
**etc** [1] - 18:16
**Europe** [2] - 40:16,
51:18
**evaluating** [1] - 67:15
**event** [1] - 69:15
**events** [2] - 49:8,
78:19
**EVIDENCE** [1] - 5:9
**evince** [1] - 22:1
**ex** [1] - 70:6
**ex-patriots** [1] - 70:6
**exact** [1] - 67:6
**exactly** [6] - 20:24,
31:17, 36:11, 44:6,
50:5, 67:5
**example** [8] - 26:2,
38:13, 44:11, 45:14,
59:12, 67:18, 69:21,
71:15
**examples** [1] - 56:20
**except** [5] - 9:23,
34:15, 42:23, 45:25,
79:6
**exception** [9] - 59:1,
59:6, 60:1, 74:5,
74:18, 77:17, 77:25,
78:24
**exceptions** [1] - 59:4
**exclude** [5] - 61:15,
64:25, 66:5, 67:3,
78:9
**excluded** [3] - 55:3,
56:21, 66:23
**excluding** [1] - 65:8
**exclusion** [1] - 78:13
**exclusive** [20] - 54:16,
55:15, 55:19, 55:25,
66:22, 67:8, 67:11,

67:12, 67:14, 67:16,
67:19, 68:1, 68:3,
68:10, 68:11, 76:1,
76:8, 76:10, 78:8
**exclusively** [1] - 65:1
**exclusivity** [1] - 76:14
**excuse** [4] - 32:15,
34:9, 36:5, 50:10
**exercise** [2] - 15:16,
38:12
**exercised** [1] - 17:1
**exhaustive** [1] - 30:8
**exhaustively** [1] - 10:9
**Exhaustively** [1] -
10:10
**Exhibit** [2] - 5:10, 5:11
**EXHIBITS** [1] - 5:9
**exist** [1] - 15:7
**explain** [5] - 11:10,
23:19, 54:8, 56:19,
57:24
**explaining** [1] - 29:24
**exploit** [1] - 56:4
**exploited** [2] - 61:17,
61:25
**exploiting** [1] - 75:20
**extended** [1] - 49:4
**extent** [1] - 22:5
**extra** [2] - 62:24, 77:23
**extracontractual** [1] -
13:12
**extraordinary** [1] -
57:21
**extraterritorial** [2] -
29:3, 62:12
**extraterritoriality** [7] -
11:9, 21:1, 21:5,
29:2, 41:14, 52:1,
60:18
**extraterritorially** [1] -
11:11

# F

**facets** [1] - 54:20
**facilities** [1] - 27:12
**fact** [21] - 18:25,
33:23, 35:10, 37:15,
38:11, 48:24, 52:7,
52:10, 54:3, 54:18,
56:5, 56:12, 62:20,
68:19, 69:9, 71:5,
74:11, 76:8, 79:21,
81:2
**factors** [5] - 14:23,
14:24, 42:19, 44:8,
74:10
**facts** [12] - 12:15,
13:9, 13:18, 15:8,
15:19, 32:20, 34:12,

34:13, 35:13, 37:5,
50:2
**factual** [12] - 19:8,
34:7, 35:3, 36:1,
37:8, 42:4, 48:12,
49:7, 56:15, 61:5,
71:7, 72:2
**factually** [2] - 36:23,
49:16
**failed** [2] - 58:22,
69:12
**fairly** [2] - 59:4, 61:9
**fall** [2] - 49:19, 54:3
**fallen** [1] - 25:24
**false** [1] - 36:7
**falsely** [2] - 32:23,
49:23
**fans** [1] - 70:7
**far** [1] - 75:11
**Farber** [5] - 6:10, 6:14,
28:15, 48:7, 71:4
**FARBER** [26] - 1:18,
6:12, 28:15, 28:22,
32:6, 32:11, 32:18,
32:20, 33:22, 34:18,
34:20, 34:25, 35:3,
35:7, 38:20, 39:20,
48:11, 49:12, 51:6,
79:19, 80:1, 80:3,
80:6, 80:8, 80:11,
81:7
**fatal** [2] - 74:8, 74:12
**favor** [2] - 48:22, 67:3
**favorable** [1] - 45:17
**FDUTPA** [1] - 79:23
**Fed** [2] - 32:16, 39:10
**Federal** [1] - 60:3
**federal** [3] - 9:24,
36:13, 56:8
**federations** [1] - 75:7
**fence** [1] - 25:24
**Ferguson** [1] - 32:6
**few** [4] - 36:7, 53:25,
54:22, 74:24, 81:12
**FIC** [2] - 47:10, 47:11
**fiduciary** [1] - 13:23
**FIFA** [1] - 58:4
**Figueredo** [1] - 40:15
**figure** [2] - 14:16,
25:22
**finally** [2] - 61:8, 62:24
**financial** [7] - 14:3,
19:4, 20:17, 20:23,
27:12, 40:3, 40:15
**financing** [1] - 45:15
**fine** [4] - 10:1, 67:9,
67:22, 81:9
**firm** [3] - 6:24, 6:25,
7:24
**first** [23] - 9:24, 10:18,

11:1, 14:13, 14:14,
17:25, 21:13, 22:24,
22:25, 23:20, 25:11,
26:18, 33:10, 47:18,
59:8, 61:11, 61:12,
62:3, 64:8, 64:10,
64:23, 74:24, 78:8
**first-party** [1] - 17:25
**fit** [3] - 54:4, 54:7,
58:17
**fits** [1] - 55:23
**five** [1] - 26:18
**fixing** [1] - 54:25
**FL** [9] - 1:16, 2:4, 2:15,
2:19, 3:5, 3:9, 3:13,
3:21, 4:4
**flag** [1] - 71:22
**Flagler** [1] - 2:4
**flip** [2] - 64:13, 65:10
**flipped** [1] - 45:25
**float** [1] - 40:10
**floated** [1] - 80:4
**Floor** [2] - 4:8, 82:8
**FLORIDA** [1] - 1:1
**Florida** [7] - 1:4, 4:9,
50:17, 50:20, 51:1,
51:2, 82:9
**flow** [2] - 41:6, 79:21
**flowed** [1] - 40:24
**flowing** [1] - 51:19
**focus** [12] - 21:12,
23:21, 24:6, 24:11,
25:16, 26:10, 27:20,
41:11, 41:12, 52:3,
52:21, 53:25
**focused** [1] - 27:3
**focuses** [2] - 19:25,
20:1
**folks** [3] - 44:2, 44:3,
44:19
**follow** [1] - 29:7
**followed** [2] - 22:4,
37:3
**following** [1] - 6:1
**football** [2] - 58:2,
69:19
**footnote** [4] - 11:14,
11:19, 11:25, 28:4
**FOR** [11] - 1:14, 2:2,
2:12, 2:18, 3:2, 3:8,
3:12, 3:19, 4:2, 5:3,
5:6
**foregoing** [1] - 82:2
**foreign** [7] - 21:19,
22:1, 54:5, 60:24,
60:25, 61:11, 62:14
**foreseeable** [1] - 62:7
**forget** [2] - 20:18,
47:22
**forgiving** [1] - 30:25

**forking** [1] - 44:1
**form** [1] - 13:13
**format** [1] - 72:5
**formed** [1] - 73:19
**forms** [1] - 70:8
**Fort** [1] - 26:24
**forth** [3] - 52:2, 72:1,
74:4
**forward** [3] - 34:15,
34:25, 36:24
**four** [3] - 6:20, 20:3,
65:13
**FOX** [2] - 1:7, 2:2
**Fox** [8] - 6:3, 6:24,
9:15, 47:17, 66:5,
68:23, 75:13, 75:19
**FRANCISCO** [1] - 3:8
**Francisco** [1] - 8:16
**frankly** [2] - 48:22,
52:21
**fraud** [39] - 11:10,
12:18, 12:20, 12:21,
12:24, 13:2, 13:19,
14:2, 17:18, 17:25,
18:6, 19:10, 20:4,
20:9, 21:18, 21:25,
22:10, 22:19, 24:1,
24:2, 24:3, 24:5,
25:17, 26:11, 27:5,
27:22, 29:18, 30:19,
31:13, 36:17, 37:17,
38:21, 39:7, 42:25
**fraudulent** [1] - 36:8
**free** [1] - 10:25
**frequently** [1] - 56:12
**fresh** [1] - 29:1
**Friday** [1] - 63:17
**Friedman** [2] - 8:21,
8:24
**FRIEDMAN** [5] - 3:19,
8:20, 8:24, 8:25, 9:3
**front** [1] - 69:9
**FTAIA** [2] - 60:18, 61:8
**Full** [1] - 45:5, 71:17
**full** [1] - 53:24
**function** [1] - 51:4
**functionally** [1] -
30:12
**furtherance** [1] -
27:16
**future** [1] - 47:14

# G

**G-A-I-T-H-E-R** [1] - 8:4
**Gables** [1] - 3:21
**Gaither** [4] - 7:23, 8:2,
51:23, 80:15
**GAITHER** [4] - 2:21,
8:7, 51:23, 80:15

gallery [1] - 19:14
games [3] - 15:20, 56:23, 58:15
GANLEY [1] - 2:13
Ganley [1] - 7:18
gathering [1] - 44:3
Gelber [2] - 2:18, 7:23
general [3] - 62:19, 66:12, 75:10
generally [2] - 24:3, 56:14
George [2] - 6:11, 6:14
GEORGE [1] - 1:18
GILLMAN [5] - 1:14, 6:6, 6:9, 6:14, 6:16
Gillman [2] - 6:7, 6:9
given [2] - 71:21, 81:10
glad [2] - 9:1, 63:7
Global [38] - 6:2, 35:9, 35:12, 35:20, 35:21, 48:1, 52:9, 52:14, 52:18, 52:21, 53:6, 59:6, 59:12, 59:14, 59:19, 60:17, 60:19, 60:24, 61:16, 62:5, 70:20, 70:24, 71:25, 72:3, 72:5, 72:14, 73:15, 73:18, 73:21, 73:24, 73:25, 77:11, 77:15, 78:22, 80:24, 81:2
glossed [1] - 29:22
gmastoris@winston.com [1] - 1:22
GOLTV [1] - 1:4
GolTV [27] - 6:2, 31:22, 34:25, 35:8, 48:1, 52:9, 52:25, 53:8, 58:25, 59:17, 59:18, 59:22, 60:2, 60:4, 64:25, 66:5, 66:23, 70:24, 71:1, 71:9, 73:20, 73:22, 72:23, 73:25, 74:1
GolTV's [3] - 70:21, 71:25, 73:16
GONZALEZ [1] - 3:3
Gonzalez [1] - 8:13
GONZALEZ-MARQUES [1] - 3:3
good-looking [1] - 63:14
Government [4] - 23:3, 23:12, 27:8, 33:1
grand [1] - 23:5
graphically [1] - 80:25
gravity [2] - 28:5, 28:7

