**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-24431-CIV-ALTONAGA/Turnoff**

**GOLTV, INC.** and
**GLOBAL SPORTS PARTNERS LLP**,

      Plaintiffs,

v.

**FOX SPORTS
LATIN AMERICA, LTD.**, *et al.*,

      Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court at a December 15, 2017 hearing [ECF No. 288] on Defendants, Fox Sports Latin America, Ltd. ("FSLA"); Pan American Sports Enterprises Company ("PASEC"); Fox International Channels (US), Inc. ("FIC"); Fox Networks Group, Inc. ("FNG"); Torneos y Competencias, S.A. ("Torneos"); T&T Sports Marketing Ltd. ("T&T"); Hernan Lopez; Carlos Martinez; James Ganley; Alejandro Burzaco; and Juan Angel Napout's Motion to Dismiss [ECF No. 255], filed October 9, 2017.  Defendants seek dismissal of Plaintiffs, GolTV, Inc. and Global Sports Partners LLP's eleven-count Amended Complaint [ECF No. 78] on the ground it fails to state a claim upon which relief may be granted.  Plaintiffs filed a Memorandum of Law in Opposition [ECF No. 279], to which Defendants filed a Reply [ECF No. 286].  The Court has carefully considered the parties' oral arguments, written submissions, the record, and applicable law.  For the reasons explained below, the Motion is granted in part and denied in part.

## I.    BACKGROUND

The Amended Complaint details how Defendants engaged in a bribery scheme between 2000 and 2015 to ensure Defendant, T&T, would secure exclusive television rights to Confederación Sudamericana de Fútbol's ("Conmebol[']s") prestigious international club soccer tournaments: the Copa Libertadores de America, the Copa Sudamericana, and the Recopa Sudamericana (collectively, the "Club Tournaments").  (*See* Am. Compl. ¶ 3).  The Amended Complaint relies on a 92-count Superseding Indictment [ECF Nos. 78-1 through 78-3] from a parallel criminal case in the Eastern District of New York, in which 27 individual defendants have been charged with crimes including racketeering, conspiracy, wire fraud, and money laundering (*see* Am. Compl. ¶ 2 (citing *United States v. Webb*, No. 15-cr-0252 (E.D.N.Y. Nov. 25, 2015))); and Torneos's Deferred Prosecution Agreement [ECF No. 78-4] acknowledging criminal culpability for wire fraud conspiracy to pay bribes and kickbacks to Conmebol officials in exchange for their support in awarding Club Tournament television rights to T&T (*see* Am. Compl. ¶ 6 (citing *United States v. Torneos y Competencias S.A.*, No. 16-00634-PKC, ECF Nos. 4-1 & 4-2 (E.D.N.Y. Dec. 13, 2016))).  Plaintiffs allege Defendants' scheme to obtain exclusive television rights for the Club Tournaments injured GolTV and Global Sports, who otherwise would have won bids for Club Tournament television rights.  (*See generally* Am. Compl.).

### A.  Parties and Relevant Entities

On October 20, 2016, Plaintiffs, GolTV and Global Sports, filed an initial Complaint [ECF No. 1], alleging 16 defendants were involved in the bribery scheme to award and obtain exclusive television rights for the Club Tournaments.  (*See generally* Compl.).  On March 6, 2017, Plaintiffs filed the Amended Complaint against 14 defendants, voluntarily dismissing

Hugo Jinkis and Mariano Jinkis from this action.  (*See* Pls.' Third Status Report [ECF No. 77] 2).  On September 19, 2017, the Court entered an Order [ECF No. 238] dismissing Conmebol and Full Play for lack of personal jurisdiction, further narrowing the list of defendants to those identified below.

While the Amended Complaint discusses multiple players and details several aspects of the bribery scheme, only the parties relevant to the present Motion are discussed.

### 1.  Plaintiffs

GolTV, a Florida-based television channel, provides Spanish and English-language soccer programming in the United States.  (*See* Am. Compl. ¶ 14).  GolTV is the only TV channel in the U.S. media market devoted exclusively to soccer.  (*See id*. ¶ 15).  GolTV is owned by Francisco "Paco" Casal, a Uruguayan businessman and former soccer player; and Nelson Gutierrez and Enzo Francescoli, former members of the Uruguayan national soccer team.  (*See id*.).  GolTV partnered with Global Sports to make offers on the worldwide or Americas television rights from Conmebol, "with the understanding that GolTV would pay for and acquire the U.S. portion of those rights."  (*Id*. ¶ 111).

Global Sports[1] is an English partnership formed by Casal and Gutierrez to acquire television and marketing rights to international soccer tournaments for GolTV.  (*See id.* ¶ 16). Global Sports "acted, among other capacities, as an agent for GolTV to attempt to acquire television broadcasting rights to the Club Tournaments."  (*Id*.).  "GolTV controlled and coordinated the actions that Global Sports took on behalf of GolTV and Global Sports served the corporate interests of GolTV in seeking to acquire television rights to the Club Tournaments." (*Id*.).

---

[1] Plaintiffs refer to GolTV and Global Sports collectively as GolTV in the Amended Complaint (*see* Am. Compl. ¶ 111), and throughout their Opposition (*see generally* Opp'n).  The Court refers to GolTV and Global Sports as Plaintiffs unless it is necessary to refer to them separately.

## 2. Defendants

T&T is a Cayman Islands company, which during the relevant time period was owned by Torneos and Fox Pan American Sports LLC[2] — the predecessor company to PASEC. (*See id.* ¶¶ 5, 17).  T&T paid tens of millions of dollars in bribes and kickbacks to Conmebol officials between 2000 and 2015 in exchange for the exclusive television rights to the Club Tournaments.  (*See id.* ¶ 3 (citing Superseding Indictment ¶¶ 174–85)).  Once the rights to Club Tournaments were licensed to T&T, T&T then sublicensed them to Fox Sports Latin America in order for the tournaments to broadcast on Fox Sports channels in the United States and abroad. (*See id.* ¶ 7).

PASEC is the surviving entity and legal successor to Fox Pan American Sports LLC, a Delaware limited liability company that did business in Florida as Fox Sports Latin America. (*See id.* ¶ 18).  Fox Pan American owned 75 percent of T&T during most of 2005 to 2015. (*See id.* ¶ 17).  In 2015, Fox Pan American merged with PASEC, which became the surviving entity and legal successor to Fox Pan American.  (*See id.* ¶ 19).  PASEC continues to directly or indirectly own 75 percent of T&T.  (*See id.*).

FIC has its principal place of business in Beverly Hills, California and offices in Florida. (*See id.* ¶ 20).  FIC owned and operated Fox Pan American Sports, and now owns PASEC. (*See id.* ¶¶ 19–21).

FSLA owns and operates the Fox Sports networks in Latin America as well as Fox Deportes, a Spanish-language sports programming service distributed in the United States. (*See id.* ¶ 18).

---

[2] Unless otherwise necessary, the Court refers to the Fox parties collectively as "Fox" or the "Fox Defendants."

FNG is a Delaware corporation and subsidiary of Twenty-First Century Fox, Inc. (*See id.* ¶ 22). In January 2016, a corporate reorganization announced FIC would be dissolved and FNG would assume operation of Fox Sports Latin America as the legal successor to FIC. (*See id.*).

Torneos is an Argentinean sports media and marketing corporation with a number of subsidiaries and affiliates. (*See id.* ¶ 24). Torneos has historically held exclusive agreements to produce and distribute television programming related to South American league soccer matches. (*See id.*). On December 13, 2016, Torneos acknowledged criminal culpability to the Department of Justice ("DOJ") for wire fraud conspiracy to pay bribes and kickbacks to Conmebol officials in exchange for their support in awarding the Club Tournament television rights to T&T. (*See id.* ¶ 6 (citing Torneos DPA)). Torneos agreed to pay over $112.8 million in forfeiture and criminal penalties after making admissions of its role in the bribery scheme. (*See id.* ¶ 11). Torneos admitted to paying and causing to be paid annual six-figure, and in some instances seven-figure, bribes and kickback payments in exchange for Club Tournament television rights. (*See id.* ¶ 7).

Martinez, a Florida resident, is President of FNG Latin America, responsible for the operations of Fox Sports Latin America. (*See id.* ¶ 26). Martinez was previously President of FIC Latin America, and as such operated Fox Pan American from the FIC offices in Florida. (*See id.*). Martinez was also on the board of T&T from approximately October 31, 2012 until December 11, 2013. (*See id.*). Martinez is alleged to have been personally involved in the bribery scheme, including signing an agreement on behalf of T&T to restructure the payment of bribes through intermediaries. (*See id.* ¶¶ 65, 78).

Lopez, a California resident, was the CEO of FIC from 2011 until January 2016, when he left the company.  (*See id*. ¶ 27).  Prior to that, Lopez was the Chief Operating Officer of FIC from 2008 to 2011 and General Manager of Fox Latin American Channels from 2000 to 2008. (*See id*.).  Lopez served on the board of directors of T&T from approximately June 1, 2010 to December 10, 2013.  (*See id*.).

Ganley, a citizen and resident of Florida, operated Fox Pan American as its Chief Operating Officer and was an employee of FSLA.  (*See id*. ¶ 28).  Ganley served on the board of directors of T&T from approximately April 28, 2005 to October 31, 2012.  (*See id*.).

Martinez, Lopez, and Ganley allegedly participated in T&T's payment of bribes to Conmebol officials to ensure FSLA would obtain the television rights for the Club Tournaments through T&T.  (*See id*. ¶¶ 7, 43, 64–66).  These executives also served as directors of T&T.  (*See id*. ¶ 8).

Burzaco, an Argentinean citizen, was a principal of T&T and a shareholder, director, and officer of Torneos.  (*See id*. ¶¶ 8, 29).  Burzaco was on the T&T board of directors from 2005 to 2013.  (*See id*. ¶ 29).  Burzaco had an ownership share in Torneos and served as the company's general manager, legal representative, and president of its board of directors between 2005 and 2015.  (*See id.*).  Burzaco was also a principal of Torneos's affiliates and shell companies, which he created and controlled off of Torneos's books.  (*See id*.).  He paid bribes to Conmebol officials.  (*See id*. ¶ 69).  In the criminal RICO action, Burzaco pled guilty to racketeering conspiracy, wire fraud conspiracy, and money laundering conspiracy involving the bribery of Conmebol officials, including bribery in connection with the television rights for the Club Tournaments.  (*See id*. ¶¶ 4, 30 (citing *Webb*, Transcript of Criminal Case for Guilty Plea [ECF No. 312-2] 5, 26–28)).

Napout, a citizen of Paraguay who has long maintained a home in Florida, was the president of Conmebol from August 2014 to December 11, 2015.  (*See id.* ¶ 34).  Napout served as a Vice President of Conmebol from 2007 to 2014.  (*See id.*).  Napout was also a member of Conmebol's Executive Committee from 2007 to 2015.  (*See id.*).  Napout is alleged to have received annual six-figure bribe payments from Burzaco in exchange for his cooperation in providing T&T the television rights to the Copa Libertadores tournament from 2011 through 2015.  (*See id.* ¶¶ 69, 76, 84).  As the then-President of Conmebol, Napout rejected Plaintiffs' October 2015 offer for the 2019 to 2022 Club Tournament television rights.  (*See id.* ¶¶ 129–31).

