# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

GOLTV, INC., and GLOBAL SPORTS
PARTNERS LLP,

                                 Plaintiffs,

          -against-

FOX SPORTS LATIN AMERICA, LTD., PAN
AMERICAN SPORTS ENTERPRISES
COMPANY, d/b/a FOX SPORTS LATIN
AMERICA (individually and as successor to FOX
PAN AMERICAN SPORTS LLC), FOX
INTERNATIONAL CHANNELS (US), INC.,
FOX NETWORKS GROUP, INC. (as successor to
FOX INTERNATIONAL CHANNELS (US),
INC.), CARLOS MARTINEZ, HERNAN LOPEZ,
JAMES GANLEY, T&T SPORTS MARKETING
LTD., TORNEOS Y COMPETENCIAS, S.A.,
ALEJANDRO BURZACO, FULL PLAY GROUP
S.A., CONFEDERACION SUDAMERICANA
DE FUTBOL, d/b/a CONMEBOL, EUGENIO
FIGUEREDO, and JUAN ANGEL NAPOUT,

                                 Defendants.

No. 16-cv-24431-CMA

**SECOND AMENDED
COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs GolTV, Inc. ("GolTV") and Global Sports Partners LLP ("Global Sports," and together with GolTV, "Plaintiffs"), by and through their undersigned attorneys, allege as follows for their complaint:

## I.      NATURE OF THE ACTION

1.      Plaintiff GolTV is a television channel based in North Bay Village, Florida, that provides Spanish and English soccer programming in the United States.  Plaintiff Global Sports is an English partnership that was formed by GolTV's owners to, among other things, acquire television rights to international soccer tournaments on GolTV's behalf.

2.      Together, Plaintiffs are victims of a bribery scheme described by the U.S. Department of Justice ("DOJ") in its criminal indictments against, among others, Defendant Alejandro Burzaco ("Burzaco"), a principal of Defendant T&T Sports Marketing Ltd. ("T&T"), Hugo Jinkis and Mariano Jinkis, principals of Defendant Full Play Group, S.A., Defendants Eugenio Figueredo and Juan Angel Napout, former presidents of Defendant Confederación Sudamericana de Futbol ("Conmebol"), and numerous other Conmebol officials.  *See* Superseding Indictment, *United States of America v. Webb et al.*, No. 15-cr-0252 (E.D.N.Y. Nov. 25, 2015), ECF No. 102 (hereinafter "*U.S. v. Webb*").  The Superseding Indictment charges these individual Defendants with RICO violations, wire fraud, and money laundering.  For ease of reference, the Superseding Indictment is attached as **Exhibit A**.

3.      As set forth in the Superseding Indictment, Defendant T&T paid tens of millions of dollars in bribes and kickbacks to corrupt Conmebol officials between 2000 and 2015 in exchange for the exclusive television rights to Conmebol's prestigious international soccer club tournaments: the Copa Libertadores de America ("Copa Libertadores"), the Copa Sudamericana, and the Recopa Sudamericana (collectively, the "Club Tournaments").  *See* Superseding Indictment ¶¶ 174-185 (describing "Conmebol Copa Libertadores Scheme # 2").

4.      To date, Defendant Burzaco and Jose Margulies, an individual who facilitated the payment of bribes from T&T to Conmebol officials, have pled guilty to racketeering conspiracy, wire fraud conspiracy, and money laundering conspiracy in connection with their bribery of Conmebol officials, including bribery in connection with the television rights to the Club Tournaments and other criminal conduct.  *See U.S. v. Webb*, ECF Nos. 90, 263, and 96, 262, respectively.  Rafael Esquivel, a Conmebol official, also has pled guilty to wire fraud conspiracy and money laundering conspiracy in connection with bribery for the television rights to the Club

Tournaments and other criminal conduct. *See U.S. v. Webb*, ECF No. 476. In separate proceedings, Conmebol officials Luis Bedoya and Sergio Jadue have pled guilty to Informations filed in *United States of America v. Bedoya*, No. 15-cr-0569 (E.D.N.Y. filed Nov. 5, 2015) and *United States of America v. Jadue*, No. 15-cr-0570 (E.D.N.Y. filed Nov. 5, 2015), respectively, which charged them with engaging in a RICO conspiracy and wire fraud conspiracy in connection with bribery for the Club Tournament television rights and other criminal wrongdoing.

5.      Burzaco and T&T did not act alone in bribing Conmebol officials for the Club Tournament television rights. During the relevant period, T&T was a Cayman Islands company with no employees or physical offices that was 75% owned by Fox Pan American Sports LLC ("Fox Pan American"), which did business as "Fox Sports Latin America." The remaining 25% ownership interest in T&T was held by Defendant Torneos y Competencias S.A. ("Torneos").

6.      Torneos has admitted that Fox Pan American and Torneos knowingly used T&T to bribe Conmebol officials in exchange for the Club Tournament television rights. On December 13, 2016, Torneos entered into a Deferred Prosecution Agreement with the DOJ ("Torneos DPA"). In the Torneos DPA, Torneos acknowledged that it is criminally culpable for a wire fraud conspiracy to pay bribes and kickbacks to Conmebol officials in exchange for their support to award the Club Tournament television rights to T&T. *See* Torneos DPA, *United States of America v. Torneos y Competencias S.A.*, No. 16-cr-00634-PKC, ECF Nos.4-1 and 4-2 (E.D.N.Y. Dec. 13, 2016). The Torneos DPA is attached as **Exhibit B**.

7.      Specifically, the DOJ alleged, and Torneos admitted, that with the agreement and support of two affiliates of a major broadcasting company headquartered in the United States, which are believed to be Defendant Fox International Channels (U.S.) Inc. ("FIC") and Fox Pan

American, and three of their executives, which are believed to be Defendants Hernan Lopez, Carlos Martinez, and James Ganley, Torneos agreed to pay and caused to be paid annual six-figure and, in some instances, seven-figure bribe and kickback payments in exchange for the Club Tournament television rights.  *See* Torneos DPA Statement of Facts ¶¶ 17-18, 37.  Those rights were then sublicensed to Fox Pan American subsidiary Defendant Fox Sports Latin America, Ltd. ("FSLA"), and the tournaments were broadcast on Fox Sports channels in the United States and abroad.

8. Martinez, who is the current President of Fox Networks Groups Latin America; Lopez, who was the CEO of FIC from 2011 to January 2016 and the COO of FIC prior to that time; and Ganley, who was the Chief Operating Officer of Fox Pan American, participated in T&T's payment of bribes to Conmebol officials to ensure that Fox Sports Latin America would obtain the lucrative television rights for the Club Tournaments through T&T.  All three of these executives were directors of T&T, and Defendant Burzaco, a shareholder, director and officer of Torneos, similarly served as a principal of T&T.

9. Torneos also has admitted that it at times relied on a sports marketing company and two of its principals, who are believed to be Defendant Full Play and its principals Hugo Jinkis and Mariano Jinkis, to facilitate the payment of bribes and kickbacks in connection with the Club Tournament television rights.  *See* Torneos DPA Statement of Facts ¶ 38.

10. Moreover, Defendant and former Conmebol President Eugenio Figueredo attested in Uruguayan criminal proceedings that "the FOX company was behind all the illicit negotiations," and identified "an executive surnamed Martinez as responsible for the contracts with Jinkis and Burzako [*sic*]."

11.     As part of the Torneos DPA and its admission of its role in the 15-year scheme involving paying tens of millions of dollars in bribes and kickbacks to Conmebol officials, Torneos agreed to over $112.8 million in forfeiture and criminal penalties.

12.     Plaintiffs GolTV and Global Sports were directly harmed by Defendants' bribery of Conmebol officials and other criminal conduct.  Global Sports, as agent for, and on behalf of, GolTV, repeatedly offered Conmebol substantially more for the television rights to air the Club Tournaments than the amounts T&T paid or offered to Conmebol for those rights.  Even though the Conmebol officials were obligated, pursuant to their fiduciary duties to Conmebol's member associations, to obtain the best terms for the television rights, the Conmebol officials repeatedly rejected Plaintiffs' superior offers in favor of T&T's inferior offers because of the bribes paid to those officials by T&T.

13.     GolTV and Global Sports now seek compensation for the harm they suffered from the loss of the rights that they otherwise would have been able to obtain in a fair and competitive market untainted by bribery and kickbacks, unreasonable restraints of trade, and other criminal and wrongful conduct.  Plaintiffs accordingly bring this action asserting violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); conspiracy in restraint of trade in violation of Section 1 of the Sherman Act; monopsonization, conspiracy to monopsonize, and attempted monopsonization in violation of Section 2 of the Sherman Act; violations of the Florida Deceptive and Unfair Trade Practices Act; tortious interference with prospective economic advantage; and civil conspiracy.

## II.     THE PARTIES

### A.     Plaintiffs

14.     Plaintiff GolTV is a Florida corporation having its principal place of business in North Bay Village, Florida.  GolTV produces and markets a television channel that provides

professional soccer programming in English and Spanish to viewers in the United States and abroad. GolTV's telecasts are made available widely in the United States through television providers such as Verizon, Charter/Time Warner, Cox, Frontier, Cablevision, and Century Link. At all relevant times GolTV was, and remains, a competitor of the Fox Defendants (as defined below in Paragraph 23), with whom it also does business.

15.     GolTV is the only TV channel in the U.S. media market devoted exclusively to soccer. For many years it had the rights to live broadcasting in the United States of the Spanish La Liga and Italian Serie A leagues. Currently, GolTV broadcasts live matches of the German Bundesliga and the Brazilian, Uruguayan and Venezuelan soccer leagues, along with various cups and tournaments. In total, GolTV broadcasts over 400 live matches per year in English and Spanish. GolTV is owned by Francisco "Paco" Casal, a Uruguayan businessman and former soccer player; Nelson Gutierrez, a former member of the Uruguayan national soccer team; and Enzo Francescoli, another former member of the Uruguayan national soccer team. Casal and Gutierrez also own the Uruguayan sports production company Tenfield S.A. and GolTV Latin America, which produces a separate soccer channel distributed throughout Latin America.

16.     Plaintiff Global Sports is a limited liability partnership organized by GolTV's owners Casal and Gutierrez under English law with its principal place of business in Montevideo, Uruguay. Global Sports was formed to obtain the television and marketing rights to international soccer matches for GolTV. During the relevant period, Global Sports acted, among other capacities, as an agent for GolTV to attempt to acquire television broadcasting rights to the Club Tournaments. To that end, GolTV controlled and coordinated the actions that Global Sports took on behalf of GolTV and Global Sports served the corporate interests of GolTV in seeking to acquire television rights to the Club Tournaments.

B.     **Defendants**

17.     Defendant T&T is a Cayman Islands limited company that on information and belief has no employees or physical offices.  During most of the relevant period (2005-2015) T&T was 75% owned by Fox Pan American and 25% owned by Defendant Torneos.

18.     Fox Pan American was a Delaware limited liability company registered to do business in Florida that did business as Fox Sports Latin America:

> FIC [Fox International Channels (US), Inc.] operates Fox Pan American Sports LLC, doing business as Fox Sports Latin America ("FSLA"), an international sports programming and production entity . . . FSLA owns and operates the Fox Sports networks in Latin America, which are comprised of Spanish-language sports networks that are distributed to subscribers in Mexico and certain Caribbean and Central and South American countries, as well as Fox Sports Brazil, a Portuguese-language sports network specifically geared to the Brazilian audience, and also owns 100% of Fox Deportes, a Spanish-language sports programming service distributed in the United States.

Twenty-First Century Fox, Inc., *Annual Report (Form 10-K)*, at 7 (Aug. 13, 2015).

19.     In June 2015, Fox Pan American merged with Defendant Pan American Sports Enterprises Company ("PASEC"), which became the surviving entity and legal successor to Fox Pan American.  PASEC is a Delaware corporation having its principal place of business in New York, New York.  On information and belief, PASEC continues to own, directly or indirectly, 75% of T&T.

20.     Defendant Fox International Channels (US), Inc. ("FIC") is a Delaware corporation having its principal place of business in Beverly Hills, California and offices in Florida.  FIC owns PASEC and owned Fox Pan American.  FIC operated Fox Pan American through its business unit FIC Latin America out of FIC's offices in Florida.

21.     Defendant Fox Sports Latin America, Ltd. ("FSLA") is a Cayman Islands limited company having its principal place of business in Coral Gables, Florida.  It was a wholly owned

subsidiary of Fox Pan American to which T&T sublicensed the Club Tournament television rights.

22.     Defendant Fox Networks Group ("FNG") is a Delaware corporation and a subsidiary of Twenty-First Century Fox, Inc.  In January 2016, a corporate reorganization was announced in which FIC would be dissolved and Fox Networks Group's business unit, Fox Networks Group Latin America ("FNG Latin America"), would assume operation of the Fox Sports Latin America business.  On information and belief, FNG will become, or has already become, the legal successor to FIC as a part of this reorganization.  The status and progress of this announced reorganization is unknown to Plaintiffs at this time.

23.     Collectively, Defendants PASEC, FSLA, FIC, and FNG, and their predecessors, including Fox Pan American, are referred to as "Fox" or the "Fox Defendants."

24.     Defendant Torneos is an Argentinean corporation.  It is a sports media and marketing business with a number of subsidiaries and affiliates, including, among others, TyC International B.V. (a wholly-owned subsidiary domiciled in the Netherlands), and Productora de Eventos S.A. (a wholly-owned subsidiary domiciled in Uruguay).  Torneos has historically held various exclusive agreements to produce and distribute programs related to soccer matches between clubs in South American soccer leagues.

25.     The relationships among the Fox Defendants, T&T, and Torneos as of 2012 are depicted in the following diagram:



26.     Defendant Carlos Martinez is currently President of FNG Latin America and is responsible for the operation of the Fox Sports Latin America business.  Previously, Martinez was President of Fox International Channels Latin America, where he also was responsible for the operation of Fox Pan American.  Martinez served on the board of Defendant T&T approximately from October 31, 2012 to December 11, 2013.  Martinez is a citizen and resident of Florida and operated Fox Pan American from FIC's offices in Florida.

27.     Defendant Hernan Lopez was the CEO of FIC from 2011 to January 2016, when he left the company.  Previously, Lopez was Chief Operating Officer of FIC from 2008 to 2011 and General Manager of Fox Latin American Channels from 2000 to 2008.  Lopez served on the board of directors of Defendant T&T approximately from June 1, 2010 to December 10, 2013.  Lopez is a citizen and resident of California.

28.     Defendant James Ganley was Chief Operating Officer of Fox Pan American and an employee of FSLA.  Ganley served on the board of directors of Defendant T&T approximately from April 28, 2005 to October 31, 2012.  Ganley is a citizen and resident of Florida and operated Fox Pan American from Florida.

29.     Defendant Alejandro Burzaco is a citizen of Argentina.  During the relevant period Burzaco had an ownership share in Defendant Torneos and at various times was the General Manager, President of the Board of Directors, and legal representative of Torneos. Burzaco served on the board of directors of Defendant T&T approximately from April 28, 2005 to December 10, 2013.  Burzaco also was a principal of Torneos's affiliates and other shell companies that Burzaco created and controlled off the books of Torneos (including FPT Sports S.A. and Arco Business and Developments Ltd., among others), to effect the bribery schemes and other criminal wrongdoing that victimized Plaintiffs.  *See* Torneos DPA Statement of Facts ¶¶ 13, 19.

30.     Burzaco has pled guilty in the DOJ's criminal RICO action to racketeering conspiracy, wire fraud conspiracy, and money laundering conspiracy in connection with, among other things, the payment of bribes to Conmebol to acquire rights to the Club Tournaments.  *See* Transcript of Criminal Cause for Guilty Plea at 5, 26-28, *U.S. v. Webb*, ECF No. 312-2 ("Burzaco Plea Tr.").

31.     Defendant Full Play Group S.A. ("Full Play") is a Uruguayan corporation and sports media and marketing business with its principal offices in Argentina and Uruguay.  Full Play's controlling principals are Hugo Jinkis and his son, Mariano Jinkis.

32.     Defendant Conmebol is one of the oldest and most prestigious soccer confederations in the world and "is exclusively authorized by FIFA to direct and control football in the [South American] region."  Conmebol Bylaws, Art. 3, ¶ 1.  Conmebol is organized under Paraguayan law as a non-profit and non-governmental association of ten national soccer associations from Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay, and Venezuela.  Its principal place of business is at Autopista Aeropuerto Internacional

- Km 12, Luque, Gran Asunción, Paraguay.  The Executive Committee of Conmebol – consisting since at least 2013 of one president, three vice presidents, a secretary general, a treasurer, and six directors (collectively, or generically, "Conmebol officials") – is Conmebol's permanent authoritative body.

33.     Defendant Eugenio Figueredo is a citizen of both the United States and Uruguay.  Between April 2013 and August 2014, Figueredo served as the president of Conmebol; from 1993 to 2013, he served as one of Conmebol's vice presidents.  *See* Superseding Indictment ¶ 48.  In both capacities, Figueredo was a member of the Executive Committee of Conmebol.  From approximately 2005 to 2015, Figueredo maintained a residence in the United States in California.  *Id*.

34.     Defendant Juan Angel Napout is a citizen of Paraguay.  He has maintained a home in Florida since the 1980s.  As of October 2016, the home was one floor of a high rise apartment building on Collins Avenue, located north of Miami, which Napout has historically visited throughout the year and now resides in full time as a condition of his bail.  From about August 2014 to December 11, 2015, Napout was the president of Conmebol; from 2007 to 2014, he was one of Conmebol's vice presidents.  *See* Superseding Indictment ¶ 41.  In both capacities, Napout was a member of the Executive Committee of Conmebol.

### III.     JURISDICTION AND VENUE

#### A.     Subject Matter Jurisdiction

35.     This Court has subject matter jurisdiction over Plaintiffs' federal law claims under 28 U.S.C. §§ 1331 and 1337 because the claims involve allegations of unlawful behavior arising under the laws of the United States, and additionally affecting United States commerce, including RICO violations under 18 U.S.C. § 1962(c)-(d) and antitrust violations under 15 U.S.C. §§ 1-2.

