# EXHIBIT B

JDG:EMN/SPN/BDM/JPL
F.#2016R01865

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

— — — — — — — — — — — — — — — — — — X

UNITED STATES OF AMERICA

    - against -

TORNEOS Y COMPETENCIAS S.A.,

          Defendant.

— — — — — — — — — — — — — — — — X

DEFERRED PROSECUTION AGREEMENT

16 CR 634 (PKC)

        The defendant TORNEOS Y COMPETENCIAS S.A. ("TORNEOS" or the

"Company"), an Argentinian corporation acting pursuant to authority granted by the Company's

Board of Directors in the form of a board resolution (as certified by its Legal Director in the

Certificate attached hereto as Attachment A), and the United States Attorney's Office for the

Eastern District of New York (the "Office") hereby enter into this Deferred Prosecution

Agreement (the "Agreement"). The Office agrees to defer prosecution of TORNEOS pursuant to

the terms and conditions described below.

## CRIMINAL INFORMATION

        1.    TORNEOS acknowledges and agrees that the Office will file a criminal

information (the "Information") in the United States District Court for the Eastern District of

New York charging the Company with wire fraud conspiracy, in violation of Title 18, United

States Code, Sections 1349. By executing this Agreement, TORNEOS waives (a) any and all

rights it has to have the crime charged in the Information presented to a grand jury and

prosecuted by indictment, (b) any and all rights to a speedy trial as set forth in paragraph 31

below, and (c) any and all objections with respect to venue or the statute of limitations to any

charges by the Office arising out of the conduct alleged in the Information or described in the statement of facts, which is attached to this Agreement as Attachment B and incorporated by reference ("Statement of Facts"), that may be later brought as provided in paragraphs 33 and 34 below. This waiver is knowing, voluntary, and made in express reliance on the advice of TORNEOS's counsel.

ACCEPTANCE OF RESPONSIBILITY

2.    TORNEOS admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as charged in the Information and as set forth in the Statement of Facts. TORNEOS acknowledges that, as a result of the conduct of certain individuals employed by the Company during the time period alleged in the Information, the Company engaged in, and is criminally culpable for, the charged violation of Title 18, United States Code, Section 1349. TORNEOS stipulates that all of the facts alleged in the Information and all of the facts described in the Statement of Facts are true and accurate.

3.    Should the Office pursue the prosecution that is deferred by this Agreement, TORNEOS stipulates to the admissibility of the Statement of Facts in any such prosecution, including any trial, guilty plea, or sentencing proceeding relating thereto, and will not contradict anything in the Statement of Facts at any such proceeding.

4.    TORNEOS accepts responsibility for the conduct described in the Information by entering into this Agreement and by, among other things: (a) continuing the implementation of enhanced internal controls and other remedial measures that the Company has undertaken to date and will continue to undertake, as described in paragraph 7 below; (b) continuing the Company's commitment to full cooperation, described in paragraphs 12

2

through 14 below, with the Office and its law enforcement agency partners, the Federal Bureau of Investigation and the Internal Revenue Service – Criminal Investigation (collectively, the "Investigating Agencies"); (c) agreeing to fulfill all of the financial undertakings the Company has made in this Agreement, including (i) consenting to the forfeiture to the United States of, and forfeiting to the United States, eighty-nine million sixty-two thousand six hundred sixteen dollars and no cents ($89,062,616.00) (the "Total Forfeiture Amount," as described in paragraph 15 below), and (ii) paying a financial penalty in the amount of twenty-three million seven hundred sixty dollars and no cents ($23,760,000.00) (described in paragraph 27 below); and (d) complying in the future with all applicable laws, including federal, state, and foreign anti-bribery and anti-money laundering laws.

TERM OF THE AGREEMENT

5. This Agreement is effective for a period beginning on the date on which the Information is filed and ending four (4) years therefrom (the "Term"). TORNEOS agrees, however, that in the event the Office determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement, an extension or extensions of the Term may be imposed by the Office, in its sole discretion, for up to a total additional period of one (1) year, without prejudice to the Office's right to proceed as provided in paragraphs 33 and 34 below. Any extension of the Agreement extends all terms of this Agreement for an equivalent period.

RELEVANT CONSIDERATIONS

6. The Office enters into this Agreement based on the individual facts and circumstances presented by this case. The Office has concluded that deferring prosecution is

3

appropriate because deferral will likely meet all of the goals of prosecution. This conclusion is based on, among others, the following factors:

      (a)    TORNEOS did not voluntarily self-disclose the offense conduct to the Office;

      (b)    The seriousness of the offense conduct, including the years-long involvement in the conduct by officials at the highest level of TORNEOS and the high-dollar amount of the bribes that certain TORNEOS officials caused to be paid to soccer officials;

      (c)    TORNEOS's substantial cooperation in the course of the Office and the Investigating Agencies' investigation, including the Company's prompt decision, upon learning of its potential involvement in corrupt conduct, to (i) conduct a diligent, thorough, and swift internal investigation, which entailed the preservation and review of millions of documents and the interviews of dozens of witnesses, and (ii) fully cooperate with the Office by identifying and providing relevant documents to the Office in a timely manner and presenting detailed factual findings of the Company's internal investigation;

      (d)    TORNEOS's promise of continued cooperation;

      (e)    TORNEOS's acceptance of responsibility;

      (f)    TORNEOS has no prior criminal history;

      (g)    TORNEOS's extensive remediation beginning in early June 2015, including the implementation of a new compliance program; and

      (h)    TORNEOS's commitment to continue to enhance its compliance program and internal controls.

## REMEDIAL MEASURES

       7.    TORNEOS has taken extensive remedial measures in response to the conduct that has been discovered in the course of the Office and Investigating Agencies' investigation. TORNEOS represents that these remedial measures have included a number of actions, including those detailed below:

       (a)    TORNEOS promptly terminated its entire senior management team, which included the then-President of the Company's Board of Directors (the "Board of Directors" or the "Board"), as well as numerous other employees;

       (b)    TORNEOS hired a new leadership team, including a new General Manager, Chief Financial Officer, Legal Director and Chief Compliance Officer, and Compliance Manager, who have established a new "tone at the top" and ensured that a culture of compliance has taken hold at the Company;

       (c)    the Board of Directors approved a new compliance department and program – to be overseen and enforced by the Board – based on international best practices, which includes a new code of business conduct, as well as anti-bribery and corruption, anti-money laundering, conflict of interest, and gifts and entertainment policies and procedures;

       (d)    TORNEOS has appointed a Chief Compliance Officer, who reports directly to the General Manager and to the President of the Board of Directors, and has hired a Compliance Manager and a Compliance Officer to support the Chief Compliance Officer;

       (e)    TORNEOS has provided in-person training on its new code of business conduct and related compliance policies and procedures to all directors and officers, all employees in positions of leadership or trust, all employees in positions that otherwise require

5

such training (e.g., sales, legal, compliance, finance), and all other employees who reasonably pose a fraud or corruption risk to the Company;

(f)     All TORNEOS employees have received the new code of conduct and related compliance policies and have certified that they have read, complied with, and will continue to comply with the Company's policies and procedures;

(g)     TORNEOS has retained an independent third party to manage an anonymous ethics hotline to provide an additional mechanism for Company employees to report concerns of potential misconduct;

(h)     TORNEOS has established a comprehensive risk-based, due diligence regime requiring it to conduct extensive due diligence on all new business partners prior to transacting with them and to conduct or update its diligence on existing business partners;

(i)     TORNEOS has restructured, amended, terminated, and/or consented to the termination of a number of contracts related to the conduct alleged in the Information; and

(j)     TORNEOS has committed to operating with integrity, transparency, and in compliance with all applicable laws in its business dealings, including business with FIFA, CONMEBOL, and CONCACAF and their constituent organizations, including the Asociación del Fútbol Argentino ("AFA").

## CORPORATE COMPLIANCE PROGRAM

8.      TORNEOS agrees that it will maintain all policies, procedures, and other remedial measures identified in paragraph 7 so long as this Agreement is in effect. TORNEOS further agrees that, so long as this Agreement is in effect, it will maintain sufficient documentation to demonstrate the functioning of TORNEOS's Corporate Compliance Program, including but not limited to documents in the following categories that relate to compliance with the anti-corruption laws (as defined in Attachment C): written policies and procedures; training materials, including attendance records; certificates of compliance; general internal communications from Company management to groups of employees ('tone at the top' emails); internal presentations, including to the Board of Directors; presentations to third parties; periodic or annual reviews and assessments; confidential reports of potential violations; investigations arising from confidential reporting or other sources; employee discipline actions; and third party due diligence files.

9.      TORNEOS further agrees that the compliance policies and procedures it will adopt and/or maintain during the period of this Agreement will include, but not be limited to, the minimum elements set forth in the Corporate Compliance Program attached to this Agreement as Attachment C and incorporated by reference.

10.     No later than six (6) months after the execution of this Agreement, TORNEOS shall provide written documentation to the Office certifying that its Corporate Compliance Program meets the minimum elements set forth in Attachment C, including without limitation the provision in paragraph 7 thereof requiring the Company to create and maintain an internal audit function.

7

11.    Not later than nine (9) months after the execution of this Agreement, and annually thereafter, TORNEOS shall provide a written report to the Office describing the results of the periodic review and testing it is required to perform pursuant to paragraph 18 of the Corporate Compliance Program.