Greenberg [2] - 2:18, 7:23
greenberg [1] - 3:8
Greenburg [1] - 8:16
growing [1] - 27:15
guess [5] - 25:21, 28:3, 47:14, 47:24, 54:1
guidance [1] - 61:20
Gutierrez [1] - 73:17

H

hand [2] - 24:17, 24:24
handing [1] - 30:14
hang [1] - 17:11
happy [8] - 28:10, 38:15, 54:9, 79:11, 79:12, 80:8, 81:14, 81:17
hard [1] - 24:24
harder [1] - 9:1
harm [26] - 13:15, 33:14, 33:16, 33:18, 34:3, 38:1, 41:4, 43:9, 61:1, 62:11, 62:12, 62:18, 62:23, 65:9, 65:12, 65:17, 65:19, 66:15, 66:21, 74:25, 75:1, 75:12
harmed [4] - 31:19, 31:20, 33:6, 33:9, 55:12, 55:13, 55:14, 78:12
harms [4] - 63:3, 63:5, 65:20, 68:7
hashed [1] - 34:14
headquartered [1] - 52:15
hear [2] - 28:13, 45:23
heard [8] - 31:12, 41:15, 48:13, 49:6, 64:2, 65:11, 70:19, 78:20
HEARING [1] - 1:10
hearing [1] - 52:10
held [3] - 6:1, 18:9, 42:19
Hemi [1] - 42:6
hereby [1] - 82:2
HERNAN [1] - 3:12
Hernan [1] - 8:19
Hicks [2] - 3:20, 8:25
high [6] - 44:24, 45:13, 46:21, 46:22, 75:24
higher [2] - 23:11, 34:21
highest [4] - 43:20,

43:23, 43:24, 45:11
highly [1] - 56:16
hire [1] - 16:10
hmm [1] - 12:1
hold [3] - 8:23, 70:4
hole [2] - 54:5, 64:3
holidays [2] - 81:14, 81:17
home [2] - 27:23, 52:7
Honest [1] - 12:21
honest [20] - 12:19, 12:20, 13:2, 13:3, 13:19, 13:21, 14:2, 15:1, 17:17, 17:19, 18:5, 20:4, 20:13, 20:24, 24:2, 27:22, 29:18, 36:21, 42:9
Honor [45] - 6:12, 6:18, 6:23, 7:2, 7:17, 7:20, 7:21, 8:11, 8:12, 8:15, 8:17, 8:20, 9:3, 9:5, 9:14, 10:17, 23:1, 28:15, 32:11, 32:14, 39:20, 41:2, 44:7, 45:9, 51:6, 51:10, 51:23, 53:15, 53:21, 63:7, 63:11, 69:4, 70:17, 74:19, 74:23, 78:2, 78:5, 79:5, 79:17, 79:20, 80:9, 80:11, 81:4, 81:7, 81:17
HONORABLE [1] - 1:10
hope [2] - 81:11, 81:15
horizontal [3] - 55:1, 55:8
host [1] - 61:2
huge [2] - 48:21, 49:17
hundreds [2] - 65:14, 65:23, 68:8

I

idea [1] - 59:17
identified [1] - 62:18
identity [1] - 77:18
idiot [1] - 25:9
idiot-proof [1] - 25:9
illegality [1] - 56:7
Illinois [4] - 53:9, 59:2, 59:3, 77:25
imagined [1] - 62:4
immediate [8] - 13:20, 14:4, 14:13, 14:18, 14:20, 41:21, 46:7, 46:13
immediately [1] -

74:15
impact [1] - 42:13
implicit [1] - 33:24
import [2] - 61:12, 61:13, 61:21
important [1] - 50:9
importantly [1] - 25:21
imported [1] - 61:16
impossible [1] - 45:8
IN [1] - 5:9
Inc [1] - 32:6
INC [1] - 1:4
incentive [1] - 48:19
incentives [4] - 47:18, 56:3, 56:4, 75:23
incidental [7] - 24:7, 27:18, 30:2, 39:5, 39:10, 39:11, 51:3
include [1] - 56:16
included [5] - 56:22, 56:23, 56:24, 57:7, 70:10
including [5] - 26:24, 31:23, 39:24, 40:15, 58:14
incorporate [1] - 59:13
incorporated [1] - 77:8
incorrect [1] - 23:25
indicted [3] - 47:19, 48:18
indictment [7] - 23:4, 24:13, 24:17, 24:19, 29:24, 31:1, 52:23
indifference [2] - 56:9, 75:20
indifferent [1] - 55:18
indirect [3] - 59:1, 74:4, 74:5
inference [1] - 35:22
information [2] - 43:1, 50:14
injure [2] - 19:15, 19:16
injured [6] - 19:20, 33:11, 33:19, 38:13, 47:1
injuries [2] - 33:20, 38:2
injury [21] - 12:17, 13:21, 14:3, 14:16, 14:25, 17:10, 19:2, 19:4, 20:17, 20:23, 29:13, 30:7, 36:13, 36:25, 37:19, 38:25, 42:6, 52:19, 53:4, 53:6, 60:9
inner [1] - 10:19
inquiries [1] - 61:10

inquiry [1] - 13:8
insofar [1] - 33:6
instance [1] - 33:10
instead [4] - 13:16, 56:1, 75:16, 80:6
institutions [3] - 27:12, 40:3, 40:16
intent [4] - 21:7, 22:1, 61:23, 71:9
Interaudi [2] - 50:20, 50:25
Intercollegiate [1] - 76:17
interest [7] - 16:10, 49:2, 70:6, 73:25, 77:18, 77:19, 78:25
interference [1] - 79:23
intermediaries [2] - 51:14, 51:20
international [3] - 56:24, 59:16, 73:20
International [1] - 45:3
interpretation [1] - 48:13
interstate [1] - 21:19
intervening [13] - 14:23, 14:24, 15:7, 15:23, 16:13, 17:14, 19:22, 19:23, 37:18, 41:22, 42:19, 44:8, 46:16
involved [8] - 18:8, 23:14, 43:12, 45:6, 46:1, 46:3, 46:4, 47:6
involves [4] - 12:13, 30:18, 46:16, 46:17
involving [2] - 28:14, 64:16
iota [1] - 37:15
irrelevant [1] - 71:24
Islands [1] - 16:6
issue [25] - 11:13, 23:17, 23:18, 28:14, 29:2, 29:6, 31:4, 34:2, 35:1, 36:9, 38:5, 52:4, 52:11, 54:14, 55:5, 56:12, 56:15, 56:17, 57:12, 58:23, 69:9, 70:19, 74:25, 76:13, 80:17
issues [21] - 9:11, 9:12, 9:16, 9:20, 9:24, 10:6, 10:7, 10:23, 11:1, 28:18, 28:19, 28:20, 28:24, 36:2, 37:8, 38:16, 52:13, 54:2, 79:9,

80:13
**itself** [3] - 52:6, 60:25, 67:13
**IV** [1] - 2:21

## J

**Jacobs** [8] - 56:13, 57:15, 69:8, 69:9, 69:11, 69:13, 70:12, 70:15
**Jakob** [1] - 8:7
**JAKOB** [1] - 2:22
**JAMES** [1] - 2:13
**Jay** [1] - 6:23
**JAY** [1] - 2:2
**job** [1] - 75:19
**JOHN** [1] - 3:2
**John** [1] - 8:12
**john.couriel@ kobrekim.com** [1] - 3:6
**joins** [1] - 51:24
**Jon** [1] - 7:1
**JONATHAN** [1] - 2:7
**Jonathan** [2] - 7:1, 9:19
**JOSEPHS** [1] - 3:15
**Josephs** [1] - 8:18
**JP** [1] - 50:22
**JPitt@wc.com** [1] - 2:10
**jsebrow@rkollp.com** [1] - 2:25
**jshapiro@ stearnsweaver. com** [1] - 2:5
**JUAN** [1] - 3:8
**JUDGE** [1] - 1:11
**Judge** [3] - 28:24, 29:22, 31:7
**judge** [2] - 30:3, 31:2
**July** [1] - 50:19
**jump** [2] - 10:25, 34:25
**jurisdiction** [3] - 21:8, 22:23, 79:24
**jury** [1] - 23:5
**Justice** [1] - 48:25
**justification** [1] - 22:6
**justifications** [1] - 76:4
**justify** [1] - 68:1

## K

**keep** [3] - 10:16, 55:9, 65:25
**kept** [2] - 57:10, 58:20
**Kibbe** [2] - 2:22, 7:24

**Kim** [1] - 3:3
**kind** [8] - 13:6, 14:14, 30:15, 45:24, 54:4, 54:22, 57:24, 77:5
**kinds** [5] - 54:2, 54:24, 57:1, 58:13, 65:20
**knotty** [1] - 61:9
**knows** [1] - 40:9
**Kobre** [1] - 3:3
**KUEHNE** [2] - 2:12, 7:17
**Kuehne** [3] - 2:13, 7:18, 25:8

## L

**L.A** [1] - 26:24
**lack** [1] - 80:18
**lacking** [1] - 41:20
**laid** [5] - 53:7, 61:12, 78:24, 80:25, 81:3
**landed** [1] - 41:7
**Landes** [1] - 3:16
**language** [2] - 21:17, 21:25
**largest** [1] - 44:2
**last** [8] - 6:15, 7:6, 8:8, 27:9, 48:7, 51:12, 63:17, 63:18
**lastly** [2] - 17:1, 77:21
**Latin** [3] - 6:3, 16:6, 27:24
**LATIN** [1] - 1:7
**Lauderdale** [1] - 26:24
**laundering** [2] - 20:7, 20:8
**LAURA** [1] - 3:3
**Laura** [1] - 8:13
**laura.gonzalez@ kobrekim.com** [1] - 3:6
**law** [20] - 9:16, 12:25, 14:8, 27:24, 28:19, 39:1, 40:6, 41:9, 42:15, 54:7, 54:21, 55:16, 55:24, 59:23, 62:21, 73:17, 75:14, 79:6, 79:15, 79:25
**Law** [1] - 2:13
**Laws** [1] - 60:3
**laws** [6] - 55:18, 56:8, 75:21, 75:25, 76:11
**lawsuit** [1] - 57:4
**lawyers** [2] - 10:12, 10:13
**lay** [3] - 30:8, 44:12, 61:3
**lays** [3] - 44:12, 62:16, 75:15
**LAZO** [2] - 8:22, 8:23