### B.  The Bribery Scheme

Fox and Plaintiffs have previously vied for and continue to compete for television broadcasting rights to the South American club soccer tournaments run by Conmebol. (*See id.* ¶¶ 56–58).  Estimates suggest the United States accounts for 16 percent of the Copa Libertadores's audience.  (*See id.* ¶ 55).  Only Conmebol, by decision of its Executive Committee, can award television rights for the Club Tournaments.  (*See id.* ¶ 59).  The combined popularity of these soccer tournaments and Conmebol's unique monopoly over the television rights to telecast Club Tournaments ensure telecasters who obtain the Club Tournament television rights derive significant revenue, including advertising revenue, from the purchase of the rights.  (*See id.* ¶ 58).

T&T acquired the exclusive television rights to the Club Tournaments through bribery and other criminal wrongdoing with the aid of co-conspirators.  (*See id.* ¶ 62 (citing Superseding Indictment ¶¶ 174–75)).  From 1999 through 2015, T&T held the exclusive worldwide television rights to the Copa Libertadores.  (*See id.* ¶ 61).  From approximately 2002 until 2015, T&T held

the exclusive worldwide television rights to the Copa Sudamericana. (*See id.*). In 2008, T&T also acquired the exclusive worldwide television rights to Recopa Sudamericana. (*See id.*).

The bribery scheme began in 2000, at which time one of the founders of Torneos unlawfully agreed to pay, and began to pay, annual bribes of $1 million to Conmebol officials Eugenio Figueredo, Nicolas Leoz, Eduardo Deluca, and Romer Osuna; such payments continued for more than 10 years. (*See id.* ¶ 62). As a result, throughout this period, Conmebol awarded the Club Tournament television rights exclusively to T&T. (*See id.*).

In 2005, Burzaco began to manage the day-to-day operations of Torneos, learned of the annual bribe payments, and helped continue the bribery scheme. (*See id.* ¶ 67). That same year, soon after Fox increased its interest in T&T from 25 percent to 75 percent, Martinez, Lopez, Fox Pan American, Ganley, and FSLA agreed with Torneos, T&T, and Burzaco that Fox and Torneos would fund and facilitate T&T's payments of bribes to Conmebol officials Leoz, Figueredo, Deluca, and Osuna. (*See id.* ¶ 64). As part of this agreement, Conmebol officials would sell the Club Tournament television rights to T&T, with the understanding the rights would be sublicensed to FSLA, and Conmebol would refuse to sell the rights to T&T's competitors or Fox, including Plaintiffs. (*See id.*). Moreover, the terms of the license agreements between Conmebol and T&T expressly contemplated the sublicensing of those rights to Fox. (*See id.* ¶ 77).

In 2009, other presidents of member associations of Conmebol began to demand annual bribes. (*See id.* ¶ 69). In response, Burzaco agreed to pay and did pay bribes to several others, including Napout. (*See id.*). "DOJ has revealed that the annual bribe payments of at least $400,000 that were made to Napout for the 2011, 2012, 2013, 2014, and 2015 editions of the

Copa Libertadores" were wired to bank accounts controlled by Hugo and Mariano Jinkis, who facilitated the payments to Napout.  (*Id.* ¶ 76).

Co-conspirators also engaged in conduct designed to prevent the detection of their illegal activities.  (*See id.* ¶ 73).  To disguise bribe payments in connection with the Copa Libertadores and other tournaments, Fox Pan American and Torneos agreed T&T would enter into sham "consulting" contracts with companies owned by Jose Margulies and companies he controlled. (*See id.* ¶¶ 71, 82–92).  T&T's payments of bribes to Conmebol officials were also made through Productora de Eventos, S.A., an affiliate of Torneos, which then paid FPT Sports S.A. in exchange for consulting services.  (*See id*. ¶¶ 99–100).  T&T did not receive any legitimate services from these financial intermediaries, but paid the companies as a way to facilitate the bribery of Conmebol.  (*See id.* ¶¶ 71, 100).  T&T, Torneos, Fox, and the financial intermediaries all knew the payments from T&T to the intermediaries, and from the intermediaries to Conmebol, were intended to serve as bribes to obtain Club Tournament television rights for the Fox Defendants.  (*See id*. ¶¶ 77–78).

### C. Conmebol Rejects Plaintiffs' Offers for Club Tournament Television Rights

The payment of tens of millions of dollars of bribes to Conmebol officials led to T&T securing the television rights for the Club Tournaments despite Plaintiffs' superior offers. (*See id.* ¶¶ 79, 108).  Plaintiffs detail how Conmebol, its Executive Committee members (including Napout), and other Defendants agreed to prevent Plaintiffs from obtaining the Club Tournament television rights by misleading Plaintiffs about when proposals for the rights would be considered; licensing Club Tournament television rights in advance of expected offers from Plaintiffs; and refusing to revoke rights wrongfully awarded to T&T at below-market prices – all due to T&T's bribery.  (*See id*. ¶ 139).  Since there were no parties actively making offers to

acquire the television rights apart from Plaintiffs and T&T (*see id.* ¶ 140), the only reason Conmebol did not accept Plaintiffs' offers was because T&T and its co-conspirators were paying illegal bribes to Conmebol officials (*see id.* ¶ 110).   To the extent rights had already been awarded to T&T when Plaintiffs made more favorable offers, had it not been for the bribery scheme, Conmebol would have revoked T&T's rights and awarded them to Plaintiffs.  (*See id.* ¶ 140).

> **1.  Conmebol Rejects Plaintiffs' March 2010 Offer for Television Rights for Years 2011 to 2014 for the Copa Libertadores and Copa Sudamericana Tournaments**

On March 3, 2010, one of GolTV and Global Sports's owners, Paco Casal, met with Nicolas Leoz, then President of Conmebol, to present a formal offer for the television rights for the Copa Libertadores and the Copa Sudamericana for years 2011 to 2014, which Conmebol had previously awarded to T&T.  (*See id.* ¶ 111).  Plaintiffs offered Conmebol a total of $270 million for the rights, representing a nearly 70 percent increase over the $164 million believed to have been paid by T&T for the same years.  (*See id.* ¶ 112).  Conmebol disclosed to T&T and Fox Plaintiffs' offer to purchase the television rights, at which time T&T, with Fox Pan American and Torneos's knowledge, urged Conmebol to reject the offer.  (*See id.* ¶ 113).  Conmebol did not accept Plaintiffs' superior offer.  (*See id.* ¶ 114).  Conmebol could have revoked its agreement with T&T, and its Executive Committee was legally obligated to revoke it in favor of Plaintiffs' superior offer based on fiduciary duties owed to Conmebol.  (*See id.* ¶ 115).

> **2.  Conmebol Rejects Plaintiffs' October 2012 Offer for Television Rights for Years 2015 to 2020 for the Copa Libertadores and Copa Sudamericana Tournaments**

In 2012, Plaintiffs offered to purchase from Conmebol the 2015 to 2020 television rights for Copa Libertadores and Copa Sudamericana.  (*See id.* ¶ 116).  Again, the offer was far more

than what was being received from T&T and Fox.  (*See id*.).  Conmebol President Leoz promised Plaintiffs that he and the Conmebol officials on the Executive Committee would formally consider the proposal at an October 24, 2012 Executive Committee meeting.  (*See id*.).  As a result, on October 21, 2012, Plaintiffs submitted a sealed proposal to purchase television rights to the Copa Libertadores and Copa Sudamericana for years 2015 to 2020, for a total price of $805 million.  (*See id*. ¶ 117).  Conmebol disclosed to T&T and Fox the offer made by Plaintiffs to purchase the television rights for the tournaments.  (*See id*. ¶ 118).  T&T and Conmebol again agreed Conmebol would reject Plaintiffs' offer and instead accepted a competing offer from T&T.  (*See id*.).

Conmebol then invited Burzaco to attend its October 24, 2012 Executive Committee meeting on behalf of T&T and offer reasons why the Plaintiffs' offer should not be accepted. (*See id*. ¶ 119).  Conmebol did not inform Plaintiffs that Burzaco would be present, nor did Conmebol invite a representative of Plaintiffs to present their offer.  (*See id*.).  Conmebol ultimately rejected Plaintiffs' offer and amended its agreement with T&T to increase the price for the 2015 to 2018 television rights for the Copa Libertadores and Copa Sudamericana tournaments.  (*See id*. ¶ 120).

### 3. Conmebol Rejects Plaintiffs' November 2013 Offer for Television Rights for Years 2015 to 2024 for Club Tournaments

On November 18, 2013, Plaintiffs made a new offer to purchase the 2015 to 2024 television rights for all three Club Tournaments.  (*See id*. ¶ 122).  Plaintiffs offered Conmebol $2.1 billion for the television rights to the three tournaments, with the total price being four times higher than the $560 million paid by T&T and its affiliate.  (*See id*. ¶ 123).  Predictably, Conmebol disclosed to T&T and Fox Pan American that Plaintiffs had offered to buy tournament rights and again, Conmebol agreed to reject Plaintiffs' offer.  (*See id*. ¶ 125).

CASE NO. 16-24431-CIV-ALTONAGA/Turnoff

**4. Conmebol Rejects Plaintiffs' May and October 2015 Offers for Television Rights for Years 2016 to 2022 for Club Tournaments**

By letter dated May 7, 2015, Plaintiffs renewed their November 2013 offer to pay $360 million per year for Club Tournament television rights for the years 2019 to 2022. (*See id*. ¶ 126). On May 27, 2015, the DOJ unsealed the indictment describing criminal wrongdoing associated with soccer tournaments, including charges against T&T principal, Burzaco. (*See id*. ¶ 127). On July 29, 2015, Conmebol released a statement advising it was reevaluating its commercial relationships with entities implicated in the wrongdoing. (*See id*. ¶ 128). Plaintiffs engaged in a series of meetings with Conmebol officials, including its then-president Napout, to propose acquiring the Club Tournament television rights on terms superior to those on which Conmebol had awarded the rights to T&T and a Torneos affiliate. (*See id*. ¶ 129). On October 16, 2015, Plaintiffs again formally renewed the offer for the Club Tournament television rights for years 2019 to 2022. (*See id*. ¶ 130). Plaintiffs additionally proposed acquiring the Club Tournament television rights for 2016 to 2017 for $170 million per year. (*See id*.). Conmebol did not accept either proposal. (*See id*. ¶ 131).

Instead, Fox negotiated an agreement with Napout, on behalf of Conmebol, under which Conmebol would award the Club Tournament television rights for years 2016 to 2018 that had previously been licensed to T&T, directly to FIC. (*See id*. ¶ 132). FIC paid between $135 million and $155 million per year, approximately $70 million to $90 million more than the $65 million to $69 million per year T&T previously agreed to pay. (*See id*.). This agreement was negotiated with FIC by Napout in secret and in violation of Conmebol's procedures. (*See id*. ¶ 132). Plaintiffs were not informed of the negotiations, nor were they invited to submit a competing bid. (*See id*. ¶ 134). Napout was subsequently indicted and arrested in connection

with accepting bribes in exchange for awarding Club Tournament television rights to T&T.  (*See id*. ¶ 135).

### D. Claims

Plaintiffs allege they are victims of Defendants' bribery, as they repeatedly offered Conmebol substantially more for Club Tournament television rights than the amounts T&T paid or offered to Conmebol for those rights.  (*See id*. ¶ 12).  Plaintiffs seek compensation for the harm they suffered from the loss of the television rights they otherwise would have been able to obtain in a fair and competitive market.  (*See id*. ¶ 13).  Plaintiffs accordingly bring this action alleging injury under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, the Sherman Act, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"); and Florida tort law.  (*See id*. ¶¶ 183–329).