36.     Subject matter jurisdiction also exists over the RICO claims under 18 U.S.C.

§ 1964(c) and the antitrust claims under Section 4 of the Sherman Act, 15 U.S.C. § 4 and Section

4 of the Clayton Act, 15 U.S.C. § 15.

37.     This Court has supplemental jurisdiction over the state law claims under 28

U.S.C. § 1367 because those claims all arise out of the same case or controversy and common

nucleus of operative facts as the federal law claims.

**B.     <u>Personal Jurisdiction</u>**

38.     This Court has general jurisdiction over individual defendants Martinez, Ganley,

and Napout because they are domiciled in the state of Florida.  *See* Paragraphs 26, 28, and 34.

39.     This Court also has personal jurisdiction over each of the Fox Defendants, Lopez,

Ganley, Burzaco, and Napout for (a) the RICO Claims under 18 U.S.C. § 1965(d)'s nationwide

service of process provision that provides this Court with statutory personal jurisdiction over

defendants served in the United States, and (b) the Florida state law claims brought herein

pursuant to the doctrine of pendent personal jurisdiction because such state law claims derive

from a common nucleus of operative facts to the RICO claims.

40.     This Court has general jurisdiction over FIC, Fox Pan American, and FSLA under

Fla. Stat. § 48.193(2) because they have engaged in substantial and not isolated activity in

Florida.  *See* Paragraphs 18-21.  Fox Pan American was registered to do business in Florida and

its principal place of business was in Coral Springs, Florida, and Coral Gables, Florida.

Likewise, FSLA was based in Coral Springs, Florida, and Coral Gables, Florida.  FIC operated

Fox Pan American and FSLA through FIC's offices in Florida.  Martinez, a resident of Florida,

was employed by FIC at its offices in Florida to, among other things, operate Fox Pan American.

Ganley, who also was a resident of Florida, was employed by Fox Pan American in Florida.

41.     This Court has specific jurisdiction over all Defendants, even if non-residents, for all claims pursuant to Fla. Stat. § 48.193(1)(a)(2) because each of the Defendants committed tortious acts within Florida and/or committed tortious acts outside of Florida that were directed at, and caused an injury to, GolTV in Florida.  Among other actions, Defendants (a) committed the RICO, antitrust, and intentional torts pled herein within the state of Florida; (b) committed such offenses in furtherance of the bribery scheme in order to benefit FIC, Fox Pan American, and FSLA, all of which were based and/or had offices in Florida, by securing for FSLA the exclusive right to broadcast the Club Tournaments in Florida and elsewhere; (c) committed such offenses by purposely availing themselves of the banking system in Florida and utilizing banks in Florida to wire the illicit bribes as essential parts to the success of the tortious scheme; (d) made communications into Florida, visited Florida, and conducted meetings in Florida in furtherance of the intentional tortious acts committed against Plaintiffs; (e) harmed competition in Florida by eliminating GolTV's opportunity to compete for the rights to broadcast the Club Tournaments in the United States, including Florida; and (f) committed tortious acts outside of Florida that were directed at GolTV and toward Florida for the purpose of preventing GolTV – a Florida corporation with its principal place of business in the Southern District of Florida – from acquiring the Club Tournament television rights, thereby injuring GolTV in Florida by depriving it of significant revenue, including programming and advertising revenue, that would have been generated from commercializing the Club Tournament television rights in Florida and the United States.  Each Defendant's actions therefore caused harm that each Defendant should have anticipated would be suffered in Florida, Plaintiffs' claims arise out of these contacts by each Defendant with Florida, and Defendants should have reasonably anticipated being subject to jurisdiction in this forum.

42.     For example, Burzaco, acting in part on behalf of Torneos, caused T&T to wire bribe and kickback payments to Conmebol officials from T&T's accounts at Lloyd's Bank in Miami, Florida.  *See* Paragraph 89 below.  Burzaco admitted that he "knew that the United States banking system would be involved in transferring payments related to the contracts secured through bribery" and that he "traveled to the United States on several occasions to advance the schemes alleged in Counts 1, 39 and 40, including trips to New York and Miami."  Burzaco Plea Tr. at 29-30, *U.S. v. Webb*, ECF No. 312-2.  Likewise, Torneos has admitted to utilizing the wire facilities of the United States to facilitate and effect certain payments in furtherance of the bribery scheme and other criminal wrongdoing.

43.     Martinez and Ganley, on behalf of the Fox Defendants and T&T, routinely conducted in-person and telephone meetings from their residences and offices in the greater Miami-Dade metropolitan area to operate Fox Pan American and T&T, including discussing and making decisions concerning the bribery scheme, such as the amounts of bribes to be paid to Conmebol officials and how to structure the payment of such bribes through intermediary companies and financial institutions in Florida and elsewhere in the United States and abroad. On information and belief, Lopez, on behalf of FIC and T&T, and Burzaco, on behalf of Torneos and T&T, participated in some of these meetings.

44.     Similarly, Full Play, including through its agents and principals Hugo Jinkis and Mariano Jinkis, engaged in communications to and from Florida and traveled to Florida in furtherance of its involvement in the schemes to pay bribes to Conmebol officials.  For example, the DOJ alleged that Hugo Jinkis and Mariano Jinkis met in South Florida with Burzaco and an individual named Jose Hawilla to discuss the payment of bribes to Conmebol officials.  *See* Superseding Indictment ¶ 360.

45.     Further, on information and belief, Defendants Conmebol (through its agents), Figueredo and Napout engaged in communications to and from Florida and/or traveled to Florida in furtherance of the torts alleged herein.

46.     The Court also has specific jurisdiction over all non-resident Defendants pursuant to Fla. Stat. § 48.193(1)(a)(2) because the statute supports personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida.  As set forth in Paragraphs 42-45 above, numerous Defendants committed tortious acts in Florida in furtherance of the conspiracy. All Defendants participated in the conspiracy to commit such actions, knowing that members of the conspiracy were responsible for committing tortious acts in Florida.

47.     Specific jurisdiction may also be obtained over FIC, Fox Pan American, FSLA, Martinez, Lopez, and Ganley under Fla. Stat. § 48.193(1)(a)(1) because, as set forth in Paragraphs 40 and 43 above, such Defendants operate, conduct, engage in, or carry on a business or business venture in Florida or have an office or agency in the state, which demonstrate a general course of business activity for pecuniary benefit in connection with broadcasting the Club Tournaments.

48.     This Court also has specific jurisdiction over Conmebol under Fla. Stat. § 48.193(1)(a)(1) because it operates, conducts, engages in, or carries on a business or business venture in Florida, which demonstrate a general course of business activity for pecuniary benefit in connection with the Club Tournament television rights.  Conmebol, either itself or through its agents or licensees, has extensively promoted and commercialized Conmebol tournaments in Florida.  For example, Conmebol's Recopa Sudamericana tournament was played in Fort

15

Lauderdale, Florida in 2004.  *See* Superseding Indictment ¶ 175.  Conmebol also has promoted

its Club Tournaments through their broadcast or transmission via television, radio or internet by

Florida based entities, including Fox Pan American and FSLA.  In addition, Conmebol

conducted business using accounts at the Florida and New York branches of major U.S. and

Swiss financial institutions.  *See* Superseding Indictment ¶ 119.  Moreover, Conmebol

representatives routinely traveled to Florida for business-related purposes, including business

relating to the Club Tournaments.

49.     In addition, this Court has specific jurisdiction over the Fox Defendants, T&T,

Torneos, Full Play, and Conmebol for the antitrust claims pursuant to 15 U.S.C. § 22's

worldwide service of process provision that provides statutory personal jurisdiction with respect

to corporations.

50.     In the alternative, the Court has personal jurisdiction over the foreign defendants

by virtue of Federal Rule of Civil Procedure 4(k)(2).  First, the RICO and antitrust claims against

the foreign defendants arise under federal law.  Second, the foreign defendants' actions targeted

GolTV and the broadcasting of the Club Tournaments in the United States, they purposely

availed themselves of the United States financial system by using bank accounts in the United

States to send and receive the bribes at issue, and meetings in furtherance of the bribery scheme

took place in the United States.  These United States contacts relate to or give rise to Plaintiffs'

causes of action and the foreign defendants' contacts with the United States are such that they

should reasonably anticipate being subject to jurisdiction in this forum.

**C.     Venue**

51.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b)(2)

because a substantial part of the events, omissions, communications, and transactions giving rise

to Plaintiffs' claims occurred in this judicial district, including wire transfers of bribes in

16

furtherance of the bribery scheme and other criminal wrongdoing perpetrated by defendants and admitted by defendant Torneos and meetings and telephone communications in Florida to plan, organize and perpetrate the bribery scheme and other criminal wrongdoing.

52.     Venue in this district additionally is proper against those Defendants not resident in the United States under 28 U.S.C. § 1391(c)(3), and venue against the remaining Defendants is additionally proper under 28 U.S.C. § 1391(c)(2) because they are subject to the court's personal jurisdiction with respect to this civil action.

53.     In addition, venue in this district is proper for the RICO claims under 18 U.S.C. § 1965(a) because one or more of the Defendants reside, are found, have an agent, and/or transact their affairs in this district, and as to all Defendants under 18 U.S.C. § 1965(b) because the ends of justice require that they be brought before this Court to the extent the federal RICO claims against them would not otherwise be subject to venue in this Court.

54.     Venue is also proper in this district for the Fox Defendants for the antitrust claims pursuant to 15 U.S.C. § 22 because such Defendants transact business in this district as set forth in Paragraphs 18-23 and 40, and for Martinez, Lopez, Ganley, Napout, Burzaco, and the Fox Defendants under 15 U.S.C. § 15 because they reside in this district or are found or have an agent in this district.

### IV.    FACTUAL ALLEGATIONS

### A.    THE CONMEBOL CLUB TOURNAMENTS

55.     Conmebol sponsors the Copa Libertadores, one of the most important soccer club tournaments in the world.  The Copa Libertadores was first held in 1960.  Over the following decades, the tournament evolved into a major competition featuring 38 club teams from Latin America.  According to Conmebol, the Copa Libertadores has been among the most widely watched sporting events in the world.  The Copa Libertadores has been telecast in more than 135

countries and, in 2009 and 2010, drew more than one billion viewers. By one estimate, the United States accounted for 16% of its audience share in 2010, behind only Brazil, Mexico, and Argentina. *See* Superseding Indictment ¶ 174.

56.     Conmebol also sponsors a soccer tournament called the Copa Sudamericana and a competition between the Copa Libertadores and Copa Sudamericana winners called the Recopa Sudamericana. The Copa Sudamericana was first hosted in 2002, with 34 teams from the Conmebol member countries participating. Since 2005, Conmebol has relied, in part, on the growing United States market for soccer to promote these tournaments. For example, in 2005 and again in 2007, a club team from Major League Soccer in the United States participated in the Copa Sudamericana. The Recopa Sudamericana has been played in the United States on several occasions, including in Los Angeles, California in 2003, and in Fort Lauderdale, Florida in 2004. *See* Superseding Indictment ¶ 175.

57.     These Club Tournaments offer viewers a unique opportunity to see the best South American soccer teams compete in a championship tournament format. In the United States, such tournaments attract a loyal and growing audience and represent a valuable opportunity for advertisers and producers of telecasts ("telecasters") to reach unique and economically valuable segments of the viewing public that would otherwise be difficult to reach.

58.     The popularity of these soccer tournaments, combined with Conmebol's unique monopoly on the television rights to telecast television programming featuring the Club Tournaments, ensures that telecasters who obtain the Club Tournament television rights are guaranteed demand for their sports programming, which they, in turn, can use to develop their channels, increase their market share, and derive significant revenue, including advertising revenue. For the same reason, preventing competitors from acquiring the Club Tournament

television rights and preventing new competitors from emerging can protect a sports telecaster from losing market share to competitors.  As a result, the television rights for the Club Tournaments are highly valuable.

59.    Only Conmebol, by decision of the Executive Committee, has the authority to award the television rights for the Club Tournaments.  *See* Conmebol Bylaws, Art. 62.

60.    The revenue generated by the commercialization of the media rights associated with the Club Tournaments constituted an essential source of revenue for Conmebol, Fox, Torneos, and T&T.  Over time, the United States became an increasingly important and lucrative market for the commercialization of these rights.  *See* Torneos DPA Statement of Facts ¶ 12; Superseding Indictment ¶ 15.

**B.    DEFENDANTS SET UP CONDUITS FOR PAYING BRIBES TO CONMEBOL OFFICIALS AND PRESIDENTS TO ENSURE ONLY T&T ACQUIRED THE CLUB TOURNAMENT TELEVISION RIGHTS**

**1.    Fox Agrees—and Participates with— Torneos and T&T to Bribe Conmebol's Officials and Presidents for Fox's Benefit**

61.    Beginning in 1999 and continuing through 2015, T&T acquired the exclusive worldwide television rights to the Copa Libertadores.  T&T eventually also acquired the exclusive worldwide television rights to the Copa Sudamericana beginning in or about 2002 and continuing through 2015 and the Recopa Sudamericana in 2008.  The rights were awarded through a series of contracts covering multi-year periods between T&T and Conmebol.

62.    As revealed in the Superseding Indictment and admitted by Torneos in the Torneos DPA, T&T acquired these rights through bribery and other criminal wrongdoing with the assistance of co-conspirators.  *See generally* Superseding Indictment ¶¶ 174-185; Torneos DPA Statement of Facts ¶¶ 36-38.  Beginning in 2000, one of the founders of Torneos, Luis Nofal, unlawfully agreed to pay, and did pay, annual bribes of $1 million to Conmebol President

Nicolas Leoz, and $600,000 each to Conmebol officials Eugenio Figueredo, Eduardo Deluca, and Romer Osuna for approximately the next 10 years.  In return, Leoz, Figueredo, Deluca, and Osuna unlawfully agreed to cause Conmebol to award the Club Tournament television rights exclusively to T&T, and to refuse to sell those rights to T&T's competitors, such as GolTV.  *See* Superseding Indictment ¶ 178.

63.     In January 2002, Fox Pan American, doing business as Fox Sports Latin America, was organized and acquired 50% of T&T.  In 2005, Fox Pan American acquired an additional 25% share of T&T previously owned by Defendant Torneos, increasing Fox Pan American's stake in T&T to 75%.

64.     Upon information and belief, in and around 2005, soon after Fox Pan American increased its interest in T&T to 75%, FIC, its executives Martinez and Lopez, Fox Pan American, its executive Ganley, and FSLA agreed with Torneos, T&T, and Burzaco, that Fox Pan American and Torneos would fund and facilitate T&T's payment of bribes to Conmebol officials including Leoz, Figueredo, Deluca, and Osuna.  As part of this agreement, Conmebol officials including Leoz, Figueredo, Deluca, and Osuna agreed that they would cause Conmebol to sell the Club Tournament television rights to T&T, with the understanding that the rights would be sublicensed to FSLA, and Conmebol would refuse to sell the rights to the competitors of T&T or the Fox Defendants, including GolTV and Global Sports.

65.     Plaintiffs' allegations concerning the Fox Defendants' agreement with T&T and Conmebol are based, in part, on admissions and allegations made by participants in the scheme, including those of Torneos and former Conmebol President Figueredo, and on the personal involvement of high-level FIC and Fox Pan American executives, including Defendants

Martinez, Lopez, and Ganley, in the bribery scheme described below.  *See, e.g.,* Paragraphs 66, 78-80.

66.     For example, Torneos has admitted that through Burzaco and with the agreement and support of parties and co-conspirators identified in the Torneos DPA, who upon information and belief are FIC (*Broadcasting Company Affiliate B*), Fox Pan American (*Broadcasting Company Affiliate C*), Lopez (*Broadcasting Company Executive #2*), Martinez (*Broadcasting Company Executive #3*), and Ganley (*Broadcasting Company Executive #4*), Torneos agreed to pay and caused to be paid annual six-figure and, in some instances, seven-figure bribe and kickback payments to 16 Conmebol officials in exchange for their support of T&T as the holder of the broadcasting rights to the Copa Libertadores.  *See* Torneos DPA Statement of Facts ¶ 37.

67.     In 2005, Burzaco began to manage the day-to-day operations of Torneos and learned from Luis Nofal of the annual bribe payments to Leoz, Figueredo, Deluca and Osuna. Burzaco helped to continue the practice by arranging for Leoz to receive $1 million bribe payments each year from in or about 2004 through in or about 2012, the year before Leoz resigned the presidency of Conmebol.  Burzaco also continued to arrange for annual six-figure bribe payments to Deluca until in or about 2011, to Osuna until in or about 2012, and to Figueredo, whose payments increased to $1 million in or about 2012, until in or about 2014.  *See* Superseding Indictment ¶ 179.

68.     As described in more detail in Paragraphs 111-135 below, Conmebol and T&T entered into a number of contracts after 2005, through which T&T retained the television rights to subsequent years of the Club Tournaments.  Each of those contracts required the support of Conmebol officials who were receiving bribes from Burzaco and other co-conspirators affiliated with T&T.  *See* Superseding Indictment ¶ 180.

69.     Beginning in 2009, a group of six presidents of the traditionally less-powerful member associations of Conmebol demanded that they, too, receive annual bribe payments in exchange for their support of T&T as the holder of television rights to the Copa Libertadores, among other tournaments.  In response to these demands, Burzaco agreed to pay and did pay annual six-figure bribe payments to Defendant Napout, Manual Burga, Carlos Chavez, Luis Chiriboga, and Rafael Esquivel.  Bribes were also paid to Luis Bedoya starting in or about 2010, and also to Sergio Jadue, starting in or about 2012, to secure their support.  *See* Superseding Indictment ¶ 182.

70.     At various times, T&T also paid bribes to Conmebol officials Marco Polo del Nero, Jose Maria Marin, Jose Luis Meiszner and Ricardo Teixeira bribes in exchange for their support of T&T as holder of the rights to the Copa Libertadores, among other tournaments.  *See* Superseding Indictment ¶ 183.