## CONTINUING OBLIGATION OF COOPERATION

12.    TORNEOS acknowledges and understands that its prior, ongoing, and future cooperation is an important and material factor underlying the Office's decision to enter into this Agreement.  TORNEOS therefore agrees to cooperate fully and actively with the Office and the Investigating Agencies regarding any matter about which the Office or the Investigating Agencies may inquire.

13.    During the Term of this Agreement, TORNEOS agrees that its continuing cooperation shall include, but not be limited to, the following:

(a)    completely and truthfully disclosing all documents, materials, and information in its possession about which the Office or the Investigating Agencies may inquire, including but not limited to all information about the Company's activities and those of its affiliates, subsidiaries, officers, employees, and agents;

(b)    assembling, organizing and providing all documents, records, and other evidence in its possession, custody, or control, wherever located, as reasonably may be requested by the Office or the Investigating Agencies;

(c)    proactively and promptly disclosing to the Office all information concerning any criminal wrongdoing or suspected criminal wrongdoing of any kind that has not yet been disclosed to the Office and that is either currently in the Company's possession or

8

which may come into its possession in the future, including conduct of the type described in the Information;

(d) using its best efforts to make available its present and former officers and employees to provide information and/or testimony as requested by the Office, including sworn testimony before a grand jury or in court proceedings, as well as interviews with law enforcement authorities. Cooperation under this sub-paragraph shall include identification of witnesses who, to the Company's knowledge, may have material information regarding the conduct described in the Information, and providing records that may contain material information regarding such conduct;

(e) providing testimony or information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of records or physical evidence in any criminal or other proceeding as requested by the Office;

(f) with respect to any information, testimony, documents, records, or physical evidence provided by the Company, consenting to any and all disclosures of such materials by the Office and the Investigating Agencies as the Office, in its sole discretion, deems appropriate. With respect to any such materials that constitute "matters occurring before the grand jury" within the meaning of Rule 6(e) of the Federal Rules of Criminal Procedure, the Company further consents to (i) any order sought by the Office permitting such disclosures, and (ii) the Office's ex parte or in camera application for such an order; and

(g) providing active assistance, including assistance by the Company's counsel, in connection with any investigation, criminal prosecution, civil trial, or other legal proceeding brought by the Office.

9

14.     TORNEOS agrees that it will continue to fulfill the cooperation obligations set forth in paragraph 13 above in connection with any investigation, criminal prosecution, and/or civil proceeding brought by the Office relating to or arising out of the conduct set forth in the Information. TORNEOS's obligation to cooperate is not intended to apply in the event that it is charged as a defendant in a criminal or civil proceeding. Notwithstanding the foregoing, TORNEOS does not waive any privilege it may have with respect to any documents now or hereafter subject to the attorney-client privilege, the attorney work-product doctrine, or other recognized legal privilege.

FORFEITURE

15.     TORNEOS acknowledges that money and property is subject to forfeiture as a result of its violations of Title 18, United States Code, Section 1349, as alleged in the Information, as well as related violations of Title 18, United States Code, Sections 1962(d), 1343, 1349, 1956, and 1957 by other persons and entities. Pursuant to Title 18, United States Code, Sections 981(a)(1)(A), 981(a)(1)(C), 982(a)(1) and 1963(a), and Title 28, United States Code, Section 2461(c), TORNEOS consents to the forfeiture of the sum of eighty-nine million sixty-two thousand six hundred sixteen dollars and no cents ($89,062,616.00), which represents profits that TORNEOS made from certain contracts obtained through the payment of bribes and kickbacks (the "Total Forfeiture Amount"), consisting more particularly of (a) a sum certain in the amount of seventy-one million three hundred forty-four thousand eight hundred ninety-five dollars and no cents ($71,344,895.00) (the "Sum Certain"), (b) all right, title, and interest in the property listed in Attachment D, which is attached to this Agreement and incorporated by reference (the "Forfeited Assets"), (c) certain outstanding and unbilled receivables arising from

10

the 2015 Copa América tournament owed to Datisa S.A. (the "Datisa Receivables"), which

TORNEOS hereby represents total approximately \$50,806,734 (and further represents

approximately \$16,935,578 of which its wholly-owned subsidiary Productora de Eventos S.A.

("Productora") holds a beneficial interest in), and (d) certain outstanding and unbilled

receivables arising from the 2015 Copa América tournament owed to Productora (the

"Productora Receivables"), which TORNEOS hereby represents total approximately \$782,143,

as: (i) property acquired and maintained by other persons and entities in violation of Title 18,

United States Code, Section 1962, property and contractual rights that afford a source of

influence over the enterprise established, operated, controlled and conducted by other persons

and entities in violation of Title 18, United States Code, Section 1962, and/or property derived

from proceeds obtained, directly and indirectly, from racketeering activity by other persons and

entities, in violation of Title 18, United States Code, Section 1962; (ii) property, real or personal,

involved in a violation by other persons and entities of Title 18, United States Code, Section

1956, or as property traceable to such property; and (iii) property, real or personal, which

constitutes or is derived from proceeds traceable to TORNEOS's violation of Title 18, United

States Code, Section 1349.

16.     TORNEOS agrees to fully assist the United States in effectuating the

forfeiture of the Total Forfeiture Amount, including payment of the Sum Certain and forfeiture

of the Forfeited Assets, by, among other things, executing any documents necessary to effectuate

the transfer of title to the Forfeited Assets to the United States and assisting the United States in

the defense of any third-party claims to the Forfeited Assets, including but not limited to

promptly providing any information requested by the United States in defense of any such

11

claims. TORNEOS agrees not to file or interpose any claim or to assist others to file or interpose any claim to the Forfeited Assets in any administrative or judicial proceeding, including but not limited to the criminal forfeiture proceedings related to any of the defendants in the case captioned United States v. Webb et al., 15-CR-252 (PKC) (the "Parallel Cases").

17. TORNEOS acknowledges that the Office, at its sole discretion, may seek to forfeit the Forfeited Assets and any payments paid towards the Sum Certain through commencement of an administrative or civil forfeiture proceeding. TORNEOS consents to the entry of an administrative declaration of forfeiture as to the Forfeited Assets and any payments towards the Sum Certain, and waives the requirements of 18 U.S.C. § 983 regarding notice of seizure in non-judicial forfeiture matters. TORNEOS further waives the filing of a civil forfeiture complaint as to the Forfeited Assets and any payments towards the Sum Certain in accordance with the procedures set forth in 18 U.S.C. § 983. TORNEOS agrees to execute any documents necessary to effectuate the administrative or civil forfeiture of the Forfeited Assets and any payments towards the Sum Certain, including but not limited to a Stipulation of Settlement and Decree of Forfeiture as to the same in the form set forth in Attachment E, which is attached to this Agreement, incorporated by reference, and may be amended from time to time by the Office in its sole and exclusive discretion.

18. Upon execution of this Agreement, the value of the Productora BVA Account, the Productora Interaudi Account, and the TyC International Accounts (as each are defined in Attachment D and, with respect to the Productora Interaudi Account, excluding any Productora Receivables transferred or deposited into the account in accordance with paragraph 20 below) shall be credited towards TORNEOS's payment of the Sum Certain. Upon the final

12

forfeiture of the T&T Sports Marketing Account (as defined in Attachment D) to the United
States, one fourth (1/4) of the value thereof (which reflects the share of such account that
TORNEOS hereby represents its wholly-owned subsidiary holds a beneficial interest in) shall be
credited towards TORNEOS's payment of the Sum Certain; provided, however, that in the event
that the Office consents to the release of any funds held in the T&T Sports Marketing Account in
full or partial settlement of any claim filed by any other partner of T&T Sports Marketing (the
"Released T&T Funds"), then one fourth (1/4) of the value of the Released T&T Funds shall also
be credited towards TORNEOS's payment of the Sum Certain. Upon final forfeiture of the
Datisa Account (as defined in Attachment D) to the United States, one-third (1/3) of the value
thereof (excluding any Datisa Receivables transferred or deposited into the account in
accordance with paragraph 20 below and which reflects the share of such account that
TORNEOS hereby represents that Productora holds a beneficial interest in) shall be credited
towards TORNEOS's payment of the Sum Certain; provided, however, that in the event that the
Office consents to the release of any funds held in the Datisa Account (excluding any Datisa
Receivables transferred or deposited into the account in accordance with paragraph 20 below) in
full or partial settlement of any claim filed by any other partner of Datisa (the "Released Datisa
Funds"), then one third (1/3) of the value of the Released Datisa Funds shall also be credited
towards TORNEOS's payment of the Sum Certain. The total amounts credited pursuant to this
paragraph as of the Applicable Due Date (as defined in paragraph 21 below) shall be referred to
herein as the "Credited Accounts Value." The Office shall use reasonable efforts, in its sole and
exclusive discretion, to perfect the forfeiture of the T&T Sports Marketing Account and the
Datisa Account, including litigating any third-party claims to such accounts that are determined

13

by the Office to be without merit; provided, however, that nothing herein shall prevent the resolution of any viable claims to the T&T Sports Marketing Account and the Datisa Account on terms and conditions deemed acceptable to the Office, in its sole and exclusive discretion.

19.     TORNEOS represents that the Productora BVA Account, the Productora Interaudi Account, and the TyC International Accounts are each held free and clear of any and all security interests, mortgages, liens, charges, encumbrances, adverse claims, preferential arrangements or restrictions of any kind (other than those restraints sought or imposed by or behalf of the United States based in whole or in part upon the conduct set forth in the Statement of Facts), and have not been pledged, alienated, hypothecated, or otherwise encumbered. TORNEOS further represents that it is not aware of any person or entity that has or may assert a viable third-party claim to any of the funds held in the Productora BVA Account, the Productora Interaudi Account, or the TyC International Accounts.