**LAZOPOULOS** [1] - 3:19
**Lazopoulos** [1] - 8:21
**League** [1] - 26:4
**league** [2] - 26:4, 57:22
**least** [1] - 16:15
**left** [2] - 7:4, 27:7
**legal** [5] - 15:18, 49:21, 59:9, 59:10, 70:20
**legislate** [3] - 21:21, 21:23, 24:9
**legislation** [1] - 21:22
**legitimate** [1] - 32:22
**less** [8] - 42:24, 43:2, 65:7, 75:6, 75:8
**letterhead** [1] - 35:20
**letters** [1] - 35:19
**letting** [1] - 43:13
**level** [1] - 30:23
**liability** [1] - 73:16
**Libertadores** [1] - 23:16
**Liberty** [1] - 2:23
**licensing** [1] - 74:7
**lie** [8] - 18:6, 18:7, 18:24, 19:10, 19:13, 19:14, 19:16
**lied** [1] - 43:8
**lien** [3] - 18:15, 18:16, 38:8
**liens** [2] - 18:8, 18:9
**lies** [1] - 42:12
**light** [2] - 45:17
**limited** [2] - 57:21, 73:16
**limits** [1] - 10:12
**Lindsey** [1] - 8:21
**LINDSEY** [1] - 3:19
**lindsey@colson. com** [1] - 3:22
**line** [9] - 14:10, 17:16, 19:6, 19:24, 42:1, 56:13, 57:2, 57:3, 59:3
**link** [1] - 53:10
**Lisa** [1] - 17:11
**list** [1] - 50:11
**listening** [1] - 29:14
**Litigation** [1] - 59:24
**Lloyds** [1] - 50:17
**LLP** [8] - 1:14, 1:19, 2:8, 2:22, 3:3, 3:16, 4:3, 6:3
**located** [2] - 27:12, 39:12
**locus** [1] - 25:22
**look** [33] - 13:4, 13:8,

13:18, 13:19, 14:9, 14:23, 15:7, 17:12, 17:15, 18:2, 19:17, 21:1, 21:5, 24:11, 24:22, 25:1, 28:5, 29:19, 31:15, 41:16, 43:5, 44:14, 46:11, 46:15, 47:22, 52:19, 62:1, 67:7, 67:15, 67:23, 68:3, 68:12, 73:2
**looked** [6] - 21:9, 21:24, 24:12, 31:3, 43:4, 67:14
**looking** [12] - 12:13, 12:14, 12:15, 24:1, 29:25, 41:10, 44:8, 45:7, 45:17, 63:14, 65:17, 69:14
**looks** [5] - 12:12, 14:11, 16:20, 24:21, 24:23
**LOPEZ** [1] - 3:12
**Lopez** [1] - 8:19
**Los** [1] - 3:17
**lose** [3] - 19:21, 36:18, 36:22
**lost** [1] - 38:12
**love** [1] - 10:19
**low** [1] - 75:25
**lowest** [6] - 18:9, 18:11, 19:3, 36:10, 42:15, 45:11
**LTD** [2] - 1:7, 3:20

## M

**M-A-H-O-N-E-Y** [1] - 7:9
**M-A-S-T-O-R-I-S** [1] - 6:16
**MAHONEY** [3] - 2:7, 7:13, 7:15
**Mahoney** [3] - 7:4, 7:7, 7:10
**major** [2] - 40:3, 61:10
**Major** [1] - 26:3
**Manhattan** [1] - 39:17
**Manufacturing** [2] - 75:14, 76:5
**Marcelo** [2] - 6:17, 63:13
**MARCELO** [1] - 1:19
**March** [2] - 50:16, 50:18
**Maria** [1] - 8:13
**MARIA** [1] - 3:3
**MARKED** [1] - 5:9
**market** [74] - 15:25, 27:15, 53:1, 53:4,

55:1, 55:3, 56:11, 56:14, 56:15, 56:22, 56:24, 57:1, 57:5, 57:7, 57:9, 57:11, 57:18, 57:21, 57:24, 58:2, 58:4, 58:5, 58:8, 58:10, 58:11, 58:20, 58:21, 60:5, 60:6, 60:20, 60:21, 60:22, 60:23, 62:10, 62:12, 63:2, 63:3, 64:5, 64:11, 64:15, 64:20, 65:1, 65:5, 65:9, 65:10, 65:12, 65:13, 66:5, 66:23, 66:25, 68:4, 69:5, 69:7, 69:11, 69:23, 70:13, 76:19, 76:21, 76:23, 76:25, 77:2, 77:3, 78:10, 78:11, 78:15, 80:22, 81:4
**marketing** [1] - 73:19
**MARKETING** [1] - 3:20
**Marketing** [2] - 8:21, 40:4
**markets** [21] - 56:11, 58:7, 60:10, 60:13, 62:16, 63:4, 63:25, 64:5, 64:10, 64:13, 65:3, 65:17, 67:2, 68:4, 68:12, 68:13, 68:17, 69:21, 75:3, 78:19, 81:4
**marquee** [1] - 78:18
**MARQUES** [1] - 3:3
**Martinez** [1] - 9:6
**MARTINEZ** [1] - 4:3
**Mastoris** [3] - 6:11, 6:14, 63:12
**MASTORIS** [1] - 1:18
**matches** [2] - 66:6, 73:20
**materials** [1] - 35:23
**matter** [6] - 20:8, 56:8, 61:23, 62:19, 75:20, 82:4
**matters** [6] - 24:3, 45:16, 45:20, 65:4, 73:9, 79:25
**mattress** [2] - 69:14, 69:15
**mblackburn@ winston.com** [1] - 1:22
**McCARN** [2] - 4:7, 82:7
**McCormick** [1] - 32:9
**mdavis@kuehnelaw. com** [1] - 2:16

**mean** [25] - 26:10, 28:4, 29:17, 30:23, 31:3, 33:10, 33:21, 33:22, 33:24, 34:25, 35:9, 35:11, 37:10, 37:21, 38:6, 38:13, 38:20, 38:22, 39:6, 39:14, 45:13, 45:16, 49:5, 49:23, 74:14
**meaningful** [2] - 31:25, 37:4
**means** [6] - 35:21, 52:18, 59:25, 60:8, 65:5, 78:22
**meet** [6] - 23:10, 23:12, 58:22, 59:1, 59:5, 77:24
**meetings** [3] - 27:15, 27:18, 30:21
**members** [1] - 65:16
**men's** [3] - 69:24, 69:25, 78:16
**Men's** [1] - 26:5
**mention** [1] - 22:24
**mentioned** [2] - 28:4, 62:9
**mentioning** [1] - 37:7
**mere** [2] - 21:25, 59:6
**merely** [1] - 73:12
**merry** [1] - 81:15
**met** [1] - 46:18
**Metro** [2] - 76:17, 78:14
**Metropolitan** [1] - 69:22
**MIAMI** [1] - 1:2
**Miami** [18] - 1:4, 1:16, 2:4, 2:14, 2:15, 2:19, 3:5, 3:9, 3:13, 4:4, 4:8, 4:9, 16:5, 50:17, 50:20, 50:25, 82:8, 82:9
**MICHAEL** [1] - 2:13
**Michael** [1] - 7:18
**Midtown** [1] - 39:17
**might** [10] - 11:24, 22:10, 37:23, 44:21, 50:1, 56:4, 58:9, 67:17, 70:9, 79:21
**Miller** [1] - 2:3
**millions** [4] - 40:4, 65:15, 65:23, 68:8
**minds** [1] - 29:1
**mine** [1] - 9:2
**minimize** [2] - 25:7, 81:2
**MISCELLANEOUS** [1] - 5:17
**misconduct** [2] - 49:2, 56:7

**missed** [5] - 6:13, 7:5, 7:25, 8:1
**missing** [1] - 76:14
**misunderstood** [1] - 79:19
**moment** [7] - 28:22, 32:11, 34:23, 50:6, 58:23, 62:9, 72:21
**Mona** [1] - 17:11
**money** [28] - 18:7, 19:3, 19:10, 19:21, 20:6, 20:7, 20:16, 39:3, 39:12, 40:11, 40:14, 40:21, 40:24, 42:24, 43:14, 43:15, 44:1, 44:4, 44:21, 44:25, 48:21, 51:18, 75:6, 75:7, 75:8
**monopinization** [1] - 64:18
**monopolist** [2] - 69:1, 75:22
**monopolization** [2] - 64:18, 64:19
**monopolize** [1] - 64:19
**monopoly** [2] - 75:23, 75:24
**monopsony** [1] - 78:13
**Montevideo** [1] - 73:18
**Morgan** [1] - 50:22
**morning** [1] - 7:20
**Morning** [1] - 32:8
**Morrison** [4] - 21:24, 22:9, 22:13, 22:14
**most** [14] - 13:20, 14:3, 14:20, 17:23, 21:14, 25:11, 31:16, 33:9, 36:15, 45:17, 50:9, 54:2, 57:15, 77:21
**MOTION** [1] - 1:10
**motion** [13] - 12:8, 16:23, 18:4, 23:2, 23:7, 35:5, 38:1, 41:19, 45:24, 46:5, 49:6, 79:8, 79:9
**motions** [1] - 30:24
**Motorola** [1] - 61:22
**mouthful** [1] - 21:2
**move** [4] - 12:3, 40:4, 53:2, 70:18
**moved** [1] - 22:20
**moves** [1] - 34:15
**moving** [2] - 39:12, 58:23
**MR** [110] - 6:6, 6:9, 6:12, 6:14, 6:16,