Plaintiffs assert eleven claims.  (*See generally id*.).  Count One is a civil RICO claim pursuant to 18 U.S.C. section 1962(c) against all Defendants.  (*See* Am. Compl. ¶¶ 183–269).  Count Two is a civil RICO conspiracy claim brought under 18 U.S.C. section 1962(d) against all Defendants.  (*See* Am. Compl. ¶¶ 270–76).

Count Three is a claim of conspiracy in restraint of trade in the Americas Television Rights Market, in violation of section 1 of the Sherman Act, 15 U.S.C section 1, against all Defendants.  (*See id*. ¶¶ 277–82).  Count Four is a claim of conspiracy in restraint of trade in the U.S. Television Programming Market, in violation of section 1 of the Sherman Act, against all Defendants.  (*See id*. ¶¶ 283–87).  Count Five is a claim of conspiracy in restraint of trade in the U.S. Television Advertising Airtime Market, in violation of section 1 of the Sherman Act, against all Defendants.  (*See id*. ¶¶ 288–92).

Count Six is a claim of monopsonization[3] of the Americas Television Rights Market, in violation of section 2 of the Sherman Act, 15 U.S.C. section 2, against T&T.  (*See id*. ¶¶ 293–98).  Count Seven is a claim of attempted monopsonization of the Americas Television Rights Market, in violation of section 2 of the Sherman Act, against T&T.  (*See id*. ¶¶ 299–303).  Count Eight is a claim of conspiracy to monopsonize the Americas Television Rights Market, in violation of Section 2 of the Sherman Act, against all Defendants.  (*See id*. ¶¶ 304–11).

Count Nine is a claim of violation of the FDUTPA, Fla. Stat. §§ 501.201 *et seq*., against all Defendants.  (*See* Am. Compl. ¶¶ 312–17).  Count Ten is a claim of tortious interference with prospective economic advantage against the Fox Defendants, Torneos, and T&T.  (*See id*. ¶¶ 318–24).  Count Eleven is a claim of civil conspiracy to commit tortious interference against all Defendants.  (*See id*. ¶¶ 325–29).  The underlying factual allegations pertaining to each count are discussed in greater detail below.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff need not plead "detailed factual allegations," but the complaint must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id*. (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555).  "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (first alteration added; internal quotation marks omitted) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

---

[3]Monopsonization is an offense involving the control or monopoly of a market, which exists where an individual or organization is the only supplier of a particular good or commodity.  *See In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1154 n.3 (5th Cir. 1979).

CASE NO. 16-24431-CIV-ALTONAGA/Turnoff

To meet the *Iqbal/Twombly* plausibility standard, a complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556 (alteration added)). A claim will not survive "if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and alteration omitted) (quoting *Twombly*, 550 U.S. at 557).

On a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and accepts its factual allegations as true. *See Brooks v. Blue Cross Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)). Unsupported allegations and conclusions of law, however, will not benefit from this favorable reading. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *see also Sinaltrainal v. Coca-Cola*, 578 F.3d 1252, 1261 (11th Cir. 2009) ("[U]nwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of [a] plaintiff's allegations." (alterations added; internal quotation marks omitted) (quoting *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005))).

While a court is generally limited to the allegations of the complaint in evaluating a Rule 12(b)(6) motion to dismiss, "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the [c]ourt may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal." *Brooks*, 116 F.3d at 1369 (alteration added; citation omitted). Where those "exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) (internal quotation marks omitted) (quoting *Griffin Indus., Inc. v. Irvin*,

496 F.3d 1189, 1206 (11th Cir. 2007); other citation omitted).  The court may also consider documents whose "authenticity and veracity are . . . unchallenged." *Long v. Slaton*, 508 F.3d 576, 578 n.3 (11th Cir. 2007) (alteration added) (considering investigative report plaintiffs submitted in opposing motion to dismiss).

## III.    DISCUSSION

Defendants[4] assert the Amended Complaint is deficient because Plaintiffs: (1) fail to state a RICO claim; (2) fail to state a claim under the Sherman Act; (3) lack standing to bring RICO and antitrust claims; and (4) fail to state claims under the FDUTPA and Florida tort law.  (*See generally* Mot.).  Burzaco writes separately, challenging the RICO claims for failure to show his underlying conduct was a proximate cause of injury to Plaintiffs; and, on behalf of all Defendants, asserts Plaintiffs' claims are time barred.  (*See id.* 81–84[5]).  Napout separately asserts all counts fall short of stating actionable causes of action against him.  (*See id*. 84–89). The Court addresses these arguments in turn.

### A.  RICO Claims (Counts 1 and 2)

In Count One, Plaintiffs allege a civil RICO claim under 18 U.S.C. section 1962(c) (*see* Am. Compl. ¶¶ 183–269); and in Count Two, they allege a civil RICO conspiracy claim under section 1962(d) (*see id.* ¶¶ 270–76).

A civil RICO claim under section 1962(c) requires a plaintiff allege defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts that caused injury to plaintiff's business or property.  *See Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) (citation omitted); *see also*

---

[4]All Defendants join the present Motion with the exception of Eugenio Figueredo, who has not appeared in the case.  (*See* Mot. 12 n.1).

[5] The Court uses the pagination generated by the Case Management/Electronic Case Files system, which appears as a header on all court filings.

CASE NO. 16-24431-CIV-ALTONAGA/Turnoff

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496–97 (1985) (requiring conduct of an enterprise through a pattern of racketeering activity in order to state a claim for civil RICO).  To establish a RICO conspiracy, a plaintiff must show defendants either (1) agreed with the objective of the conspiracy, or (2) agreed to commit two racketeering predicates.  *See Rajput v. City Trading, LLC*, 476 F. App'x 177, 180 (11th Cir. 2012).

Plaintiffs allege Defendants operated a scheme to bribe Conmebol officials in exchange for assurances T&T would receive Club Tournament television rights.  (*See* Am. Compl. ¶ 188).  Defendants' illicit actions, including wire fraud, commercial bribery, money laundering and monetary transactions in property derived from unlawful activity, over a period of 15 years, caused Conmebol to award T&T the television rights for the Club Tournaments, which otherwise would have gone to Plaintiffs because they were the only other bidders and they offered more favorable proposals.  (*See id.* ¶¶ 108–37, 139, 268, 276).  Plaintiffs suffered substantial injury to their business and property, including loss of revenues and profits, lower market share, and lessened profile in the sports telecasting marketplace, amounting to hundreds of millions of dollars or more in damages.  (*See id.* ¶¶ 268, 276).

Notwithstanding the requisite elements are alleged, Defendants argue Plaintiffs fail to state a civil RICO claim because they do not show: (1) Defendants' actions were the proximate cause of an injury to Plaintiffs; (2) the underlying bribery scheme presents a pattern of racketeering; and (3) Defendants committed two or more predicate acts.  (*See* Mot. 20–32).

### 1.  Proximate Cause

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).  To satisfy RICO's heightened proximate cause

standard and withstand a motion to dismiss, a complaint must allege a "direct relationship" between the alleged RICO violations and the plaintiff's alleged injury. *E.g.*, *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010). The "direct relationship" test is more than "a mere pleading rule." *Id.* at 13. Although the unlawful conduct need not be the sole cause of the injury asserted, there must be a direct and identifiable connection between the fraud and a plaintiff's injury. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654–55 (2008). A plaintiff cannot "circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense," because RICO only reaches harm that necessarily is caused by the predicate acts. *Hemi Grp.*, 559 U.S. at 13 (citation and quotation marks omitted).

When evaluating whether proximate cause exists, "courts should consider the motivating principles behind the directness component of the proximate-cause standard in RICO cases." *Corcel Corp., Inc. v. Ferguson Enters., Inc.*, 551 F. App'x 571, 576 (11th Cir. 2014) (citations and internal quotation marks omitted). The motivating principles include: whether (1) difficulty would arise when a court attempts to ascertain damages caused by a remote action; (2) the nature of the proceedings would be speculative if the plaintiff were permitted to proceed; (3) the harm could have resulted from independent factors; (4) there is a risk of duplicative recoveries by other plaintiffs; and (5) other immediate victims of the RICO violation are better suited to vindicate the laws by pursuing their own claims. *See id.* (citing *Anza*, 547 U.S. at 458–60). The Supreme Court has cautioned "proximate cause is generally not amenable to bright-line rules." *Bridge*, 553 U.S. at 659 (citation omitted).

Defendants assert Plaintiffs do not satisfy the proximate causation requirement because they were not direct victims of the bribery scheme and, as such, their alleged injuries are too

remote.  (*See* Mot. 23–24; Reply 10–15).  Defendants supply several arguments in support of their remoteness characterization.

First, Defendants urge the Court find the RICO claims foreclosed because Plaintiffs are not the direct victims of the alleged RICO predicates.  (*See* Mot. 23; Reply 10–12).  But Defendants rely on authorities involving significantly different factual scenarios than that of a plaintiff, who but for its competitor's fraudulent activity during a bidding process, would have won the bid, as is the case here.  (*See* Mot. 22–23 (citing cases)).  Plaintiffs' position is the more persuasive because Plaintiffs rely on cases in which, had it not been for the fraudulent acts of competitors in bidding processes, the plaintiffs would have won the bids.

For example, Plaintiffs rely on *Bridge* for the proposition a plaintiff may be directly harmed by the acts of a rival bidder when, but for the fraudulent actions of the rival bidder, the plaintiff would have received the winning bid.  (*See* Opp'n 25–26).  The facts in *Bridge* involved an annual public auction at which a county government sold off tax liens on delinquent taxpayers' properties.  *See Bridge*, 553 U.S. at 642.  The county established an allocation system to ensure fair apportionment of the liens, including a requirement that any entity submitting a bid do so in its own name and a prohibition on the purchase of liens through agents or employees.  *See id.* at 643.  The plaintiffs in *Bridge*, would-be purchasers, alleged the defendants defrauded the county by attesting they were not purchasing liens through agents or employees, while engaging several related bidders to submit bids on their behalf.  *See id.* at 643–44.

The predicate act in *Bridge* was mail fraud.  *See id.* 644.  The plaintiffs claimed they were injured as a result of the defendants' criminal actions because, based on the allocation system, but for the illicit actions of the defendants, the plaintiffs would have received a greater share of liens and financial benefits.  *See id.*  After noting "RICO's text provides no basis for imposing a

first-party reliance requirement," *id.* at 660, the Supreme Court found the defendants' fraudulent acts proximately caused plaintiffs' injuries by causing competitors to win a county contract over the plaintiffs, *see id.* at 660–61.

In *Corcel Corp.*, the Eleventh Circuit similarly examined whether a pleading sufficiently demonstrated proximate causation where the plaintiff would have received a contract had it not been for the fraud of its competitors, the rival bidders. 551 F. App'x at 577–78. The complaint there alleged "if the County had not relied on the defendants' false and fraudulent documents and actions[,] the County would have awarded plaintiff Corcel the supply and construction contract at issue because plaintiff Corcel was the next lowest [] bidder." *Id.* at 577 (alterations added). This allegation was sufficient to show a direct relation between the claimed injury and the defendants' federal civil RICO violations, satisfying proximate causation. *See id.*

At the December 15 hearing, Defendants attempted to distinguish *Bridge*, stating the basis upon which tax liens were apportioned by the county government was a unique situation in which, unlike here, there was certainty the plaintiffs would have won because they were next in line. Defendants also attempted to distinguish this case from *Corcel Corp.* for the same reason, stating the facts of *Corcel* are inapplicable because Conmebol may not have accepted Plaintiffs' bids regardless of whether Defendants conspired and bribed Conmebol officials. In their oral arguments and their written briefing, Plaintiffs liken the facts of this case to the facts in *Bridge* and *Corcel Corp.*, emphasizing their allegation they were the only parties making offers to acquire the rights to the Club Tournaments other than T&T, and had Plaintiffs' competitors not been engaged in bribery and fraud, Plaintiffs would have prevailed and been awarded the television rights. (*See* Am. Compl. ¶ 140; Opp'n 23–24).