71.     To disguise its bribe payments to the Conmebol officials in connection with the Copa Libertadores and other tournaments, Fox Pan American and Torneos agreed that T&T would enter into sham "consulting" contracts with companies owned by Jose Margulies. Torneos has admitted that Jose Margulies and companies that he controlled (together, the "Margulies Intermediaries"), facilitated the payment of bribes and kickbacks to Conmebol officials in connection with the Copa Libertadores.  *See* Torneos DPA Statement of Facts ¶¶ 24, 38.  At various times, Margulies used accounts in the names of the Margulies Intermediaries that were held at United States financial institutions to make illicit payments on behalf of multiple members of the conspiracy, including Torneos and certain of its subsidiaries and affiliates and off-the-books companies.  *See* Torneos DPA Statement of Facts ¶ 24.

72.      Fox Pan American and Torneos also relied on Hugo Jinkis, Mariano Jinkis and Defendant Full Play to facilitate the payment of bribes and kickbacks to Conmebol officials.  *See* Superseding Indictment ¶ 184.  Torneos has admitted, for example, that co-conspirators identified in the Torneos DPA, and who upon information and belief are Hugo Jinkis (*Sports Marketing Executive #1*), Mariano Jinkis (*Sports Marketing Executive #2*), Defendant Full Play (*Sports Marketing Company A*), were used to facilitate the payment of bribes and kickbacks to Conmebol officials in connection with the Copa Libertadores.  *See* Torneos DPA Statement of Facts ¶ 38.

73.      Torneos summed up its deception when it admitted in the DPA that Torneos and its co-conspirators engaged in conduct designed to prevent the detection of their illegal activities, to conceal the location and ownership of proceeds of those activities, and to promote the carrying on of those activities.  The conduct engaged in by various members of the conspiracy included, among other things:  the use of "consulting services" agreements, sham invoices and payment instructions, and other similar types of records to create an appearance of legitimacy for illicit payments; the use of various mechanisms, including trusted intermediaries (including the Margulies Intermediaries), bankers, and currency dealers, to make and facilitate the making of illicit payments; the creation and use of shell companies; and the use of cash.  *See* Torneos DPA Statement of Facts ¶ 44.

74.      T&T did not receive any legitimate services from these financial intermediaries.  Rather, the purported "consulting" contracts were shams and were used to disguise the payments from T&T to the financial intermediaries.  At least some of these sham "consulting" contracts contained New York choice of forum and choice of law clauses.

75.     In the course of paying bribes in exchange for the television rights to the Club Tournaments, T&T and other defendants used wire facilities and financial institutions located in the United States, among other countries, to make and receive bribe payments and kickbacks and to transfer payments related to contracts secured through bribery, with the actions taking place in the United States being central and essential to the scheme's success.  Torneos has admitted, for example, that such use of United States wire facilities included, among other things, the use of the bank accounts of Torneos's subsidiaries and affiliates held at United States financial institutions to transfer tens of millions of dollars in payments related to contracts secured through bribery and other criminal wrongdoing, as well as the use of the bank accounts of co-conspirators, including the Margulies Intermediaries, held at United States financial institutions to transfer millions of dollars in bribe and kickback payments.  Torneos DPA Statement of Facts ¶ 43.  Defendants also relied on the growing U.S. market for soccer to generate profits from the scheme, and, on information and belief, conducted meetings in the United States in furtherance of their schemes.  *See id*.; Superseding Indictment ¶ 185.

76.     In addition, the DOJ has revealed that the annual bribe payments of at least $400,000 that were made to Napout for the 2011, 2012, 2013, 2014, and 2015 editions of the Copa Libertadores were wired to one or more Full Play-affiliated bank accounts controlled by Napout's co-conspirators Hugo and Mariano Jinkis, who facilitated the payment of the Copa Libertadores bribes, as well as bribes in relation to the Copa America Centenario Scheme, to Napout and other Conmebol officials.  "The conspirators sought to prevent the detection of these bribe payments through various means, including by having the Jinkises hold the payments for periodic disbursements to the bribe recipients through the use of bank accounts around the world, including at banks in the United States."  *See* Opp. Br. at 55-56, *U.S. v. Webb*, ECF No. 516.

77.     T&T, Torneos, Fox Pan American, FIC, Full Play and the financial intermediaries all knew that the payments from T&T to the intermediaries, and from the intermediaries to Conmebol, did and were intended to serve as bribes to obtain the Club Tournament television rights for the benefit of the Fox Defendants.  In fact, the terms of the license agreements between Conmebol and T&T expressly contemplate their sublicensing of those rights to "Fox Sports."

78.     FIC and Fox Pan American employees not only knew of the bribes paid to Conmebol officials to secure the Club Tournament television rights for the Fox Defendants, they were personally involved in authorizing and facilitating the payment of those bribes.  For example, Fox Pan American COO Ganley signed many of the sham "consulting" agreements between T&T and the Margulies Intermediaries that channeled bribes to Conmebol officials.  *See* Paragraph 85.  Likewise, Defendant Martinez, the President of FIC Latin America, signed an agreement on behalf of T&T restructuring the payment of bribes through the Margulies Intermediaries.  *See* Paragraphs 90-92.

79.     As described by Defendant and former Conmebol President Eugenio Figueredo in a cooperation agreement with Uruguayan prosecutors in February 2016, the Fox Defendants were understood to be behind all of the illegal bribery and kickbacks:

> [Figueredo] references T&T, Torneos y Competencias and Full Play as the companies that contracted with Conmebol, for amounts very inferior to those of the market, and which later assigned the rights to the FOX company, as well as GLOBO of Brazil, obtaining the profits that the payments permitted them, which he acknowledges having received and indicating that, in his opinion, the FOX company was behind all the illicit negotiations and indicating an executive surnamed Martinez as responsible for the contracts with Jinkis and Burzako [*sic*].

80.     On information and belief, the "Martinez" referred to in Figueredo's cooperation agreement is Defendant Carlos Martinez.

81.     Some of the conduits that T&T used to pay these bribes are described below.

### 2.     T&T Pays Bribes to Conmebol Officials via the Margulies Intermediaries

82.     Beginning in 2005, T&T executed "consulting" contracts with three shell companies controlled by Jose Margulies.  These shell companies were Somerton Ltd. ("Somerton"), registered in Panama; Valente Corp. ("Valente"), registered in Turks and Caicos; and Spoart S.A. ("Spoart"), registered in Brazil.  The "consulting" contracts were not real consulting agreements.

83.     Margulies was indicted and has entered a guilty plea in connection with, among other things, his role facilitating the payment of bribes from T&T to Conmebol officials.  *See* Margulies Guilty Plea, *U.S v. Webb*, ECF Nos. 96, 262; *see also* Superseding Indictment ¶ 184.

84.     As set forth in the Superseding Indictment, Margulies used the Margulies Intermediaries' accounts in the Florida and New York branches of major U.S. and European financial institutions to move millions of dollars among the sports marketing companies (such as T&T) to soccer officials who were the recipients of illicit payments (such as Napout and Figueredo), including to their accounts at financial institutions in Europe and South America. Margulies took additional steps to conceal the nature of the payments he was facilitating beyond his use of the U.S.-based accounts.  For example, he used the services of currency dealers, he regularly shredded records of his activities, and he discouraged soccer officials who were receiving payments from using accounts in their own name lest they draw attention from law enforcement, though they did not always heed his advice.  To take one five-year period, for example, between March 2003 and March 2008, the Margulies Intermediaries wired more than $3.5 million in to accounts controlled by persons including Figueredo, almost entirely though even, six-figure payments.  *See* Superseding Indictment ¶¶ 116, 119.

85.     T&T's first sham contracts with the Margulies Intermediaries were signed on May 5, 2005 by Defendant Ganley, who was both a T&T director and Fox Pan American's Chief Operating Officer.  T&T's contract with Valente provided that T&T would pay Valente $360,000 annually, but was subsequently amended to provide for payments of $660,000 annually from 2006 through 2014.  T&T's contract with Somerton, which was subsequently modified in November 2006, provided that T&T would pay Somerton $1 million annually from 2005 through 2014.  Several years later, on or around January 1, 2010, T&T executed another sham contract, this time with Spoart, in which it agreed to pay Spoart $600,000 annually.

86.     Although the sham contracts provided for "intermediary" and "consulting" services by Valente, Somerton and Spoart to T&T, no legitimate services were in fact provided. Rather, the monies paid were used to make bribe payments to Conmebol officials who then awarded the Club Tournament television rights to T&T, which then sublicensed those rights to FSLA.

87.     On information and belief, T&T made the payments provided for under these sham contracts on or about the dates when they were due and made certain additional one-time payments to the intermediaries as well.  In total, T&T either paid or agreed to pay the Margulies Intermediaries, directly and indirectly, approximately $23 million from 2005 through 2014.

88.     In addition to Ganley, FIC executives Lopez and Martinez were T&T directors during the period when bribes were paid through the Margulies Intermediaries.  On information and belief, Lopez and Martinez, on behalf of FIC and Fox Pan American, not only agreed and supported T&T's payment of bribes to Conmebol officials via the Margulies Intermediaries, but provided the funds to do so.

89.     Most of these bribes were paid by wire transfer by T&T from its accounts at Lloyds Bank in Miami, Florida, Clariden Leu in Switzerland, and Interaudi Bank in Miami, Florida, to the bank accounts of Somerton and Valente at J.P. Morgan Chase Bank in New York. As an example, these bribe payments included the following wire transfers:

| Wire Transfers from T&T to the Margulies Intermediaries | | | |
|---|---|---|---|
| Date | From | To | Amount |
| July 14, 2011 | T&T:<br>Clariden Leu (Acct. No. XXXX-XXXXXX3-32) | Somerton:<br>J.P. Morgan New York (Acct. No. XXX-X-XXX157) | $500,000 |
| December 7, 2011 | T&T:<br>Clariden Leu (Acct. No. XXXX-XXXXXX3-32) | Valente:<br>J.P. Morgan-New York (Acct. No. XXX-X-XXXX332) | $100,000 |
| March 14, 2012 | T&T:<br>Clariden Leu (Acct. No. XXXX-XXXXXX3-32) | Valente:<br>J.P. Morgan-New York (Acct. No. XXX-X-XXXX332) | $500,000 |
| April 19, 2012 | T&T:<br>Clariden Leu (Acct. No. XXXX-XXXXXX3-32) | Spoart:<br>Banco Industrial e Comercial, S.A., Sao Paolo-Brazil (Acct. No. XXX13-3 Ag.0007) | $50,000 |

90.     In or around December 19, 2012, T&T restructured how it paid bribes to the Conmebol officials through the Margulies Intermediaries.  Instead of paying bribes directly to the Margulies Intermediaries, T&T arranged for all amounts called for under the consulting contracts with the Margulies Intermediaries to be paid by Torneos & Traffic Sports Marketing B.V. ("Torneos Holland"), which on information and belief is an affiliate of Torneos.

91.     In exchange for Torneos Holland's agreement to assume these payment obligations, T&T agreed to give Torneos Holland certain television and marketing rights that Conmebol had previously granted to T&T.  Notwithstanding this modification in the manner by which the bribes were paid, the Margulies Intermediaries continued to channel the bribes to the Conmebol officials for the benefit of T&T, and ultimately Fox.

92.     On information and belief, T&T implemented this restructuring of its bribe payments at the instruction of Fox Pan American and FIC.  This belief is based, in part, on Defendant Martinez's involvement signing the documents providing for continued payments to the Margulies Intermediaries on behalf of T&T.

### 3.      T&T Pays Bribes to Conmebol Officials via Torneos Holland and Arco

93.     In addition to making payments through the Margulies Intermediaries, Fox Pan American and Torneos, through T&T, also arranged with Torneos Holland to pay additional bribes to the Conmebol officials through a different payment conduit.

94.     Prior to 2004, T&T had sold the Club Tournament television rights for Brazil to a leading Brazilian media company, Globo Comunicação e Participações S.A. ("Globo"), for approximately $6 million per year.  Beginning in 2005, however, Fox Pan American and Torneos caused T&T to sell the Club Tournament television rights for Brazil to Torneos Holland for the dramatically lower price of $900,000 per year.

95.     The drop in price was due to bribery and kickbacks, not to any decrease in the value of the Club Tournament television rights for Brazil.  In fact, after obtaining a lower price for the Club Tournament television rights for Brazil in 2005, Torneos Holland sold those rights to Globo for at least the same price ($6 million) at which T&T had previously sold the rights to Globo directly.  Torneos Holland then took the over $5 million difference between T&T's acquisition price and Torneos Holland's resale price and paid it to Arco Business and Developments Ltd. ("Arco"), or other intermediary entities controlled by T&T's principal and Torneos executive Burzaco, which, in turn, transferred the funds to the corrupt Conmebol officials as bribes.

96.     In 2010, the price Globo paid Torneos Holland for the rights rose to $8 million, and in 2011 and 2012, the price rose again to $11.1 million.  For 2013, the price rose yet again to $16.1 million.  T&T concurrently increased its corresponding bribe payments to the Conmebol officials through Arco, from $5.2 million in 2009, to $6.2 million in 2010, to $9.1 million in 2011 and 2012, and finally to $12.5 million in 2013.

97.     The difference between the market value of the Brazilian rights and the value that T&T received for those rights between 2005 and 2013 was at least $50 million.  This difference was used to pay bribes and kickbacks to Conmebol officials in exchange for their support of T&T's award and retention of the television rights.

98.     Martinez, Lopez, and Ganley, as executives of FIC, Fox Pan American and FSLA, and directors of T&T, knew from their industry experience that the price for which T&T sold the Club Tournament television rights for Brazil to Torneos Holland was tens of millions of dollars below the market price, and thus was part of a scheme to pay bribes and kickbacks to Conmebol official in exchange for the television rights, and agreed and supported that scheme.

### 4.     T&T Pays Bribes to the Conmebol Officials Through Productora and FPT

99.     T&T's payment of bribes to Conmebol officials was not limited to payments made via the Margulies Intermediaries and Torneos Holland.  For example, in September 2013, Fox Pan American and Torneos caused T&T to agree to pay $1.5 million in bribes to the Conmebol officials through a new intermediary named Productora de Eventos, S.A. ("Productora").  Productora was a subsidiary or affiliate of Torneos.  The payments were unrelated to any services provided by Productora.  Productora, in turn, executed a mirror contract on December 15, 2013 to pay FPT Sports S.A. ("FPT") $1.5 million, purportedly in exchange for "consulting, supervision and logistics" services.

100.    On information and belief, no such services were provided.  FPT was a financial intermediary that funneled bribes to the Conmebol officials.  *See* Superseding Indictment ¶ 311. The $1.5 million paid by T&T to Productora, and then by Productora to FPT, was, on information and belief, ultimately delivered to the Conmebol officials in exchange for their continued support of Conmebol's award of the Club Tournament television rights to T&T and Conmebol's exclusion of GolTV, despite its manifestly superior offers.  On information and belief, T&T's $1.5 million payment to Productora was made from T&T's account at Interaudi Bank in Miami, Florida to Productora's account at Interaudi Bank in Miami, Florida, and Lopez and Martinez agreed and supported such payment.

**5.    T&T Pays Bribes and Kickbacks to Conmebol
Officials via Full Play, Hugo Jinkis, and Mariano Jinkis**

101.    Conmebol's president Leoz and the other corrupt Conmebol officials also requested that T&T pay additional bribes and kickbacks to Conmebol officials by paying amounts due under the contracts for the rights to intermediaries associated with Defendant Full Play, Hugo Jinkis, and Mariano Jinkis.  Those intermediaries would in turn funnel the payments to Conmebol officials.  Fox Pan American and Torneos caused T&T to agree to this new bribery arrangement.

102.    By letter dated March 16, 2011, Leoz instructed T&T to pay $2,400,000 of the amount that T&T owed to Conmebol for the 2011 Copa Libertadores television rights directly to the New York bank account of an affiliate of Full Play named Yorkfields S.A. ("Yorkfields"). On information and belief, Fox Pan American and Torneos caused T&T to make this payment from T&T's account at Lloyds Bank in Miami.

103.    On March 20, 2012, Leoz again instructed T&T to pay $2,400,000 of the amount that T&T owed to Conmebol for the 2012 Club Tournament television rights directly to

Yorkfields' New York bank account.  Fox Pan American and Torneos caused T&T to make these payments from T&T's account at Clariden Leu.

104.    On March 20, 2013, Fox Pan American and Torneos caused T&T to make a similar payment of $3,600,000 in connection with the 2013 Copa Libertadores television rights to the Swiss bank account of another Full Play affiliate, Cross Trading S.A. ("Cross Trading").

105.    Upon information and belief, Yorkfields and Cross Trading served as intermediaries to funnel bribes from T&T to the Conmebol officials.  Yorkfields and Cross Trading are companies controlled by Full Play's principals, Hugo Jinkis and Mariano Jinkis. The Superseding Indictment charges that Hugo and Mariano Jinkis facilitated T&T's bribe payments in exchange for continued support of T&T's retention of the Club Tournament television rights.  Superseding Indictment ¶¶ 55, 184.

106.    In addition, Conmebol officials at times directed T&T to make payments of amounts due to the Conmebol officials directly to Arco accounts.  For example, on March 12, 2013 Conmebol sent T&T a letter requesting that T&T make a payment of $1,400,000 to Arco's J.P. Morgan Chase Bank account in New York in connection with the Broadcasting Rights Agreement for the Copa Libertadores dated March 6, 2012.  On information and belief, Fox Pan American and Torneos caused this amount to be paid by T&T and it was subsequently funneled by Arco to the Conmebol officials.

107.    The flow of bribes from the Fox Defendants to Conmebol officials in exchange for their support of Conmebol's award of exclusive television rights to the Club Tournaments is depicted in the following chart:

## The Fox Bribes-for-Rights Scheme



**C. CONMEBOL REJECTS PLAINTIFFS' SUPERIOR OFFERS FOR THE CLUB TOURNAMENT TELEVISION RIGHTS IN FAVOR OF T&T'S INFERIOR OFFERS**

108.     T&T's unlawful agreement with Conmebol and its payment of tens of millions of dollars in bribes to the Conmebol officials had their intended effect.  Conmebol repeatedly rejected Plaintiffs' superior offers for the Club Tournament television rights in favor of inferior terms from T&T.