20.     TORNEOS shall take all steps requested by the Office, in its sole and exclusive discretion, to collect or cause its affiliate Datisa S.A. ("Datisa") to collect the Datisa Receivables, including but not limited to issuing letters of collection, instituting and prosecuting direct and derivative collections actions, locating creditors' assets and perfecting and enforcing judgments against such assets regardless of where such assets may be found, and shall further cause the Datisa Receivables to be directed to the Datisa Account (as defined in Attachment D) or such other account as the Office may direct from time to time in its sole and exclusive discretion.  TORNEOS shall respond within three (3) business days to any and all requests by the Office for information regarding such collection efforts and activities.  TORNEOS shall further take all steps requested by the Office, in its sole and exclusive discretion, to collect or cause

14

Productora to collect the Productora Receivables, such steps including but not limited to issuing letters of collection, instituting and prosecuting direct and derivative collections actions, locating creditors' assets and perfecting and enforcing judgments against such assets regardless of where such assets may be found, and shall further cause the Productora Receivables to be directed to the Productora Interaudi Account (as defined in Attachment D) or such other account as the Office may direct from time to time in its sole and exclusive discretion.  TORNEOS shall respond within three (3) business days to any and all requests for information by the Office regarding such collection efforts and activities.

       21.    TORNEOS shall pay any outstanding balance of the Sum Certain portion of the Total Forfeiture Amount (the "Outstanding Balance") in full no later than forty-two months (42) following the date of execution of this Agreement (the "Applicable Due Date"); provided, however, that to the extent that any funds held in either the T&T Sports Marketing Account or the Datisa Account (excluding any Datisa Receivables transferred or deposited into the account in accordance with paragraph 20 above) are finally forfeited to the United States or released in settlement of any claim filed by any other partner of T&T Sports Marketing or Datisa, respectively, as contemplated in paragraph 18 above following TORNEOS's full payment of any Outstanding Balance by the Applicable Due Date, then TORNEOS shall be refunded, out of and up to the amount of such payment, a total of (a) one fourth (1/4) of the sum of (i) any such funds finally forfeited to the United States from the T&T Sports Marketing Account following the Applicable Due Date and (ii) any Released T&T Funds that are released following the Applicable Due Date, and (b) one-third (1/3) of the sum of (i) any such funds finally forfeited to the United States from the Datisa Account following the Applicable Due Date

15

and (ii) any Released Datisa Funds that are released following the Applicable Due Date. To the extent that the Credited Accounts Value exceeds the Sum Certain, the difference between the Credited Accounts Value and the Sum Certain shall be referred to herein and, for the purposes set forth in paragraph 27 below, as the "Excess Amount."

22. All payments towards the Sum Certain shall be made by certified or bank check, payable to the United States Marshals Service, and delivered by hand or overnight courier on or before the Applicable Due Date to Assistant United States Attorney Brian Morris, United States Attorney's Office, Eastern District of New York, 271 Cadman Plaza East, 7th Floor, Brooklyn, New York 11201, with the criminal docket number noted on the face of the checks. TORNEOS acknowledges that all funds paid by it pursuant to this paragraph, together with the Forfeited Assets, shall be subject to a restitution hold to ensure their availability to satisfy any order of restitution entered in any of the Parallel Cases at sentencing for the benefit of any individuals or entities that qualify as victims under the provisions set forth in 18 U.S.C. §§ 3663 and 3663A. In the event that the Court enters an order of restitution in any of the Parallel Cases for the benefit of any such victim or victims at the time of sentencing, the Office may request remission or restoration by the Attorney General or his or her designee of all funds forfeited pursuant to this paragraph, up to the total amount of the restitution ordered, in accordance with the provisions of 21 U.S.C. § 853(i) and 28 C.F.R. Part 9. TORNEOS acknowledges that the decision to grant remission or restoration of such property lies within the sole and exclusive discretion of the Attorney General or his or her designee and that, only if granted, will such property be transferred to the Clerk of Court in full or partial satisfaction of any order of restitution entered in any of the Parallel Cases.

16

23.     If any payments towards the Sum Certain are not paid on or before the Applicable Due Date, interest shall accrue on any unpaid portion thereof at the judgment rate of interest from that date. If TORNEOS fails to pay any portion of the Sum Certain on or before the Applicable Due Date, TORNEOS consents to the seizure and entry of a summary declaration of forfeiture of any other property of its up to the unpaid balance of the Sum Certain, pursuant to the Federal Debt Collection Procedures Act or any other applicable law.

24.     The failure of TORNEOS to forfeit any monies and/or properties as required under this Agreement, including the failure of the Company to execute any document to accomplish same on timely notice to do so, shall constitute a material breach of this agreement. Upon such a breach, TORNEOS acknowledges that the Office shall be entitled to exercise all of its rights and remedies under this Agreement, including but not limited to subjecting TORNEOS to prosecution as specified in paragraphs 33 and 34 below.

25.     TORNEOS knowingly and voluntarily waives its right to any required notice concerning the forfeiture of the monies and/or properties forfeited hereunder, including notice set forth in an indictment or information. In addition, TORNEOS knowingly and voluntarily waives its right, if any, to a jury trial on the forfeiture of said monies and/or properties, and waives all constitutional, legal and equitable defenses to the forfeiture of said monies and/or properties, including, but not limited to, any defenses based on principles of double jeopardy, the Ex Post Facto Clause of the Constitution, the statute of limitations, venue or any defense under the Eighth Amendment, including a claim of excessive fines.

17

26.     TORNEOS agres that the payment of the Sum Certain and the forfeiture of the Forfeited Assets, the Datisa Receivables, and the Productora Receivables shall not be considered a fine or penalty or a payment on any income taxes or civil penalties that may be due.

## FINANCIAL PENALTY

27.     In addition to the forfeiture obligations set forth in paragraphs 15 through 26 above, and as a further result of the conduct described in the Information and the Statement of Facts, TORNEOS agrees to pay the sum of twenty-three million seven hundred sixty dollars and no cents ($23,760,000.00) to the United States Treasury as a financial penalty (the "Penalty Amount"). TORNEOS agrees to pay the Penalty Amount according to the following schedule: the first payment in the amount of five million dollars and no cents ($5,000,000.00) within 30 days of the date of the execution of this Agreement; the second payment in the amount of six million two hundred sixty thousand dollars and no cents ($6,260,000.00) within one year of the date of the execution of this Agreement; the third payment in the amount of six million two hundred fifty thousand dollars and no cents ($6,250,000.00) within two years of the execution of this Agreement; and the fourth payment in the amount of six million two hundred fifty thousand dollars and no cents ($6,250,000.00) less the Excess Amount (as defined in paragraph 21 above), if any, within 42 months of the execution of this Agreement.

28.     The Office and TORNEOS agree that, consistent with the factors set forth in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3572(a), the Penalty Amount is an appropriate penalty in this case. The Penalty Amount takes into account, among other considerations, the policy statement set forth in U.S.S.G. § 8C4.1 and the application note thereto. The Office and TORNEOS agree that the Penalty Amount is appropriate given the facts and circumstances of

this case, including the nature and seriousness of the Company's conduct and the pervasiveness

of the wrongdoing at the Company, as set forth in the Information, and, in mitigation of a higher

penalty, among other factors, (a) TORNEOS's diligent, thorough, and swift cooperation, and (b)

TORNEOS's provision of substantial assistance in the investigation and prosecution of crimes

committed by individuals, including individuals not directly affiliated with the Company, and

other entities.

    29.    TORNEOS agrees that it will not, in connection with the financial penalty

described in paragraph 27 above, seek, obtain or accept any reimbursement or other payments or

credits from any insurer of the Company or of any of its divisions or subsidiaries. TORNEOS

also agrees that it will not seek, obtain or accept any tax deduction in connection with the

financial penalty described in paragraph 27 above.

## CONDITIONAL RELEASE FROM LIABILITY

    30.    Subject to paragraphs 33 and 34 below, the Office agrees, except as

provided in this Agreement, that it will not bring any criminal or civil case against TORNEOS or

any of its current or former subsidiaries relating to any of the conduct described in either the

Statement of Facts or the Information filed pursuant to this Agreement, or any other heretofore

disclosed criminal activity engaged in by the Company in connection with the acquisition and/or

exploitation of soccer-related rights. This Agreement does not provide any protection against

prosecution for any prior but undisclosed conduct by TORNEOS or any future conduct by

TORNEOS. In addition, this Agreement does not provide any protection against prosecution of

19

any individuals, regardless of their affiliation with TORNEOS. The Office, however, may use

any information related to the conduct described in the Statement of Facts against TORNEOS:

> (a) in a prosecution for perjury or obstruction of justice;

> (b) in a prosecution for making a false statement;

> (c) in a prosecution or other proceeding relating to any crime of

violence; or

> (d) in a prosecution or other proceeding relating to a violation of any

provision of Title 26 of the United States Code.