6:18, 6:23, 7:2, 7:4, 7:7, 7:9, 7:11, 7:13, 7:15, 7:17, 7:20, 7:21, 8:2, 8:4, 8:7, 8:9, 8:11, 8:12, 8:15, 8:17, 9:5, 9:14, 9:19, 9:22, 10:1, 10:4, 10:10, 10:13, 10:16, 10:22, 11:16, 11:20, 11:23, 12:2, 12:5, 12:7, 15:12, 15:14, 24:21, 25:2, 25:5, 25:9, 25:11, 26:16, 28:15, 28:22, 32:6, 32:11, 32:18, 32:20, 33:22, 34:18, 34:20, 34:25, 35:3, 35:7, 38:20, 39:20, 39:21, 43:18, 43:22, 44:6, 44:20, 45:1, 45:19, 45:23, 48:11, 49:12, 51:6, 51:9, 51:12, 51:23, 53:21, 63:10, 63:11, 63:13, 63:16, 63:20, 63:22, 63:24, 67:5, 72:9, 72:12, 72:16, 72:19, 72:24, 73:3, 73:5, 73:8, 73:14, 74:21, 74:23, 78:4, 78:5, 78:7, 79:5, 79:17, 79:19, 80:1, 80:3, 80:6, 80:8, 80:11, 80:15, 81:7
**MS** [3] - 8:20, 8:24, 9:3
**multiple** [1] - 36:18

**N**

**Nabisco** [2] - 21:3, 52:3
**name** [6] - 6:13, 6:15, 7:25, 8:6, 8:8, 9:1
**named** [1] - 6:4
**NAPOUT** [1] - 3:8
**Napout** [5] - 8:16, 40:15, 47:17, 47:18, 48:16
**narrow** [2] - 76:21, 76:23
**narrowing** [1] - 77:6
**NASL** [1] - 26:5
**nature** [3] - 31:6, 70:22, 73:12
**NBA** [1] - 57:19
**NCAA** [4] - 69:22, 69:25, 76:24, 78:15
**necessarily** [13] - 16:15, 19:4, 34:8, 34:9, 42:3, 42:4,

42:7, 42:18, 42:20, 45:13, 71:12, 79:21
**necessary** [4] - 42:8, 51:4, 70:15, 77:10
**need** [2] - 69:10, 70:11
**needed** [1] - 10:3
**needs** [1] - 29:11
**never** [3] - 44:11, 49:5, 57:20
**new** [1] - 59:3
**New** [32] - 1:20, 2:23, 11:8, 11:15, 20:5, 20:9, 20:11, 20:16, 20:23, 22:17, 30:13, 30:17, 39:1, 39:3, 39:4, 39:5, 39:8, 39:9, 39:12, 39:13, 39:22, 40:3, 40:8, 40:12, 40:20, 40:21, 40:24, 50:22, 51:1, 51:2, 51:19
**next** [17] - 6:13, 16:2, 19:5, 19:6, 19:24, 26:1, 26:2, 26:21, 36:10, 46:15, 47:13, 47:22, 50:23, 56:10, 62:6, 81:12
**NFL** [4] - 57:18, 58:1, 58:2, 69:19
**NHL** [1] - 57:19
**nice** [2] - 7:19, 10:2
**Nice** [1] - 8:14
**Nick** [5] - 67:7, 67:17, 68:10, 76:2, 76:3
**night** [1] - 66:18
**NIT** [1] - 76:24
**NO** [1] - 1:2
**nobody** [1] - 15:1
**non** [2] - 52:5, 69:18
**non-substitutable** [1] - 69:18
**non-U.S** [1] - 52:5
**none** [1] - 57:6
**normally** [1] - 45:24
**North** [2] - 4:8, 82:8
**note** [1] - 70:24
**notes** [1] - 69:9
**nothing** [10] - 25:16, 26:9, 26:11, 26:12, 27:1, 61:16, 61:17, 81:7, 81:8
**notice** [1] - 23:4
**notion** [3] - 76:3, 77:10, 77:22
**Notwithstanding** [1] - 41:17
**number** [21] - 9:11, 12:14, 19:6, 19:7, 20:18, 25:15, 26:9, 31:21, 41:21, 41:22,

42:1, 45:8, 45:9, 49:16, 53:22, 59:7, 69:2, 69:16, 74:9, 74:13, 75:5
**NW** [1] - 2:8
**NY** [2] - 1:20, 2:23

**O**

**obligation** [3] - 57:5, 57:6, 58:22
**obtain** [2] - 18:6, 73:19
**obtained** [1] - 58:13
**obtaining** [1] - 48:9
**obvious** [3] - 21:20, 57:6, 57:10
**obviously** [10] - 10:5, 10:7, 10:24, 22:18, 29:19, 33:23, 38:18, 51:24, 53:21, 54:9
**occasions** [1] - 26:23
**occur** [5] - 21:12, 23:22, 24:7, 27:20, 71:15
**occurred** [8] - 22:12, 27:21, 28:5, 29:20, 60:8, 62:2, 62:11, 74:8
**occurs** [1] - 74:12
**OF** [1] - 1:1
**offense** [5] - 14:17, 18:3, 18:5, 19:9, 20:21
**offer** [2] - 26:18, 35:19
**offered** [3] - 13:11, 57:1, 67:20
**offering** [3] - 58:12, 67:24, 76:8
**offers** [7] - 18:13, 35:16, 45:13, 47:8, 47:9, 58:6, 70:25
**office** [2] - 39:16, 39:18
**OFFICER** [2] - 53:16, 53:18
**offices** [2] - 80:20, 80:21
**official** [5] - 4:7, 13:17, 27:23, 40:12, 40:25
**Official** [1] - 82:8
**officials** [7] - 13:24, 16:18, 40:5, 40:14, 41:8, 43:13, 51:21
**once** [2] - 21:9, 75:23
**One** [2] - 3:13, 4:4
**one** [74] - 6:21, 8:1, 9:8, 9:12, 10:18, 14:22, 14:24, 16:15,

17:19, 18:15, 19:6, 20:3, 20:4, 21:4, 25:13, 25:15, 26:8, 26:9, 28:3, 28:14, 31:23, 32:13, 34:3, 35:8, 36:21, 37:10, 37:15, 38:5, 39:4, 39:6, 39:12, 40:13, 41:21, 43:12, 43:16, 43:19, 43:25, 45:8, 47:3, 49:16, 50:6, 51:1, 51:2, 51:16, 51:25, 55:9, 55:10, 55:25, 56:5, 58:1, 59:1, 62:20, 63:14, 64:10, 65:20, 65:23, 67:3, 69:1, 69:14, 70:20, 71:3, 71:11, 71:17, 72:21, 74:6, 75:16, 75:23, 76:8, 76:14, 77:14, 77:19, 77:22, 80:16
**ones** [11] - 33:9, 35:15, 35:16, 44:1, 46:1, 47:15, 47:16, 47:17, 50:9
**operation** [1] - 42:15
**opinion** [3] - 29:22, 30:4, 73:11
**opportunity** [1] - 53:23
**opposition** [1] - 35:19
**optimistic** [1] - 63:22
**oral** [2] - 25:3, 81:9
**Orbe** [2] - 2:22, 7:24
**order** [2] - 28:25, 77:23
**organized** [1] - 73:16
**otherwise** [2] - 65:7, 65:24
**output** [2] - 68:15, 75:25
**outside** [7] - 21:8, 21:10, 22:2, 22:11, 22:20, 71:17, 79:1
**overview** [1] - 66:12
**owed** [6] - 13:3, 13:22, 13:23, 13:24, 15:1, 27:25
**own** [9] - 16:13, 18:19, 18:23, 18:24, 35:21, 42:17, 44:23, 58:2, 58:10
**owned** [1] - 71:8
**owners** [1] - 73:17

**P**

**P.A** [3] - 2:13, 2:18, 3:8

**p.m** [6] - 1:6, 6:1, 53:17, 81:18
**packaging** [1] - 72:4
**Paco** [2] - 48:1, 71:8
**Page** [7] - 5:3, 5:6, 5:18, 24:23, 32:14, 36:6, 42:5
**page** [3] - 10:12, 26:2, 50:10
**Pages** [1] - 1:8
**paid** [9] - 13:15, 34:10, 39:22, 39:24, 44:19, 44:21, 50:7, 75:4, 75:6
**paper** [1] - 24:19
**papers** [4] - 29:4, 53:23, 55:16, 61:13
**Paragraph** [7] - 40:2, 50:11, 65:19, 70:22, 73:14, 74:17, 80:19
**paragraph** [16] - 25:11, 26:1, 26:21, 26:22, 27:9, 27:10, 29:23, 30:22, 39:25, 40:6, 40:7, 40:13, 40:16, 50:23, 51:15, 74:3
**Paragraphs** [2] - 50:13, 50:15
**paragraphs** [7] - 24:13, 24:14, 24:22, 50:8, 50:14, 51:13, 77:13
**Paraguay** [1] - 28:1
**Paraguayan** [4] - 12:25, 13:1, 27:24, 27:25
**Park** [1] - 1:20
**part** [14] - 7:6, 17:17, 19:8, 19:9, 21:4, 29:22, 39:18, 50:12, 54:2, 54:23, 60:18, 71:23, 72:21, 72:24
**participate** [5] - 60:5, 60:6, 60:9, 60:21, 66:1
**participated** [2] - 26:6, 60:19
**particular** [4] - 56:17, 59:9, 69:19, 70:7
**particularly** [3] - 15:8, 24:2, 27:21
**PARTIES** [2] - 53:15, 81:17
**parties** [3] - 10:8, 37:12, 54:12
**partnered** [1] - 70:24
**Partners** [1] - 6:3
**partnership** [1] - 73:16