CASE NO. 16-24431-CIV-ALTONAGA/Turnoff

The Court is persuaded the facts in *Bridge* and the line of cases involving injuries of a bidder by a competitor are analogous to this case.  Plaintiffs allege the relative certainty of their winning the bids for Club Tournament television rights in the absence of Defendants' wrongdoing, as the plaintiffs did in *Bridge* and *Corcel Corp.*  As such, Plaintiffs sufficiently allege a plausible direct injury flowing from Defendants' bribery scheme.

Second, Defendants state the claims of injury are too remote and speculative because Plaintiffs' injuries depend on intervening and independent factors.  (*See* Mot. 24–28; Reply 15–19).  Defendants describe Plaintiffs' injuries as speculative because the bids were received after Conmebol had entered into contracts with T&T (*see* Mot. 25), and revoking the television rights from T&T and awarding them to Plaintiffs is necessarily an intervening step that breaks the chain of causation between the predicate acts alleged (wire fraud, commercial bribery, money laundering, etc.) and Plaintiffs' injuries (*see id*. 25–27).  Defendants highlight Plaintiffs' failed last bid, made after the bribery scheme stopped, as evidence Plaintiffs would not have necessarily won the rights absent the fraudulent acts.  (*See id*. 25–26).

Plaintiffs point to their allegation that had it not been for Defendants' illicit actions, no other factors supported awarding the licensing to T&T over Plaintiffs' higher bids.  (*See* Opp'n 23 (citing Am. Compl. ¶ 110)).  Plaintiffs explain not every proposal was under contract with T&T at the time of each offer.  (*See* Opp'n 46).  Indeed, the pleading does not identify whether the rights at issue in each proposal were under contract with T&T at the time of each offer.  (*See* Am. Compl. ¶¶ 116–18).  Furthermore, to the extent the television rights were already under contract, Conmebol would have revoked T&T's rights and awarded them to Plaintiffs in exchange for more favorable terms from Plaintiffs, but for Defendants' bribery of Conmebol officials.  (*See id*. ¶ 140).  Plaintiffs also refute Defendants' characterization of the circumstances

of their last failed bid for Club Tournament television rights (*see* Opp'n 30), as the illegal activities continued throughout 2015, when the last bid was rejected (*see* Am. Compl. ¶¶ 3, 133). The Court is persuaded the claims of injury are not so remote and speculative as to defeat the causes of action, and agrees with Plaintiffs that many of the issues raised in this section of the briefing are factual disputes not appropriate for consideration on a Rule 12(b)(6) motion.  (*See* Opp'n 31).

Defendants next assert that upon receiving the television rights, Plaintiffs would have had to exploit the rights to make a profit – yet another causal gap between Defendants' conduct and Plaintiffs' injuries.  (*See* Reply 18).  According to Plaintiffs, the proximate cause standard articulated in *Bridge* is concerned with the conduct and the allegation of injury, not the later steps a plaintiff would need to take to make a profit from winning a bid.  (*See* Opp'n 31).  The Court agrees.  Alleging a loss of profits is sufficient to establish proximate cause, *see Bridge*, 553 U.S. at 644 n.3; whether Plaintiffs would have exploited the rights or in fact been successful in making a profit is not considered at this stage.

Third, Defendants assert determining damages will be very difficult because of the "numerous intervening decisions by Conmebol, TV viewers, and advertisers" (Mot. 28), and because there may be future plaintiffs in Conmebol and its member organizations that may have an incentive to vindicate the law (*see* Reply 14).  With regard to the issue of calculating damages, Defendants rely on *Harris v. Orange S.A.*, 636 F. App'x 476 (11th Cir. 2015).  There, the Eleventh Circuit found no proximate cause because it was difficult to determine what losses were attributable to the defendants' conduct, as opposed to market conditions and the like, as well as the fact another plaintiff was necessary to vindicate the same interest.  (*See* Mot. 28 (citing *Harris*, 636 F. App'x at 483)).

*Harris* is distinguishable.  In *Harris*, the plaintiff was a shareholder and employee of a company capable of vindicating the same interest as the plaintiff.  *See Harris*, 636 F. App'x at 483.  In order to calculate damages in *Harris*, the shareholder and employee's damages would have depended on the company's damages calculation.  Here, there is no reason to believe Plaintiffs' damages calculation will depend on a potential damages calculation by Conmebol.  Plaintiffs' damages calculation will likely come from their losses as a result of not receiving the bids, whereas Conmebol's loss in revenue will likely be calculated by looking at the difference between the revenue received and what Conmebol was offered by Plaintiffs for the Club Tournament rights.

Difficulty in ascertaining Plaintiffs' lost profits is not sufficient in and of itself to find a lack of proximate cause.  *See Maiz v. Virani*, 253 F.3d 641, 663 (11th Cir. 2001) ("The touchstone of the inquiry . . . is proximate cause; there is no automatic rule against the recovery of any type of lost profits or lost value damages if proximate cause is shown." (alteration added)).

Last, Plaintiffs state Defendants implicitly concede there is no risk of duplicative recoveries, as they do not address the issue in the Motion.  (*See* Opp'n 34–35).  In any event, Plaintiffs argue there is minimal risk of duplicative recoveries from other disappointed bidders because Plaintiffs were next in line to receive the bids, similar to the plaintiff in *Corcel Corp.* vying for the county contract.  (*See id.* 35 (citing *Corcel Corp.*, 551 F. App'x at 578)).

In their Reply, Defendants insist there is a significant risk of duplicative recoveries, stating other media companies may claim that, absent the bribery scheme, they, too, could have obtained television rights for the Club Tournaments.  (*See* Reply 13 n.3).  Discovery may reveal if Defendants' supposition is correct.  But as Plaintiffs allege they were the only other entities

bidding on Club Tournament television rights, other than T&T (*see* Am. Compl. ¶ 140), Defendants' argument fails to persuade Counts One and Two fail to state claims for relief on the basis proximate cause is not sufficiently alleged.

### 2. "Pattern of Racketeering Activity"

To establish a "pattern of racketeering" under section 1962(c), a plaintiff must allege the defendants committed (1) at least two predicate acts over a ten year period that (2) amount to, or threaten, continued criminal activity. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989) (A "pattern of racketeering activity . . . requires at least two acts of racketeering activity . . . within ten years" (alterations added; internal quotation marks and citation omitted)); *see also id.* at 239 ("[T]o prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates . . . amount to or pose a threat of continued criminal activity." (alterations added)). A plaintiff must also allege either open-ended or closed-ended continuity. *See id.* at 241; *see also Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373, 381 (S.D. Fla. 1999) ("[T]he continuity requirement can be satisfied either by showing past conduct that by its nature shows a threat of future racketeering or by showing repeated racketeering acts over a substantial period of time." (alteration added)). Defendants argue Plaintiffs do not properly allege either open-ened or closed-ended continuity. (*See* Mot. 30–32).

"A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. According to Defendants, Plaintiffs do not properly allege closed-ended continuity because the RICO allegations concern "only a single scheme with a discrete goal." (Mot. 30 (quoting *Jackson v. Bell S. Telecomms.*, 372 F.3d 1250, 1267 (11th Cir. 2004); other citations omitted)). Defendants cite to several cases where courts found fraudulent activity that took place

over several years was insufficient to establish continuity because in each case there was only one scheme. (*See id.* (collecting cases)). In *Daedalus Capital LLC v. Vinecombe*, for example, the Eleventh Circuit found a multi-year scheme to divert a company's proceeds and bleed the company of assets did not show closed-ended continuity because there was only one victim and a single scheme with "one discrete goal, directed at one individual." 625 F. App'x 975, 976 (11th Cir. 2015) (internal quotation marks and citation omitted). Defendants argue the scheme to bribe Conmebol officials in exchange for Club Tournament television rights is similarly one multi-year scheme with one discrete goal.

The Amended Complaint details a number of illegal bribe payments: first in order to obtain the rights for the Copa Libertadores in 2000, then in 2002 to obtain the rights to the Copa Sudamericana, and again in 2008 for the rights to the Recopa Sudamericana. (*See* Am. Compl. ¶¶ 3, 61–62). Defendants are alleged to have engaged in several rounds of fraudulent acts with a series of distinct goals over a substantial period of time. While there is no precise definition of "substantial period of time," *H.J. Inc.*, 492 U.S. at 242–43, the allegations of wrongdoing during a 15-year period satisfy the requirement.

Plaintiffs adequately allege closed-ended continuity. Consequently, the Court does not address the arguments directed to open-ended continuity.

### 3. Predicate Acts

A RICO claim under 18 U.S.C. section 1962 requires a plaintiff allege defendants "received . . . income derived, directly or indirectly," from "racketeering activity," and the proceeds of the racketeering activity were then used to engage in activities impacting "interstate or foreign commerce." *Id.* § 1962(a) (alteration added). The term "racketeering activity" includes a list of predicate acts that violate federal or state law. *Id.* § 1961(1). "[A] private

plaintiff who wants to recover under civil RICO must show some injury flowing from *one or more* predicate acts." *Pelletier v. Zweifel*, 921 F.2d 1465, 1497 (11th Cir. 1991) (alteration and emphasis added), *abrogated on other grounds by Bridge*, 553 U.S. 639.

Plaintiffs allege Defendants committed the following RICO predicates: (1) wire fraud, in violation of 18 U.S.C. section 1343 (*see* Am. Compl. ¶¶ 193–204); (2) money laundering (promotion by international transfer), in violation of 18 U.S.C. section 1956(a)(2)(A) (*see id.* ¶¶ 205–09); (3) money laundering (concealment by use of an international transfer), in violation of 18 U.S.C. section 1956(a)(2)(B)(i) (*see id.* ¶¶ 210–17); (4) money laundering (promotional money laundering), in violation of 18 U.S.C. section 1956(a)(1)(A)(i) (*see id.* ¶¶ 218–24); (5) money laundering (money laundering by concealment), in violation of 18 U.S.C. section 1956(a)(1)(B)(i) (*see id.* ¶¶ 225–32); (6) monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. section 1957 (*see id.* ¶¶ 233–36); (7) bribery under New York state law, N.Y. Penal Law sections 180.03 and 180.08 (*see id.* ¶¶ 237–47); and (8) violation of the Travel Act, 18 U.S.C. sections 1952(a)(1) and 1952(a)(3) (*see id.* ¶¶ 248–53).   To recover on a RICO claim, a plaintiff need only allege two predicate acts constituting a pattern.

Defendants argue Plaintiffs do not properly allege any predicate acts because the wrongdoing occurred extraterritorially and cannot be tied to Plaintiffs' injury.  (*See* Mot. 32–43). In this regard, the Court examines two of the RICO predicates alleged: wire fraud and New York commercial bribery.