109.     GolTV has extensive experience telecasting major tournament and league soccer matches, including the Spanish La Liga and the Italian Serie A.  Together with Tenfield and GolTV Latin America, it is part of one of the major soccer telecasting groups in the Americas

and can draw on its combined resources.  As a sports telecaster focused on soccer, GolTV is especially capable of delivering high-quality soccer telecasts and promoting the Club Tournaments throughout the United States in order to increase the visibility, viewership, market share, revenue, and value associated with the Club Tournaments, both for GolTV's own benefit and the benefit of Conmebol, its member associations, and their teams and players.

110.    At all times relevant hereto, Plaintiffs had the experience and expertise and all other qualifications and capabilities necessary to telecast and promote the Club Tournaments and provide all other associated benefits to Conmebol as well as, if not better than, the Fox Defendants.  There were no legitimate business or other factors that would have warranted licensing the Club Tournament television rights to T&T in preference to Plaintiffs' higher bids, and in any event Conmebol's licensing decisions for the Club Tournament television rights were not in fact motivated by any legitimate factors.  The only reason Plaintiffs' superior offers were not accepted by Conmebol was that T&T, at the instruction and through the participation of the Fox Defendants and Torneos, paid illegal bribes to Conmebol officials.

**1.    Conmebol Rejects Plaintiffs' Superior Offer in March 2010 to Purchase Rights to 2011-2014 <u>Copa Libertadores and Copa Sudamericana</u>**

111.    On March 3, 2010, GolTV's owner Paco Casal met with Nicolas Leoz, then President of Conmebol, to present a formal offer for the television rights for the Copa Libertadores and the Copa Sudamericana for the years 2011 to 2014, which Conmebol had previously awarded to T&T.  Because the rights sold were the worldwide or Americas rights, and not solely the U.S. rights, GolTV partnered with its agent Global Sports to make offers on the worldwide or Americas rights from Conmebol, with the understanding that GolTV would pay for and acquire the U.S. portion of those rights.  For simplicity's sake, GolTV's and Global Sports' offers for these rights are referred to as GolTV's offers in Paragraphs 112-126 below.

112.    GolTV offered Conmebol a total of U.S. $270 million for the rights, as reflected in a letter dated March 3, 2010 and summarized in the table below.  On information and belief, this offer represented nearly a 70% increase over the $164 million paid by T&T for the same years:

| Television Rights for Copa Libertadores/Copa Sudamericana (2011-2014) | | | |
|---|---|---|---|
| Year | GolTV Offer (USD $ millions) | T&T Price (USD $ millions) | Difference (USD $ millions) |
| 2011 | 60 | 41 | -19 |
| 2012 | 65 | 41 | -24 |
| 2013 | 70 | 41 | -29 |
| 2014 | 75 | 41 | -34 |
| TOTAL | 270 | 164 | -106 |

113.    On information and belief, Conmebol disclosed to T&T, Fox Pan American, and FIC that GolTV had in March 2010 submitted an offer to purchase the television rights for the tournaments.  Further, on information and belief, T&T – with Fox and Torneos's knowledge and consent – urged Conmebol to reject GolTV's offer.

114.    Although GolTV's offer was superior to what T&T had agreed to pay, Conmebol did not accept GolTV's offer.

115.    Conmebol could have revoked, and was in fact legally obligated to revoke, its wrongful sale of the Club Tournament rights to T&T in favor of GolTV's superior offer.  Under Paraguayan law, the Conmebol officials, each serving on the Executive Committee, owed fiduciary duties to Conmebol and to their member associations that required them to license the rights on the terms most favorable to Conmebol and its member associations.

### 2.    Conmebol Rejects Plaintiffs' Superior Offer in October 2012 to Purchase Rights to 2015-2020 Copa Libertadores and Copa Sudamericana

116.    In 2012, GolTV offered to purchase from Conmebol tournament television rights for 2015 through 2020, a different span of years from the period at issue in GolTV's March 2010 offer.  Again, GolTV offered Conmebol far more than it was receiving from T&T and Fox. Conmebol President Leoz promised GolTV that he and the other Conmebol officials on the Executive Committee would formally consider GolTV's proposal at an October 24, 2012 Executive Committee meeting, thereby inducing GolTV to submit a new proposal.

117.    Accordingly, on October 21, 2012, GolTV submitted a sealed proposal to purchase television rights to the Copa Libertadores and Copa Sudamericana for the years 2015 to 2020, to be considered at Conmebol's October 24, 2012 Executive Committee meeting.  GolTV offered to purchase the rights for a total price of $805 million, reflecting escalating prices of $125 to $140 million for each year of the 2015-2020 period.

118.    On information and belief, Conmebol, without informing GolTV, disclosed to T&T, Fox Pan American, and FIC that GolTV had submitted an offer to purchase the television rights for the tournaments.  As they had done before, T&T and Conmebol agreed that Conmebol would reject GolTV's offer and instead accept a competing offer from T&T.

119.    To provide a veneer of justification for the refusal, Conmebol invited Defendant Burzaco to attend its October 24, 2012 Executive Committee meeting on behalf of T&T and offer reasons why the GolTV offer should not be accepted and to promote T&T's offer. Conmebol neither informed GolTV that Burzaco would be present at the meeting nor invited a representative of GolTV to present its superior competing offer.

120.    Conmebol ultimately rejected GolTV's offer, and in December 2012 it amended its agreement with T&T to increase the price for the rights to the Copa Libertadores and Copa

Sudamericana for 2015 through 2018.  Conmebol also agreed to award Torneos and T&T affiliate TyC International B.V. ("TyC International") the Americas television rights for those tournaments for 2019 through 2022, and to designate TyC International and Defendant Full Play as the exclusive commercial agents for the negotiation and commercialization of the worldwide rights for those tournaments excluding the Americas.

121.    As reflected in the chart below, the price that Conmebol accepted from T&T and TyC International for the 2015-2020 rights was only $416 million – approximately *half* of GolTV's competing $805 million offer:

| Television Rights for Copa Libertadores/Copa Sudamericana (2015-2020) | | | |
|---|---|---|---|
| **Year** | **GolTV Offer (USD $ millions)** | **Prices from T&T (2015-2018) and TyC Int'l (2019-2022) (USD $ millions)** | **Difference (USD $ millions)** |
| 2015 | 125 | 65 | -60 |
| 2016 | 130 | 67 | -63 |
| 2017 | 130 | 69 | -61 |
| 2018 | 135 | 71 | -64 |
| 2019 | 140 | Higher of 72 or the 2018 combined price + 15% | -68 |
| 2020 | 145 | Higher of 72 or the 2018 combined price + 15% | -73 |
| **TOTAL** | **805** | **416** | **-389** |

### 3.    Conmebol Rejects Plaintiffs' Superior Offer in November 2013 to Purchase Rights to 2015-2024 Club Tournaments

122.    On or about November 18, 2013, GolTV made a new offer to purchase rights to all three Club Tournaments – the Copa Libertadores, the Copa Sudamericana, and the Recopa Sudamericana – for the years 2015 through 2024.

123.    GolTV offered Conmebol U.S. $2.1 billion for the television rights to the three tournaments – including a $360 million annual price starting in 2019 – for a total price almost *four times higher* than the $560 million paid by T&T and TyC International for the same period.

124.    The following chart illustrates the difference between GolTV's higher offer and the price that Conmebol was to obtain from T&T and TyC International for the corresponding years:

| Years | GolTV Offer (USD $ millions) | Price from T&T (2015-2018) and TyC Int'l (2019-2022) (USD $ millions) | Difference (USD $ millions) |
|---|---|---|---|
| **Television Rights for Club Tournaments (2015-2022)** | | | |
| 2015 | 170 | 65 | -105 |
| 2016 | 170 | 67 | -103 |
| 2017 | 170 | 69 | -101 |
| 2018 | 170 | 71 | -99 |
| 2019 | 360 | Higher of 72 or the 2018 combined price + 15% | -288 |
| 2020 | 360 | Higher of 72 or the 2018 combined price + 15% | -288 |
| 2021 | 360 | Higher of 72 or the 2018 combined price + 15% | -288 |
| 2022 | 360 | Higher of 72 or the 2018 combined price + 15% | -288 |
| **TOTAL** | **2,120** | **560** | **-1,560** |

125.    On information and belief, Conmebol again disclosed to T&T, Fox Pan American, and FIC that GolTV had offered to buy tournament rights, and T&T and Conmebol agreed that Conmebol would reject GolTV's November 2013 offer.  Conmebol rejected GolTV's offer.

**4.    Conmebol Rejects Plaintiffs' Superior Offers
in May and October 2015 to Purchase Rights
to the 2016-2022 Club Tournaments**

126.    In a letter to Conmebol dated May 7, 2015, GolTV renewed its November 2013 offer to pay $360 million per year for the 2019-2022 Club Tournament television rights.

127.    Shortly thereafter, on May 27, 2015, the DOJ unsealed its original indictment, which described some of the bribery, fraud and other criminal wrongdoing by which Conmebol awarded rights associated with soccer tournaments to various sports marketing companies.  *See* Original Indictment, *U.S. v. Webb*, ECF No. 1.  Among those arrested pursuant to the charges in the Indictment of receiving bribes and taking actions accordingly were Defendant T&T's principal Defendant Burzaco and Conmebol's then-President, Defendant Figueredo.

128.    After release of the Original Indictment, on July 29, 2015, Conmebol issued Circular 6/2015, which stated that Conmebol would reevaluate its commercial relationships with entities implicated in the wrongdoing and refuse to enter into any contract with an entity charged by a competent governmental entity.

129.    Initially encouraged by Conmebol's representations that it was seeking to reform the process by which it awarded the Club Tournament television rights, GolTV engaged in a series of meetings with Conmebol officials, including with Conmebol's interim and then-permanent president Defendant Napout, to propose acquiring the Club Tournament television rights on terms that were superior to the terms for which Conmebol had awarded the rights to T&T and another Torneos affiliate, TyC International.

130.    As 2015 progressed without Conmebol accepting GolTV's superior offers, GolTV on October 16, 2015 formally renewed the offer it had made in May 2015 for the 2019-2022 Club Tournament television rights.  In addition, GolTV proposed acquiring the 2016-2018 Club Tournament television rights for $170 million per year, the price it had first offered in 2013.

131.    Conmebol did not accept GolTV's proposals of May and October 2015.

132.    Instead, in November 2015, Defendants Martinez and Lopez, on behalf of FIC, negotiated an agreement with Defendant Napout, on behalf of Conmebol, under which Conmebol would award directly to FIC the 2016-2018 Club Tournament television rights that Conmebol had previously licensed to T&T, and which T&T had in turn sublicensed to FSLA. On information and belief, the agreement was negotiated in part by phone and in-person meetings in Florida.  The price paid for these rights from FIC was $135–$155 million per year, approximately $70-90 million more than the $65-69 million per year that T&T had previously agreed to pay.  The more than doubling of the price of the rights dramatically illustrated how far below market value Conmebol had previously awarded the rights to T&T, and in turn, Fox.

133.    Defendant Napout's unlawful agreement in November 2015 with FIC was negotiated in secret and violated Conmebol's procedures.  Prior to its signing, the agreement was neither disclosed to the presidents of the ten national member organizations that constitute Conmebol nor voted on by Conmebol's executive committee.

134.    GolTV was not informed of the negotiations or invited to submit a competing bid. Nevertheless, even with the dramatic increase in the price paid for the rights from $65-69 million to $135-155 million per year, FIC's contract price was still significantly below the $170 million per year that GolTV had offered Conmebol only a month before.  Napout did not offer any reason why he had rejected GolTV's offer in favor of a lower price offered by FIC, and there was in fact no legitimate reason for doing so.

135.    Tellingly, Napout was subsequently indicted and arrested in connection with allegations in the Superseding Indictment that he had accepted bribes in exchange for awarding the Club Tournament television rights to T&T.

136.     Prior to the release of the Original Indictment in May 2015, Plaintiffs exercised due diligence in attempting to discover the reasons for Conmebol's rejection of their numerous offers but, due to Defendants' concealment of their unlawful agreements and transactions, were unable to obtain information sufficient to assert a claim for Defendants' wrongdoing. Defendants' concealment of their bribery scheme, including their use of sham consulting agreements and other artifices to hide the scheme, constituted an extraordinary circumstance preventing Plaintiffs from bringing suit previously.

137.     Upon learning of the Original Indictment, and again upon learning of the Superseding Indictment, which was unsealed December 3, 2015, GolTV exercised due diligence in investigating the relationships between the conduct alleged in the indictments and Conmebol's repeated rejections of GolTV's offers.  In the course of their investigation, Plaintiffs ultimately discovered information to support the allegations of Defendants' unlawful conduct herein and exercised diligence in filing suit thereafter on October 20, 2016.

**D.     DEFENDANTS' BRIBERY SCHEME DEPRIVED PLAINTIFFS OF CLUB TOURNAMENT TELEVISION RIGHTS THEY OTHERWISE WOULD HAVE OBTAINED**

138.     Defendants devised their bribery scheme with the intent that T&T and Fox retain television rights to the Club Tournaments, thereby harming Plaintiffs, and any other potential competitors, by depriving them of the opportunity to fairly compete for and obtain those rights. Defendants' actions achieved these results.

139.     Among other things, Conmebol, its Executive Committee officials (including former presidents Figueredo and Napout) and the other Defendants unlawfully agreed to prevent Plaintiffs from obtaining the Club Tournament television rights by misleading Plaintiffs about when proposals for the rights would be considered; by licensing the Club Tournament television rights in advance of expected offers from Plaintiffs, then using the existence of such agreements

as an excuse to reject Plaintiffs' more favorable proposals; and by refusing to revoke rights wrongfully awarded to T&T at below-market prices, as a result of T&T's bribery and kickbacks, in favor of the more favorable proposals from Plaintiffs, even though Conmebol was legally permitted and, indeed, obligated to do so.

140.    During the period relevant to Plaintiffs' claims, Plaintiffs were the only parties actively making offers to acquire the rights other than T&T.  The Conmebol officials' fiduciary duties to Conmebol, as members of the Executive Committee, required them to accept Plaintiffs' offers because they were significantly superior offers to those T&T's offers, and there was no legitimate reason to justify licensing the club tournament rights for the Club Tournaments to T&T.  Accordingly, if not for Conmebol's agreement with Fox and T&T that Conmebol would refuse to deal with T&T's competitors, Conmebol would have accepted Plaintiffs' superior proposals for the Club Tournament television rights and, to the extent that such rights had already been awarded to T&T as a result of T&T's bribe payments, Conmebol would have revoked such rights from T&T and awarded them to Plaintiffs in exchange for Plaintiffs' more favorable terms.

141.    Plaintiffs were injured in the United States by Defendants' illicit bribery scheme and other criminal wrongdoing.  GolTV is headquartered in Florida and operates from Florida. GolTV and Global Sports together were denied the ability to provide telecasts of the Club Tournaments in the Florida market and throughout the United States.

142.    The financial impact of these injuries inflicted upon Plaintiffs amounts to at least hundreds of millions of dollars.

143.    Plaintiffs were not the only entities injured by Defendants' actions.  Defendants' conduct also injured Conmebol member associations and affiliated soccer clubs, which obtained

less revenue from the Club Tournaments than they otherwise would have because Conmebol

accepted lower television rights payments due to Defendants' bribery of its Executive Committee

officials.

**E.      DEFENDANTS INJURED COMPETITION IN VARIOUS
         MARKETS IN VIOLATION OF THE ANTITRUST LAWS**

144.      In addition to constituting RICO violations and independent tortious acts as set

forth herein, Defendants' bribery and other crimes harmed competition in various markets in

violation of the antitrust laws.  They were part of a series of conspiracies in restraint of trade in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and reflected monopsonization,

attempted monopsonization, and a conspiracy to monopsonize in violation of Section 2 of the

Sherman Act, 15 U.S.C. §2.  By virtue of the foregoing, Defendants' antitrust violations also

violate the Florida Deceptive and Unfair Trade Practices Act.

**1.      The Relevant Markets**

145.      Defendants' unlawful conduct affected at least three markets, which are among

the relevant markets for purposes of these antitrust claims:  (1) the market for the purchase of

rights to televise South American international soccer club tournaments (and in particular the

Club Tournaments) in the Americas, including the United States and Florida (the "Americas

Television Rights Market"); (2) the market for the sale of television programming featuring

South American international soccer club tournaments by telecasters to cable and satellite

television providers in the United States, including Florida (the "U.S. Television Programming

Market"); and (3) the market for the sale by telecasters of advertising airtime on television

programming in the United States (including Florida) featuring South American international

soccer club tournaments (the "U.S. Television Advertising Airtime Market").

### a. **The Americas Television Rights Market**

146.     Conmebol's Club Tournaments are recognized by soccer viewers as the premium standard in South American international soccer and as the only source for high-level international play among South American soccer clubs.  As a result, Conmebol is effectively the only seller in the Americas Television Rights Market.

147.     The purchasers and potential purchasers in the Americas Television Rights Market include both (1) new or existing telecasters that purchase or would purchase the rights to telecast South American international soccer club tournaments for the purpose of creating television programming featuring such tournaments, and (2) intermediaries that purchase the rights for the purpose of reselling them to telecasters.

148.     At all times relevant to this Complaint, rights in the Americas Television Rights Market were bought and sold in transactions concerning the television rights for South American international soccer club tournaments for all countries in the Americas over a given period of time.  Purchasers and prospective purchasers in the Americas Television Rights Market did not purchase or seek to purchase such rights on a country-by-country basis, nor did the seller (Conmebol) offer rights for sale on a country-by-country basis.

149.     Television rights for South American international soccer club tournaments are not reasonably interchangeable with television rights for other types of sports or soccer-oriented programming due to the significantly different size, demographic profile, and growth potential of the viewing audience for these tournaments.  As a result, the supply of South American international soccer club tournament television rights is limited to Conmebol's Club Tournaments.

150.     Purchasers in the Americas Television Rights Market cannot satisfy their demand for television rights for South American international soccer club tournaments by purchasing

rights for other forms of sports- or soccer-related programming.  Price and competition activity in the Americas Television Rights Market does not affect price and competition activity in the markets for other such rights, and price and competition activity in the markets for other rights does not affect price and competition activity in the Americas Television Rights Market.