## DEFERRAL OF PROSECUTION

31. In consideration of TORNEOS's remedial actions to date and its

commitment to: (a) accept and acknowledge responsibility for its conduct; (b) continue its

cooperation with the Office and the Investigating Agencies as described in paragraphs 12

through 14 above; (c) consent to forfeiture as set forth in paragraphs 15 through 27 above; (d)

make the payment of a financial penalty to the United States as set forth in paragraphs 27

through 29 above; (e) comply in the future with all applicable laws, including all applicable

federal, state, and foreign anti-bribery and anti-money laundering laws; and (f) otherwise comply

with all of the terms of this Agreement, the Office shall, at the time it files the Information,

simultaneously file a joint motion with TORNEOS pursuant to Title 18, United States Code,

Section 3161(h)(2), to defer the prosecution of the Company for the conduct set forth in the

Statement of Facts and the Information, and for the conduct that the Company disclosed to the

Office prior to the signing of this Agreement, for a period of 48 months and to obtain an

exclusion of time under the Speedy Trial Act to allow the Company to demonstrate good conduct

and compliance with the terms of this Agreement. By executing this Agreement and joining in said motion, TORNEOS expressly waives all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Sections 3161 et seq., Rule 48(b) of the Federal Rules of Criminal Procedure, and any other applicable statutes or rules, including the Local Rules of the United States District Court for the Eastern District of New York, for the period during which this Agreement is in effect. This waiver is knowing, voluntary, and made in express reliance on the advice of TORNEOS's counsel.

32.     The Office agrees that, if TORNEOS remains in compliance with all of its obligations under this Agreement, this Agreement shall expire at the conclusion of the Term and the Office will, within six (6) months of the expiration of this Agreement, move the Court pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure to dismiss the Information with prejudice.

BREACH OF THE AGREEMENT

33.     TORNEOS understands and agrees that should the Office, in its sole discretion, determine that the Company has deliberately given false, incomplete, or misleading information under this Agreement, has otherwise deliberately violated any provisions of this Agreement or has committed, or attempted to commit, any crime other than those set forth in the Information or otherwise previously disclosed to the Office, then the Company will be subject to prosecution for any crimes of which the Office has knowledge and jurisdiction to prosecute, including prosecution relating to the conduct set forth in the Information and the Statement of Facts. Any such prosecution may be premised on any information provided by or on behalf of TORNEOS to the Office or to the Investigating Agencies at any time. Moreover, TORNEOS

21

agrees that any such prosecution relating to the allegations in the Information that is not time-barred by the applicable statute of limitations as of the date of the execution of this Agreement may be commenced against the Company, notwithstanding the expiration of any applicable statute of limitations between the date of the execution of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, TORNEOS agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, TORNEOS agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Office is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations. By this Agreement, TORNEOS expressly intends to and does waive any defense or claim to relief under any statute of limitations to the extent such a defense or claim is foreclosed by the terms of this Agreement. This waiver is knowing, voluntary, and made in express reliance on the advice of TORNEOS's counsel. Moreover, the commission of an additional crime by TORNEOS shall constitute a breach of this Agreement.

34.     Furthermore, it is agreed that if the Office, in its sole discretion, determines that TORNEOS has committed any crime or otherwise violated any provision of the Agreement:

(a)     this Agreement and the Statement of Facts are admissible in any future court proceedings by the Office against TORNEOS as an admission by the Company; all statements made by or on behalf of TORNEOS or any of its officers, directors, employees, or

22

agents to the Office or the Investigating Agencies, including its admission that the facts alleged in the Information and set forth in the Statement of Facts are true and accurate, and/or any testimony given by TORNEOS or any of its officers, directors, employees, or agents before a grand jury or elsewhere, whether before or after the date of execution of this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Office against TORNEOS; and

(b)     TORNEOS shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other statute or federal rule that statements made by or on behalf of the Company before or after the date of execution of this Agreement, or any leads derived therefrom, should be suppressed. However, nothing in this Agreement shall constitute a waiver of any Confrontation Clause rights under the Sixth Amendment to the United States Constitution that TORNEOS may have.

## PUBLIC STATEMENTS BY COMPANY

35.     TORNEOS agrees that it shall not, through its present or future attorneys, board of directors, agents, or employees, make any public statement, in litigation or otherwise, contradicting the facts set forth in the Statement of Facts or alleged in the Information, its admission that those facts established the elements of offenses charged in the Information, and its acceptance of responsibility for the acts of its officers, directors, employees, and agents as described in the Information. Any such contradictory statement by TORNEOS or its present or future attorneys, officers, directors, employees, or agents shall constitute a breach of this Agreement and the Company thereafter shall be subject to prosecution as specified in paragraphs

23

33 and 34 above. The decision whether any such contradictory statement will be imputed to TORNEOS for the purpose of determining whether the Company has breached this Agreement shall be at the sole discretion of the Office. If the Office determines that TORNEOS has committed a knowing, intentional, and material breach of any provision of this Agreement, the Office shall provide written notice of the alleged breach to TORNEOS, through its counsel, David B. Massey, Esq. and Lee S. Richards, III, Esq., Richards Kibbe & Orbe LLP, 200 Liberty Street, New York, New York 10281-1003, or to any successor counsel that TORNEOS may designate. Upon receipt of notification by the Office of any such contradictory statement, TORNEOS may avoid a finding of a breach of this Agreement by publicly repudiating such statement within five (5) business days after receipt of notice by the Office. TORNEOS shall be permitted to raise defenses and assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of TORNEOS in the course of any criminal, regulatory, governmental, or civil investigation or case initiated against such individual, unless such individual is speaking on behalf of the Company.

36.    TORNEOS agrees that if it or any of its subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the

24

Office and the Company and (b) whether the Office has any objection to the release or proposed statements.

37. The Office agrees, if requested to do so, to bring to the attention of other law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to such authorities, the Office is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

## SALE, MERGER, OR OTHER CHANGE IN CORPORATE FORM

38. Except as may otherwise be agreed by the parties in connection with a particular transaction, TORNEOS agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct set forth in the Information or Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The Company shall obtain approval from the Office at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form, including dissolution, in order to give the Office an opportunity to determine if such change in corporate form would impact the terms or obligations of the Agreement.

25

### LIMITATIONS ON BINDING EFFECT OF AGREEMENT

39.     This Agreement is binding on TORNEOS and the Office but specifically does not bind any federal, state, or local law enforcement or regulatory agency, although the Office will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

### PUBLIC FILING

40.     TORNEOS and the Office agree that, upon the filing of the Information in accordance with paragraph 1 above, this Agreement (including its attachments) shall be publicly filed in the United States District Court for the Eastern District of New York.

### COMPLETE AGREEMENT

41.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Offices.  No amendments, modifications or additions

26

to this Agreement shall be valid unless they are in writing and signed by the Offices, the

attorneys for the Company and a duly authorized representative of the Company.

AGREED:

FOR TORNEOS Y COMPETENCIAS S.A.

Ignacio Juan Galarza
General Manager
Torneos y Competencias S.A.

David B. Massey, Esq.
Lee S. Richards, III, Esq.
Jeffrey A. Lehtman, Esq.
Maria E. Lapetina, Esq.
Richards Kibbe & Orbe LLP
Counsel to the Company

Date: 12/13/16

FOR THE UNITED STATES ATTORNEY'S OFFICE:

ROBERT L. CAPERS
United States Attorney
Eastern District of New York

Evan M. Norris
Samuel P. Nitze
Brian D. Morris
M. Kristin Mace
Assistant United States Attorneys

James D. Gatta
Chief, Criminal Division

Date: 12/13/2016

27

ATTACHMENT A

## FORM OF CERTIFICATE RELATING TO CORPORATE RESOLUTIONS

I, Pedro Castro Nevares, in my capacity as Legal Director of Torneos y

Competencias S.A. (hereinafter, the "Company"), a *sociedad anónima* duly organized and

existing under the laws of Argentina and having its principal place of business at calle Balcarce

510, Autonomous City of Buenos Aires, Argentina, hereby CERTIFY that on December 12,

2016, the Board of Directors of the Company, in the presence of the members of the Company's

Supervisory Commission and having been advised of its rights, possible defenses, the Sentencing

Guidelines provisions, and the consequences of entering into a Deferred Prosecution Agreement

with the United States Attorney's Office for the Eastern District of New York (the "Office"),

unanimously RESOLVED:

1.      That the Company: (a) consents to the filing of the one-count Information

charging the Company with violation of 18 U.S.C. § 1349; (b) knowingly waives indictment on

such charges and enters into a deferred prosecution agreement with the Office (the

"Agreement"); (c) agrees to accept a monetary penalty against the Company totaling

$23,760,000 and to pay such monetary penalty with respect to the conduct described in the

Information in the manner described in the Agreement; and (d) consents to the forfeiture to the

United States of, and forfeits to the United States, $89,062,616.00 in the manner described in the

Agreement;

2.      That the Company accept the terms and conditions of the Agreement,

including, but not limited to: (a) a knowing waiver of its rights to a speedy trial pursuant to the

Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161,

A-1

and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of the Deferred Prosecution Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts of any objection with respect to venue, and consent to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.     That the General Manager of the Company, Ignacio Juan Galarza, is authorized, empowered, and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the General Manager of the Company, Ignacio Juan Galarza, may approve;

4.     That the General Manager of the Company, Ignacio Juan Galarza, is authorized, empowered, and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms, or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions;

A-2

5.  That all of the actions of the General Manager of the Company, Ignacio Juan Galarza, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are severally ratified, confirmed, approved, and adopted as actions on behalf of the Company; and

6.  That U.S. counsel for the Company, David B. Massey and Lee S. Richards, III, of Richards Kibbe & Orbe LLP, be authorized, empowered, and directed to appear before the United States District Court for the Eastern District of New York and to waive on the Company's behalf the Company's right to indictment by a grand jury as to the matter referred to in the Agreement (the "Matter"); to represent and affirm that the Company's waiver of its right to indictment by a grand jury and consent to proceed by Information in the Matter is knowing and voluntary; to enter a plea of not-guilty to the Information to be filed in accordance with the terms of the Agreement; and to move to defer the prosecution of the Company for the conduct set forth in the Information for a period of 48 months and to obtain an exclusion of time under the Speedy Trial Act to allow the Company to demonstrate good conduct and compliance with the terms of the Agreement.