**party** [15] - 9:9, 13:2, 13:11, 17:25, 19:13, 47:24, 55:18, 55:25, 56:2, 56:5, 56:6, 62:20, 75:16, 75:17, 75:21
**Pasquantino** [4] - 22:9, 22:14, 22:15
**passing** [3] - 66:18, 75:6, 75:7
**past** [3] - 48:21, 49:2, 61:4
**patriots** [1] - 70:6
**Pause** [1] - 81:13
**pay** [9] - 13:11, 39:13, 44:16, 44:17, 44:18, 65:7, 65:8, 71:1, 71:10
**paying** [1] - 42:24
**payment** [5] - 13:12, 20:22, 29:20, 30:15
**payments** [21] - 27:13, 27:14, 30:1, 30:8, 30:12, 30:18, 31:6, 31:8, 39:2, 39:9, 50:12, 50:13, 50:15, 50:18, 50:19, 50:21, 50:24, 51:13, 51:14, 51:20
**peg** [3] - 54:4, 54:5, 64:3
**Penthouse** [1] - 3:20
**people** [7] - 14:18, 16:9, 25:19, 34:5, 40:14, 46:24, 70:5
**per** [2] - 67:11, 68:10
**percent** [5] - 25:14, 25:23, 25:24, 32:25, 49:25
**perfectly** [1] - 67:22
**perhaps** [5] - 30:24, 39:8, 50:1, 63:22, 79:19
**period** [2] - 49:4, 73:21
**periods** [1] - 47:9
**permission** [4] - 28:16, 61:14, 63:25, 73:15
**permit** [1] - 52:5
**permitted** [1] - 69:20
**person** [2] - 19:24, 43:6
**personally** [1] - 71:20
**perspective** [1] - 56:7
**persuasive** [1] - 21:14
**phase** [1] - 45:22
**phrase** [1] - 77:16
**physical** [2] - 80:20, 80:21

**picture** [1] - 43:17
**pie** [1] - 59:15
**pieces** [2] - 29:2, 76:14
**Pitt** [6] - 7:1, 9:19, 53:2, 53:20, 63:9, 74:22
**PITT** [6] - 2:7, 7:2, 53:21, 63:10, 74:23, 78:4
**Pitts** [1] - 70:19
**place** [1] - 73:18
**plagued** [1] - 54:2
**plainly** [2] - 34:20, 36:24
**plaintiff** [8] - 16:24, 36:6, 36:9, 36:10, 38:6, 52:5, 69:12, 77:2
**Plaintiff** [9] - 1:5, 13:22, 13:23, 36:17, 43:2, 45:18, 46:25, 73:15
**PLAINTIFF** [2] - 1:14, 5:3
**Plaintiffs** [22] - 6:5, 6:7, 9:10, 15:11, 16:15, 17:2, 17:9, 17:20, 26:17, 28:16, 28:25, 31:5, 43:12, 43:13, 45:18, 48:9, 52:8, 52:24, 56:18, 79:14, 79:18, 80:19
**Plaintiffs'** [7] - 5:10, 14:25, 16:13, 27:3, 28:13, 43:16, 62:8
**planning** [1] - 9:16
**plausibility** [1] - 23:11
**plausible** [1] - 48:10
**plausibly** [2] - 69:10, 70:13
**Play** [2] - 45:5, 71:18
**played** [4] - 15:21, 26:8, 26:19, 26:23
**player** [2] - 75:3, 75:9
**players** [1] - 65:25
**plays** [1] - 70:4
**pleaded** [1] - 12:10
**pleading** [1] - 56:18
**pled** [2] - 12:15, 15:8
**PLLC** [1] - 3:12
**plural** [1] - 34:24
**plus** [1] - 13:15
**pocket** [3] - 13:17, 41:7, 51:21
**pockets** [1] - 16:17
**podium** [1] - 79:12
**point** [30] - 16:22, 26:25, 34:6, 41:5, 41:6, 46:17, 49:12,

52:1, 52:14, 54:11, 55:23, 56:10, 57:25, 58:21, 67:6, 71:11, 74:6, 74:25, 75:2, 75:13, 76:1, 76:7, 77:7, 78:8, 78:9, 78:15, 80:16
**pointed** [2] - 71:4, 77:15
**pointing** [3] - 48:12, 60:4, 62:25
**points** [10] - 28:2, 48:7, 53:22, 53:25, 63:8, 74:24, 76:16, 77:9, 78:1, 79:2
**policies** [2] - 17:16, 19:17, 33:7
**policy** [5] - 14:14, 14:15, 41:20, 43:4, 52:1
**portion** [4] - 29:24, 29:25, 61:24, 71:2
**position** [4] - 35:24, 37:21, 59:22, 65:6
**possible** [3] - 15:22, 49:13, 71:19
**possibly** [1] - 46:16
**post** [1] - 76:18
**post-season** [1] - 76:18
**postseason** [4] - 69:24, 70:1, 78:16, 78:18
**POULOS** [1] - 8:24
**power** [1] - 75:24
**practices** [1] - 56:16
**PRE** [1] - 5:9
**precedent** [2] - 21:16, 57:23
**predated** [1] - 22:9
**predicate** [11] - 12:13, 12:17, 13:5, 13:19, 18:3, 18:5, 31:15, 38:18, 38:24, 50:12, 54:23
**predicates** [3] - 20:4, 20:10, 37:17
**prepared** [1] - 11:23
**present** [3] - 37:5, 53:3, 75:12
**presented** [1] - 81:10
**presenting** [1] - 49:23
**presumably** [2] - 37:13, 49:23
**presumed** [3] - 23:5, 75:22
**presumption** [2] - 21:5, 75:16
**pretty** [13] - 10:8, 11:13, 12:8, 12:19,

20:1, 27:21, 46:21, 46:22, 61:19, 61:20, 61:22, 65:11, 75:15
**prevail** [1] - 38:3
**prevent** [1] - 50:3
**previously** [1] - 68:14
**price** [5] - 54:25, 67:20, 67:21, 68:17, 68:20
**pricing** [1] - 75:24
**primarily** [1] - 56:13
**primary** [1] - 79:7
**principal** [8] - 12:22, 13:1, 20:15, 20:19, 27:25, 41:4, 73:18
**principles** [2] - 14:9, 14:22
**probe** [1] - 45:21
**problem** [5] - 10:11, 49:21, 53:9, 60:22, 76:19
**problems** [3] - 49:16, 59:7, 61:2
**procedures** [1] - 37:11
**proceeding** [1] - 49:1
**proceedings** [4] - 6:1, 81:13, 81:18, 82:3
**Proceedings.............**
**.........................** [1] -
5:19
**process** [1] - 36:21
**procompetitive** [5] -
67:16, 67:21, 67:25, 68:5, 76:4
**procured** [1] - 15:13
**produce** [1] - 65:24
**produced** [1] - 66:3
**product** [2] - 65:25, 66:2
**Productura** [1] - 50:25
**professional** [1] - 26:4
**profile** [2] - 70:3, 70:14
**profit** [2] - 17:10, 17:14
**profits** [1] - 38:12
**program** [1] - 60:12
**programming** [8] -
58:8, 62:15, 63:2, 64:14, 64:16, 65:21, 66:9, 68:13
**programs** [1] - 63:1
**projects** [1] - 33:3
**pronounce** [1] - 7:12
**proof** [1] - 25:9
**properly** [2] - 54:25, 58:20
**property** [2] - 18:7, 19:11
**proposition** [1] - 77:5

**protect** [1] - 18:22
**prove** [1] - 38:7
**provision** [1] - 40:6
**proximate** [10] - 11:2, 29:16, 31:11, 34:1, 36:3, 36:14, 41:19, 50:4, 53:7, 79:10
**purchase** [3] - 60:23, 63:2, 64:12
**purchaser** [6] - 59:1, 60:2, 65:6, 74:4, 74:5, 76:9
**purchasers** [5] -
37:22, 63:1, 63:4, 66:9, 68:17
**purchasing** [9] - 59:7, 72:7, 72:18, 72:19, 73:13, 74:11, 77:16, 77:24, 78:24
**purposes** [2] - 34:13, 57:19
**pushing** [1] - 75:24
**put** [9] - 16:8, 24:25, 36:16, 52:15, 65:24, 69:7, 71:11, 71:21, 77:1
**putatively** [1] - 60:14
**putting** [1] - 65:6

---

## Q

**qualify** [2] - 59:25, 77:25
**quality** [4] - 65:21, 68:15, 68:21, 75:3
**quantifying** [1] - 38:12
**quantity** [4] - 44:1, 44:2, 65:21, 68:20
**questions** [13] - 9:25, 10:5, 10:24, 14:15, 28:11, 38:15, 57:14, 63:7, 69:5, 70:18, 74:19, 79:11, 80:8
**quibble** [1] - 35:4
**quickly** [1] - 78:5
**quid** [1] - 49:3
**quintessentially** [1] -
75:17
**quite** [6] - 10:18, 44:25, 62:11, 72:3, 75:14, 81:10
**quo** [1] - 49:3
**quote** [3] - 63:5, 69:10, 77:13
**quoted** [1] - 77:14

---

## R

**raise** [3] - 35:4, 56:10, 67:6

**raised** [3] - 53:22, 74:6, 76:17
**Ramon** [1] - 9:5
**RAMON** [1] - 4:2
**ramon.abadin@**
**sedgwicklaw.com**
[1] - 4:5
**rather** [4] - 30:7, 66:6, 76:9, 76:22
**rationales** [1] - 43:4
**Ray** [1] - 59:24
**Re** [1] - 59:24
**reach** [1] - 14:11
**read** [2] - 11:17, 73:15
**reads** [2] - 14:8, 17:4
**ready** [1] - 11:17
**real** [4] - 29:10, 43:25, 54:11, 81:1
**realize** [1] - 11:17
**really** [29] - 10:6, 10:23, 11:8, 13:8, 15:6, 22:6, 29:16, 31:25, 33:12, 34:2, 37:22, 39:15, 43:7, 43:24, 50:9, 54:7, 54:17, 55:6, 55:22, 58:7, 58:9, 61:10, 62:25, 68:25, 70:11, 74:16, 76:25, 77:9, 77:20
**reason** [10] - 21:20, 22:11, 42:5, 44:6, 46:23, 48:15, 67:15, 67:19, 68:2, 68:5
**reasonably** [2] -
21:20, 62:7
**reasoning** [1] - 29:24
**reasons** [5] - 23:20, 41:20, 53:7, 54:8, 69:3
**rebut** [1] - 77:10
**rebuttal** [1] - 28:13
**receive** [1] - 27:13
**received** [4] - 34:17, 35:17, 48:21, 51:17
**receiving** [1] - 30:1
**recent** [1] - 48:8
**recess** [3] - 51:8, 53:13, 53:17
**recipient** [1] - 48:17
**recipients** [2] - 51:15, 51:17
**recognize** [1] - 36:23
**recognized** [4] - 57:9, 59:2, 69:17, 78:17
**recognizes** [1] - 74:13
**recover** [1] - 34:8
**recovering** [1] - 34:5
**recovery** [3] - 33:15, 41:16, 41:18