### i.  Wire Fraud

When a plaintiff's section 1962(c) RICO claims are premised on the predicate act of wire fraud, the substantive RICO allegations must comply with Federal Rule of Civil Procedure 9(b)'s

heightened pleading standard, requiring the plaintiff state, with particularity, the circumstances constituting fraud or mistake. *See Ambrosia Coal & Constr. Co. v. Pages Morales,* 482 F.3d 1309, 1316 & n.10 (11th Cir. 2007) (holding civil RICO claims, which are "essentially a certain breed of fraud claims, must be pled with an increased level of specificity" under Rule 9(b)); *see also Durham v. Business Mgmt. Assocs.*, 847 F.2d 1505, 1511–12 (11th Cir. 1988) (finding the Rule 9(b) pleading requirement applicable to RICO claims predicated on wire and/or mail fraud). The Eleventh Circuit has further held to meet this heightened standard, a plaintiff must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks*, 116 F.3d at 1380–81 (citation omitted).

As stated, Defendants maintain Plaintiffs' allegations of wire fraud fail because they rely on extraterritorial conduct outside the scope of the statute. (*See* Mot. 35). A two-step analysis is used to determine whether the civil RICO statute applies to instances of foreign racketeering. *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). First, the court asks whether the statute giving rise to the predicate act in question "gives a clear, affirmative indication that it applies extraterritorially." *Id.* If it does, the inquiry is over and the conduct violating the statute may constitute a predicate act for RICO purposes. *See id*. at 2099. If not, the court must "determine whether the case involves a domestic application of the statute," which is also sufficient for RICO purposes. *Id.* at 2101.

Defendants insist wire fraud under 18 U.S.C. section 1343 does not apply extraterritorially because there is no language evincing an intent to reach foreign conduct. (*See* Mot. 36 (citing *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014), *rev'd*

*and remanded on other grounds by RJR Nabisco, Inc.*, 136 S. Ct. 2090)).  Plaintiffs point to a

circuit split and cite to contrary decisions of the First and Third Circuits, which have found the

language of section 1343 supports the extraterritorial reach of the statute.  *See, e.g.*, *United States*

*v. Georgiou*, 777 F.3d 125, 137–38 (3d Cir. 2015) (stating wire fraud statute applies

extraterritorially, as section 1343 "punishes frauds executed in "interstate or foreign commerce,

and is surely not a statute in which Congress had only domestic concerns in mind" (internal

quotation marks and citations omitted)); *see also United States v. Lyons*, 740 F.3d 702, 718 (1st

Cir. 2014) (same).

While the Eleventh Circuit has yet to weigh in on the issue, one district court in this

Circuit recently found the First and Third Circuit decisions persuasive.  *See Drummond Co., Inc.*

*v. Collingsworth*, No. 2:15-CV-506-RDP, 2017 WL 3268907, at *17 (N.D. Ala. Aug. 1, 2017)

("While the Second Circuit has held that 18 U.S.C. [section] 1343 does not have extraterritorial

application . . . other courts have held to the contrary[.]" (internal citations omitted; alterations

added) (quoting *Absolute Activist Value Master Fund Ltd. v. Devine*, 233 F. Supp. 3d 1297, 1324

(M.D. Fla. 2017))).  Given this precedent, the Court concludes 18 U.S.C. section 1343 applies to

actions taken extraterritorially.

Defendants also assert Count One is insufficient because Plaintiffs do not explain how

the wire fraud injured them.  (*See* Mot. 39 (quoting *United States v. Takhalov*, 827 F.3d 1307,

1313 (11th Cir. 2016))).  According to Defendants, Plaintiffs fail to meet the standard in

*Takhalov*, where the Eleventh Circuit found a scheme to defraud exists where a defendant

intends to do harm to a victim.  *See Takhalov*, 827 F.3d at 1312–13, *as revised* (Oct. 3, 2016),

*opinion modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016).

Plaintiffs sufficiently plead wire fraud for the same reasons they sufficiently plead proximate cause: they have demonstrated how the wire fraud directly harmed them. The Amended Complaint details Defendants' knowledge Plaintiffs were seeking Club Tournament television rights from Conmebol and the increasing bribe payments extracted to ensure T&T, and not Plaintiffs, received those rights. (*See* Am. Compl. ¶¶ 113–118, 122, 125). These are allegations of Defendants intending to do harm. Reading the Complaint in the light most favorable to Plaintiffs, the Court finds they meet the heightened standard for wire fraud as a RICO predicate act.

ii. New York commercial bribery

New York Penal Law Section 180.03 prohibits "confer[ring] . . . any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal," where the benefit conferred "causes economic harm to the employer or principal in an amount exceeding two hundred fifty dollars." N.Y. Penal Law § 180.03 (alterations added). A well-pled claim for violation of the New York commercial bribery statute requires allegations "a person conferred, offered or agreed to confer a benefit of value exceeding one thousand dollars upon an employee or agent without the consent of his employer or principal with the intent to influence the employee's or agent's conduct in relation to his employer's or principal's affairs." *Welch Foods Inc. v. Gilchrist*, No. 93-CV-0641E(F), 1996 WL 607059, at *5 (W.D.N.Y. Oct. 18, 1996) (citing N.Y. Penal Law § 180.03).

The parties agree New York Penal Law Section 180.03 does not have extraterritorial application. (*See* Mot. 40–41; Opp'n 46). Defendants argue Plaintiffs do not allege a domestic violation of the statute because T&T, a foreign entity, made payments through foreign subsidiaries to bribe Conmebol officials overseas. (*See* Mot. 41).

29

CASE NO. 16-24431-CIV-ALTONAGA/Turnoff

In response, Plaintiffs point to trips to New York, use of New York bank accounts, and sham contracts with New York choice-of-law provisions, as constituting domestic conduct. (*See* Opp'n 45–46 (citing Am. Compl. ¶¶ 42, 74, 84)).  Certainly the Amended Complaint details the transmission of bribe payments by Defendants into accounts in New York.  (*See* Am. Compl. ¶¶ 185–86).  The transfer of money from one New York bank account to another is hardly dissimilar to standing in New York with a bag of cash and handing it to someone as a bribe payment — an example offered by Plaintiffs at oral argument.  There is sufficient domestic conduct allowing New York commercial bribery to serve as a RICO predicate act.

Defendants also argue there are no allegations Conmebol suffered economic harm as a result of the bribes, and as such not all elements of New York commercial bribery are satisfied. (*See* Mot. 42).  Defendants challenge Plaintiffs' assertion that Conmebol suffered harm by not accepting Plaintiffs' higher bids.  (*See id*.).  According to Defendants, the fact the rights at issue were under contract would have left Conmebol subject to suit for breach of contract.  (*See id*.). And Defendants insist Plaintiffs do not demonstrate Conmebol stood to gain more than it could have lost.  (*See id*.).

While Plaintiffs submitted a proposal on October 21, 2012, covering the years 2015 to 2020, it is unclear whether the rights for 2015 to 2020 were already under contract.  (*See* Am. Compl. ¶¶ 116–18).  Plaintiffs also state any contracts in place with T&T at the time were the result of a bribery scheme, and thus void as a matter of law.  (*See* Opp'n 46).  Furthermore, the effects of Defendants' wrongdoing extended to "misleading Plaintiffs about when proposals for the rights would be considered," thus making it difficult for Plaintiffs to present offers before the rights were awarded to T&T at below-market prices.  (Am. Compl. ¶ 139).  The allegations, viewed in the light most favorable to Plaintiffs, plausibly show Conmebol suffered economic

harm.  As such, Plaintiffs sufficiently allege New York commercial bribery as a RICO predicate act.

Because Plaintiffs allege injury flowing from the predicate acts of wire fraud and bribery under New York state law, the Court does not address whether money laundering, monetary transactions, bribery under New York state law or violations of the Travel Act may serve as RICO predicate acts.

  **B.  Antitrust Claims (Counts 3–8)**

Plaintiffs state antitrust claims against all Defendants for conspiracy in restraint of trade under Section 1 of the Sherman Act (Counts 3–5); and conspiracy to monopsonize the Americas Television Rights Market under Section 2 of the Sherman Act (Count 8).  (*See* Am. Compl. ¶¶ 277–92, 304–11).  Plaintiffs also bring claims against T&T for monopsonization and attempted monopsonization of the Americas Television Rights Market, under Section 2 of the Sherman Act (Counts 6–7).  (*See id.* ¶¶ 293–303).

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . ."  15 U.S.C. § 1 (alterations added).  To establish a Section 1 violation of conspiracy in restraint of trade, a plaintiff does not need to allege the specific elements of conspiracy to monopolize, but instead, must show "concerted action between two or more persons — a conscious commitment to a common scheme designed to achieve an unlawful objective — in restraint of trade." *Procaps S.A. v. Patheon, Inc*., 845 F.3d 1072, 1080 (11th Cir. 2016) (internal quotation marks and citation omitted); *see also Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1262 (11th Cir. 1998).  It is not enough to allege conspiracy in restraint of trade; the contract, combination or conspiracy in the restraint must rise to the level of "unreasonable and

CASE NO. 16-24431-CIV-ALTONAGA/Turnoff

anticompetitive." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 870 F.3d 1262, 1271 (11th Cir. 2017) (internal quotation marks omitted) (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)).

Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. To demonstrate a violation of section 2 of the Sherman Act, a plaintiff must allege: (1) monopoly power, which is the power to control prices in or to exclude competition from a relevant market; and (2) the willful acquisition or maintenance of power through predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the same relevant market. *See Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293–94 (11th Cir. 2004) (citations omitted).

In their oral arguments, Defendants generally characterized Plaintiffs' antitrust claims as trying to fit the square peg of bribery into the round hole of antitrust law — an apt description. Defendants challenge the sufficiency of the antitrust claims, stating they should be dismissed because Plaintiffs: (1) only allege harm to themselves as competitors, not harm to consumers and competition; (2) fail to plead a viable theory of causation; and (3) do not plead plausible antitrust markets. (*See* Mot. 47–62). Defendants also argue the complained-of conduct amounts to commercial bribery, which alone is neither exclusionary conduct cognizable under Section 2 of the Sherman Act, nor an agreement in restraint of trade in violation of Section 1 of the Act. (*See id*. 44–47). Last, Defendants argue the Foreign Trade Antitrust Improvement Act bars Plaintiffs' claims because the conduct alleged concerns commerce that is not U.S. import commerce (*see id*. 62–68), and does not have a "direct, substantial and reasonably foreseeable effect" on U.S.

commerce (*id.* 63).   Because the Court agrees Plaintiffs do not sufficiently allege harm to competition, this Order does not address Defendants' arguments as to causation, plausible antitrust markets, commercial bribery or the FTAIA.

Under Sections 1 and 2 of the Sherman Act, an antitrust plaintiff must allege injury to competition, not merely to the plaintiff as a competitor.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977); *see also Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579 n.8 (11th Cir. 1985) ("Harm to competition is a necessary element of all private antitrust suits under Sections 1 and 2 of the Sherman Act[.]" (alteration added; citation omitted)).   To allege actual harm to competition, Plaintiffs must "point to the specific damage done to consumers in the market[.]" *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010) (alteration added; internal quotation marks and citation omitted).

Defendants contend Plaintiffs do not allege harm to competition because each reference of harm to competition is conclusory and implausible.  (*See* Mot. 49).   In response, Plaintiffs argue (1) cases of monopsonization only require harm to the seller — not to consumers; but in any event, (2) they do include sufficient allegations of harm to consumers.  (*See* Opp'n 54–58).