### b.  The U.S. Television Programming Market

151.    The purchasers and potential purchasers in the U.S. Television Programming Market are cable and satellite television providers that seek or might seek to purchase programming featuring South American international soccer club tournaments for telecast to viewers in the United States.

152.    Because of Defendants' conduct in furtherance of the bribery and other criminal wrongdoing described herein, in effect, the only sellers in the U.S. Television Programming Market are currently the Fox Defendants, who maneuvered themselves into being the sole providers in the United States of television programming featuring South American international soccer club tournaments.

153.    Absent Defendants' unlawful conduct, multiple parties could have obtained and provided programming in the U.S. Television Programming Market, including obtaining and providing programming separately for any one or more of the Copa Libertadores, the Copa Sudamericana and/or the Recopa Sudamericana, respectively, and/or obtaining and providing programming separately for the various years of any particular tournament or combination of tournaments.  Absent Defendants' unlawful conduct, purchasers in the U.S. Television Programming Market would not have been limited to a single seller because multiple parties could have obtained and provided programming in the U.S. Television Programming Market, including GolTV.

154.    Television programming featuring South American international soccer club tournaments is not reasonably interchangeable with other forms of sports- or soccer-oriented programming due to the significantly different size, demographic profile, and growth potential of the viewing audience for South American international soccer club tournaments.

155.    Cable and satellite television providers cannot satisfy their demand for programming featuring South American international soccer club tournaments by purchasing other forms of sports- or soccer-related programming.  Price and competition activity in the U.S. Television Programming Market does not affect price and competition activity in markets for other sports- or soccer-related programming, and price and competition activity in the markets for other such programming does not affect price and competition activity in the U.S. Television Programming Market.

### c.    The U.S. Television Advertising Airtime Market

156.    The purchasers and potential purchasers in the U.S. Television Advertising Airtime Market are advertisers that seek or might seek to purchase airtime on television programming featuring South American international soccer club tournaments that is telecast to television viewers in the United States.

157.    Because of the conduct of Defendants in furtherance of the bribery and other criminal wrongdoing described herein, in effect, the only sellers in the U.S. Television Advertising Airtime Market are the Fox Defendants, who maneuvered themselves into being the sole providers in the United States of television programming featuring South American international soccer club tournaments, and therefore the sole sellers of advertising airtime on such programming.

158.    Absent Defendants' unlawful conduct, multiple parties could have obtained and provided advertising airtime in the U.S. Television Advertising Airtime Market, including

obtaining and providing advertising airtime separately for any one or more of the Copa Libertadores, the Copa Sudamericana and/or the Recopa Sudamericana, respectively, and/or obtaining and providing advertising airtime separately for the various years of any particular tournament or combination of tournaments. Absent Defendants' unlawful conduct, purchasers in the U.S. Television Advertising Airtime Market would not have been limited to a single seller because multiple parties could have obtained and provided programming in the .S. Television Advertising Airtime Market, including GolTV.

159.    Advertising airtime on programming featuring South American international soccer club tournaments is not reasonably interchangeable with advertising airtime on other forms of sports- or soccer-oriented programming due to the significantly different size, demographic profile, and growth potential of the viewing audience for South American international soccer club tournaments.

160.    Advertisers cannot satisfy their demand for airtime on television programming featuring South American international soccer club tournaments by purchasing airtime on other forms of sports- or soccer-related programming.  Price and competition activity in the U.S. Television Advertising Airtime Market does not affect price and competition activity in markets for advertising airtime on other sports- or soccer-related programming, and price and competition activity in the markets for other airtime does not affect price and competition activity in the U.S. Television Advertising Airtime Market.

    **2.**    **Defendants Engaged in Conspiracies in Restraint of Trade in <u>Multiple Markets in Violation of Section One of the Sherman Act</u>**

161.    As set forth in Paragraphs 61-80, Defendants knowingly and intentionally agreed that in exchange for T&T's payment of bribes to Conmebol officials, Conmebol would sell

television rights to the Club Tournaments only to T&T and would refuse to deal with T&T's or Fox's competitors, such as GolTV.

162.    As a result, pursuant to Defendants' agreements, T&T would be the only purchaser in the Americas Television Rights Market, and the Fox Defendants would be the exclusive sellers of telecasts of South American international soccer club tournaments in the U.S. Television Programming Market and the exclusive sellers of airtime in the U.S Television Advertising Airtime Market.

163.    These agreements imposed unreasonable restraints on trade and constituted unlawful contracts, combinations, or conspiracies in restraint of trade or commerce among the several States and with foreign nations in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

164.    Defendants' activities, founded on bribery and the improper elimination of competition, lacked any pro-competitive justification and in fact were not pro-competitive. Indeed, Conmebol rejected the well-qualified Plaintiffs' much more lucrative offer for the rights to televise the Club Tournaments.

165.    This anti-competitive conduct created a direct, substantial and reasonably foreseeable effect on domestic commerce.  Plaintiffs (and other market participants) lost the opportunity to broadcast the Club Tournaments in the United States, including in Florida, at a minimum losing advertising revenue derived from such broadcasts.

166.    Even if, in the alternative, the U.S. Television Programming Market and/or the U.S. Television Advertising Airtime Market were deemed to encompass programming or advertising airtime relating beyond South American international soccer club tournaments to some or all additional kinds of soccer programming in the United States, Defendants' agreements

nevertheless still imposed unreasonable restraints on trade as to such markets, and constituted unlawful contracts, combinations, or conspiracies in restraint of trade or commerce among the several states and with foreign nations in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Defendants' activities, founded on bribery and the improper elimination of competition, still lacked any pro-competitive justification and in fact were not pro-competitive.

### 3. T&T Engaged in Monopsonization and Attempted Monopsonization in the Americas Television Rights Market in Violation of Section 2 of the Sherman Act

167.    T&T created and maintained an unlawful monopsony – that is, a market in which there is effectively only one buyer – within the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

168.    As a general matter, in a free and competitive market for television rights, a seller of rights considers bids from multiple, competing potential purchasers and sells the rights to the highest bidder.  T&T prevented such a free and competitive market from occurring in the Americas Television Rights Market by bribing Conmebol officials (including Figueredo and Napout) and causing Conmebol to enter into exclusive agreements with T&T and to refuse to deal with T&T's competitors, such as GolTV, thus preventing T&T's competitors from entering the Americas Television Rights Market.

169.    Because T&T was the sole purchaser of television rights for the Club Tournaments, it was the sole purchaser in the Americas Television Rights Market.  T&T caused the creation of barriers that prevented its competitors or potential competitors, including GolTV, from purchasing rights in the Americas Television Rights Market even when able and willing to pay prices higher than those paid by T&T.

170.     As a result, T&T willfully acquired and maintained market power, and indeed monopsony power, within the Americas Television Rights Market.  T&T had the ability to control prices and purchase television rights from Conmebol at prices lower than those that would be paid for such rights in a free and competitive market.  Indeed, the price offered by GolTV for the purchase of television rights to the Club Tournaments was higher than the sum of the stated price paid by T&T for such rights and the cost of the bribes T&T paid to the Conmebol officials.

171.     T&T's market and monopsony power did not result from a superior product, business acumen, or historical acumen.  It was a shell corporation with no assets.

172.     T&T's predatory and anticompetitive conduct also constituted an attempt to create and maintain a monopsony in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  T&T specifically intended to create and maintain a monopsony in the Americas Television Rights Market, and that market, to the extent not already monopsonized, reflected a dangerous probability of being monopsonized as a result of T&T's conduct.

173.     This anti-competitive conduct created a direct, substantial and reasonably foreseeable effect on domestic commerce.  Plaintiffs (and other broadcasters) lost the opportunity to broadcast the Club Tournaments in the United States (including Florida), at a minimum losing advertising revenue derived from such broadcasts.

### 4.     Defendants Conspired to Create a Monopsony for T&T in the Americas Television Rights Market

174.     As set forth in Paragraphs 61-80, Defendants knowingly and intentionally agreed that in exchange for T&T's payment of bribes to Conmebol and its Executive Committee officials, Conmebol would sell television rights to the Club Tournaments only to T&T and would refuse to deal with T&T's competitors.

175.    This agreement among the Defendants constituted an unlawful conspiracy to monopsonize the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

### 5.    Defendants' Conduct Has Caused Anticompetitive Effects and Harmed Competition

176.    As stated in the Superseding Indictment, Defendants' activities "had powerful anti-competitive effects, distorting the market for the commercial rights associated with soccer and undermining the ability of other sports marketing companies to compete for such rights on terms more favorable to the rights-holders."  Superseding Indictment ¶ 97.

177.    Defendants' unlawful exclusionary and monopsonistic conduct has materially and substantially harmed competition and injured the welfare of purchasers, suppliers, and consumers.

178.    Defendants' unlawful exclusionary and monopsonistic conduct has caused the following direct, substantial, and reasonably foreseeable anticompetitive effects on domestic commerce including, *inter alia*:

a.    Creating substantial, if not insurmountable, barriers to entry for potential purchasers in the Americas Television Rights Market, depriving potential purchasers of the opportunity to profit therefrom;

b.    Creating substantial, if not insurmountable, barriers to entry for potential sellers in the U.S. Television Programming Market, depriving potential sellers of the opportunity to profit therefrom;

c.    Creating substantial, if not insurmountable, barriers to entry for potential sellers in the U.S. Television Advertising Airtime Market, depriving potential sellers of the opportunity to profit therefrom;

d.  Enabling T&T to create and maintain a monopsony in the Americas Television Rights Market;

e.  Reducing Conmebol's revenues for television rights to the Club Tournament, and consequently reducing the revenues passed on by Conmebol to its member soccer associations, thereby decreasing the funds available to recruit, develop and retain soccer players and to develop new facilities, organizations, and events, including events both in the U.S. and abroad, and consequently decreasing the quality and quantity of soccer entertainment available to end consumers, both television viewers and game attendees;

f.  Limiting the quantity of rights available for sale to purchasers in the Americas Television Rights Market;

g.  Decreasing demand within the Americas Television Rights Market;

h.  Decreasing the quantity, quality, and diversity of television programming catering to viewers of South American international club soccer tournaments, due in part to the Fox Defendants' decision not to air all games of the Club Tournaments, but instead to fill its airtime with other content; and

i.  Decreasing the quantity, quality, and diversity of advertising opportunities for companies seeking to advertise to viewers of South American international club soccer tournaments and, on information and belief, increasing the prices charged to such advertisers.

**F.   DEFENDANTS' CONDUCT HAS PROXIMATELY AND DIRECTLY CAUSED PLAINTIFFS TO SUFFER SUBSTANTIAL INJURIES**

179.   Defendants' unlawful conduct set forth above has directly and proximately caused the following effects, *inter alia*, on Plaintiffs' businesses and property:

a. Preventing Plaintiffs, who were well qualified and offered superior offers to Conmebol, from purchasing rights in the Americas Television Rights Market, and deriving profit therefrom;

b. Preventing Plaintiffs from selling programming in the U.S. Television Programming Market, and deriving profit therefrom;

c. Preventing Plaintiffs from selling airtime in the U.S. Television Advertising Airtime Market, and deriving profit therefrom;

d. Preventing GolTV's television programming from being included by cable providers in premium cable packages;

e. Denying Plaintiffs the opportunity to enter into valuable partnerships with other telecasters based on the provision by Plaintiffs of televised telecasts of the Club Tournaments;

f. Decreasing the viewership of GolTV programming;

g. Decreasing the value and desirability of television advertising airtime on GolTV, thereby decreasing the value and quantity of advertising sold by Plaintiffs on GolTV;

h. Preventing Plaintiffs from obtaining valuable rights to telecast additional content that would have been available if the GolTV channel had been included by cable providers in premium cable packages; and

i. Substantially decreasing the value of Plaintiffs' companies.

180. Plaintiffs' exclusion from the Americas Television Rights Market, the U.S. Television Advertising Airtime Market, and the U.S. Television Programming Market, together

with other effects of Defendants' unlawful conduct, both individually and collectively, constituted antitrust injury to Plaintiffs.

181.     On information and belief, the financial impact of these injuries upon Plaintiffs amounts to at least hundreds of millions of dollars.

## G.     ADDITIONAL BASES OF CORPORATE DEFENDANTS' LIABILITY

182.     In addition to their direct liability for their own actions and as members of the conspiracies pled herein, the entity Defendants also are liable for the conduct of other persons and parties alleged herein on bases of vicarious liability and as legal successors in interest through mergers and corporate transactions, among others:

    a.  T&T is vicariously liable for all wrongful acts in connection with the bribery scheme described herein committed by its employee and agent Burzaco.  Such wrongful acts were related to and committed by Burzaco within the course of his employment with T&T, were committed in furtherance of the business of T&T to obtain the broadcasting rights to the Club Tournaments from Conmebol by means of bribery, and T&T authorized or subsequently acquiesced in such acts by Burzaco.  T&T benefited from the wrongful acts of Burzaco by, among other reasons, profiting from the purchase of television broadcasting rights for the Club Tournaments from Conmebol and the sublicense of such rights to Fox;

    b.  Torneos is vicariously liable for all wrongful acts in connection with the bribery scheme described herein committed by its employee and agent Burzaco.  Such wrongful acts by Burzaco were related to and committed by Burzaco within the course of his employment with Torneos, were committed

in furtherance of the business of Torneos to profit off the sale of the broadcasting rights to the Club Tournaments to Torneos's subsidiaries and affiliates T&T and TyC International, and Torneos authorized or subsequently acquiesced in such acts by Burzaco.  Torneos benefited from the acts of Burzaco by, among other reasons, profiting from T&T and TyC International's purchase of the broadcasting rights and sublicense of such rights to Fox.  In addition, in the Torneos DPA, Torneos stated that it "admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees and agents."  Torneos's admission further evidences its liability for the wrongful actions of Burzaco as well as the subsidiaries which Torneos controlled by itself and together with the Fox Defendants, and which acted as Torneos's agent, including T&T, Torneos Holland, TyC, Productora, Arco and FPT.

c.  FIC is vicariously liable for all wrongful acts in connection with the bribery scheme described herein committed by its employees and agents Martinez and Lopez.  Such wrongful acts were related to and committed by Martinez and Lopez within the course of their employment with FIC, were committed in furtherance of the business of FIC to obtain the broadcasting rights to the Club Tournaments from Conmebol by means of bribery, and FIC authorized or subsequently acquiesced in such acts by Martinez and Lopez.  FIC benefited from the wrongful acts of Martinez and Lopez by, among other reasons, profiting from the purchase of television broadcasting rights for the Club Tournaments from Conmebol and the sublicense of such rights to FSLA;

d.   Fox Pan American is vicariously liable for all wrongful acts in connection with the bribery scheme described herein committed by its employee and agent Ganley.  Such wrongful acts were related to and committed by Ganley within the course of his employment with Fox Pan American, were committed in furtherance of the business of Fox Pan American to obtain the broadcasting rights to the Club Tournaments from Conmebol by means of bribery, and Fox Pan American authorized or subsequently acquiesced in such acts by Ganley. Fox Pan American benefited from the wrongful acts of Ganley by, among other reasons, profiting from the purchase of television broadcasting rights for the Club Tournaments from Conmebol and the sublicense of such rights to FSLA;

e.   FSLA is liable for all wrongful acts in connection with the bribery scheme described herein committed by its employee and agent Ganley.  Such wrongful acts were related to and committed by Ganley within the course of his employment with FSLA, were committed in furtherance of the business of FSLA to obtain the broadcasting rights to the Club Tournaments from Conmebol by means of bribery, and FSLA authorized or subsequently acquiesced in such acts by Ganley.  FSLA benefited from the wrongful acts of Ganley by, among other reasons, profiting from the purchase of television broadcasting rights for the Club Tournaments from Conmebol and the sublicense of such rights to FSLA;

f.   PASEC is liable as a matter of law as a successor to Fox Pan American and is also vicariously liable for all wrongful acts in connection with the bribery

scheme described herein committed by its employee and agent Ganley.  Such wrongful acts were related to and committed by Ganley within the course of his employment and/or agency with and for PASEC, were committed in furtherance of the business of PASEC to obtain an indirect interest, as a shareholder of Fox Pan American, in the broadcasting rights to the Club Tournaments from Conmebol by means of bribery, and PASEC authorized or subsequently acquiesced in such acts by Ganley.  PASEC benefited from the wrongful acts of Ganley by, among other reasons, profiting from the purchase of television broadcasting rights for the Club Tournaments from Conmebol and the sublicense of such rights to Fox Pan American's subsidiary FSLA;

g. Full Play is vicariously liable for all wrongful acts in connection with the bribery scheme described herein committed by its principals and agents Hugo and Mariano Jinkis.  Such wrongful acts were related to and committed by the Jinkises in furtherance of the business of Full Play to obtain rights from Conmebol, and Full Play authorized or subsequently acquiesced in such acts by the Jinkises.  Full Play benefited from the wrongful acts of the Jinkises by, among other reasons, obtaining agency rights from Conmebol in connection with the 2019-2022 Club Tournaments.

V.      **CAUSES OF ACTION**

**Count One**

**Civil RICO, 18 U.S.C. § 1962(c)**

**(Against the Fox Defendants, Martinez, Lopez, Ganley, Torneos, Burzaco, T&T, Full Play, Figueredo and Napout)**

183.    Plaintiffs re-allege and incorporate the allegations contained in Paragraphs 1-143 and 182 as if fully set forth in this paragraph.

184.    The Fox Defendants, Martinez, Lopez, Ganley, Torneos, Burzaco, T&T, Full Play, Figueredo and Napout (collectively "RICO Defendants") operated or managed an enterprise through a pattern of racketeering activity that included at least two racketeering acts, with such violations injuring Plaintiffs in their business or property.