I further CERTIFY that (a) the above is an accurate translation of resolutions adopted originally in

the Spanish language, and (b) such resolutions have not been since amended or revoked and remain

in full force and effect as of the date hereof.

IN WITNESS WHEREOF, this CERTIFICATE is executed and delivered in Buenos Aires, Argentina, on December 12, 2016.

TORNEOS Y COMPETENCIAS S.A.

By:

Name: Pedro Castro Nevares
Title: Legal Director

ATTACHMENT B

STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Eastern District of New York (the "Office") and the defendant TORNEOS Y COMPETENCIAS S.A. ("TORNEOS" or the "Company"). TORNEOS hereby agrees and stipulates that the following information is true and accurate. Certain of the facts herein are based on information obtained from third parties by the Office through their investigation and described to TORNEOS. TORNEOS admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the Office pursue the prosecution that is deferred by the Agreement, TORNEOS agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The Office's evidence establishes the following facts during the relevant time frame and proves beyond a reasonable doubt the charges set forth in the Criminal Information filed in the United States District Court for the Eastern District of New York pursuant to the Agreement:

BACKGROUND

A.     FIFA

1.     The Fédération Internationale de Football Association ("FIFA") was the international body governing organized soccer, commonly known outside the United States as football. FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland. FIFA comprised as many as 209 member associations, each representing organized soccer in a particular nation or territory, including the United States

B-1

and four of its overseas territories. At various times, FIFA maintained offices both in Zurich
and elsewhere in the world, including in the United States, where FIFA maintained a
development office since at least 2011.

2.      FIFA's purpose was, among other things, to develop and promote the
game of soccer globally by organizing international competitions and creating and enforcing
rules that govern FIFA's member confederations and associations. FIFA financed its efforts
in significant part by commercializing the media and marketing rights associated with the
World Cup, the sport's premier event.

3.      FIFA first instituted a written code of ethics in October 2004, which
code was revised in 2006 and again in 2009 (generally, the "code of ethics"). The code of
ethics governed the conduct of soccer "officials," expressly defined by FIFA's statues to
include, among others, all board members, committee members and administrators of FIFA
as well as FIFA's continental confederations and member associations. Among other things,
the code of ethics provided that soccer officials were prohibited from accepting bribes or
cash gifts and from otherwise abusing their positions for personal gain. The code of ethics
further provided, from its inception, that soccer officials owed certain duties to FIFA and its
confederations and member associations, including a duty of absolute loyalty. By 2009, the
code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to
FIFA and its constituent confederations, member associations, leagues and clubs.

B.      The Continental Confederations

4.      Each of FIFA's member associations also was a member of one of the
six continental confederations recognized by FIFA: the Confederation of North, Central

B-2

American and Caribbean Association Football ("CONCACAF"), the Confederación

Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de

Football, the Confédération Africaine de Football, the Asian Football Confederation, and the

Oceania Football Confederation. Under FIFA's statutes, no national soccer association could

become a member of FIFA without first joining one of the six continental confederations.

Member associations were required to pay to FIFA annual dues, known as subscriptions.

     5.     In addition to providing representatives who helped to govern FIFA,

the six continental confederations worked closely with FIFA and one another to organize

international soccer competitions and carry out FIFA directives on a regional basis. The

leaders and representatives of the confederations conducted business with one another, as

well as with the leaders and associates of FIFA, throughout the year at locations around the

world, including in the United States.

     6.     CONCACAF was a continental soccer confederation incorporated as a

non-profit corporation in Nassau, Bahamas. CONCACAF comprised as many as 41 member

associations, representing organized soccer in North America, Central America, the

Caribbean, and three South American countries. The United States and two of its overseas

territories, Puerto Rico and the United States Virgin Islands, were members of CONCACAF.

From approximately 1990 to 2012, CONCACAF's principal administrative office was

located in New York, New York, where the former general secretary was based (until the end

of 2011) and where CONCACAF regularly conducted business. Beginning in 2012,

CONCACAF's principal administrative office was located in Miami, Florida, where the new

general secretary was based. CONCACAF also conducted business at various times

throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation. In June 2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

       7.     CONMEBOL was a continental soccer confederation domiciled and headquartered in Paraguay. CONMEBOL comprised as many as 10 member associations, representing organized soccer in South America. Among other tournaments, CONMEBOL organized the Copa América, featuring the men's national teams of its 10 members and two non-CONMEBOL national teams that were invited to participate, as well as tournaments featuring the top men's club teams, including the Copa Libertadores. Since 1993, the United States has participated in the Copa América as an invitee four times. Most recently, the United States hosted and participated in the 2016 Copa América Centenario, a special edition of the Copa América organized jointly by CONMEBOL and CONCACAF to commemorate its centennial. In December 2013, CONMEBOL adopted a code of ethics that, among other things, prohibited bribery and corruption.

C.     Regional Federations and National Associations

       8.     In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations.

       9.     The national associations promoted, organized, and governed soccer, often including club-level soccer, within individual nations. The national association of the United States, the United States Soccer Federation, was based in Chicago, Illinois. The

national association of Argentina, the Asociación del Fútbol Argentino ("AFA"), was a
national member association of CONMEBOL and was based in Buenos Aires, Argentina.

10.   The national associations, also often referred to as "federations,"
worked together to organize exhibition soccer matches between national teams, known as
"friendlies," which also took place on the club level. Friendlies took place in venues
throughout the United States, including the Eastern District of New York, as well as in other
venues worldwide.

D.   The Sports Marketing Companies

11.   FIFA, the continental confederations, the regional federations, and the
national member associations often entered into contracts with sports marketing companies
to commercialize the media and marketing rights to various soccer events, including the
World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies, and other
events, as well as other rights associated with the sport. Often operating in coordination with
affiliated consultants and intermediaries, these sports marketing companies, including
multinational corporations with headquarters, offices, or affiliates located in the United
States, often acquired an array of media and marketing rights, including television and radio
broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights,
and ticketing rights. These sports marketing companies often sold these rights to, among
others, television and radio broadcast networks, sponsors, and sub-licensees, including those
located in the United States.

12.   The revenue generated by the commercialization of the media and
marketing rights associated with soccer constituted an essential source of revenue for FIFA,

B-5

other governing bodies, and the sports marketing companies. Over time, the United States

became an increasingly important and lucrative market for the commercialization of these

rights.

## THE DEFENDANT

13. TORNEOS was a sports media and marketing business headquartered in

Argentina with a number of subsidiaries and affiliates, including, among others, T&T Sports

Marketing Ltd., domiciled in the Cayman Islands, TyC International B.V., domiciled in the

Netherlands, and Productora de Eventos S.A., domiciled in Uruguay. In addition, Alejandro

Burzaco, Torneos Executive #1, Torneos Executive #2, Torneos Executive #3 (all three of

whom are defined below), and others created and/or controlled shell companies off the books

of TORNEOS, including FPT Sports S.A. and Arco Business and Developments Ltd., among

others (collectively, the "Off-the-Books Companies"), to effect certain transactions with and

on behalf of TORNEOS, including as described in paragraphs 34 through 42 below.

## RELEVANT INDIVIDUALS AND ENTITIES

14. At various times, Banker #1 and Banker #2 worked as client advisors in

the private banking sector at prominent banking institutions based in Switzerland. The

identities of Banker #1 and Banker #2 are known to the Office and the Company.

15. At various times, Luis Bedoya was a high-ranking official of FIFA,

CONMEBOL, and the Federación Colombiana de Fútbol, the Colombian soccer federation,

one of FIFA's national member associations.

16. At various times, Broadcasting Company Executive #1 was a high-

ranking executive of Broadcasting Company Affiliate A, an affiliate of a major broadcasting

company headquartered in Latin America, which obtained from FIFA rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup in certain territories in Latin America. The identities of Broadcasting Company Executive #1 and Broadcasting Company Affiliate A are known to the Office and the Company.

17.    At various times, Broadcasting Company Executive #2 and Broadcasting Company Executive #3 were high-ranking executives of Broadcasting Company Affiliate B, an affiliate of a major broadcasting company headquartered in the United States, which was, through another affiliate, part of a group of investors in an affiliate of the TORNEOS that owned the exclusive worldwide broadcasting rights to the CONMEBOL Copa Libertadores. The identities of Broadcasting Company Executive #2, Broadcasting Company Executive #3, and Broadcasting Company Affiliate B are known to the Office and the Company.

18.    At various times, Broadcasting Company Executive #4 was a high-ranking executive of Broadcasting Company Affiliate C, which was among the investors in an affiliate of TORNEOS that owned the exclusive worldwide broadcasting rights to the CONMEBOL Copa Libertadores. Broadcasting Company Affiliate C was owned, at times in part and at times wholly, by Broadcasting Company Affiliate B. The identities of Broadcasting Company Executive #4 and Broadcasting Company Affiliate C are known to the Office and the Company.