**recruitment** [1] - 75:9
**redounds** [1] - 55:14
**refer** [1] - 64:11
**reference** [6] - 21:18, 22:1, 57:8, 59:13, 72:6, 77:8
**referenced** [1] - 33:14
**referred** [3] - 29:5, 32:8, 72:25
**referring** [3] - 30:3, 32:5, 50:8
**refers** [1] - 78:24
**refusal** [3] - 54:17, 55:6, 55:7
**regard** [2] - 48:8, 61:11
**regardless** [1] - 48:24
**regime** [1] - 19:5
**region** [1] - 70:4
**regulations** [1] - 45:12
**related** [1] - 27:14
**relates** [1] - 11:8
**relating** [1] - 42:12
**relation** [1] - 36:12
**relationship** [10] -
11:2, 12:7, 12:16, 14:10, 20:2, 46:12, 67:17, 68:1, 68:4, 70:23
**relevant** [6] - 21:12, 23:21, 23:23, 24:14, 33:20, 73:20
**reliance** [2] - 17:25, 69:8
**reliant** [1] - 19:13
**relied** [6] - 25:12, 26:22, 27:15, 36:7, 40:13, 79:10
**relies** [2] - 21:15, 76:3
**rely** [2] - 40:17, 79:7
**relying** [2] - 41:20, 76:7
**remains** [1] - 78:15
**remarks** [1] - 38:18
**remedies** [1] - 52:6
**remote** [1] - 75:11
**reply** [5] - 17:5, 62:16, 67:6, 78:20, 79:8
**REPORTED** [1] - 4:7
**Reporter** [2] - 4:7, 82:8
**Reporter's** [1] - 5:19
**require** [2] - 20:12, 47:15
**required** [7] - 14:1, 16:24, 20:16, 24:8, 51:3, 57:16, 77:17
**requirement** [1] -
36:15
**requires** [1] - 62:24

**Research** [2] - 75:15, 76:6
**resolve** [1] - 46:3
**resolved** [1] - 36:2
**resolving** [1] - 49:6
**respect** [2] - 78:14, 78:25
**respectfully** [1] - 74:3
**respectively** [1] -
64:10
**response** [1] - 74:24
**rest** [2] - 64:4, 80:9
**restraining** [1] - 60:7
**restraint** [5] - 60:7, 60:21, 62:2, 62:3, 64:9
**result** [9] - 13:10, 14:11, 15:20, 36:19, 42:25, 54:19, 55:4, 64:22, 68:6
**retain** [1] - 79:24
**retention** [1] - 75:9
**returned** [1] - 23:5
**reverse** [1] - 28:24
**review** [1] - 63:25
**Rey** [3] - 23:16, 26:19, 26:22
**rgaither@rkollp.com**
[1] - 2:24
**Richards** [2] - 2:22, 7:24
**RICO** [22] - 9:16, 10:6, 10:23, 12:9, 12:17, 16:24, 28:14, 28:18, 31:23, 33:25, 36:13, 38:14, 46:10, 46:22, 50:4, 51:8, 52:4, 52:7, 52:20, 53:8, 79:14, 79:22
**rig** [1] - 55:1
**rights** [70] - 15:3, 15:4, 15:5, 15:9, 15:20, 15:25, 16:11, 16:14, 17:7, 17:8, 17:12, 26:18, 35:8, 37:23, 38:4, 47:23, 52:18, 52:25, 53:3, 55:19, 55:21, 56:1, 56:4, 58:13, 58:14, 58:15, 58:18, 58:19, 58:20, 59:16, 59:18, 59:19, 59:21, 60:5, 60:20, 60:23, 61:15, 61:17, 61:24, 62:10, 64:12, 64:20, 65:5, 65:8, 66:8, 66:11, 66:25, 68:23, 70:25, 71:2, 71:10, 71:13, 71:17, 72:4, 73:19, 73:23, 74:1, 75:13, 75:20,

78:11, 78:23, 79:1,
80:23, 80:25, 81:4
**rigidly** [1] - 59:4
**rise** [4] - 53:16, 53:18,
62:8, 63:6
**risk** [2] - 15:17, 41:18
**RJR** [3] - 21:3, 23:21,
52:3
**ROMERO** [36] - 2:6,
9:14, 9:19, 9:22,
10:1, 10:4, 10:10,
10:13, 10:16, 10:22,
11:16, 11:20, 11:23,
12:2, 12:5, 12:7,
15:12, 15:14, 24:21,
25:2, 25:5, 25:9,
25:11, 26:16, 39:21,
43:18, 43:22, 44:6,
44:20, 45:1, 45:19,
45:23, 51:9, 51:12,
79:5, 79:17
**Romero** [11] - 7:1,
9:15, 10:20, 18:19,
18:20, 38:19, 48:8,
50:7, 51:7, 79:4,
79:20
**rotate** [1] - 18:14
**rotational** [2] - 19:23,
41:25
**round** [3] - 54:4, 54:6,
64:3
**route** [1] - 29:7
**ROWAN** [2] - 2:21, 8:4
**Rowan** [4] - 7:23, 8:2,
51:23, 80:15
**RPR** [2] - 4:7, 82:7
**rstumphauzer@**
**sslawyers.com** [1] -
3:14
**rule** [6] - 18:22, 59:2,
59:3, 60:1, 67:14,
68:5
**ruled** [1] - 22:18
**ruling** [1] - 76:18
**RYAN** [1] - 3:12
**Ryan** [1] - 8:18

---

# S

**S-E-B-R-O-W** [1] - 8:9
**S.A** [1] - 2:19
**sale** [1] - 62:3
**sales** [1] - 74:7
**sam@spertuslaw.**
**com** [1] - 3:18
**Samuel** [1] - 8:18
**SAMUEL** [1] - 3:15
**SANCHEZ** [2] - 3:8,
8:15
**Sanchez** [1] - 8:16

---

sanchezfo@gtlaw.
**com** [1] - 3:10
**sanctioned** [1] - 26:6
**Sand** [2] - 76:2, 76:3
**Sands** [3] - 67:7,
67:17, 68:10
**satisfied** [2] - 20:2,
70:12
**satisfies** [1] - 74:3
**satisfy** [1] - 60:8
**scenario** [1] - 62:13
**SCHACHTER** [6] -
2:18, 7:21, 8:2, 8:4,
8:9, 8:11
**Schachter** [4] - 2:18,
7:22, 7:23, 8:1
**scheme** [11] - 13:2,
24:5, 24:6, 24:11,
25:18, 27:2, 27:10,
27:16, 28:5, 28:8,
48:17
**schemes** [3] - 23:14,
24:15
**scope** [1] - 26:14
**screen** [1] - 24:20
**se** [2] - 67:11, 68:10
**season** [1] - 76:18
**seated** [1] - 53:19
**Sebrow** [1] - 8:7
**SEBROW** [1] - 2:22
**second** [10] - 7:25,
11:5, 22:21, 32:13,
32:14, 34:3, 49:21,
65:4, 66:13, 71:23
**Second** [1] - 2:14
**secondary** [2] - 15:6
**secret** [1] - 10:19
**Section** [3] - 64:8,
64:18, 64:24
**secured** [1] - 27:14
**securities** [1] - 21:25
**SECURITY** [2] - 53:16,
53:18
**sedgwick** [1] - 4:3
**see** [6] - 7:19, 9:1,
9:21, 39:25, 44:20,
65:4
**seeking** [1] - 74:1
**selection** [1] - 10:20
**sell** [1] - 64:14
**seller** [1] - 76:8
**sellers** [1] - 65:15
**selling** [3] - 62:13,
62:14, 64:15
**sense** [6] - 13:4,
14:15, 20:8, 45:25,
57:25, 64:6
**sentence** [3] - 25:12,
26:21, 36:16
**separate** [3] - 77:12,

---

78:19, 79:6
**sequence** [1] - 12:4
**series** [1] - 37:2
**served** [1] - 73:25
**services** [19] - 12:20,
12:21, 13:2, 13:3,
13:19, 13:21, 14:2,
15:1, 17:18, 17:19,
18:5, 20:4, 20:13,
20:25, 24:2, 27:22,
29:18, 42:10
**set** [14] - 18:11, 18:22,
37:11, 46:21, 46:22,
47:13, 48:14, 52:2,
56:1, 57:14, 71:25,
74:4, 75:2, 76:20
**SETH** [1] - 1:18
**Seth** [3] - 6:10, 6:14,
28:15
**several** [3] - 6:3, 22:9,
26:23
**sfarber@winston.**
**com** [1] - 1:21
**sgillman@shutts.**
**com** [1] - 1:17
**Shapiro** [1] - 6:23
**SHAPIRO** [6] - 2:2,
6:23, 7:4, 7:7, 7:9,
7:11
**share** [1] - 25:14
**Sherman** [3] - 64:8,
64:18, 64:24
**ships** [1] - 66:18
**short** [5] - 30:6, 49:19,
61:9, 62:17, 78:8
**shortly** [1] - 48:6
**show** [5] - 17:9, 46:1,
52:19, 59:14, 66:20
**showing** [4] - 22:25,
46:2, 48:9, 51:16
**Shutts** [3] - 1:14, 6:7,
6:9
**sic** [1] - 70:19
**side** [2] - 20:22, 64:13
**sign** [1] - 21:1
**significance** [1] - 70:4
**significant** [2] - 25:25,
66:24
**similar** [3] - 21:16,
21:24, 68:15
**similarly** [2] - 28:17,
31:22
**simple** [1] - 13:4
**simply** [5] - 36:16,
55:2, 57:4, 72:6,
72:17
**sit** [1] - 11:16
**sits** [1] - 66:7
**Sitterson** [1] - 2:3
**sitting** [2] - 27:23,