Plaintiffs cite to two out-of-circuit cases for the proposition they only need demonstrate harm to the seller, not the end consumer.  (*See id.* 54 (citing *O'Bannon v. NCAA*, 7 F. Supp. 3d 955 (N.D. Cal. 2014), *aff'd in part, vacated in part on other grounds*, 802 F.3d 1049 (9th Cir. 2015); then citing *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124 (10th Cir. 2002); additional citation omitted)).   In *O'Bannon*, the district court characterized student athletes bringing a labor-related suit against the NCAA as sellers and the schools they attended as the buyers, finding the student-sellers' alleged injury harmed competition because the legal theory of the case was that of a monopsony.  *See O'Bannon*, 7 F. Supp. 3d at 991–92.  In *Telecor*, the

Tenth Circuit held "[t]he Supreme Court's treatment of monopsony cases strongly suggests that suppliers . . . are protected by antitrust laws even when the anti-competitive activity does not harm end-users." 305 F.3d at 1133–34 (alterations added).

Defendants distinguish the facts in both *O'Bannon* and *Telecor* from the allegations here. (*See* Reply 29–30). Defendants argue *O'Bannon* involved labor markets for student athletes, in which the buyers are more like consumers, and thus should be treated differently. (*See id*. 29 (citing *Todd v. Exxon Corp*., 275 F.3d 1327, 1339 (11th Cir. 2010)). Defendants also assert the facts in *Telecor* differ significantly from the facts of this case because they involved multiple entities being prevented from entering a market.

Both decisions rely on *Mandeville Island Farms v. Am. Crystal Sugar Co.*, where the Supreme Court stated the Sherman Act "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers." 334 U.S. 219, 236 (1948). Admittedly, the court in *O'Bannon* observed "the Supreme Court has indicated that monopsonistic practices that harm suppliers may violate antitrust law even if they do not ultimately harm consumers." 7 F. Supp. 3d at 992 (citing *Mandeville Island Farms*, 334 U.S. at 236). But while *O'Bannon* reads this standard into *Mandeville Island Farms*, the Supreme Court made no such pronouncement. *See generally Mandeville Island Farms*, 334 U.S. 219. The Supreme Court found injured parties bringing antitrust claims need not be customers or consumers, *see id*. at 235–36; but it did not go so far as to state there need not also be harm to consumers.

In *O'Bannon*, the district court extrapolated an additional meaning from *Mandeville Island Farms* — that antitrust laws do not require harm to consumers — by relying on Justice Jackson's dissent, which noted the price of sugar had not been impacted. *See* 7 F. Supp. 3d at 992 (citation omitted). It is unclear from the majority or the dissent in *Mandeville Island Farms*

whether there was other alleged harm to consumers; and it does not appear the specific issue of whether harm to consumers is required as a secondary harm was reached.  As a result, the Court interprets *Mandeville Island Farms* as allowing parties that are not customers or consumers to bring claims under the Sherman Act, but does not read beyond the holding of the case to find harm to consumers is not a required element of antitrust claims.

Defendants correctly point to binding Eleventh Circuit precedent (*see* Reply 29), which holds "[i]n order for a practice to be exclusionary, it must harm the competitive process and thereby harm consumers."  *Morris*, 364 F.3d at 1294 (alteration added; internal quotation marks and citations omitted).  More recently, the Eleventh Circuit again held plaintiffs seeking to meet the burden of alleging actual harm to competition "should point to the specific damage done to consumers in the market."  *Jacobs*, 626 F.3d at 1339 (internal quotation marks omitted).  Most importantly, neither *Jacobs* or *Morris*, nor any other Eleventh Circuit precedent, carves out exceptions to the rule federal antitrust claims require harm to the consumer.

The Court next turns to Plaintiffs' assertion the Amended Complaint sufficiently alleges harm to consumers as a result of Defendants' conduct.  Two allegations involving harm to consumers appear in the pleading: (1) "[d]ecreasing the quantity, quality, and diversity of television programming catering to viewers of South American international club soccer tournaments, due in part to the Fox Defendants' decision not to air all games of the Club Tournaments" (Am. Compl. ¶ 178(h) (alteration added)); and (2) "[r]educing Conmebol's revenues for television rights to the Club Tournament[s], and consequently reducing the revenues passed on by Conmebol to its member soccer associations, thereby decreasing the funds available to recruit, develop and retain soccer players and to develop new facilities, organizations, and events" (*id*. ¶ 178(e) (alterations added)).

First, Defendants correctly note Plaintiffs do not explain how the Fox Defendants not airing all of the games is connected to the bribery scheme. (*See* Reply 30–31). The Amended Complaint falls short of establishing a connection between the bribery scheme and the decrease in quantity, quality, and diversity of television programming catering to South American international club soccer fans.

Second, Defendants argue the harm related to Conmebol's reduced revenues is too removed from the conduct at issue, and thus amounts to an unexplained and conclusory assertion. (*See id*. 31 (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983))). In *Associated General Contractors*, the harm alleged by the plaintiffs was held to be overly removed from the conduct because it required "several somewhat vaguely defined links," 459 U.S. at 540. Here, Plaintiffs ask the Court to take several logical steps: (1) Conmebol received less revenue (*see* Am. Compl. ¶¶ 12, 112, 121, 124); which in turn meant (2) less revenue for the soccer clubs (*see id*. ¶ 178(e)); and therefore, (3) less investment in recruiting, developing and retaining players or developing new facilities, organizations and events (*see id*.); which then finally (4) harmed viewers of soccer matches (*see id*.). The Amended Complaint is vague as to this alleged harm, as Plaintiffs do not spell out whether less revenue for Conmebol necessarily leads to less revenue for the soccer clubs; and whether less revenue for the soccer clubs necessarily leads to spending less on players, facilities, or events.[6] (*See id*.). It is too late now for Plaintiffs to connect the dots for the Court in their Opposition Memorandum by citing to evidence outside the pleading. (*See* Opp'n 57 (citing González Aff. ¶ 24)).

---

[6] The Court does not consider the information contained in the Affidavit of Fatima Lorena González Toppi [ECF No. 204], filed in response to Defendants' Motion to Dismiss for Lack of Jurisdiction and cited in Plaintiffs' Opposition Memorandum. (*See* Opp'n 43).

CASE NO. 16-24431-CIV-ALTONAGA/Turnoff

The Amended Complaint does not allege a direct harm to consumers.  Counts Three through Eight, alleging violations of Sections 1 and 2 of the Sherman Act, are therefore dismissed.

## C. Standing

Defendants argue neither GolTV nor Global Sports has standing to bring civil RICO or antitrust claims.  (*See* Mot. 69).  According to Defendants, GolTV is not a proper plaintiff because it did not directly bid for the Club Tournament rights.  (*See id*.).  And while Global Sports did bid for the Club Tournament rights, Defendants argue Global Sports is barred from bringing claims because any injury it suffered occurred outside the United States.  (*See id*.). Because Counts Three through Eight are dismissed on other grounds, *see supra* Part III.B., the Court considers whether Plaintiffs have standing to bring the civil RICO claims stated in Counts One and Two.

The RICO statute gives "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter [standing to] sue."  18 U.S.C. § 1964(c) (alterations added).  To determine whether a plaintiff has RICO standing, the Eleventh Circuit requires a plaintiff show "his injuries were proximately caused by the RICO violation."  *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 906 (11th Cir. 1998) (citing *Pelletier*, 921 F.2d at 1499).  The Eleventh Circuit has also found the same motivating principles required to find proximate cause should be considered in determining whether a plaintiff's injury is sufficiently direct for a plaintiff to have RICO standing.  *See Harris*, 636 F. App'x at 483.

### 1.  GolTV

The Eleventh Circuit has interpreted the Sherman Act as limiting antitrust standing to "only the customer who purchased the goods or services at issue directly from the alleged

37

CASE NO. 16-24431-CIV-ALTONAGA/Turnoff

antitrust violator." *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*, 763 F.3d 1280, 1285 (11th Cir. 2014) (emphasis omitted) (citing *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977); other citations omitted).   Defendants contend this indirect-purchaser doctrine for antitrust standing must also be applied in determining whether a plaintiff has standing to bring civil RICO claims.   (*See* Mot. 70 (citing *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996))).   Plaintiffs disagree and reference a footnote in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 270 n.15 (1992), as evidence the Supreme Court has rejected the application of antitrust injury principles to RICO claims.   (*See* Opp'n 71 (citing *Holmes*, 503 U.S. 258, 270 n.15)).   Plaintiffs also cite *Sedima*, 473 U.S. at 493–99, *Anza*, 547 U.S. at 457, and *Bridge*, 553 U.S. at 654–55, in which the Supreme Court applied a proximate cause standard to determine whether plaintiffs could bring civil RICO claims.   (*See* Opp'n 72.)

While Defendants assert multiple circuits have applied the antitrust standing doctrine to RICO claims (*see* Reply 43), they only cite to decisions of the Third Circuit (*see* Mot. 70; Reply 43).   The parties have not cited to any Eleventh Circuit case applying such a standard. Instead, the Eleventh Circuit has found the standard for RICO standing is a determination of proximate cause.   *See, e.g.*, *Bivens Gardens Office Bldg.*, 140 F.3d at 906; *Pelletier*, 921 F.2d at 1499; *Harris*, 636 F. App'x at 483.   Here, the pleading alleges proximate cause, and as such, is sufficient to establish GolTV's RICO standing.   *See Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 155 F. Supp. 3d 1344, 1357 (S.D. Fla. 2015) (recognizing "the intertwined nature of the standing, proximate cause, and damages analyses under the RICO statutes" in determining the plaintiffs failed to allege proximate cause and damages in addition to RICO standing).

### 2. Global Sports

"A private RICO plaintiff [] must allege and prove a *domestic* injury to its business or property" in order to establish standing to bring suit under RICO. *RJR Nabisco, Inc.*, 136 S. Ct. at 2106 (alteration added; emphasis in original). In determining whether an injury is domestic or foreign, "[t]he application of this rule in any given case will not always be self-evident, as disputes may arise as to whether a particular alleged injury is 'foreign' or 'domestic.'" *Id.* at 2111 (alteration added). The parties disagree whether Global Sports alleges a domestic or foreign injury — and whether it has standing to bring RICO claims against Defendants.

Many district courts have grappled with this issue, some taking a nuanced approach, and others simply looking to the nationality or home of the plaintiff to determine where the injury was felt. *Compare Tatung Co., Ltd. v. Hsu*, 217 F. Supp. 3d 1138 (C.D. Cal. 2016) (holding the plaintiff suffered a domestic RICO injury because the conduct in question was directed at the plaintiff's business pursuits in the United States), *and Glock v. Glock*, No. 1:14-CV-3249, 2017 WL 1049448, at *7 (N.D. Ga. Mar. 20, 2017) (deciding the injury of an Austrian ex-wife was not suffered in the United States because there was no indication the injury arose when she was working, traveling, or doing business in the United States, or that the assets at issue were in the United States), *appeal filed*, Apr. 7, 2017; *with Armada (Singapore) Pte Ltd. v. Amcol Int'l Corp.*, No. 13 C 3455, 2017 WL 1862836, at *1 (N.D. Ill. May 9, 2017) (determining the injury was foreign because it was suffered at the plaintiff's principal place of business in Singapore), *and Cevdet Aksut Ogullari Koll. Sti v. Cavusoglu*, 245 F. Supp. 3d 650, 659 (D.N.J. 2017) (holding injury to a business was foreign because the business was located in Turkey). Recently, in *Lan Li v. Walsh*, No. 16-81871-CIV, 2017 WL 3130388, at *10 (S.D. Fla. July 24, 2017), the court held Iranian and Chinese immigrant investors were injured abroad, not domestically,

because they did not allege an economic impact felt in the United States, nor did they allege they were working, traveling, or doing business in the United States at the time.