**A.     Predicate Acts**

185.    Upon information and belief, based in part on the payments provided for in T&T's sham consulting agreements described in Paragraphs 82-89 above, and the payments described in Paragraphs 99-106 above, T&T made the following bribe payments to financial intermediaries, and ultimately to Conmebol officials, in whole or in part, in exchange for those officials support of the award of the Club Tournament television rights to T&T

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| May 5, 2005 | Valente | $200,000 |
| Aug. 18, 2005 | Somerton | $200,000 |
| Aug. 30, 2005 | Valente | $80,000 |
| Sept. 29, 2005 | Somerton | $200,000 |
| Sept. 30, 2005 | Valente | $80,000 |

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| Nov. 4, 2005 | Somerton | $200,000 |
| Dec. 6, 2005 | Somerton | $200,000 |
| Dec. 15, 2005 | Somerton | $200,000 |
| July 13, 2006 | Somerton | $100,000 |
| Sept. 30, 2006 | Valente | $260,000 |
| Oct. 31, 2006 | Valente | $400,000 |
| Nov. 17, 2006 | Somerton | $300,000 |
| Dec. 14, 2006 | Somerton | $300,000 |
| Dec. 21, 2006 | Somerton | $200,000 |
| Dec. 21, 2006 | Somerton | $100,000 |
| March 15, 2007 | Somerton | $200,000 |
| May 15, 2007 | Somerton | $200,000 |
| May 31, 2007 | Valente | $200,000 |
| July 15, 2007 | Somerton | $200,000 |
| Aug. 31, 2007 | Valente | $260,000 |
| Oct. 15, 2007 | Somerton | $200,000 |
| Oct. 31, 2007 | Valente | $200,000 |
| Dec. 15, 2007 | Somerton | $200,000 |
| March 15, 2008 | Somerton | $200,000 |
| March 8, 2008 | Somerton | $3,300,000 |
| May 15, 2008 | Somerton | $200,000 |
| May 15, 2008 | Somerton | $400,000 |

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| May 31, 2008 | Valente | $200,000 |
| July 15, 2008 | Somerton | $200,000 |
| Aug. 31, 2008 | Valente | $260,000 |
| Oct. 15, 2008 | Somerton | $200,000 |
| Oct. 31, 2008 | Valente | $200,000 |
| Dec. 15, 2008 | Somerton | $200,000 |
| March 15, 2009 | Somerton | $200,000 |
| May 15, 2009 | Somerton | $200,000 |
| May 31, 2009 | Valente | $200,000 |
| July 15, 2009 | Somerton | $200,000 |
| Aug. 31, 2009 | Valente | $260,000 |
| Oct. 15, 2009 | Somerton | $200,000 |
| Oct. 31, 2009 | Valente | $200,000 |
| Dec. 15, 2009 | Somerton | $200,000 |
| Jan. 15, 2010 | Spoart | $50,000 |
| Feb. 15, 2010 | Spoart | $50,000 |
| March 15, 2010 | Spoart | $50,000 |
| March 15, 2010 | Somerton | $200,000 |
| April 15, 2010 | Spoart | $50,000 |
| May 15, 2010 | Spoart | $50,000 |
| May 15, 2010 | Somerton | $200,000 |
| May 31, 2010 | Valente | $200,000 |

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| June 15, 2010 | Spoart | $50,000 |
| July 15, 2010 | Spoart | $50,000 |
| July 15, 2010 | Somerton | $200,000 |
| Aug. 15, 2010 | Spoart | $50,000 |
| Aug. 31, 2010 | Valente | $260,000 |
| Sept. 15, 2010 | Spoart | $50,000 |
| Oct. 15, 2010 | Spoart | $50,000 |
| Oct. 15, 2010 | Somerton | $200,000 |
| Oct. 31, 2010 | Valente | $200,000 |
| Nov. 15, 2010 | Spoart | $50,000 |
| Dec. 15, 2010 | Spoart | $50,000 |
| Dec. 15, 2010 | Somerton | $200,000 |
| Jan. 15, 2011 | Spoart | $50,000 |
| Feb. 15, 2011 | Spoart | $50,000 |
| March 15, 2011 | Spoart | $50,000 |
| March 15, 2011 | Somerton | $200,000 |
| April 2011 | Yorkfields | $2,400,000 |
| April 15, 2011 | Spoart | $50,000 |
| May 15, 2011 | Spoart | $50,000 |
| May 15, 2011 | Somerton | $200,000 |
| May 31, 2011 | Valente | $200,000 |
| June 15, 2011 | Spoart | $50,000 |

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| July 15, 2011 | Spoart | $50,000 |
| July 14, 2011 | Somerton | $500,000 |
| Aug. 15, 2011 | Spoart | $50,000 |
| Aug. 31, 2011 | Valente | $260,000 |
| Sept. 15, 2011 | Spoart | $50,000 |
| Oct. 15, 2011 | Spoart | $50,000 |
| Oct. 31, 2011 | Valente | $200,000 |
| Nov. 15, 2011 | Spoart | $50,000 |
| Dec. 15, 2011 | Spoart | $50,000 |
| Dec. 7, 2011 | Valente | $100,000 |
| Jan. 15, 2012 | Spoart | $50,000 |
| Feb. 15, 2012 | Spoart | $50,000 |
| March 15, 2012 | Spoart | $50,000 |
| March 14, 2012 | Valente | $500,000 |
| April 3, 2012 | Yorkfields | $2,000,000 |
| April 19, 2012 | Spoart | $50,000 |
| May 3, 2012 | Yorkfields | $400,000 |
| May 15, 2012 | Spoart | $50,000 |
| May 31, 2012 | Valente | $200,000 |
| June 15, 2012 | Spoart | $50,000 |
| July 15, 2012 | Spoart | $50,000 |
| July 15, 2012 | Valente | $200,000 |

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| Aug. 15, 2012 | Spoart | $50,000 |
| Aug. 31, 2012 | Valente | $260,000 |
| Sept. 15, 2012 | Spoart | $50,000 |
| Oct. 15, 2012 | Spoart | $50,000 |
| Oct. 15, 2012 | Valente | $200,000 |
| Oct. 31, 2012 | Valente | $200,000 |
| Nov. 15, 2012 | Spoart | $50,000 |
| Dec. 15, 2012 | Spoart | $50,000 |
| Dec. 7, 2012 | Valente | $100,000 |
| March 2013 | Cross Trading | $3,600,000 |
| March 2013 | Arco | $1,400,000 |
| Sept. 2013 | Productora | $1,500,000 |

186.    Upon information and belief, as described in Paragraphs 93-97 above, the Fox Defendants, Torneos and T&T, and their representatives, executives and managers Burzaco, Ganley, Martinez and Lopez, agreed with Conmebol officials (including Figueredo and Napout) to pay and/or caused Torneos Holland to pay the following bribe payments to financial intermediaries, and ultimately to Conmebol officials, in whole or in part, in exchange for those officials support of the award of the Club Tournament television rights to T&T and, ultimately, FSLA:

| Bribe Payments from Torneos Holland to Intermediaries | | |
|---|---|---|
| Approx. Date | Immediate Recipient | Amount |
| 2005 | Arco | $5,300,000 |
| 2006 | Arco | $5,300,000 |
| 2007 | Arco | $5,300,000 |
| 2008 | Arco | $5,300,000 |
| 2009 | Arco | $5,300,000 |
| 2010 | Arco | $6,200,000 |
| 2011 | Arco | $9,100,000 |
| 2012 | Arco | $9,100,000 |
| 2013 | Arco | $12,500,000 |
| 2013 | Valente | $660,000 |
| 2013 | Valente | $1,000,000 |
| 2013 | Spoart | $600,000 |
| 2014 | Valente | $660,000 |
| 2014 | Valente | $1,000,000 |
| 2014 | Spoart | $600,000 |

187.    As set forth in Paragraphs 29-30 and 42, Burzaco, in his capacity as a director and principal of T&T and general manager of Torneos, caused T&T and Torneos Holland to make the bribe payments to Conmebol officials listed in Paragraphs 185-186 above in exchange for their support of the award of the rights to T&T.  Burzaco has admitted his unlawful conduct and

pled guilty to racketeering conspiracy in connection with, among other things, the payment of bribes to Conmebol to acquire rights to the Club Tournaments.

188.    As set forth in Paragraphs 6-7 and 9, and in Torneos's DPA, Torneos agreed to pay and caused to be paid, directly and indirectly, bribe payments to Conmebol officials in exchange for their support of T&T in its efforts to obtain, maintain and exploit media and marketing rights to the Club Tournaments.  *See* Torneos DPA Statement of Facts ¶ 32.  In particular, Torneos has admitted that it relied on the Margulies Intermediaries to facilitate the payment of bribes and kickbacks to Conmebol officials.  *Id*. at ¶ 38.  Such bribes and kickbacks include the payments made to the Margulies Intermediaries listed in Paragraph 185 above.

189.    As set forth in Paragraphs 61- 107, FIC and its executives Lopez and Martinez, agreed to pay and caused to be paid, directly and indirectly, the bribe payments listed in Paragraphs 185-186 above to Conmebol officials in exchange for their support of T&T in its efforts to obtain, maintain and exploit media and marketing rights to the Club Tournaments, and for the sublicense of those rights to FSLA.  Among other things, Martinez signed an agreement providing for payments to the Margulies Intermediaries.  *See* Paragraphs 78-80.  Torneos has admitted that "Broadcasting Company Affiliate B," believed to be FIC, and "Broadcasting Company Executives #2 and #3," believed to be Lopez and Martinez, agreed and supported Torneos in the payment of bribes and kickbacks to Conmebol officials, including Figueredo and Napout.  *See* Torneos DPA Statement of Facts ¶¶ 17, 37.

190.    As set forth in Paragraphs 61- 107, PASEC, Fox Pan American, Fox Pan American's subsidiary FSLA, and Ganley, Chief Operating Officer of Fox Pan American and director of Defendant T&T, agreed to pay and caused to be paid, directly and indirectly, the bribe payments listed in Paragraphs 185-186 above to Conmebol officials in exchange for their support

of T&T in its efforts to obtain, maintain and exploit media and marketing rights to the Club

Tournaments, and for the sublicense of those rights to FSLA.  Among other things, Ganley

signed a number of the sham consulting agreements providing for the payments listed in

Paragraph 185 above.  *See* Paragraph 85 above.  Torneos has admitted that "Broadcasting

Company Affiliate C," believed to be Fox Pan American, and "Broadcasting Company

Executive #4," believed to be Ganley, agreed and supported Torneos in the payment of bribes

and kickbacks to Conmebol officials, including Figueredo and Napout.  *See* Torneos DPA

Statement of Facts ¶¶ 18, 37.

191.     As set forth in in Paragraphs 72, 76 and 79, Full Play and its principals Hugo

Jinkis and Mariano Jinkis facilitated the payment of bribes to Conmebol officials.  Torneos has

admitted that "Sports Marketing Company A," believed to be Full Play, and "Sports Marketing

Executives #1 and #2," believed to be Hugo Jinkis and Mariano Jinkis, agreed and supported

Torneos in the payment of bribes and kickbacks to Conmebol officials, including Figueredo and

Napout.  *See* Torneos DPA Statement of Facts ¶¶ 26, 38.  On information and belief, in return for

facilitating the bribe payments, Full Play, among other things, was named the exclusive

commercial agent for the negotiation and commercialization of the worldwide rights excluding

the Americas for the 2019-2022 Club Tournaments.

192.     As set forth in Paragraphs 61- 107, Figueredo and Napout, as former officials and

Presidents of Conmebol, solicited, agreed to receive and did receive bribes in exchange for their

support of T&T in its efforts to obtain, maintain and exploit media and marketing rights to the

Club Tournaments.

**1.     <u>Wire Fraud</u>**

193.     The bribe payments set forth in Paragraphs 185-186 were transmitted by RICO

Defendants, and/or were caused to be transmitted or reasonably foreseen to be caused by RICO

Defendants, by means of wire and/or radio communication in interstate and/or foreign commerce.

194.     On information and belief, all of the payments in Paragraphs 185-186 made by T&T before March 31, 2011 were made by wire transfer from its account at Lloyds Bank in Miami, Florida, account number 11031883.  Beginning in March 31, 2011, payments were made from T&T's account at Clariden Leu in Switzerland, account number XXXX-XXXXXX3-32. Beginning on July 18, 2013, payments were made from T&T's account at Interaudi Bank in Miami, Florida, account number XXX093.

195.     On information and belief, all payments in Paragraphs 185-186 made to Somerton were made to its account at J.P. Morgan Chase in New York, New York, account number XXX-X-XX917.

196.     On information and belief, all payments in Paragraphs 185-186 made to Valente were made to its account at J.P. Morgan Chase in New York, New York, account number XXX-X-XXXX332.

197.     On information and belief, all payments in Paragraphs 185-186 made to Productora were made to its account at Interaudi Bank in Miami, Florida, account number XXX621.

198.     For each RICO Defendant herein, where any payment set forth in Paragraphs 185-186 originated from a person other than such RICO Defendant, such payment was reasonably foreseeable to, and/or caused by, such RICO Defendant.

199.     RICO Defendants' above-alleged activities constituted, in addition to a bribery scheme, a scheme or artifice to defraud (including a scheme or artifice to deprive another of the intangible right of honest services) or for obtaining money or property by means of false or

fraudulent pretenses, representations, or promises within the meanings of 18 U.S.C. § 1343 and 1346, in which RICO Defendants each conducted or participated knowingly and with the intent to defraud.

200.    As set forth in Paragraphs 1-143 and 182, RICO Defendants participated in a scheme in which the Fox Defendants, Torneos and T&T paid and/or caused to be paid bribes by means of wire transfers to Conmebol officials in exchange for their support of Conmebol's licensing of the Club Tournament television rights to T&T, and indirectly to FSLA, at below-market rates.  This bribery scheme defrauded Conmebol and Conmebol's member associations of hundreds of millions of dollars in revenue, breached the Conmebol officials' fiduciary duties to Conmebol and its member associations, and violated Conmebol's bylaws.

201.    The payments set forth in Paragraphs 185-186 were all in furtherance and execution of RICO Defendants' above-described scheme to defraud.

202.    RICO Defendants intended to defraud, and did defraud, Conmebol and Conmebol's member associations of hundreds of millions of dollars in revenue and caused the Conmebol officials to breach their fiduciary duties to Conmebol and violate Conmebol's bylaws. These Conmebol officials, as members of the Executive Committee, had a duty to disclose the bribery to Conmebol and its member organizations and to seek the best offer for the sale of the Club Tournament television rights.  RICO Defendants caused the Conmebol officials not to disclose the bribes and Conmebol to reject Plaintiffs' superior offers for the television rights.

203.    Each RICO Defendant benefited from the fraud:

a.    T&T obtained the Club Tournament television rights and the profits from sublicensing the rights to FSLA;

b.  The Fox Defendants obtained a sublicense to the Club Tournament television rights, and the increased profit resulting from such rights, including the increased demand for programming provided by the Fox Defendants and the advertising revenue associated with such programming, as well as their share of T&T's profits;

c.  Torneos obtained the right to generate revenue from the production services it provided connection with the Club Tournaments, as well as its share of T&T's profits;

d.  Burzaco obtained compensation and professional success as a result of T&T obtaining the Club Tournament television rights and Torneos obtaining production services and revenue in connection with those rights and its interest in T&T;

e.  Ganley obtained compensation and professional success in connection with T&T obtaining the Club Tournament television rights and his employer Fox Pan American and PASEC benefiting from the sublicense of those rights to Fox Pan American's subsidiary FSLA;

f.  Lopez and Martinez obtained compensation and professional success in connection with T&T obtaining the Club Tournament television rights and their employer FIC benefiting from the sublicense of those rights to FSLA;

g.  Figueredo and Napout benefited from receiving bribe payments; and

h.  Full Play benefitted by, among other things, receiving rights to act as agent for the commercialization of the 2019-2022 Club Tournament television rights outside of the Americas.

204.    Each of the wire transfer payments set forth in Paragraphs 185-186 is individually indictable as an act of wire fraud under 18 U.S.C. § 1343.  As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

**2.    Money Laundering: Promotion by International Transfer**

205.    By their foregoing conduct set forth in Paragraphs 1-143 and 182, each RICO Defendant transported, transmitted, or transferred, or attempted to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, wire fraud in violation of 18 U.S.C.§ 1343 (Paragraphs 193-204), commercial bribery in violation of N.Y. Penal Law §§ 180.03 and 180.08 (Paragraphs 237-247), and violations of the Travel Act, 18 U.S.C. § 1952(a)(1), (3), in violation of 18 U.S.C. § 1956(a)(2)(A).

206.    As set forth in Paragraphs 1-143 above, each RICO Defendant paid bribes or caused bribes to be paid by wire transfer through financial institutions from Miami, Florida and/or New York, New York to accounts in Europe and South America, and vice-versa, on an ongoing basis.  These payments promoted the continuation of the bribery scheme, which lasted for approximately 15 years and for the Club Tournament television rights for the years 2000-2022.  Transfers of funds were made through wire transfers between financial institutions, with such transfers of funds being from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States.

207.    Jurisdiction is proper against any RICO Defendants deemed to be foreign persons because the offenses committed herein involve financial transactions that occurred in whole or in part in the United States.

208.    There is extraterritorial jurisdiction over conduct constituting the violation of 18 U.S.C. § 1956 (promotional money laundering by international transfer) for RICO Defendants that are United States citizens or, in the case of a non-United States citizen the conduct occurs in part in the United States, and the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

209.    The making of each of the payments set forth in Paragraphs 185-186 is individually indictable as an act of promotional money laundering by international transfer under 18 U.S.C. § 1956(a)(2)(A).  As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### 3.    Money Laundering: Concealment by Use of an International Transfer

210.    By their foregoing conduct set forth in Paragraphs 1-143 and 182, each RICO Defendant transported, transmitted, or transferred, or attempted to transport, transmit, or transfer, a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from and through a place outside the United States knowing that the monetary instruments or funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity (the bribery scheme) and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity, all in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

211.    As set forth in Paragraphs 1-143 above, each RICO Defendant paid bribes or caused bribes to be paid by wire transfer through financial institutions from Miami, Florida and/or New York, New York to Europe and South America, and vice-versa, on an ongoing basis. These bribes constituted specified unlawful activity of wire fraud in violation of 18 U.S.C. §

1343 as set forth in Paragraphs 193-204, commercial bribery under N.Y. Penal Law §§ 180.03 and 180.08, as set forth in Paragraphs 237-247, and violations of the Travel Act, 18 U.S.C. § 1952(a)(1), (3), as set forth in Paragraphs 248-253.