19.    At various times, Alejandro Burzaco was the General Manager, President of the Board of Directors, and legal representative of TORNEOS and a principal of TORNEOS's subsidiaries and affiliates, as well as the Off-the-Books Companies.

B-7

20. At various times, Datisa S.A. ("Datisa") was a Uruguayan company formed in 2013 by Productora de Eventos S.A., a subsidiary of TORNEOS, Traffic (defined below), and Sports Marketing Company A (defined below) that held the exclusive worldwide commercial rights to the 2015, 2019 and 2023 editions of the Copa América and the 2016 Copa América Centenario.

21. At various times, Rafael Esquivel was a high-ranking official of CONMEBOL and the Federación Venezolana de Fútbol, the Venezuelan soccer federation, one of FIFA's national member associations.

22. At various times, José Hawilla was the founder and owner of the Traffic Group, a multinational sports marketing company based in São Paulo, Brazil. The Traffic Group comprised, among other entities, Traffic Assessoria e Comunicações S/C Ltda., Traffic Sports International, Inc., Traffic Sports USA, Inc., Traffic Sports Europe B.V., and Continental Sports International, Inc. (referred to collectively herein as "Traffic" or the "Traffic Group").

23. At various times, Sergio Jadue was a high-ranking official of CONMEBOL and the Asociación Nacional de Fútbol Profesional de Chile, the Chilean soccer federation, one of FIFA's national member associations, and a member of FIFA's associations committee.

24. At various times, José Margulies was a controlling principal of Valente Corp. ("Valente") and Somerton Ltd ("Somerton") (together, the "Margulies Intermediaries"), South American companies registered in Panama and Turks and Caicos, respectively, that were involved in the broadcasting of soccer matches. At various times,

B-8

Margulies used accounts in the names of Valente and Somerton that were held at United States financial institutions to make illicit payments on behalf of multiple members of the conspiracy, including TORNEOS and certain of its subsidiaries and affiliates and the Off-the-Books Companies.

25.    At various times, the following individuals, whose identities are known to the Office and the Company, were high-ranking soccer officials of FIFA and/or one or more of FIFA's constituent bodies:

- Soccer Official #1 was a high-ranking official of FIFA, CONMEBOL, and AFA.

- Soccer Official #2 was a high-ranking official of a national member association of CONMEBOL and an official of FIFA.

- Soccer Official #3 was a high-ranking official of CONMEBOL and a national member association of CONMEBOL.

- Soccer Official #4 was a high-ranking official of CONMEBOL and a national member association of CONMEBOL.

- Soccer Official #5 was a high-ranking official of FIFA and a national member association of CONMEBOL.

- Soccer Official #6 was a high-ranking official of CONMEBOL.

- Soccer Official #7 was a high-ranking official of FIFA, CONMEBOL, and a national member association of CONMEBOL.

- Soccer Official #8 was a high-ranking official of FIFA and CONMEBOL.

- Soccer Official #9 was an official of FIFA and a high-ranking official of a national member association of CONMEBOL.

- Soccer Official #10 was a high-ranking official of CONMEBOL and a national member association of CONMEBOL.

B-9

- Soccer Official #11 was a high-ranking official of FIFA, CONMEBOL, and a national member association of CONMEBOL.

- Soccer Official #12 was an official of FIFA and a high-ranking official of CONMEBOL.

- Soccer Official #13 was a high-ranking official of FIFA and a national member association of CONMEBOL.

26. At various times, Sports Marketing Executive #1 and Sports Marketing Executive #2 were the controlling principals of Sports Marketing Company A, a sports media and marketing business with its principal offices in Argentina. Sports Marketing Company A had a number of subsidiaries and affiliates, all of which are referred to collectively below as "Sports Marketing Company A." The identities of Sports Marketing Executive #1, Sports Marketing Executive #2, and Sports Marketing Company A are known to the Office and the Company.

27. At various times, the following individuals, whose identities are known to the Office and the Company, were high-ranking executives of TORNEOS:

- Torneos Executive #1 was a co-founder, director, and principal of TORNEOS until in or about March 2010.

- Torneos Executive #2 worked in administration and finance for TORNEOS until in or about June 2015.

- Torneos Executive #3 worked in the legal department of TORNEOS until in or about June 2015.

28. At various times, Jeffrey Webb was the president of the Cayman Island Football Association, a member of the Caribbean Football Union ("CFU") executive committee, the chairman of CFU's normalization committee, the president of CONCACAF,

and a FIFA vice president and executive committee member. Webb also served on multiple FIFA standing committees, including the finance committee and the organizing committee for the World Cup.

* * * *

29.     Luis Bedoya, Rafael Esquivel, Sergio Jadue, Jeffrey Webb, Soccer Official #1, Soccer Official #2, Soccer Official #3, Soccer Official #4, Soccer Official #5, Soccer Official #6, Soccer Official #7, Soccer Official #8, Soccer Official #9, Soccer Official #10, Soccer Official #11, Soccer Official #12, and Soccer Official #13 were bound by fiduciary duties to each of their respective soccer governing bodies.

## THE SCHEME

A.     Overview

30.     Beginning in or about the 1990s and continuing until in or about May 2015, the defendant TORNEOS and its co-conspirators, including the above-referenced soccer officials, devised a scheme and artifice to deprive FIFA and its constituent organizations of their respective rights to the honest and faithful services of certain of their leaders through the systematic payment of bribes and kickbacks. Specifically, TORNEOS, at the direction and through the conduct of its employees, including Alejandro Burzaco, Torneos Executive #1, Torneos Executive #2, and Torneos Executive #3, agreed to pay and did pay bribes and kickbacks to certain officials of FIFA, CONMEBOL, CONCACAF, and AFA in exchange for the officials' provision of support and assistance to TORNEOS in its efforts to obtain, maintain, and exploit lucrative media and marketing rights to various soccer tournaments and matches.

31. Over the course of the scheme, TORNEOS agreed to pay and caused to be paid, directly and indirectly, tens of millions of dollars in bribe and kickback payments to Soccer Official #1 in exchange for, among other things, Soccer Official #1's provision of support and assistance to TORNEOS in its efforts to obtain, maintain, and exploit the media and marketing rights to various soccer tournaments and matches. TORNEOS and Soccer Official #1 developed a close relationship of mutual support, maintained and promoted through the payment of bribes and kickbacks to Soccer Official #1, that contributed to the common benefit of TORNEOS and its co-conspirators.

32. In furtherance of the scheme and to effect its objects, TORNEOS agreed to pay and caused to be paid, directly and indirectly, bribes and kickbacks to Soccer Official #1 and other soccer officials, including Luis Bedoya, Rafael Esquivel, Sergio Jadue, Jeffrey Webb, Soccer Official #2, Soccer Official #3, Soccer Official #4, Soccer Official #5, Soccer Official #6, Soccer Official #7, Soccer Official #8, Soccer Official #9, Soccer Official #10, Soccer Official #11, Soccer Official #12, and Soccer Official #13. TORNEOS agreed to pay these officials and did cause them to be paid in exchange for their official support of TORNEOS in its efforts to obtain, maintain, and exploit media and marketing rights to various soccer tournaments and matches, including, among other tournaments and matches, the FIFA World Cup, CONMEBOL Copa América, CONMEBOL/CONCACAF Copa América Centenario, CONMEBOL Copa Libertadores, CONMEBOL Copa Sudamericana, CONMEBOL Recopa Sudamericana, and international friendlies featuring the Argentinian men's national soccer team.

B-12

### B.    Conduct in Furtherance of the Conspiracy

33.    By way of example, set forth below are further details regarding certain conduct undertaken TORNEOS and its co-conspirators in furtherance of the scheme and to effect its objects.

#### i.    FIFA World Cup Rights

34.    In or about and between 2010 and 2013, TORNEOS's wholly-owned subsidiary TyC International B.V. obtained the rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup to audiences in Argentina, Uruguay, and Paraguay through a series of contracts with the Off-the-Books Companies and Broadcasting Company Affiliate A, which had secured the rights to broadcast the tournaments in these and other territories directly from FIFA.  TORNEOS, through Alejandro Burzaco and others, and at times with the assistance of one or more representatives of Broadcasting Company Affiliate A, including Broadcasting Company Executive #1, agreed to pay and did pay millions of dollars in bribe and kickback payments to Soccer Official #1 – a high-ranking FIFA official who exercised enormous influence within the association – in order to secure his support for Broadcasting Company Affiliate A's acquisition of rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup in certain territories, and the subsequent purchase and exploitation of certain of those rights by TyC International B.V.

35.    Among other things, Soccer Official #1 agreed to use and did use his influence to push FIFA to sell the rights to broadcast the 2026 and 2030 editions of the World Cup in certain Latin American territories to Broadcasting Company Affiliate A in

2013, earlier than anticipated and long before the selection of host countries for those editions of the tournament.

ii.     CONMEBOL Copa Libertadores Rights

36.     Beginning in or about 1999 and continuing through in or about May 2015, T&T Sports Marketing Ltd. ("T&T"), an affiliate of TORNEOS, acquired the exclusive worldwide broadcasting rights to each edition of the Copa Libertadores, an annual tournament organized by CONMEBOL featuring the confederation's top men's club teams, through a series of contracts between T&T and CONMEBOL. T&T eventually acquired the rights to two less prominent tournaments, the Copa Sudamericana and Recopa Sudamericana, also through a series of contracts between T&T and CONMEBOL. T&T was owned in part by TORNEOS and in part by partners in the venture, including, for a brief period, Traffic, and, later, a group of investors that included Broadcasting Company Affiliate B. Broadcasting Company Affiliate B invested in T&T through its ownership interest in Broadcasting Company Affiliate C.