---

75:13
**situated** [1] - 31:22
**situation** [15] - 32:21,
36:11, 42:8, 49:6,
50:5, 55:7, 55:8,
55:24, 67:8, 67:10,
67:11, 67:24, 68:14,
68:23
**six** [1] - 65:13
**skate** [1] - 61:3
**slightly** [1] - 65:18
**Sloman** [1] - 3:12
**slowly** [1] - 21:2
**small** [6] - 32:22,
32:23, 32:24, 33:7,
49:24
**Soccer** [2] - 26:4, 26:6
**soccer** [7] - 26:4,
27:23, 58:4, 58:5,
70:4, 70:7, 73:20
**sold** [3] - 15:3, 15:4,
15:5
**solicit** [1] - 16:9
**someday** [1] - 10:21
**someone** [3] - 15:17,
31:16, 39:18
**Somerton** [1] - 50:21
**sometimes** [1] - 12:19
**somewhat** [1] - 28:17
**somewhere** [3] - 16:6,
28:1, 28:6
**soon** [1] - 81:15
**sorry** [9] - 6:8, 26:20,
32:4, 42:24, 47:3,
66:23, 68:20, 72:12,
74:5
**sort** [21] - 14:9, 17:15,
29:21, 30:2, 30:20,
33:2, 37:2, 37:18,
42:8, 51:3, 54:3,
55:2, 57:2, 61:10,
66:20, 67:16, 69:17,
70:9, 72:4, 75:12,
78:18
**sorts** [1] - 33:3
**soul** [1] - 9:13
**sounds** [3] - 10:4,
16:21, 46:16
**South** [16] - 1:15, 3:4,
3:16, 4:3, 12:25,
27:23, 27:24, 40:16,
41:1, 41:5, 41:8,
41:13, 51:18, 70:3,
70:6, 70:7
**Southeast** [2] - 2:14,
3:13
**Southern** [1] - 39:9
**SOUTHERN** [1] - 1:1
**Spanish** [1] - 70:5
**Spanish-speaking** [1]

---

- 70:5
**SPE** [2] - 36:10, 42:13
**speaking** [2] - 56:15,
70:5
**specific** [6] - 30:8,
30:21, 31:4, 31:5,
56:16, 77:10
**specifically** [4] -
25:12, 29:25, 58:5,
70:22
**specify** [1] - 57:6
**speculate** [2] - 45:20,
48:2
**speculation** [8] -
16:23, 46:1, 46:2,
46:4, 46:17, 46:18,
47:5, 47:15
**speculative** [4] -
16:21, 37:19, 38:2,
75:11
**spell** [5] - 6:15, 7:8,
8:3, 8:8, 55:17
**spells** [1] - 61:22
**spend** [4] - 11:5, 11:6,
50:6, 75:9
**spertus** [1] - 3:16
**split** [2] - 21:13, 29:6
**sport** [1] - 57:21
**sports** [4] - 58:3,
69:15, 69:16
**SPORTS** [2] - 1:7,
3:20
**Sports** [41] - 6:2, 6:3,
8:21, 35:9, 35:12,
35:20, 35:21, 40:4,
48:1, 52:9, 52:14,
52:19, 52:21, 53:6,
59:6, 59:12, 59:14,
59:19, 60:17, 60:19,
60:25, 61:16, 62:5,
70:20, 70:24, 71:25,
72:3, 72:5, 72:15,
73:16, 73:19, 73:21,
73:24, 73:25, 77:11,
77:15, 78:22, 80:24,
81:2
**spot** [2] - 39:12, 39:13
**square** [3] - 54:4,
54:5, 64:3
**squarely** [1] - 55:23
**stage** [4] - 35:5, 56:18,
70:11, 70:16
**stand** [4] - 17:21,
40:19, 47:16, 77:5
**standard** [11] - 23:8,
23:11, 30:25, 31:3,
31:18, 36:4, 70:16,
71:24, 71:25, 72:1,
74:16
**standards** [2] - 23:7,

74:4
**standing** [14] - 9:20, 30:13, 34:23, 35:1, 35:6, 35:11, 52:13, 53:23, 58:23, 61:2, 70:18, 70:19, 75:2, 77:7
**stands** [1] - 23:3
**Star** [1] - 32:8
**start** [9] - 12:2, 12:12, 12:18, 28:25, 34:7, 37:7, 48:12, 54:1, 72:23
**started** [3] - 17:17, 29:15
**starting** [2] - 37:3, 50:10
**state** [15] - 6:5, 9:16, 9:24, 20:5, 20:10, 20:11, 20:16, 20:24, 28:19, 30:17, 63:19, 79:6, 79:14, 79:15, 79:25
**statement** [1] - 21:7
**States** [17] - 22:13, 22:15, 25:13, 26:5, 28:9, 30:9, 30:10, 30:11, 30:22, 31:9, 41:6, 41:12, 61:1, 61:16, 61:18, 82:8
**STATES** [2] - 1:1, 1:11
**status** [1] - 42:13
**statute** [32] - 11:11, 12:14, 19:25, 20:12, 20:13, 20:24, 21:6, 21:7, 21:10, 21:12, 21:18, 21:25, 22:2, 22:10, 22:19, 23:22, 23:24, 24:1, 24:3, 24:6, 25:17, 26:10, 27:5, 27:20, 29:4, 30:17, 39:1, 41:2, 61:9
**statutory** [1] - 21:17
**Stearns** [1] - 6:24
**stearns** [1] - 2:3
**step** [12] - 15:23, 16:2, 21:4, 21:11, 21:13, 22:21, 34:3, 37:18, 59:25, 62:24, 74:12, 77:23
**STEPHANIE** [2] - 4:7, 82:7
**Stephanie** [1] - 6:20
**Stephanie_McCarn @flsd.uscourts. gov** [1] - 4:10
**STEPHEN** [1] - 1:14
**steps** [8] - 15:7, 16:13, 17:14, 19:22, 19:23,

46:16, 75:5, 75:9
**Steve** [2] - 6:7, 6:9
**still** [6] - 17:9, 21:11, 48:25, 49:1, 49:19, 55:5
**stood** [1] - 46:6
**stop** [2] - 14:7, 70:17
**straight** [1] - 14:5
**Straits** [1] - 44:11
**straits** [1] - 44:11
**Strawn** [2] - 1:19, 6:10
**street** [1] - 30:14
**Street** [4] - 2:4, 2:8, 2:14, 2:23
**strictly** [1] - 79:25
**stringent** [1] - 12:8
**stuck** [1] - 40:18
**stuff** [3] - 28:23, 39:24, 40:20
**STUMPHAUZER** [2] - 3:12, 8:17
**Stumphauzer** [1] - 8:18
**stumphauzer** [1] - 3:12
**subdivisions** [1] - 69:21
**subject** [1] - 64:1
**sublicense** [4] - 59:18, 59:22, 68:24, 74:8
**sublicensed** [1] - 80:24
**sublicensee** [1] - 75:19
**sublicensing** [3] - 66:7, 71:13, 74:15
**submit** [3] - 18:18, 18:22, 74:3
**submitted** [2] - 52:15, 55:20
**substantial** [1] - 62:7
**substitutable** [3] - 69:18, 76:25, 77:1
**substitutes** [2] - 57:7, 57:10
**substituting** [1] - 69:1
**subway** [1] - 39:17
**succeed** [1] - 71:18
**Sudamericana** [3] - 23:16, 26:7, 26:20
**sue** [3] - 63:3, 63:4, 75:2
**suffer** [1] - 43:9
**suffered** [2] - 33:18, 61:1
**suffers** [2] - 33:17, 33:18
**sufficient** [3] - 23:6, 36:14, 52:23

**suggest** [3] - 22:10, 69:10, 70:13
**suggesting** [1] - 57:20
**suing** [1] - 43:6
**Suite** [8] - 1:15, 2:4, 2:14, 2:19, 3:4, 3:13, 3:16, 4:4
**superb** [1] - 81:9
**superseding** [1] - 24:13
**suppliers** [1] - 55:10
**supply** [1] - 36:9
**support** [1] - 61:6
**supporting** [1] - 72:25
**supposed** [8] - 14:7, 14:8, 14:22, 21:10, 28:7, 43:5, 44:7, 77:14
**supposedly** [1] - 39:22
**Supreme** [18] - 11:3, 17:23, 19:18, 19:19, 21:4, 21:16, 21:24, 22:7, 22:8, 22:13, 23:10, 41:16, 41:17, 42:6, 46:9, 47:2, 52:2
**suspect** [1] - 17:21
**Switzerland** [1] - 50:19
**system** [4] - 18:12, 18:13, 19:23, 41:25

---

**T**

**T&T** [24] - 3:20, 8:21, 13:11, 13:15, 15:3, 16:3, 16:16, 43:13, 44:3, 44:15, 44:16, 44:21, 45:5, 47:11, 49:15, 50:16, 55:22, 62:4, 65:1, 65:6, 66:7, 66:23, 67:24, 80:20
**T&T's** [1] - 50:20
**table** [2] - 6:10, 44:5
**talks** [1] - 22:14
**task** [1] - 63:17
**tax** [2] - 18:8, 18:9
**teams** [5] - 26:7, 26:19, 66:1, 75:8
**television** [10] - 64:14, 64:16, 65:4, 65:21, 66:9, 66:25, 68:13, 73:19, 73:22, 74:1
**terminate** [1] - 16:1
**terms** [4] - 17:3, 50:6, 57:15, 75:19
**test** [19] - 11:2, 12:7, 12:8, 12:11, 12:12,

14:5, 14:6, 14:10, 14:19, 20:2, 21:4, 31:16, 33:12, 46:13, 46:18, 59:4, 60:8, 62:1, 78:23
**thankfully** [1] - 41:16
**THE** [118] - 1:10, 1:14, 2:2, 2:12, 2:18, 3:2, 3:8, 3:12, 3:19, 4:2, 5:3, 5:6, 6:2, 6:8, 6:13, 6:15, 6:19, 7:3, 7:5, 7:8, 7:10, 7:12, 7:14, 7:16, 7:19, 7:25, 8:3, 8:5, 8:8, 8:10, 8:14, 8:23, 9:1, 9:4, 9:7, 9:18, 9:21, 9:23, 10:2, 10:9, 10:11, 10:15, 10:18, 11:13, 11:19, 11:22, 12:1, 12:4, 12:6, 15:10, 15:13, 24:18, 24:25, 25:3, 25:7, 25:10, 26:15, 28:12, 28:21, 32:4, 32:8, 32:16, 32:19, 33:21, 34:16, 34:19, 34:22, 35:2, 35:6, 38:17, 39:19, 43:11, 43:20, 43:24, 44:19, 44:24, 45:16, 45:20, 48:5, 49:11, 51:5, 51:7, 51:11, 51:22, 53:12, 53:19, 63:9, 63:12, 63:15, 63:18, 63:21, 63:23, 67:3, 72:8, 72:10, 72:14, 72:17, 72:22, 73:2, 73:4, 73:7, 73:9, 74:20, 74:22, 78:3, 78:6, 79:3, 79:13, 79:18, 79:24, 80:2, 80:5, 80:7, 80:10, 80:12, 81:5, 81:8, 81:14
**themselves** [2] - 49:24, 63:5
**theoretical** [1] - 43:8
**theoretically** [1] - 42:22
**there'd** [1] - 30:16
**there're** [1] - 49:15
**they've** [7] - 22:5, 44:11, 56:21, 57:1, 62:13, 71:3, 81:3
**third** [3] - 8:6, 64:15, 78:20
**Third** [1] - 3:13
**thoroughly** [2] - 10:8, 80:10
**three** [11] - 23:17, 26:18, 57:13, 58:5,