Defendants argue Global Sports may not bring RICO claims because it is not based in the United States and thus any injury or economic impact felt as a result of Defendants' actions occurred where Global Sports is located — in Uruguay. (*See* Mot. 74 (citing *Absolute Activist Value Master Fund Ltd.*, 2017 WL 519066, at *20)). Plaintiffs contend where Global Sports suffered the injury is not necessarily where the company is based. They offer alternative tests to determine whether an injury is domestic or foreign. (*See* Opp'n 75 (citing *Bascuñan v. Elsaca*, 874 F.3d 806, 814 (2d Cir. 2017); and *Tatung*, 217 F. Supp. 3d at 1138)). In *Bascuñan*, where misappropriation of property was at issue, the Second Circuit concluded "an injury to tangible property is generally a domestic injury only if the property was physically located in the United States." 874 F.3d at 819. In *Tatung*, the court found the defendants "thwarted" the plaintiff's business dealings in California and noted it "cannot be the case that the mere fact that a loss is economic means that foreign corporations are unable to avail themselves of the protections of civil RICO." 217 F. Supp. 3d at 1155. Plaintiffs similarly argue Global Sports's exclusion and injury are domestic events because of its efforts to conduct business in the United States in the form of purchasing U.S. broadcasting rights to Club Tournaments. (*See* Opp'n 75).

The Court is persuaded by the nuanced approach to determining whether a RICO injury is "domestic" or "foreign." Evidence of foreign nationality or primary place of business alone is insufficient to categorize an injury as foreign under RICO. Consideration of factors such as where the injury to a property interest took place, *see Bascuñan*, 874 F.3d at 819; and whether Plaintiffs were working, traveling or doing business in the United States at the time, *see Lan Li*, 2017 WL 3130388, at *10; are relevant.

Here, the injury to Global Sports's property interest was the loss of bids to purchase the U.S. and Americas broadcasting rights for Club Tournaments.  (*See* Am. Compl. ¶¶ 111–12, 116–17, 122–23).  Each of the bids was also an attempt by Global Sports to do business in the United States, as "GolTV and Global Sports together were denied the ability to provide telecasts of the Club Tournaments in the Florida market and throughout the United States."  (*Id.* ¶ 141).  As a result, the Amended Complaint alleges domestic injury to Global Sports, and Global Sports has civil RICO standing.

### D.  State Law Claims (Counts 9–11)

In their Amended Complaint, Plaintiffs raise claims against Defendants under the FDUTPA (Count 9) (*see id.* ¶¶ 312–17); and for civil conspiracy to commit tortious interference under Florida law (Count 11) (*see id.* ¶¶ 325–29).  Plaintiffs also bring a claim against T&T, Torneos and the Fox Defendants for tortious interference with prospective economic advantage under Florida law (Count 10).  (*See id.* ¶¶ 318–24).  Defendants request the Court dismiss all of the Florida law claims.  (*See* Mot. 75–81).

#### 1.  Florida Deceptive and Unfair Trade Practices Act Claim

The FDUTPA "protect[s] the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.202(2) (alteration added).  The "FDUTPA can be violated in two ways: (1) a per se violation premised on the violation of another law proscribing unfair or deceptive practice and (2) adopting an unfair or deceptive practice."  *Felice v. Invicta Watch Co. of Am., Inc.*, No. 16-CV-62772, 2017 WL 3336715, at *2 (S.D. Fla. Aug. 4, 2017) (internal quotation marks and citation omitted).  "An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive,

unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (internal quotation marks and citations omitted).   An act is deceptive "if there is a representation, omission[,] or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Millennium Commc'ns & Fulfillment, Inc. v. Office of the Att'y Gen.*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000) (alteration added) (quoting *Sw. Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1434–35 (9th Cir. 1986)).

Defendants argue the FDUTPA claim fails because it is derivative of Plaintiffs' deficient federal antitrust claims, and so should also be dismissed.   (*See* Mot. 75).   To this, Plaintiffs respond, "even if the Court were to conclude that Defendants' conduct has not violated the antitrust laws, Defendants' use of commercial bribery to deprive Plaintiffs of a fair opportunity to bid upon and obtain the tournament rights would by itself be sufficient to state a FDUTPA claim." (Opp'n 77).   The Court agrees dismissal of antitrust claims does not necessarily strike a death knell for a claim under the FDUTPA.

Yet, as is the case for antitrust claims, claims under the FDUTPA require harm to consumers.   Plaintiffs concede as much, asserting an unfair or deceptive practice must be "injurious to consumers."   (*Id.* (quoting *Am. Airlines, Inc. v. Despegar.com USA, Inc.*, No. 13-2277-CIV, 2013 WL 12064859, at *7 (S.D. Fla. Nov. 13, 2013))).   For the same reasons articulated in *supra* Part III.B., the Amended Complaint fails to sufficiently plead harm to consumers for purposes of articulating a claim under the FDUTPA.   Consequently, the Court does not address Defendants' other arguments regarding the FDUTPA claim, and dismisses Count Nine.

CASE NO. 16-24431-CIV-ALTONAGA/Turnoff

### 2.   Tortious Interference and Conspiracy to Interfere Claims

To state a claim for tortious interference with prospective economic advantage or business relationship, a plaintiff must show: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985); *see also G.M. Brod & Co. Inc.*, *v. U.S. Home Corp.*, 759 F.2d 1526, 1534 (11th Cir. 1985) (explaining elements of tortious interference under Florida law).

The Eleventh Circuit has held "[a] mere offer to sell . . . does not, by itself, give rise to sufficient legal rights to support a claim of intentional interference with a business relationship." *Duty Free Ams., Inc. v. Estée Lauder Cos., Inc.*, 797 F.3d 1248, 1279–80 (11th Cir. 2015) (internal quotation marks and citation omitted; alterations added).  Instead, "an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994); *see also Int'l Sales & Serv.*, 262 F.3d at 1154.  To be clear, "[a] business relationship need not be evidenced by a contract." *Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (alteration added; citation omitted).

Defendants argue Plaintiffs fail to state two of the required elements for this claim in Count Ten: the existence of a relationship between Conmebol and Plaintiffs beyond that of offeror and offeree, and damage to Plaintiffs as a result of a breach of the relationship.  (*See* Mot. 79–81).  According to Defendants, no business relationship is alleged because Plaintiffs'

connection to Conmebol was limited to Global Sports's offers to purchase Club Tournament television rights from Conmebol.  (*See id*. 80).  Defendants describe Plaintiffs' claims as even weaker than those in a typical case in which a party makes an offer because here the rights were not for sale and were under contract to T&T when the offers were made.[7]  (*See id*.).  For their part, Plaintiffs emphasize facts Defendants overlook supporting Plaintiffs' relationship with Conmebol, including:[8] a preexisting and ongoing relationship at the time Plaintiffs pursued the tournament rights; Conmebol's President's promise Plaintiffs' proposal would receive formal consideration by the Conmebol Executive Committee; and the fact Plaintiffs' submissions were the only other proposals for the television rights for the Club Tournaments.  (*See* Opp'n 84–85 (citing Am. Compl. ¶¶ 116–17, 321)).

Other courts have addressed the standard for whether a business relationship arises in the context of a bidding process for a contract or exclusive rights.  "[T]o establish a protected business relationship within a bidding process, a plaintiff must allege additional facts indicating that the relationship went beyond the bidding process and into negotiations which in all probability would have been completed."  *Duty Free Ams., Inc. v. Estée Lauder Cos., Inc.*, 946 F. Supp. 2d 1321, 1339 (S.D. Fla. 2013) (alteration added; citations omitted).  In *Diversified Management Solutions, Inc. v. Control Systems Research, Inc.*, No. 15-81062-CIV, 2016 WL 4256916 (S.D. Fla. May 16, 2016), the court held the plaintiff, a weather observation service,

---

[7]Arguments focused on whether the television rights were already under contract at the precise moment Plaintiffs brought each proposal to Conmebol and whether Conmebol would have revoked those contracts had it not been for the fraudulent acts of Defendants are factual disputes the Court will not address.  *See supra* Part III.A.1.

[8] The Court does not consider extraneous facts referenced in Plaintiffs' Opposition stating T&T reacted to Plaintiffs' 2012 offer to Conmebol by paying an additional $200,000 per year to two Conmebol directors and that Defendants' actions were aimed at preventing Plaintiffs from being awarded the Club Tournament television rights.  (*See* Opp'n 85–86).

had a business relationship with the Federal Aviation Authority as part of a bidding process. *See id*. at *7. The defendant, a rival contractor that interfered in the bidding process, argued the plaintiff's relationship with the FAA was limited to that of offeror and offeree, but the court found plaintiff had shown two of its bids were later accepted by the FAA, indicating the plaintiff would have had significantly more than a "speculative hope" of winning the contracts had it not been for the defendant. *Id.*

In this case, there are allegations of a relationship between Conmebol and Plaintiffs go beyond the simple submission of offers. Plaintiffs were the only party other than T&T to bid for the Club Tournament television rights (*see* Am. Compl. ¶ 140); Plaintiffs' bids were significantly higher than T&T's (*see id*. ¶¶ 112, 117, 121–24, 126); Conmebol officials told Plaintiffs if they submitted a proposal, it would be formally considered by the Executive Committee (*see id*. ¶¶ 116–20); Conmebol shared its bids with Defendants, resulting in an increase in the amount T&T ultimately paid for the television rights (*see id*. ¶¶ 113–14, 118, 120, 125, 321); and Global Sports had previously entered into an agreement with Conmebol to purchase static advertising rights, such as billboard space for the Club Tournaments from 2010 to 2014 (*see id*. ¶ 320). Together, these are plausible allegations of a business relationship in which, had it not been for Defendants, Conmebol and Plaintiffs would have in all probability reached an agreement for Plaintiffs to purchase the Club Tournament television rights. *See Ethan Allen Inc.*, 647 So. 2d at 815. For these reasons, as well as those previously explained, the Amended Complaint sufficiently alleges damage to Plaintiffs as a result of a breach of the relationship.

Count Ten for tortious interference under Florida law survives the Motion. As to Count Eleven, Defendants do not present a meaningful challenge to Plaintiffs' conspiracy claim. (*See generally* Mot.). In fact, Defendants' only reference to the conspiracy claim is in the title of the

subsection on tortious interference, which states "Plaintiffs Do Not Plead Cognizable Claims for Tortious Interference or Conspiracy to Interfere." (*Id*. 79). As such, Count Eleven is not dismissed.

### E. Alejandro Burzaco

While Burzaco adopts and joins Defendants' Motion, he also writes separately. (*See id*. 81). First, Burzaco addresses the RICO claims, arguing Plaintiffs fail to allege their injury was proximately caused by Defendants' conduct. (*See id*.). Second, Burzaco argues Plaintiffs' claims are time-barred to the extent the claims are based on events surrounding the rejection of an offer made by Plaintiffs to Conmebol in March 2010.[9] (*See id*. 82–84). Burzaco does not make any new arguments regarding proximate cause (*see id*. 81), and so the Court only addresses his arguments as they pertain to whether the claims are time-barred.

"[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845–46 (11th Cir. 2004) (alteration added; internal quotation marks and citations omitted). The Court considers whether the RICO claims (Counts 1 & 2) and the remaining Florida state law claims (Counts 10 & 11) are time-barred.