212.     The result of the bribery and other criminal wrongdoing was that Conmebol officials caused Conmebol to award the Club Tournament television rights to T&T, which sublicensed the rights to FSLA, generating substantial revenue for the Fox Defendants.

213.     RICO Defendants concealed the source of this revenue – which they knew constituted proceeds from unlawful activity – by depositing such criminally derived proceeds in financial institutions and using such proceeds in financial institutions to wire the payment of bribes on an ongoing basis.

214.     The bribes were funneled by RICO Defendants to the Conmebol officials in highly irregular transactions used to disguise the source of the funds and prevent tracing.  The Fox Defendants and Torneos provided the funds to Burzaco, who with the assistance of the other RICO Defendants, used T&T and the Margulies Intermediaries and Full Play to transmit the bribes by wire transfers between financial institutions to the Conmebol officials. Transfers of funds were made through wire transfers between financial institutions, with such transfers of funds being from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States.

215.     Jurisdiction is proper against any RICO Defendants deemed to be foreign persons because the offenses committed herein involve financial transactions that occurred in whole or in part in the United States.

216.     There is extraterritorial jurisdiction over conduct constituting the violation of 18 U.S.C. § 1956(a)(2)(B)(i) (concealment money laundering by use of an international transfer) for

the RICO Defendants that are United States citizens or, in the case of a non-United States citizen the conduct occurs in part in the United States, and the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

217.    The making of each of the payments set forth in Paragraphs 185-186 is individually indictable as an act of concealment laundering of monetary instruments by international transfer under 18 U.S.C. § 1956(a)(2)(B)(i).  As such each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

**4.      Money Laundering:  Promotional Money Laundering**

218.    By their foregoing conduct set forth in Paragraphs 1-143 and 182, each RICO Defendant, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity (the bribery scheme), conducted or attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity (to wit, wire fraud in violation of 18 U.S.C. § 1343 as set forth in Paragraphs 193-204, commercial bribery in violation of N.Y. Penal Law §§ 180.03, and 180.08, as set forth in Paragraphs 237-247, and in violation of the Travel Act, 18 U.S.C. §§ 1952(a)(1) and (3), as set forth in Paragraphs 248-253), with the intent to promote the carrying on of such specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

219.    Each of the wire transfer payments between financial institutions set forth in Paragraphs 185-186 constitute the movement of funds through wires or other means by means of financial institutions that affect interstate or foreign commerce and therefore constitute financial transactions.

220.    Each RICO Defendant knew that the ongoing wire transfers represented the proceeds of some unlawful activity – the bribery scheme – and such property was in fact derived from the proceeds of specified unlawful activity of wire fraud in violation of 18 U.S.C. § 1343,

commercial bribery in violation of N.Y. Penal Law §§180.03 and 180.08, and in violation of the Travel Act, 18 U.S.C. § 1952(a)(1), (3).

221.    Each RICO Defendant caused T&T and FSLA to be awarded the exclusive broadcasting rights to the Club Tournaments through wire fraud and commercial bribery.  The Fox Defendants derived revenue from the broadcast of the Club Tournaments obtained through such unlawful activity, and each RICO Defendant used such proceeds to continue paying bribes to Conmebol officials to promote the continuation of the bribery scheme and continued award of broadcasting rights to the Club Tournaments to FSLA, all constituting specified unlawful activity (wire fraud in violation of 18 U.S.C. § 1343, commercial bribery in violation of N.Y. Penal Law §§ 180.03 and 180.08, and violations of the Travel Act, 18 U.S.C. § 1952(a)(1), (3)).

222.    Jurisdiction is proper against any RICO Defendants deemed to be foreign persons because the offenses committed herein involve financial transactions that occurred in whole or in part in the United States.

223.    There is extraterritorial jurisdiction over conduct constituting the violation of 18 U.S.C. § 1956(a)(1)(A)(i) (promotional money laundering) for the RICO Defendants that are United States citizens or, in the case of a non-United States citizen, because the conduct occurs in part in the United States, and the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

224.    The making of each of the payments set forth in Paragraphs 185-186 is individually indictable as an act of promotional money laundering under 18 U.S.C. § 1956(a)(1)(A)(i).  As such each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

**5.** **Money Laundering: Money Laundering by Concealment**

225.    By their foregoing conduct set forth in Paragraphs 1-143 and 182, each RICO Defendant, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity (the bribery scheme), conducted or attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity, to wit, wire fraud under 18 U.S.C. §1343 (Paragraphs 193-204), commercial bribery under N.Y. Penal Law §§ 180.03 and 180.08 (Paragraphs 237-247), and violations of the Travel Act, 18 U.S.C. § 1952(a)(1), (3) (Paragraphs 248-253), knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

226.    Each of the wire transfer payments between financial institutions set forth in Paragraphs 185-186 constitutes the movement of funds through wires or other means by means of financial institutions that affect interstate or foreign commerce and therefore constitute financial transactions.

227.    Each RICO Defendant knew that the ongoing wire transfers represented the proceeds of some unlawful activity – the bribery scheme – and such property was in fact derived from the proceeds of wire fraud in violation of 18 U.S.C. § 1343, commercial bribery in violation of N.Y. Penal Law §§ 180.03 and 180.08, and violations of the Travel Act, 18 U.S.C. §1952(a)(1), (3).

228.    Each RICO Defendant caused Conmebol to award the Club Tournament television rights to T&T, and T&T to sublicense such rights to FSLA, through wire fraud and commercial bribery.  The Fox Defendants derived programming and advertising revenue from the broadcast of the Club Tournaments obtained through such unlawful activity, and each RICO

Defendant received proceeds from the scheme.  Each RICO Defendant concealed such proceeds by depositing such proceeds in financial institutions and using such proceeds in financial institutions by means of wire transfers to continue to pay bribes, and cause bribes to be paid, to Conmebol officials in exchange for their continued support of awarding the Club Tournament television rights to T&T, which sublicensed them to FSLA.

229.    The concealment of the proceeds of the bribery scheme was accomplished by structuring the bribe payments in a highly unusual manner to avoid detection and tracing. Among other methods, the Fox Defendants provided funds to T&T, which with the assistance of the other RICO Defendants, used financial intermediaries, including Full Play and companies controlled by Full Play principals Hugo Jinkis and Mariano Jinkis, to transmit the bribes by wire transfers between financial institutions to the Conmebol officials.

230.    Jurisdiction is proper against any RICO Defendants deemed to be foreign persons because the offenses committed herein involve financial transactions that occurred in whole or in part in the United States.

231.    There is extraterritorial jurisdiction over conduct constituting the violation of 18 U.S.C. § 1956(a)(1)(B)(i) (money laundering by concealment) for the RICO Defendants that are United States citizens or, in the case of a non-United States citizen the conduct occurs in part in the United States, and the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

232.    The making of each of the payments set forth in Paragraphs 185-186 is individually indictable as an act of money laundering by concealment under 18 U.S.C. § 1956(a)(1)(B)(i).  As such each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

**6.      Monetary Transactions in Property**
**Derived from Unlawful Activity**

233.    Each RICO Defendant, by participating in the bribery scheme and payments described in Paragraphs 1-143 and 182 above, knowingly engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, wire fraud under 18 U.S.C. § 1343, commercial bribery under N.Y. Penal Law §§ 180.03, 180.08, and in violation of the Travel Act under 18 U.S.C. § 1952(a)(1), (3), all indictable or chargeable under 18 U.S.C. 1961(1), and that took place in the United States or in the special maritime and territorial jurisdiction of the United States, or, in the case of those RICO Defendants who are United States persons, outside the United States and such special jurisdiction, in violation of 18 U.S.C. § 1957.

234.    RICO Defendants' bribery scheme caused FSLA, through a licensing agreement with T&T, to be awarded the exclusive broadcasting rights to the Club Tournaments.  Fox derived revenue from the broadcast of the Club Tournaments, which was derived from the specified unlawful activities.

235.    Fox used the proceeds to continue to pay bribes in transactions greater than $10,000 by means of deposits, withdrawals, transfers, or exchanges, in or affecting interstate or foreign commerce, of funds or a monetary instrument by, through, or to a financial institution, to Conmebol officials, with such bribes being paid through, and with the assistance and participation of, Torneos, T&T, Burzaco, Ganley, Martinez, Lopez, Full Play, Hugo Jinkis, Mariano Jinkis, and the Margulies Intermediaries as set forth in Paragraphs 1-143.

236.    Participating in each monetary transaction set forth in Paragraphs 185-186 is thus individually indictable as an act of engaging in monetary transactions in property derived from

specified unlawful activity under 18 U.S.C. § 1957.  As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### 7. Bribery Under New York State Law

237.    For each RICO Defendant herein, where any payment set forth in Paragraphs 185-186 originated from a person other than such RICO Defendant, such payment was reasonably foreseeable to, and caused by, such RICO Defendant.

### a.    Commercial Bribing in the First Degree

238.    The Fox Defendants (including PASEC, whose principal place of business is New York, New York), Torneos, T&T, Burzaco, Martinez, Ganley, Lopez, and Full Play conferred, or offered or agreed to confer, or was reasonably foreseeable to cause to confer, the amounts paid in Paragraphs 185-186, as bribes to benefit Conmebol officials (including Napout and Figueredo), without the consent of the latter's employer principal, Conmebol or Conmebol's member organizations.

239.    The Conmebol officials owed a fiduciary duty to their employer or principal, Conmebol and their member organizations, to obtain the highest amount for the sale of the television broadcasting rights to the Club Tournaments.

240.    RICO Defendants made the payments set forth in Paragraphs 185-186, including through the use of accounts in New York financial institutions to wire such payments, with the intent to influence the Conmebol officials' conduct in relation to Conmebol and its member organization's affairs, namely that Conmebol and its member organizations turn down Plaintiffs' superior offers and instead accept a lower amount offered by T&T for the broadcasting rights for the gain of RICO Defendants, including PASEC, which is headquartered in New York, New York, and the other Fox Defendants, which are wholly-owned subsidiaries of Twenty-First Century Fox, Inc., which is headquartered in New York, New York.

241.    The value of the payments conferred on the Conmebol officials exceeded one thousand dollars.

242.    As a result, Conmebol and its member organizations suffered economic harm in excess of two-hundred fifty dollars.  Specifically, absent the corrupt arrangement, Conmebol and its member organizations would have obtained more money and better terms for the sale of the broadcasting rights to the Club Tournaments to Plaintiffs, who offered substantially more for the rights than the amount for which Conmebol awarded the rights to T&T.

243.    As a result of RICO Defendants' use of accounts at financial institutions located in New York for the transmission of the payments alleged in Paragraphs 185-186 above, such actions by RICO Defendants constitute commercial bribing in the first degree as chargeable under New York law and punishable by imprisonment for more than one year under N.Y. Penal Law § 180.03 and each such payment constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### b.    Commercial Bribe Receiving in the First Degree

244.    The Conmebol officials are employees, agents or fiduciaries of Conmebol and its member organizations.

245.    Without the consent of their employer or principal, Napout and Figueredo solicited, accepted, or agreed to accept the payments set forth in Paragraphs 185-186, which constitute benefits, from another person upon an agreement or understanding that such benefit would influence each of their conduct in relation to Conmebol and its member organizations' affairs, namely that Conmebol and its member organizations would award the television broadcasting rights to the Club Tournaments to T&T and FSLA.

246.     The value of the payments solicited, accepted, or agreed to be accepted exceeded one thousand dollars and caused economic harm to Conmebol and its member organizations in an amount exceeding two hundred fifty dollars.  Specifically, Conmebol and its member organizations were deprived by the difference between the far greater offers made by Plaintiffs for the right to televise the Club Tournaments and the lower offers that Conmebol and its member organizations accepted from T&T and Fox.  Plaintiffs' offers significantly exceeded what Conmebol and its member organizations accepted.  Absent the corrupt arrangement, Conmebol and its member organizations would have secured better terms and received more money for the broadcast rights.

247.     As a result of each of the RICO Defendants' use of accounts at financial institutions located in New York for the transmission of the payments alleged in Paragraphs 185-186 above, such actions constitute commercial bribing in the first degree as chargeable under New York law and punishable by imprisonment for more than one year under N.Y. Penal Law § 180.08, and each such payment constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### 8.     Travel Act (18 U.S.C. § 1952)

248.     By their foregoing conduct set forth in Paragraphs 1-143 and 182, each RICO Defendant travelled in interstate or foreign commerce or used the mail or any facility in interstate or foreign commerce, with intent to distribute the proceeds of any unlawful activity or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, to wit, bribery in violation of the laws of the State in which committed or of the United States, and any act which is indictable under 18 U.S.C. § 1956 or 1957.

249.     RICO Defendants travelled to Florida and New York, used the wire facilities of financial institutions in Florida and New York, or made communications into and out of Florida and New York using facilities of interstate and/or foreign commerce, with the intent to distribute the proceeds and promote, manage, establish, carry on, or facilitate the commercial bribery violations under N.Y. Penal Law §§ 180.03 and 180.08 as set forth in Paragraphs 237-247.

250.     For the same reasons, the Fox Defendants, Lopez, Martinez, Ganley, Burzaco, T&T, Torneos, and Full Play also violated N.Y. Penal Law § 180.00 (Commercial bribing in the second degree) because each conferred, offered, or agreed to confer any benefit (the funds which constituted bribes) upon any employee, agent, or fiduciary without the consent of the latter's employer or principal (Conmebol and its member organizations), with intent to influence his conduct in relation to his employer's or principals' affairs, to wit, that Conmebol and its member organizations would award the television broadcasting rights to the Club Tournaments to T&T and the Fox Defendants, and Figueredo and Napout violated N.Y. Penal Law § 180.05 (Commercial bribe receiving in the second degree because, each, without the consent of his employer or principal (Conmebol and its member organizations), solicited, accepted, or agreed to accept any benefit (the funds which constituted bribes) from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs, to wit, that Conmebol and its member organizations would award the television broadcasting rights to the Club Tournaments to T&T and the Fox Defendants.

251.     RICO Defendants also travelled to Florida and New York, used the wire facilities in Florida and New York, or made communications into and out of Florida and New York using facilities of interstate and/or foreign commerce, with the intent to distribute the proceeds and

promote, manage, establish, carry on, or facilitate the money laundering violations set forth in Paragraphs 205-232 above in violation of 18 U.S.C. §§ 1956, 1957.

252.    Upon information and belief, RICO Defendants used electronic mail communications from or to Florida and New York with intent to distribute the proceeds from – and promote, manage, establish, carry on, or facilitate – the promotion, management, establishment, or carrying on of the commercial bribery violations under N.Y. Penal Law §§ 180.00, 180.03, 180.05, and 180.08, and the money laundering violations of 18 U.S.C. §§ 1956 and 1957.

253.    Each such act is individually indictable as a violation of the travel act under 18 U.S.C. §§ 1952(a)(1) or 1952(a)(3).  As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

**B.**    **Pattern of Racketeering Activity**

254.    The above-described acts of racketeering activity consist of more than two acts of racketeering activity, all of which occurred after the effective date of the RICO statute, and the last of which was within 10 years after the commission of any prior above-described act of racketeering activity (the earliest of which is identified above as having been on May 5, 2005).

255.    The above-described racketeering activity constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The above-described racketeering activity was a series of acts that amounted to and posed a threat of continued criminal activity, that were neither isolated nor sporadic, and that were related to each other by virtue of common participants, common victims, common method of commission, and the common purpose and result of effectuating the bribery scheme and the scheme to defraud alleged above.

C.      **Enterprises**

256.    Each of PASEC, FSLA, FIC, T&T, Torneos, and Conmebol is a "partnership, corporation, association, or other legal entity," and as such constitutes an "enterprise" as defined in 18 U.S.C. § 1961(4).  Fox Pan American likewise was, prior to its merger into PASEC, a "partnership, corporation, association, or other legal entity," and as such constituted an "enterprise" as defined in 18 U.S.C. § 1961(4).

257.    At all times relevant to the Complaint, each of the enterprises Fox Pan American, PASEC, FSLA, FIC, T&T, Torneos, and Conmebol was engaged in, and its activities affected, United States interstate and foreign commerce.  Among other things, Conmebol awarded the television rights for the Club Tournaments, including the television rights for the United States, which is one of the principal markets for such rights.  Among the acquirers and would-be acquirers of such rights were U.S.-based and Florida-based businesses, such as the Fox Defendants and Plaintiff GolTV.  Moreover, Plaintiff GolTV, Fox Pan American, PASEC, FSLA, FIC, Torneos, T&T, and Conmebol, frequently engaged in banking and investment activities with United States persons and used United States financial institutions.

258.    Fox Pan American and Defendants PASEC (individually and as successor to Fox Pan American), FSLA, FIC, Torneos, T&T, Full Play, Martinez, Lopez, Ganley, Burzaco, Figueredo and Napout also comprised an association-in-fact, the "Bribery Enterprise," which constituted an "association in fact" enterprise as defined in 18 U.S.C. § 1961(4).  The Bribery Enterprise functioned with the common purpose of financial gain by awarding the exclusive television rights for the Club Tournaments through bribery to T&T and the Fox Defendants and excluding Plaintiffs from fair competition for such rights.  PASEC, Fox Pan American, FSLA, FIC, and T&T benefited from the Bribery Enterprise by ensuring they would retain exclusive rights to the Club Tournaments at artificially low prices, the Conmebol officials (including

Figueredo and Napout) benefited by pocketing bribes, Torneos benefited from this enterprise by receiving a share of T&T's profits and the rights to provide production services, Full Play benefited from receiving a percentage of the bribes and agency rights to certain Club Tournaments, and Martinez, Lopez, Ganley, and Burzaco obtained compensation and professional success.

259.    The Bribery Enterprise retained an ongoing informal organization in which the Fox Defendants' role was to fund bribes and receive Club Tournament rights, T&T was the primary intermediary responsible for acquiring rights from Conmebol and facilitating bribes from the Fox Defendants to the Conmebol officials, Torneos provided additional funding for bribes and assisted in facilitating their payment, Full Play facilitated bribe payments, and Martinez, Lopez, Ganley, and Burzaco organized and executed the bribery scheme.