37.     Beginning at least as early as in or about 2000 and continuing through in or about May 2015, TORNEOS, through Torneos Executive #1 and, later, Alejandro Burzaco and others, and at times with the agreement and support of representatives of Broadcasting Company Affiliate B and Broadcasting Company Affiliate C, including Broadcasting Company Executive #2, Broadcasting Company Executive #3, and Broadcasting Company Executive #4, agreed to pay and caused to be paid annual six-figure and, in some instances, seven-figure bribe and kickback payments to, variously, Luis

B-14

Bedoya, Rafael Esquivel, Sergio Jadue, Soccer Official #1, Soccer Official #2, Soccer

Official #3, Soccer Official #4, Soccer Official #5, Soccer Official #6, Soccer Official #7,

Soccer Official #8, Soccer Official #9, Soccer Official #10, Soccer Official #11, Soccer

Official #12, and Soccer Official #13 in exchange for the officials' support of T&T as the

holder of the broadcasting rights to the Copa Libertadores.

38.     TORNEOS, through Alejandro Burzaco and others, at times relied on

Sports Marketing Executive #1, Sports Marketing Executive #2, Sports Marketing Company

A, and the Off-the-Books Companies to facilitate the payment of bribes and kickbacks to

certain of the co-conspirator soccer officials in connection with the Copa Libertadores.

TORNEOS also relied on José Margulies and the Margulies Intermediaries, among other

intermediaries, to facilitate the payment of bribes and kickbacks to CONMEBOL officials in

connection with the Copa Libertadores.

> iii.     CONMEBOL Copa América and CONMEBOL/CONCACAF
> Copa América Centenario Rights

39.     In or about May 2013, Productora de Eventos S.A., a subsidiary of

TORNEOS, Traffic, and Sports Marketing Company A formed Datisa, a new company in

which each entity held a one-third interest. Datisa subsequently entered into a $317.5 million

contract with CONMEBOL to obtain the exclusive worldwide rights to the 2015, 2019, and

2023 editions of the Copa América and the 2016 Copa América Centenario.

40.     Following negotiations between CONMEBOL and CONCACAF, it

was determined that the men's national teams of six CONCACAF member associations,

including the U.S. national team, would participate in the Copa América Centenario with the

10 CONMEBOL men's national teams. It was further determined that the tournament would
be hosted by the United States in recognition of the growth of the market for soccer in North
America. Datisa subsequently entered into a $35 million contract with CONCACAF, in its
capacity as the co-organizer of the Copa América Centenario, to acquire CONCACAF's
media rights to the tournament.

41.     In connection with the acquisition of the media rights to the Copa
América and the Copa América Centenario, TORNEOS, through Alejandro Burzaco, and
TORNEOS's partners in Datisa agreed to pay and caused to be paid tens of millions of
dollars in bribes to various soccer officials, including Luis Bedoya, Rafael Esquivel, Sergio
Jadue, Jeffrey Webb, Soccer Official #1, Soccer Official #2, Soccer Official #3, Soccer
Official #4, Soccer Official #5, Soccer Official #7, Soccer Official #8, Soccer Official #9,
Soccer Official #10, Soccer Official #11, Soccer Official #12, and Soccer Official #13. The
Datisa partners agreed to make these payments at various times over the life of the contracts.

42.     TORNEOS's subsidiary Productora de Eventos S.A. and its Datisa
partners relied on the Off-the-Books Companies, José Margulies, and the Margulies
Intermediaries, among others, to facilitate the payment of bribes and kickbacks to
CONMEBOL officials from and through accounts controlled by the Datisa shareholders in
connection with the Copa América and Copa América Centenario tournaments.

\* \* \* \*

43.     TORNEOS and its co-conspirators used the wire facilities of the United
States to facilitate and effect certain payments in furtherance of the criminal scheme,
including in connection with each of the tournaments referenced in paragraphs 34 through 42

above, and to communicate with co-conspirators and others in furtherance of the criminal scheme. Such use of United States wire facilities included, among other things, the use of the bank accounts of TORNEOS's subsidiaries and affiliates held at United States financial institutions to transfer tens of millions of dollars in payments related to contracts secured through bribery, as well as the use of the bank accounts of co-conspirators, including the Margulies Intermediaries, held at United States financial institutions to transfer millions of dollars in bribe payments. TORNEOS and its co-conspirators also relied, in part, on the growing market for soccer in the United States to generate profits from the scheme, and conducted meetings in furtherance of the scheme in the United States.

44.     TORNEOS and its co-conspirators engaged in conduct designed to prevent the detection of their illegal activities, to conceal the location and ownership of proceeds of those activities, and to promote the carrying on of those activities. The conduct engaged in by various members of the conspiracy included, among other things: the use of "consulting services" agreements, sham invoices and payment instructions, and other similar types of records to create an appearance of legitimacy for illicit payments; the use of various mechanisms, including trusted intermediaries (including the Margulies Intermediaries), bankers (including Banker #1 and Banker #2), and currency dealers, to make and facilitate the making of illicit payments; the creation and use of shell companies; and the use of cash.

45.     No disclosure of any of the foregoing bribery and kickback schemes was made to FIFA, CONMEBOL, or CONCACAF, including without limitation to their respective executive committees, congresses, or constituent organizations.

B-17

ATTACHMENT C

CORPORATE COMPLIANCE PROGRAM

       In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with all applicable federal, state, and foreign anti-bribery and anti-money laundering laws, TORNEOS Y COMPETENCIAS S.A. ("TORNEOS" or the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

       Where necessary and appropriate, TORNEOS agrees to adopt new or to modify its existing internal controls, compliance code, policies, and procedures in order to ensure that it maintains: (a) a system of internal accounting controls designed to ensure that the Company makes and keeps fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that includes policies and procedures designed to detect and deter violations of anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of TORNEOS's existing internal controls, compliance code, policies, and procedures:

### High-Level Commitment

       1.     TORNEOS will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of anti-corruption laws (as defined in paragraph 2 below) and to its compliance code.

C-1

## Policies and Procedures

2.      TORNEOS will develop and promulgate clearly articulated and visible

corporate policies against violations of all applicable federal, state, and foreign anti-bribery and

anti-money laundering laws, including without limitation federal racketeering, mail and wire

fraud, and anti-money laundering statutes, the Travel Act, the Foreign Corrupt Practices Act,

state commercial bribery statutes, and the analogues of such laws in foreign jurisdictions in

which the Company conducts business ("anti-corruption laws"), which policies shall be

memorialized in a written compliance code.

3.      The Company will develop and promulgate compliance policies and

procedures designed to reduce the prospect of violations of the anti-corruption laws and the

Company's compliance code, and the Company will take appropriate measures to encourage and

support the observance of ethics and compliance policies and procedures against violation of the

anti-corruption laws by personnel at all levels of the Company. These anti-corruption policies

and procedures shall apply to all directors, officers, and employees and, where necessary and

appropriate, outside parties acting on behalf of the Company in foreign jurisdictions, including,

but not limited to, agents and intermediaries, consultants, representatives, distributors, sponsors,

vendors, broadcasters, contractors, suppliers, consortia, and joint venture partners (collectively,

"agents and business partners"). The Company shall notify all employees that compliance with

C-2

the policies and procedures is the duty of individuals at all levels of the Company. Such policies and procedures shall address:

      (a)    gifts;

      (b)    hospitality, entertainment, and expenses, including in connection with soccer matches and tournaments and meetings of officials responsible for soccer governance;

      (c)    customer, client, employee, and vendor travel;

      (d)    facilitation payments, finders' fees, commissions, and other incentive payments; and

      (e)    solicitation and extortion.

4.    The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts. This system should be designed to provide reasonable assurances that:

      (a)    all payments made by the Company and its subsidiaries are made in exchange for legitimate services and at a reasonable market price;

      (b)    transactions are executed in accordance with management's general or specific authorization;

      (c)    transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted

accounting principles or any other criteria applicable to such

statements, and to maintain accountability for assets;

(d)     access to assets is permitted only in accordance with

management's general or specific authorization; and

(e)     the recorded accountability for assets is compared with the existing

assets at reasonable intervals and appropriate action is taken with

respect to any differences.

### Periodic Risk-Based Review

5.     The Company will develop these compliance policies and procedures on

the basis of a periodic risk assessment addressing the individual circumstances of the Company,

in particular the bribery risks facing the Company, including, but not limited to, the geographical

bases of its operations, interactions with various types and levels of government officials,

involvement in joint venture arrangements, the importance of marketing rights acquisition and

production licenses and permits to the Company's business, and the broad, international scope of

the Company's target markets.

6.     The Company shall review its anti-corruption compliance policies and

procedures no less than annually and update them as appropriate to ensure their continued

effectiveness, taking into account relevant developments in the field and evolving international

and industry standards.

### Proper Oversight and Independence

7.     The Company will assign responsibility to one or more senior corporate

executives of the Company for the implementation and oversight of the Company's anti-

C-4

corruption compliance code, policies, and procedures. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including (a) the Supervisory Commission ("Syndics"), which is an independent committee appointed by the Company's shareholders under Argentine Corporate Law for the purpose of, among other things, overseeing the management of the Company, examining periodically all books and records of the Company, ensuring the Company's compliance with Argentine law, the Company's by-laws, and the shareholders' resolutions, and investigating any shareholder claims; (b) internal audit; (c) the Company's Board of Directors; or (d) any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy. The Company will create and maintain an internal audit function.