64:8, 64:10, 64:17, 64:23, 67:2, 68:5, 79:2
**thwarted** [1] - 33:8
**tied** [1] - 15:20
**title** [1] - 74:14
**Tobin** [1] - 7:1
**TOBIN** [2] - 2:6
**Toby** [2] - 9:15, 18:19
**today** [1] - 81:10
**together** [2] - 44:3, 55:9
**took** [3] - 20:15, 40:1, 73:24
**topics** [1] - 63:8
**TORNEOS** [1] - 2:18
**Torneos** [5] - 7:22, 45:4, 51:23, 51:24, 80:15
**tortious** [1] - 79:23
**touched** [1] - 63:19
**tournament** [5] - 26:8, 64:17, 66:11, 70:10, 76:24
**tournaments** [16] - 23:17, 56:23, 56:24, 57:13, 58:6, 58:16, 65:22, 66:6, 69:24, 70:1, 73:23, 74:2, 76:19, 76:22, 78:16
**Tower** [2] - 2:14, 4:4
**town** [1] - 39:18
**trade** [1] - 64:9
**tranche** [2] - 47:12, 47:22
**transaction** [6] - 40:10, 51:4, 62:1, 74:12, 77:13, 78:25
**transcription** [1] - 82:3
**transfer** [2] - 27:14, 61:24
**transferred** [1] - 61:15
**transfers** [1] - 50:16
**Traurig** [2] - 3:8, 8:16
**Travel** [2] - 20:7
**treble** [3] - 46:23, 52:6, 54:6
**trial** [2] - 23:14, 38:3
**trials** [1] - 36:1
**tried** [1] - 61:3
**trips** [1] - 40:1
**TRomero@wc.com** [1] - 2:10
**true** [9] - 30:23, 31:21, 34:14, 37:10, 37:25, 70:21, 71:4, 73:11, 76:5
**truly** [2] - 15:6, 35:12
**try** [2] - 51:9, 63:16

**trying** [8] - 14:16, 25:22, 33:7, 35:4, 52:24, 52:25, 54:4, 60:15
**Tube** [1] - 59:24
**tune** [1] - 68:8
**turn** [7] - 35:25, 64:21, 66:14, 69:5, 70:23, 73:6, 74:15
**turned** [2] - 31:7, 36:20
**turning** [2] - 31:11, 36:3
**Twelfth** [3] - 2:8, 4:8, 82:8
**two** [36] - 10:6, 10:23, 11:1, 12:14, 18:15, 19:7, 21:4, 23:20, 25:15, 26:7, 26:8, 29:2, 34:4, 39:14, 41:20, 41:22, 43:13, 45:9, 47:8, 47:9, 49:16, 61:10, 64:12, 65:20, 65:23, 66:6, 66:18, 67:2, 68:4, 71:8, 71:19, 74:7, 74:12, 76:22
**two-part** [1] - 21:4
**two-step** [1] - 74:12
**TyC** [1] - 45:3
**type** [7] - 16:23, 31:13, 33:16, 37:14, 69:14, 78:19
**types** [1] - 33:20
**TYT** [2] - 80:24

**U**

**U.S** [27] - 21:11, 24:7, 25:23, 26:3, 26:4, 26:7, 26:23, 27:12, 27:15, 27:18, 30:1, 40:3, 40:10, 40:11, 52:5, 53:3, 54:6, 59:18, 61:12, 61:21, 61:25, 62:7, 64:14, 70:5, 71:2, 71:10
**UK** [1] - 52:16
**ultimate** [1] - 75:19
**ultimately** [6] - 17:1, 27:17, 29:6, 37:1, 40:24, 75:4
**Umhofer** [1] - 3:16
**uncertainty** [1] - 15:21
**under** [35] - 12:25, 13:1, 14:1, 15:9, 15:15, 19:5, 20:16, 23:20, 27:24, 37:8, 41:9, 42:17, 43:1, 44:4, 46:10, 47:25,

52:7, 57:5, 57:15, 57:21, 57:23, 59:23, 60:2, 62:13, 62:21, 64:17, 67:14, 68:5, 70:15, 73:17, 75:10, 75:25, 76:10
**underbidding** [1] - 43:1
**underlie** [1] - 14:9
**underlying** [1] - 20:9
**undermine** [1] - 61:7
**understood** [1] - 73:3
**undertaken** [1] - 52:22
**UNITED** [2] - 1:1, 1:11
**United** [17] - 22:12, 22:15, 25:13, 26:5, 28:9, 30:9, 30:10, 30:11, 30:22, 31:9, 41:6, 41:12, 61:1, 61:16, 61:18, 82:8
**unless** [6] - 59:1, 61:17, 69:4, 70:17, 74:19
**unsuccessful** [1] - 48:9
**up** [30] - 9:12, 9:13, 14:10, 15:20, 16:10, 17:11, 17:16, 17:21, 18:11, 18:13, 18:22, 22:25, 23:3, 24:24, 24:25, 37:11, 40:19, 40:25, 42:24, 43:14, 46:6, 47:16, 49:9, 49:12, 52:25, 68:18, 68:22, 69:9, 73:9, 74:14
**upheld** [2] - 31:23, 33:25
**upholds** [1] - 36:11
**upstream** [7] - 58:10, 60:5, 60:20, 62:9, 64:11, 64:20, 68:4
**urge** [1] - 22:22
**Uruguay** [3] - 52:15, 58:16, 73:18
**US** [1] - 79:1
**USSF** [1] - 26:6

**V**

**vague** [1] - 27:7
**Valente** [1] - 50:24
**valid** [2] - 23:5, 50:4
**validity** [1] - 20:9
**value** [1] - 72:3
**variants** [1] - 54:18
**various** [2] - 27:10, 74:10
**Venezuela** [1] - 58:16
**version** [3] - 39:16,

49:8
**versus** [2] - 68:5, 69:14
**vertical** [1] - 77:23
**victim** [22] - 13:1, 13:6, 13:20, 14:4, 14:17, 14:21, 17:19, 20:20, 20:21, 31:17, 33:6, 33:23, 33:24, 41:21, 42:22, 43:5, 43:6, 43:7, 43:8, 46:8, 65:9
**victims** [4] - 14:14, 14:18, 19:20, 46:13
**view** [3] - 48:15, 63:1, 64:4
**viewer** [1] - 58:9
**viewers** [2] - 58:2, 70:5
**violated** [1] - 27:5
**violation** [4] - 11:12, 39:1, 55:17, 67:11
**violations** [2] - 36:14, 64:9
**visited** [1] - 34:3
**visuals** [1] - 25:3
**void** [2] - 15:16, 15:18
**voidable** [3] - 15:10, 15:12, 15:15
**vs** [1] - 1:6

**W**

**walking** [1] - 30:14
**wall** [1] - 17:12
**wants** [1] - 17:6
**Washington** [1] - 2:9
**watch** [1] - 58:9
**watching** [1] - 25:19
**ways** [4] - 20:12, 39:15, 65:23, 68:19
**Weaver** [2] - 2:3, 6:24
**weeks** [1] - 81:12
**weigh** [2] - 68:5, 74:9
**weight** [2] - 71:12, 71:22
**Weissler** [1] - 2:3
**West** [1] - 2:4
**whichever** [1] - 75:21
**whole** [3] - 46:17, 54:6, 59:15
**Williams** [2] - 2:8, 6:25
**Willie** [1] - 32:9
**willing** [1] - 44:16
**win** [2] - 14:6, 34:9
**winning** [1] - 75:21
**wins** [2] - 19:24, 42:16
**Winston** [2] - 1:19, 6:10

**Wire** [1] - 22:19
**wire** [28] - 11:9, 12:18, 12:20, 12:21, 13:19, 17:25, 18:6, 19:10, 20:4, 20:9, 21:18, 22:10, 24:1, 24:2, 24:3, 25:17, 27:4, 27:11, 30:12, 30:18, 30:19, 37:16, 38:21, 39:7, 50:16
**wired** [1] - 39:4
**wires** [13] - 21:19, 23:24, 24:4, 24:8, 25:20, 26:12, 26:13, 27:1, 27:18, 30:3, 39:6, 39:11
**wish** [1] - 81:14
**WITNESSES** [3] - 5:2, 5:3, 5:6
**won** [3] - 56:2, 59:20, 75:21
**word** [6] - 21:2, 42:3, 42:4, 42:5, 42:6, 61:8
**words** [3] - 16:13, 16:14, 49:18
**workings** [2] - 10:19, 10:20
**world** [11] - 15:5, 44:9, 44:15, 44:20, 45:1, 45:8, 47:5, 47:7, 49:14, 62:4
**worldwide** [2] - 55:20, 70:25
**worth** [3] - 38:4, 38:8, 38:9
**would've** [1] - 59:21
**wound** [1] - 40:25
**written** [3] - 35:20, 73:11, 81:9
**wrongdoing** [2] - 30:21, 33:4
**wrongfully** [1] - 33:2

**Y**

**years** [5] - 22:9, 26:8, 26:18, 26:19, 47:13
**York** [32] - 1:20, 2:23, 11:8, 11:15, 20:5, 20:9, 20:11, 20:16, 20:23, 22:17, 30:13, 30:17, 39:1, 39:3, 39:4, 39:5, 39:8, 39:9, 39:12, 39:13, 39:22, 40:3, 40:8, 40:12, 40:20, 40:21, 40:24, 50:22, 51:1, 51:2, 51:19

**Z**

**zero** [1] - 41:18