#### 1. RICO claims

A four-year statute of limitations applies to civil RICO claims. *See Rotella v. Wood*, 528 U.S. 549, 552 (2000) (citation omitted). The date of accrual is based on the date the plaintiff knew or should have known it was injured. *See id.* at 553; *see also Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1251 (11th Cir. 2011) (citation omitted). Defendants maintain the injury occurred when Plaintiffs' March 2010 offer to purchase the Club Tournament

---

[9] Defendants join and adopt Burzaco's argument Plaintiffs' claims are time-barred. (*See* Mot. 84 n.27; *see also* Reply 52 n.30).

rights was rejected,[10] falling outside the four-year statute of limitations.   (*See* Mot. 82–83).  According to Plaintiffs, Defendants' fraudulent concealment in the form of sham consulting agreements and the hidden bribery scheme prevented Plaintiffs from learning of the injury.  (*See* Opp'n 87; *see also* Am. Compl. ¶ 136).   The Court looks to the Amended Complaint to determine the accrual date.

The Amended Complaint shows the accrual date was May 27, 2015, when Plaintiffs learned of an indictment for bribery, fraud, and other criminal wrongdoing associated with Conmebol's awarding of rights for soccer tournaments.   (*See* Am. Compl. ¶ 127).   Plaintiffs claim to have investigated why Conmebol had rejected their offers prior to May of 2015, but were unable to uncover the injuries caused by Defendants' wrongdoing and interference until the criminal indictments brought Defendants' bribery conspiracy to light.   (*See id*. ¶¶ 136–37).  Unlike *Pacific Harbor*, 252 F.3d at 1246, where the plaintiff suspected wrongdoing several years before beginning to investigate, there is no indication Plaintiffs should have suspected they had been injured by Defendants prior to the May 2015 indictment.   Since the accrual date is May 27, 2015 and Plaintiffs filed suit on October 20, 2016 — less than four years later — the RICO claims are not time-barred.

### 2.   State law claims

Under Florida law, the statute of limitations for malicious interference and other intentional tort claims is four years.   *See* Fla. Stat. § 95.11(3)(o).   "A cause of action accrues, for statute of limitations purposes 'when the last element constituting the cause of action occurs.'"

---

[10] The offer to Conmebol to purchase television rights for 2011 to 2014 was presented through a series of meetings, the first of which occurred on March 3, 2010.  (*See* Am. Compl. ¶¶ 111-12).  The Amended Complaint is not specific as to when Conmebol rejected Plaintiffs' offer, stating only that "Conmebol did not accept [Plaintiffs'] offer."  (*Id*. ¶ 114 (alteration added)).

CASE NO. 16-24431-CIV-ALTONAGA/Turnoff

*New Lenox Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 906 (M.D. Fla. 2007) (footnote call number omitted) (quoting Fla. Stat. § 95.031(1)).

Defendants argue the Florida state law claims are brought occurred outside the applicable four-year limitations period and no delayed discovery doctrine applies. (*See* Mot. 84 n.27 (citing *Yusuf Mohamad Excavation, Inc. v. Ringhaver Equip., Co.*, 793 So. 2d 1127, 1127 (Fla. 5th DCA 2001))). Plaintiffs concede Defendants' point, instead arguing the doctrine of fraudulent concealment should be employed to toll the statute of limitations. (*See* Opp'n 88 n.26 (citing *Razor Capital, LLC v. CMAX Fin. LLC*, No. 17-80388, 2017 WL 3481761, at *3 (S.D. Fla. Aug. 14, 2017))).

Generally two elements are required for fraudulent concealment to toll the statute of limitations: "'[a] plaintiff must show both successful concealment of the cause of action and fraudulent means to achieve that concealment.'" *Jones v. Childers*, 18 F.3d 899, 909 (11th Cir. 1994) (alteration added) (quoting *Nardone v. Reynolds*, 333 So. 2d 25, 37 (Fla. 1976), *holding modified on other grounds by Tanner v. Hartog*, 618 So. 2d 177 (Fla. 1993)). The Amended Complaint describes how Burzaco and his co-Defendants successfully concealed their bribery conspiracy for years through a series of sham consulting agreements that disguised bribery payments to corrupt Conmebol officials as payments for legitimate services which were never rendered. (*See* Am. Compl. ¶¶ 71–74, 136). Defendants' actions fall squarely into the standard set by the Florida Supreme Court for fraudulent concealment. As such, Counts Ten and Eleven are not dismissed.

### F.   Juan Angel Napout

Napout[11] argues the general allegations against Conmebol officials do not give him fair notice of the claims against him; and the specific factual allegations fall short of stating a claim against him.  (*See* Mot. 84–89).  Certainly, Rule 8 requires a plaintiff give "fair notice" of what its claims are and the "grounds upon which [they] rest[]."  *Twombly*, 550 U.S. at 555 (alterations added; citation omitted).  To satisfy the minimum standard of Rule 8, a complaint "must delineate the conduct at issue as to each Defendant, [and] allege facts showing knowledge or intent as to each Defendant[.]"  *Bentley v. Bank of Am., N.A.*, 773 F. Supp. 2d 1367, 1373 (S.D. Fla. 2011) (alterations added).  As discussed in *supra* Part III.A.3., civil RICO plaintiffs alleging wire fraud, as is the case here, must additionally satisfy the heightened pleading requirements of Rule 9(b).  *See Durham*, 847 F.2d at 1511–12.

Napout accuses Plaintiffs of lumping him together with other Conmebol officials by using the term "Conmebol officials," which refers to as many as 16 individuals.  (*See* Mot. 87 (citing Am. Compl. ¶ 66)).  Plaintiffs use the term "Conmebol officials" to refer to (1) individuals other than Napout (*see id*. (citing Am. Compl. ¶¶ 62, 64, 66, 70, 116)); (2) an unspecified and general set of individuals (*see id*. (citing Am. Compl. ¶¶ 3, 4, 5, 11, 12, 71, 78)); and (3) Napout and Figueredo (*see id*. (citing Am. Compl. ¶¶ 129, 139, 168, 186, 189, 190, 191, 238, 258, 274)).  Napout cites several cases for the unremarkable proposition a plaintiff cannot lump together defendants.  (*See id*. 86 (citations omitted)).

In *Joseph v. Bernstein*, only one of the five defendants was specifically named as engaging in fraudulent activities, while other allegations lacked any explanation of how each defendant was liable.  *See* No. 13-24355, 2014 WL 4101392, at *6 (S.D. Fla. Aug. 19, 2014).  In

---

[11]Napout additionally adopts and joins Defendants' arguments for dismissal of Counts One through Five, Eight, Nine and Eleven of the Amended Complaint.  (*See* Mot. 84 n.28; *see also* Reply 55 n.32).

*Lane v. Capital Acquisitions & Mgmt. Co.*, the complaint did not differentiate among the defendants, instead alleging violations by one collective defendant despite naming five defendants. *See* No. 04-60602 CIV, 2006 WL 4590705, at *5 (S.D. Fla. Apr. 14, 2006). Consequently, the district court found each individual defendant could not determine from the face of the complaint which acts or omissions the plaintiffs sought to hold them each liable for. *See id.* In *City of Miami v. Bank of Am. Corp.*, the plaintiff lumped together the defendants and made "undifferentiated allegations against the composite entity." 171 F. Supp. 3d 1314 (S.D. Fla. 2016).

The Amended Complaint is unlike the pleadings discussed in *Joseph*, *Lane*, and *City of Miami*. There are 34 paragraphs containing specific allegations against Napout. (*See* Am. Compl. ¶¶ 2, 34, 38–39, 45, 54, 69, 76, 84, 129, 132–35, 139, 168, 184, 186, 189–92, 203, 238, 245, 250, 258, 262–64, 266–67, 274, 327). The term "Conmebol officials" is defined as members of the Executive Committee of Conmebol (*see id.* ¶ 32), and Napout was a member of the Executive Committee from 2007 to 2014 (*see id.* ¶ 34). The Amended Complaint's specificity is thus a far cry from the indiscriminate lumping together of defendants in the cases Napout cites. Furthermore, Plaintiffs point out Napout's ability to distinguish which allegations do not pertain to him is itself evidence the pleading provides Napout with fair notice of the claims against him. (*See* Opp'n 92). The Court agrees.

Napout also asserts the Amended Complaint falls short of stating an actionable claim against him. (*See* Mot. 88–89). But he merely recycles Defendants' prior arguments that Plaintiffs (1) could not have successfully bid for Club Tournament rights already under contract and (2) were unsuccessful in bidding for broadcasting rights once there was no ongoing bribery

taking place.  (*See id.* 89).  Again, the Court declines to address what amounts to a factual dispute between the parties.

Instead, the Court looks to the Amended Complaint to determine whether the factual allegations against Napout are sufficient.  Plaintiffs allege Napout committed illegal acts, including: (1) unlawfully negotiating and reaching agreements regarding the television rights (*see, e.g.*, Am. Compl. ¶¶ 132–35, 139, 168, 186, 189–92, 245, 250, 258); (2) soliciting and receiving six-figure bribe payments in exchange for those rights (*see, e.g.*, *id.* ¶¶ 69, 76, 135, 168, 186, 189–92, 203, 238, 245, 250, 258); (3) misleading Plaintiffs about when the rights were available and licensing those rights in advance of expected offers from Plaintiffs (*see, e.g.*, *id.* ¶¶ 129, 139); and (4) conspiring with co-Defendants to conceal the fraudulent activity (*see, e.g.*, *id.* ¶¶ 84, 186).  These allegations are sufficient to state a claim under RICO with wire fraud and commercial bribery as predicate offenses.  *See supra* Part III.A.3.

The Court also considers whether the pleading states a claim against Napout for conspiracy to commit tortious interference.  Since the alleged conduct sufficiently demonstrates tortious interference, *see* Part III.D.2., the Court limits its analysis below to whether Plaintiffs plead a claim for civil conspiracy against Napout.

In Florida, the elements of a civil conspiracy claim are: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy."  *UTC Indus., Inc. v. Presidential Fin. Corp.*, 976 So. 2d 92, 94 (Fla. 3d DCA 2008) (citation and internal quotation marks omitted).  The "gist of a civil conspiracy is . . . the civil wrong which is done through the conspiracy which results in injury to the Plaintiff."  *Czarnecki v. Roller*, 726 F. Supp. 832, 840 (S.D. Fla. 1989) (alteration added; citation and

CASE NO. 16-24431-CIV-ALTONAGA/Turnoff

internal quotation marks omitted).  The Amended Complaint makes it clear Napout agreed to participate in wire fraud and commercial bribery involving several parties (*see* Am. Compl. ¶¶ 69, 186, 189–92, 245); received bribes in exchange for ensuring T&T rather than Plaintiffs received the rights to the Club Tournaments (*see id.* ¶¶ 76, 84, 139, 250); and caused harm to Plaintiffs in the form of loss of profits (*see id.* ¶ 179, 268).  Count Eleven for conspiracy to commit tortious interference amply states a claim for relief.

For the reasons stated above, the antitrust claims (Counts 3–5 & 8), and the FDUTPA claim (Count 9), against Napout are dismissed.  *See supra* Part III.B. (dismissing antitrust claims for failing to allege harm to consumers); *see also supra* Part III.D.1. (dismissing the FDUTPA claim for the same reasons).

## IV.    CONCLUSION

In accordance with the foregoing, it is

**ORDERED AND ADJUDGED** that the Motion to Dismiss **[ECF No. 255]** is **GRANTED in part** and **DENIED in part**.  The parties shall file a joint scheduling report, as required by Local Rule 16.1, by **February 8, 2018**.

**DONE AND ORDERED** in Miami, Florida, this 26th day of January, 2018.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

52