260.    The longevity of the Bribery Enterprise was determined by the period of years provided for in each new agreement between T&T and Conmebol, and the enterprise existed continually at least until the unsealing of the Superseding Indictment on December 3, 2015.

261.    In addition, the Superseding Indictment charged that "[FIFA] and its six constituent continental confederations – [CONCACAF], [Defendant Conmebol], the Union des Associations Européennes de Football ('UEFA'), the Confédération Africaine de Football ('CAF'), the Asian Football Confederation ('AFC'), and the Oceania Football Confederation ('OFC') – together with affiliated regional federations, national member associations, and sports marketing companies, collectively constituted an 'enterprise,' as defined in Title 18, United States Code, Section 1961(4), that is, a group of legal entities associated in fact . . . " Superseding Indictment ¶ 1.  The Superseding Indictment further charged that this enterprise (referred to hereinafter as the "Indictment Enterprise") "constituted an ongoing organization

whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise," *id.*, and this enterprise has had the longevity sufficient to permit its members to pursue that common purpose.  The Superseding Indictment described that common purpose as being "to regulate and promote the sport of soccer worldwide," and stated that the members of this enterprise "carried out this purpose by using a variety of methods and means, including creating and enforcing uniform standards and rules, organizing international competitions, and commercializing the media and marketing rights associated with the sport." The Superseding Indictment further charged that the Indictment Enterprise "was engaged in, and its activities affected, interstate and foreign commerce," *id.* ¶ 1, and that "[its] members . . . as well as individuals and entities employed by and associated with the enterprise, frequently engaged in banking and investment activities with United States financial institutions," *id.* ¶ 2.

262.    Martinez, Lopez, Ganley, Burzaco, Figueredo and Napout were employed by or associated with these enterprises and corrupted each of these enterprises with their co-conspirators by engaging in bribery, fraud and money laundering in pursuit of personal and commercial gain.  They also participated in the corruption of each enterprise by conspiring with and aiding and abetting their co-conspirators in the abuse of their positions of trust and the violation of their fiduciary duties.

**D.    Violations of 18 U.S.C. § 1962(c)**

263.    As set forth in Paragraphs 1-143 and 182, Defendants PASEC (individually and as successor to Fox Pan American), FSLA, FIC, T&T, Torneos, Full Play, Martinez, Lopez, Ganley, Burzaco, Figueredo, and Napout were associated with and conducted and participated, directly and indirectly, in the conduct, management, or operation of the affairs of Conmebol through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

264.     As set forth in Paragraphs 1-143 and 182, Defendants Martinez, Lopez, Ganley, Burzaco, Figueredo, and Napout were associated with and conducted and participated, directly and indirectly, in the conduct, management, or operation of the affairs of Fox Pan American, PASEC, FSLA, FIC, Torneos, and T&T through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C.§ 1962(c).

265.     As set forth in Paragraphs 1-143 and 182 above, Fox Defendants and Torneos were associated with and conducted and participated, directly and indirectly, in the conduct, management, or operation of the affairs of T&T through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

266.     As set forth in Paragraphs 1-143 and 182 above, Defendants PASEC (individually and as successor to Fox Pan American), FSLA, FIC, Torneos, T&T, Full Play, Martinez, Lopez, Ganley, Burzaco, Figueredo and Napout were associated with and conducted and participated, directly and indirectly, in the conduct, management, or operation of the affairs of the Bribery Enterprise through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

267.     As set forth in Paragraphs 1-143 and 182 above, Defendants PASEC (individually and as successor to Fox Pan American), FSLA, FIC, Torneos, T&T, Martinez, Lopez, Ganley, Burzaco, Full Play, Figueredo, and Napout were associated with and conducted and participated, directly and indirectly, in the conduct, management, or operation of the affairs of the Indictment Enterprise through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

**E.     Injury to Plaintiffs' Business and Property**

268.     By reason and as a direct and proximate result of RICO Defendants' violations of 18 U.S.C. § 1962(c), and for no reason other than RICO Defendants' violation of law, Plaintiffs

were not awarded the Club Tournament television rights despite Plaintiffs' superior offers. Plaintiffs accordingly suffered substantial injury to their business and property, including without limitation loss of revenues, loss of profits, lower market share, and lessened profile in the sports telecasting marketplace, in an amount to be determined at trial but not less than hundreds of millions of dollars.

269.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from RICO Defendants threefold the damages Plaintiffs sustained from RICO Defendants' violations of 18 U.S.C. § 1962(c) and the cost of this action, including a reasonable attorney's fee.

## Count Two

## Civil RICO Conspiracy, 18 U.S.C. § 1962(d)

### (Against the Fox Defendants, Martinez, Lopez, Ganley, T&T, Torneos, Burzaco, Full Play, Figueredo, and Napout)

270.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-143 and 182-269 as if fully set forth in this paragraph.

271.    RICO Defendants conspired with each other to commit the violations of 18 U.S.C. § 1962(c) alleged above.  Each RICO Defendant agreed, and objectively manifested their agreement through words or actions, that at least one conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprises alleged above, the last of which would occur within 10 years of a prior act of racketeering activity.

272.    RICO Defendants conspired in two ways.  First, each RICO Defendant agreed to the overall objective of the conspiracy – to cause Conmebol to award the Club Tournament television rights T&T and FSLA through the bribery scheme.  Second, each Defendant agreed to commit two predicate acts of racketeering, to wit, wire fraud (18 U.S.C. § 1343), commercial bribery (N.Y. Penal Law §§ 180.03 (conferring) and 180.08 (receiving)), money laundering (18

U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i), (a)(2)(A), (a)(2)(B)(i), and 18 U.S.C. § 1957) and violations of the Travel Act (18 U.S.C. § 1952(a)(1), (3)).

273.    Each of the RICO Defendants' agreement to the overall objective of the conspiracy and agreement to commit two predicate acts can be inferred from the conduct summarized in Paragraphs 185-192 above to further the conspiracy, including the transfers of funds identified above in Paragraphs 185-186, the creation and use of intermediary entities and payment mechanisms to conceal bribes to the Conmebol officials, and T&T's and FSLA's acquisition of rights from Conmebol.

274.    To the extent it were determined that any RICO Defendant did not commit two predicate acts, the conduct of RICO Defendants described in Paragraphs 185-192 above shows that each RICO Defendant agreed to commit two predicate acts, including Torneos's admission that Broadcasting Company Affiliates B and C (believed to be FIC and Fox Pan American), and Broadcasting Company Executives #2, #3, and #4 (believed to be Martinez, Lopez, and Ganley), at times agreed and supported the payment of bribes and kickbacks by T&T and Torneos affiliates to Conmebol officials, including Figueredo and Napout, and that Sports Marketing Company A and Sports Marketing Executives #1 and #2 (believed to be Full Play, Hugo Jinkis, and Mariano Jinkis, respectively) facilitated the payment of bribes and kickbacks to certain Conmebol officials.

275.    An additional predicate act to which each RICO Defendant agreed is money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), by agreeing to commit an offense in violation of 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i), (a)(2)(A), (a)(2)(B)(i)), and 18 U.S.C. § 1957, and knowing and voluntary participation in that agreement as evidenced by their conduct.

276.     By reason and as a direct and proximate result of RICO Defendants' violations of 18 U.S.C. § 1962(d), and for no reason other than RICO Defendants' violation of law, Plaintiffs were not awarded the Club Tournament television rights, and accordingly suffered substantial injury to their business and property, including without limitation loss of revenues, loss of profits, lower market share, and lessened profile in the sports telecasting marketplace, in an amount to be determined at trial but not less than hundreds of millions of dollars.

## Count Three

### Conspiracy in Restraint of Trade in the Americas Television Rights Market in Violation of Section 1 of the Sherman Act

### (Against all Defendants)

277.     Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph.

278.     Defendants knowingly and voluntarily entered into a series of contracts, combinations, or conspiracies in restraint of trade or commerce among the several states and with foreign nations, which substantially lessened or eliminated competition in the Americas Television Rights Market in violation of 15 U.S.C. § 1.

279.     Defendants' anticompetitive activities caused unreasonable restraints of trade and anticompetitive effects and lacked any pro-competitive benefit or justification.

280.     Defendants' wrongful conduct substantially affected interstate and foreign commerce and occurred within the flow of interstate and foreign commerce.

281.     To the extent Defendants' activities concerned trade outside the United States, they had direct, substantial, and reasonably foreseeable effects on U.S. commerce.

282.     Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of Defendants' aforementioned Sherman Act

violations with respect to the Americas Television Rights Market and accordingly are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

## Count Four

### Conspiracy in Restraint of Trade in the U.S. Television Programming Market in Violation of Section 1 of the Sherman Act

#### (Against all Defendants)

283.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph.

284.    Defendants knowingly and voluntarily entered into a series of contracts, combinations, or conspiracies in restraint of trade or commerce among the several states and with foreign nations, which substantially lessened or eliminated competition in the U.S. Television Programming Market in violation of 15 U.S.C. § 1.

285.    Defendants' anticompetitive activities caused unreasonable restraints of trade and anticompetitive effects and lacked any pro-competitive benefit or justification.

286.    Defendants' wrongful conduct substantially affected interstate and foreign commerce and occurred within the flow of interstate and foreign commerce.

287.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of Defendants' aforementioned Sherman Act violations with respect to the U.S. Television Programming Market, and accordingly, Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

## Count Five

**Conspiracy in Restraint of Trade in the U.S. Television Advertising Airtime Market in Violation of Section 1 of the Sherman Act**

**(Against all Defendants)**

288.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph.

289.    Defendants knowingly and voluntarily entered into a series of contracts, combinations, or conspiracies in restraint of trade or commerce among the several states and with foreign nations, which substantially lessened or eliminated competition in the U.S. Television Advertising Airtime Market in violation of 15 U.S.C. § 1.

290.    Defendants' anticompetitive activities caused unreasonable restraints of trade and anticompetitive effects and lacked any pro-competitive benefit or justification.

291.    Defendants' wrongful conduct substantially affected interstate and foreign commerce and occurred within the flow of interstate and foreign commerce.

292.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of Defendants' aforementioned Sherman Act violations with respect to the U.S. Television Advertising Airtime Market, and accordingly Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

## Count Six

**Monopsonization of the Americas Television Rights Market in Violation of Section 2 of the Sherman Act**

**(Against T&T)**

293.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph.

294.     T&T engaged in monopsonization of the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

295.     T&T had market power and monopsony power in the Americas Television Rights Market, engaged in anticompetitive conduct, and monopsonized the Americas Television Rights Market.

296.     The intent and effect of T&T's monopsonization was to substantially weaken and/or drive T&T's competitors, including Plaintiffs, out of the Americas Television Rights Market, and/or prevent T&T's competitors from entering that market.

297.     T&T's wrongful, anticompetitive conduct materially and substantially harmed competition, injured the welfare of purchasers, suppliers, and consumers, and monopsonized a part of the trade or commerce among the several States and with foreign nations.

298.     Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of T&T's aforementioned monopsonization of the Americas Television Rights Market, and accordingly Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

## Count Seven

**Attempted Monopsonization of the Americas Television Rights Market in Violation of Section 2 of the Sherman Act**

**(Against T&T)**

299.     Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph.

300.     T&T engaged in attempted monopsonization of the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

301.    T&T engaged in predatory and anticompetitive conduct with the specific intent, purpose, and plan to monopsonize, and in furtherance of monopsonizing, the Americas Television Rights Market, and there was and continues to be a dangerous probability that T&T would obtain monopsony power and succeed in monopsonizing that market.

302.    T&T's wrongful conduct materially and substantially harmed competition and injured the welfare of purchasers, suppliers, and consumers.

303.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of T&T's conduct, and accordingly Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

## Count Eight

### Conspiracy to Monopsonize the Americas Television Rights Market in Violation of Section 2 of the Sherman Act

### (Against all Defendants)

304.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph.

305.    Defendants engaged in a conspiracy to monopsonize the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

306.    Defendants formed an agreement in restraint of trade in the Americas Television Rights Market.

307.    Defendants knowingly and voluntarily conspired with the mutual understanding and specific intent that T&T would unlawfully obtain and maintain a monopsony in the Americas Television Rights Market.

308.    Defendants engaged in overt acts in furtherance of the conspiracy.

309.    Defendants conspired to monopsonize a part of the trade or commerce among the several States and with foreign nations.

310.    Defendants' wrongful conduct caused and threatened to cause anticompetitive effects.

311.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of Defendants' aforementioned conduct, and accordingly Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

**Count Nine**

**Violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq.**

**(Against all Defendants)**

312.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph. Defendants' illegal and wrongful actions herein alleged violated the Florida Deceptive and Unfair Trade Practices Act.

313.    As set forth in Paragraphs 185-247, the Defendants have engaged in unfair acts and deceptive practices in the course of trade or commerce in that they have conspired to engage in and have engaged in bribery, fraud, and money laundering in violation of federal RICO laws, and have conspired to and have actually restrained trade in violation of the Sherman Act.

314.    Defendants' conduct was designed to preclude Plaintiffs and any other competitors of T&T and Fox from obtaining or fairly competing for the Club Tournament television rights.

315.    Such unfair trade practices as bribery, fraud, money laundering, and unreasonable restraint of trade are immoral, unethical, oppressive, unscrupulous, offensive to well-established

public policy, and materially and substantially injurious to the welfare of purchasers, suppliers, and consumers.

316.    Plaintiffs, each a legitimate business enterprise, have suffered actual damages as a direct and proximate result of Defendants' wrongful, deceptive, and unfair trade practices.

317.    Plaintiffs are entitled to recover their actual damages and reasonable attorney's fees.

## Count Ten

### Tortious Interference with Prospective Economic Advantage

### (Against the Fox Defendants, Torneos, and T&T)

318.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-143 and 182 as if fully set forth in this paragraph.

319.    The Fox Defendants and Torneos, using T&T, tortiously interfered with Plaintiffs' prospective economic advantage.

320.    Plaintiffs had a prior and ongoing business relationship with Conmebol based on their repeated negotiations regarding the purchase of television rights for the Club Tournaments and on Global Sports' agreement with Conmebol to purchase from Conmebol the rights to sell so-called "static" advertising and publicity, including on-field billboards, at the Club Tournaments ("Static Advertising Rights").  Global Sports entered into an agreement with Conmebol to purchase the Static Advertising Rights for the year 2010 and, in or around April 2011, entered into a new agreement with Conmebol to purchase Static Advertising Rights for the 2011–2014 period.

321.    On information and belief, Fox Defendants, Torneos, and T&T, were aware of Global Sports' business relationship with Conmebol because Conmebol officials informed them

of Global Sports' attempts to acquire television rights to the Club Tournaments and Global

Sports' agreement with Conmebol to purchase Static Advertising Rights.

322.    Fox Defendants, Torneos, and T&T were aware that Plaintiffs' opportunity to

obtain television rights for the Club Tournaments from Conmebol represented a prospective

economic advantage for Plaintiffs.

323.    By bribing Conmebol officials and causing Conmebol to refuse to deal with

Global Sports, the Fox Defendants, Torneos and T&T acted with the intent to interfere with

Plaintiffs' prospective economic advantage and without a legitimate business justification.

324.    Plaintiffs have suffered actual damages as a direct and proximate result of

Defendants' wrongful conduct.

## Count Eleven

### Civil Conspiracy to Commit Tortious Interference

### (Against the Fox Defendants, Torneos, T&T, Full Play, Martinez, Lopez, Ganley, Burzaco, Figueredo, and Napout)

325.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs

1-143 and 182 as if fully set forth in this paragraph.

326.    T&T tortiously interfered with Plaintiffs' prospective economic advantage.

327.    The Fox Defendants, Torneos, T&T, Full Play, Martinez, Lopez, Ganley,

Burzaco, Figueredo, and Napout ("Conspiracy Defendants") agreed to participate in a common

scheme in which T&T would tortiously interfere with Plaintiffs' prospective economic

advantage.

328.    The Conspiracy Defendants intentionally participated in the common scheme and

committed overt and unlawful acts in furtherance of it.

329.    Plaintiffs have been damaged in their business and property as a direct and proximate result of Conspiracy Defendants' conspiracy and the overt acts committed in furtherance of it.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment awarding:

A.    Compensatory damages in an amount to be determined at trial, including interest;

B.    Trebling of those compensatory damages awarded under Plaintiffs' RICO and Sherman Act claims (Counts One through Eight);

C.    Disgorgement damages of profit earned as a result of wrongful conduct and punitive damages under Plaintiffs' Tortious Interference and Civil Conspiracy claims (Counts Ten and Eleven);

D.    Reasonable attorney's fees under Plaintiffs' RICO, Sherman Act and Florida Deceptive and Unfair Trade Practices Act claims (Counts One through Nine);

E.    The cost of this action; and

F.    Such other and further relief as the Court may deem just and proper.

Dated:  February 16, 2018
New York, New York

/s/ *Peter H. Levitt*
Peter H. Levitt (FBN 650978)
Stephen Bernard Gillman (FBN 196734)

/s/ *Julissa Reynoso*
Seth C. Farber (*pro hac vice*)
Julissa Reynoso (*pro hac vice*)
George Mastoris (*pro hac vice*)
Marcelo Blackburn (*pro hac vice*)
Cristina I. Calvar (FBN 114201)
Michael A. Fernández (*pro hac vice*)
Lauren Duxstad (*pro hac vice*)

SHUTTS & BOWEN LLP
200 South Biscayne Boulevard
Suite 4100
Miami, FL 33131
Tel.: (305) 358-6300
Fax: (305) 381-9982
plevitt@shutts.com
sgillman@shutts.com

WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Tel.: (212) 294-6700
Fax: (212) 294-4700
sfarber@winston.com
jreynoso@winston.com
gmastoris@winston.com
mblackburn@winston.com
ccalvar@winston.com
mafernandez@winston.com
lduxstad@winston.com

**Counsel for Plaintiffs GolTV, Inc. and Global Sports Partners LLP**