Training and Guidance

8.    The Company will implement mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b)

corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

        9.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

### Internal Reporting and Investigation

        10.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

        11.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

### Enforcement and Discipline

12.    The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.    The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance code, policies, and procedures by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

### Third-Party Relationships

14.    The Company will institute comprehensive risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners – including existing agents and business partners – prior to transacting with them, including:

(a)    properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

(b)    informing agents and business partners of the Company's
commitment to abiding by anti-corruption laws, and of the
Company's anti-corruption compliance code, policies, and
procedures;

(c)    seeking a reciprocal commitment from agents and business
partners; and

(d)    refresh and update its diligence on existing agents and business
partners.

15.    Where necessary and appropriate, the Company will include standard
provisions in agreements, contracts, and renewals thereof with all agents and business partners
that are reasonably calculated to prevent violations of the anti-corruption laws, which may,
depending upon the circumstances, include: (a) anti-corruption representations and undertakings
relating to compliance with anti-corruption laws; (b) rights to conduct audits of the books and
records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to
terminate an agent or business partner as a result of any breach of the anti-corruption laws, the
Company's compliance code, policies, or procedures, or the representations and undertakings
related to such matters.

Mergers and Acquisitions

16.    The Company will develop and implement policies and procedures for
mergers and acquisitions requiring that the Company conduct appropriate risk-based due

C-8

diligence on potential new business entities, including appropriate anti-corruption due diligence by legal, accounting, and compliance personnel.

      17.     The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

      (a)    train the directors, officers, employees, agents, and business partners consistent with paragraph 8 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

      (b)    where warranted, conduct a bribery-specific audit of all newly acquired or merged businesses as quickly as practicable.

Monitoring and Testing

      18.     The Company will conduct periodic reviews and testing of its anti-corruption compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption code, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.

C-9

# ATTACHMENT D

ANY AND ALL FUNDS ON DEPOSIT IN BANCO BILBAO VIZCAYA ARGENTARIA ACCOUNT NUMBER 7584831 HELD IN THE NAME OF PRODUCTORA DE EVENTOS S.A., AND ALL PROCEEDS TRACEABLE THERETO (the "Productora BVA Account");

ANY AND ALL FUNDS ON DEPOSIT IN INTERAUDI BANK ACCOUNT NUMBER 723621 HELD IN THE NAME OF PRODUCTORA DE EVENTOS S.A., AND ALL PROCEEDS TRACEABLE THERETO (the "Productora Interaudi Account");

ANY AND ALL FUNDS ON DEPOSIT IN ABN AMRO ACCOUNTS NUMBER 242069819; 585885842; 249059746; and 585918023 HELD IN THE NAME OF TYC INTERNATIONAL B.V., AND ALL PROCEEDS TRACEABLE THERETO (the "TyC International Accounts");

ANY AND ALL FUNDS ON DEPOSIT IN INTERAUDI BANK ACCOUNT NUMBER 724093 HELD IN THE NAME OF T&T SPORTS MARKETING LTD., AND ALL PROCEEDS TRACEABLE THERETO (the "T&T Sports Marketing Account"); and

ANY AND ALL FUNDS ON DEPOSIT IN BANK HAPOALIM ACCOUNT NUMBER CH040828170441801000U AND/OR CUSTOMER NUMBER 7044180 HELD IN

THE NAME OF DATISA S.A., AND ALL PROCEEDS TRACEABLE THERETO (the "Datisa Account").

D-1

ATTACHMENT E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

       -against-

TORNEOS Y COMPETENCIAS, S.A.,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       STIPULATION OF
       SETTLEMENT AND
       DECREE OF FORFEITURE

WHEREAS, on or about December 13, 2016, the United States of America, by the United States Attorney's Office for the Eastern District of New York (the "United States"), and TORNEOS Y COMPETENCIAS S.A. ("TORNEOS"), by its General Manager, Ignacio Juan Galarza, and counsel, David B. Massey, Esq., Lee S. Richards, III, Esq., Jeffrey A. Lehtman, Esq., Maria E. Lapetina, Esq., Richards Kibbe & Orbe LLP, entered into a deferred-prosecution agreement (the "Agreement") whereby the United States agreed to defer prosecution of TORNEOS in connection with conduct described in a criminal information filed in the United States District Court for the Eastern District of New York charging the Company with wire fraud conspiracy, in violation of Title 18, United States Code, Sections 1349;

WHEREAS, as part of its obligations under the Agreement, TORNEOS has agreed, inter alia, to forfeit the sum of _____

($_____.___) (the "Forfeited Amount") to the United States;

E-1

WHEREAS, TORNEOS has agreed to waive the filing of a civil forfeiture complaint as to the Forfeited Amount in accordance with the procedures set forth in 18 U.S.C. § 983; and

WHEREAS, the United States and TORNEOS desire to resolve this matter upon the below mutually agreeable terms and conditions.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between the undersigned parties as follows:

1.  [Name, General Manager, Torneos] and the undersigned attorney represent that they are authorized to enter into this Stipulation of Settlement and to execute this and all other documents necessary to effectuate the settlement of this action on behalf of TORNEOS.

2.  Upon the entry of this Stipulation of Settlement and Decree of Forfeiture, TORNEOS hereby consents to the forfeiture of the Forfeited Amount to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(a), 981(a)(1)(C) and 982(a)(1), and 28 U.S.C. § 2461(c), which represents profits that TORONEOS made from certain contracts obtained through the conduct of certain of its directors, officers and employees as described in the Information as property, real or personal, constituting or derived from proceeds traceable to a violation of 18 U.S.C. § 1349, or any property traceable to such property.

3.  TORNEOS shall pay the Forfeited Amount by certified or bank check, payable to "United States Marshals Service," and said check shall be delivered to Assistant United States Attorney Brian D. Morris, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, 7th Floor, Brooklyn, New York 11201, by hand delivery or by

express, overnight delivery on or before the Applicable Due Date as that term is defined in the Agreement. TORNEOS agrees that the Forfeited Amount does not constitute a fine, penalty, or payment of any taxes that may be due or owing.

    4.    In connection with the forfeiture set forth in Paragraph 2, above, TORNEOS agrees to release, remise and forever discharge plaintiff, the United States of America and its agencies, agents, officers, and employees, past and present, for all claims or causes of action which TORNEOS and its agents, assigns, representatives, and successors ever had, now have, or hereafter may have against the plaintiff and its agencies, agents, officers, and employees, past and present, for or on account of the commencement of this action, the settlement of this action, and the seizure and forfeiture of the Forfeited Amount.

    5.    TORNEOS waives its right, if any, to use the instant action or its settlement as a basis for any statutory or constitutional defense in any other civil, criminal or administrative action, including, without limitation, venue, defenses based upon the Double Jeopardy Clause of the Fifth Amendment and the Excessive Fines Clause of the Eighth Amendment.

    6.    The parties agree that each party shall bear its own costs and attorney's fees, and TORNEOS further agrees to waive any and all rights it has, if any, to recover attorney's fees and/or interest under the Equal Access to Justice Act, the Civil Asset Forfeiture Reform Act, or any other legal or statutory authority with respect to the forfeiture of the Forfeited Amount.

    7.    The United States will publish notice of this seizure and of its intent to forfeit the Forfeited Amount on the government's official website, www.forfeiture.gov, consistent with the custom and practice in this judicial district.

E-3

8.      Upon completion of publication and provided that no third party claims are filed with respect to the Forfeited Amount, the Forfeited Amount shall be forfeited to the United States.

9.      At that time, the Department of Justice, United States Federal Bureau of Investigation, the United States Marshals Service, and their duly authorized agents and/or contractors shall be authorized to dispose of the Forfeited Amount in accordance with all laws and regulations.

10.     The District Court shall retain jurisdiction over this action to enforce the terms of this Stipulation of Settlement and Decree of Forfeiture.

11.     This Stipulation and Decree sets forth the entire, final agreement of the parties and may not be modified orally.

E-4

12.    The Clerk of the Court shall forward four (4) certified copies of this

Stipulation and Decree of Forfeiture to FSA Senior Law Clerk William K. Helwagen, Esq., and

then is directed to close this case.

Dated:  Brooklyn, New York

_____, 201\_

ROBERT L. CAPERS
United States Attorney
Eastern District of New York
*Attorney for United States*
271-A Cadman Plaza East
Brooklyn, New York 11201

By:    _____
        Brian D. Morris
        Assistant United States Attorney
        (718) 254-6512

Dated: _____, _____
_____, 201\_\_

_____
[NAME], Esq.
[FIRM]
*Attorney for Torneos Y Campetencias S.A.*
[STREET]
[CITY/STATE/COUNTRY]
(PHONE NUMBER)

AGREED AND CONSENTED TO:

Dated: _____, _____
_____, 201\_\_

_____
[NAME]
[TITLE]
TORNEOS Y COMPETENCIAS S.A.

On the \_\_\_\_\_ day of _____, in the year of 201\_\_, _____, known to me, the undersigned or provided to me on the basis of satisfactory evidence to be the individual whose name is subscribed to above, personally appeared before me and acknowledged to me that he executed the foregoing document.

_____
Notary Public

SO ORDERED:

_____
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

_____
Dated:

E-6