# ATTACHMENT 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

GOLTV, INC., and GLOBAL SPORTS
PARTNERS LLP,

                              Plaintiffs,

            -against-

FOX SPORTS LATIN AMERICA, LTD., PAN
AMERICAN SPORTS ENTERPRISES
COMPANY, d/b/a FOX SPORTS LATIN
AMERICA (individually and as successor to FOX
PAN AMERICAN SPORTS LLC), FOX
INTERNATIONAL CHANNELS (US), INC.,
FOX NETWORKS GROUP, INC. (as successor to
FOX INTERNATIONAL CHANNELS (US),
INC.), CARLOS MARTINEZ, HERNAN LOPEZ,
JAMES GANLEY, T&T SPORTS MARKETING
LTD., TORNEOS Y COMPETENCIAS, S.A.,
ALEJANDRO BURZACO, FULL PLAY GROUP
S.A., CONFEDERACION SUDAMERICANA
DE FUTBOL, d/b/a CONMEBOL, EUGENIO
FIGUEREDO, and JUAN ANGEL NAPOUT,

                              Defendants.

No. 16-cv-24431-CMA

**SECOND AMENDED
COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs GolTV, Inc. ("GolTV") and Global Sports Partners LLP ("Global Sports," and

together with GolTV, "Plaintiffs"), by and through their undersigned attorneys, allege as follows

for their complaint:

## I.    NATURE OF THE ACTION

1.    Plaintiff GolTV is a television channel based in North Bay Village, Florida, that

provides Spanish and English soccer programming in the United States.  Plaintiff Global Sports

is an English partnership that was formed by GolTV's owners to, among other things, acquire

television rights to international soccer tournaments on GolTV's behalf.

2.      Together, Plaintiffs are victims of a bribery scheme described by the U.S.
Department of Justice ("DOJ") in its criminal indictments against, among others, Defendant
Alejandro Burzaco ("Burzaco"), a principal of Defendant T&T Sports Marketing Ltd. ("T&T"),
Hugo Jinkis and Mariano Jinkis, principals of Defendant Full Play Group, S.A., Defendants
Eugenio Figueredo and Juan Angel Napout, former presidents of Defendant Confederación
Sudamericana de Futbol ("Conmebol"), and numerous other Conmebol officials.  *See*
Superseding Indictment, *United States of America v. Webb et al.*, No. 15-cr-0252 (E.D.N.Y.
Nov. 25, 2015), ECF No. 102 (hereinafter "*U.S. v. Webb*").  The Superseding Indictment charges
these individual Defendants with RICO violations, wire fraud, and money laundering.  For ease
of reference, the Superseding Indictment is attached as **Exhibit A**.

3.      As set forth in the Superseding Indictment, Defendant T&T paid tens of millions
of dollars in bribes and kickbacks to corrupt Conmebol officials between 2000 and 2015 in
exchange for the exclusive television rights to Conmebol's prestigious international soccer club
tournaments: the Copa Libertadores de America ("Copa Libertadores"), the Copa Sudamericana,
and the Recopa Sudamericana (collectively, the "Club Tournaments").  *See* Superseding
Indictment ¶¶ 174-185 (describing "Conmebol Copa Libertadores Scheme # 2").

4.      To date, Defendant Burzaco and Jose Margulies, an individual who facilitated the
payment of bribes from T&T to Conmebol officials, have pled guilty to racketeering conspiracy,
wire fraud conspiracy, and money laundering conspiracy in connection with their bribery of
Conmebol officials, including bribery in connection with the television rights to the Club
Tournaments and other criminal conduct.  *See U.S. v. Webb*, ECF Nos. 90, 263, and 96, 262,
respectively.  Rafael Esquivel, a Conmebol official, also has pled guilty to wire fraud conspiracy
and money laundering conspiracy in connection with bribery for the television rights to the Club

Tournaments and other criminal conduct.  *See U.S. v. Webb*, ECF No. 476.  In separate

proceedings, Conmebol officials Luis Bedoya and Sergio Jadue have pled guilty to Informations

filed in *United States of America v. Bedoya*, No. 15-cr-0569 (E.D.N.Y. filed Nov. 5, 2015) and

*United States of America v. Jadue*, No. 15-cr-0570 (E.D.N.Y. filed Nov. 5, 2015), respectively,

which charged them with engaging in a RICO conspiracy and wire fraud conspiracy in

connection with bribery for the Club Tournament television rights and other criminal

wrongdoing.

      5.      Burzaco and T&T did not act alone in bribing Conmebol officials for the Club

Tournament television rights.  During the relevant period, T&T was a Cayman Islands company

with no employees or physical offices that was 75% owned by Fox Pan American Sports LLC

("Fox Pan American"), which did business as "Fox Sports Latin America."  The remaining 25%

ownership interest in T&T was held by Defendant Torneos y Competencias S.A. ("Torneos").

      6.      Torneos has admitted that Fox Pan American and Torneos knowingly used T&T

to bribe Conmebol officials in exchange for the Club Tournament television rights.  On

December 13, 2016, Torneos entered into a Deferred Prosecution Agreement with the DOJ

("Torneos DPA").  In the Torneos DPA, Torneos acknowledged that it is criminally culpable for

a wire fraud conspiracy to pay bribes and kickbacks to Conmebol officials in exchange for their

support to award the Club Tournament television rights to T&T.  *See* Torneos DPA, *United

States of America v. Torneos y Competencias S.A*., No. 16-cr-00634-PKC, ECF Nos.4-1 and 4-2

(E.D.N.Y. Dec. 13, 2016).  The Torneos DPA is attached as **Exhibit B**.

      7.      Specifically, the DOJ alleged, and Torneos admitted, that with the agreement and

support of two affiliates of a major broadcasting company headquartered in the United States,

which are believed to be Defendant Fox International Channels (U.S.) Inc. ("FIC") and Fox Pan

American, and three of their executives, which are believed to be Defendants Hernan Lopez,

Carlos Martinez, and James Ganley, Torneos agreed to pay and caused to be paid annual six-

figure and, in some instances, seven-figure bribe and kickback payments in exchange for the

Club Tournament television rights. *See* Torneos DPA Statement of Facts ¶¶ 17-18, 37. Those

rights were then sublicensed to Fox Pan American subsidiary Defendant Fox Sports Latin

America, Ltd. ("FSLA"), and the tournaments were broadcast on Fox Sports channels in the

United States and abroad.

8. Martinez, who is the current President of Fox Networks Groups Latin America;

Lopez, who was the CEO of FIC from 2011 to January 2016 and the COO of FIC prior to that

time; and Ganley, who was the Chief Operating Officer of Fox Pan American, participated in

T&T's payment of bribes to Conmebol officials to ensure that Fox Sports Latin America would

obtain the lucrative television rights for the Club Tournaments through T&T. All three of these

executives were directors of T&T, and Defendant Burzaco, a shareholder, director and officer of

Torneos, similarly served as a principal of T&T.

9. Torneos also has admitted that it at times relied on a sports marketing company

and two of its principals, who are believed to be Defendant Full Play and its principals Hugo

Jinkis and Mariano Jinkis, to facilitate the payment of bribes and kickbacks in connection with

the Club Tournament television rights. *See* Torneos DPA Statement of Facts ¶ 38.

10. Moreover, Defendant and former Conmebol President Eugenio Figueredo attested

in Uruguayan criminal proceedings that "the FOX company was behind all the illicit

negotiations," and identified "an executive surnamed Martinez as responsible for the contracts

with Jinkis and Burzako [*sic*]."

11.     As part of the Torneos DPA and its admission of its role in the 15-year scheme involving paying tens of millions of dollars in bribes and kickbacks to Conmebol officials, Torneos agreed to over $112.8 million in forfeiture and criminal penalties.

12.     Plaintiffs GolTV and Global Sports were directly harmed by Defendants' bribery of Conmebol officials and other criminal conduct.  Global Sports, as agent for, and on behalf of, GolTV, repeatedly offered Conmebol substantially more for the television rights to air the Club Tournaments than the amounts T&T paid or offered to Conmebol for those rights.  Even though the Conmebol officials were obligated, pursuant to their fiduciary duties to Conmebol's member associations, to obtain the best terms for the television rights, the Conmebol officials repeatedly rejected Plaintiffs' superior offers in favor of T&T's inferior offers because of the bribes paid to those officials by T&T.

13.     GolTV and Global Sports now seek compensation for the harm they suffered from the loss of the rights that they otherwise would have been able to obtain in a fair and competitive market untainted by bribery and kickbacks, unreasonable restraints of trade, and other criminal and wrongful conduct.  Plaintiffs accordingly bring this action asserting violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); conspiracy in restraint of trade in violation of Section 1 of the Sherman Act; monopsonization, conspiracy to monopsonize, and attempted monopsonization in violation of Section 2 of the Sherman Act; violations of the Florida Deceptive and Unfair Trade Practices Act; tortious interference with prospective economic advantage; and civil conspiracy.

## II.     THE PARTIES

### A.     Plaintiffs

14.     Plaintiff GolTV is a Florida corporation having its principal place of business in North Bay Village, Florida.  GolTV produces and markets a television channel that provides

professional soccer programming in English and Spanish to viewers in the United States and abroad. GolTV's telecasts are made available widely in the United States through television providers such as Verizon, Charter/Time Warner, Cox, Frontier, Cablevision, and Century Link. At all relevant times GolTV was, and remains, a competitor of the Fox Defendants (as defined below in Paragraph 23), with whom it also does business.

15. GolTV is the only TV channel in the U.S. media market devoted exclusively to soccer. For many years it had the rights to live broadcasting in the United States of the Spanish La Liga and Italian Serie A leagues. Currently, GolTV broadcasts live matches of the German Bundesliga and the Brazilian, Uruguayan and Venezuelan soccer leagues, along with various cups and tournaments. In total, GolTV broadcasts over 400 live matches per year in English and Spanish. GolTV is owned by Francisco "Paco" Casal, a Uruguayan businessman and former soccer player; Nelson Gutierrez, a former member of the Uruguayan national soccer team; and Enzo Francescoli, another former member of the Uruguayan national soccer team. Casal and Gutierrez also own the Uruguayan sports production company Tenfield S.A. and GolTV Latin America, which produces a separate soccer channel distributed throughout Latin America.

16. Plaintiff Global Sports is a limited liability partnership organized by GolTV's owners Casal and Gutierrez under English law with its principal place of business in Montevideo, Uruguay. Global Sports was formed to obtain the television and marketing rights to international soccer matches for GolTV. During the relevant period, Global Sports acted, among other capacities, as an agent for GolTV to attempt to acquire television broadcasting rights to the Club Tournaments. To that end, GolTV controlled and coordinated the actions that Global Sports took on behalf of GolTV and Global Sports served the corporate interests of GolTV in seeking to acquire television rights to the Club Tournaments.

## B. <u>Defendants</u>

17.     Defendant T&T is a Cayman Islands limited company that on information and belief has no employees or physical offices.  During most of the relevant period (2005-2015) T&T was 75% owned by Fox Pan American and 25% owned by Defendant Torneos.

18.     Fox Pan American was a Delaware limited liability company registered to do business in Florida that did business as Fox Sports Latin America:

> FIC [Fox International Channels (US), Inc.] operates Fox Pan American Sports LLC, doing business as Fox Sports Latin America ("FSLA"), an international sports programming and production entity . . . FSLA owns and operates the Fox Sports networks in Latin America, which are comprised of Spanish-language sports networks that are distributed to subscribers in Mexico and certain Caribbean and Central and South American countries, as well as Fox Sports Brazil, a Portuguese-language sports network specifically geared to the Brazilian audience, and also owns 100% of Fox Deportes, a Spanish-language sports programming service distributed in the United States.

Twenty-First Century Fox, Inc., *Annual Report (Form 10-K)*, at 7 (Aug. 13, 2015).

19.     In June 2015, Fox Pan American merged with Defendant Pan American Sports Enterprises Company ("PASEC"), which became the surviving entity and legal successor to Fox Pan American.  PASEC is a Delaware corporation having its principal place of business in New York, New York.  On information and belief, PASEC continues to own, directly or indirectly, 75% of T&T.

20.     Defendant Fox International Channels (US), Inc. ("FIC") is a Delaware corporation having its principal place of business in Beverly Hills, California and offices in Florida.  FIC owns PASEC and owned Fox Pan American.  FIC operated Fox Pan American through its business unit FIC Latin America out of FIC's offices in Florida.

21.     Defendant Fox Sports Latin America, Ltd. ("FSLA") is a Cayman Islands limited company having its principal place of business in Coral Gables, Florida.  It was a wholly owned

subsidiary of Fox Pan American to which T&T sublicensed the Club Tournament television rights.

22.     Defendant Fox Networks Group ("FNG") is a Delaware corporation and a subsidiary of Twenty-First Century Fox, Inc.  In January 2016, a corporate reorganization was announced in which FIC would be dissolved and Fox Networks Group's business unit, Fox Networks Group Latin America ("FNG Latin America"), would assume operation of the Fox Sports Latin America business.  On information and belief, FNG will become, or has already become, the legal successor to FIC as a part of this reorganization.  The status and progress of this announced reorganization is unknown to Plaintiffs at this time.

23.     Collectively, Defendants PASEC, FSLA, FIC, and FNG, and their predecessors, including Fox Pan American, are referred to as "Fox" or the "Fox Defendants."

24.     Defendant Torneos is an Argentinean corporation.  It is a sports media and marketing business with a number of subsidiaries and affiliates, including, among others, TyC International B.V. (a wholly-owned subsidiary domiciled in the Netherlands), and Productora de Eventos S.A. (a wholly-owned subsidiary domiciled in Uruguay).  Torneos has historically held various exclusive agreements to produce and distribute programs related to soccer matches between clubs in South American soccer leagues.

25.     The relationships among the Fox Defendants, T&T, and Torneos as of 2012 are depicted in the following diagram:



26.  Defendant Carlos Martinez is currently President of FNG Latin America and is responsible for the operation of the Fox Sports Latin America business.  Previously, Martinez was President of Fox International Channels Latin America, where he also was responsible for the operation of Fox Pan American.  Martinez served on the board of Defendant T&T approximately from October 31, 2012 to December 11, 2013.  Martinez is a citizen and resident of Florida and operated Fox Pan American from FIC's offices in Florida.

27.  Defendant Hernan Lopez was the CEO of FIC from 2011 to January 2016, when he left the company.  Previously, Lopez was Chief Operating Officer of FIC from 2008 to 2011 and General Manager of Fox Latin American Channels from 2000 to 2008.  Lopez served on the board of directors of Defendant T&T approximately from June 1, 2010 to December 10, 2013.  Lopez is a citizen and resident of California.

28.  Defendant James Ganley was Chief Operating Officer of Fox Pan American and an employee of FSLA.  Ganley served on the board of directors of Defendant T&T approximately from April 28, 2005 to October 31, 2012.  Ganley is a citizen and resident of Florida and operated Fox Pan American from Florida.

29. Defendant Alejandro Burzaco is a citizen of Argentina. During the relevant period Burzaco had an ownership share in Defendant Torneos and at various times was the General Manager, President of the Board of Directors, and legal representative of Torneos. Burzaco served on the board of directors of Defendant T&T approximately from April 28, 2005 to December 10, 2013. Burzaco also was a principal of Torneos's affiliates and other shell companies that Burzaco created and controlled off the books of Torneos (including FPT Sports S.A. and Arco Business and Developments Ltd., among others), to effect the bribery schemes and other criminal wrongdoing that victimized Plaintiffs. *See* Torneos DPA Statement of Facts ¶¶ 13, 19.

30. Burzaco has pled guilty in the DOJ's criminal RICO action to racketeering conspiracy, wire fraud conspiracy, and money laundering conspiracy in connection with, among other things, the payment of bribes to Conmebol to acquire rights to the Club Tournaments. *See* Transcript of Criminal Cause for Guilty Plea at 5, 26-28, *U.S. v. Webb*, ECF No. 312-2 ("Burzaco Plea Tr.").

31. Defendant Full Play Group S.A. ("Full Play") is a Uruguayan corporation and sports media and marketing business with its principal offices in Argentina and Uruguay. Full Play's controlling principals are Hugo Jinkis and his son, Mariano Jinkis.

32. Defendant Conmebol is one of the oldest and most prestigious soccer confederations in the world and "is exclusively authorized by FIFA to direct and control football in the [South American] region." Conmebol Bylaws, Art. 3, ¶ 1. Conmebol is organized under Paraguayan law as a non-profit and non-governmental association of ten national soccer associations from Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay, and Venezuela. Its principal place of business is at Autopista Aeropuerto Internacional

- Km 12, Luque, Gran Asunción, Paraguay. The Executive Committee of Conmebol – consisting since at least 2013 of one president, three vice presidents, a secretary general, a treasurer, and six directors (collectively, or generically, "Conmebol officials") – is Conmebol's permanent authoritative body.

33. Defendant Eugenio Figueredo is a citizen of both the United States and Uruguay. Between April 2013 and August 2014, Figueredo served as the president of Conmebol; from 1993 to 2013, he served as one of Conmebol's vice presidents. *See* Superseding Indictment ¶ 48. In both capacities, Figueredo was a member of the Executive Committee of Conmebol. From approximately 2005 to 2015, Figueredo maintained a residence in the United States in California. *Id*.

34. Defendant Juan Angel Napout is a citizen of Paraguay. He has maintained a home in Florida since the 1980s. As of October 2016, the home was one floor of a high rise apartment building on Collins Avenue, located north of Miami, which Napout has historically visited throughout the year and now resides in full time as a condition of his bail. From about August 2014 to December 11, 2015, Napout was the president of Conmebol; from 2007 to 2014, he was one of Conmebol's vice presidents. *See* Superseding Indictment ¶ 41. In both capacities, Napout was a member of the Executive Committee of Conmebol.

### III.     JURISDICTION AND VENUE

#### A.     Subject Matter Jurisdiction

35. This Court has subject matter jurisdiction over Plaintiffs' federal law claims under 28 U.S.C. §§ 1331 and 1337 because the claims involve allegations of unlawful behavior arising under the laws of the United States, and additionally affecting United States commerce, including RICO violations under 18 U.S.C. § 1962(c)-(d) and antitrust violations under 15 U.S.C. §§ 1-2.

36.     Subject matter jurisdiction also exists over the RICO claims under 18 U.S.C.

§ 1964(c) and the antitrust claims under Section 4 of the Sherman Act, 15 U.S.C. § 4 and Section

4 of the Clayton Act, 15 U.S.C. § 15.

37.     This Court has supplemental jurisdiction over the state law claims under 28

U.S.C. § 1367 because those claims all arise out of the same case or controversy and common

nucleus of operative facts as the federal law claims.

**B.     <u>Personal Jurisdiction</u>**

38.     This Court has general jurisdiction over individual defendants Martinez, Ganley,

and Napout because they are domiciled in the state of Florida.  *See* Paragraphs 26, 28, and 34.

39.     This Court also has personal jurisdiction over each of the Fox Defendants, Lopez,

Ganley, Burzaco, and Napout for (a) the RICO Claims under 18 U.S.C. § 1965(d)'s nationwide

service of process provision that provides this Court with statutory personal jurisdiction over

defendants served in the United States, and (b) the Florida state law claims brought herein

pursuant to the doctrine of pendent personal jurisdiction because such state law claims derive

from a common nucleus of operative facts to the RICO claims.

40.     This Court has general jurisdiction over FIC, Fox Pan American, and FSLA under

Fla. Stat. § 48.193(2) because they have engaged in substantial and not isolated activity in

Florida.  *See* Paragraphs 18-21.  Fox Pan American was registered to do business in Florida and

its principal place of business was in Coral Springs, Florida, and Coral Gables, Florida.

Likewise, FSLA was based in Coral Springs, Florida, and Coral Gables, Florida.  FIC operated

Fox Pan American and FSLA through FIC's offices in Florida.  Martinez, a resident of Florida,

was employed by FIC at its offices in Florida to, among other things, operate Fox Pan American.

Ganley, who also was a resident of Florida, was employed by Fox Pan American in Florida.

41.     This Court has specific jurisdiction over all Defendants, even if non-residents, for all claims pursuant to Fla. Stat. § 48.193(1)(a)(2) because each of the Defendants committed tortious acts within Florida and/or committed tortious acts outside of Florida that were directed at, and caused an injury to, GolTV in Florida.  Among other actions, Defendants (a) committed the RICO, antitrust, and intentional torts pled herein within the state of Florida; (b) committed such offenses in furtherance of the bribery scheme in order to benefit FIC, Fox Pan American, and FSLA, all of which were based and/or had offices in Florida, by securing for FSLA the exclusive right to broadcast the Club Tournaments in Florida and elsewhere; (c) committed such offenses by purposely availing themselves of the banking system in Florida and utilizing banks in Florida to wire the illicit bribes as essential parts to the success of the tortious scheme; (d) made communications into Florida, visited Florida, and conducted meetings in Florida in furtherance of the intentional tortious acts committed against Plaintiffs; (e) harmed competition in Florida by eliminating GolTV's opportunity to compete for the rights to broadcast the Club Tournaments in the United States, including Florida; and (f) committed tortious acts outside of Florida that were directed at GolTV and toward Florida for the purpose of preventing GolTV – a Florida corporation with its principal place of business in the Southern District of Florida – from acquiring the Club Tournament television rights, thereby injuring GolTV in Florida by depriving it of significant revenue, including programming and advertising revenue, that would have been generated from commercializing the Club Tournament television rights in Florida and the United States.  Each Defendant's actions therefore caused harm that each Defendant should have anticipated would be suffered in Florida, Plaintiffs' claims arise out of these contacts by each Defendant with Florida, and Defendants should have reasonably anticipated being subject to jurisdiction in this forum.

42.     For example, Burzaco, acting in part on behalf of Torneos, caused T&T to wire bribe and kickback payments to Conmebol officials from T&T's accounts at Lloyd's Bank in Miami, Florida.  *See* Paragraph 89 below.  Burzaco admitted that he "knew that the United States banking system would be involved in transferring payments related to the contracts secured through bribery" and that he "traveled to the United States on several occasions to advance the schemes alleged in Counts 1, 39 and 40, including trips to New York and Miami."  Burzaco Plea Tr. at 29-30, *U.S. v. Webb*, ECF No. 312-2.  Likewise, Torneos has admitted to utilizing the wire facilities of the United States to facilitate and effect certain payments in furtherance of the bribery scheme and other criminal wrongdoing.

43.     Martinez and Ganley, on behalf of the Fox Defendants and T&T, routinely conducted in-person and telephone meetings from their residences and offices in the greater Miami-Dade metropolitan area to operate Fox Pan American and T&T, including discussing and making decisions concerning the bribery scheme, such as the amounts of bribes to be paid to Conmebol officials and how to structure the payment of such bribes through intermediary companies and financial institutions in Florida and elsewhere in the United States and abroad.  On information and belief, Lopez, on behalf of FIC and T&T, and Burzaco, on behalf of Torneos and T&T, participated in some of these meetings.

44.     Similarly, Full Play, including through its agents and principals Hugo Jinkis and Mariano Jinkis, engaged in communications to and from Florida and traveled to Florida in furtherance of its involvement in the schemes to pay bribes to Conmebol officials.  For example, the DOJ alleged that Hugo Jinkis and Mariano Jinkis met in South Florida with Burzaco and an individual named Jose Hawilla to discuss the payment of bribes to Conmebol officials.  *See* Superseding Indictment ¶ 360.

45.     Further, on information and belief, Defendants Conmebol (through its agents), Figueredo and Napout engaged in communications to and from Florida and/or traveled to Florida in furtherance of the torts alleged herein.

46.     The Court also has specific jurisdiction over all non-resident Defendants pursuant to Fla. Stat. § 48.193(1)(a)(2) because the statute supports personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida.  As set forth in Paragraphs 42-45 above, numerous Defendants committed tortious acts in Florida in furtherance of the conspiracy. All Defendants participated in the conspiracy to commit such actions, knowing that members of the conspiracy were responsible for committing tortious acts in Florida.

47.     Specific jurisdiction may also be obtained over FIC, Fox Pan American, FSLA, Martinez, Lopez, and Ganley under Fla. Stat. § 48.193(1)(a)(1) because, as set forth in Paragraphs 40 and 43 above, such Defendants operate, conduct, engage in, or carry on a business or business venture in Florida or have an office or agency in the state, which demonstrate a general course of business activity for pecuniary benefit in connection with broadcasting the Club Tournaments.

48.     This Court also has specific jurisdiction over Conmebol under Fla. Stat. § 48.193(1)(a)(1) because it operates, conducts, engages in, or carries on a business or business venture in Florida, which demonstrate a general course of business activity for pecuniary benefit in connection with the Club Tournament television rights.  Conmebol, either itself or through its agents or licensees, has extensively promoted and commercialized Conmebol tournaments in Florida.  For example, Conmebol's Recopa Sudamericana tournament was played in Fort

Lauderdale, Florida in 2004. *See* Superseding Indictment ¶ 175. Conmebol also has promoted its Club Tournaments through their broadcast or transmission via television, radio or internet by Florida based entities, including Fox Pan American and FSLA. In addition, Conmebol conducted business using accounts at the Florida and New York branches of major U.S. and Swiss financial institutions. *See* Superseding Indictment ¶ 119. Moreover, Conmebol representatives routinely traveled to Florida for business-related purposes, including business relating to the Club Tournaments.

49. In addition, this Court has specific jurisdiction over the Fox Defendants, T&T, Torneos, Full Play, and Conmebol for the antitrust claims pursuant to 15 U.S.C. § 22's worldwide service of process provision that provides statutory personal jurisdiction with respect to corporations.

50. In the alternative, the Court has personal jurisdiction over the foreign defendants by virtue of Federal Rule of Civil Procedure 4(k)(2). First, the RICO and antitrust claims against the foreign defendants arise under federal law. Second, the foreign defendants' actions targeted GolTV and the broadcasting of the Club Tournaments in the United States, they purposely availed themselves of the United States financial system by using bank accounts in the United States to send and receive the bribes at issue, and meetings in furtherance of the bribery scheme took place in the United States. These United States contacts relate to or give rise to Plaintiffs' causes of action and the foreign defendants' contacts with the United States are such that they should reasonably anticipate being subject to jurisdiction in this forum.

**C.** **Venue**

51. Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, communications, and transactions giving rise to Plaintiffs' claims occurred in this judicial district, including wire transfers of bribes in

furtherance of the bribery scheme and other criminal wrongdoing perpetrated by defendants and admitted by defendant Torneos and meetings and telephone communications in Florida to plan, organize and perpetrate the bribery scheme and other criminal wrongdoing.

52.     Venue in this district additionally is proper against those Defendants not resident in the United States under 28 U.S.C. § 1391(c)(3), and venue against the remaining Defendants is additionally proper under 28 U.S.C. § 1391(c)(2) because they are subject to the court's personal jurisdiction with respect to this civil action.

53.     In addition, venue in this district is proper for the RICO claims under 18 U.S.C. § 1965(a) because one or more of the Defendants reside, are found, have an agent, and/or transact their affairs in this district, and as to all Defendants under 18 U.S.C. § 1965(b) because the ends of justice require that they be brought before this Court to the extent the federal RICO claims against them would not otherwise be subject to venue in this Court.

54.     Venue is also proper in this district for the Fox Defendants for the antitrust claims pursuant to 15 U.S.C. § 22 because such Defendants transact business in this district as set forth in Paragraphs 18-23 and 40, and for Martinez, Lopez, Ganley, Napout, Burzaco, and the Fox Defendants under 15 U.S.C. § 15 because they reside in this district or are found or have an agent in this district.

## IV.      FACTUAL ALLEGATIONS

### A.     THE CONMEBOL CLUB TOURNAMENTS

55.     Conmebol sponsors the Copa Libertadores, one of the most important soccer club tournaments in the world.  The Copa Libertadores was first held in 1960.  Over the following decades, the tournament evolved into a major competition featuring 38 club teams from Latin America.  According to Conmebol, the Copa Libertadores has been among the most widely watched sporting events in the world.  The Copa Libertadores has been telecast in more than 135

countries and, in 2009 and 2010, drew more than one billion viewers.  By one estimate, the

United States accounted for 16% of its audience share in 2010, behind only Brazil, Mexico, and

Argentina.  *See* Superseding Indictment ¶ 174.

56.     Conmebol also sponsors a soccer tournament called the Copa Sudamericana and a

competition between the Copa Libertadores and Copa Sudamericana winners called the Recopa

Sudamericana.  The Copa Sudamericana was first hosted in 2002, with 34 teams from the

Conmebol member countries participating.  Since 2005, Conmebol has relied, in part, on the

growing United States market for soccer to promote these tournaments.  For example, in 2005

and again in 2007, a club team from Major League Soccer in the United States participated in the

Copa Sudamericana.  The Recopa Sudamericana has been played in the United States on several

occasions, including in Los Angeles, California in 2003, and in Fort Lauderdale, Florida in 2004.

*See* Superseding Indictment ¶ 175.

57.     These Club Tournaments offer viewers a unique opportunity to see the best South

American soccer teams compete in a championship tournament format.  In the United States,

such tournaments attract a loyal and growing audience and represent a valuable opportunity for

advertisers and producers of telecasts ("telecasters") to reach unique and economically valuable

segments of the viewing public that would otherwise be difficult to reach.

58.     The popularity of these soccer tournaments, combined with Conmebol's unique

monopoly on the television rights to telecast television programming featuring the Club

Tournaments, ensures that telecasters who obtain the Club Tournament television rights are

guaranteed demand for their sports programming, which they, in turn, can use to develop their

channels, increase their market share, and derive significant revenue, including advertising

revenue.  For the same reason, preventing competitors from acquiring the Club Tournament

television rights and preventing new competitors from emerging can protect a sports telecaster from losing market share to competitors.  As a result, the television rights for the Club Tournaments are highly valuable.

59.     Only Conmebol, by decision of the Executive Committee, has the authority to award the television rights for the Club Tournaments.  *See* Conmebol Bylaws, Art. 62.

60.     The revenue generated by the commercialization of the media rights associated with the Club Tournaments constituted an essential source of revenue for Conmebol, Fox, Torneos, and T&T.  Over time, the United States became an increasingly important and lucrative market for the commercialization of these rights.  *See* Torneos DPA Statement of Facts ¶ 12; Superseding Indictment ¶ 15.

## B.   DEFENDANTS SET UP CONDUITS FOR PAYING BRIBES TO CONMEBOL OFFICIALS AND PRESIDENTS TO ENSURE ONLY T&T ACQUIRED THE CLUB TOURNAMENT TELEVISION RIGHTS

### 1.   Fox Agrees—and Participates with— Torneos and T&T to Bribe Conmebol's Officials and Presidents for Fox's Benefit

61.     Beginning in 1999 and continuing through 2015, T&T acquired the exclusive worldwide television rights to the Copa Libertadores.  T&T eventually also acquired the exclusive worldwide television rights to the Copa Sudamericana beginning in or about 2002 and continuing through 2015 and the Recopa Sudamericana in 2008.  The rights were awarded through a series of contracts covering multi-year periods between T&T and Conmebol.

62.     As revealed in the Superseding Indictment and admitted by Torneos in the Torneos DPA, T&T acquired these rights through bribery and other criminal wrongdoing with the assistance of co-conspirators.  *See generally* Superseding Indictment ¶¶ 174-185; Torneos DPA Statement of Facts ¶¶ 36-38.  Beginning in 2000, one of the founders of Torneos, Luis Nofal, unlawfully agreed to pay, and did pay, annual bribes of $1 million to Conmebol President

Nicolas Leoz, and $600,000 each to Conmebol officials Eugenio Figueredo, Eduardo Deluca, and Romer Osuna for approximately the next 10 years.  In return, Leoz, Figueredo, Deluca, and Osuna unlawfully agreed to cause Conmebol to award the Club Tournament television rights exclusively to T&T, and to refuse to sell those rights to T&T's competitors, such as GolTV.  *See* Superseding Indictment ¶ 178.

63.     In January 2002, Fox Pan American, doing business as Fox Sports Latin America, was organized and acquired 50% of T&T.  In 2005, Fox Pan American acquired an additional 25% share of T&T previously owned by Defendant Torneos, increasing Fox Pan American's stake in T&T to 75%.

64.     Upon information and belief, in and around 2005, soon after Fox Pan American increased its interest in T&T to 75%, FIC, its executives Martinez and Lopez, Fox Pan American, its executive Ganley, and FSLA agreed with Torneos, T&T, and Burzaco, that Fox Pan American and Torneos would fund and facilitate T&T's payment of bribes to Conmebol officials including Leoz, Figueredo, Deluca, and Osuna.  As part of this agreement, Conmebol officials including Leoz, Figueredo, Deluca, and Osuna agreed that they would cause Conmebol to sell the Club Tournament television rights to T&T, with the understanding that the rights would be sublicensed to FSLA, and Conmebol would refuse to sell the rights to the competitors of T&T or the Fox Defendants, including GolTV and Global Sports.

65.     Plaintiffs' allegations concerning the Fox Defendants' agreement with T&T and Conmebol are based, in part, on admissions and allegations made by participants in the scheme, including those of Torneos and former Conmebol President Figueredo, and on the personal involvement of high-level FIC and Fox Pan American executives, including Defendants

Martinez, Lopez, and Ganley, in the bribery scheme described below.  *See, e.g.,* Paragraphs 66, 78-80.

66.     For example, Torneos has admitted that through Burzaco and with the agreement and support of parties and co-conspirators identified in the Torneos DPA, who upon information and belief are FIC (*Broadcasting Company Affiliate B*), Fox Pan American (*Broadcasting Company Affiliate C*), Lopez (*Broadcasting Company Executive #2*), Martinez (*Broadcasting Company Executive #3*), and Ganley (*Broadcasting Company Executive #4*), Torneos agreed to pay and caused to be paid annual six-figure and, in some instances, seven-figure bribe and kickback payments to 16 Conmebol officials in exchange for their support of T&T as the holder of the broadcasting rights to the Copa Libertadores.  *See* Torneos DPA Statement of Facts ¶ 37.

67.     In 2005, Burzaco began to manage the day-to-day operations of Torneos and learned from Luis Nofal of the annual bribe payments to Leoz, Figueredo, Deluca and Osuna. Burzaco helped to continue the practice by arranging for Leoz to receive $1 million bribe payments each year from in or about 2004 through in or about 2012, the year before Leoz resigned the presidency of Conmebol.  Burzaco also continued to arrange for annual six-figure bribe payments to Deluca until in or about 2011, to Osuna until in or about 2012, and to Figueredo, whose payments increased to $1 million in or about 2012, until in or about 2014.  *See* Superseding Indictment ¶ 179.

68.     As described in more detail in Paragraphs 111-135 below, Conmebol and T&T entered into a number of contracts after 2005, through which T&T retained the television rights to subsequent years of the Club Tournaments.  Each of those contracts required the support of Conmebol officials who were receiving bribes from Burzaco and other co-conspirators affiliated with T&T.  *See* Superseding Indictment ¶ 180.

69.     Beginning in 2009, a group of six presidents of the traditionally less-powerful member associations of Conmebol demanded that they, too, receive annual bribe payments in exchange for their support of T&T as the holder of television rights to the Copa Libertadores, among other tournaments.  In response to these demands, Burzaco agreed to pay and did pay annual six-figure bribe payments to Defendant Napout, Manual Burga, Carlos Chavez, Luis Chiriboga, and Rafael Esquivel.  Bribes were also paid to Luis Bedoya starting in or about 2010, and also to Sergio Jadue, starting in or about 2012, to secure their support.  *See* Superseding Indictment ¶ 182.

70.     At various times, T&T also paid bribes to Conmebol officials Marco Polo del Nero, Jose Maria Marin, Jose Luis Meiszner and Ricardo Teixeira bribes in exchange for their support of T&T as holder of the rights to the Copa Libertadores, among other tournaments.  *See* Superseding Indictment ¶ 183.

71.     To disguise its bribe payments to the Conmebol officials in connection with the Copa Libertadores and other tournaments, Fox Pan American and Torneos agreed that T&T would enter into sham "consulting" contracts with companies owned by Jose Margulies. Torneos has admitted that Jose Margulies and companies that he controlled (together, the "Margulies Intermediaries"), facilitated the payment of bribes and kickbacks to Conmebol officials in connection with the Copa Libertadores.  *See* Torneos DPA Statement of Facts ¶¶ 24, 38.  At various times, Margulies used accounts in the names of the Margulies Intermediaries that were held at United States financial institutions to make illicit payments on behalf of multiple members of the conspiracy, including Torneos and certain of its subsidiaries and affiliates and off-the-books companies.  *See* Torneos DPA Statement of Facts ¶ 24.

72.     Fox Pan American and Torneos also relied on Hugo Jinkis, Mariano Jinkis and Defendant Full Play to facilitate the payment of bribes and kickbacks to Conmebol officials.  *See* Superseding Indictment ¶ 184.  Torneos has admitted, for example, that co-conspirators identified in the Torneos DPA, and who upon information and belief are Hugo Jinkis (*Sports Marketing Executive #1*), Mariano Jinkis (*Sports Marketing Executive #2*), Defendant Full Play (*Sports Marketing Company A*), were used to facilitate the payment of bribes and kickbacks to Conmebol officials in connection with the Copa Libertadores.  *See* Torneos DPA Statement of Facts ¶ 38.

73.     Torneos summed up its deception when it admitted in the DPA that Torneos and its co-conspirators engaged in conduct designed to prevent the detection of their illegal activities, to conceal the location and ownership of proceeds of those activities, and to promote the carrying on of those activities.  The conduct engaged in by various members of the conspiracy included, among other things:  the use of "consulting services" agreements, sham invoices and payment instructions, and other similar types of records to create an appearance of legitimacy for illicit payments; the use of various mechanisms, including trusted intermediaries (including the Margulies Intermediaries), bankers, and currency dealers, to make and facilitate the making of illicit payments; the creation and use of shell companies; and the use of cash.  *See* Torneos DPA Statement of Facts ¶ 44.

74.     T&T did not receive any legitimate services from these financial intermediaries.  Rather, the purported "consulting" contracts were shams and were used to disguise the payments from T&T to the financial intermediaries.  At least some of these sham "consulting" contracts contained New York choice of forum and choice of law clauses.

75.     In the course of paying bribes in exchange for the television rights to the Club

Tournaments, T&T and other defendants used wire facilities and financial institutions located in

the United States, among other countries, to make and receive bribe payments and kickbacks and

to transfer payments related to contracts secured through bribery, with the actions taking place in

the United States being central and essential to the scheme's success.  Torneos has admitted, for

example, that such use of United States wire facilities included, among other things, the use of

the bank accounts of Torneos's subsidiaries and affiliates held at United States financial

institutions to transfer tens of millions of dollars in payments related to contracts secured through

bribery and other criminal wrongdoing, as well as the use of the bank accounts of co-

conspirators, including the Margulies Intermediaries, held at United States financial institutions

to transfer millions of dollars in bribe and kickback payments.  Torneos DPA Statement of Facts

¶ 43.  Defendants also relied on the growing U.S. market for soccer to generate profits from the

scheme, and, on information and belief, conducted meetings in the United States in furtherance

of their schemes.  *See id.*; Superseding Indictment ¶ 185.

76.     In addition, the DOJ has revealed that the annual bribe payments of at least

$400,000 that were made to Napout for the 2011, 2012, 2013, 2014, and 2015 editions of the

Copa Libertadores were wired to one or more Full Play-affiliated bank accounts controlled by

Napout's co-conspirators Hugo and Mariano Jinkis, who facilitated the payment of the Copa

Libertadores bribes, as well as bribes in relation to the Copa America Centenario Scheme, to

Napout and other Conmebol officials.  "The conspirators sought to prevent the detection of these

bribe payments through various means, including by having the Jinkises hold the payments for

periodic disbursements to the bribe recipients through the use of bank accounts around the world,

including at banks in the United States."  *See* Opp. Br. at 55-56, *U.S. v. Webb*, ECF No. 516.

77.     T&T, Torneos, Fox Pan American, FIC, Full Play and the financial intermediaries all knew that the payments from T&T to the intermediaries, and from the intermediaries to Conmebol, did and were intended to serve as bribes to obtain the Club Tournament television rights for the benefit of the Fox Defendants.  In fact, the terms of the license agreements between Conmebol and T&T expressly contemplate their sublicensing of those rights to "Fox Sports."

78.     FIC and Fox Pan American employees not only knew of the bribes paid to Conmebol officials to secure the Club Tournament television rights for the Fox Defendants, they were personally involved in authorizing and facilitating the payment of those bribes.  For example, Fox Pan American COO Ganley signed many of the sham "consulting" agreements between T&T and the Margulies Intermediaries that channeled bribes to Conmebol officials.  *See* Paragraph 85.  Likewise, Defendant Martinez, the President of FIC Latin America, signed an agreement on behalf of T&T restructuring the payment of bribes through the Margulies Intermediaries.  *See* Paragraphs 90-92.

79.     As described by Defendant and former Conmebol President Eugenio Figueredo in a cooperation agreement with Uruguayan prosecutors in February 2016, the Fox Defendants were understood to be behind all of the illegal bribery and kickbacks:

> [Figueredo] references T&T, Torneos y Competencias and Full Play as the companies that contracted with Conmebol, for amounts very inferior to those of the market, and which later assigned the rights to the FOX company, as well as GLOBO of Brazil, obtaining the profits that the payments permitted them, which he acknowledges having received and indicating that, in his opinion, the FOX company was behind all the illicit negotiations and indicating an executive surnamed Martinez as responsible for the contracts with Jinkis and Burzako [*sic*].

80.     On information and belief, the "Martinez" referred to in Figueredo's cooperation agreement is Defendant Carlos Martinez.

81.     Some of the conduits that T&T used to pay these bribes are described below.

### 2.  T&T Pays Bribes to Conmebol Officials via the Margulies Intermediaries

82.     Beginning in 2005, T&T executed "consulting" contracts with three shell companies controlled by Jose Margulies.  These shell companies were Somerton Ltd. ("Somerton"), registered in Panama; Valente Corp. ("Valente"), registered in Turks and Caicos; and Spoart S.A. ("Spoart"), registered in Brazil.  The "consulting" contracts were not real consulting agreements.

83.     Margulies was indicted and has entered a guilty plea in connection with, among other things, his role facilitating the payment of bribes from T&T to Conmebol officials.  *See* Margulies Guilty Plea, *U.S v. Webb*, ECF Nos. 96, 262; *see also* Superseding Indictment ¶ 184.

84.     As set forth in the Superseding Indictment, Margulies used the Margulies Intermediaries' accounts in the Florida and New York branches of major U.S. and European financial institutions to move millions of dollars among the sports marketing companies (such as T&T) to soccer officials who were the recipients of illicit payments (such as Napout and Figueredo), including to their accounts at financial institutions in Europe and South America. Margulies took additional steps to conceal the nature of the payments he was facilitating beyond his use of the U.S.-based accounts.  For example, he used the services of currency dealers, he regularly shredded records of his activities, and he discouraged soccer officials who were receiving payments from using accounts in their own name lest they draw attention from law enforcement, though they did not always heed his advice.  To take one five-year period, for example, between March 2003 and March 2008, the Margulies Intermediaries wired more than $3.5 million in to accounts controlled by persons including Figueredo, almost entirely though even, six-figure payments.  *See* Superseding Indictment ¶¶ 116, 119.

85.     T&T's first sham contracts with the Margulies Intermediaries were signed on May 5, 2005 by Defendant Ganley, who was both a T&T director and Fox Pan American's Chief Operating Officer.  T&T's contract with Valente provided that T&T would pay Valente $360,000 annually, but was subsequently amended to provide for payments of $660,000 annually from 2006 through 2014.  T&T's contract with Somerton, which was subsequently modified in November 2006, provided that T&T would pay Somerton $1 million annually from 2005 through 2014.  Several years later, on or around January 1, 2010, T&T executed another sham contract, this time with Spoart, in which it agreed to pay Spoart $600,000 annually.

86.     Although the sham contracts provided for "intermediary" and "consulting" services by Valente, Somerton and Spoart to T&T, no legitimate services were in fact provided.  Rather, the monies paid were used to make bribe payments to Conmebol officials who then awarded the Club Tournament television rights to T&T, which then sublicensed those rights to FSLA.

87.     On information and belief, T&T made the payments provided for under these sham contracts on or about the dates when they were due and made certain additional one-time payments to the intermediaries as well.  In total, T&T either paid or agreed to pay the Margulies Intermediaries, directly and indirectly, approximately $23 million from 2005 through 2014.

88.     In addition to Ganley, FIC executives Lopez and Martinez were T&T directors during the period when bribes were paid through the Margulies Intermediaries.  On information and belief, Lopez and Martinez, on behalf of FIC and Fox Pan American, not only agreed and supported T&T's payment of bribes to Conmebol officials via the Margulies Intermediaries, but provided the funds to do so.

89.     Most of these bribes were paid by wire transfer by T&T from its accounts at Lloyds Bank in Miami, Florida, Clariden Leu in Switzerland, and Interaudi Bank in Miami, Florida, to the bank accounts of Somerton and Valente at J.P. Morgan Chase Bank in New York. As an example, these bribe payments included the following wire transfers:

| Wire Transfers from T&T to the Margulies Intermediaries | | | |
|---|---|---|---|
| Date | From | To | Amount |
| July 14, 2011 | T&T: Clariden Leu (Acct. No. XXXX-XXXXXX3-32) | Somerton: J.P. Morgan New York (Acct. No. XXX-X-XXX157) | $500,000 |
| December 7, 2011 | T&T: Clariden Leu (Acct. No. XXXX-XXXXXX3-32) | Valente: J.P. Morgan-New York (Acct. No. XXX-X-XXXX332) | $100,000 |
| March 14, 2012 | T&T: Clariden Leu (Acct. No. XXXX-XXXXXX3-32) | Valente: J.P. Morgan-New York (Acct. No. XXX-X-XXXX332) | $500,000 |
| April 19, 2012 | T&T: Clariden Leu (Acct. No. XXXX-XXXXXX3-32) | Spoart: Banco Industrial e Comercial, S.A., Sao Paolo-Brazil (Acct. No. XXX13-3 Ag.0007) | $50,000 |

90.     In or around December 19, 2012, T&T restructured how it paid bribes to the Conmebol officials through the Margulies Intermediaries. Instead of paying bribes directly to the Margulies Intermediaries, T&T arranged for all amounts called for under the consulting contracts with the Margulies Intermediaries to be paid by Torneos & Traffic Sports Marketing B.V. ("Torneos Holland"), which on information and belief is an affiliate of Torneos.

91.     In exchange for Torneos Holland's agreement to assume these payment obligations, T&T agreed to give Torneos Holland certain television and marketing rights that Conmebol had previously granted to T&T. Notwithstanding this modification in the manner by which the bribes were paid, the Margulies Intermediaries continued to channel the bribes to the Conmebol officials for the benefit of T&T, and ultimately Fox.

92.     On information and belief, T&T implemented this restructuring of its bribe payments at the instruction of Fox Pan American and FIC.  This belief is based, in part, on Defendant Martinez's involvement signing the documents providing for continued payments to the Margulies Intermediaries on behalf of T&T.

### 3.     T&T Pays Bribes to Conmebol Officials via Torneos Holland and Arco

93.     In addition to making payments through the Margulies Intermediaries, Fox Pan American and Torneos, through T&T, also arranged with Torneos Holland to pay additional bribes to the Conmebol officials through a different payment conduit.

94.     Prior to 2004, T&T had sold the Club Tournament television rights for Brazil to a leading Brazilian media company, Globo Comunicação e Participações S.A. ("Globo"), for approximately $6 million per year.  Beginning in 2005, however, Fox Pan American and Torneos caused T&T to sell the Club Tournament television rights for Brazil to Torneos Holland for the dramatically lower price of $900,000 per year.

95.     The drop in price was due to bribery and kickbacks, not to any decrease in the value of the Club Tournament television rights for Brazil.  In fact, after obtaining a lower price for the Club Tournament television rights for Brazil in 2005, Torneos Holland sold those rights to Globo for at least the same price ($6 million) at which T&T had previously sold the rights to Globo directly.  Torneos Holland then took the over $5 million difference between T&T's acquisition price and Torneos Holland's resale price and paid it to Arco Business and Developments Ltd. ("Arco"), or other intermediary entities controlled by T&T's principal and Torneos executive Burzaco, which, in turn, transferred the funds to the corrupt Conmebol officials as bribes.

96.     In 2010, the price Globo paid Torneos Holland for the rights rose to $8 million, and in 2011 and 2012, the price rose again to $11.1 million.  For 2013, the price rose yet again to $16.1 million.  T&T concurrently increased its corresponding bribe payments to the Conmebol officials through Arco, from $5.2 million in 2009, to $6.2 million in 2010, to $9.1 million in 2011 and 2012, and finally to $12.5 million in 2013.

97.     The difference between the market value of the Brazilian rights and the value that T&T received for those rights between 2005 and 2013 was at least $50 million.  This difference was used to pay bribes and kickbacks to Conmebol officials in exchange for their support of T&T's award and retention of the television rights.

98.     Martinez, Lopez, and Ganley, as executives of FIC, Fox Pan American and FSLA, and directors of T&T, knew from their industry experience that the price for which T&T sold the Club Tournament television rights for Brazil to Torneos Holland was tens of millions of dollars below the market price, and thus was part of a scheme to pay bribes and kickbacks to Conmebol official in exchange for the television rights, and agreed and supported that scheme.

**4.      T&T Pays Bribes to the Conmebol
         Officials Through Productora and FPT**

99.     T&T's payment of bribes to Conmebol officials was not limited to payments made via the Margulies Intermediaries and Torneos Holland.  For example, in September 2013, Fox Pan American and Torneos caused T&T to agree to pay $1.5 million in bribes to the Conmebol officials through a new intermediary named Productora de Eventos, S.A. ("Productora").  Productora was a subsidiary or affiliate of Torneos.  The payments were unrelated to any services provided by Productora.  Productora, in turn, executed a mirror contract on December 15, 2013 to pay FPT Sports S.A. ("FPT") $1.5 million, purportedly in exchange for "consulting, supervision and logistics" services.

100.    On information and belief, no such services were provided.  FPT was a financial intermediary that funneled bribes to the Conmebol officials.  *See* Superseding Indictment ¶ 311. The $1.5 million paid by T&T to Productora, and then by Productora to FPT, was, on information and belief, ultimately delivered to the Conmebol officials in exchange for their continued support of Conmebol's award of the Club Tournament television rights to T&T and Conmebol's exclusion of GolTV, despite its manifestly superior offers.  On information and belief, T&T's $1.5 million payment to Productora was made from T&T's account at Interaudi Bank in Miami, Florida to Productora's account at Interaudi Bank in Miami, Florida, and Lopez and Martinez agreed and supported such payment.

### 5.    T&T Pays Bribes and Kickbacks to Conmebol Officials via Full Play, Hugo Jinkis, and Mariano Jinkis

101.    Conmebol's president Leoz and the other corrupt Conmebol officials also requested that T&T pay additional bribes and kickbacks to Conmebol officials by paying amounts due under the contracts for the rights to intermediaries associated with Defendant Full Play, Hugo Jinkis, and Mariano Jinkis.  Those intermediaries would in turn funnel the payments to Conmebol officials.  Fox Pan American and Torneos caused T&T to agree to this new bribery arrangement.

102.    By letter dated March 16, 2011, Leoz instructed T&T to pay $2,400,000 of the amount that T&T owed to Conmebol for the 2011 Copa Libertadores television rights directly to the New York bank account of an affiliate of Full Play named Yorkfields S.A. ("Yorkfields"). On information and belief, Fox Pan American and Torneos caused T&T to make this payment from T&T's account at Lloyds Bank in Miami.

103.    On March 20, 2012, Leoz again instructed T&T to pay $2,400,000 of the amount that T&T owed to Conmebol for the 2012 Club Tournament television rights directly to

Yorkfields' New York bank account.  Fox Pan American and Torneos caused T&T to make these payments from T&T's account at Clariden Leu.

104.    On March 20, 2013, Fox Pan American and Torneos caused T&T to make a similar payment of $3,600,000 in connection with the 2013 Copa Libertadores television rights to the Swiss bank account of another Full Play affiliate, Cross Trading S.A. ("Cross Trading").

105.    Upon information and belief, Yorkfields and Cross Trading served as intermediaries to funnel bribes from T&T to the Conmebol officials.  Yorkfields and Cross Trading are companies controlled by Full Play's principals, Hugo Jinkis and Mariano Jinkis.  The Superseding Indictment charges that Hugo and Mariano Jinkis facilitated T&T's bribe payments in exchange for continued support of T&T's retention of the Club Tournament television rights.  Superseding Indictment ¶¶ 55, 184.

106.    In addition, Conmebol officials at times directed T&T to make payments of amounts due to the Conmebol officials directly to Arco accounts.  For example, on March 12, 2013 Conmebol sent T&T a letter requesting that T&T make a payment of $1,400,000 to Arco's J.P. Morgan Chase Bank account in New York in connection with the Broadcasting Rights Agreement for the Copa Libertadores dated March 6, 2012.  On information and belief, Fox Pan American and Torneos caused this amount to be paid by T&T and it was subsequently funneled by Arco to the Conmebol officials.

107.    The flow of bribes from the Fox Defendants to Conmebol officials in exchange for their support of Conmebol's award of exclusive television rights to the Club Tournaments is depicted in the following chart:



**The Fox Bribes-for-Rights Scheme**

**C.   CONMEBOL REJECTS PLAINTIFFS' SUPERIOR OFFERS
FOR THE CLUB TOURNAMENT TELEVISION RIGHTS
IN FAVOR OF T&T'S INFERIOR OFFERS**

108.    T&T's unlawful agreement with Conmebol and its payment of tens of millions of dollars in bribes to the Conmebol officials had their intended effect.  Conmebol repeatedly rejected Plaintiffs' superior offers for the Club Tournament television rights in favor of inferior terms from T&T.

109.    GolTV has extensive experience telecasting major tournament and league soccer matches, including the Spanish La Liga and the Italian Serie A.  Together with Tenfield and GolTV Latin America, it is part of one of the major soccer telecasting groups in the Americas

and can draw on its combined resources. As a sports telecaster focused on soccer, GolTV is especially capable of delivering high-quality soccer telecasts and promoting the Club Tournaments throughout the United States in order to increase the visibility, viewership, market share, revenue, and value associated with the Club Tournaments, both for GolTV's own benefit and the benefit of Conmebol, its member associations, and their teams and players.

110. At all times relevant hereto, Plaintiffs had the experience and expertise and all other qualifications and capabilities necessary to telecast and promote the Club Tournaments and provide all other associated benefits to Conmebol as well as, if not better than, the Fox Defendants. There were no legitimate business or other factors that would have warranted licensing the Club Tournament television rights to T&T in preference to Plaintiffs' higher bids, and in any event Conmebol's licensing decisions for the Club Tournament television rights were not in fact motivated by any legitimate factors. The only reason Plaintiffs' superior offers were not accepted by Conmebol was that T&T, at the instruction and through the participation of the Fox Defendants and Torneos, paid illegal bribes to Conmebol officials.

**1.    Conmebol Rejects Plaintiffs' Superior Offer in March 2010 to Purchase Rights to 2011-2014 Copa Libertadores and Copa Sudamericana**

111. On March 3, 2010, GolTV's owner Paco Casal met with Nicolas Leoz, then President of Conmebol, to present a formal offer for the television rights for the Copa Libertadores and the Copa Sudamericana for the years 2011 to 2014, which Conmebol had previously awarded to T&T. Because the rights sold were the worldwide or Americas rights, and not solely the U.S. rights, GolTV partnered with its agent Global Sports to make offers on the worldwide or Americas rights from Conmebol, with the understanding that GolTV would pay for and acquire the U.S. portion of those rights. For simplicity's sake, GolTV's and Global Sports' offers for these rights are referred to as GolTV's offers in Paragraphs 112-126 below.

112.    GolTV offered Conmebol a total of U.S. $270 million for the rights, as reflected in a letter dated March 3, 2010 and summarized in the table below.  On information and belief, this offer represented nearly a 70% increase over the $164 million paid by T&T for the same years:

| Television Rights for Copa Libertadores/Copa Sudamericana (2011-2014) | | | |
|---|---|---|---|
| Year | GolTV Offer (USD $ millions) | T&T Price (USD $ millions) | Difference (USD $ millions) |
| 2011 | 60 | 41 | -19 |
| 2012 | 65 | 41 | -24 |
| 2013 | 70 | 41 | -29 |
| 2014 | 75 | 41 | -34 |
| **TOTAL** | **270** | **164** | **-106** |

113.    On information and belief, Conmebol disclosed to T&T, Fox Pan American, and FIC that GolTV had in March 2010 submitted an offer to purchase the television rights for the tournaments.  Further, on information and belief, T&T – with Fox and Torneos's knowledge and consent – urged Conmebol to reject GolTV's offer.

114.    Although GolTV's offer was superior to what T&T had agreed to pay, Conmebol did not accept GolTV's offer.

115.    Conmebol could have revoked, and was in fact legally obligated to revoke, its wrongful sale of the Club Tournament rights to T&T in favor of GolTV's superior offer.  Under Paraguayan law, the Conmebol officials, each serving on the Executive Committee, owed fiduciary duties to Conmebol and to their member associations that required them to license the rights on the terms most favorable to Conmebol and its member associations.

## 2. Conmebol Rejects Plaintiffs' Superior Offer in October 2012 to Purchase Rights to 2015-2020 Copa Libertadores and Copa Sudamericana

116.     In 2012, GolTV offered to purchase from Conmebol tournament television rights for 2015 through 2020, a different span of years from the period at issue in GolTV's March 2010 offer.  Again, GolTV offered Conmebol far more than it was receiving from T&T and Fox. Conmebol President Leoz promised GolTV that he and the other Conmebol officials on the Executive Committee would formally consider GolTV's proposal at an October 24, 2012 Executive Committee meeting, thereby inducing GolTV to submit a new proposal.

117.     Accordingly, on October 21, 2012, GolTV submitted a sealed proposal to purchase television rights to the Copa Libertadores and Copa Sudamericana for the years 2015 to 2020, to be considered at Conmebol's October 24, 2012 Executive Committee meeting.  GolTV offered to purchase the rights for a total price of $805 million, reflecting escalating prices of $125 to $140 million for each year of the 2015-2020 period.

118.     On information and belief, Conmebol, without informing GolTV, disclosed to T&T, Fox Pan American, and FIC that GolTV had submitted an offer to purchase the television rights for the tournaments.  As they had done before, T&T and Conmebol agreed that Conmebol would reject GolTV's offer and instead accept a competing offer from T&T.

119.     To provide a veneer of justification for the refusal, Conmebol invited Defendant Burzaco to attend its October 24, 2012 Executive Committee meeting on behalf of T&T and offer reasons why the GolTV offer should not be accepted and to promote T&T's offer. Conmebol neither informed GolTV that Burzaco would be present at the meeting nor invited a representative of GolTV to present its superior competing offer.

120.     Conmebol ultimately rejected GolTV's offer, and in December 2012 it amended its agreement with T&T to increase the price for the rights to the Copa Libertadores and Copa

Sudamericana for 2015 through 2018.  Conmebol also agreed to award Torneos and T&T affiliate TyC International B.V. ("TyC International") the Americas television rights for those tournaments for 2019 through 2022, and to designate TyC International and Defendant Full Play as the exclusive commercial agents for the negotiation and commercialization of the worldwide rights for those tournaments excluding the Americas.

121.    As reflected in the chart below, the price that Conmebol accepted from T&T and TyC International for the 2015-2020 rights was only $416 million – approximately *half* of GolTV's competing $805 million offer:

| Television Rights for Copa Libertadores/Copa Sudamericana (2015-2020) | | | |
|---|---|---|---|
| Year | GolTV Offer (USD $ millions) | Prices from T&T (2015-2018) and TyC Int'l (2019-2022) (USD $ millions) | Difference (USD $ millions) |
| 2015 | 125 | 65 | -60 |
| 2016 | 130 | 67 | -63 |
| 2017 | 130 | 69 | -61 |
| 2018 | 135 | 71 | -64 |
| 2019 | 140 | Higher of 72 or the 2018 combined price + 15% | -68 |
| 2020 | 145 | Higher of 72 or the 2018 combined price + 15% | -73 |
| **TOTAL** | **805** | **416** | **-389** |

3.    **Conmebol Rejects Plaintiffs' Superior Offer in November 2013 to Purchase Rights to 2015-2024 Club Tournaments**

122.    On or about November 18, 2013, GolTV made a new offer to purchase rights to all three Club Tournaments – the Copa Libertadores, the Copa Sudamericana, and the Recopa Sudamericana – for the years 2015 through 2024.

123.    GolTV offered Conmebol U.S. $2.1 billion for the television rights to the three tournaments – including a $360 million annual price starting in 2019 – for a total price almost *four times higher* than the $560 million paid by T&T and TyC International for the same period.

124.    The following chart illustrates the difference between GolTV's higher offer and the price that Conmebol was to obtain from T&T and TyC International for the corresponding years:

| **Television Rights for Club Tournaments (2015-2022)** | | | |
|---|---|---|---|
| **Years** | **GolTV Offer (USD $ millions)** | **Price from T&T (2015-2018) and TyC Int'l (2019-2022) (USD $ millions)** | **Difference (USD $ millions)** |
| 2015 | 170 | 65 | -105 |
| 2016 | 170 | 67 | -103 |
| 2017 | 170 | 69 | -101 |
| 2018 | 170 | 71 | -99 |
| 2019 | 360 | Higher of 72 or the 2018 combined price + 15% | -288 |
| 2020 | 360 | Higher of 72 or the 2018 combined price + 15% | -288 |
| 2021 | 360 | Higher of 72 or the 2018 combined price + 15% | -288 |
| 2022 | 360 | Higher of 72 or the 2018 combined price + 15% | -288 |
| **TOTAL** | **2,120** | **560** | **-1,560** |

125.    On information and belief, Conmebol again disclosed to T&T, Fox Pan American, and FIC that GolTV had offered to buy tournament rights, and T&T and Conmebol agreed that Conmebol would reject GolTV's November 2013 offer. Conmebol rejected GolTV's offer.

4.     **Conmebol Rejects Plaintiffs' Superior Offers**
       **in May and October 2015 to Purchase Rights**
       **to the 2016-2022 Club Tournaments**

126.     In a letter to Conmebol dated May 7, 2015, GolTV renewed its November 2013 offer to pay $360 million per year for the 2019-2022 Club Tournament television rights.

127.     Shortly thereafter, on May 27, 2015, the DOJ unsealed its original indictment, which described some of the bribery, fraud and other criminal wrongdoing by which Conmebol awarded rights associated with soccer tournaments to various sports marketing companies.  *See* Original Indictment, *U.S. v. Webb*, ECF No. 1.  Among those arrested pursuant to the charges in the Indictment of receiving bribes and taking actions accordingly were Defendant T&T's principal Defendant Burzaco and Conmebol's then-President, Defendant Figueredo.

128.     After release of the Original Indictment, on July 29, 2015, Conmebol issued Circular 6/2015, which stated that Conmebol would reevaluate its commercial relationships with entities implicated in the wrongdoing and refuse to enter into any contract with an entity charged by a competent governmental entity.

129.     Initially encouraged by Conmebol's representations that it was seeking to reform the process by which it awarded the Club Tournament television rights, GolTV engaged in a series of meetings with Conmebol officials, including with Conmebol's interim and then-permanent president Defendant Napout, to propose acquiring the Club Tournament television rights on terms that were superior to the terms for which Conmebol had awarded the rights to T&T and another Torneos affiliate, TyC International.

130.     As 2015 progressed without Conmebol accepting GolTV's superior offers, GolTV on October 16, 2015 formally renewed the offer it had made in May 2015 for the 2019-2022 Club Tournament television rights.  In addition, GolTV proposed acquiring the 2016-2018 Club Tournament television rights for $170 million per year, the price it had first offered in 2013.

131.     Conmebol did not accept GolTV's proposals of May and October 2015.

132.     Instead, in November 2015, Defendants Martinez and Lopez, on behalf of FIC, negotiated an agreement with Defendant Napout, on behalf of Conmebol, under which Conmebol would award directly to FIC the 2016-2018 Club Tournament television rights that Conmebol had previously licensed to T&T, and which T&T had in turn sublicensed to FSLA. On information and belief, the agreement was negotiated in part by phone and in-person meetings in Florida.  The price paid for these rights from FIC was $135–$155 million per year, approximately $70-90 million more than the $65-69 million per year that T&T had previously agreed to pay.  The more than doubling of the price of the rights dramatically illustrated how far below market value Conmebol had previously awarded the rights to T&T, and in turn, Fox.

133.     Defendant Napout's unlawful agreement in November 2015 with FIC was negotiated in secret and violated Conmebol's procedures.  Prior to its signing, the agreement was neither disclosed to the presidents of the ten national member organizations that constitute Conmebol nor voted on by Conmebol's executive committee.

134.     GolTV was not informed of the negotiations or invited to submit a competing bid. Nevertheless, even with the dramatic increase in the price paid for the rights from $65-69 million to $135-155 million per year, FIC's contract price was still significantly below the $170 million per year that GolTV had offered Conmebol only a month before.  Napout did not offer any reason why he had rejected GolTV's offer in favor of a lower price offered by FIC, and there was in fact no legitimate reason for doing so.

135.     Tellingly, Napout was subsequently indicted and arrested in connection with allegations in the Superseding Indictment that he had accepted bribes in exchange for awarding the Club Tournament television rights to T&T.

136.     Prior to the release of the Original Indictment in May 2015, Plaintiffs exercised

due diligence in attempting to discover the reasons for Conmebol's rejection of their numerous

offers but, due to Defendants' concealment of their unlawful agreements and transactions, were

unable to obtain information sufficient to assert a claim for Defendants' wrongdoing.

Defendants' concealment of their bribery scheme, including their use of sham consulting

agreements and other artifices to hide the scheme, constituted an extraordinary circumstance

preventing Plaintiffs from bringing suit previously.

137.     Upon learning of the Original Indictment, and again upon learning of the

Superseding Indictment, which was unsealed December 3, 2015, GolTV exercised due diligence

in investigating the relationships between the conduct alleged in the indictments and Conmebol's

repeated rejections of GolTV's offers.  In the course of their investigation, Plaintiffs ultimately

discovered information to support the allegations of Defendants' unlawful conduct herein and

exercised diligence in filing suit thereafter on October 20, 2016.

**D.     DEFENDANTS' BRIBERY SCHEME DEPRIVED**
**PLAINTIFFS OF CLUB TOURNAMENT TELEVISION**
**RIGHTS THEY OTHERWISE WOULD HAVE OBTAINED**

138.     Defendants devised their bribery scheme with the intent that T&T and Fox retain

television rights to the Club Tournaments, thereby harming Plaintiffs, and any other potential

competitors, by depriving them of the opportunity to fairly compete for and obtain those rights.

Defendants' actions achieved these results.

139.     Among other things, Conmebol, its Executive Committee officials (including

former presidents Figueredo and Napout) and the other Defendants unlawfully agreed to prevent

Plaintiffs from obtaining the Club Tournament television rights by misleading Plaintiffs about

when proposals for the rights would be considered; by licensing the Club Tournament television

rights in advance of expected offers from Plaintiffs, then using the existence of such agreements

as an excuse to reject Plaintiffs' more favorable proposals; and by refusing to revoke rights wrongfully awarded to T&T at below-market prices, as a result of T&T's bribery and kickbacks, in favor of the more favorable proposals from Plaintiffs, even though Conmebol was legally permitted and, indeed, obligated to do so.

140.    During the period relevant to Plaintiffs' claims, Plaintiffs were the only parties actively making offers to acquire the rights other than T&T.  The Conmebol officials' fiduciary duties to Conmebol, as members of the Executive Committee, required them to accept Plaintiffs' offers because they were significantly superior offers to those T&T's offers, and there was no legitimate reason to justify licensing the club tournament rights for the Club Tournaments to T&T.  Accordingly, if not for Conmebol's agreement with Fox and T&T that Conmebol would refuse to deal with T&T's competitors, Conmebol would have accepted Plaintiffs' superior proposals for the Club Tournament television rights and, to the extent that such rights had already been awarded to T&T as a result of T&T's bribe payments, Conmebol would have revoked such rights from T&T and awarded them to Plaintiffs in exchange for Plaintiffs' more favorable terms.

141.    Plaintiffs were injured in the United States by Defendants' illicit bribery scheme and other criminal wrongdoing.  GolTV is headquartered in Florida and operates from Florida. GolTV and Global Sports together were denied the ability to provide telecasts of the Club Tournaments in the Florida market and throughout the United States.

142.    The financial impact of these injuries inflicted upon Plaintiffs amounts to at least hundreds of millions of dollars.

143.    Plaintiffs were not the only entities injured by Defendants' actions.  Defendants' conduct also injured Conmebol member associations and affiliated soccer clubs, which obtained

less revenue from the Club Tournaments than they otherwise would have because Conmebol

accepted lower television rights payments due to Defendants' bribery of its Executive Committee

officials.

**E.     DEFENDANTS INJURED COMPETITION IN VARIOUS
        MARKETS IN VIOLATION OF THE ANTITRUST LAWS**

144.    In addition to constituting RICO violations and independent tortious acts as set

forth herein, Defendants' bribery and other crimes harmed competition in various markets in

violation of the antitrust laws.  They were part of a series of conspiracies in restraint of trade in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and reflected monopsonization,

attempted monopsonization, and a conspiracy to monopsonize in violation of Section 2 of the

Sherman Act, 15 U.S.C. §2.  By virtue of the foregoing, Defendants' antitrust violations also

violate the Florida Deceptive and Unfair Trade Practices Act.

**1.      The Relevant Markets**

145.    Defendants' unlawful conduct affected at least three markets, which are among

the relevant markets for purposes of these antitrust claims:  (1) the market for the purchase of

rights to televise South American international soccer club tournaments (and in particular the

Club Tournaments) in the Americas, including the United States and Florida (the "Americas

Television Rights Market"); (2) the market for the sale of television programming featuring

South American international soccer club tournaments by telecasters to cable and satellite

television providers in the United States, including Florida (the "U.S. Television Programming

Market"); and (3) the market for the sale by telecasters of advertising airtime on television

programming in the United States (including Florida) featuring South American international

soccer club tournaments (the "U.S. Television Advertising Airtime Market").

### a. **The Americas Television Rights Market**

146.    Conmebol's Club Tournaments are recognized by soccer viewers as the premium standard in South American international soccer and as the only source for high-level international play among South American soccer clubs.  As a result, Conmebol is effectively the only seller in the Americas Television Rights Market.

147.    The purchasers and potential purchasers in the Americas Television Rights Market include both (1) new or existing telecasters that purchase or would purchase the rights to telecast South American international soccer club tournaments for the purpose of creating television programming featuring such tournaments, and (2) intermediaries that purchase the rights for the purpose of reselling them to telecasters.

148.    At all times relevant to this Complaint, rights in the Americas Television Rights Market were bought and sold in transactions concerning the television rights for South American international soccer club tournaments for all countries in the Americas over a given period of time.  Purchasers and prospective purchasers in the Americas Television Rights Market did not purchase or seek to purchase such rights on a country-by-country basis, nor did the seller (Conmebol) offer rights for sale on a country-by-country basis.

149.    Television rights for South American international soccer club tournaments are not reasonably interchangeable with television rights for other types of sports or soccer-oriented programming due to the significantly different size, demographic profile, and growth potential of the viewing audience for these tournaments.  As a result, the supply of South American international soccer club tournament television rights is limited to Conmebol's Club Tournaments.

150.    Purchasers in the Americas Television Rights Market cannot satisfy their demand for television rights for South American international soccer club tournaments by purchasing

rights for other forms of sports- or soccer-related programming. Price and competition activity in the Americas Television Rights Market does not affect price and competition activity in the markets for other such rights, and price and competition activity in the markets for other rights does not affect price and competition activity in the Americas Television Rights Market.

### b.  The U.S. Television Programming Market

151.   The purchasers and potential purchasers in the U.S. Television Programming Market are cable and satellite television providers that seek or might seek to purchase programming featuring South American international soccer club tournaments for telecast to viewers in the United States.

152.   Because of Defendants' conduct in furtherance of the bribery and other criminal wrongdoing described herein, in effect, the only sellers in the U.S. Television Programming Market are currently the Fox Defendants, who maneuvered themselves into being the sole providers in the United States of television programming featuring South American international soccer club tournaments.

153.   Absent Defendants' unlawful conduct, multiple parties could have obtained and provided programming in the U.S. Television Programming Market, including obtaining and providing programming separately for any one or more of the Copa Libertadores, the Copa Sudamericana and/or the Recopa Sudamericana, respectively, and/or obtaining and providing programming separately for the various years of any particular tournament or combination of tournaments. Absent Defendants' unlawful conduct, purchasers in the U.S. Television Programming Market would not have been limited to a single seller because multiple parties could have obtained and provided programming in the U.S. Television Programming Market, including GolTV.

154.     Television programming featuring South American international soccer club tournaments is not reasonably interchangeable with other forms of sports- or soccer-oriented programming due to the significantly different size, demographic profile, and growth potential of the viewing audience for South American international soccer club tournaments.

155.     Cable and satellite television providers cannot satisfy their demand for programming featuring South American international soccer club tournaments by purchasing other forms of sports- or soccer-related programming.  Price and competition activity in the U.S. Television Programming Market does not affect price and competition activity in markets for other sports- or soccer-related programming, and price and competition activity in the markets for other such programming does not affect price and competition activity in the U.S. Television Programming Market.

### c.   The U.S. Television Advertising Airtime Market

156.     The purchasers and potential purchasers in the U.S. Television Advertising Airtime Market are advertisers that seek or might seek to purchase airtime on television programming featuring South American international soccer club tournaments that is telecast to television viewers in the United States.

157.     Because of the conduct of Defendants in furtherance of the bribery and other criminal wrongdoing described herein, in effect, the only sellers in the U.S. Television Advertising Airtime Market are the Fox Defendants, who maneuvered themselves into being the sole providers in the United States of television programming featuring South American international soccer club tournaments, and therefore the sole sellers of advertising airtime on such programming.

158.     Absent Defendants' unlawful conduct, multiple parties could have obtained and provided advertising airtime in the U.S. Television Advertising Airtime Market, including

obtaining and providing advertising airtime separately for any one or more of the Copa Libertadores, the Copa Sudamericana and/or the Recopa Sudamericana, respectively, and/or obtaining and providing advertising airtime separately for the various years of any particular tournament or combination of tournaments. Absent Defendants' unlawful conduct, purchasers in the U.S. Television Advertising Airtime Market would not have been limited to a single seller because multiple parties could have obtained and provided programming in the .S. Television Advertising Airtime Market, including GolTV.

159.    Advertising airtime on programming featuring South American international soccer club tournaments is not reasonably interchangeable with advertising airtime on other forms of sports- or soccer-oriented programming due to the significantly different size, demographic profile, and growth potential of the viewing audience for South American international soccer club tournaments.

160.    Advertisers cannot satisfy their demand for airtime on television programming featuring South American international soccer club tournaments by purchasing airtime on other forms of sports- or soccer-related programming.  Price and competition activity in the U.S. Television Advertising Airtime Market does not affect price and competition activity in markets for advertising airtime on other sports- or soccer-related programming, and price and competition activity in the markets for other airtime does not affect price and competition activity in the U.S. Television Advertising Airtime Market.

### 2.    Defendants Engaged in Conspiracies in Restraint of Trade in Multiple Markets in Violation of Section One of the Sherman Act

161.    As set forth in Paragraphs 61-80, Defendants knowingly and intentionally agreed that in exchange for T&T's payment of bribes to Conmebol officials, Conmebol would sell

television rights to the Club Tournaments only to T&T and would refuse to deal with T&T's or Fox's competitors, such as GolTV.

162.     As a result, pursuant to Defendants' agreements, T&T would be the only purchaser in the Americas Television Rights Market, and the Fox Defendants would be the exclusive sellers of telecasts of South American international soccer club tournaments in the U.S. Television Programming Market and the exclusive sellers of airtime in the U.S Television Advertising Airtime Market.

163.     These agreements imposed unreasonable restraints on trade and constituted unlawful contracts, combinations, or conspiracies in restraint of trade or commerce among the several States and with foreign nations in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

164.     Defendants' activities, founded on bribery and the improper elimination of competition, lacked any pro-competitive justification and in fact were not pro-competitive. Indeed, Conmebol rejected the well-qualified Plaintiffs' much more lucrative offer for the rights to televise the Club Tournaments.

165.     This anti-competitive conduct created a direct, substantial and reasonably foreseeable effect on domestic commerce.  Plaintiffs (and other market participants) lost the opportunity to broadcast the Club Tournaments in the United States, including in Florida, at a minimum losing advertising revenue derived from such broadcasts.

166.     Even if, in the alternative, the U.S. Television Programming Market and/or the U.S. Television Advertising Airtime Market were deemed to encompass programming or advertising airtime relating beyond South American international soccer club tournaments to some or all additional kinds of soccer programming in the United States, Defendants' agreements

nevertheless still imposed unreasonable restraints on trade as to such markets, and constituted unlawful contracts, combinations, or conspiracies in restraint of trade or commerce among the several states and with foreign nations in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Defendants' activities, founded on bribery and the improper elimination of competition, still lacked any pro-competitive justification and in fact were not pro-competitive.

### 3. T&T Engaged in Monopsonization and Attempted Monopsonization in the Americas Television Rights Market in Violation of Section 2 of the Sherman Act

167. T&T created and maintained an unlawful monopsony – that is, a market in which there is effectively only one buyer – within the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

168. As a general matter, in a free and competitive market for television rights, a seller of rights considers bids from multiple, competing potential purchasers and sells the rights to the highest bidder. T&T prevented such a free and competitive market from occurring in the Americas Television Rights Market by bribing Conmebol officials (including Figueredo and Napout) and causing Conmebol to enter into exclusive agreements with T&T and to refuse to deal with T&T's competitors, such as GolTV, thus preventing T&T's competitors from entering the Americas Television Rights Market.

169. Because T&T was the sole purchaser of television rights for the Club Tournaments, it was the sole purchaser in the Americas Television Rights Market. T&T caused the creation of barriers that prevented its competitors or potential competitors, including GolTV, from purchasing rights in the Americas Television Rights Market even when able and willing to pay prices higher than those paid by T&T.

170.    As a result, T&T willfully acquired and maintained market power, and indeed monopsony power, within the Americas Television Rights Market.  T&T had the ability to control prices and purchase television rights from Conmebol at prices lower than those that would be paid for such rights in a free and competitive market.  Indeed, the price offered by GolTV for the purchase of television rights to the Club Tournaments was higher than the sum of the stated price paid by T&T for such rights and the cost of the bribes T&T paid to the Conmebol officials.

171.    T&T's market and monopsony power did not result from a superior product, business acumen, or historical acumen.  It was a shell corporation with no assets.

172.    T&T's predatory and anticompetitive conduct also constituted an attempt to create and maintain a monopsony in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  T&T specifically intended to create and maintain a monopsony in the Americas Television Rights Market, and that market, to the extent not already monopsonized, reflected a dangerous probability of being monopsonized as a result of T&T's conduct.

173.    This anti-competitive conduct created a direct, substantial and reasonably foreseeable effect on domestic commerce.  Plaintiffs (and other broadcasters) lost the opportunity to broadcast the Club Tournaments in the United States (including Florida), at a minimum losing advertising revenue derived from such broadcasts.

**4.    Defendants Conspired to Create a Monopsony for T&T in the Americas Television Rights Market**

174.    As set forth in Paragraphs 61-80, Defendants knowingly and intentionally agreed that in exchange for T&T's payment of bribes to Conmebol and its Executive Committee officials, Conmebol would sell television rights to the Club Tournaments only to T&T and would refuse to deal with T&T's competitors.

175.     This agreement among the Defendants constituted an unlawful conspiracy to monopsonize the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

### 5.     Defendants' Conduct Has Caused Anticompetitive Effects and Harmed Competition

176.     As stated in the Superseding Indictment, Defendants' activities "had powerful anti-competitive effects, distorting the market for the commercial rights associated with soccer and undermining the ability of other sports marketing companies to compete for such rights on terms more favorable to the rights-holders."  Superseding Indictment ¶ 97.

177.     Defendants' unlawful exclusionary and monopsonistic conduct has materially and substantially harmed competition and injured the welfare of purchasers, suppliers, and consumers.

178.     Defendants' unlawful exclusionary and monopsonistic conduct has caused the following direct, substantial, and reasonably foreseeable anticompetitive effects on domestic commerce including, *inter alia*:

> a.     Creating substantial, if not insurmountable, barriers to entry for potential purchasers in the Americas Television Rights Market, depriving potential purchasers of the opportunity to profit therefrom;
>
> b.     Creating substantial, if not insurmountable, barriers to entry for potential sellers in the U.S. Television Programming Market, depriving potential sellers of the opportunity to profit therefrom;
>
> c.     Creating substantial, if not insurmountable, barriers to entry for potential sellers in the U.S. Television Advertising Airtime Market, depriving potential sellers of the opportunity to profit therefrom;

d. Enabling T&T to create and maintain a monopsony in the Americas Television Rights Market;

e. Reducing Conmebol's revenues for television rights to the Club Tournament, and consequently reducing the revenues passed on by Conmebol to its member soccer associations, thereby decreasing the funds available to recruit, develop and retain soccer players and to develop new facilities, organizations, and events, including events both in the U.S. and abroad, and consequently decreasing the quality and quantity of soccer entertainment available to end consumers, both television viewers and game attendees;

f. Limiting the quantity of rights available for sale to purchasers in the Americas Television Rights Market;

g. Decreasing demand within the Americas Television Rights Market;

h. Decreasing the quantity, quality, and diversity of television programming catering to viewers of South American international club soccer tournaments, due in part to the Fox Defendants' decision not to air all games of the Club Tournaments, but instead to fill its airtime with other content; and

i. Decreasing the quantity, quality, and diversity of advertising opportunities for companies seeking to advertise to viewers of South American international club soccer tournaments and, on information and belief, increasing the prices charged to such advertisers.

## F. DEFENDANTS' CONDUCT HAS PROXIMATELY AND DIRECTLY CAUSED PLAINTIFFS TO SUFFER SUBSTANTIAL INJURIES

179. Defendants' unlawful conduct set forth above has directly and proximately caused the following effects, *inter alia*, on Plaintiffs' businesses and property:

a.  Preventing Plaintiffs, who were well qualified and offered superior offers to Conmebol, from purchasing rights in the Americas Television Rights Market, and deriving profit therefrom;

b.  Preventing Plaintiffs from selling programming in the U.S. Television Programming Market, and deriving profit therefrom;

c.  Preventing Plaintiffs from selling airtime in the U.S. Television Advertising Airtime Market, and deriving profit therefrom;

d.  Preventing GolTV's television programming from being included by cable providers in premium cable packages;

e.  Denying Plaintiffs the opportunity to enter into valuable partnerships with other telecasters based on the provision by Plaintiffs of televised telecasts of the Club Tournaments;

f.  Decreasing the viewership of GolTV programming;

g.  Decreasing the value and desirability of television advertising airtime on GolTV, thereby decreasing the value and quantity of advertising sold by Plaintiffs on GolTV;

h.  Preventing Plaintiffs from obtaining valuable rights to telecast additional content that would have been available if the GolTV channel had been included by cable providers in premium cable packages; and

i.  Substantially decreasing the value of Plaintiffs' companies.

180.  Plaintiffs' exclusion from the Americas Television Rights Market, the U.S. Television Advertising Airtime Market, and the U.S. Television Programming Market, together

with other effects of Defendants' unlawful conduct, both individually and collectively, constituted antitrust injury to Plaintiffs.

181.    On information and belief, the financial impact of these injuries upon Plaintiffs amounts to at least hundreds of millions of dollars.

## G.    ADDITIONAL BASES OF CORPORATE DEFENDANTS' LIABILITY

182.    In addition to their direct liability for their own actions and as members of the conspiracies pled herein, the entity Defendants also are liable for the conduct of other persons and parties alleged herein on bases of vicarious liability and as legal successors in interest through mergers and corporate transactions, among others:

    a.  T&T is vicariously liable for all wrongful acts in connection with the bribery scheme described herein committed by its employee and agent Burzaco.  Such wrongful acts were related to and committed by Burzaco within the course of his employment with T&T, were committed in furtherance of the business of T&T to obtain the broadcasting rights to the Club Tournaments from Conmebol by means of bribery, and T&T authorized or subsequently acquiesced in such acts by Burzaco.  T&T benefited from the wrongful acts of Burzaco by, among other reasons, profiting from the purchase of television broadcasting rights for the Club Tournaments from Conmebol and the sublicense of such rights to Fox;

    b.  Torneos is vicariously liable for all wrongful acts in connection with the bribery scheme described herein committed by its employee and agent Burzaco.  Such wrongful acts by Burzaco were related to and committed by Burzaco within the course of his employment with Torneos, were committed

in furtherance of the business of Torneos to profit off the sale of the broadcasting rights to the Club Tournaments to Torneos's subsidiaries and affiliates T&T and TyC International, and Torneos authorized or subsequently acquiesced in such acts by Burzaco.  Torneos benefited from the acts of Burzaco by, among other reasons, profiting from T&T and TyC International's purchase of the broadcasting rights and sublicense of such rights to Fox.  In addition, in the Torneos DPA, Torneos stated that it "admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees and agents."  Torneos's admission further evidences its liability for the wrongful actions of Burzaco as well as the subsidiaries which Torneos controlled by itself and together with the Fox Defendants, and which acted as Torneos's agent, including T&T, Torneos Holland, TyC, Productora, Arco and FPT.

c.   FIC is vicariously liable for all wrongful acts in connection with the bribery scheme described herein committed by its employees and agents Martinez and Lopez.  Such wrongful acts were related to and committed by Martinez and Lopez within the course of their employment with FIC, were committed in furtherance of the business of FIC to obtain the broadcasting rights to the Club Tournaments from Conmebol by means of bribery, and FIC authorized or subsequently acquiesced in such acts by Martinez and Lopez.  FIC benefited from the wrongful acts of Martinez and Lopez by, among other reasons, profiting from the purchase of television broadcasting rights for the Club Tournaments from Conmebol and the sublicense of such rights to FSLA;

d.  Fox Pan American is vicariously liable for all wrongful acts in connection with the bribery scheme described herein committed by its employee and agent Ganley.  Such wrongful acts were related to and committed by Ganley within the course of his employment with Fox Pan American, were committed in furtherance of the business of Fox Pan American to obtain the broadcasting rights to the Club Tournaments from Conmebol by means of bribery, and Fox Pan American authorized or subsequently acquiesced in such acts by Ganley. Fox Pan American benefited from the wrongful acts of Ganley by, among other reasons, profiting from the purchase of television broadcasting rights for the Club Tournaments from Conmebol and the sublicense of such rights to FSLA;

e.  FSLA is liable for all wrongful acts in connection with the bribery scheme described herein committed by its employee and agent Ganley.  Such wrongful acts were related to and committed by Ganley within the course of his employment with FSLA, were committed in furtherance of the business of FSLA to obtain the broadcasting rights to the Club Tournaments from Conmebol by means of bribery, and FSLA authorized or subsequently acquiesced in such acts by Ganley.  FSLA benefited from the wrongful acts of Ganley by, among other reasons, profiting from the purchase of television broadcasting rights for the Club Tournaments from Conmebol and the sublicense of such rights to FSLA;

f.  PASEC is liable as a matter of law as a successor to Fox Pan American and is also vicariously liable for all wrongful acts in connection with the bribery

scheme described herein committed by its employee and agent Ganley.  Such wrongful acts were related to and committed by Ganley within the course of his employment and/or agency with and for PASEC, were committed in furtherance of the business of PASEC to obtain an indirect interest, as a shareholder of Fox Pan American, in the broadcasting rights to the Club Tournaments from Conmebol by means of bribery, and PASEC authorized or subsequently acquiesced in such acts by Ganley.  PASEC benefited from the wrongful acts of Ganley by, among other reasons, profiting from the purchase of television broadcasting rights for the Club Tournaments from Conmebol and the sublicense of such rights to Fox Pan American's subsidiary FSLA;

g.  Full Play is vicariously liable for all wrongful acts in connection with the bribery scheme described herein committed by its principals and agents Hugo and Mariano Jinkis.  Such wrongful acts were related to and committed by the Jinkises in furtherance of the business of Full Play to obtain rights from Conmebol, and Full Play authorized or subsequently acquiesced in such acts by the Jinkises.  Full Play benefited from the wrongful acts of the Jinkises by, among other reasons, obtaining agency rights from Conmebol in connection with the 2019-2022 Club Tournaments.

## V.  CAUSES OF ACTION

### Count One

### Civil RICO, 18 U.S.C. § 1962(c)

### (Against the Fox Defendants, Martinez, Lopez, Ganley, Torneos, Burzaco, T&T, Full Play, Figueredo and Napout)

183.  Plaintiffs re-allege and incorporate the allegations contained in Paragraphs 1-143 and 182 as if fully set forth in this paragraph.

184.  The Fox Defendants, Martinez, Lopez, Ganley, Torneos, Burzaco, T&T, Full Play, Figueredo and Napout (collectively "RICO Defendants") operated or managed an enterprise through a pattern of racketeering activity that included at least two racketeering acts, with such violations injuring Plaintiffs in their business or property.

### A.  Predicate Acts

185.  Upon information and belief, based in part on the payments provided for in T&T's sham consulting agreements described in Paragraphs 82-89 above, and the payments described in Paragraphs 99-106 above, T&T made the following bribe payments to financial intermediaries, and ultimately to Conmebol officials, in whole or in part, in exchange for those officials support of the award of the Club Tournament television rights to T&T

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| May 5, 2005 | Valente | $200,000 |
| Aug. 18, 2005 | Somerton | $200,000 |
| Aug. 30, 2005 | Valente | $80,000 |
| Sept. 29, 2005 | Somerton | $200,000 |
| Sept. 30, 2005 | Valente | $80,000 |

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| Nov. 4, 2005 | Somerton | $200,000 |
| Dec. 6, 2005 | Somerton | $200,000 |
| Dec. 15, 2005 | Somerton | $200,000 |
| July 13, 2006 | Somerton | $100,000 |
| Sept. 30, 2006 | Valente | $260,000 |
| Oct. 31, 2006 | Valente | $400,000 |
| Nov. 17, 2006 | Somerton | $300,000 |
| Dec. 14, 2006 | Somerton | $300,000 |
| Dec. 21, 2006 | Somerton | $200,000 |
| Dec. 21, 2006 | Somerton | $100,000 |
| March 15, 2007 | Somerton | $200,000 |
| May 15, 2007 | Somerton | $200,000 |
| May 31, 2007 | Valente | $200,000 |
| July 15, 2007 | Somerton | $200,000 |
| Aug. 31, 2007 | Valente | $260,000 |
| Oct. 15, 2007 | Somerton | $200,000 |
| Oct. 31, 2007 | Valente | $200,000 |
| Dec. 15, 2007 | Somerton | $200,000 |
| March 15, 2008 | Somerton | $200,000 |
| March 8, 2008 | Somerton | $3,300,000 |
| May 15, 2008 | Somerton | $200,000 |
| May 15, 2008 | Somerton | $400,000 |

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| May 31, 2008 | Valente | $200,000 |
| July 15, 2008 | Somerton | $200,000 |
| Aug. 31, 2008 | Valente | $260,000 |
| Oct. 15, 2008 | Somerton | $200,000 |
| Oct. 31, 2008 | Valente | $200,000 |
| Dec. 15, 2008 | Somerton | $200,000 |
| March 15, 2009 | Somerton | $200,000 |
| May 15, 2009 | Somerton | $200,000 |
| May 31, 2009 | Valente | $200,000 |
| July 15, 2009 | Somerton | $200,000 |
| Aug. 31, 2009 | Valente | $260,000 |
| Oct. 15, 2009 | Somerton | $200,000 |
| Oct. 31, 2009 | Valente | $200,000 |
| Dec. 15, 2009 | Somerton | $200,000 |
| Jan. 15, 2010 | Spoart | $50,000 |
| Feb. 15, 2010 | Spoart | $50,000 |
| March 15, 2010 | Spoart | $50,000 |
| March 15, 2010 | Somerton | $200,000 |
| April 15, 2010 | Spoart | $50,000 |
| May 15, 2010 | Spoart | $50,000 |
| May 15, 2010 | Somerton | $200,000 |
| May 31, 2010 | Valente | $200,000 |

| Bribe Payments from T&T to Intermediaries | | |
| --- | --- | --- |
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| June 15, 2010 | Spoart | $50,000 |
| July 15, 2010 | Spoart | $50,000 |
| July 15, 2010 | Somerton | $200,000 |
| Aug. 15, 2010 | Spoart | $50,000 |
| Aug. 31, 2010 | Valente | $260,000 |
| Sept. 15, 2010 | Spoart | $50,000 |
| Oct. 15, 2010 | Spoart | $50,000 |
| Oct. 15, 2010 | Somerton | $200,000 |
| Oct. 31, 2010 | Valente | $200,000 |
| Nov. 15, 2010 | Spoart | $50,000 |
| Dec. 15, 2010 | Spoart | $50,000 |
| Dec. 15, 2010 | Somerton | $200,000 |
| Jan. 15, 2011 | Spoart | $50,000 |
| Feb. 15, 2011 | Spoart | $50,000 |
| March 15, 2011 | Spoart | $50,000 |
| March 15, 2011 | Somerton | $200,000 |
| April 2011 | Yorkfields | $2,400,000 |
| April 15, 2011 | Spoart | $50,000 |
| May 15, 2011 | Spoart | $50,000 |
| May 15, 2011 | Somerton | $200,000 |
| May 31, 2011 | Valente | $200,000 |
| June 15, 2011 | Spoart | $50,000 |

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| July 15, 2011 | Spoart | $50,000 |
| July 14, 2011 | Somerton | $500,000 |
| Aug. 15, 2011 | Spoart | $50,000 |
| Aug. 31, 2011 | Valente | $260,000 |
| Sept. 15, 2011 | Spoart | $50,000 |
| Oct. 15, 2011 | Spoart | $50,000 |
| Oct. 31, 2011 | Valente | $200,000 |
| Nov. 15, 2011 | Spoart | $50,000 |
| Dec. 15, 2011 | Spoart | $50,000 |
| Dec. 7, 2011 | Valente | $100,000 |
| Jan. 15, 2012 | Spoart | $50,000 |
| Feb. 15, 2012 | Spoart | $50,000 |
| March 15, 2012 | Spoart | $50,000 |
| March 14, 2012 | Valente | $500,000 |
| April 3, 2012 | Yorkfields | $2,000,000 |
| April 19, 2012 | Spoart | $50,000 |
| May 3, 2012 | Yorkfields | $400,000 |
| May 15, 2012 | Spoart | $50,000 |
| May 31, 2012 | Valente | $200,000 |
| June 15, 2012 | Spoart | $50,000 |
| July 15, 2012 | Spoart | $50,000 |
| July 15, 2012 | Valente | $200,000 |

| Bribe Payments from T&T to Intermediaries | | |
|---|---|---|
| **Approx. Date** | **Immediate Recipient** | **Amount** |
| Aug. 15, 2012 | Spoart | $50,000 |
| Aug. 31, 2012 | Valente | $260,000 |
| Sept. 15, 2012 | Spoart | $50,000 |
| Oct. 15, 2012 | Spoart | $50,000 |
| Oct. 15, 2012 | Valente | $200,000 |
| Oct. 31, 2012 | Valente | $200,000 |
| Nov. 15, 2012 | Spoart | $50,000 |
| Dec. 15, 2012 | Spoart | $50,000 |
| Dec. 7, 2012 | Valente | $100,000 |
| March 2013 | Cross Trading | $3,600,000 |
| March 2013 | Arco | $1,400,000 |
| Sept. 2013 | Productora | $1,500,000 |

186.    Upon information and belief, as described in Paragraphs 93-97 above, the Fox Defendants, Torneos and T&T, and their representatives, executives and managers Burzaco, Ganley, Martinez and Lopez, agreed with Conmebol officials (including Figueredo and Napout) to pay and/or caused Torneos Holland to pay the following bribe payments to financial intermediaries, and ultimately to Conmebol officials, in whole or in part, in exchange for those officials support of the award of the Club Tournament television rights to T&T and, ultimately, FSLA:

| Bribe Payments from Torneos Holland to Intermediaries | | |
|---|---|---|
| Approx. Date | Immediate Recipient | Amount |
| 2005 | Arco | $5,300,000 |
| 2006 | Arco | $5,300,000 |
| 2007 | Arco | $5,300,000 |
| 2008 | Arco | $5,300,000 |
| 2009 | Arco | $5,300,000 |
| 2010 | Arco | $6,200,000 |
| 2011 | Arco | $9,100,000 |
| 2012 | Arco | $9,100,000 |
| 2013 | Arco | $12,500,000 |
| 2013 | Valente | $660,000 |
| 2013 | Valente | $1,000,000 |
| 2013 | Spoart | $600,000 |
| 2014 | Valente | $660,000 |
| 2014 | Valente | $1,000,000 |
| 2014 | Spoart | $600,000 |

187.    As set forth in Paragraphs 29-30 and 42, Burzaco, in his capacity as a director and principal of T&T and general manager of Torneos, caused T&T and Torneos Holland to make the bribe payments to Conmebol officials listed in Paragraphs 185-186 above in exchange for their support of the award of the rights to T&T. Burzaco has admitted his unlawful conduct and

pled guilty to racketeering conspiracy in connection with, among other things, the payment of bribes to Conmebol to acquire rights to the Club Tournaments.

188.     As set forth in Paragraphs 6-7 and 9, and in Torneos's DPA, Torneos agreed to pay and caused to be paid, directly and indirectly, bribe payments to Conmebol officials in exchange for their support of T&T in its efforts to obtain, maintain and exploit media and marketing rights to the Club Tournaments.  *See* Torneos DPA Statement of Facts ¶ 32.  In particular, Torneos has admitted that it relied on the Margulies Intermediaries to facilitate the payment of bribes and kickbacks to Conmebol officials.  *Id*. at ¶ 38.  Such bribes and kickbacks include the payments made to the Margulies Intermediaries listed in Paragraph 185 above.

189.     As set forth in Paragraphs 61- 107, FIC and its executives Lopez and Martinez, agreed to pay and caused to be paid, directly and indirectly, the bribe payments listed in Paragraphs 185-186 above to Conmebol officials in exchange for their support of T&T in its efforts to obtain, maintain and exploit media and marketing rights to the Club Tournaments, and for the sublicense of those rights to FSLA.  Among other things, Martinez signed an agreement providing for payments to the Margulies Intermediaries.  *See* Paragraphs 78-80.  Torneos has admitted that "Broadcasting Company Affiliate B," believed to be FIC, and "Broadcasting Company Executives #2 and #3," believed to be Lopez and Martinez, agreed and supported Torneos in the payment of bribes and kickbacks to Conmebol officials, including Figueredo and Napout.  *See* Torneos DPA Statement of Facts ¶¶ 17, 37.

190.     As set forth in Paragraphs 61- 107, PASEC, Fox Pan American, Fox Pan American's subsidiary FSLA, and Ganley, Chief Operating Officer of Fox Pan American and director of Defendant T&T, agreed to pay and caused to be paid, directly and indirectly, the bribe payments listed in Paragraphs 185-186 above to Conmebol officials in exchange for their support

of T&T in its efforts to obtain, maintain and exploit media and marketing rights to the Club Tournaments, and for the sublicense of those rights to FSLA. Among other things, Ganley signed a number of the sham consulting agreements providing for the payments listed in Paragraph 185 above. *See* Paragraph 85 above. Torneos has admitted that "Broadcasting Company Affiliate C," believed to be Fox Pan American, and "Broadcasting Company Executive #4," believed to be Ganley, agreed and supported Torneos in the payment of bribes and kickbacks to Conmebol officials, including Figueredo and Napout. *See* Torneos DPA Statement of Facts ¶¶ 18, 37.

191.    As set forth in in Paragraphs 72, 76 and 79, Full Play and its principals Hugo Jinkis and Mariano Jinkis facilitated the payment of bribes to Conmebol officials. Torneos has admitted that "Sports Marketing Company A," believed to be Full Play, and "Sports Marketing Executives #1 and #2," believed to be Hugo Jinkis and Mariano Jinkis, agreed and supported Torneos in the payment of bribes and kickbacks to Conmebol officials, including Figueredo and Napout. *See* Torneos DPA Statement of Facts ¶¶ 26, 38. On information and belief, in return for facilitating the bribe payments, Full Play, among other things, was named the exclusive commercial agent for the negotiation and commercialization of the worldwide rights excluding the Americas for the 2019-2022 Club Tournaments.

192.    As set forth in Paragraphs 61- 107, Figueredo and Napout, as former officials and Presidents of Conmebol, solicited, agreed to receive and did receive bribes in exchange for their support of T&T in its efforts to obtain, maintain and exploit media and marketing rights to the Club Tournaments.

1.    **Wire Fraud**

193.    The bribe payments set forth in Paragraphs 185-186 were transmitted by RICO Defendants, and/or were caused to be transmitted or reasonably foreseen to be caused by RICO

Defendants, by means of wire and/or radio communication in interstate and/or foreign commerce.

194.     On information and belief, all of the payments in Paragraphs 185-186 made by T&T before March 31, 2011 were made by wire transfer from its account at Lloyds Bank in Miami, Florida, account number 11031883.  Beginning in March 31, 2011, payments were made from T&T's account at Clariden Leu in Switzerland, account number XXXX-XXXXXX3-32. Beginning on July 18, 2013, payments were made from T&T's account at Interaudi Bank in Miami, Florida, account number XXX093.

195.     On information and belief, all payments in Paragraphs 185-186 made to Somerton were made to its account at J.P. Morgan Chase in New York, New York, account number XXX-X-XX917.

196.     On information and belief, all payments in Paragraphs 185-186 made to Valente were made to its account at J.P. Morgan Chase in New York, New York, account number XXX-X-XXXX332.

197.     On information and belief, all payments in Paragraphs 185-186 made to Productora were made to its account at Interaudi Bank in Miami, Florida, account number XXX621.

198.     For each RICO Defendant herein, where any payment set forth in Paragraphs 185-186 originated from a person other than such RICO Defendant, such payment was reasonably foreseeable to, and/or caused by, such RICO Defendant.

199.     RICO Defendants' above-alleged activities constituted, in addition to a bribery scheme, a scheme or artifice to defraud (including a scheme or artifice to deprive another of the intangible right of honest services) or for obtaining money or property by means of false or

fraudulent pretenses, representations, or promises within the meanings of 18 U.S.C. § 1343 and 1346, in which RICO Defendants each conducted or participated knowingly and with the intent to defraud.

200.    As set forth in Paragraphs 1-143 and 182, RICO Defendants participated in a scheme in which the Fox Defendants, Torneos and T&T paid and/or caused to be paid bribes by means of wire transfers to Conmebol officials in exchange for their support of Conmebol's licensing of the Club Tournament television rights to T&T, and indirectly to FSLA, at below-market rates.  This bribery scheme defrauded Conmebol and Conmebol's member associations of hundreds of millions of dollars in revenue, breached the Conmebol officials' fiduciary duties to Conmebol and its member associations, and violated Conmebol's bylaws.

201.    The payments set forth in Paragraphs 185-186 were all in furtherance and execution of RICO Defendants' above-described scheme to defraud.

202.    RICO Defendants intended to defraud, and did defraud, Conmebol and Conmebol's member associations of hundreds of millions of dollars in revenue and caused the Conmebol officials to breach their fiduciary duties to Conmebol and violate Conmebol's bylaws.  These Conmebol officials, as members of the Executive Committee, had a duty to disclose the bribery to Conmebol and its member organizations and to seek the best offer for the sale of the Club Tournament television rights.  RICO Defendants caused the Conmebol officials not to disclose the bribes and Conmebol to reject Plaintiffs' superior offers for the television rights.

203.    Each RICO Defendant benefited from the fraud:

    a.    T&T obtained the Club Tournament television rights and the profits from sublicensing the rights to FSLA;

    b.  The Fox Defendants obtained a sublicense to the Club Tournament television rights, and the increased profit resulting from such rights, including the increased demand for programming provided by the Fox Defendants and the advertising revenue associated with such programming, as well as their share of T&T's profits;

    c.  Torneos obtained the right to generate revenue from the production services it provided connection with the Club Tournaments, as well as its share of T&T's profits;

    d.  Burzaco obtained compensation and professional success as a result of T&T obtaining the Club Tournament television rights and Torneos obtaining production services and revenue in connection with those rights and its interest in T&T;

    e.  Ganley obtained compensation and professional success in connection with T&T obtaining the Club Tournament television rights and his employer Fox Pan American and PASEC benefiting from the sublicense of those rights to Fox Pan American's subsidiary FSLA;

    f.  Lopez and Martinez obtained compensation and professional success in connection with T&T obtaining the Club Tournament television rights and their employer FIC benefiting from the sublicense of those rights to FSLA;

    g.  Figueredo and Napout benefited from receiving bribe payments; and

    h.  Full Play benefitted by, among other things, receiving rights to act as agent for the commercialization of the 2019-2022 Club Tournament television rights outside of the Americas.

204.     Each of the wire transfer payments set forth in Paragraphs 185-186 is individually indictable as an act of wire fraud under 18 U.S.C. § 1343.  As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### 2.     Money Laundering: Promotion by International Transfer

205.     By their foregoing conduct set forth in Paragraphs 1-143 and 182, each RICO Defendant transported, transmitted, or transferred, or attempted to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, wire fraud in violation of 18 U.S.C.§ 1343 (Paragraphs 193-204), commercial bribery in violation of N.Y. Penal Law §§ 180.03 and 180.08 (Paragraphs 237-247), and violations of the Travel Act, 18 U.S.C. § 1952(a)(1), (3), in violation of 18 U.S.C. § 1956(a)(2)(A).

206.     As set forth in Paragraphs 1-143 above, each RICO Defendant paid bribes or caused bribes to be paid by wire transfer through financial institutions from Miami, Florida and/or New York, New York to accounts in Europe and South America, and vice-versa, on an ongoing basis.  These payments promoted the continuation of the bribery scheme, which lasted for approximately 15 years and for the Club Tournament television rights for the years 2000-2022.  Transfers of funds were made through wire transfers between financial institutions, with such transfers of funds being from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States.

207.     Jurisdiction is proper against any RICO Defendants deemed to be foreign persons because the offenses committed herein involve financial transactions that occurred in whole or in part in the United States.

208.     There is extraterritorial jurisdiction over conduct constituting the violation of 18 U.S.C. § 1956 (promotional money laundering by international transfer) for RICO Defendants that are United States citizens or, in the case of a non-United States citizen the conduct occurs in part in the United States, and the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

209.     The making of each of the payments set forth in Paragraphs 185-186 is individually indictable as an act of promotional money laundering by international transfer under 18 U.S.C. § 1956(a)(2)(A).  As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

**3.     Money Laundering: Concealment by Use of an International Transfer**

210.     By their foregoing conduct set forth in Paragraphs 1-143 and 182, each RICO Defendant transported, transmitted, or transferred, or attempted to transport, transmit, or transfer, a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from and through a place outside the United States knowing that the monetary instruments or funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity (the bribery scheme) and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity, all in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

211.     As set forth in Paragraphs 1-143 above, each RICO Defendant paid bribes or caused bribes to be paid by wire transfer through financial institutions from Miami, Florida and/or New York, New York to Europe and South America, and vice-versa, on an ongoing basis. These bribes constituted specified unlawful activity of wire fraud in violation of 18 U.S.C. §

1343 as set forth in Paragraphs 193-204, commercial bribery under N.Y. Penal Law §§ 180.03 and 180.08, as set forth in Paragraphs 237-247, and violations of the Travel Act, 18 U.S.C. § 1952(a)(1), (3), as set forth in Paragraphs 248-253.

212.    The result of the bribery and other criminal wrongdoing was that Conmebol officials caused Conmebol to award the Club Tournament television rights to T&T, which sublicensed the rights to FSLA, generating substantial revenue for the Fox Defendants.

213.    RICO Defendants concealed the source of this revenue – which they knew constituted proceeds from unlawful activity – by depositing such criminally derived proceeds in financial institutions and using such proceeds in financial institutions to wire the payment of bribes on an ongoing basis.

214.    The bribes were funneled by RICO Defendants to the Conmebol officials in highly irregular transactions used to disguise the source of the funds and prevent tracing.  The Fox Defendants and Torneos provided the funds to Burzaco, who with the assistance of the other RICO Defendants, used T&T and the Margulies Intermediaries and Full Play to transmit the bribes by wire transfers between financial institutions to the Conmebol officials. Transfers of funds were made through wire transfers between financial institutions, with such transfers of funds being from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States.

215.    Jurisdiction is proper against any RICO Defendants deemed to be foreign persons because the offenses committed herein involve financial transactions that occurred in whole or in part in the United States.

216.    There is extraterritorial jurisdiction over conduct constituting the violation of 18 U.S.C. § 1956(a)(2)(B)(i) (concealment money laundering by use of an international transfer) for

the RICO Defendants that are United States citizens or, in the case of a non-United States citizen the conduct occurs in part in the United States, and the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

217.     The making of each of the payments set forth in Paragraphs 185-186 is individually indictable as an act of concealment laundering of monetary instruments by international transfer under 18 U.S.C. § 1956(a)(2)(B)(i).  As such each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### 4.     Money Laundering:  Promotional Money Laundering

218.     By their foregoing conduct set forth in Paragraphs 1-143 and 182, each RICO Defendant, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity (the bribery scheme), conducted or attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity (to wit, wire fraud in violation of 18 U.S.C. § 1343 as set forth in Paragraphs 193-204, commercial bribery in violation of N.Y. Penal Law §§ 180.03, and 180.08, as set forth in Paragraphs 237-247, and in violation of the Travel Act, 18 U.S.C. §§ 1952(a)(1) and (3), as set forth in Paragraphs 248-253), with the intent to promote the carrying on of such specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

219.     Each of the wire transfer payments between financial institutions set forth in Paragraphs 185-186 constitute the movement of funds through wires or other means by means of financial institutions that affect interstate or foreign commerce and therefore constitute financial transactions.

220.     Each RICO Defendant knew that the ongoing wire transfers represented the proceeds of some unlawful activity – the bribery scheme – and such property was in fact derived from the proceeds of specified unlawful activity of wire fraud in violation of 18 U.S.C. § 1343,

commercial bribery in violation of N.Y. Penal Law §§180.03 and 180.08, and in violation of the Travel Act, 18 U.S.C. § 1952(a)(1), (3).

221.    Each RICO Defendant caused T&T and FSLA to be awarded the exclusive broadcasting rights to the Club Tournaments through wire fraud and commercial bribery.  The Fox Defendants derived revenue from the broadcast of the Club Tournaments obtained through such unlawful activity, and each RICO Defendant used such proceeds to continue paying bribes to Conmebol officials to promote the continuation of the bribery scheme and continued award of broadcasting rights to the Club Tournaments to FSLA, all constituting specified unlawful activity (wire fraud in violation of 18 U.S.C. § 1343, commercial bribery in violation of N.Y. Penal Law §§ 180.03 and 180.08, and violations of the Travel Act, 18 U.S.C. § 1952(a)(1), (3)).

222.    Jurisdiction is proper against any RICO Defendants deemed to be foreign persons because the offenses committed herein involve financial transactions that occurred in whole or in part in the United States.

223.    There is extraterritorial jurisdiction over conduct constituting the violation of 18 U.S.C. § 1956(a)(1)(A)(i) (promotional money laundering) for the RICO Defendants that are United States citizens or, in the case of a non-United States citizen, because the conduct occurs in part in the United States, and the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

224.    The making of each of the payments set forth in Paragraphs 185-186 is individually indictable as an act of promotional money laundering under 18 U.S.C. § 1956(a)(1)(A)(i).  As such each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### 5.    Money Laundering:  Money Laundering by Concealment

225.    By their foregoing conduct set forth in Paragraphs 1-143 and 182, each RICO Defendant, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity (the bribery scheme), conducted or attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity, to wit, wire fraud under 18 U.S.C. §1343 (Paragraphs 193-204), commercial bribery under N.Y. Penal Law §§ 180.03 and 180.08 (Paragraphs 237-247), and violations of the Travel Act, 18 U.S.C. § 1952(a)(1), (3) (Paragraphs 248-253), knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

226.    Each of the wire transfer payments between financial institutions set forth in Paragraphs 185-186 constitutes the movement of funds through wires or other means by means of financial institutions that affect interstate or foreign commerce and therefore constitute financial transactions.

227.    Each RICO Defendant knew that the ongoing wire transfers represented the proceeds of some unlawful activity – the bribery scheme – and such property was in fact derived from the proceeds of wire fraud in violation of 18 U.S.C. § 1343, commercial bribery in violation of N.Y. Penal Law §§ 180.03 and 180.08, and violations of the Travel Act, 18 U.S.C. §1952(a)(1), (3).

228.    Each RICO Defendant caused Conmebol to award the Club Tournament television rights to T&T, and T&T to sublicense such rights to FSLA, through wire fraud and commercial bribery.  The Fox Defendants derived programming and advertising revenue from the broadcast of the Club Tournaments obtained through such unlawful activity, and each RICO

Defendant received proceeds from the scheme. Each RICO Defendant concealed such proceeds by depositing such proceeds in financial institutions and using such proceeds in financial institutions by means of wire transfers to continue to pay bribes, and cause bribes to be paid, to Conmebol officials in exchange for their continued support of awarding the Club Tournament television rights to T&T, which sublicensed them to FSLA.

229.    The concealment of the proceeds of the bribery scheme was accomplished by structuring the bribe payments in a highly unusual manner to avoid detection and tracing. Among other methods, the Fox Defendants provided funds to T&T, which with the assistance of the other RICO Defendants, used financial intermediaries, including Full Play and companies controlled by Full Play principals Hugo Jinkis and Mariano Jinkis, to transmit the bribes by wire transfers between financial institutions to the Conmebol officials.

230.    Jurisdiction is proper against any RICO Defendants deemed to be foreign persons because the offenses committed herein involve financial transactions that occurred in whole or in part in the United States.

231.    There is extraterritorial jurisdiction over conduct constituting the violation of 18 U.S.C. § 1956(a)(1)(B)(i) (money laundering by concealment) for the RICO Defendants that are United States citizens or, in the case of a non-United States citizen the conduct occurs in part in the United States, and the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

232.    The making of each of the payments set forth in Paragraphs 185-186 is individually indictable as an act of money laundering by concealment under 18 U.S.C. § 1956(a)(1)(B)(i).  As such each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### 6.    Monetary Transactions in Property Derived from Unlawful Activity

233.    Each RICO Defendant, by participating in the bribery scheme and payments described in Paragraphs 1-143 and 182 above, knowingly engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, wire fraud under 18 U.S.C. § 1343, commercial bribery under N.Y. Penal Law §§ 180.03, 180.08, and in violation of the Travel Act under 18 U.S.C. § 1952(a)(1), (3), all indictable or chargeable under 18 U.S.C. 1961(1), and that took place in the United States or in the special maritime and territorial jurisdiction of the United States, or, in the case of those RICO Defendants who are United States persons, outside the United States and such special jurisdiction, in violation of 18 U.S.C. § 1957.

234.    RICO Defendants' bribery scheme caused FSLA, through a licensing agreement with T&T, to be awarded the exclusive broadcasting rights to the Club Tournaments.  Fox derived revenue from the broadcast of the Club Tournaments, which was derived from the specified unlawful activities.

235.    Fox used the proceeds to continue to pay bribes in transactions greater than $10,000 by means of deposits, withdrawals, transfers, or exchanges, in or affecting interstate or foreign commerce, of funds or a monetary instrument by, through, or to a financial institution, to Conmebol officials, with such bribes being paid through, and with the assistance and participation of, Torneos, T&T, Burzaco, Ganley, Martinez, Lopez, Full Play, Hugo Jinkis, Mariano Jinkis, and the Margulies Intermediaries as set forth in Paragraphs 1-143.

236.    Participating in each monetary transaction set forth in Paragraphs 185-186 is thus individually indictable as an act of engaging in monetary transactions in property derived from

specified unlawful activity under 18 U.S.C. § 1957. As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### 7.    Bribery Under New York State Law

237.    For each RICO Defendant herein, where any payment set forth in Paragraphs 185-186 originated from a person other than such RICO Defendant, such payment was reasonably foreseeable to, and caused by, such RICO Defendant.

### a.    Commercial Bribing in the First Degree

238.    The Fox Defendants (including PASEC, whose principal place of business is New York, New York), Torneos, T&T, Burzaco, Martinez, Ganley, Lopez, and Full Play conferred, or offered or agreed to confer, or was reasonably foreseeable to cause to confer, the amounts paid in Paragraphs 185-186, as bribes to benefit Conmebol officials (including Napout and Figueredo), without the consent of the latter's employer principal, Conmebol or Conmebol's member organizations.

239.    The Conmebol officials owed a fiduciary duty to their employer or principal, Conmebol and their member organizations, to obtain the highest amount for the sale of the television broadcasting rights to the Club Tournaments.

240.    RICO Defendants made the payments set forth in Paragraphs 185-186, including through the use of accounts in New York financial institutions to wire such payments, with the intent to influence the Conmebol officials' conduct in relation to Conmebol and its member organization's affairs, namely that Conmebol and its member organizations turn down Plaintiffs' superior offers and instead accept a lower amount offered by T&T for the broadcasting rights for the gain of RICO Defendants, including PASEC, which is headquartered in New York, New York, and the other Fox Defendants, which are wholly-owned subsidiaries of Twenty-First Century Fox, Inc., which is headquartered in New York, New York.

241.    The value of the payments conferred on the Conmebol officials exceeded one thousand dollars.

242.    As a result, Conmebol and its member organizations suffered economic harm in excess of two-hundred fifty dollars.  Specifically, absent the corrupt arrangement, Conmebol and its member organizations would have obtained more money and better terms for the sale of the broadcasting rights to the Club Tournaments to Plaintiffs, who offered substantially more for the rights than the amount for which Conmebol awarded the rights to T&T.

243.    As a result of RICO Defendants' use of accounts at financial institutions located in New York for the transmission of the payments alleged in Paragraphs 185-186 above, such actions by RICO Defendants constitute commercial bribing in the first degree as chargeable under New York law and punishable by imprisonment for more than one year under N.Y. Penal Law § 180.03 and each such payment constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### b.    Commercial Bribe Receiving in the First Degree

244.    The Conmebol officials are employees, agents or fiduciaries of Conmebol and its member organizations.

245.    Without the consent of their employer or principal, Napout and Figueredo solicited, accepted, or agreed to accept the payments set forth in Paragraphs 185-186, which constitute benefits, from another person upon an agreement or understanding that such benefit would influence each of their conduct in relation to Conmebol and its member organizations' affairs, namely that Conmebol and its member organizations would award the television broadcasting rights to the Club Tournaments to T&T and FSLA.

246.     The value of the payments solicited, accepted, or agreed to be accepted exceeded one thousand dollars and caused economic harm to Conmebol and its member organizations in an amount exceeding two hundred fifty dollars.  Specifically, Conmebol and its member organizations were deprived by the difference between the far greater offers made by Plaintiffs for the right to televise the Club Tournaments and the lower offers that Conmebol and its member organizations accepted from T&T and Fox.  Plaintiffs' offers significantly exceeded what Conmebol and its member organizations accepted.  Absent the corrupt arrangement, Conmebol and its member organizations would have secured better terms and received more money for the broadcast rights.

247.     As a result of each of the RICO Defendants' use of accounts at financial institutions located in New York for the transmission of the payments alleged in Paragraphs 185-186 above, such actions constitute commercial bribing in the first degree as chargeable under New York law and punishable by imprisonment for more than one year under N.Y. Penal Law § 180.08, and each such payment constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### 8.    Travel Act (18 U.S.C. § 1952)

248.     By their foregoing conduct set forth in Paragraphs 1-143 and 182, each RICO Defendant travelled in interstate or foreign commerce or used the mail or any facility in interstate or foreign commerce, with intent to distribute the proceeds of any unlawful activity or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, to wit, bribery in violation of the laws of the State in which committed or of the United States, and any act which is indictable under 18 U.S.C. § 1956 or 1957.

249.    RICO Defendants travelled to Florida and New York, used the wire facilities of financial institutions in Florida and New York, or made communications into and out of Florida and New York using facilities of interstate and/or foreign commerce, with the intent to distribute the proceeds and promote, manage, establish, carry on, or facilitate the commercial bribery violations under N.Y. Penal Law §§ 180.03 and 180.08 as set forth in Paragraphs 237-247.

250.    For the same reasons, the Fox Defendants, Lopez, Martinez, Ganley, Burzaco, T&T, Torneos, and Full Play also violated N.Y. Penal Law § 180.00 (Commercial bribing in the second degree) because each conferred, offered, or agreed to confer any benefit (the funds which constituted bribes) upon any employee, agent, or fiduciary without the consent of the latter's employer or principal (Conmebol and its member organizations), with intent to influence his conduct in relation to his employer's or principals' affairs, to wit, that Conmebol and its member organizations would award the television broadcasting rights to the Club Tournaments to T&T and the Fox Defendants, and Figueredo and Napout violated N.Y. Penal Law § 180.05 (Commercial bribe receiving in the second degree because, each, without the consent of his employer or principal (Conmebol and its member organizations), solicited, accepted, or agreed to accept any benefit (the funds which constituted bribes) from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs, to wit, that Conmebol and its member organizations would award the television broadcasting rights to the Club Tournaments to T&T and the Fox Defendants.

251.    RICO Defendants also travelled to Florida and New York, used the wire facilities in Florida and New York, or made communications into and out of Florida and New York using facilities of interstate and/or foreign commerce, with the intent to distribute the proceeds and

promote, manage, establish, carry on, or facilitate the money laundering violations set forth in Paragraphs 205-232 above in violation of 18 U.S.C. §§ 1956, 1957.

252.    Upon information and belief, RICO Defendants used electronic mail communications from or to Florida and New York with intent to distribute the proceeds from – and promote, manage, establish, carry on, or facilitate – the promotion, management, establishment, or carrying on of the commercial bribery violations under N.Y. Penal Law §§ 180.00, 180.03, 180.05, and 180.08, and the money laundering violations of 18 U.S.C. §§ 1956 and 1957.

253.    Each such act is individually indictable as a violation of the travel act under 18 U.S.C. §§ 1952(a)(1) or 1952(a)(3).  As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

## B.    Pattern of Racketeering Activity

254.    The above-described acts of racketeering activity consist of more than two acts of racketeering activity, all of which occurred after the effective date of the RICO statute, and the last of which was within 10 years after the commission of any prior above-described act of racketeering activity (the earliest of which is identified above as having been on May 5, 2005).

255.    The above-described racketeering activity constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The above-described racketeering activity was a series of acts that amounted to and posed a threat of continued criminal activity, that were neither isolated nor sporadic, and that were related to each other by virtue of common participants, common victims, common method of commission, and the common purpose and result of effectuating the bribery scheme and the scheme to defraud alleged above.

C.   **Enterprises**

256.   Each of PASEC, FSLA, FIC, T&T, Torneos, and Conmebol is a "partnership, corporation, association, or other legal entity," and as such constitutes an "enterprise" as defined in 18 U.S.C. § 1961(4).  Fox Pan American likewise was, prior to its merger into PASEC, a "partnership, corporation, association, or other legal entity," and as such constituted an "enterprise" as defined in 18 U.S.C. § 1961(4).

257.   At all times relevant to the Complaint, each of the enterprises Fox Pan American, PASEC, FSLA, FIC, T&T, Torneos, and Conmebol was engaged in, and its activities affected, United States interstate and foreign commerce.  Among other things, Conmebol awarded the television rights for the Club Tournaments, including the television rights for the United States, which is one of the principal markets for such rights.  Among the acquirers and would-be acquirers of such rights were U.S.-based and Florida-based businesses, such as the Fox Defendants and Plaintiff GolTV.  Moreover, Plaintiff GolTV, Fox Pan American, PASEC, FSLA, FIC, Torneos, T&T, and Conmebol, frequently engaged in banking and investment activities with United States persons and used United States financial institutions.

258.   Fox Pan American and Defendants PASEC (individually and as successor to Fox Pan American), FSLA, FIC, Torneos, T&T, Full Play, Martinez, Lopez, Ganley, Burzaco, Figueredo and Napout also comprised an association-in-fact, the "Bribery Enterprise," which constituted an "association in fact" enterprise as defined in 18 U.S.C. § 1961(4).  The Bribery Enterprise functioned with the common purpose of financial gain by awarding the exclusive television rights for the Club Tournaments through bribery to T&T and the Fox Defendants and excluding Plaintiffs from fair competition for such rights.  PASEC, Fox Pan American, FSLA, FIC, and T&T benefited from the Bribery Enterprise by ensuring they would retain exclusive rights to the Club Tournaments at artificially low prices, the Conmebol officials (including

Figueredo and Napout) benefited by pocketing bribes, Torneos benefited from this enterprise by receiving a share of T&T's profits and the rights to provide production services, Full Play benefited from receiving a percentage of the bribes and agency rights to certain Club Tournaments, and Martinez, Lopez, Ganley, and Burzaco obtained compensation and professional success.

259.    The Bribery Enterprise retained an ongoing informal organization in which the Fox Defendants' role was to fund bribes and receive Club Tournament rights, T&T was the primary intermediary responsible for acquiring rights from Conmebol and facilitating bribes from the Fox Defendants to the Conmebol officials, Torneos provided additional funding for bribes and assisted in facilitating their payment, Full Play facilitated bribe payments, and Martinez, Lopez, Ganley, and Burzaco organized and executed the bribery scheme.

260.    The longevity of the Bribery Enterprise was determined by the period of years provided for in each new agreement between T&T and Conmebol, and the enterprise existed continually at least until the unsealing of the Superseding Indictment on December 3, 2015.

261.    In addition, the Superseding Indictment charged that "[FIFA] and its six constituent continental confederations – [CONCACAF], [Defendant Conmebol], the Union des Associations Européennes de Football ('UEFA'), the Confédération Africaine de Football ('CAF'), the Asian Football Confederation ('AFC'), and the Oceania Football Confederation ('OFC') – together with affiliated regional federations, national member associations, and sports marketing companies, collectively constituted an 'enterprise,' as defined in Title 18, United States Code, Section 1961(4), that is, a group of legal entities associated in fact . . . " Superseding Indictment ¶ 1.  The Superseding Indictment further charged that this enterprise (referred to hereinafter as the "Indictment Enterprise") "constituted an ongoing organization

whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise," *id.*, and this enterprise has had the longevity sufficient to permit its members to pursue that common purpose. The Superseding Indictment described that common purpose as being "to regulate and promote the sport of soccer worldwide," and stated that the members of this enterprise "carried out this purpose by using a variety of methods and means, including creating and enforcing uniform standards and rules, organizing international competitions, and commercializing the media and marketing rights associated with the sport." The Superseding Indictment further charged that the Indictment Enterprise "was engaged in, and its activities affected, interstate and foreign commerce," *id.* ¶ 1, and that "[its] members . . . as well as individuals and entities employed by and associated with the enterprise, frequently engaged in banking and investment activities with United States financial institutions," *id.* ¶ 2.

262.    Martinez, Lopez, Ganley, Burzaco, Figueredo and Napout were employed by or associated with these enterprises and corrupted each of these enterprises with their co-conspirators by engaging in bribery, fraud and money laundering in pursuit of personal and commercial gain. They also participated in the corruption of each enterprise by conspiring with and aiding and abetting their co-conspirators in the abuse of their positions of trust and the violation of their fiduciary duties.

**D.    Violations of 18 U.S.C. § 1962(c)**

263.    As set forth in Paragraphs 1-143 and 182, Defendants PASEC (individually and as successor to Fox Pan American), FSLA, FIC, T&T, Torneos, Full Play, Martinez, Lopez, Ganley, Burzaco, Figueredo, and Napout were associated with and conducted and participated, directly and indirectly, in the conduct, management, or operation of the affairs of Conmebol through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

264.     As set forth in Paragraphs 1-143 and 182, Defendants Martinez, Lopez, Ganley, Burzaco, Figueredo, and Napout were associated with and conducted and participated, directly and indirectly, in the conduct, management, or operation of the affairs of Fox Pan American, PASEC, FSLA, FIC, Torneos, and T&T through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C.§ 1962(c).

265.     As set forth in Paragraphs 1-143 and 182 above, Fox Defendants and Torneos were associated with and conducted and participated, directly and indirectly, in the conduct, management, or operation of the affairs of T&T through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

266.     As set forth in Paragraphs 1-143 and 182 above, Defendants PASEC (individually and as successor to Fox Pan American), FSLA, FIC, Torneos, T&T, Full Play, Martinez, Lopez, Ganley, Burzaco, Figueredo and Napout were associated with and conducted and participated, directly and indirectly, in the conduct, management, or operation of the affairs of the Bribery Enterprise through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

267.     As set forth in Paragraphs 1-143 and 182 above, Defendants PASEC (individually and as successor to Fox Pan American), FSLA, FIC, Torneos, T&T, Martinez, Lopez, Ganley, Burzaco, Full Play, Figueredo, and Napout were associated with and conducted and participated, directly and indirectly, in the conduct, management, or operation of the affairs of the Indictment Enterprise through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

**E.     Injury to Plaintiffs' Business and Property**

268.     By reason and as a direct and proximate result of RICO Defendants' violations of 18 U.S.C. § 1962(c), and for no reason other than RICO Defendants' violation of law, Plaintiffs

were not awarded the Club Tournament television rights despite Plaintiffs' superior offers. Plaintiffs accordingly suffered substantial injury to their business and property, including without limitation loss of revenues, loss of profits, lower market share, and lessened profile in the sports telecasting marketplace, in an amount to be determined at trial but not less than hundreds of millions of dollars.

269.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from RICO Defendants threefold the damages Plaintiffs sustained from RICO Defendants' violations of 18 U.S.C. § 1962(c) and the cost of this action, including a reasonable attorney's fee.

## Count Two

## Civil RICO Conspiracy, 18 U.S.C. § 1962(d)

### (Against the Fox Defendants, Martinez, Lopez, Ganley, T&T, Torneos, Burzaco, Full Play, Figueredo, and Napout)

270.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-143 and 182-269 as if fully set forth in this paragraph.

271.    RICO Defendants conspired with each other to commit the violations of 18 U.S.C. § 1962(c) alleged above.  Each RICO Defendant agreed, and objectively manifested their agreement through words or actions, that at least one conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprises alleged above, the last of which would occur within 10 years of a prior act of racketeering activity.

272.    RICO Defendants conspired in two ways.  First, each RICO Defendant agreed to the overall objective of the conspiracy – to cause Conmebol to award the Club Tournament television rights T&T and FSLA through the bribery scheme.  Second, each Defendant agreed to commit two predicate acts of racketeering, to wit, wire fraud (18 U.S.C. § 1343), commercial bribery (N.Y. Penal Law §§ 180.03 (conferring) and 180.08 (receiving)), money laundering (18

U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i), (a)(2)(A), (a)(2)(B)(i), and 18 U.S.C. § 1957) and violations of the Travel Act (18 U.S.C. § 1952(a)(1), (3)).

273.    Each of the RICO Defendants' agreement to the overall objective of the conspiracy and agreement to commit two predicate acts can be inferred from the conduct summarized in Paragraphs 185-192 above to further the conspiracy, including the transfers of funds identified above in Paragraphs 185-186, the creation and use of intermediary entities and payment mechanisms to conceal bribes to the Conmebol officials, and T&T's and FSLA's acquisition of rights from Conmebol.

274.    To the extent it were determined that any RICO Defendant did not commit two predicate acts, the conduct of RICO Defendants described in Paragraphs 185-192 above shows that each RICO Defendant agreed to commit two predicate acts, including Torneos's admission that Broadcasting Company Affiliates B and C (believed to be FIC and Fox Pan American), and Broadcasting Company Executives #2, #3, and #4 (believed to be Martinez, Lopez, and Ganley), at times agreed and supported the payment of bribes and kickbacks by T&T and Torneos affiliates to Conmebol officials, including Figueredo and Napout, and that Sports Marketing Company A and Sports Marketing Executives #1 and #2 (believed to be Full Play, Hugo Jinkis, and Mariano Jinkis, respectively) facilitated the payment of bribes and kickbacks to certain Conmebol officials.

275.    An additional predicate act to which each RICO Defendant agreed is money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), by agreeing to commit an offense in violation of 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i), (a)(2)(A), (a)(2)(B)(i)), and 18 U.S.C. § 1957, and knowing and voluntary participation in that agreement as evidenced by their conduct.

276.     By reason and as a direct and proximate result of RICO Defendants' violations of 18 U.S.C. § 1962(d), and for no reason other than RICO Defendants' violation of law, Plaintiffs were not awarded the Club Tournament television rights, and accordingly suffered substantial injury to their business and property, including without limitation loss of revenues, loss of profits, lower market share, and lessened profile in the sports telecasting marketplace, in an amount to be determined at trial but not less than hundreds of millions of dollars.

## Count Three

### Conspiracy in Restraint of Trade in the Americas Television Rights Market in Violation of Section 1 of the Sherman Act

### (Against all Defendants)

277.     Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph.

278.     Defendants knowingly and voluntarily entered into a series of contracts, combinations, or conspiracies in restraint of trade or commerce among the several states and with foreign nations, which substantially lessened or eliminated competition in the Americas Television Rights Market in violation of 15 U.S.C. § 1.

279.     Defendants' anticompetitive activities caused unreasonable restraints of trade and anticompetitive effects and lacked any pro-competitive benefit or justification.

280.     Defendants' wrongful conduct substantially affected interstate and foreign commerce and occurred within the flow of interstate and foreign commerce.

281.     To the extent Defendants' activities concerned trade outside the United States, they had direct, substantial, and reasonably foreseeable effects on U.S. commerce.

282.     Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of Defendants' aforementioned Sherman Act

violations with respect to the Americas Television Rights Market and accordingly are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

### Count Four

**Conspiracy in Restraint of Trade in the U.S. Television Programming Market in Violation of Section 1 of the Sherman Act**

**(Against all Defendants)**

283.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph.

284.    Defendants knowingly and voluntarily entered into a series of contracts, combinations, or conspiracies in restraint of trade or commerce among the several states and with foreign nations, which substantially lessened or eliminated competition in the U.S. Television Programming Market in violation of 15 U.S.C. § 1.

285.    Defendants' anticompetitive activities caused unreasonable restraints of trade and anticompetitive effects and lacked any pro-competitive benefit or justification.

286.    Defendants' wrongful conduct substantially affected interstate and foreign commerce and occurred within the flow of interstate and foreign commerce.

287.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of Defendants' aforementioned Sherman Act violations with respect to the U.S. Television Programming Market, and accordingly, Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

### Count Five

**Conspiracy in Restraint of Trade in the U.S. Television Advertising Airtime Market in Violation of Section 1 of the Sherman Act**

**(Against all Defendants)**

288.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph.

289.    Defendants knowingly and voluntarily entered into a series of contracts, combinations, or conspiracies in restraint of trade or commerce among the several states and with foreign nations, which substantially lessened or eliminated competition in the U.S. Television Advertising Airtime Market in violation of 15 U.S.C. § 1.

290.    Defendants' anticompetitive activities caused unreasonable restraints of trade and anticompetitive effects and lacked any pro-competitive benefit or justification.

291.    Defendants' wrongful conduct substantially affected interstate and foreign commerce and occurred within the flow of interstate and foreign commerce.

292.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of Defendants' aforementioned Sherman Act violations with respect to the U.S. Television Advertising Airtime Market, and accordingly Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

### Count Six

**Monopsonization of the Americas Television Rights Market in Violation of Section 2 of the Sherman Act**

**(Against T&T)**

293.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph.

294.     T&T engaged in monopsonization of the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

295.     T&T had market power and monopsony power in the Americas Television Rights Market, engaged in anticompetitive conduct, and monopsonized the Americas Television Rights Market.

296.     The intent and effect of T&T's monopsonization was to substantially weaken and/or drive T&T's competitors, including Plaintiffs, out of the Americas Television Rights Market, and/or prevent T&T's competitors from entering that market.

297.     T&T's wrongful, anticompetitive conduct materially and substantially harmed competition, injured the welfare of purchasers, suppliers, and consumers, and monopsonized a part of the trade or commerce among the several States and with foreign nations.

298.     Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of T&T's aforementioned monopsonization of the Americas Television Rights Market, and accordingly Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

## Count Seven

**Attempted Monopsonization of the Americas Television Rights Market in Violation of Section 2 of the Sherman Act**

**(Against T&T)**

299.     Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph.

300.     T&T engaged in attempted monopsonization of the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

301.    T&T engaged in predatory and anticompetitive conduct with the specific intent, purpose, and plan to monopsonize, and in furtherance of monopsonizing, the Americas Television Rights Market, and there was and continues to be a dangerous probability that T&T would obtain monopsony power and succeed in monopsonizing that market.

302.    T&T's wrongful conduct materially and substantially harmed competition and injured the welfare of purchasers, suppliers, and consumers.

303.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of T&T's conduct, and accordingly Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

### Count Eight

### Conspiracy to Monopsonize the Americas Television Rights Market in Violation of Section 2 of the Sherman Act

### (Against all Defendants)

304.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph.

305.    Defendants engaged in a conspiracy to monopsonize the Americas Television Rights Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

306.    Defendants formed an agreement in restraint of trade in the Americas Television Rights Market.

307.    Defendants knowingly and voluntarily conspired with the mutual understanding and specific intent that T&T would unlawfully obtain and maintain a monopsony in the Americas Television Rights Market.

308.    Defendants engaged in overt acts in furtherance of the conspiracy.

309.    Defendants conspired to monopsonize a part of the trade or commerce among the several States and with foreign nations.

310.    Defendants' wrongful conduct caused and threatened to cause anticompetitive effects.

311.    Plaintiffs have suffered antitrust injury and have been proximately and directly injured in their business or property by reason of Defendants' aforementioned conduct, and accordingly Plaintiffs are entitled to recover threefold the damages they sustained and the cost of suit, including reasonable attorney's fees.

## Count Nine

## Violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq.

## (Against all Defendants)

312.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-182 as if fully set forth in this paragraph. Defendants' illegal and wrongful actions herein alleged violated the Florida Deceptive and Unfair Trade Practices Act.

313.    As set forth in Paragraphs 185-247, the Defendants have engaged in unfair acts and deceptive practices in the course of trade or commerce in that they have conspired to engage in and have engaged in bribery, fraud, and money laundering in violation of federal RICO laws, and have conspired to and have actually restrained trade in violation of the Sherman Act.

314.    Defendants' conduct was designed to preclude Plaintiffs and any other competitors of T&T and Fox from obtaining or fairly competing for the Club Tournament television rights.

315.    Such unfair trade practices as bribery, fraud, money laundering, and unreasonable restraint of trade are immoral, unethical, oppressive, unscrupulous, offensive to well-established

public policy, and materially and substantially injurious to the welfare of purchasers, suppliers, and consumers.

316.    Plaintiffs, each a legitimate business enterprise, have suffered actual damages as a direct and proximate result of Defendants' wrongful, deceptive, and unfair trade practices.

317.    Plaintiffs are entitled to recover their actual damages and reasonable attorney's fees.

## Count Ten

**Tortious Interference with Prospective Economic Advantage**

**(Against the Fox Defendants, Torneos, and T&T)**

318.    Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-143 and 182 as if fully set forth in this paragraph.

319.    The Fox Defendants and Torneos, using T&T, tortiously interfered with Plaintiffs' prospective economic advantage.

320.    Plaintiffs had a prior and ongoing business relationship with Conmebol based on their repeated negotiations regarding the purchase of television rights for the Club Tournaments and on Global Sports' agreement with Conmebol to purchase from Conmebol the rights to sell so-called "static" advertising and publicity, including on-field billboards, at the Club Tournaments ("Static Advertising Rights").  Global Sports entered into an agreement with Conmebol to purchase the Static Advertising Rights for the year 2010 and, in or around April 2011, entered into a new agreement with Conmebol to purchase Static Advertising Rights for the 2011–2014 period.

321.    On information and belief, Fox Defendants, Torneos, and T&T, were aware of Global Sports' business relationship with Conmebol because Conmebol officials informed them

of Global Sports' attempts to acquire television rights to the Club Tournaments and Global Sports' agreement with Conmebol to purchase Static Advertising Rights.

322.     Fox Defendants, Torneos, and T&T were aware that Plaintiffs' opportunity to obtain television rights for the Club Tournaments from Conmebol represented a prospective economic advantage for Plaintiffs.

323.     By bribing Conmebol officials and causing Conmebol to refuse to deal with Global Sports, the Fox Defendants, Torneos and T&T acted with the intent to interfere with Plaintiffs' prospective economic advantage and without a legitimate business justification.

324.     Plaintiffs have suffered actual damages as a direct and proximate result of Defendants' wrongful conduct.

## Count Eleven

### Civil Conspiracy to Commit Tortious Interference

### (Against the Fox Defendants, Torneos, T&T, Full Play, Martinez, Lopez, Ganley, Burzaco, Figueredo, and Napout)

325.     Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1-143 and 182 as if fully set forth in this paragraph.

326.     T&T tortiously interfered with Plaintiffs' prospective economic advantage.

327.     The Fox Defendants, Torneos, T&T, Full Play, Martinez, Lopez, Ganley, Burzaco, Figueredo, and Napout ("Conspiracy Defendants") agreed to participate in a common scheme in which T&T would tortiously interfere with Plaintiffs' prospective economic advantage.

328.     The Conspiracy Defendants intentionally participated in the common scheme and committed overt and unlawful acts in furtherance of it.

329.    Plaintiffs have been damaged in their business and property as a direct and proximate result of Conspiracy Defendants' conspiracy and the overt acts committed in furtherance of it.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment awarding:

A.    Compensatory damages in an amount to be determined at trial, including interest;

B.    Trebling of those compensatory damages awarded under Plaintiffs' RICO and Sherman Act claims (Counts One through Eight);

C.    Disgorgement damages of profit earned as a result of wrongful conduct and punitive damages under Plaintiffs' Tortious Interference and Civil Conspiracy claims (Counts Ten and Eleven);

D.    Reasonable attorney's fees under Plaintiffs' RICO, Sherman Act and Florida Deceptive and Unfair Trade Practices Act claims (Counts One through Nine);

E.    The cost of this action; and

F.    Such other and further relief as the Court may deem just and proper.

Dated: March 13, 2018
New York, New York

/s/ *Peter H. Levitt*
Peter H. Levitt (FBN 650978)
Stephen Bernard Gillman (FBN 196734)

/s/ *Julissa Reynoso*
Seth C. Farber (*pro hac vice*)
Julissa Reynoso (*pro hac vice*)
George Mastoris (*pro hac vice*)
Marcelo Blackburn (*pro hac vice*)
Cristina I. Calvar (FBN 114201)
Michael A. Fernández (*pro hac vice*)
Lauren Duxstad (*pro hac vice*)

SHUTTS & BOWEN LLP
200 South Biscayne Boulevard
Suite 4100
Miami, FL 33131
Tel.: (305) 358-6300
Fax: (305) 381-9982
plevitt@shutts.com
sgillman@shutts.com

WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Tel.: (212) 294-6700
Fax: (212) 294-4700
sfarber@winston.com
jreynoso@winston.com
gmastoris@winston.com
mblackburn@winston.com
ccalvar@winston.com
mafernandez@winston.com
lduxstad@winston.com

*Counsel for Plaintiffs GolTV, Inc. and Global Sports Partners LLP*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 13th day of March, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record.

/s/ Cristina I. Calvar

# EXHIBIT A

DSS:EMN/AH/DAL/SPN/MKM/PT/KDE/TH/BDM
F.#2015R00747

FILED
CLERK

2015 NOV 25 PM 3: 25

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ALFREDO HAWIT,
ARIEL ALVARADO,
RAFAEL CALLEJAS,
BRAYAN JIMÉNEZ,
EDUARDO LI,
JULIO ROCHA,
RAFAEL SALGUERO,
COSTAS TAKKAS,
HÉCTOR TRUJILLO,
REYNALDO VASQUEZ,
JACK WARNER,
JUAN ÁNGEL NAPOUT,
MANUEL BURGA,
CARLOS CHÁVEZ,
LUÍS CHIRIBOGA,
MARCO POLO DEL NERO,
EDUARDO DELUCA,
RAFAEL ESQUIVEL,
EUGENIO FIGUEREDO,
NICOLÁS LEOZ,
JOSÉ MARIA MARIN,
JOSÉ LUÍS MEISZNER,
ROMER OSUNA,
RICARDO TEIXEIRA,
AARON DAVIDSON,
HUGO JINKIS, and
MARIANO JINKIS,

          Defendants.

- - - - - - - - - - - - - - - - - - - -X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. <u>15-252 (S-1) (RJD)</u>
(T. 8, U.S.C., § 1451(e);
T. 18, U.S.C., §§
981(a)(1)(C), 982(a)(1),
982(a)(6), 982(b), 1343,
1349, 1425(a), 1512(c)(2),
1512(k), 1956(a)(2)(A),
1956(a)(2)(B)(i), 1956(h),
1957(a), 1957(b),
1957(d)(1), 1962(d), 1963,
1963(a), 1963(m), 2, and
3551 <u>et seq.</u>; T. 21,
U.S.C., § 853(p); T. 26,
U.S.C., § 7206(2); T. 28,
U.S.C., § 2461(c))

A TRUE COPY
ATTEST

DATE _November 25_ 20 _15_
DOUGLAS C. PALMER

BY _R. Tarou_ CLERK
DEPUTY CLERK

# CONTENTS

INTRODUCTION TO ALL COUNTS ................................... 1

I.  The Enterprise........................................... 1

    A.  FIFA ............................................... 2
    B.  The Continental Confederations ..................... 9
    C.  The Regional Federations and National Associations ..13
    D.  The Sports Marketing Companies ..................... 14

II.  The Defendants......................................... 15

    A.  CONCACAF Region Officials .......................... 15
    B.  CONMEBOL Region Officials .......................... 20
    C.  Sports Marketing Executives ........................ 25

III. The Defendants' Co-Conspirators....................... 27

    A.  Named Co-Conspirators .............................. 27
    B.  Unnamed Co-Conspirators ............................ 32

IV.  The Conspirators' Corruption of the Enterprise........ 37

V.  Overview of the Racketeering Conspiracy................ 39

    A.  The Initial Corruption of the Enterprise ........... 41
    B.  The Growth of the Sports Marketing Companies ....... 45
    C.  Embezzlement and Misappropriation .................. 50
    D.  The Centrality of the U.S. Financial System ........ 50
    E.  Scandals and Resignations .......................... 52
    F.  The Continued Corruption of the Enterprise ......... 53
        i.  Pre-Indictment Period.......................... 54
        ii. Post-Indictment Period......................... 59
    G.  Obstruction of Justice ............................. 61

VI.  The Criminal Schemes.................................. 62

    A.  CONMEBOL Copa América Scheme ....................... 62
    B.  CONCACAF Gold Cup Scheme ........................... 69
    C.  CONMEBOL Copa Libertadores Scheme #1 ............... 71
    D.  CONMEBOL Copa Libertadores Scheme #2 ............... 75
    E.  CBF Copa do Brasil Scheme .......................... 80
    F.  CBF Sponsorship Scheme ............................. 83
    G.  CFU World Cup Qualifiers Scheme #1 ................. 86
    H.  2010 FIFA World Cup Vote Scheme .................... 90

i

  I.  UNCAF Region World Cup Qualifiers Schemes ...........96
    i.  FEDEFUT (Costa Rica) .........................100
    ii.  FENIFUT (Nicaragua) .........................103
    iii. FENAFUTH (Honduras) .........................105
    iv.  FESFUT (El Salvador) ........................107
    v.  FENAFUTG (Guatemala) ........................109
    vi.  FEPAFUT (Panama) ............................112
  J.  UNCAF Region Friendlies Schemes ...................114
    i.  FESFUT (El Salvador) ........................115
    ii.  FENAFUTG (Guatemala) ........................118
    iii. FEDEFUT (Costa Rica) ........................119
  K.  2011 FIFA Presidential Election Scheme ............120
  L.  CONCACAF Media and Marketing Rights Scheme ........124
  M.  CFU World Cup Qualifiers Scheme #2 ................131
  N.  CONCACAF Gold Cup/Champions League Scheme .........137
  O.  CONMEBOL/CONCACAF Copa América Centenario Scheme ...140

CRIMINAL COUNTS ...........................................149

CRIMINAL FORFEITURE ALLEGATIONS ...........................225

THE GRAND JURY CHARGES:

<u>INTRODUCTION TO ALL COUNTS</u>

At all times relevant to this Superseding Indictment (the "Indictment"), unless otherwise indicated:

I.   <u>The Enterprise</u>

1.   The Fédération Internationale de Football Association ("FIFA") and its six constituent continental confederations – the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football ("UEFA"), the Confédération Africaine de Football ("CAF"), the Asian Football Confederation ("AFC"), and the Oceania Football Confederation ("OFC") – together with affiliated regional federations, national member associations, and sports marketing companies, collectively constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of legal entities associated in fact (hereinafter the "enterprise").  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

1

2.    The principal purpose of the enterprise was to regulate and promote the sport of soccer worldwide.  The members of the enterprise carried out this purpose by using a variety of methods and means, including creating and enforcing uniform standards and rules, organizing international competitions, and commercializing the media and marketing rights associated with the sport.  The members of the enterprise, as well as individuals and entities employed by and associated with the enterprise, frequently engaged in banking and investment activities with United States financial institutions.

3.    The enterprise operated in the Eastern District of New York and elsewhere, including overseas.

A.    FIFA

4.    FIFA was the international body governing organized soccer, commonly known outside the United States as football.  FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland.  FIFA was composed of as many as 209 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories.  The United States first became affiliated with FIFA in 1914; Puerto Rico first became affiliated with FIFA in 1960, with Guam, American Samoa, and the United States Virgin Islands following suit in the

2

1990s.  At various times relevant to the Indictment, FIFA
maintained offices both in Zurich, Switzerland and elsewhere in
the world, including in the United States, where FIFA maintained
a development office since at least 2011.

5.    Each of FIFA's member associations also was a
member of one of the six continental confederations recognized
by FIFA: CONCACAF, CONMEBOL, UEFA, CAF, AFC, and OFC.  Since at
least 1996, under FIFA's statutes, no national soccer
association could become a member of FIFA without first joining
one of the six continental confederations.  Since at least 2004,
member associations were required to pay to FIFA annual dues,
known as subscriptions.

6.    FIFA was governed by: a congress composed of its
member associations, which acted as the association's highest
legislative body; an executive committee, which acted as the
executive body; and a general secretariat, which acted as the
administrative body.  FIFA also had a president, who represented
the association worldwide and was responsible for the
implementation of decisions.  FIFA also operated several
standing committees, including a committee that organized
Olympic soccer qualifying tournaments, whose members included
soccer officials from various national member associations.
FIFA also operated through a number of subsidiaries, including

3

subsidiaries that assisted with FIFA's media and marketing
activities.

7.    The FIFA congress was composed of delegates from
each of its member associations as well as observers appointed
by each of the confederations.  Among other things, the congress
was responsible for amending FIFA's statutes and electing the
FIFA president.  The congress convened in ordinary sessions
biennially or annually, and at other times in extraordinary
sessions in various countries around the world, including the
United States.

8.    The FIFA executive committee, often referred to
as the "ExCo," was composed of the FIFA president and a number
of ordinary members, some of whom also held the title of vice
president.  The president was elected by the FIFA congress.  The
vice presidents and ordinary members were appointed by the
confederations.  Each confederation was entitled to appoint a
specific number of vice presidents and ordinary members, as set
forth in the FIFA statutes.  Since at least 1996, the executive
committee was required by FIFA statutes to meet at least twice
per year.  The executive committee held meetings at FIFA's
headquarters in Zurich, Switzerland, as well as in various
countries around the world, including the United States.

9.    Among other duties, the executive committee was responsible for selecting the host nations of FIFA tournaments, including, among others, the World Cup, the Women's World Cup, the Confederations Cup, the Under-20 World Cup, the Under-20 Women's World Cup, the Under-17 World Cup, the Under-17 Women's World Cup, and the Club World Cup.

10.    The World Cup, the sport's premier event, was a quadrennial international tournament involving the senior national men's teams of 24 and, beginning in 1998, 32 nations. In selecting the host nation for the World Cup, the executive committee typically followed a process in which bid committees for the competing nations campaigned for votes among the members of the executive committee.  Following this process, and at least six years prior to each World Cup, the executive committee typically held a vote in which its members cast their votes via secret ballot.  The winners, or host nations, for the World Cups from 1990 to 2022, as well as the other bidding nations that maintained their bids to the end of the process, are reflected in the table below:

**TABLE 1:** World Cup Host Selection

| World Cup | Date Selected by the ExCo | Winning Nation | Other Bidding Nation/Nations |
|---|---|---|---|
| 1990 | May 19, 1984 | Italy | Soviet Union |
| 1994 | July 4, 1988 | United States | Morocco Brazil |
| 1998 | July 2, 1992 | France | Morocco |
| 2002 | May 31, 1996 | Japan/South Korea | Mexico |
| 2006 | July 6, 2000 | Germany | South Africa England Morocco |
| 2010 | May 15, 2004 | South Africa | Morocco Egypt |
| 2014 | October 30, 2007 | Brazil | – |
| 2018 | December 2, 2010 | Russia | Spain/Portugal Netherlands/Belgium England |
| 2022 | December 2, 2010 | Qatar | United States South Korea Japan Australia |

The U.S. men's national team qualified for each edition of the World Cup from 1990 to 2014.

11. Since at least 1996, under FIFA's statutes, the six continental confederations had certain rights and obligations, including, among other things, that they comply with and enforce FIFA's statutes, regulations, and decisions and work closely with FIFA to further FIFA's objectives and organize international soccer competitions.

6

12.    FIFA's purpose was, among other things, to develop and promote the game of soccer globally by organizing international competitions and by creating and enforcing rules that govern the confederations and member associations.  FIFA financed its efforts in significant part by commercializing the media and marketing rights associated with the World Cup.

- According to its published income statement for the 2007-2010 financial period, FIFA had total revenues of $4.189 billion, 83% of which ($3.480 billion) was attributable to the sale of television and marketing rights to the 2010 World Cup.  FIFA's profits during this same period were $631 million.

- According to its published income statement for the 2011-2014 financial period, FIFA had total revenues of $5.718 billion, 70% of which ($4.008 billion) was attributable to the sale of television and marketing rights to the 2014 World Cup.  FIFA's profits during this same period were $338 million.

- According to the same 2011-2014 income statement, well over one third of FIFA's revenue from the sale of marketing rights to the 2014 World Cup was attributable to a class of six sponsors known as the FIFA Partners, which included two major U.S.-based companies.  The second largest source of marketing revenue was a class of eight sponsors known as FIFA World Cup Sponsors, which included three U.S.-based companies.  Together, the FIFA Partners and FIFA World Cup Sponsors provided FIFA with more than $300 million in marketing revenue in connection with the 2014 World Cup.

In a sign of the enormous value of the commercial rights to the World Cup, several major broadcasters had already reached

7

agreements with FIFA and downstream parties for the broadcast
and commercialization of the 2026 World Cup and 2030 World Cup,
notwithstanding that the host sites for those events – an
important factor in the ultimate value of the rights – had yet
to be selected.

13.   FIFA helped finance the confederations and their
member associations, including by providing funds through the
Financial Assistance Program ("FAP") and the Goal Program, which
were established in the late 1990s to support the development of
youth academies, soccer fields, technical centers, and other
infrastructure projects.  According to its published income
statement for the 2011-2014 financial period, FIFA spent $1.052
billion on development projects, including $538 million for the
FAP program.

14.   FIFA first instituted a written code of ethics in
October 2004, which code was revised in 2006, again in 2009, and
most recently in 2012 (generally, the "code of ethics").  The
code of ethics governed the conduct of soccer "officials," which
expressly included, among others, various individuals with
responsibilities within FIFA, the confederations, member
associations, leagues, and clubs.  Among other things, the code
of ethics provided that soccer officials were prohibited from
accepting bribes or cash gifts and from otherwise abusing their

8

positions for personal gain. The code of ethics further
provided, from its inception, that soccer officials owed certain
duties to FIFA and its confederations and member associations,
including a duty of absolute loyalty. By 2009, the code of
ethics explicitly recognized that FIFA officials stand in a
fiduciary relationship to FIFA and its constituent
confederations, member associations, leagues, and clubs.

      B.   <u>The Continental Confederations</u>

      15.   In addition to providing representatives who
helped to govern FIFA, the six continental confederations worked
closely with FIFA and one another to organize international
soccer competitions and carry out FIFA directives on a regional
basis. The leaders and representatives of the confederations
conducted business with one another, as well as with the leaders
and associates of FIFA, throughout the year at locations around
the world, including in the United States. Each confederation
was governed by its own congress, general secretariat, executive
committee and standing committees. From time to time, some of
the confederations, like FIFA, also operated through
subsidiaries, including subsidiaries that assisted with media
and marketing activities.

      16.   CONCACAF was a continental soccer confederation
incorporated, since 1994, as a non-profit corporation in Nassau,

Bahamas. CONCACAF comprised as many as 41 member associations, representing organized soccer in North America, Central America, the Caribbean, and three South American countries. The United States and two of its overseas territories, Puerto Rico and the United States Virgin Islands, were members of CONCACAF. From approximately 1990 to 2012, CONCACAF's principal administrative office was located in New York, New York, where the former general secretary was based (until the end of 2011) and where CONCACAF regularly conducted business. Beginning in 2012, CONCACAF's principal administrative office was located in Miami, Florida, where the new general secretary was based. CONCACAF also conducted business at various times throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation. Among other tournaments, CONCACAF organized the Gold Cup, featuring the men's national teams from CONCACAF and, from time to time, other confederations, as well as a tournament featuring the top men's professional league – or club – teams. In June 2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

17. CONMEBOL was a continental soccer confederation domiciled in Paraguay and headquartered in Asunción, Paraguay and, later, Luque, Paraguay. CONMEBOL comprised as many as 10

10

member associations, representing organized soccer in South America.  Among other tournaments, CONMEBOL organized the Copa América, featuring the men's national teams of its 10 members and two non-CONMEBOL national teams that were invited to participate, as well as tournaments featuring the top men's club teams.  Since 1993, the United States has participated in the Copa América as an invitee three times, and in 2016 the United States will host and participate in a special edition of the tournament, the Copa América Centenario, to commemorate its centennial.

18.  UEFA was a continental soccer confederation registered as a legal entity under the laws of Switzerland and headquartered in Nyon, Switzerland.  UEFA comprised as many as 54 member associations, representing organized soccer in Europe and certain nations in the Middle East and Central Asia.  Among other tournaments, UEFA organized the European Championship, featuring the top men's national teams, as well as tournaments featuring the top men's club teams.

19.  CAF was a continental soccer confederation headquartered in Cairo, Egypt.  CAF comprised as many as 56 member associations, representing organized soccer in Africa. Among other tournaments, CAF organized the Africa Cup of

11

Nations, featuring the top men's national teams, as well as a tournament featuring the top men's club teams.

20. AFC was a continental soccer confederation registered as a legal entity under the laws of Malaysia and headquartered in Kuala Lumpur, Malaysia. AFC comprised as many as 47 member associations, representing organized soccer in Asia, as well as on the island of Guam, a territory of the United States. Among other tournaments, AFC organized the Asian Cup, featuring the top men's national teams, as well as a tournament featuring the top men's club teams.

21. OFC was a continental soccer confederation incorporated under the laws of New Zealand and headquartered in Auckland, New Zealand. OFC comprised as many as 14 member associations, representing organized soccer in New Zealand and the Pacific Island countries, including American Samoa, a territory of the United States. Among other tournaments, OFC organized the Nations Cup, a tournament founded in 1996 featuring the top men's national teams, as well as a tournament featuring the top men's club teams.

22. The confederations also organized World Cup qualifying matches, using a variety of formats, and, from time to time, worked together to organize inter-confederation competitions, often with the support and approval of FIFA.

12

C.    The Regional Federations and National Associations

23.    In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations.

24.    For example, CONCACAF's member associations were organized into three smaller regional federations: the Caribbean Football Union ("CFU"), the Central American Football Union ("UNCAF"), and the North American Football Union ("NAFU").  The United States Soccer Federation ("USSF") was thus a member association of CONCACAF as well as NAFU, while Puerto Rico and the United States Virgin Islands were both members of CONCACAF and CFU.

25.    At various times, CFU was an entity headquartered in Trinidad and Tobago and Jamaica.  The CFU statutes effective May 22, 2012 provided, in pertinent part, that CFU officials "shall observe all pertinent statutes, regulations, directives and decisions" of FIFA, CONCACAF, and CFU, "including in particular . . . FIFA's Code of Ethics."

26.    The national associations promoted, organized, and governed soccer, often including club-level soccer, within individual nations.  The national association of the United States, the USSF, was based in Chicago, Illinois.

13

27.  The national associations, also often referred to as "federations," worked together to organize exhibition soccer matches between national teams, known as "friendlies," which also took place on the club level.  Friendlies took place in venues throughout the United States, including the Eastern District of New York, as well as in other venues worldwide.

D.   The Sports Marketing Companies

28.  FIFA, the continental confederations, the regional federations and the national member associations often entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events, including the World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies, and other events, as well as other rights associated with the sport.  Often operating in coordination with affiliated consultants and intermediaries, these sports marketing companies, including multinational corporations with headquarters, offices, or affiliates located in the United States, often acquired an array of media and marketing rights, including television and radio broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights, and ticketing rights.  These sports marketing companies often sold these rights to, among others,

television and radio broadcast networks, sponsors, and sub-
licensees, including those located in the United States.

29. The revenue generated by the commercialization of
the media and marketing rights associated with soccer
constituted an essential source of revenue for the enterprise.
The United States was an increasingly important and lucrative
market for the commercialization of these rights.

## II. The Defendants

### A. CONCACAF Region Officials

30. The defendant ALFREDO HAWIT, a citizen of
Honduras, was an individual employed by and associated with the
enterprise. At various times relevant to the Indictment, HAWIT
was a member of the CONCACAF executive committee and the general
secretary, and then president, of the Federación Nacional
Autonoma de Futbol de Honduras ("FENAFUTH"), the Honduran soccer
federation, which was a national member association of FIFA,
CONCACAF, and UNCAF. From in or about June 2011 to May 2012,
HAWIT was the acting president of CONCACAF. From in or about
June 2015 to the present, HAWIT was the president of CONCACAF,
as well as a FIFA vice president serving on the FIFA executive
committee. At various times relevant to the Indictment, HAWIT
was also a member of various FIFA standing committees, including
the finance committee.

31. The defendant ARIEL ALVARADO, a citizen of Panama, was an individual employed by and associated with the enterprise. From at least in or about 2004 to 2012, ALVARADO was the president of the Federación Panamena de Futbol ("FEPAFUT"), the Panamanian soccer federation, which was a national member association of FIFA, CONCACAF, and UNCAF. At various times relevant to the Indictment, ALVARADO was a member of the CONCACAF executive committee and the FIFA disciplinary committee, which latter membership continued through the present.

32. The defendant RAFAEL CALLEJAS, a citizen of Honduras, was an individual employed by and associated with the enterprise. At various times relevant to the Indictment, CALLEJAS was the president of FENAFUTH. At various times relevant to the Indictment, CALLEJAS was also a member of the FIFA marketing and television committee, which membership continued through the present. From 1990 to 1994, CALLEJAS was the president of the Republic of Honduras.

33. The defendant BRAYAN JIMÉNEZ, a citizen of Guatemala, was an individual employed by and associated with the enterprise. From in or about 2010 to the present, JIMÉNEZ was the president of the Federación Nacional de Futbol de Guatemala ("FENAFUTG"), the Guatemalan soccer federation, which was a

16

national member association of FIFA, CONCACAF, and UNCAF. At various times relevant to the Indictment, JIMÉNEZ was a member of the FIFA committee for fair play and social responsibility, which membership continued through the present.

34. The defendant EDUARDO LI, a citizen of Costa Rica, was an individual employed by and associated with the enterprise. At various times relevant to the Indictment, LI was the president of the Federación Costarricense de Fútbol ("FEDEFUT"), the Costa Rican soccer federation, which was a national member association of FIFA, CONCACAF and UNCAF. From in or about 2013 to at least May 2015, LI was also a member of CONCACAF's executive committee. In April 2015, LI was elected by the CONCACAF congress to become one of CONCACAF's three representatives on FIFA's executive committee. At various times relevant to the Indictment, LI was also a member of multiple FIFA standing committees, including the players' status committee. At various times relevant to the Indictment, LI owned a residence in the United States, specifically in the state of Florida.

35. The defendant JULIO ROCHA, a citizen of Nicaragua, was an individual employed by and associated with the enterprise. Until approximately December 2012, ROCHA was the president of the Federación Nicaragüense de Fútbol ("FENIFUT"),

17

the Nicaraguan soccer federation, which was a national member
association of FIFA, CONCACAF and UNCAF.  From in or about 2003
to 2007, ROCHA was president of UNCAF.  From in or about January
2013 to at least May 2015, ROCHA was a FIFA development officer
based in Panama, responsible for overseeing FIFA's development
efforts in Central America.

36.  The defendant RAFAEL SALGUERO, a citizen of
Guatemala, was an individual employed by and associated with the
enterprise.  At various times relevant to the Indictment,
SALGUERO was designated by CONCACAF to serve as one of its three
representatives on the FIFA executive committee.  At various
times relevant to the Indictment, SALGUERO was also a member of
various FIFA standing committees, including the legal committee,
and was also the president of FENAFUTG, the Guatemalan soccer
federation.

37.  The defendant COSTAS TAKKAS, a citizen of the
United Kingdom, was an individual employed by and associated
with the enterprise.  At various times relevant to the
Indictment, TAKKAS was the principal of a number of businesses,
including Kosson Ventures Limited ("Kosson Ventures"), a British
Virgin Islands-registered personal holding company, and CPL
Limited, a Cayman Islands-registered personal holding company.
At various times relevant to the Indictment, TAKKAS was also the

18

general secretary of the Cayman Islands Football Association

("CIFA"), a national member association of FIFA and CONCACAF,

and was also an attaché to the CONCACAF president after Jeffrey

Webb assumed that role.

38. The defendant HÉCTOR TRUJILLO, a citizen of

Guatemala, was an individual employed by and associated with the

enterprise. From in or about at least 2010 to the present,

TRUJILLO was the general secretary of FENAFUTG. At various

times relevant to the Indictment, including the present,

TRUJILLO was also a judge on the Constitutional Court of

Guatemala.

39. The defendant REYNALDO VASQUEZ, a citizen of El

Salvador, was an individual employed by and associated with the

enterprise. At various times relevant to the Indictment,

VASQUEZ was the president of the Federación Salvadoreña de

Futbol ("FESFUT"), the Salvadoran soccer federation, which was a

national member association of FIFA, CONCACAF, and UNCAF.

40. The defendant JACK WARNER, a citizen of Trinidad

and Tobago and, between approximately 1993 and 2013, a legal

permanent resident of the United States, was an individual

employed by and associated with the enterprise. From in or

about 1983 to June 2011, WARNER was a member of the FIFA

executive committee, and, beginning in 1997, was also a FIFA

19

vice president.  From in or about 1990 to June 2011, WARNER was also the president of CONCACAF and CFU, as well as a "special advisor" to the Trinidad and Tobago Football Federation, a national member association of FIFA, CONCACAF and the CFU.

B.    CONMEBOL Region Officials

41.   The defendant JUAN ÁNGEL NAPOUT, a citizen of Paraguay, was an individual employed by and associated with the enterprise.  On or about and between May 29, 2015 and the present, NAPOUT was a member of FIFA's executive committee and a FIFA vice president.  At various times relevant to the Indictment, NAPOUT was also a member of multiple FIFA standing committees, including the disciplinary committee and the organizing committee for the World Cup.  From in or about August 2014 to the present, NAPOUT was the CONMEBOL president; prior to that, he was one of CONMEBOL's vice presidents.  From in or about 2003 to 2013, NAPOUT was vice president and then president of the Asociación Paraguaya de Fútbol, the Paraguayan soccer federation, which was a national member association of FIFA and CONMEBOL.

42.   The defendant MANUEL BURGA, a citizen of Peru, was an individual employed by and associated with the enterprise.  From in or about 2002 to 2014, BURGA was the president of Federación Peruana de Fútbol, the Peruvian soccer

20

federation, which was a national member association of FIFA and CONMEBOL. At various times relevant to the Indictment, BURGA was a member of the FIFA development committee, which membership continued through the present.

43. The defendant CARLOS CHÁVEZ, a citizen of Bolivia, was an individual employed by and associated with the enterprise. From in or about 2006 to at least August 2015, CHÁVEZ was the president of Federación Boliviana de Fútbol, the Bolivian soccer federation, which was a national member association of FIFA and CONMEBOL. At various times relevant to the Indictment, CHÁVEZ was also the treasurer of CONMEBOL.

44. The defendant LUÍS CHIRIBOGA, a citizen of Ecuador, was an individual employed by and associated with the enterprise. From in or about 1998 to the present, CHIRIBOGA was the president of Federación Ecuatoriana de Fútbol, the Ecuadorian soccer federation, which was a national member association of FIFA and CONMEBOL. At various times relevant to the Indictment, CHIRIBOGA was also a member of the CONMEBOL executive committee.

45. The defendant MARCO POLO DEL NERO, a citizen of Brazil, was an individual employed by and associated with the enterprise. In or about April 2015 to the present, DEL NERO was the president of the Confederação Brasileira de Futebol ("CBF"),

21

the Brazilian soccer federation, which was a national member
association of FIFA and CONMEBOL.  From in or about 2012 to the
present, DEL NERO was also a member of FIFA's executive
committee.  At various times relevant to the Indictment, DEL
NERO was also a member of multiple FIFA standing committees,
including the organizing committee for the Olympic football
tournaments, for which he served as chairman, and the organizing
committee for the World Cup, for which he served as deputy
chairman.

46.   The defendant EDUARDO DELUCA, a citizen of
Argentina, was an individual employed by and associated with the
enterprise.  In or about 1986 to 2011, DELUCA was the general
secretary of CONMEBOL.

47.   The defendant RAFAEL ESQUIVEL, a citizen of
Venezuela, was an individual employed by and associated with the
enterprise.  ESQUIVEL was the president of the Federación
Venezolana de Fútbol ("FVF"), the Venezuelan soccer federation,
which was a national member association of FIFA and CONMEBOL.
In or about 2014 to at least May 2015, ESQUIVEL was also a vice
president on the CONMEBOL executive committee.  At various times
relevant to the Indictment, ESQUIVEL owned several pieces of
residential property in the United States, specifically in the
state of Florida.

48.     The defendant EUGENIO FIGUEREDO, a citizen of the United States and Uruguay, was an individual employed by and associated with the enterprise.  From in or about May 2013 to May 2015, FIGUEREDO was a member of FIFA's executive committee and a FIFA vice president.  At various times relevant to the Indictment, FIGUEREDO was also a member of multiple FIFA standing committees, including the finance committee and the organizing committee for the World Cup.  From in or about April 2013 to August 2014, FIGUEREDO was the CONMEBOL president; prior to that, he was one of CONMEBOL's vice presidents.  In or about 1997 to 2006, FIGUEREDO was the president of the Asociación Uruguaya de Fútbol, the Uruguayan soccer federation, which was a national member association of FIFA and CONMEBOL.  From at least in or about 2005 to the present, FIGUEREDO maintained a residence in the United States, specifically in Arcadia, California.  According to a naturalization application FIGUEREDO filed in 2005 with U.S. immigration authorities, beginning in 1997 FIGUEREDO worked in "sales" at a "decorative rock" business in Irwindale, California.  In his application, FIGUEREDO falsely affirmed under penalty of perjury that (a) he neither worked anywhere else in the previous five years nor ever had any affiliation with any organization or association in the United States or in any other place; and (b) he was exempt from the

23

required English language and civics exams because of a mental disability. Prior to obtaining his U.S. citizenship in August 2006, FIGUEREDO submitted documentation explaining his mental disability that falsely stated that he had severe dementia.

49. The defendant NICOLÁS LEOZ, a citizen of Paraguay, was an individual employed by and associated with the enterprise. In or about 1986 to April 2013, LEOZ was the president of CONMEBOL. In or about 1998 to April 2013, LEOZ was also a member of FIFA's executive committee.

50. The defendant JOSÉ MARIA MARIN, a citizen of Brazil, was an individual employed by and associated with the enterprise. In or about March 2012 to April 2015, MARIN was the president of CBF, the Brazilian soccer federation. At various times relevant to the Indictment, MARIN was also a member of multiple FIFA standing committees, including the organizing committee for the Olympic football tournaments, as well as the organizing committees for the World Cup and the Confederations Cup, as to which he was a special adviser. At various times relevant to the Indictment, MARIN maintained a residence in the United States, specifically in the state of New York.

51. The defendant JOSÉ LUÍS MEISZNER, a citizen of Argentina, was an individual employed by and associated with the enterprise. From in or about 2012 to the present, MEISZNER was

24

the general secretary of CONMEBOL.  Previously, MEISZNER was the

general secretary of the Asociación del Futbol Argentina

("AFA"), the Argentinian soccer federation.

52.  The defendant ROMER OSUNA, a citizen of Bolivia,

was an individual employed by and associated with the

enterprise.  From in or about 1986 to 2013, OSUNA was the

treasurer of CONMEBOL.  At various times relevant to the

Indictment, OSUNA was a member of the FIFA audit and compliance

committee, which membership continued through the present.

53.  The defendant RICARDO TEIXEIRA, a citizen of

Brazil, was an individual employed by and associated with the

enterprise.  From in or about 1989 to March 2012, TEIXEIRA was

the president of CBF, the Brazilian soccer federation.  In or

about 1994 to March 2012, TEIXEIRA was also a member of FIFA's

executive committee.

C.   Sports Marketing Executives

54.  The defendant AARON DAVIDSON, a citizen of the

United States, was an individual employed by and associated with

the enterprise.  At various times relevant to the Indictment,

DAVIDSON was a high-level executive, including the president, of

Traffic Sports USA, Inc. ("Traffic USA").  Traffic USA was a

Florida corporation that had its headquarters and principal

place of business in Miami, Florida and was involved in the

25

purchase and sale of media and marketing rights associated with soccer in the United States and other parts of the CONCACAF region. Traffic USA also participated in the ownership and management of the North American Soccer League ("NASL"), a division of United States men's club soccer sanctioned by the USSF, as well as the ownership and management of multiple clubs within the league. The NASL was headquartered in New York, New York and its teams were based in various cities in Canada and the United States, including in the Eastern District of New York. As further described below, Traffic USA was part of the Traffic Group, a multinational sports marketing conglomerate based in São Paulo, Brazil.

55. The defendant HUGO JINKIS and his son, the defendant MARIANO JINKIS, both citizens of Argentina, were individuals employed by and associated with the enterprise. At various times relevant to the Indictment, HUGO JINKIS and MARIANO JINKIS were the controlling principals of Full Play Group S.A., a sports media and marketing business with its principal offices in Argentina. HUGO JINKIS and MARIANO JINKIS also controlled subsidiaries and affiliates of Full Play Group S.A., including, among others, Cross Trading S.A. ("Cross Trading") and Yorkfields S.A. HUGO JINKIS and MARIANO JINKIS's companies are referred to collectively below as "Full Play."

26

\* \* \* \*

56.   The foregoing officials of FIFA, CONCACAF,
CONMEBOL, and other soccer governing bodies were bound by
fiduciary duties to their respective organizations.

III. The Defendants' Co-Conspirators

   A.   Named Co-Conspirators

57.   At various times relevant to the Indictment,
Charles Blazer was the general secretary of CONCACAF.  Blazer
resided in New York, New York, where he oversaw CONCACAF's
administrative headquarters and staff.  From in or about
February 1997 to May 2013, Blazer was also a member of FIFA's
executive committee, serving as one of the three members of that
body who had been appointed by CONCACAF and the only member who
represented the United States.  At various times relevant to the
Indictment, Blazer was also a member of various FIFA standing
committees, including the marketing and television committee.

58.   At various times relevant to the Indictment, José
Hawilla was the founder and owner of the Traffic Group, a
multinational sports marketing company based in São Paulo,
Brazil.  The Traffic Group was comprised of, among other
entities, Traffic Assessoria e Comunicações S/C Ltda. ("Traffic
Brazil"), Traffic Sports International, Inc. ("Traffic
International"), Traffic USA, Traffic Sports Europe B.V., and

27

Continental Sports International, Inc. (referred to collectively herein as "Traffic" or the "Traffic Group").

59. At various times relevant to the Indictment, Traffic's operations focused on, among other things, the commercialization of soccer in South America through the purchase and sale of media and marketing rights associated with the sport. Beginning in or about 1990, José Hawilla expanded Traffic's operations to the United States, partnering with and later acquiring a Florida company called Inter/Forever Sports, Inc., which was renamed Traffic Sports USA, Inc. (collectively referred to below as "Traffic USA") in or about 2003. Over time, Traffic began to expand its operations even beyond the Americas, including by contracting directly with FIFA in the late 1990s and early 2000s to acquire the rights to the first editions of the Club World Championship. Hawilla funded Traffic through various mechanisms, including revenues generated by the downstream sale of television and other rights obtained from media and marketing contracts and direct and frequent infusions of capital from Continental Sports International, Inc. ("Continental Sports"), a Cayman Islands company that Hawilla controlled and that maintained an account at Citi Private Bank in New York, New York. Between 2006 and 2013, Continental Sports wire transferred tens of millions of dollars to Traffic

28

International's account at Delta Bank in Miami, Florida and tens of millions of dollars more to Traffic Brazil's accounts overseas.

60. At various times relevant to the Indictment, José Margulies was a controlling principal of Valente Corp. ("Valente") and Somerton Ltd ("Somerton"), South American companies registered in Panama and Turks and Caicos, respectively, that were involved in the broadcasting of soccer matches. Valente and Somerton and their affiliates are referred to collectively below as the "Margulies Intermediaries."

61. At various times relevant to the Indictment, Fabio Tordin was employed in the finance department of Traffic Brazil, working out of the São Paulo office, and, later, served as the chief executive officer of Traffic USA in Miami, Florida. In or about 2007 to 2010, while remaining based in Miami, Tordin was self-employed, including as a consultant in the field of soccer and media marketing rights. In or about 2011 to the present, Tordin worked as an executive of Media World, LLC (together with its successor entities, "Media World"), a sports marketing company based in Miami identified further in section B below.

62. At various times relevant to the Indictment, Roger Huguet was a high-ranking executive and part owner of

29

Media World and its parent company Media Company A, identified further in section B below.

63.   At various times relevant to the Indictment, Zorana Danis was the controlling principal of International Soccer Marketing, Inc. ("ISM"), a company engaged in the purchase and sale of sponsorship and other commercial rights to soccer events.   ISM was incorporated in Delaware and headquartered in Jersey City, New Jersey.   Danis resided in the United States.

64.   At various times relevant to the Indictment, Alejandro Burzaco was a principal of Torneos y Competencias S.A. (together with its affiliates, "TyC"), a sports media and marketing business headquartered in Argentina.   Burzaco was also a principal of a number of subsidiaries and affiliates of TyC, including FPT Sports S.A. (together with its affiliates, "FPT Sports") and Productora de Eventos S.A.   Burzaco's companies are referred to collectively below as "Torneos."

65.   At various times relevant to the Indictment, Jeffrey Webb was the president of CIFA, a member of the CFU executive committee, the chairman of CFU's normalization committee, the president of CONCACAF, and a FIFA vice president and executive committee member.   Webb also served on multiple FIFA standing committees, including the finance committee and

30

the organizing committee for the World Cup. Outside of soccer, Webb worked at various times as an executive of a bank in the Cayman Islands. Since approximately 2013, Webb owned a residence in the United States, specifically in Loganville, Georgia. Webb also owned other pieces of residential property in the United States, specifically in Stone Mountain, Georgia and Conyers, Georgia.

66. At various times relevant to the Indictment, Luis Bedoya was a high-ranking official of FIFA, CONMEBOL, and Federación Colombiana de Fútbol, the Colombian soccer federation, one of FIFA's national member associations.

67. At various times relevant to the Indictment, Sergio Jadue was a high-ranking official of CONMEBOL and Asociación Nacional de Fútbol Profesional de Chile, the Chilean soccer federation, one of FIFA's national member associations, and a member of FIFA's associations committee.

68. At various times relevant to the Indictment, Daryan Warner, a relative of the defendant JACK WARNER, was a businessman involved in, among other things, a number of soccer-related ventures.

B.   Unnamed Co-Conspirators

69.  The identities of the following individuals and business entities are known to the Grand Jury:

70.  At various times relevant to the Indictment, Co-Conspirator #1 was a high-ranking official of FIFA, CONMEBOL and AFA, the Argentinian soccer federation, which was a national member association of FIFA and CONMEBOL.

71.  At various times relevant to the Indictment, Co-Conspirator #2 was an owner and high-level executive of Inter/Forever Sports, Inc., a Miami-based sports marketing company that subsequently became Traffic USA.  Co-Conspirator #2 was later self-employed as a sports marketing consultant, who, among other things, assisted in the negotiation of contracts for media and marketing rights to soccer matches.

72.  At various times relevant to the Indictment, Co-Conspirator #3 was employed as a high-ranking executive of Traffic USA.  In or about July 2012 to June 2015, Co-Conspirator #3 left Traffic USA to become the general secretary of CONCACAF. In the latter role, Co-Conspirator #3 oversaw the transition of CONCACAF's administrative headquarters from New York, New York, where the prior general secretary (Charles Blazer) resided, to Miami, Florida, where it remained located up through the present.  In addition to his duties as CONCACAF general

32

secretary, Co-Conspirator #3 was also the general secretary of the Copa América Centenario executive committee, a joint CONCACAF/CONMEBOL body that was created in 2014 to oversee the 2016 Copa América Centenario, further described below.

73. At various times relevant to the Indictment, Co-Conspirator #4 was an executive of Traffic USA in Miami, Florida.

74. At various times relevant to the Indictment, Co-Conspirator #5 was a part owner of Media Company A and a high-ranking executive and part owner of Media Company B. Media World, discussed in section A above, was a subsidiary of Media Company A, which engaged in a variety of media activities primarily in the United States and Latin America, including television production. Media Company A, which was also based in Miami, Florida, was affiliated with Media Company B, a multinational media conglomerate based in Europe.

75. At various times relevant to the Indictment, Co-Conspirator #6 was an employee of Traffic USA and then a consultant, residing in South Florida, specializing in negotiating soccer media and marketing rights, principally with certain CONCACAF member associations. In addition to working as a consultant, from time to time Co-Conspirator #6 was involved in sports marketing ventures on his own behalf. Co-Conspirator

#6 was the controlling principal of a number of small companies, including Consulting Company A, Consulting Company B, and Consulting Company C, which he used in connection with his consulting and sports marketing work.

76.  At various times relevant to the Indictment, Co-Conspirator #7 was a senior executive of Traffic Brazil and, later, of a group of companies under common ownership and control that were engaged in the commercialization of media rights associated with soccer.  The latter group of companies is referred to individually and collectively below as Sports Marketing Company A.

77.  At various times relevant to the Indictment, Co-Conspirator #8 was a high-ranking official of FIFA and AFC, the regional confederation representing much of Asia.

78.  At various times relevant to the Indictment, Co-Conspirator #9 was employed as a high-ranking executive of Traffic Brazil and Traffic USA.

79.  At various times relevant to the Indictment, Co-Conspirator #10 was an intermediary who operated, among other businesses, a consulting firm based in Latin America.

80.  At various times relevant to the Indictment, Co-Conspirator #11 was a co-founder and principal of Torneos.

81. At various times relevant to the Indictment, Co-Conspirator #12 was a high-ranking Torneos executive.

82. At various times relevant to the Indictment, Co-Conspirator #13 was a high-ranking official of the 2006 South Africa World Cup bid committee and the 2010 South Africa World Cup bid committee and local organizing committee.

83. At various times relevant to the Indictment, Co-Conspirator #14 was a high-ranking official of FIFA.

84. At various times relevant to the Indictment, Co-Conspirator #15 was a high-ranking official of the 2006 South Africa World Cup bid committee and the 2010 South Africa World Cup bid committee and local organizing committee, as well as a high-ranking official of the South African Football Association, one of FIFA's national member associations.

85. At various times relevant to the Indictment, Co-Conspirator #16 was a high-ranking official of CONMEBOL and a member of the FIFA executive committee.

86. At various times relevant to the Indictment, Co-Conspirator #17 was a high-ranking FIFA official.

87. At various times relevant to the Indictment, Co-Conspirator #18 was a high-ranking official of FESFUT, the Salvadoran soccer federation.

35

88. At various times relevant to the Indictment, Co-Conspirator #19 was a high-ranking official of FENAFUTG, the Guatemalan soccer federation.

89. At various times relevant to the Indictment, Co-Conspirator #20 was a high-ranking official of FESFUT, the Salvadoran soccer federation.

90. At various times relevant to the Indictment, Co-Conspirator #21 was a FIFA official.

91. At various times relevant to the Indictment, Co-Conspirator #22 was an official of FESFUT, the Salvadoran soccer federation.

92. At various times relevant to the Indictment, Co-Conspirator #23 was the beneficial owner of Front Company A.

93. At various times relevant to the Indictment, Co-Conspirator #24 was a high-ranking official of one of FIFA's national member associations, an official of FIFA and CFU, and a businessman.

\* \* \* \*

94. The foregoing officials of FIFA, CONCACAF, CONMEBOL, and other soccer governing bodies were bound by fiduciary duties to each of their respective organizations.

36

IV.   The Conspirators' Corruption of the Enterprise

95.   Certain individuals and entities employed by and associated with the enterprise, including the defendants ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL CALLEJAS, BRAYAN JIMÉNEZ, EDUARDO LI, JULIO ROCHA, RAFAEL SALGUERO, COSTAS TAKKAS, HÉCTOR TRUJILLO, REYNALDO VASQUEZ, JACK WARNER, JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA, AARON DAVIDSON, HUGO JINKIS, and MARIANO JINKIS, together with others, conspired with one another to use their positions within the enterprise to engage in schemes involving the solicitation, offer, acceptance, payment, and receipt of undisclosed and illegal payments, bribes, and kickbacks.  Although they also helped pursue the principal purpose of the enterprise, the defendants and their co-conspirators corrupted the enterprise by engaging in various criminal activities, including fraud, bribery, and money laundering, in pursuit of personal and commercial gain.  The defendants also participated in the corruption of the enterprise by conspiring with and aiding and abetting their co-conspirators in the abuse of their positions of trust and the violation of their fiduciary duties.

37

96.    To further their corrupt ends, the defendants and their co-conspirators provided one another with mutual aid and protection.  The conspirators engaged in conduct designed to prevent the detection of their illegal activities, to conceal the location and ownership of proceeds of those activities, and to promote the carrying on of those activities.  The conduct engaged in by various members of the conspiracy included, among other things: the use of "consulting services" agreements and other similar types of contracts to create an appearance of legitimacy for illicit payments; the use of various mechanisms, including trusted intermediaries, bankers, financial advisors, and currency dealers, to make and facilitate the making of illicit payments; the creation and use of shell companies, nominees, and numbered bank accounts in tax havens and other secretive banking jurisdictions; the active concealment of foreign bank accounts; the structuring of financial transactions to avoid currency reporting requirements; bulk cash smuggling; the purchase of real property and other physical assets; the use of safe deposit boxes; income tax evasion; and obstruction of justice.  Within the United States, such conduct took place within the Eastern District of New York and elsewhere.

97.    The damage inflicted by the defendants and their co-conspirators was far-reaching.  By conspiring to enrich

themselves through bribery and kickback schemes relating to media and marketing rights, among other schemes, the defendants deprived FIFA, the confederations, and their constituent organizations - and, therefore, the national member associations, national teams, youth leagues, and development programs that relied on financial support from their parent organizations - of the full value of those rights. In addition, the schemes had powerful anti-competitive effects, distorting the market for the commercial rights associated with soccer and undermining the ability of other sports marketing companies to compete for such rights on terms more favorable to the rights-holders. Finally, the schemes deprived FIFA, the confederations, and their constituent organizations of their right to the honest and loyal services of the soccer officials involved. Over time, and in the aggregate, such deprivations inflicted significant reputational harm on the victimized institutions, damaging their prospects for attracting conscientious members and leaders and limiting their ability to operate effectively and carry out their core missions.

V.   Overview of the Racketeering Conspiracy

        98.   Over a period of approximately 25 years, the defendants and their co-conspirators rose to positions of power and influence in the world of organized soccer. During that

same period, sometimes with the assistance of the defendants and their co-conspirators, a network of marketing companies developed to capitalize on the expanding media market for the sport, particularly in the United States. Over time, the organizations formed to promote and govern soccer in regions and localities throughout the world, including the United States, became increasingly intertwined with one another and with the sports marketing companies that enabled them to generate unprecedented profits through the sale of media rights to soccer matches. The corruption of the enterprise arose and flourished in this context.

99. The corruption of the enterprise became endemic. Certain defendants and their co-conspirators rose to power, unlawfully amassed significant personal fortunes by defrauding the organizations they were chosen to serve, and were exposed and then either expelled from those organizations or forced to resign. Other defendants and their co-conspirators came to power in the wake of scandal, promising reform. Rather than repair the harm done to the sport and its institutions, however, these defendants and their co-conspirators quickly engaged in the same unlawful practices that had enriched their predecessors. In some instances, these practices continued even after the original indictment returned by the Grand Jury in this

case was unsealed on May 27, 2015 and most of the defendants charged in that indictment were arrested.

100. Over the period of the Indictment, the defendants and their co-conspirators were involved in criminal schemes involving the agreement to pay and receive well over $200 million in bribes and kickbacks.

A. The Initial Corruption of the Enterprise

101. From in or about 1983 to 2011, the defendant JACK WARNER obtained power and influence over the enterprise, first in the CONCACAF region, and then worldwide, eventually becoming a FIFA vice president and member of its executive committee. In or about 1983, WARNER, who was then the secretary of the Trinidad and Tobago Football Federation ("TTFF"), became a CONCACAF vice president and was appointed to the FIFA executive committee. In or about 1990, WARNER was elected president of CFU and resigned his formal position with TTFF, becoming a special advisor. The same year, WARNER ran for CONCACAF president and, with the support of Charles Blazer, who had worked as an official in the USSF, was elected. WARNER worked closely thereafter with Blazer, whose fortunes rose with WARNER's and who was appointed to be WARNER's general secretary at CONCACAF. Following his appointment, Blazer transferred CONCACAF's administrative headquarters to New York, New York.

WARNER established the president's office in his home country of Trinidad and Tobago.

102. In Trinidad and Tobago and elsewhere, the defendant JACK WARNER established and controlled numerous bank accounts and corporate entities in which he mingled his personal assets and those of CONCACAF, CFU, and TTFF. Beginning in the early 1990s, WARNER, often with the assistance of Charles Blazer, began to leverage his influence and exploit his official positions for personal gain. Among other things, WARNER began to solicit and accept bribes in connection with his official duties, including the selection of the host nation for the World Cups held in 1998 and 2010, which he participated in as a member of the FIFA executive committee.

103. The defendant JACK WARNER also became involved in a number of other schemes, including the diversion of FIFA, CONCACAF, and CFU funds into accounts that he controlled and used for his personal benefit. Among other things, WARNER funded a 2005 purchase of a Miami, Florida condominium, held in the name of a member of his family, with money drawn from an account held in the name of a soccer facility that was ostensibly affiliated with CONCACAF and was supported in part through FAP funds.

104. During approximately the same period of the defendant JACK WARNER's rise, the defendants NICOLÁS LEOZ and RICARDO TEIXEIRA, along with Co-Conspirator #1, established themselves as powerful officials of CONMEBOL and FIFA. In or about 1986, LEOZ, who had held other positions in soccer governance, was elected president of CONMEBOL. LEOZ would serve in this position for over 25 years. The defendant RICARDO TEIXEIRA became president of the Brazilian soccer federation, known as CBF, in or about 1989, a position he held until in or about 2012. Co-Conspirator #1 became president of the Argentine soccer federation, known as AFA, in or about 1979, a position he held until his death in 2014. As presidents of the national federations of the region's two traditional soccer powers – Brazil and Argentina – TEIXEIRA and Co-Conspirator #1 joined LEOZ in wielding significant influence over CONMEBOL.

105. Like the defendant JACK WARNER, the defendants NICHOLAS LEOZ and RICARDO TEIXEIRA, along with Co-Conspirator #1, would come to use their power and influence to unlawfully enrich themselves.

106. During the defendant NICOLÁS LEOZ's presidency, CONMEBOL developed a lucrative commercial relationship with Traffic, a growing sports marketing company that had been founded a few years earlier in Brazil. In 1986, Traffic,

43

represented by José Hawilla (the company's founder and owner), entered into a contract with CONMEBOL to acquire the worldwide commercial rights associated with the 1987 edition of the Copa América, CONMEBOL's men's national team tournament.  Traffic would remain the exclusive holder of these rights through the 2011 edition of the tournament.

107. Beginning in the early 1990s, as the value of the rights associated with the Copa América increased, various CONMEBOL officials began soliciting bribe payments from José Hawilla in exchange for the performance of various acts, including the renewal of the Copa América contract.  Hawilla agreed to pay.  Over time, Hawilla agreed to pay and paid tens of millions of dollars in bribes to CONMEBOL officials in connection with, among other things, the Copa América contracts, media and marketing rights to other South American soccer tournaments, and sponsorship rights acquired by a United States sportswear company.

108. José Hawilla used a number of sophisticated money laundering techniques to pay bribes and kickbacks, often relying on intermediaries to make and conceal bribe payments to soccer officials, including, at times, the defendants NICOLÁS LEOZ and RICARDO TEIXEIRA.  One such intermediary was José Margulies, the brother of a late friend of Hawilla.  Margulies used accounts in

44

the names of offshore corporations that were held at United States financial institutions to make payments on Hawilla's behalf.

B. The Growth of the Sports Marketing Companies

109. In or about 1992, José Hawilla relocated from Brazil to the United States, where he began negotiations with the defendant JACK WARNER and Charles Blazer to acquire the marketing rights to the Gold Cup, CONCACAF's men's national team tournament, for Traffic's United States affiliate, Traffic USA, which was based in Miami, Florida. Hawilla, with the assistance of Co-Conspirator #2, a U.S.-based co-conspirator, won the contract, which was subsequently amended and renewed so that Traffic acquired the rights to the five editions of the Gold Cup played between 1996 and 2003. In connection with the acquisition and renewal of those rights, Hawilla and Co-Conspirator #2 together caused bribe payments to be made to WARNER and Blazer.

110. In the late 1990s and 2000s, Traffic, through Traffic USA, continued to grow its business with CONCACAF and its regional federations and member associations. José Hawilla and several high-ranking executives working at Traffic USA engaged in a number of bribery and fraud schemes in connection with their efforts to obtain various rights from CONCACAF, CFU,

45

and various federations in the region, including the federations from Trinidad and Tobago, Costa Rica, Panama, Honduras, Guatemala, El Salvador and Nicaragua. The Traffic USA executives involved in these schemes included, among others, the defendant AARON DAVIDSON, Fabio Tordin, Co-Conspirator #3, and Co-Conspirator #4. The beneficiaries of the schemes included, among others, the defendants ARIEL ALVARADO, ALFREDO HAWIT, EDUARDO LI, JULIO ROCHA, and JACK WARNER.

111. As Traffic attempted to expand its operations and develop its ties with CONCACAF and CONMEBOL, several competing sports marketing companies sought a share of the growing profits associated with organized soccer. Frequently, those companies, like Traffic, paid bribes to soccer officials in order to win business. At times, bribes also were paid to former officials who continued to exert influence over their respective federations.

112. Within the CONCACAF region, for example, starting in the mid-2000s, Media World, based in Miami, Florida, began to compete with Traffic USA to obtain media and marketing rights for matches played by member associations in the region, in particular members of UNCAF. Like Traffic, Media World obtained these rights by paying bribes to high-ranking officials of some of those federations, and officials of FIFA, including, among

46

others, the defendants ALFREDO HAWIT, RAFAEL CALLEJAS, BRAYAN
JIMÉNEZ, RAFAEL SALGUERO, HÉCTOR TRUJILLO, and REYNALDO VASQUEZ.
Media World, which was owned in part by Co-Conspirator #5 and
Roger Huguet, among others, used off-shore intermediary accounts
controlled by Co-Conspirator #6 and Co-Conspirator #2 to help
effectuate the scheme by transmitting and concealing the bribe
payments.

113. ISM, a New Jersey-based company owned and
operated by Zorana Danis, was another company engaged in the
commercialization of media and marketing rights to soccer
matches.  In or about 1996, CONMEBOL designated ISM as its
marketing agent for sponsorship and title sponsorship rights
associated with the Copa Libertadores, CONMEBOL's premier club
team tournament.  Danis, either directly through ISM or
indirectly through affiliates, thereafter acted as agent in
multi-party contracts to sell certain marketing rights to the
tournament.  At various times between the late 1990s and 2012,
Danis used bank accounts in New York, New York and elsewhere to
pay bribes and kickbacks to the defendants NICOLÁS LEOZ and
EDUARDO DELUCA to maintain these rights in connection with
editions of the tournament through 2012.

114. Torneos, along with its affiliates and
subsidiaries, also was engaged in the commercialization of media

47

and marketing rights to various soccer tournaments and matches
within the CONMEBOL region, including the Copa Libertadores,
Copa América, and various friendly matches. For example,
starting in or about 1999 and continuing to the present, Torneos
and its partners held the broadcasting rights to each edition of
the Copa Libertadores, among other tournaments. Alejandro
Burzaco, among other co-conspirators affiliated with Torneos,
secured those rights through the systematic payment of bribes
and kickbacks to high-ranking CONMEBOL officials, including the
defendants JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS
CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, RAFAEL ESQUIVEL,
EUGENIO FIGUEREDO, NICOLÁS LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS
MEISZNER, ROMER OSUNA, and RICARDO TEIXEIRA.

115. Other sports marketing companies that competed
for business in the region with Traffic and Torneos included
Full Play, controlled by the defendants HUGO JINKIS and MARIANO
JINKIS, and Sports Marketing Company A, controlled by Co-
Conspirator #7. At times, the sports marketing companies worked
in conflict with one another, each seeking to win business from
soccer organizations in the CONMEBOL and CONCACAF regions. At
other times, the companies worked in concert, entering into
contracts to share the media rights obtained from soccer
organizations. All of these sports marketing companies at

48

various times and at the direction of the defendants HUGO JINKIS and MARIANO JINKIS and Alejandro Burzaco, José Hawilla, and Co-Conspirator #7 paid bribes and kickbacks to obtain and retain media rights contracts, with José Margulies as an intermediary to facilitate and conceal these payments.

116. Over the course of the racketeering conspiracy, José Margulies used the Margulies Intermediaries' accounts at United States financial institutions to move millions of dollars among the sports marketing companies and to soccer officials who were the recipients of illicit payments. Margulies took additional steps to conceal the nature of the payments he was facilitating beyond his use of the U.S.-based accounts. For example, he used the services of currency dealers, he regularly shredded records of his activities, and he discouraged soccer officials who were receiving payments from using accounts in their own names lest they draw attention from law enforcement, though they did not always heed his advice. To take one five-year period, for example, between March 2003 and March 2008, the Margulies Intermediaries wired more than $3.5 million into accounts controlled by the defendants RAFAEL ESQUIVEL, NICOLÁS LEOZ, and EUGENIO FIGUEREDO, almost entirely through even, six-figure payments.

C.    Embezzlement and Misappropriation

117. The conspirators' corruption of the enterprise extended beyond the payment and receipt of bribes and kickbacks. FIFA's provision of money – which totaled in the hundreds of millions of dollars – to its member associations in connection with the Goal Program, Financial Assistance Program (FAP), and other programs created opportunities for officials to embezzle or otherwise fraudulently appropriate funding intended to benefit FIFA's member associations and their constituent organizations, including youth leagues.  Certain of the defendants and their co-conspirators, including the defendant JACK WARNER and Jeffrey Webb, took advantage of these opportunities and embezzled or otherwise personally appropriated funds provided by FIFA, including funds intended for natural disaster relief.

D.    The Centrality of the U.S. Financial System

118. Over the course of the 1990s and increasingly in the 2000s and 2010s, the defendants and their co-conspirators relied heavily on the United States financial system in connection with their activities with the enterprise, including the schemes set forth below.  This reliance was significant and sustained and was one of the central methods and means through which they promoted and concealed their schemes.

119. For example, at various times relevant to the Indictment:

- FIFA wired billions of dollars from its accounts at a major Swiss financial institution into beneficiary accounts in the United States and throughout the world via a correspondent account at the U.S. branch of a major Swiss financial institution;

- CONCACAF and CONMEBOL conducted business using accounts at the Florida and New York branches of major U.S. and Swiss financial institutions;

- CFU and two South American soccer federations, Federación Venezolana de Fútbol (FVF) and Asociación del Futbol Argentina (AFA), conducted business using the New York and Florida branches of multiple major and regional U.S. and foreign financial institutions;

- Continental Sports, a Traffic Group holding company, provided tens of millions of dollars in capital to support the operations of the Traffic Group using its account at the New York branch of a major U.S. financial institution;

- Traffic USA and Traffic International, two subsidiaries of the Traffic Group, conducted business using their accounts at the Florida branches of a major U.S. financial institution and a small U.S. financial institution that specialized in providing private banking services to clients from Latin America, respectively;

- Media World conducted business using its accounts at a Miami branch of a major U.S. financial institution;

- Full Play, Torneos, ISM, and Sports Marketing Company A conducted business using New York branches of major U.S., Swiss, and Brazilian financial institutions;

51

- Somerton and Valente, the intermediaries controlled by José Margulies, conducted business using accounts at the New York and Florida branches of major U.S. and European financial institutions;

- Various defendants and co-conspirators maintained and controlled bank accounts in the United States into which they received or from which they sent bribe and kickback payments in connection with the charged schemes, including accounts at branches of major U.S. and Swiss financial institutions in New York and Miami; and

- The defendant NICOLÁS LEOZ used a New York-based investment advisor registered with the U.S. Securities and Exchange Commission to manage a $40 million portfolio (as of 2012) of his worldwide investments.

In addition to the use of the particular financial institutions and wire facilities identified above, the conspirators also relied on the broader strength and stability of the U.S. financial system, including access to the private equity markets.

E.    Scandals and Resignations

120. In 2011, 2012, and 2013, public revelation of corruption scandals involving the defendants JACK WARNER, RICARDO TEIXEIRA, and NICOLÁS LEOZ forced all three men to resign from their positions in the enterprise.

121. In May 2011, the defendant JACK WARNER facilitated the payment of bribes by Co-Conspirator #8, who was

52

running for the FIFA presidency, to members of CFU. The following month, after the scheme came to light and FIFA commenced an investigation into the matter, WARNER resigned from his positions with FIFA, CONCACAF, CFU, and TTFF. By the end of 2011, after the revelation of other financial irregularities at CONCACAF began to come to light, Charles Blazer resigned from his position as general secretary of CONCACAF.

122. In March 2012, the defendant RICARDO TEIXEIRA resigned from his position as CBF president and a member of the FIFA executive committee amid allegations of corruption.

123. In April 2013, the defendant NICOLÁS LEOZ resigned from his positions as president of CONMEBOL and a member of the FIFA executive committee. LEOZ's resignation followed the conclusion of an investigation by the FIFA ethics committee into payments made in the late 1980s and early 2000s to LEOZ and two other soccer officials from a Swiss sports marketing company in connection with the purchase of FIFA media and marketing rights. The FIFA ethics committee found that the payments to LEOZ and the other officials, including the defendant RICARDO TEIXEIRA, were bribes.

F.   The Continued Corruption of the Enterprise

124. The change in administration at CONCACAF and CONMEBOL between 2011 and 2013 did not usher in an era of reform

53

at those organizations.  Instead, the new leadership continued
to engage in criminal schemes in violation of their fiduciary
duties, both in the period that ended with the unsealing of the
original indictment on May 27, 2015 and in the period that
followed.

### i.    Pre-Indictment Period

125. Following WARNER's resignation, the defendant
ALFREDO HAWIT was selected to serve as acting president of
CONCACAF until a new president was elected.  HAWIT held that
role in or about June 2011 to May 2012.  During this period,
HAWIT, the defendant ARIEL ALVARADO, who was then president of
the Panamanian soccer federation and a member of the CONCACAF
executive committee, and the defendant RAFAEL SALGUERO, who was
then serving as one of CONCACAF's three representatives on the
FIFA executive committee, agreed to accept, and did accept,
$450,000 in bribes from the defendants HUGO JINKIS and MARIANO
JINKIS, who were seeking to expand the operations of Full Play
further into the CONCACAF region.  In return for these bribes,
HAWIT, ALVARADO, and SALGUERO agreed to seek to cause CONCACAF
to award media and marketing rights owned by CONCACAF, including
rights to the Gold Cup, to Full Play.

126. In early 2012, Jeffrey Webb, who had long been
the president of CIFA, the Cayman Islands soccer federation,

emerged as a candidate to succeed the defendant JACK WARNER as the next CONCACAF president.  During the course of his campaign, Webb, with the defendant COSTAS TAKKAS's aid and assistance, used his growing influence to solicit a bribe from Traffic USA in connection with its efforts to acquire from CFU the commercial rights of its members to the qualifier matches to be played in advance of the 2018 and 2022 World Cups.

127.  In May 2012, Jeffrey Webb was elected to be president of CONCACAF.  Like the defendant JACK WARNER, Webb thereafter became a FIFA vice president and member of its executive committee.  Co-Conspirator #3 was appointed to be CONCACAF's general secretary and left his position at Traffic USA to oversee CONCACAF's operations under Webb.  Upon assuming their respective positions, Webb and Co-Conspirator #3 made public pronouncements about reforming CONCACAF.  Almost immediately after taking office, however, both men resumed their involvement in criminal schemes.

128.  For example, weeks after beginning work as general secretary, Co-Conspirator #3 began negotiations with the defendant AARON DAVIDSON, under whom he previously worked at Traffic USA, regarding the media rights to the Gold Cup and the CONCACAF Champions League, CONCACAF's club tournament.  Upon direction by and on behalf of Jeffrey Webb, Co-Conspirator #3

negotiated a bribe payment for Webb. In or about November 2012, CONCACAF awarded the contract for the rights to the 2013 Gold Cup and the next two seasons of the CONCACAF Champions League to Traffic USA.

129. Approximately one year later, Co-Conspirator #3 negotiated a second bribe from Traffic USA to Jeffrey Webb in connection with the renewal of the Gold Cup and Champions League contract. In the interim, Co-Conspirator #3 had begun to benefit personally from Webb's bribe schemes, obtaining an expensive painting from an art gallery in New York that was paid for by the defendant COSTAS TAKKAS, who, having previously served under Webb as general secretary at CIFA, obtained the new title of attaché to the CONCACAF president.

130. In or about April 2013, following the defendant NICOLÁS LEOZ's resignation, the defendant EUGENIO FIGUEREDO — a dual citizen of the United States and Uruguay, who maintained a residence in California — assumed the CONMEBOL presidency and LEOZ's place as a vice president on the FIFA executive committee. Shortly after the elevation of FIGUEREDO to these positions, CONMEBOL, CONCACAF, and the sports marketing companies controlled by José Hawilla, Alejandro Burzaco, and the defendants HUGO JINKIS and MARIANO JINKIS consummated a scheme to obtain a suite of valuable rights from CONCACAF and CONMEBOL

56

officials in exchange for an agreement to pay tens of millions of dollars in bribes.

131. As part of the scheme, José Hawilla, Alejandro Burzaco, and the defendants HUGO JINKIS and MARIANO JINKIS caused their respective companies to join together and form a new entity known as Datisa. Following the creation of this entity, Datisa entered into a $317.5 million contract with CONMEBOL to obtain the exclusive worldwide rights to the 2015, 2019, and 2023 editions of the Copa América and the 2016 Copa América Centenario, a tournament to celebrate the 100th anniversary of the first edition of the Copa América. Following negotiations between CONMEBOL and CONCACAF, it was determined that the men's national teams of six CONCACAF member associations, including the U.S. federation, would participate in the Copa América Centenario with the 10 CONMEBOL men's national teams. It was further determined that the tournament would be hosted by the United States in recognition of the growth of the market for soccer in North America.

132. Datisa subsequently entered into a $35 million contract with CONCACAF, in its capacity as the co-organizer of the Copa América Centenario, to acquire CONCACAF's media rights to the tournament.

133. In connection with the acquisition of the media rights to the Copa América and Centenario tournaments from CONMEBOL and CONCACAF, Datisa agreed to pay tens of millions of dollars in bribes to the defendants RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ, and JOSÉ MARIA MARIN, Jeffrey Webb and several other soccer officials. Datisa agreed to make these payments at various times over the life of the contracts.

134. On May 1, 2014, CONCACAF and CONMEBOL held a press conference in Miami, Florida to officially announce and promote the Copa América Centenario. Datisa representatives, including the defendants HUGO JINKIS and MARIANO JINKIS, José Hawilla, and Alejandro Burzaco attended the press conference. A press release issued in connection with the announcement trumpeted the growing unity of organized soccer in the Americas. In the release, the defendant EUGENIO FIGUEREDO stated, "We are proud to play a leading role in the celebration of the centennial of a tournament born to unite all America. . . . Now, CONCACAF and the United States will play host to the world's oldest national team competition." The event's promotional materials bore the logo of Datisa's trade name – wematch – alongside the logos of CONCACAF and CONMEBOL, superimposed over a map of the western hemisphere.

58

135. The Copa América Centenario was scheduled to be played in June 2016 in cities located throughout the United States.

## ii.  Post-Indictment Period

136. In the months following the unsealing of the original indictment on May 27, 2015, several of the co-conspirators of the defendants who were charged in the original indictment sought to harness the disruptive effects of the charges to their own advantage, in some cases by seeking or moving to maintain or solidify their hold on positions of power.

137. For example, in June 2015, the defendant ALFREDO HAWIT became president of CONCACAF and a vice president and executive committee member of FIFA, moving to fill the void left by the indictment of former CONCACAF president Jeffrey Webb. The defendant JUAN ÁNGEL NAPOUT, the CONMEBOL president and, like HAWIT, a FIFA vice president and executive committee member, sought to portray himself as an agent of reform, notwithstanding his own long-standing involvement in the solicitation and receipt of bribe and kickback payments in exchange for his influence as a CONMEBOL and FIFA official.  The defendant RAFAEL SALGUERO, who in April 2015 lost his seat on the FIFA executive committee – the "Central American" seat – to the defendant EDUARDO LI, sought support from CONCACAF

59

federations and others for his possible return to the FIFA
executive committee.  And the defendant ROMER OSUNA, who
solicited and received millions of dollars in bribe payments
during his years as treasurer of CONMEBOL, maintained his
position as a member of FIFA's audit and compliance committee, a
committee in charge of, among other things, developing proposals
for organizational reform.

138. In some instances, the conspirators' criminal
conduct continued even after the unsealing of the original
indictment.  For example, on or about May 31, 2015 and June 5,
2015, the Salvadoran national soccer team played friendly
matches in Washington, DC and Chile, respectively.  Prior to the
May 27, 2015 unsealing of the original indictment, Fabio Tordin
and Co-Conspirator #6 had agreed to pay a $5,000 bribe to a
Salvadoran federation official in exchange for that official's
agreement to have his team participate in each match.  After the
indictment was unsealed, Tordin did not pay the bribe.  In
response, the Salvadoran official and others associated with him
repeatedly pressured Tordin to make the payment, through
telephone calls and letters and by traveling to the United
States from El Salvador to meet with Tordin.

139. As set forth below, the conspirators' criminal
conduct also included obstruction of justice.

G.    Obstruction of Justice

140. Beginning in or about 2012 and continuing through the present, as their awareness of law enforcement scrutiny began to increase, many conspirators engaged in additional conduct designed to prevent detection of their own illegal activities and to provide one another with mutual aid and protection.  At times, such conduct constituted obstruction of justice.

141. The following are four examples of acts of obstruction engaged in by the conspirators.  First, upon learning that a co-conspirator was being interviewed by federal law enforcement agents, another co-conspirator attempted to persuade the co-conspirator being interviewed not to disclose to agents everything he or she knew.  Second, conspirators, including the defendant AARON DAVIDSON, alerted co-conspirators to the possibility that they would be recorded making admissions of their crimes.  Third, a co-conspirator destroyed evidence of bribe payments.  Fourth, after the initial indictment in this case was unsealed on May 27, 2015, the defendant ALFREDO HAWIT directed a co-conspirator to create sham contracts for the purpose of concealing bribe payments and to make false statements about these bribe payments to federal law enforcement agents.

61

## VI. The Criminal Schemes

142. Set forth below are further details regarding certain criminal schemes in which the defendants and their co-conspirators agreed to engage in connection with their activities with the enterprise.

### A. CONMEBOL Copa América Scheme

143. In 1916, CONMEBOL organized the first edition of the Copa América, a tournament featuring the men's national teams of its members. According to CONMEBOL, the tournament, which continues to be played today, is the longest continuously running such tournament in the world.

144. Beginning with the 1987 edition and continuing thereafter through 2011, Traffic held the exclusive worldwide commercial rights for each edition of the Copa América tournament, which rights were secured through a series of contracts between Traffic and CONMEBOL. On or about January 23, 1991, at a signing ceremony for one such contract held at CONMEBOL headquarters in Asunción, Paraguay, José Hawilla signed the contract on behalf of Traffic, as did two CONMEBOL officials on behalf of the confederation. The defendant NICOLÁS LEOZ, then the president of CONMEBOL, declined to sign the contract. In a private meeting, LEOZ told Hawilla, in sum and substance, that Hawilla would make a lot of money from the rights he was

acquiring and LEOZ did not think it was fair that he (LEOZ) did
not also make money. LEOZ told Hawilla that he would only sign
the contract if Hawilla agreed to pay him a bribe. After
Hawilla agreed to make the payment, LEOZ signed the contract.
Hawilla caused the payment – a six-figure U.S. dollar payment –
to be made to an account designated by LEOZ.

145. In approximately 1993 or 1995, the defendant
NICOLÁS LEOZ began demanding additional bribe payments around
the time each edition of the tournament was played. José
Hawilla agreed to make these payments and caused them to be
made. The defendant NICOLÁS LEOZ solicited and received bribe
payments from Hawilla in connection with every Copa América
edition until 2011. The payments increased over time, and
ultimately reached the seven figures.

146. The defendant RAFAEL ESQUIVEL also solicited and
received bribe and kickback payments in connection with the Copa
América tournament. Over the course of the 2007 and 2011
editions of the tournament, held in Venezuela and Argentina,
respectively, ESQUIVEL solicited and received bribe and kickback
payments totaling in the seven figures from, variously, José
Hawilla and another senior Traffic executive, Co-Conspirator #9.
Hawilla agreed to make the bribe payments to ESQUIVEL, who at
the time was the president of FVF, the Venezuelan soccer

63

federation, and a member of the CONMEBOL executive committee, in exchange for ESQUIVEL's continued official support of Traffic's position as exclusive holder of the marketing rights to the Copa América and of Traffic's ability to commercialize the rights.

147. For example, in 2011, ESQUIVEL solicited a $1 million bribe and kickback payment from José Hawilla in light of the substantial profits Hawilla had earned in connection with the 2007 tournament. After discussing the matter with Co-Conspirator #9, Hawilla agreed to the payment and caused it to be made, in part because he hoped to secure ESQUIVEL's official support for Traffic in a dispute between Traffic and Full Play (see CONMEBOL/CONCACAF Copa América Centenario Scheme, below) concerning which company would hold the commercial rights to the Copa América going forward.

148. José Hawilla caused the $1,000,000 bribe to be paid to the defendant RAFAEL ESQUIVEL in a manner designed to conceal the source and nature of the payment. On or about July 22, 2011, at the direction of Traffic executives, approximately $1,000,000 was wired from an account held in the name of Co-Conspirator #10, an intermediary, at Banco Itaú in Brazil, to an account held in the name of Co-Conspirator #10's investment company ("Investment Company A"), the identity of which is known to the Grand Jury, at Banco Itaú in Miami, Florida. That same

64

day, the funds were wired from the latter account to an account at UBS in Miami held in the name of an entity controlled by ESQUIVEL.

149. José Hawilla made personal payments to other CONMEBOL officials over the course of his and Traffic's involvement as holder of the rights to Copa América. For example, Hawilla made periodic six-figure payments to the defendants EDUARDO DELUCA, EUGENIO FIGUEREDO, and ROMER OSUNA in connection with multiple editions of the tournament through in or about 2007, during which time DELUCA, FIGUEREDO, and OSUNA, were the general secretary, vice president, and treasurer of CONMEBOL, respectively.

150. Starting in or about the 1990s, José Hawilla agreed on behalf of Traffic International to pay AFA, the Argentinian soccer federation, millions of dollars per edition of the Copa América so that AFA would field its best players. At times, Hawilla was directed to send the payments not to AFA, but to a travel agency used to facilitate payments to Co-Conspirator #1 personally. Hawilla then sent the payments as directed. Hawilla also agreed to make payments to CBF, the Brazilian soccer federation, to ensure that CBF would field its best players for the Copa América editions played in or about and between 2001 to 2011. At times, the defendant RICARDO

65

TEIXEIRA directed Hawilla to make the payments to accounts that
were unknown to Hawilla, and that a Traffic financial officer
informed Hawilla were not CBF accounts.

151. The defendants and their co-conspirators
understood that accepting bribes was improper and thus sought to
conceal the nature of the payments received from José Hawilla.
Accordingly, they used a number of sophisticated money
laundering techniques, including the use of a numbered account
at a Swiss bank, currency dealers, and trusted intermediaries,
to effect bribe payments in a manner that obscured their true
source and nature and promoted the corrupt schemes. Hawilla was
particularly reliant on intermediaries, including José
Margulies, to make the bribe payments to the defendant NICOLÁS
LEOZ in connection with the Copa América. Margulies, with whom
the defendant RAFAEL ESQUIVEL was close, also conveyed at least
one solicitation to Traffic from ESQUIVEL.

152. As described above, José Margulies and his family
controlled the Margulies Intermediaries, using accounts held in
the names of offshore corporations at United States financial
institutions to make payments to the defendants on José
Hawilla's behalf. Margulies used the accounts of the Margulies
Intermediaries to mask the sources and beneficiaries of bribe
and kickback payments.

66

153. In the course of the scheme, and as far back as 1997, the defendants and their co-conspirators frequently used wire facilities and financial institutions located in the United States to make and receive payments related to the Copa América contracts. In particular, Traffic International, which held the rights on behalf of Traffic beginning with the 1999 edition, maintained bank accounts in the United States and used the wire facilities of the United States to transfer payments in connection with Traffic's exploitation of the media and marketing rights associated with the Copa América. For example, Traffic International used the wire facilities of the United States to transfer funds from its account at Delta National Bank & Trust Co. in Miami, Florida in satisfaction of contract payments due to CONMEBOL for the rights associated with the editions of the Copa América played from 2004 through 2011.

154. The revenue generated by the commercialization of media and marketing rights associated with the Copa América increased dramatically over the course of the tournament editions covered by the Copa América Contract signed in 1991 and Traffic's subsequent renewals, all of which José Hawilla obtained through bribery. Over time, these increases in revenue, and associated increases in profits, arose in significant part from Hawilla and Traffic's successful promotion

67

and commercialization of the Copa América in the United States,
including through contractual relationships with an array of
broadcasters and advertisers based in the United States.

155. For example, the 2001 Copa América was quite
profitable for Traffic, owing in part to the sale of broadcast
and advertising rights to broadcast networks and beverage
companies based in the United States. To take another example,
the 2007 Copa América was even more profitable for Traffic than
the 2001 edition. Traffic's television broadcasting revenues
from the United States/Canadian market were its highest from any
market worldwide, and its revenues from radio broadcasting and
mobile telephone/Internet services in the United States market
were similarly its highest worldwide.

156. The value of the sponsorship rights owned by
Traffic also increased over time, owing in part to increased
interest in the tournament in the United States. For example,
for the 2011 edition of the Copa América, Traffic sold
sponsorship rights to 10 official sponsors, up from seven
official sponsorships sold for the 2007 edition. The official
sponsors included major beverage companies based in the United
States. Sponsorship fees more than tripled between 2007 and
2011.

157. Traffic used its presence in the United States to assist it in exploiting the United States market. For example, Traffic International assigned to Traffic USA, Traffic's Miami-based subsidiary, a portion of the rights it held under the 2001 Copa América Contract. Traffic USA exploited those rights in the United States by contracting directly with television and radio networks based in the United States and serving as an agent for Traffic in connection with the sale of global sponsorship rights.

158. In or about 2010, however, CONMEBOL terminated its long-standing relationship with Traffic and sold the rights to future editions of the tournament to Full Play, owned by the defendants HUGO JINKIS and MARIANO JINKIS.

B.   CONCACAF Gold Cup Scheme

159. A few years after José Hawilla entered into a bribe scheme with CONMEBOL officials in connection with the Copa América, Hawilla entered into a similar scheme with CONCACAF officials in connection with CONCACAF's analogue to the Copa América: the Gold Cup.

160. In or about 1991, CONCACAF began organizing and promoting the Gold Cup, a tournament featuring member associations of CONCACAF and, in later years, those of other confederations.

69

161.  In or about 1992, José Hawilla relocated to the
United States in part to seek additional business opportunities
for Traffic USA in the period leading up to the 1994 World Cup,
which was to be hosted by the United States.  During this
period, Hawilla and Co-Conspirator #2, then a Traffic USA
executive based in Miami, Florida variously began negotiations
with high-ranking CONCACAF officials, including the defendant
JACK WARNER and Charles Blazer, for Traffic USA to purchase the
media and marketing rights associated with the Gold Cup.
Negotiations regarding the rights took place in the United
States.

162.  José Hawilla's pitch to CONCACAF, in sum and
substance, was that Traffic could replicate the commercial and
sporting success it had had with the Copa América and make the
Gold Cup a similar success.  On or about October 3, 1994,
Traffic USA entered into a contract with CONCACAF for $9.75
million for the commercial rights associated with the 1996,
1998, and 2000 editions of the Gold Cup.  Beginning with the
1996 Gold Cup and continuing for four subsequent editions of the
tournament (1998, 2000, 2002, and 2003), pursuant to the
contract with Traffic USA (as subsequently amended and renewed
following additional negotiations), CONCACAF granted to Traffic
USA the exclusive worldwide commercial rights to the Gold Cup.

70

163. During this period, Traffic caused hundreds of thousands of dollars in bribe payments to be made to the defendant JACK WARNER and Charles Blazer, including payments that were made from or through banks based in the United States.

164. For example, on or about March 29, 1999, Traffic caused $200,000 to be wired to a correspondent account at Barclays Bank in New York, New York, for credit to an account held in the name of an entity controlled by Charles Blazer at Barclays Bank in the Cayman Islands. Approximately three weeks later, on April 23, 1999, $100,000 – half of the amount paid to Blazer – was transferred from Blazer's Cayman account to an account at First Citizens Bank in Trinidad and Tobago, held in the name of the defendant JACK WARNER. As it had done in connection with the Copa América scheme, Traffic used an intermediary to make the payment to Blazer in order to conceal the source and nature of the payment.

165. In or about 2003, CONCACAF terminated its contract with Traffic for Gold Cup media rights.

C.    CONMEBOL Copa Libertadores Scheme #1

166. In connection with its efforts to promote the sport of soccer in South America, CONMEBOL organized and funded a variety of international soccer tournaments to showcase the region's best teams. Among other tournaments, CONMEBOL

71

organized the Copa Libertadores, an annual tournament featuring
the top men's club teams.  The first edition of the Copa
Libertadores was held in 1960 with seven teams.  Over the
following decades, the tournament evolved into a major
competition featuring 38 teams from approximately 10 countries.

167. As the tournament developed and gained
popularity, CONMEBOL entered into contracts with sports
marketing companies to commercialize the marketing rights to the
tournament.  The marketing rights sold by CONMEBOL in connection
with the Copa Libertadores included an array of broadcasting
rights, sponsorship rights, and, starting in 1997, title
sponsorship rights.  As the popularity and reach of the Copa
Libertadores grew, so, too, did the value of the sponsorship
rights to the tournament sold by CONMEBOL.  The United States
was an important and lucrative market for the commercialization
of these rights.

168. Starting in or about 1996 and continuing
thereafter, Zorana Danis - operating through ISM, a New Jersey-
based sports marketing company that Danis founded and owned -
was the exclusive marketing agent for the worldwide sponsorship
rights to the Copa Libertadores.  As marketing agent, Danis
identified potential tournament sponsors and negotiated
contracts for the commercialization of the sponsorship rights to

the tournament, including with major international businesses based or with offices in the United States, all in exchange for commission payments.

169. Starting in or about 1997 and continuing to the present, ISM, CONMEBOL, various sponsors, and, at times, an entity affiliated with ISM ("ISM Affiliate A"), the identity of which is known to the Grand Jury, entered into a series of contracts pursuant to which ISM and/or ISM Affiliate A acquired the sponsorship rights to the Copa Libertadores. Several of the contracts, including contracts pursuant to which Toyota Motor Corporation became the first title sponsor of the Copa Libertadores, starting in 1998, and Grupo Santander became the second title sponsor, from 2008 through 2012, were signed by the defendants NICOLÁS LEOZ and EDUARDO DELUCA on behalf of CONMEBOL.

170. Beginning in or about the early 2000s, the defendant NICOLÁS LEOZ at various times solicited bribe and kickback payments from Zorana Danis in exchange for LEOZ's support, as CONMEBOL's president and a member of its executive committee, of Danis and her company as the exclusive marketing agent for the sponsorship rights to the Copa Libertadores. LEOZ specified various means for Danis to make the payments, including direct payments into bank accounts controlled by LEOZ,

73

diversion of funds owed to CONMEBOL into LEOZ's personal bank accounts, and transfers of extra-contractual payments into a CONMEBOL bank account.

171. In or about 2008, after ISM, CONMEBOL, and Grupo Santander entered into a $40 million title sponsorship contract, the defendant EDUARDO DELUCA solicited bribe and kickback payments from Zorana Danis in the amount of $400,000 per year. Danis agreed to make these payments and made the payments, periodically until 2012, from ISM's U.S.-based bank accounts to a Merrill Lynch account in the name of Fleetwood Properties S.A. ("Fleetwood Properties") in Uruguay and to a brokerage account opened in the United States in the name of Gemini Global Trading Ltd. ("Gemini Global Trading") that was cleared through Pershing, LLC, a subsidiary of Bank of New York, Mellon, based in Jersey City, New Jersey. Fleetwood Properties and Gemini Global Trading were companies controlled by DELUCA.

172. Zorana Danis agreed to make and did make bribe payments to the defendants NICOLÁS LEOZ and EDUARDO DELUCA in order to, among other things, obtain and/or retain, for ISM and for ISM Affiliate A, contracts for the sponsorship rights associated with the Copa Libertadores, the ability to commercialize those rights, and the potential to secure

74

contracts for sponsorship rights to additional CONMEBOL tournaments.

173. The defendants NICOLÁS LEOZ and EDUARDO DELUCA and Zorana Danis, directly or through personal assistants, frequently used the wire facilities of the United States to communicate by email in furtherance of the criminal scheme and to effect the transfer of payments in furtherance of the scheme.

D.   CONMEBOL Copa Libertadores Scheme #2

174. Television broadcasts of the Copa Libertadores reached millions of viewers in markets across the globe, including the United States.  According to CONMEBOL, the Copa Libertadores was among the most widely watched sporting events in the world.  The tournament was broadcast in more than 135 countries and, in 2009 and 2010, drew more than one billion viewers.  By one estimate, the United States accounted for 16% of the audience share in 2010, behind only Brazil, Mexico, and Argentina.  Notably, two of the top four markets were in the CONCACAF region.

175.  CONMEBOL's efforts to promote two less popular club team events — a tournament called the Copa Sudamericana and a competition between the Copa Libertadores and Copa Sudamericana winners called the Recopa Sudamericana — also relied, in part, on the growing U.S. market for soccer.  For

example, in 2005 and again in 2007, a club team from Major
League Soccer, another division, along with the NASL, of United
States men's club soccer sanctioned by the USSF, participated in
the Copa Sudamericana.  The Recopa Sudamericana has been played
in the United States on several occasions, including in Los
Angeles, California in 2003, and in Fort Lauderdale, Florida in
2004.

176. Prior to 1999, the television broadcasting rights
to the Copa Libertadores were held by the individual teams that
competed in the tournament.  In or about 1999, CONMEBOL acquired
and consolidated the broadcasting rights to the tournament in
order to maximize the collective value of the rights, ostensibly
for the benefit of both CONMEBOL and the competing teams.

177. Beginning in or about 1999 and continuing through
2015, T&T Sports Marketing Ltd ("T&T"), a Torneos affiliate
domiciled in the Cayman Islands, acquired the exclusive
worldwide broadcasting rights to each edition of the Copa
Libertadores, and eventually to the Copa Sudamericana and Recopa
Sudamericana, through a series of contracts between T&T and
CONMEBOL.  T&T was owned in part by Torneos y Competencias S.A.
and in part by partners in the venture, including, for a brief
period, Traffic, and, later, a group of investors that included

an affiliate of a major broadcasting company headquartered in the United States whose identity is known to the Grand Jury.

178. Beginning in or about 2000, the defendants EDUARDO DELUCA, EUGENIO FIGUEREDO, NICOLÁS LEOZ, and ROMER OSUNA, among other conspirators, solicited annual bribe payments from Co-Conspirator #11, one of the co-founders of Torneos, in exchange for the officials' support of T&T as the holder of the broadcasting rights to the Copa Libertadores.  Co-Conspirator #11 agreed to pay and did pay annual bribes in the amount of $1 million to LEOZ and $600,000 each to OSUNA, DELUCA, and FIGUEREDO for approximately the next 10 years.

179. In or about 2005, Alejandro Burzaco acquired a minority ownership interest in Torneos and began to manage the day-to-day operations of the company in partnership with Co-Conspirator #11.  Burzaco learned from Co-Conspirator #11 of Torneos's practice of making annual bribe payments to defendants NICOLÁS LEOZ, ROMER OSUNA, EDUARDO DELUCA, and EUGENIO FIGUEREDO, among others, and helped to continue the practice. With the assistance of Co-Conspirator #12, a high-ranking executive at Torneos, among other co-conspirators affiliated with Torneos, Burzaco continued to arrange for annual six-figure bribe payments to DELUCA until in or about 2011, to OSUNA until in or about 2012, and to FIGUEREDO, whose payments increased to

$1 million in or about 2012, until in or about 2014. Burzaco arranged for LEOZ to receive $1 million bribe payments each year from in or about 2004 through in or about 2012, the year before LEOZ resigned the presidency of CONMEBOL.

180. CONMEBOL and T&T entered into a number of contracts during the years after Alejandro Burzaco became an owner of Torneos through which T&T retained the broadcasting rights to subsequent editions of the Copa Libertadores, Copa Sudamericana, and Recopa Sudamericana. Each of those contracts required the support of CONMEBOL officials who were receiving bribes from Burzaco and other co-conspirators affiliated with T&T.

181. In or about 2009, a group of six presidents of the traditionally less-powerful member associations of CONMEBOL formed a bloc to obtain greater control over decisions relating to the governance of CONMEBOL and the sale of CONMEBOL's commercial properties, which decisions previously had been dominated by the representatives of soccer powers Argentina and Brazil. This bloc was led by the defendants LUÍS CHIRIBOGA and RAFAEL ESQUIVEL and Luis Bedoya. The other members of the bloc, at its inception, were the defendants JUAN ÁNGEL NAPOUT, MANUEL BURGA, and CARLOS CHÁVEZ.

182. Starting in or about 2009, the members of the "Group of Six," as the members of the bloc were known by some, demanded that they, too, receive annual bribe payments in exchange for their support of T&T as the holder of broadcasting rights to the Copa Libertadores, among other tournaments. Alejandro Burzaco agreed to pay and did pay annual six-figure bribe payments to the defendants JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, and RAFAEL ESQUIVEL and to Luis Bedoya starting in or about 2010, and also to Sergio Jadue, starting in or about 2012, to secure their support.

183. At various times, the defendants MARCO POLO DEL NERO, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, and RICARDO TEIXEIRA also solicited and received bribe and kickback payments from Alejandro Burzaco and Co-Conspirator #12 in exchange for their support of T&T as holder of the rights to the Copa Libertadores, among other tournaments.

184. Alejandro Burzaco and Co-Conspirator #12 at times relied on the defendants HUGO JINKIS and MARIANO JINKIS and on José Margulies and the Margulies Intermediaries to facilitate the payment of bribes and kickbacks to CONMEBOL officials in connection with the Copa Libertadores and other tournaments.

185. In the course of the scheme, various of the defendants and their co-conspirators used wire facilities and

79

financial institutions located in the United States, among other countries, to make and receive bribe payments and to transfer payments related to contracts secured through bribery; relied on the growing U.S. market for soccer to generate profits from the scheme; and conducted meetings in the United States in furtherance of the scheme.

E. CBF Copa do Brasil Scheme

186. Between in or about 1990 and 2009, Traffic entered into a series of contracts with CBF, the Brazilian soccer federation, to acquire the commercial rights associated with the Copa do Brasil, an annual tournament for Brazil's top club teams. During the course of this period, the defendant RICARDO TEIXEIRA – the long-time president of CBF and member of the FIFA executive committee – solicited and received bribes from José Hawilla in connection with the sale of the Copa do Brasil media rights.

187. As a result of an agreement reached between CBF and Traffic on or about January 22, 2009, Traffic Brazil owned the rights to each edition of the Copa do Brasil to be played from 2009 through 2014.

188. On or about December 8, 2011, Sports Marketing Company A, a Traffic competitor owned by Co-Conspirator #7, entered into a contract with CBF to purchase the commercial

rights for all editions of the Copa do Brasil between 2015 and 2022.

189. In order to obtain the contract from CBF, Co-Conspirator #7 agreed to pay an annual bribe to the defendant RICARDO TEIXEIRA, as José Hawilla had done in the past. During the course of their negotiations, Co-Conspirator #7 traveled to the United States to discuss the matter with TEIXEIRA.

190. The signing of the foregoing contract between Sports Marketing Company A and CBF led to a dispute between Co-Conspirator #7 and José Hawilla, who perceived Co-Conspirator #7 – a former employee of his from Traffic Brazil – as stealing Traffic's business with CBF.

191. On or about August 15, 2012, to resolve this dispute, Traffic Brazil and Sports Marketing Company A entered into a contract to pool their marketing rights for future editions of the Copa do Brasil, from 2013 to 2022, and to share equally in the profits. As part of the contract, Traffic Brazil also agreed to pay 12 million Brazilian reais to Sports Marketing Company A over the course of the contract. As of August 15, 2012, 12 million reais equated to approximately $5.9 million.

192. Co-Conspirator #7 advised José Hawilla of the bribe payments he had agreed to make to the defendant RICARDO

TEIXEIRA. Co-Conspirator #7 further advised Hawilla that the bribe payment he had originally negotiated with the defendant RICARDO TEIXEIRA had increased when other CBF officials, the defendants JOSÉ MARIA MARIN (who became the president of CBF in or about 2012) and MARCO POLO DEL NERO (who was elected by CBF in 2014 to take over as MARIN's successor in 2015), requested bribe payments as well. Hawilla agreed to pay half the cost of the bribe payments, which totaled 2 million Brazilian reais per year, to be distributed among TEIXEIRA, MARIN, and DEL NERO. As of August 15, 2012, 2 million reais equated to approximately $988,000.

193. José Hawilla and Co-Conspirator #7 used the wire facilities of the United States in furtherance of the Copa do Brasil bribery scheme, including in connection with the following domestic and international wire transfers:

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| December 5, 2013 | Wire transfer of $500,000 from Sports Marketing Company A's account at Itaú Unibanco in New York, New York, to a JP Morgan Chase correspondent account in New York, New York, for credit to the account of a luxury yacht manufacturer at HSBC bank in London, England. |
| December 23, 2013 | Wire transfer of $450,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco Itaú |

account in New York, New York in
the name of Sports Marketing
Company B.

194. In or about April 2014, the defendant JOSÉ MARIA
MARIN traveled to Miami, Florida to attend a press conference
announcing the Copa América Centenario, a joint CONCACAF-
CONMEBOL tournament discussed further in section O below.  MARIN
had a meeting with José Hawilla during the trip in which MARIN
discussed the status of the payments due to him and the
defendant MARCO POLO DEL NERO in connection with the Copa do
Brasil scheme.  At one point, when Hawilla asked whether it was
really necessary to continue to pay bribes to the defendant
RICARDO TEIXEIRA, MARIN's predecessor as CBF president, MARIN
stated, "[I]t's about time to – to have it coming our way.  True
or not?"  Hawilla agreed, stating, "Of course, of course, of
course.  That money had to be given to you."  MARIN agreed:
"That's it, that's right."

F.    CBF Sponsorship Scheme

195. The Brazilian national team won the 1994 World
Cup, which was hosted by the United States in June and July of
that year.  Around the same time, a representative of a
multinational sportswear company headquartered in the United
States (together with its affiliates, "Sportswear Company A"),
the identity of which is known to the Grand Jury, approached CBF

83

to determine whether CBF was interested in being sponsored by Sportswear Company A. At the time, CBF already had a sponsorship agreement with another American sportswear company ("Sportswear Company B"), the identity of which is known to the Grand Jury. Thereafter the defendant RICARDO TEIXEIRA, then the president of CBF, and José Hawilla, on behalf of Traffic Brazil, which at the time served as CBF's marketing agent, began negotiations with representatives of Sportswear Company A.

196. The negotiations lasted into 1996. The parties ultimately agreed to a 10-year deal, which required, among other things, that Sportswear Company A compensate Sportswear Company B, which agreed to terminate its existing contract with CBF. As part of the basic agreement, Sportswear Company A agreed to spend $200 million.

197. The parties met in New York, New York for the closing. The sponsorship agreement, dated July 11, 1996, was signed by the defendant RICARDO TEIXEIRA on behalf of CBF, José Hawilla on behalf of Traffic Brazil, and four representatives of Sportswear Company A. Among other terms, the contract, a 44-page Sponsorship and Endorsement Agreement (the "Agreement"), required Sportswear Company A to pay CBF $160 million over 10 years for the right to be one of CBF's co-sponsors and to be CBF's exclusive footwear, apparel, accessories, and equipment

84

supplier. CBF remitted a percentage of the value of the payments it received under the Agreement to Traffic Brazil.

198. Additional financial terms, including the agency fee owed to Traffic, were not reflected in the Agreement. Sportswear Company A agreed to pay a Traffic affiliate with a Swiss bank account an additional $40 million in base compensation on top of the $160 million it was obligated to pay to CBF pursuant to the Agreement. At the closing, a representative of Sportswear Company A and a representative of Traffic Brazil (José Hawilla) signed a one-page letter agreement dated July 14, 1996 acknowledging as follows: "CBF has authorized Traffic, or its designated banking agent, to invoice [Sportswear Company A] directly for marketing fees earned upon successful negotiation and performance of the ... [Agreement]."

199. Between 1996 and 1999, Wabern Corp. ("Wabern"), the Traffic affiliate with the Swiss bank account, invoiced Sportswear Company A directly for $40 million in payments. Sportswear Company A – including the U.S. parent company itself – made the payments to Wabern's account in Switzerland.

200. José Hawilla agreed to pay and did pay the defendant RICARDO TEIXEIRA half of the money he made from the sponsorship deal, totaling in the millions of dollars, as a bribe and kickback.

201. On or about January 25, 2002, the parties agreed to terminate the Agreement before the end of the 10-year term, ending any further obligations thereunder between Sportswear Company A and CBF, and between Sportswear Company A and Traffic Brazil.

G. CFU World Cup Qualifiers Scheme #1

202. Since at least in or about 1998, the media rights to matches played by nations seeking to qualify for the World Cup have been owned by the home team for each qualifier match. In negotiating the sale of these rights, CFU member associations agreed to pool their "home team" rights. The value of such rights was dependent in significant part on the market size of the opponent of the CFU member association, with Mexico and the United States generally being the largest markets – and thus the most "valuable" opponents to play – in the CONCACAF region. By pooling their rights and selling them prior to the draw for the next round of World Cup qualifier matches, CFU member associations sought to maximize leverage and increase profitability to all the members.

203. From at least in or about 1998 until in or about May 2011, the defendant JACK WARNER, as president of CFU, was responsible for negotiating the sale of the CFU member associations' rights with sports marketing companies, including

86

with Traffic USA. During the same period, WARNER was also a special advisor to TTFF, the Trinidadian federation.

204. Beginning in 1998, CFU entered into contracts with Traffic USA for the sale of its members' rights to their home World Cup qualifier matches. The first such contract, dated October 10, 1998, concerned the rights to qualifier matches to be played in advance of the 2002 World Cup (the "2002 World Cup qualifiers contract"). The second contract, dated July 17, 2000, concerned the rights to qualifier matches to be played in advance of the 2006 World Cup (the "2006 World Cup qualifiers contract"). The third contract, dated August 13, 2005, concerned the rights to qualifier matches to be played in advance of the 2010 World Cup (the "2010 World Cup qualifiers contract"). The fourth contract, dated July 3, 2009, and then subsequently revised on December 9, 2010, concerned the rights to qualifier matches to be played in advance of the 2014 World Cup (the "2014 World Cup qualifiers contract"). CFU's negotiations regarding each of these contracts were controlled by the defendant JACK WARNER, and WARNER signed each of these contracts on behalf of CFU.

205. Beginning with at least the 2006 World Cup qualifiers contract, the contracts stated that they included the

sale of media rights owned by all CFU member associations, including TTFF.

206. Separately, however, at the defendant JACK WARNER's request, Traffic USA executives, including Co-Conspirator #3, Co-Conspirator #9, and Fabio Tordin, created another document purporting to be a contract with TTFF for the same rights Traffic USA had purchased as part of its deal with CFU. WARNER signed these contracts, which were typically negotiated at the same time as the CFU contracts, as "special advisor" to TTFF.

207. Rather than paying the full value of CFU's contract to CFU and its member associations, Traffic USA executives, including Co-Conspirator #3, with the knowledge and consent of Fabio Tordin, at the defendant JACK WARNER's request, diverted a substantial portion of that value to an account controlled by WARNER, purportedly as payment on Traffic USA's contract with TTFF.

208. For example, the 2006 World Cup qualifiers contract provided that Traffic USA was to pay CFU a base price of $900,000 for the media rights covered by the contract, which included the media rights owned by TTFF. At the same time, Traffic USA entered into a contract with TTFF providing that

Traffic USA would pay TTFF $800,000 for the same TTFF rights it had purchased as part of its contract with CFU.

209. Upon the defendant JACK WARNER's request, Traffic USA executives subsequently wired payments on the TTFF contract to an account at a bank in Trinidad and Tobago that WARNER controlled.

210. For example, on or about April 19, 2004, Traffic wired $40,000 from an account at Citibank in Miami, Florida to a correspondent account at Wachovia Bank, for credit to an account held in the name of "LOC Germany 2006 Limited" at First Citizens Bank in Trinidad and Tobago.

211. Approximately 11 days prior to the transfer, the defendant JACK WARNER sent an email to First Citizens Bank, requesting that the bank transfer $60,000 from the LOC Germany 2006 Limited account to his "personal checking account."  In the same email, WARNER advised that he expected a $40,000 deposit into the account the following week.

212. Similarly, the 2010 World Cup qualifiers contract provided that Traffic USA was to pay CFU $2.2 million for the media rights covered by the contract, which included the media rights owned by TTFF.  At the same time, Traffic USA entered into a contract with TTFF providing that Traffic USA would pay

TTFF $800,000 for the same TTFF rights it had purchased as part of its contract with CFU.

213. Upon the defendant JACK WARNER's request and as payment on the TTFF contract, on or about June 1, 2005, Traffic USA executives wired $40,000 from an account at Citibank in Miami, Florida to a correspondent account at Wachovia Bank, for credit to the LOC Germany 2006 Limited account at First Citizens Bank in Trinidad and Tobago.

214. Five days later, on or about June 6, 2005, the defendant JACK WARNER transferred $40,000 from the LOC Germany 2006 Limited account to another bank account held in his name.

215. As part of this scheme and in order to ensure that TTFF would continue to receive payments from Traffic USA related to the TTFF contracts, the defendant JACK WARNER concealed the existence of the TTFF contracts from the CFU member associations.

H.    2010 FIFA World Cup Vote Scheme

216. In or about 2004, the FIFA executive committee considered bids from Morocco, South Africa and Egypt, as well as other nations that withdrew before the vote, to host the 2010 World Cup.

217. Previously, the defendant JACK WARNER and his family had cultivated ties with South African soccer officials

in connection with and subsequent to a failed bid by South Africa to host the 2006 World Cup.  In the early 2000s, Daryan Warner, a member of WARNER's family, had used WARNER's contacts in South Africa to organize friendly matches for CONCACAF teams to play in South Africa.  At one point, WARNER also directed Daryan Warner to fly to Paris, France and accept a briefcase containing bundles of U.S. currency in $10,000 stacks in a hotel room from Co-Conspirator #13, a high-ranking South African bid committee official.  Hours after arriving in Paris, Daryan Warner boarded a return flight and carried the briefcase back to Trinidad and Tobago, where Daryan Warner provided it to WARNER.

218. In the months before the selection of the host nation for the 2010 World Cup, which was scheduled to take place in May 2004, the defendant JACK WARNER and Charles Blazer traveled to Morocco as they had done in 1992, in advance of the voting for the 1998 World Cup host.  While in Morocco during the 2004 trip, a representative of the Moroccan bid committee offered to pay $1 million to WARNER in exchange for his agreement to cast his secret ballot on the FIFA executive committee for Morocco to host the 2010 World Cup.

219. Subsequently, Charles Blazer learned from the defendant JACK WARNER that high-ranking officials of FIFA, including Co-Conspirator #14, the South African bid committee,

91

including Co-Conspirator #15, and the South African government

were prepared to arrange for the government of South Africa to

pay $10 million to CFU to "support the African diaspora."

Blazer understood the offer to be in exchange for the agreement

of WARNER, Blazer, and Co-Conspirator #16 to all vote for South

Africa, rather than Morocco, to host the 2010 World Cup.  At the

time, Co-Conspirator #16, like WARNER and Blazer, was a FIFA

executive committee member.  WARNER indicated that he had

accepted the offer and told Blazer that he would give a $1

million portion of the $10 million payment to Blazer.

220. In FIFA's executive committee vote held on May

15, 2004, South Africa was selected over Morocco and Egypt to

host the 2010 World Cup.  The defendant JACK WARNER, Charles

Blazer, and Co-Conspirator #16 indicated that they voted for

South Africa.

221. In the months and years after the vote, Charles

Blazer periodically asked WARNER about the status of the $10

million payment.

222. At one point, Charles Blazer learned that the

South Africans were unable to arrange for the payment to be made

directly from government funds.  Arrangements were thereafter

made with FIFA officials to instead have the $10 million sent

from FIFA – using funds that would otherwise have gone from FIFA to South Africa to support the World Cup – to CFU.

223. In fact, on January 2, 2008, January 31, 2008 and March 7, 2008, a high-ranking FIFA official, Co-Conspirator #17, caused payments of $616,000, $1,600,000, and $7,784,000 – totaling $10 million – to be wired from a FIFA account in Switzerland to a Bank of America correspondent account in New York, New York, for credit to accounts held in the names of CFU and CONCACAF, but controlled by the defendant JACK WARNER, at Republic Bank in Trinidad and Tobago.

224. Soon after receiving these wire transfers, the defendant JACK WARNER caused a substantial portion of the funds to be diverted for his personal use. For example, on January 9, 2008, WARNER directed Republic Bank officials to apply $200,000 of the $616,000 that had been transferred into a CFU account from FIFA one week earlier toward a personal loan account held in his name.

225. The defendant JACK WARNER also diverted a portion of the funds into his personal accounts by laundering the funds through intermediaries. For example, in or about and between February 13, 2008 and October 3, 2008, WARNER caused over $4 million of the funds received from FIFA to be transferred to Individual #1, a Trinidadian businessman whose identity is known

93

to the Grand Jury, Trinidadian Company A, a large supermarket chain in Trinidad and Tobago controlled by Individual #1, and Trinidadian Company B, a real estate and investment company also controlled by Individual #1. During approximately the same period, funds equating to at least $1 million were transferred from these same accounts into a bank account held in the name of WARNER and a family member at First Citizens Bank in Trinidad and Tobago. The identities of Trinidadian Company A and Trinidadian Company B are known to the Grand Jury.

226. During the three years following WARNER's receipt of the $10 million from FIFA, WARNER made three payments to Charles Blazer, totaling over $750,000, in partial payment of the $1 million that WARNER had earlier promised Blazer as part of the bribe scheme.

227. The first payment, in the amount of $298,500, was made by wire transfer sent on or about December 19, 2008 from an account held in the name of CFU at Republic Bank in Trinidad and Tobago, to a Bank of America correspondent account in New York, New York, for credit to an account controlled by Charles Blazer at a bank in the Cayman Islands.

228. The second payment, in the amount of $205,000, was made by check drawn on an account held in the name of CFU at Republic Bank in Trinidad and Tobago. On or about September 27,

94

2010, Charles Blazer caused the check to be deposited into his Merrill Lynch brokerage account in New York, New York. Approximately one month earlier, on or about August 23, 2010, WARNER sent an email to Blazer to advise him that the payment was forthcoming.

229. The third payment, in the amount of $250,000, was made by check drawn on an account held in the name of CFU at Republic Bank in Trinidad and Tobago. The check was delivered to Charles Blazer by another individual who traveled by airplane from Trinidad and Tobago to JFK International Airport in Queens, New York, and then to CONCACAF's headquarters in New York, New York, where he delivered the check to Blazer. A representative of FirstCaribbean International Bank in the Bahamas, where Blazer held another account, subsequently traveled by airplane to New York, landing at Kennedy Airport. After arriving, the bank representative traveled to New York, New York, where he took custody of the check. He subsequently traveled to the Bahamas and, on or about May 3, 2011, deposited the check into Blazer's account. Approximately two months earlier, on or about March 13, 2011, WARNER sent an email to Blazer to advise him that the payment was forthcoming.

230. Charles Blazer never received the balance of the promised $1 million payment.

95

I.   UNCAF Region World Cup Qualifiers Schemes

231. UNCAF was a regional federation within CONCACAF that included as members the soccer federations of the Central American nations.  Like CFU members, UNCAF members sought to sell the media rights they owned to home team matches played to qualify for the World Cup.  Unlike CFU, the UNCAF members did not pool their rights; instead, the UNCAF member federations negotiated separately with prospective purchasers of the rights, which included Traffic USA and Media World.

232. From in or about the late 1990s to 2006, Traffic USA obtained contracts for the rights to the World Cup qualifier matches held by most or all of the UNCAF federations.  From in or about 2004 to 2006, Co-Conspirator #3, supervised by Fabio Tordin, was the Traffic USA executive responsible for negotiating with the UNCAF federations for the purchase of media rights to World Cup qualifier matches.  In or about 2006, Tordin left Traffic USA.  Co-Conspirator #3 continued to work at Traffic USA until his departure in or about July 2012.

233. Beginning in approximately 2005, Media World began to compete with Traffic USA for these rights.  Initially, Media World's efforts in this regard were overseen by Roger Huguet, a part owner of the company, with the assistance of Co-Conspirator #6, a sports marketing consultant who had previously

96

worked for Traffic USA. Subsequently, Huguet, on behalf of Media World, entered into a consulting agreement with Co-Conspirator #2 and Fabio Tordin, both of whom had by then left Traffic USA, in which Co-Conspirator #2 and Tordin agreed to help Media World obtain media and marketing rights to UNCAF federations' home World Cup qualifier matches. In or about 2011, Huguet hired Tordin to work as an executive of Media World.

234. Co-Conspirator #5 was a part owner of both Media World's parent company Media Company A and Media Company A's affiliated global media conglomerate Media Company B. In that capacity, Co-Conspirator #5 regularly traveled to Miami, Florida to meet with Roger Huguet and receive updates on Media World's operations, including its efforts to obtain media and marketing rights to World Cup qualifier matches owned by the UNCAF federations.

235. In or about the spring of 2012, Media World and Traffic USA, which until that time had been competitors in this market, agreed to pool their resources and share both costs expended and revenue earned from the purchase of rights to World Cup qualifier matches played by all CONCACAF member associations, including those in UNCAF.

236. Throughout this period – both while Traffic USA and Media World were competitors and after they entered into a revenue-sharing agreement – representatives of the two companies agreed to pay, and did pay, bribes to numerous UNCAF federation officials and former UNCAF federation officials who retained influence over those federations in order to obtain contracts for World Cup qualifier rights. The sports marketing executives and consultants who participated in these schemes included, among others, Co-Conspirator #2, Co-Conspirator #3, Co-Conspirator #4, Fabio Tordin, Co-Conspirator #5, Roger Huguet, and Co-Conspirator #6. The contracts obtained through bribes included, at a minimum, the contracts for rights relating to the World Cup qualifier cycles described in the table below.

**TABLE 2:** UNCAF Federation Contracts Obtained Through Bribery

| Federation | World Cup Qualifiers Cycle |
|---|---|
| FEDEFUT (Costa Rica) | 2010, 2018, 2022 |
| FENIFUT (Nicaragua) | 2018 |
| FENAFUTH (Honduras) | 2014, 2018, 2022 |
| FESFUT (El Salvador) | 2014, 2018 |
| FENAFUTG (Guatemala) | 2010, 2014, 2018, 2022 |
| FEPAFUT (Panama) | 2014, 2018 |

237. Roger Huguet regularly apprised Co-Conspirator #5 of the bribes paid on behalf of Media World to officials of

UNCAF federations in order to secure the rights to these federations' World Cup qualifier matches.  Huguet and Co-Conspirator #5 also discussed the fact that Media World had taken steps to conceal the true nature and purpose of bribe payments made in furtherance of the scheme, including by disguising those payments as fees payable pursuant to certain "consulting" contracts.  Co-Conspirator #5 approved of Media World's participation in this scheme.

238. The officials who agreed to accept, and did accept, bribes paid in connection with these schemes included, among others, the defendants ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL CALLEJAS, BRAYAN JIMÉNEZ, EDUARDO LI, JULIO ROCHA, RAFAEL SALGUERO, HÉCTOR TRUJILLO, and REYNALDO VASQUEZ, as well as Co-Conspirator #18, Co-Conspirator #19, and Co-Conspirator #20.

239. During the course of this scheme, bribe payments were made by Traffic USA and Media World from bank accounts located in the United States, utilizing the wires of the United States.  Moreover, in all cases, periodic payments pursuant to the terms of the rights contracts obtained through this scheme were made by wire transfer from bank accounts controlled by Traffic USA and Media World in the United States to bank accounts controlled by the UNCAF federations located outside the United States.

240. Set forth below are examples of bribe payments made during the course of this scheme to officials of six of the UNCAF federations.

### i.  FEDEFUT (Costa Rica)

241. In or about 2009, the defendant EDUARDO LI was the president of FEDEFUT, the Costa Rican soccer federation. During that time, Co-Conspirator #3, while employed at Traffic USA, began negotiating with LI to renew with Traffic USA the contract for the exclusive worldwide commercial rights to that federation's home qualifier matches to be played in advance of the 2018 World Cup.

242. At approximately the same time, the defendant EDUARDO LI and Co-Conspirator #21 met in Miami, Florida with Fabio Tordin, who had left Traffic USA and was then representing Media World as a consultant.  During this meeting, LI, the FEDEFUT president, asked Tordin for a six-figure bribe to sell the same commercial rights to Media World.  Media World did not ultimately pay the bribe or obtain the contract.

243. Instead, on or about September 4, 2009, Traffic USA and FEDEFUT entered into a contract for these commercial rights, which was signed by the defendant EDUARDO LI and Co-Conspirator #3.  During the negotiations, LI asked Co-Conspirator #3 for a six-figure bribe in exchange for his

100

agreement to award the contract to Traffic USA.  After obtaining approval within Traffic, Co-Conspirator #3 agreed to the payment and caused it to be made.

244. In or about July 2012, Co-Conspirator #3 left Traffic USA to become general secretary of CONCACAF.  Traffic USA subsequently hired Individual #2, an individual whose identity is known to the Grand Jury, to oversee negotiations for the purchase of media and marketing rights from CONCACAF member associations, including from FEDEFUT.

245. In or about July 2014, Individual #2 entered into negotiations with the defendant EDUARDO LI to obtain for Traffic USA the media and marketing rights owned by FEDEFUT to home qualifier matches to be played in advance of the 2022 World Cup. LI, on behalf of FEDEFUT, signed a letter of intent indicating that FEDEFUT would enter into a contract with Traffic USA for these rights.

246. On multiple occasions during this approximate period, including during meetings held in Miami, Florida, the defendant EDUARDO LI asked Individual #2 to divert to LI tens of thousands of dollars that Traffic USA owed FEDEFUT on the contract for FEDEFUT's rights to qualifier matches that had been played in advance of the 2014 World Cup.  Individual #2 refused to divert these funds to LI.  LI thereafter declined to sign the

contract for Costa Rica's 2022 World Cup qualifying matches with Traffic USA.

247. Subsequently, Fabio Tordin, then an executive of Media World, learned that the defendant EDUARDO LI was considering selling FEDEFUT's 2022 World Cup qualifier rights to another sports marketing company rather than to Traffic USA or to Media World. As noted, pursuant to its 2012 revenue-sharing agreement with Traffic USA, Media World stood to benefit from any contracts for World Cup qualifier rights between Traffic USA and any CONCACAF member association, including FEDEFUT. Accordingly, following negotiations with LI and without informing Individual #2, Tordin and Roger Huguet agreed to pay LI a bribe of approximately $600,000 to cause LI to enter into a contract with Traffic USA for FEDEFUT's rights to its 2022 World Cup qualifier matches. On or about February 9, 2015, Traffic USA and FEDEFUT entered into a contract for these rights.

248. Media World subsequently paid at least $300,000 to the defendant EDUARDO LI towards the promised bribe. In order to conceal the source and nature of the payment, the conspirators paid the bribe to LI using an intermediary account in Panama controlled by Co-Conspirator #6, at the time a consultant engaged by Media World.

102

249. In furtherance of this scheme, on or about February 27, 2015 and April 20, 2015, Roger Huguet and Fabio Tordin caused payments of $200,000 and $150,000, respectively, to be wired from Media World's account at Bank of America in Miami, Florida to an account at Multibank in Panama controlled by Co-Conspirator #6. Thereafter, on or about March 2, 2015 and April 28, 2015, respectively, Co-Conspirator #6 caused payments totaling $300,000 to be wired from the same Panamanian Multibank account to a correspondent account at Bank of America in New York, New York, for credit to an account at Citibank in Miami held in the name of Warrior Holdings, S.A., a company located in Costa Rica.

## ii. FENIFUT (Nicaragua)

250. In or about 2011, the defendant JULIO ROCHA was the president of FENIFUT, the Nicaraguan soccer federation. During that time, ROCHA began negotiating with Co-Conspirator #3, then still with Traffic USA, to renew the exclusive worldwide commercial rights to exploit FENIFUT's rights to home qualifier matches to be played in advance of the 2018 World Cup. On or about April 26, 2011, Traffic USA and FENIFUT entered into a contract for these rights. The contract was signed by Co-Conspirator #3 on behalf of Traffic USA and by ROCHA on behalf of FENIFUT.

103

251. During the negotiations, the defendant JULIO ROCHA asked Co-Conspirator #3 for a six-figure bribe in exchange for his agreement to award the contract to Traffic USA. Co-Conspirator #21, a FIFA official who was involved in facilitating the negotiations, also asked for a payment for himself and was aware of the payment to ROCHA. After obtaining approval within Traffic, Co-Conspirator #3 agreed to the payments and caused them to be made.

252. The bribe payment was sent to the defendant JULIO ROCHA in a manner designed to conceal the source and nature of the payment. On or about May 26, 2011, at the direction of Traffic executives, $150,000 was wired from an account held in the name of Co-Conspirator #10, an intermediary, at Banco Itaú in Brazil, to an account held in the name of Investment Company A at Banco Itaú in Miami, Florida. The following day, the funds were wired from the latter account to an account at BankInter in Madrid, Spain that was held in ROCHA's name. According to ROCHA, his portion of the payment was $100,000, and $50,000 was for Co-Conspirator #10.

253. In or about 2012, the defendant JULIO ROCHA stepped down as president of FENIFUT. Nonetheless, he continued to solicit bribe payments in connection with the sale of FENIFUT's future World Cup qualifier rights.

104

254. On or about February 25, 2014, the defendant JULIO ROCHA met with Co-Conspirator #3 in Miami, Florida. At the time, ROCHA was employed by FIFA as a development officer, and Co-Conspirator #3 was the general secretary of CONCACAF. During the meeting, ROCHA asked Co-Conspirator #3 to speak with his successor at Traffic USA about whether ROCHA could receive a payment in connection with the sale of FENIFUT's rights to their qualifier matches to be played in advance of the 2022 World Cup.

### iii. FENAFUTH (Honduras)

255. In or about 2012, the defendants RAFAEL CALLEJAS and ALFREDO HAWIT were, respectively, the president and general secretary of FENAFUTH, the Honduran soccer federation. On or about December 3, 2012, Media World entered into a contract with FENAFUTH for the media and marketing rights to qualifier matches to be played in advance of the 2022 World Cup. The contract was signed by Roger Huguet on behalf of Media World and by CALLEJAS on behalf of FENAFUTH.

256. To obtain this contract, Media World agreed to pay, and did pay, approximately $600,000 in bribes to the defendants RAFAEL CALLEJAS and ALFREDO HAWIT. In furtherance of this scheme, on or about December 13, 2012, Roger Huguet and Fabio Tordin caused $500,000 to be wired from Media World's account at Bank of America in Miami, Florida to an account at

105

Citibank in Panama City, Panama controlled by Co-Conspirator #6, intending that a portion of those funds be paid as bribes to obtain the FENAFUTH contract. Approximately one week later, on or about December 21, 2012, Co-Conspirator #6 caused $234,970 to be wired from an account he controlled at Banco Cuscatlan in Panama City, Panama to an account at Banco Ficohsa in Tegucigalpa, Honduras to which the funds were directed by CALLEJAS. In furtherance of the scheme, on or about December 26, 2012 and again on or about December 31, 2012, Co-Conspirator #6 twice caused $50,000 to be wired from the same Panamanian account at Banco Cuscatlan to an account at Banco Ficohsa in Panama City, Panama in the name of HAWIT's wife.

257. On or about January 7, 2013, Roger Huguet and Fabio Tordin caused $500,000 to be wired from Media World's account at Bank of America in Miami, Florida to an account at Citibank in Panama City, Panama controlled by Co-Conspirator #6, intending that a portion of those funds be paid as bribes to obtain the FENAFUTH contract. Approximately two weeks later, on or about January 22, 2013, Co-Conspirator #6 caused $263,720 to be wired from the same Citibank account in Panama to the same account at Banco Ficohsa in Panama City, Panama held in the name of the defendant ALFREDO HAWIT's wife.

258. Media World also paid bribes to obtain rights owned by FENAFUTH to its 2014 and 2018 World Cup qualifier matches to the defendants RAFAEL CALLEJAS and ALFREDO HAWIT, then the general secretary and president of FENAFUTH, respectively. In both cases, the bribes were paid by wire transfer from Media World's Bank of America account in Miami, Florida to Panamanian accounts of companies controlled by Co-Conspirator #6, who in turn transmitted the funds to Honduran accounts designated by CALLEJAS and HAWIT.

### iv. FESFUT (El Salvador)

259. In or about 2009, the defendant REYNALDO VASQUEZ was the president of FESFUT, the Salvadoran soccer federation. During that time, FESFUT entered into negotiations to sell to Media World the media and marketing rights it owned to World Cup qualifier matches to be played in advance of the 2014 World Cup. On or about September 25, 2009, Media World entered into a contract with FESFUT for the media and marketing rights owned by FESFUT to its 2014 World Cup qualifier matches. The contract was signed by Roger Huguet on behalf of Media World and by VASQUEZ on behalf of FESFUT.

260. To obtain this contract, Media World agreed to pay, and did pay, a six-figure bribe to the defendant REYNALDO VASQUEZ and to Co-Conspirator #18, a former high-ranking

official of FESFUT who retained influence over the federation. In order to conceal the source and purpose of the payments, the conspirators used an intermediary account controlled by Co-Conspirator #2 - the former Traffic USA executive who at the time worked as a sports marketing consultant - at FPB Bank in Panama City, Panama to make the payments, among other means and methods.

261. In furtherance of the scheme, on or about November 4, 2011, Media World wired $100,000 from its account at Bank of America in Miami, Florida to an account in the name of FESFUT at Banco Cuscatlan in El Salvador pursuant to the contract for the 2014 World Cup qualifier matches.

262. In or about 2012, Media World again paid a six-figure bribe to obtain rights owned by FESFUT to its 2018 World Cup qualifier matches. These bribes were paid by wire transfer from Media World's Bank of America account in Miami, Florida to the Panamanian account of a company controlled by Co-Conspirator #6, who in turn transmitted the funds to a Panamanian account in the name of the defendant REYNALDO VASQUEZ. VASQUEZ, who by this time was the former president of FESFUT but nevertheless retained influence over current federation officials, kept some of the funds himself and also provided a portion to Fabio

Tordin, who delivered it to Co-Conspirator #20, a high-ranking official of FESFUT, as VASQUEZ instructed.

v.    FENAFUTG (Guatemala)

263. In or about 2010, the defendants BRAYAN JIMÉNEZ and HÉCTOR TRUJILLO were the president and general secretary, respectively, of FENAFUTG, the Guatemalan soccer federation.  On or about March 16, 2010, Media World entered into a contract with FENAFUTG for the media and marketing rights it owned for qualifier matches to be played in advance of the 2018 World Cup. The contract was signed by Roger Huguet on behalf of Media World and by JIMÉNEZ on behalf of FENAFUTG.

264. In the course of negotiating the contract, Fabio Tordin met in Miami, Florida with the defendants BRAYAN JIMÉNEZ, HÉCTOR TRUJILLO, and RAFAEL SALGUERO.  At the time, SALGUERO, the former FENAFUTG president, was one of three members on the FIFA executive committee representing the CONCACAF region and retained influence over FENAFUTG.  During the meeting, the conspirators agreed that Media World would pay a six-figure bribe, to be split among JIMÉNEZ, TRUJILLO, and SALGUERO, in order to obtain FENAFUTG's rights to its 2018 World Cup qualifier matches.

265. The bribe was subsequently paid by wire transfers from Media World's account at Bank of America in Miami, Florida.

In order to conceal the source and purpose of the payments, the conspirators used the same intermediary account controlled by Co-Conspirator #2 at FPB Bank in Panama City, Panama to make the payments, among other means and methods. In addition, on or about March 31, 2011, Fabio Tordin caused $20,000 to be wired from Media World's account at Bank of America in Miami, Florida, to a correspondent account at Citibank in New York, New York, for credit to a Guatemalan bank account designated by the defendant RAFAEL SALGUERO in the name of a travel agency. SALGUERO caused a sham invoice for this payment to be sent to Media World.

266. On or about February 28, 2014, Media World entered into a contract with FENAFUTG for the media and marketing rights owned by the federation to its qualifier matches to be played in advance of the 2022 World Cup. The contract was again signed by Roger Huguet on behalf of Media World and by the defendant BRAYAN JIMÉNEZ on behalf of FENAFUTG.

267. In the course of negotiating the contract, Fabio Tordin met in Miami, Florida with the defendants BRAYAN JIMÉNEZ and HÉCTOR TRUJILLO. They agreed that Media World would pay JIMÉNEZ and TRUJILLO a bribe in order to obtain these rights. Tordin arranged to pay a $200,000 bribe to TRUJILLO, which TRUJILLO would split with JIMÉNEZ. Tordin also agreed to pay an

110

additional $200,000 to JIMÉNEZ, which Tordin agreed to not disclose to TRUJILLO.

268.  In furtherance of the scheme, on or about March 28, 2014, Fabio Tordin caused $200,000 to be wired from Media World's account at Bank of America in Miami, Florida, to an account at Chase Bank in Seattle, Washington, held in the name of Construction Company A, the identity of which is known to the Grand Jury, which had been designated by the defendant HÉCTOR TRUJILLO to receive the portion of the bribe TRUJILLO was to share with the defendant BRAYAN JIMÉNEZ.  At JIMÉNEZ's direction, in order to receive the portion of the bribe he hid from TRUJILLO, on or about July 22, 2014, September 28, 2014, January 20, 2015, and February 6, 2015, Tordin caused funds totaling approximately $200,000 to be wired to accounts at Banco G&T in Guatemala City, Guatemala held in the name of Co-Conspirator #19, a former high-ranking official of FENAFUTG.

269.  On or about July 9, 2015, Fabio Tordin met with the defendants BRAYAN JIMÉNEZ and HÉCTOR TRUJILLO in Chicago, Illinois.  During the meeting, the men discussed the manner in which they had received the bribe payments described above for the 2022 World Cup qualifying matches.  At the outset of the conversation, JIMÉNEZ stated, "Nothing should be said over the telephone.  Nothing!... Nothing!  Nothing!"

270. During the same meeting, the defendant HÉCTOR TRUJILLO stated, in sum and substance, that the most recent bribe he received had been paid to an account held in the name of a construction company controlled by a third party, and that the third party had paid TRUJILLO from that account. TRUJILLO further stated that he did not think the payment would appear suspicious, as a sham contract had been created, and the payment had been made after the contract between Media World and FENAFUTG had been signed.

### vi.   FEPAFUT (Panama)

271. In or about 2009, the defendant ARIEL ALVARADO was the president of FEPAFUT, the Panamanian soccer federation. On or about June 9, 2009, Traffic USA entered into a contract with FEPAFUT for the media and marketing rights owned by the federation to qualifier matches to be played in advance of the 2014 World Cup. The contract was signed by Co-Conspirator #3 on behalf of Traffic USA and by ALVARADO on behalf of FEPAFUT.

272. During the course of the negotiations, the conspirators agreed that Traffic USA would pay a bribe of $70,000 to the defendant ARIEL ALVARADO in order to obtain FEPAFUT's rights to the 2014 World Cup qualifier matches.

273. The bribe was paid by wire transfer from Traffic USA's account at Citibank in Miami, Florida. In order to

conceal the purpose of the payment, it was agreed that the payment would be made to an account in Panama held in the name of a Panamanian attorney designated by the defendant ARIEL ALVARADO. To further conceal the nature of the payment, the conspirators created a sham contract between Traffic USA and the attorney's law firm, which ALVARADO emailed to Co-Conspirator #3 on or about June 29, 2010, as well as a sham invoice.

274. In furtherance of the scheme, on or about July 20, 2010, Co-Conspirator #3 and Co-Conspirator #4 caused $70,000 to be wired from Traffic USA's account at Citibank in Miami, Florida to a bank account in Panama held in the name of the Panamanian attorney designated by the defendant ARIEL ALVARADO.

275. In furtherance of the scheme, on or about December 13, 2013, Traffic USA wired $15,000 from its account at Citibank in Miami, Florida to an account held in the name of FEPAFUT at Banco General in Panama City, Panama pursuant to the contract for the 2014 World Cup qualifier matches.

276. Traffic USA also paid a $60,000 bribe to the defendant ARIEL ALVARADO to obtain rights owned by FEPAFUT to its 2010 World Cup qualifier matches. As with the 2014 World Cup qualifier cycle bribe described above, the bribe in connection with the 2010 cycle was paid by two wire transfers from Traffic USA's Citibank account in Miami, Florida to a

113

Panamanian account held by the same Panamanian attorney's law firm, as designated by ALVARADO. Also similarly, the conspirators created a sham contract between Traffic USA and the law firm to mask the true nature and purpose of the bribe payment.

J.   UNCAF Region Friendlies Schemes

277. From in or about 2009 to 2015, Fabio Tordin and Co-Conspirator #6 operated a business venture to organize and promote friendly matches involving the men's national soccer teams of Costa Rica, El Salvador, and Guatemala, as well as friendly matches involving other FIFA member associations. The matches were frequently played at venues in the United States. In order to obtain the agreement of the Costa Rican, Salvadoran, and Guatemalan federations to participate in these friendly matches, Tordin and Co-Conspirator #6 agreed to pay, and did pay, bribes to high-ranking current and former FEDEFUT, FESFUT, and FENAFUTG officials, including the defendants EDUARDO LI, REYNALDO VASQUEZ, and BRAYAN JIMÉNEZ.

278. At times, these bribes were paid in cash in the United States. At other times, they were paid by wire transfer sent from and through bank accounts in the United States to bank accounts outside the United States. The conspirators used the

114

wires of the United States to communicate between the United States and foreign countries regarding the schemes.

i.   FESFUT (El Salvador)

279. From in or about 2012 to 2015, Fabio Tordin and Co-Conspirator #6 organized and promoted friendly matches between the Salvadoran men's national team and the teams of other FIFA member associations.  In order to induce FESFUT, the Salvadoran soccer federation, to participate in these matches, Tordin and Co-Conspirator #6 agreed to pay, and did pay, bribes to the defendant REYNALDO VASQUEZ, a former FESFUT federation president who retained influence over FESFUT affairs, as well as to Co-Conspirator #20 and Co-Conspirator #22, two then current FESFUT officials.

280. In or about May and June of 2012, the Salvadoran team played friendly matches in Houston, Texas; Dallas, Texas; and Washington, D.C.  To induce FESFUT to participate in these matches, Fabio Tordin and Co-Conspirator #6 agreed to pay, and did pay, approximately $60,000 in bribes to Co-Conspirator #20, a high-ranking official of FESFUT.  In furtherance of this scheme, Tordin paid a portion of the bribes to Co-Conspirator #20 in United States currency while they were in the Washington, D.C. area.

115

281. On or about October 10, 2014 and October 14, 2014, the Salvadoran team played friendly matches in Harrison, New Jersey, just outside of New York City. To induce FESFUT to participate in these matches, Fabio Tordin and Co-Conspirator #6 agreed to pay, and did pay, a $10,000 bribe to Co-Conspirator #22, an official of FESFUT. The conspirators agreed this bribe would, in the first instance, be wired to an account controlled by the defendant REYNALDO VASQUEZ, and then distributed by VASQUEZ to Co-Conspirator #22. On or about October 17, 2014, the payment was wired from a Bank of America account in Wellington, Florida controlled by Co-Conspirator #6 and held in the name of Consulting Company C, a company whose identity is known to the grand jury, to an account at Banco Promerica in El Salvador held by a retail business controlled by VASQUEZ. VASQUEZ sent Tordin a sham invoice to mask the true nature of the payment.

282. On or about March 28, 2015 and March 31, 2015, the Salvadoran national team played friendly matches in Fort Lauderdale, Florida and Carson, California. To induce FESFUT to participate in these matches, Fabio Tordin and Co-Conspirator #6 agreed to pay, and did pay, a $10,000 bribe to Co-Conspirator #22.

116

283. On or about May 31, 2015 and June 5, 2015, the Salvadoran national team played friendly matches in Washington, D.C. and Rancagua, Chile. To induce FESFUT to participate in these matches, Fabio Tordin and Co-Conspirator #6 agreed to pay a $10,000 bribe to Co-Conspirator #22. The bribe was never paid, though VASQUEZ and Co-Conspirator #22 continued to seek its payment.

284. For instance, on or about September 2, 2015, Fabio Tordin met with Co-Conspirator #22 in Miami, Florida. During the meeting, Co-Conspirator #22 asked Tordin about the bribe. Tordin said, in sum and substance, that he thought he was not sure he could obtain approval for the payment.

285. Thereafter, on or about September 23, 2015, Fabio Tordin received a letter in Miami, Florida, via common carrier sent from a return address in El Salvador and dated September 16, 2015. The letter, which was unsigned, scolded Tordin for paying "little attention" to their "mutual friend" at their recent meeting, and stated that their "mutual friend," who had "taken care of your interests," was "very disappointed and frustrated."

286. The same day, Fabio Tordin, while still in Miami, Florida, spoke with the defendant REYNALDO VASQUEZ, who was in El Salvador, by telephone. During the conversation, VASQUEZ

117

acknowledged that he had written the above-referenced letter and
suggested that Co-Conspirator #22 might block negotiations to
renew Media World's contract with FESFUT for 2022 World Cup
qualifier rights if Tordin did not pay the bribe.

### ii. FENAFUTG (Guatemala)

287. From in or about 2014 to 2015, Fabio Tordin and
Co-Conspirator #6 organized and promoted friendly matches
between the Guatemalan men's national team and the teams of
other FIFA member associations.  In order to induce FENAFUTG,
the Guatemalan soccer federation, to participate in these
matches, Tordin and Co-Conspirator #6 agreed to pay, and did
pay, bribes to the defendant BRAYAN JIMÉNEZ, the president of
FENAFUTG.

288. On or about October 14, 2014, the Guatemalan
national team played a friendly match in Lima, Peru.  To induce
FENAFUTG to participate in the match, Fabio Tordin and Co-
Conspirator #6 agreed to pay, and did pay, a $10,000 bribe to
the defendant BRAYAN JIMÉNEZ.  Tordin used the wire facilities
of the United States to communicate with JIMÉNEZ regarding the
scheme while JIMÉNEZ was in Guatemala.  Tordin paid the bribe in
United States currency to JIMÉNEZ while they were in Miami,
Florida.

289. On or about March 31, 2015, the Guatemalan national team played a friendly match in Carson, California. To induce FENAFUTG to participate in the match, Fabio Tordin and Co-Conspirator #6 agreed to pay a $10,000 bribe to the defendant BRAYAN JIMÉNEZ. Tordin met with JIMÉNEZ in Miami, Florida in order to provide him with $10,000 in United States currency, but JIMÉNEZ told Tordin to keep the funds as a kickback for previously agreeing to pay bribes to JIMÉNEZ in connection with the sale of FENAFUTG's rights to qualifier matches for the 2022 World Cup, the scheme described above in paragraphs 266 through 270. Tordin used the wire facilities of the United States to communicate with JIMÉNEZ regarding the scheme while JIMÉNEZ was in Guatemala.

### iii. FEDEFUT (Costa Rica)

290. From in or about 2013 to 2014, Co-Conspirator #6 arranged and promoted friendly matches played by the Costa Rican men's national soccer team. In order to induce FEDEFUT, the Costa Rican soccer federation, to play these matches, Co-Conspirator #6 paid bribes to the defendant EDUARDO LI, the president of FEDEFUT.

291. In or about October 2014, the Costa Rican national team played friendly matches in South Korea and Oman against the national teams of those countries. To induce

119

FEDEFUT to participate in the matches, Co-Conspirator #6 agreed to pay a $40,000 bribe to the defendant EDUARDO LI. In furtherance of the scheme, on or about October 20, 2014 and November 28, 2014, Co-Conspirator #6 caused payments totaling $40,000 to be wired from an account he controlled at Bank of America in Wellington, Florida and held in the name of Consulting Company C to an account at BCT Bank in Panama held in LI's name.

K.    2011 FIFA Presidential Election Scheme

292. In or about March 2011, Co-Conspirator #8 declared his candidacy for the FIFA presidential election scheduled for June 1, 2011. At the time, Co-Conspirator #8 was a high-ranking official of FIFA and AFC. In accordance with the FIFA statues, the president of FIFA was elected by the FIFA congress, which was composed of representatives from each of the 200+ FIFA member associations.

293. On or about April 1, 2011, Co-Conspirator #8 sent an email to the defendant JACK WARNER's America Online email account and asked WARNER to organize an extraordinary congress of the CONCACAF member associations, so that Co-Conspirator #8 could address them regarding his candidacy. WARNER subsequently sent emails to CONCACAF officials, including to officials based in New York, New York, for the purpose of organizing the

120

requested meeting. For a time, before he was denied a visa, Co-Conspirator #8 was to have addressed the entire CONCACAF congress in the first week of May.

294. Following further correspondence, the defendant JACK WARNER agreed to organize a special meeting of the CFU member associations, rather than the entire CONCACAF membership. It was further agreed that Co-Conspirator #8 would pay the costs associated with organizing the meeting.

295. On or about April 28, 2011, $363,537.98 was wired from an account controlled by Co-Conspirator #8 to an account held in the name of CFU and controlled by the defendant JACK WARNER at Republic Bank in Trinidad and Tobago. The funds were transmitted to Trinidad and Tobago through an account at Bank of America in New York, New York.

296. Upon direction by the defendant JACK WARNER, CFU officials sent emails to representatives of CFU member associations, including two member associations based in United States territories, inviting them to the meeting with Co-Conspirator #8. The CFU meeting took place on May 10 and May 11, 2011 at the Hyatt Regency Hotel in Trinidad and Tobago. The meeting was attended by the presidents and other officials representing the CFU member associations, including high-ranking officials of the Puerto Rico Football Federation and the U.S.

Virgin Islands Football Federation, whose identities are known to the Grand Jury.

297. On May 10, 2011, Co-Conspirator #8 addressed the member associations regarding his candidacy, stating, among other things, that he was seeking their support in the June 1, 2011 FIFA presidential election. Following Co-Conspirator #8's address, the defendant JACK WARNER advised the CFU officials that they could pick up a "gift" that afternoon at a conference room in the hotel.

298. During the afternoon of May 10, 2011, certain CFU officials, including an official of one of the member associations of a United States territory ("Official #1"), went to the appointed conference room, as directed by the defendant JACK WARNER. The officials were instructed by CFU staff members in the room to enter the room one at a time. Inside the room, CFU staff handed each official an envelope bearing the name of the member association that he represented. Inside each envelope was $40,000 in United States currency.

299. Prior to entering the conference room, Official #1 was advised that he must enter alone, and could not be accompanied by any other officials from his delegation. Upon receiving his envelope, Official #1 was directed by CFU staff to

open it while in the conference room.  Official #1 was further
instructed not to discuss the payment with anyone.

300. The following day, May 11, 2011, the defendant
JACK WARNER convened a meeting of the CFU officials prior to the
scheduled start time.  At the meeting WARNER stated that the
U.S. currency the members had received was from Co-Conspirator
#8, and that WARNER had advised Co-Conspirator #8 to allow CFU
staff to distribute the money so that it would not "even
remotely appear that anybody has any obligation for your vote
because of what gift you have given them."   WARNER further
stated that a representative of one of the CFU member
associations had contacted CONCACAF offices in New York to
advise Charles Blazer of the payments.  WARNER was angry that
the representative had done this.  WARNER stated, "There are
some people here who think they are more pious than thou.  If
you're pious, open a church, friends.  Our business is our
business."

301. On or about May 12, 2011, Official #1 flew back
home.  On or about May 13, 2011, Official #1 deposited the
$40,000 into a bank account in the United States.

302. The purpose of the $40,000 payments was to induce
officials of the CFU member associations, including Official #1,
to vote for Co-Conspirator #8 in the June 1, 2011 FIFA

123

presidential election.  The defendant JACK WARNER participated
in the scheme by organizing the CFU meeting on May 10 and May
11, 2011, and by facilitating the $40,000 payment to each of the
CFU officials in attendance.

303. On or about July 14, 2011, after the scheme had
been uncovered and the defendant JACK WARNER resigned from his
soccer-related positions, Co-Conspirator #8 caused $1,211,980 to
be wired from an account that he controlled at Doha Bank in
Qatar, to a correspondent account at Citibank, for credit to an
account held in WARNER's name at Intercommercial Bank in
Trinidad and Tobago.  Prior to receiving the funds in this
account, WARNER attempted to have them wired instead to the bank
accounts of two of his family members, including Daryan Warner,
and a member of his staff, but the bank where those accounts
were held refused to accept the funds.

L.  CONCACAF Media and Marketing Rights Scheme

304. On or about May 10, 2011, a representative of one
of the CFU member associations who had been offered one of the
$40,000 cash payments described in section K above reported the
payment to Charles Blazer, at the time general secretary of
CONCACAF.  Blazer subsequently advised FIFA, which initiated
disciplinary proceedings against the defendant JACK WARNER and
Co-Conspirator #8.  In or about June 2011, WARNER agreed to

124

resign from all soccer-related positions, including as FIFA vice president and executive committee member, CONCACAF president, CFU president, and TTFF special advisor. Later that year, Blazer resigned as general secretary of CONCACAF.

305. Shortly after WARNER's resignation, the defendant ALFREDO HAWIT was appointed to be the acting president of CONCACAF.

306. In or about the fall of 2011, the defendants HUGO JINKIS and MARIANO JINKIS sought to exploit the change in leadership at CONCACAF and win business with CONCACAF, which had not historically sold media and marketing rights to the JINKISES' company, Full Play. The JINKISES asked Co-Conspirator #6, who had a close relationship with the defendant ALFREDO HAWIT, to assist them in these efforts. Co-Conspirator #6 in turn enlisted Fabio Tordin, who had extensive contacts with the CONCACAF member associations as a result of his work for Media World, to assist as well.

307. Co-Conspirator #6 and Fabio Tordin developed a plan during discussions held in Miami, Florida, and thereafter flew from Miami to Buenos Aires, Argentina, where they met with the defendants HUGO and MARIANO JINKIS. At the conclusion of the meeting, the JINKISES decided to invite the defendants ALFREDO HAWIT, ARIEL ALVARADO, and RAFAEL SALGUERO to meet with

125

them.  At the time, ALAVARDO was a member of the CONCACAF executive committee, and SALGUERO was one of CONCACAF's three representatives to the FIFA executive committee.

308. Subsequently, arrangements were made for the defendants ALFREDO HAWIT, ARIEL ALVARADO, and RAFAEL SALGUERO to fly to Buenos Aires, Argentina to meet with the defendants HUGO JINKIS and MARIANO JINKIS.  In November 2011, the JINKISES paid for HAWIT, ALVARADO, and SALGUERO, as well as Fabio Tordin and Co-Conspirator #6, to fly to Buenos Aires.  Prior to their departure, Co-Conspirator #6 helped make travel arrangements for HAWIT and his wife, including by sending email messages from South Florida to HAWIT in Honduras.

309. Following their arrival in Buenos Aires, Argentina the group was flown on a private jet by the defendants HUGO JINKIS and MARIANO JINKIS to the JINKISES' estate in Punta del Este, Uruguay.  During meetings held there, the defendants ALFREDO HAWIT, ARIEL ALVARADO, and RAFAEL SALGUERO agreed to use their influence to try to cause CONCACAF to sell media marketing rights for CONCACAF tournaments, including the Gold Cup, to Full Play.

310. In order to induce the defendants ALFREDO HAWIT, ARIEL ALVARADO, and RAFAEL SALGUERO to make this agreement, the defendants HUGO JINKIS and MARIANO JINKIS agreed to pay bribes

126

to each of them.  Specifically, the JINKISES agreed to pay HAWIT a bribe of approximately \$250,000 and ALVARADO and SALGUERO bribes of \$100,000 each.  In order to conceal the source and purpose of the payments, the conspirators used an intermediary account at Citibank in Panama City, Panama, controlled by Co-Conspirator #6 to transmit the funds to the bribe recipients.

311. In furtherance of this scheme, on or about December 1, 2011, the defendants HUGO JINKIS and MARIANO JINKIS caused \$450,000 to be wired from an account they controlled at Bank Hapoalim in Zurich, Switzerland, to a correspondent account at Citibank in the United States, for credit to a Citibank account in Panama City controlled by Co-Conspirator #6.  Over the course of the next several months, Co-Conspirator #6 caused the funds to be disbursed to the defendants ALFREDO HAWIT, ARIEL ALVARADO, and RAFAEL SALGUERO in the amounts previously agreed.

312. The defendants ALFREDO HAWIT and ARIEL ALVARADO attempted to put the topic of awarding the rights Full Play sought on the agenda for the CONCACAF executive committee meeting held in Miami, Florida on or about January 15, 2012. For multiple reasons, including because they believed it premature to discuss the matter and because of exclusivity provisions in existing contracts with other companies, other CONCACAF officials attempted to block HAWIT and ALVARADO's

127

efforts. In response, in an email message ALVARADO sent to CONCACAF officials on or about January 12, 2012, copying HAWIT, the topic was taken off the official agenda for the meeting, but some sports marketing companies made presentations anyway. The defendant MARIANO JINKIS traveled to Miami for the meeting.

313. Subsequently, on or about April 17, 2012, the defendant ARIEL ALVARADO forwarded via email to CONCACAF officials in New York, New York a draft agreement for CONCACAF to sell certain media rights to Full Play. On or about April 18, 2012, the defendant MARIANO JINKIS flew from Argentina to John F. Kennedy International Airport in Queens, New York, in order to attend a meeting in New York City on or about April 19, 2012 with CONCACAF officials in which Full Play's efforts to obtain these rights were discussed again. The conspirators efforts' were unsuccessful and CONCACAF did not award the rights to Full Play. Ultimately certain of these rights were sold by CONCACAF to Traffic USA, as described in section N below.

314. On or about July 1, 2015, Co-Conspirator #6 met with the defendant ALFREDO HAWIT and HAWIT's wife in Houston, Texas. During the meeting, Co-Conspirator #6 expressed concern that because the defendants HUGO JINKIS and MARIANO JINKIS had been indicted and might cooperate with law enforcement, Co-Conspirator #6 might be questioned by law enforcement about the

128

bribe payments the JINKISES had made to HAWIT and the defendants ARIEL ALVARADO and RAFAEL SALGUERO. During the conversation, HAWIT instructed Co-Conspirator #6 to create a sham contract between Full Play and Co-Conspirator #6's company for consulting services, in order to mask the true nature of the $450,000 wire transfer Co-Conspirator #6 had received from Full Play. HAWIT also instructed Co-Conspirator #6 to make false statements to the Federal Bureau of Investigation about the true nature and purpose of the funds he had received from Full Play if asked.

315. During the same meeting, the defendant ALFREDO HAWIT and his wife also counseled Co-Conspirator #6 to create a sham land purchase contract between Co-Conspirator #6 and HAWIT's wife, so Co-Conspirator #6 and HAWIT's wife could falsely claim that the payment was made in connection with a land purchase. HAWIT and his wife also supported the idea of creating consulting contracts between Co-Conspirator #6 and the defendant ARIEL ALVARADO, and between Co-Conspirator #6 and SALGUERO, to mask the true nature of the payments that Co-Conspirator #6 had made to them.

316. On or about July 26, 2015, Fabio Tordin met with the defendant ALFREDO HAWIT in Philadelphia, Pennsylvania. During the meeting, Tordin expressed concern to HAWIT about the bribe payment from Full Play that Co-Conspirator #6 had

129

transmitted to HAWIT. HAWIT stated, in sum and substance, that he was not concerned because "[Co-Conspirator #6] did not pay me . . . . [H]e bought land in Honduras . . . from my wife." Discussing Co-Conspirator #6's payments to the defendants ARIEL ALVARADO and RAFAEL SALGUERO, HAWIT said that ALVARADO got the money in person in Panama and that he assumed that Co-Conspirator #6 sent SALGUERO's payment to SALGUERO in Guatemala.

317. On or about September 2, 2015, Fabio Tordin met with the defendant RAFAEL SALGUERO in Miami, Florida. During the meeting, SALGUERO discussed the bribe payments he and the defendant ARIEL ALVARADO had received from Co-Conspirator #6 in connection with the Full Play scheme. SALGUERO acknowledged having received his payment and that he (SALGUERO), ALVARADO, and the defendant ALFREDO HAWIT could all be in trouble because law enforcement could continue its investigation. Referring to himself, ALVARADO, and HAWIT, SALGUERO said that the three of them needed to meet in person to discuss the matter and that "the three of us are in the same shit." In the same meeting, SALGUERO indicated that he was seeking to return to his former position as a member of the FIFA executive committee and that had sought and received expressions of support from multiple CONCACAF federations.

M.    CFU World Cup Qualifiers Scheme #2

318. Prior to his appointment as CONCACAF general secretary, Co-Conspirator #3 participated, on behalf of Traffic USA, in the negotiation of a contract to acquire the media and marketing rights to the 2018 and 2022 World Cup qualifier matches from the CFU member associations.  Jeffrey Webb, at the time the president of CIFA, the Cayman Islands soccer federation, and a high-level CFU official, participated in the negotiations on behalf of CFU.

319. During the negotiations, Co-Conspirator #3 met with the defendant COSTAS TAKKAS, a close associate of Jeffrey Webb, who informed Co-Conspirator #3 that Webb wanted a $3 million bribe in exchange for his agreement to cause the CFU contract to be awarded to Traffic USA.  Co-Conspirator #3 agreed.  When he returned to the United States, Co-Conspirator #3 advised the defendant AARON DAVIDSON, at the time the Traffic USA president, of the bribe.

320. Separately, in or about the spring of 2012, Media World and Traffic USA, which until that time had been competitors in the market, agreed to pool their resources and share revenue earned from the purchase of rights to World Cup qualifier matches played by CONCACAF member associations, which included the CFU World Cup qualifier rights.  Among others, Co-

131

Conspirator #3, Fabio Tordin, Co-Conspirator #5, Roger Huguet,

Co-Conspirator #4, and the defendant AARON DAVIDSON participated

in the negotiations over the terms of the partnership.

321. During these negotiations, Co-Conspirator #5

learned that Traffic USA had agreed to pay a bribe to Jeffrey

Webb to obtain the CFU World Cup qualifier rights.  Co-

Conspirator #5 agreed on behalf of Media World to split the cost

of the bribe payment with Traffic USA, which meant that both

companies would be obligated to pay Webb a $1.5 million bribe.

Co-Conspirator #5 subsequently informed Roger Huguet of the

agreement to pay the bribe and of the fact that the defendant

COSTAS TAKKAS would contact Huguet about arranging the payment

for Webb.

322. In or about May 2012, CONCACAF elected Jeffrey

Webb to be its president.  In or about July 2012, Co-Conspirator

#3, who had been a vice president at Traffic USA, was appointed

as CONCACAF's general secretary.

323. The agreement by Traffic USA to purchase from CFU

the media and marketing rights to World Cup qualifier matches

was reached prior to Co-Conspirator #3's departure from Traffic

USA but was not formally executed until a few weeks after his

departure.  On or about August 28, 2012, the parties entered

into a $23 million contract for the exclusive worldwide

132

commercial rights for CFU's 2018 and 2022 World Cup qualifier matches. The defendant AARON DAVIDSON signed the contract on behalf of Traffic USA.

324. To effectuate payment of Traffic USA's portion of the bribe, Co-Conspirator #3 put the defendant COSTAS TAKKAS into contact with Traffic executives in Brazil and also participated in meetings on the subject. Co-Conspirator #3 participated in such meetings by telephone from Miami, Florida and also in person in Brazil. The payment was eventually made to accounts held in the name of entities controlled by TAKKAS, the identities of which are known to the Grand Jury, and then forwarded on through an intermediary account to Jeffrey Webb.

325. Specifically, Traffic USA's payment was transmitted to the defendant COSTAS TAKKAS in the following manner: On or about November 13, 2012, $1.2 million was wired from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a correspondent account at HSBC bank in Buffalo, New York, for credit to an account held in the name of Front Company A, the identity of which is known to the Grand Jury, at HSBC bank in Hong Kong. Approximately one week later, on or about November 21, 2012, two wire transfers of $750,000 and $250,000 were sent from Front Company A's account at HSBC bank in Hong Kong to a correspondent account at Standard

Chartered Bank in New York, New York, for credit to an account in the name of Kosson Ventures, controlled by TAKKAS, at Fidelity Bank in the Cayman Islands. The remaining $200,000 was a fee paid to Co-Conspirator #23, the beneficial owner of Front Company A and a resident of Florida, to facilitate the payment.

326. On or about December 14, 2012, the remaining $500,000 of the $1.5 million promised to Jeffrey Webb was paid by Traffic through the account of another individual, a business associate of José Hawilla, to another account controlled by the defendant COSTAS TAKKAS at Fidelity Bank in the Cayman Islands.

327. After receiving the funds, the defendant COSTAS TAKKAS wired a portion to an account in his name at Citibank in Miami, Florida. TAKKAS subsequently transferred the funds to an account in the name of a swimming pool builder at United Community Bank in Blairsville, Georgia, for the benefit of Jeffrey Webb, who was having a pool built at his residence in Loganville, Georgia. TAKKAS transferred another portion of the funds directly from his Kosson Ventures account at Fidelity Bank in the Cayman Islands to SunTrust Bank in Georgia for Webb's benefit in connection with Webb's purchase of other real estate in Stone Mountain, Georgia.

328. To facilitate Media World's payment of its portion of the bribe, in or about 2012, Co-Conspirator #5

informed Roger Huguet that Media World's portion of the bribe payment for Jeffrey Webb would be made by Production Company A, a wholly owned subsidiary of an entity affiliated with Media Company B in Spain. Co-Conspirator #5 directed Huguet to find an intermediary to receive the payment so as to conceal its true nature and purpose. Huguet contacted Co-Conspirator #6, who agreed to use one of his companies, Consulting Company A, to receive the payment from Production Company A.

329. Thereafter, in or about 2013, Co-Conspirator #5 put Roger Huguet in contact with certain executives of Production Company A. Co-Conspirator #5 also instructed Huguet to direct Co-Conspirator #6 to send a false invoice to Production Company A purporting to be for work related to the 2013 Gold Cup, and to copy a high-ranking executive of Media Company B on the correspondence. In the course of facilitating this payment, the conspirators used various methods of communication, including email and telephone calls.

330. In April 2014, the defendant AARON DAVIDSON met with José Hawilla in New York to discuss the status of Traffic's ongoing bribe schemes, including the CFU World Cup qualifier scheme. According to DAVIDSON, Media World still had not yet found a way to pay Jeffrey Webb its portion of the bribe.

331. Roger Huguet and the defendant COSTAS TAKKAS met on several occasions in South Florida in an effort to arrange the payment from Consulting Company A to entities as directed by TAKKAS. Ultimately, payments from Media World were transmitted to TAKKAS. For example, on or about October 28, 2014, $80,000 was wired from Consulting Company A's account at Multibank in Panama, to a correspondent account at Bank of America in New York, New York, for credit to an account held in the name of Individual #3, a Caymanian attorney whose identity is known to the Grand Jury, at Citibank in Florida. Approximately five weeks later, on or about December 2, 2014, $170,000 was wired from the same Consulting Company A account, to a correspondent account at Deutsche Bank Trust Company Americas in New York, New York, to an account in the name of Kosson Ventures Inc. at Loyal Bank Limited in St. Vincent and the Grenadines, an account controlled by TAKKAS.

332. During this same approximate time period - that is, the winter of 2014-2015 - Co-Conspirator #5 informed Roger Huguet that due to information Co-Conspirator #5 had learned regarding the government's ongoing investigation of José Hawilla, Media World should not make additional payments toward the $1.5 million bribe it owed to Jeffrey Webb.

333. With respect to both Traffic USA's and Media World's bribe payments in connection with this scheme, the use of entities controlled by or associated with the defendant COSTAS TAKKAS to receive the payments, and TAKKAS's participation in the transaction as an intermediary more generally, was intended to conceal the fact that Jeffrey Webb was the beneficiary of the payments.

N.   CONCACAF Gold Cup/Champions League Scheme

334. Shortly after he was appointed to be CONCACAF's general secretary in July 2012, Co-Conspirator #3, now on behalf of CONCACAF, entered into negotiations with Traffic USA to sell the commercial rights associated with upcoming editions of the Gold Cup and Champions League, CONCACAF's club tournament.  The defendant AARON DAVIDSON was involved in the negotiations on behalf of Traffic USA.  Ultimately, on or about November 27, 2012, CONCACAF and Traffic USA entered into a $15.5 million contract for the exclusive worldwide commercial rights for the 2013 edition of the Gold Cup and the 2013-14 and 2014-15 seasons of the CONCACAF Champions League (the "2012 Gold Cup/Champions League Contract").

335. Jeffrey Webb directed Co-Conspirator #3 to seek a bribe payment in connection with the negotiations.  Accordingly, in addition to the contract price, Co-Conspirator #3 solicited

137

from Traffic USA its agreement to pay Webb a $1.1 million bribe in exchange for Webb's agreement to award the 2012 Gold Cup/Champions League Contract to Traffic USA. The defendant AARON DAVIDSON and José Hawilla #2 agreed to the bribe payment.

336. Thereafter, Jeffrey Webb and Co-Conspirator #3 discussed the best way to effectuate the bribe payment in a manner that would conceal its nature. Ultimately, Webb decided to use an overseas company that manufactured soccer uniforms and soccer balls ("Soccer Uniform Company A"), the identity of which is known to the Grand Jury. Co-Conspirator #24, like the defendant COSTAS TAKKAS a close associate of Webb, had a connection to Soccer Uniform Company A. Webb eventually instructed Co-Conspirator #3 to submit a false invoice to Traffic USA for $1.1 million to be paid to Soccer Uniform Company A, which Co-Conspirator #3 did.

337. Traffic USA made domestic and international wire transfers to make the contract and bribe payments, respectively, in connection with the 2012 Gold Cup/Champions League Contract. For example, in 2013, five contract payments totaling $11 million were made by wire transfer from Traffic USA's account at Citibank in Miami, Florida to an account in CONCACAF's name at JP Morgan Chase bank in New York, New York. On or about December 4, 2013, the $1.1 million bribe payment for Jeffrey

Webb was made by wire transfer from Traffic International's account at Delta National Bank & Trust in Miami, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Soccer Uniform Company A at Capital Bank in Panama City, Panama.

338. On or about November 15, 2013, Traffic USA entered into a $60 million renewal contract for exclusive sponsorship rights associated with the 2015, 2017, 2019, and 2021 editions of the Gold Cup and the 2015-16, 2016-17, 2017-18, 2018-19, 2019-20, 2020-21, and 2021-22 seasons of the CONCACAF Champions League (the "2013 Gold Cup/Champions League Contract"). Co-Conspirator #3 led the negotiations on behalf of CONCACAF and the defendant AARON DAVIDSON led the negotiations on behalf of Traffic USA.

339. Again, Jeffrey Webb directed Co-Conspirator #3 to solicit a bribe for Webb in exchange for Webb's agreement to award the 2013 Gold Cup/Champions League Contract to Traffic USA. Though Webb wanted more, the parties eventually settled on $2 million as the size of the bribe payment. The defendant AARON DAVIDSON and José Hawilla agreed to the bribe payment.

340. In a March 2014 meeting with José Hawilla in Queens, New York to discuss the status of Traffic's ongoing bribe schemes, including the Gold Cup/Champions League schemes,

139

the defendant AARON DAVIDSON said, referring to the practice of paying bribes to obtain commercial rights: "Is it illegal?  It is illegal.  Within the big picture of things, a company that has worked in this industry for 30 years, is it bad?  It is bad."

     O.    <u>CONMEBOL/CONCACAF Copa América Centenario Scheme</u>

341. As alleged in section A above, from in or about 1991 to 2011, Traffic entered into contracts with CONMEBOL, obtained and retained through bribery, awarding Traffic the exclusive media and marketing rights to all editions of the Copa América from 1993 to 2011.

342. In or about June 2010, CONMEBOL and Full Play entered into an agreement pursuant to which Full Play was designated CONMEBOL's exclusive agent for the commercialization of the media and marketing rights to the 2015, 2019, and 2023 editions of the Copa América, among other tournaments.  Traffic International and Traffic USA, alleging that the agreement violated a contract signed in 2001 that gave Traffic the rights to the 2015 edition of the tournament and an option to retain those rights for the subsequent three editions, sued CONMEBOL, Full Play, and others, including the defendants LUÍS CHIRIBOGA and RAFAEL ESQUIVEL and Luis Bedoya, the leaders of the Group of Six referenced in paragraphs 181 and 182 above.  The lawsuit was

filed in Florida state court by virtue of a forum selection clause in the 2001 Copa América Contract designating the courts of Florida as the forum of choice in the event FIFA declined to arbitrate, as it ultimately did.

343. The lawsuit was settled in or about June 2013.

344. In the months preceding the settlement, José Hawilla and other representatives of Traffic met with the defendants HUGO JINKIS and MARIANO JINKIS, as well as Alejandro Burzaco, to discuss a resolution of Traffic's lawsuit that would involve Full Play, Torneos, and Traffic jointly acquiring commercial rights to the Copa América in exchange for Traffic agreeing to end the lawsuit and assume its share of the costs associated with those rights. Specifically, the representatives of the three companies discussed forming a new company that would obtain and exploit the commercial rights to the 2015, 2019, and 2023 editions of the tournament, as well as to a special centennial edition of the tournament to be held in the United States in 2016.

345. By in or about March 2013, the discussions regarding the formation of the company advanced significantly. Those discussions addressed settlement of the Florida state court litigation, the percentage of shares each member would hold in the new company, and the operations of the new company.

141

At a meeting in Buenos Aires, Argentina in or about March 2013
among José Hawilla, Alejandro Burzaco, and the defendants HUGO
JINKIS and MARIANO JINKIS, Hawilla was told that Full Play and
Torneos had agreed to make bribe payments to CONMEBOL officials
in connection with the Copa América rights, and had already made
some of the bribe payments.  Hawilla was asked to contribute $10
million toward the cost of expenses, including the bribes, to
date.  Hawilla agreed to make these bribe payments and
subsequently caused them to be made.

346.  The creation of the new company, Datisa, was
formalized in a shareholders' agreement dated May 21, 2013.
Among other things, the agreement provided that Traffic,
Torneos, and Full Play each held a one-third interest in the
company.

347.  Four days later, in London, England, Datisa
entered into a contract with CONMEBOL and Full Play whereby
Datisa obtained from CONMEBOL the exclusive worldwide commercial
rights to the 2015, 2019, and 2023 editions of the Copa América
and the 2016 Copa América Centenario, and CONMEBOL and Full Play
assigned to Datisa the contracts related thereto that they had
already executed with third parties (the "2013 Copa América
Contract").  The 2013 Copa América Contract, dated May 25, 2013
and signed by representatives of each of Datisa's three

142

shareholders and 12 CONMEBOL officials, was for $317.5 million: $75 million for the 2015 edition, $77.5 million for the 2016 edition, $80 million for the 2019 edition, and $85 million for the 2023 edition.

348. Datisa agreed to pay tens of millions of dollars in bribes to CONMEBOL officials — all of whom were also FIFA officials — in connection with the 2013 Copa América Contract, including bribe payments for contract signature and for each of the four editions of the tournament included in the contract. The agreement called for seven-figure bribe payments to be made to each of the "top" three CONMEBOL officials (the president of the confederation and the presidents of the Brazilian and Argentinian federations) and to as many as seven other CONMEBOL federation presidents in connection with the signature and each edition of the tournament, and for bribe payments reaching six figures to be made to the CONMEBOL general secretary. The officials who had solicited and/or were to receive bribes included the defendants MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EUGENIO FIGUEREDO, RAFAEL ESQUIVEL, NICOLÁS LEOZ, RICARDO TEIXEIRA, JOSÉ LUÍS MEISZNER, JUAN ÁNGEL NAPOUT, and JOSÉ MARIA MARIN, and Co-Conspirator #1 and Luis Bedoya, among others.

349. In or about June and September 2013, José Hawilla and Traffic used financial institutions in the United States to make three payments, totaling $11.667 million, representing Traffic's contribution to the other shareholders of Datisa, who had paid and were responsible for continuing to pay bribes due to the CONMEBOL officials for the 2015 edition of the Copa América and the signing of the 2013 Copa América Contract. The three payments were made from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, and/or through Citibank and/or JP Morgan Chase correspondent accounts in New York, New York, for credit to accounts at banks in Zurich, Switzerland in the names of Cross Trading (a Full Play affiliate) and FPT Sports (a Torneos affiliate), respectively, as follows:

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| June 17, 2013 | Wire transfer of $5,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Citibank correspondent account in New York, New York, for credit to an account in the name of Cross Trading, a Full Play affiliate, at Bank Hapoalim in Zurich, Switzerland. |
| June 17, 2013 | Wire transfer of $5,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a JP Morgan Chase correspondent account in New York, New York, for credit to an |

144

account in the name of FPT Sports,
a Torneos affiliate, at Bank
Julius Baer & Co. in Zurich,
Switzerland.

September 11, 2013   Wire transfer of $1,666,667 from
Datisa's account at Bank Hapoalim
in Zurich, Switzerland, via
Citibank and JP Morgan Chase
correspondent accounts in New
York, New York, for credit to an
account in the name of FPT Sports
at Bank Julius Baer & Co. in
Zurich, Switzerland.

A fourth payment of $1.667 million — bringing the total to
$13.333 million — was made by a transfer from an account in the
name of Datisa at Bank Hapoalim in Zurich, Switzerland to an
account in the name of Cross Trading at the same bank.

350. Bribe payments were subsequently wired from bank
accounts in Switzerland controlled by Datisa and its partners,
including defendants HUGO JINKIS and MARIANO JINKIS, to accounts
controlled by CONMEBOL officials throughout the world, including
accounts in the United States.

351. José Margulies also participated in the Datisa
scheme, facilitating the payment and laundering of bribe money
from and through accounts controlled by the Datisa shareholders.

352. As the bribery scheme discussed in the preceding
paragraphs evolved and progressed, so, too, did CONMEBOL's and
CONCACAF's efforts to organize and promote the 2016 Copa América
Centenario.  In or about 2012, the defendant ALFREDO HAWIT, the

145

then-acting president of CONCACAF, informally announced that a special, Pan-America edition of the Copa América would be held in 2016, involving teams from CONMEBOL and CONCACAF, to celebrate the 100th anniversary of the first edition of the tournament. HAWIT stated that he hoped the tournament would be hosted in the United States because "the market is in the United States, the stadiums are in the United States, [and] the people are in the United States. The study that we have made [shows] that everything's in the United States."

353. At a press conference held in Miami, Florida on May 1, 2014, high-ranking officials of CONMEBOL and CONCACAF officially announced that CONMEBOL would celebrate the 100th anniversary of the Copa América by organizing a special edition of the tournament for the entire hemisphere – to be called the Copa América Centenario – to include all 10 CONMEBOL men's national teams and the men's national teams of six CONCACAF member associations, including the United States. The tournament was to be played at major sporting venues in various cities in the United States in June 2016. The defendant EUGENIO FIGUEREDO and Jeffrey Webb presided over the press conference. Datisa representatives – including José Hawilla, Alejandro Burzaco, and the defendants HUGO JINKIS and MARIANO JINKIS – attended the press conference, and the logo of Datisa's trade

146

name was included alongside the logos of CONCACAF and CONMEBOL in various promotional materials.

354. As set forth above, Datisa acquired the exclusive commercial rights to the Copa América Centenario that CONMEBOL held as part of the 2013 Copa América Contract. In addition, Datisa contracted with CONCACAF, in its capacity as the co-organizer of the tournament, to acquire CONCACAF's rights to that tournament as well. By letter agreement dated March 4, 2014 (the "2014 Centenario Contract"), Datisa agreed to pay $35 million to CONCACAF for those rights, which amount was in addition to the $77.5 million Datisa had already agreed to pay to CONMEBOL, pursuant to the 2013 Copa América Contract, for CONMEBOL's rights to the same tournament.

355. In connection with the negotiations between Datisa and CONCACAF, which involved Co-Conspirator #3, Jeffrey Webb, Alejandro Burzaco and the defendants AARON DAVIDSON, EUGENIO FIGUEREDO, HUGO JINKIS, and MARIANO JINKIS, among others, Datisa also agreed to pay Webb a bribe in exchange for Webb's agreement to cause CONCACAF to enter into the 2014 Centenario Contract.

356. In a March 2014 meeting in Queens, New York, which occurred days after the 2014 Centenario Contract was signed, the defendant AARON DAVIDSON told José Hawilla that the

147

defendant MARIANO JINKIS had called him (DAVIDSON) the prior
week to get DAVIDSON's help in figuring out a way to make the
payment to Jeffrey Webb.  DAVIDSON said he cut JINKIS off
because he did not want to talk about the subject on the phone
and told JINKIS that they would talk in person when JINKIS
traveled to Miami, Florida the following week.

357. On or about April 1, 2014, the first payment
pursuant to the 2014 Centenario Contract of $7 million was made
from Datisa's account at Bank Hapoalim in Zurich, Switzerland,
to an account in CONCACAF's name at JP Morgan Chase bank in
Miami, Florida.

358. In or about August 2014, the defendant JUAN ÁNGEL
NAPOUT, the CONMEBOL president, stated publicly: "The Americas
are one, it is man who creates frontiers.  I believe in a single
America in a working context with CONCACAF and we've reached
something real which will go ahead in 2016."

359. On or about September 25, 2014, at a meeting of
the FIFA executive committee in Zurich, Switzerland, FIFA put
its imprimatur on the Copa América Centenario by placing the
tournament on its official calendar.

360. Following the press conference in South Florida
earlier that year to announce the Copa América Centenario, the
principals of Datisa – José Hawilla, Alejandro Burzaco, and the

148

defendants HUGO JINKIS and MARIANO JINKIS — met in South Florida and discussed the bribery scheme.  At one point, Burzaco said: "All can get hurt because of this subject. . . . All of us go to prison."

*   *   *   *

361. Apart from Charles Blazer's disclosure to FIFA of the 2011 FIFA presidential election bribery scheme set forth above, no disclosure of any of the foregoing bribery and kickback schemes was made to FIFA, CONCACAF, or CONMEBOL, including without limitation to their respective executive committees, congresses, or constituent organizations.

CRIMINAL COUNTS

COUNT ONE<br>(Racketeering Conspiracy)

362. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

363. In or about and between 1991 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL CALLEJAS, BRAYAN JIMÉNEZ, EDUARDO LI, JULIO ROCHA, RAFAEL SALGUERO, COSTAS TAKKAS, HÉCTOR TRUJILLO, REYNALDO VASQUEZ, JACK WARNER, JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL

149

NERO, EDUARDO DELUCA, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA, AARON DAVIDSON, HUGO JINKIS, and MARIANO JINKIS, together with others, being persons employed by and associated with the enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of such enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

364. The pattern of racketeering activity through which the defendants ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL CALLEJAS, BRAYAN JIMÉNEZ, EDUARDO LI, JULIO ROCHA, RAFAEL SALGUERO, COSTAS TAKKAS, HÉCTOR TRUJILLO, REYNALDO VASQUEZ, JACK WARNER, JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA, AARON DAVIDSON, HUGO JINKIS, and MARIANO JINKIS, together with others, agreed to conduct and participate, directly and indirectly, in the conduct

of the affairs of the enterprise consisted of multiple acts
indictable under:

        (a)   Title 18, United States Code, Section 1343
              (wire fraud, including honest-services wire
              fraud);

        (b)   Title 18, United States Code, Sections 1956
              and 1957 (money laundering and money
              laundering conspiracy);

        (c)   Title 18, United States Code, Section 1952
              (interstate and foreign travel in-aid-of
              racketeering);

        (d)   Title 18, United States Code, Section 1512
              (obstruction of justice and obstruction of
              justice conspiracy); and

multiple acts involving bribery, in violation of New York State
Penal Law Sections 180.03 and 180.08 and New Jersey Statute
2C:21-10.  Each defendant agreed that a conspirator would commit
at least two acts of racketeering activity in the conduct of the
affairs of the enterprise, the last of which would occur within
10 years of a prior act of racketeering activity.

      (Title 18, United States Code, Sections 1962(d), 1963
and 3551 et seq.)

151

COUNT TWO
(Wire Fraud Conspiracy - CONMEBOL Copa América Scheme)

365. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

366. In or about and between January 1991 and July 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendants RAFAEL ESQUIVEL and NICOLÁS LEOZ, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

152

<u>COUNTS THREE AND FOUR</u>
(Wire Fraud – CONMEBOL Copa América Scheme)

367. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

368. On or about the dates set forth below, within the Southern District of New York, the defendant NICOLÁS LEOZ, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

369. For the purpose of executing such scheme and artifice, the defendant NICOLÁS LEOZ, together with others, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|-------------|-------------------|
| THREE | November 12, 2010 | Wire transfer of $4,000,000 from Traffic International's account at Delta National Bank & Trust in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| FOUR | June 10, 2011 | Wire transfer of $9,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT FIVE
(Money Laundering Conspiracy – CONMEBOL Copa América Scheme)

370. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

371. In or about and between January 1991 and July 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendants RAFAEL ESQUIVEL and NICOLÁS LEOZ, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the

154

United States and to places in the United States from and
through places outside the United States, (a) with the intent to
promote the carrying on of specified unlawful activity, to wit:
wire fraud, contrary to Title 18, United States Code, Section
1343, all contrary to Title 18, United States Code, Section
1956(a)(2)(A), and (b) knowing that the monetary instruments and
funds involved in the transportation, transmission, and transfer
represented the proceeds of some form of unlawful activity and
knowing that such transportation, transmission, and transfer was
designed in whole and in part to conceal and disguise the
nature, the location, the source, the ownership and the control
of the proceeds of said specified unlawful activity, all
contrary to Title 18, United States Code, Section
1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and
3551 et seq.)

COUNT SIX
(Money Laundering – CONMEBOL Copa América Scheme)

372. The allegations contained in paragraphs 1 through
361 are realleged and incorporated as if fully set forth in this
paragraph.

373. In or about and between November 2010 and June
2011, both dates being approximate and inclusive, within the
Southern District of New York, the defendant NICOLÁS LEOZ,

155

together with others, did knowingly and intentionally transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

COUNT SEVEN
(Wire Fraud Conspiracy – CONMEBOL Copa Libertadores Scheme #1)

374. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

375. In or about and between 2000 and 2012, both dates being approximate and inclusive, within the Southern District of New York, the defendants EDUARDO DELUCA and NICOLÁS LEOZ, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of

156

materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT EIGHT
(Money Laundering Conspiracy –
CONMEBOL Copa Libertadores Scheme #1)

376. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

377. In or about and between 2000 and 2012, both dates being approximate and inclusive, within the Southern District of New York, the defendants EDUARDO DELUCA and NICOLÁS LEOZ, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to

Title 18, United States Code, Section 1343, all contrary to
Title 18, United States Code, Section 1956(a)(2)(A), and (b)
knowing that the monetary instruments and funds involved in the
transportation, transmission, and transfer represented the
proceeds of some form of unlawful activity and knowing that such
transportation, transmission, and transfer was designed in whole
and in part to conceal and disguise the nature, the location,
the source, the ownership and the control of the proceeds of
said specified unlawful activity, all contrary to Title 18,
United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and
3551 et seq.)

## COUNT NINE
(Wire Fraud Conspiracy - CONMEBOL Copa Libertadores Scheme #2)

378. The allegations contained in paragraphs 1 through
361 are realleged and incorporated as if fully set forth in this
paragraph.

379. In or about and between 2000 and 2015, both dates
being approximate and inclusive, within the Eastern District of
New York and elsewhere, the defendants JUAN ÁNGEL NAPOUT, MANUEL
BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL NERO,
EDUARDO DELUCA, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS
LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, ROMER OSUNA, RICARDO

158

TEIXEIRA, HUGO JINKIS, and MARIANO JINKIS, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TEN
(Money Laundering Conspiracy –
CONMEBOL Copa Libertadores Scheme #2)

380. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

381. In or about and between 2000 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JUAN ÁNGEL NAPOUT, MANUEL

159

BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA, HUGO JINKIS, and MARIANO JINKIS, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT ELEVEN
(Wire Fraud Conspiracy — CBF Copa do Brasil Scheme)

382. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

383. In or about and between December 2011 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MARCO

160

POLO DEL NERO, JOSÉ MARIA MARIN, and RICARDO TEIXEIRA, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CBF and their constituent organizations, including to deprive FIFA and CBF and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, telephone calls and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT TWELVE
(Money Laundering Conspiracy – CBF Copa do Brasil Scheme)

384. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

385. In or about and between December 2011 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendants MARCO POLO DEL

161

NERO, JOSÉ MARIA MARIN, and RICARDO TEIXEIRA, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT THIRTEEN
(Wire Fraud Conspiracy – CFU World Cup Qualifiers Scheme #1)

386. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

387. In or about and between July 2000 and June 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud CFU and its constituent organizations, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS FOURTEEN AND FIFTEEN
(Wire Fraud – CFU World Cup Qualifiers Scheme #1)

388. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

163

389. On or about the dates set forth below, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally devise a scheme and artifice to defraud CFU and its constituent organizations, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

390. For the purpose of executing such scheme and artifice, the defendant JACK WARNER, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|-------------|--------------------|
| FOURTEEN | December 13, 2010 | Wire transfer of $290,000 from Traffic USA's account at Citibank in Miami, Florida to a Bank of America correspondent account in New York, New York, for credit to an account in the name of CFU at Republic Bank in Trinidad and Tobago. |
| FIFTEEN | February 2, 2011 | Wire transfer of $250,000 from Traffic USA's account at Citibank in Miami, Florida to a Bank of America correspondent account in New York, New York, for credit to an account in the name of CFU at Republic Bank in Trinidad and Tobago. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

164

## COUNT SIXTEEN
(Money Laundering Conspiracy –
CFU World Cup Qualifiers Scheme #1)

391. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

392. In or about and between July 2000 and June 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT SEVENTEEN
(Money Laundering – CFU World Cup Qualifiers Scheme #1)

393. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

165

394. In or about and between December 2010 and February 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

### COUNT EIGHTEEN
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FEDEFUT))

395. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

396. In or about and between September 2009 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and

166

FEDEFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FEDEFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

<u>COUNTS NINETEEN THROUGH TWENTY-THREE</u>
(Wire Fraud –
UNCAF Region World Cup Qualifiers Schemes (FEDEFUT))

397. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

398. On or about the dates set forth below, within the Southern District of New York and the Southern District of Florida, the defendant EDUARDO LI, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FEDEFUT and their constituent

167

organizations, including to deprive FIFA, CONCACAF, and FEDEFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

399. For the purpose of executing such scheme and artifice, the defendant EDUARDO LI, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|---|---|---|
| NINETEEN | January 2, 2014 | Wire transfer of $42,708 from Traffic USA's account at Citibank in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Federación Costarricense de Futbol at Banco Lafise in Costa Rica. |
| TWENTY | February 27, 2015 | Wire transfer of $200,000 from Media World's account at Bank of America in Miami, Florida, to an account in the name of Consulting Company A at Multibank in Panama. |
| TWENTY-ONE | March 2, 2015 | Wire transfer of $150,000 from Consulting Company A's account at Multibank in Panama, to an account in the name of Warrior Holdings, S.A. at Citibank in Miami, Florida. |
| TWENTY-TWO | April 20, 2015 | Wire transfer of $150,000 from Media World's account at Bank of America in Miami, Florida, to an account in the name of Consulting Company A at Multibank in Panama. |
| TWENTY-THREE | April 28, 2015 | Wire transfer of $150,000 from Consulting Company A's account at Multibank in Panama, to an account in the name of Warrior Holdings, S.A. at Citibank in Miami, Florida. |

(Title 18, United States Code, Sections 1343, 2 and

3551 et seq.)

169

COUNT TWENTY-FOUR
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FEDEFUT))

400. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

401. In or about and between September 2009 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT TWENTY-FIVE
(Money Laundering —
UNCAF Region World Cup Qualifiers Schemes (FEDEFUT))

402. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

403. In or about and between January 2014 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

171

## COUNT TWENTY-SIX
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FENIFUT)

404. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

405. In or about and between April 2011 and December 2012, both dates being approximate and inclusive, within the Southern District of Florida, the defendant JULIO ROCHA, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and FENIFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FENIFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

172

COUNTS TWENTY-SEVEN AND TWENTY-EIGHT
(Wire Fraud —
UNCAF Region World Cup Qualifiers Schemes (FENIFUT))

406. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

407. On or about the dates set forth below, within the Southern District of Florida, the defendant JULIO ROCHA, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FENIFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FENIFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

408. For the purpose of executing such scheme and artifice, the defendant JULIO ROCHA, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

173

| Count | Approx. Date | Wire Communication |
|-------|-------------|-------------------|
| TWENTY-SEVEN | April 27, 2011 | Wire transfer of $88,000 from Traffic USA's account at Citibank in Miami, Florida, to a Citibank correspondent account, for credit to an account in the name of Federación Nicaragüense de Fútbol at Banco de Credito Centroamerica in Managua, Nicaragua. |
| TWENTY-EIGHT | May 27, 2011 | Wire transfer of $150,000 from Investment Company A at Banco Itaú in Miami, Florida, to a JP Morgan Chase correspondent account, for credit to an account in the name of Julio Rocha Lopez at BankInter in Madrid, Spain. |

(Title 18, United States Code, Sections 1343, 2 and

3551 et seq.)

COUNT TWENTY-NINE
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FENIFUT))

409. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as if fully set forth in this

paragraph.

410. In or about and between April 2011 and December

2012, both dates being approximate and inclusive, within the

Southern District of Florida, the defendant JULIO ROCHA,

together with others, did knowingly and intentionally conspire

to transport, transmit and transfer monetary instruments and

funds, to wit: wire transfers, from places in the United States

to and through places outside the United States and to places in

the United States from and through places outside the United

174

States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT THIRTY
(Money Laundering –
UNCAF Region World Cup Qualifiers Schemes (FENIFUT))

411. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

412. In or about and between April 2011 and December 2012, both dates being approximate and inclusive, within the Southern District of Florida, the defendant JULIO ROCHA, together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful

activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

## COUNT THIRTY-ONE
### (Wire Fraud Conspiracy – UNCAF Region World Cup Qualifiers Schemes (FENAFUTH))

413. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

414. In or about and between January 2008 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendants ALFREDO HAWIT and RAFAEL CALLEJAS, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and FENAFUTH and their constituent organizations, including to deprive FIFA, CONCACAF, and FENAFUTH and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals,

pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNTS THIRTY-TWO THROUGH THIRTY-FIVE
(Wire Fraud —
UNCAF Region World Cup Qualifiers Schemes (FENAFUTH))

415. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

416. On or about the dates set forth below, within the Southern District of New York and the Southern District of Florida, the defendants ALFREDO HAWIT and RAFAEL CALLEJAS, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FENAFUTH and their constituent organizations, including to deprive FIFA, CONCACAF, and FENAFUTH and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

417. For the purpose of executing such scheme and artifice, the defendants ALFREDO HAWIT and RAFAEL CALLEJAS, together with others, did transmit and cause to be transmitted,

177

by means of wire communication in interstate and foreign

commerce, writings, signs, signals, pictures, and sounds as

described below:

| Count | Approx. Date | Wire Communication |
|-------|--------------|--------------------|
| THIRTY-TWO | March 23, 2011 | Wire transfer of $450,000 from Media World's account at Bank of America in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Consulting Company B at Banco Cuscatlan de Panama in Panama. |
| THIRTY-THREE | August 26, 2011 | Wire transfer of $150,000 from Media World's account at Bank of America in Miami, Florida to an account in the name of FENAFUTH at Banco Ficohsa in Tegucigalpa, Honduras. |
| THIRTY-FOUR | December 13, 2012 | Wire transfer of $500,000 from Media World's account at Bank of America in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Consulting Company B at Banco Citibank in Panama City, Panama. |
| THIRTY-FIVE | January 7, 2013 | Wire transfer of $500,000 from Media World's account at Bank of America in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Consulting Company B at Banco Citibank in Panama City, Panama. |

(Title 18, United States Code, Sections 1343, 2 and

3551 et seq.)

COUNT THIRTY-SIX
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTH))

418. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

419. In or about and between January 2008 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant ALFREDO HAWIT and RAFAEL CALLEJAS, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

179

COUNT THIRTY-SEVEN
(Money Laundering –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTH))

420. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

421. In or about and between March 2011 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant ALFREDO HAWIT and RAFAEL CALLEJAS, together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

COUNT THIRTY-EIGHT
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FESFUT))

422. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

180

423. In or about and between January 2009 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF and FESFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FESFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS THIRTY-NINE AND FORTY
(Wire Fraud –
UNCAF Region World Cup Qualifiers Schemes (FESFUT))

424. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

425. On or about the dates set forth below, within the Southern District of New York, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FESFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FESFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

426. For the purpose of executing such scheme and artifice, the defendant REYNALDO VASQUEZ, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|--------------|--------------------|
| THIRTY-NINE | November 4, 2011 | Wire transfer of $100,000 from Media World's account at Bank of America in Miami, Florida, to a Citibank correspondent account in New York, New York, for credit to an account in the name of FESFUT at Banco Cuscatlan in El Salvador. |
| FORTY | October 10, 2012 | Wire transfer of $350,000 from Media World's account at Bank of America in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Consulting Company B at Banco Citibank in Panama. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

### COUNT FORTY-ONE
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FESFUT))

427. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

428. In or about and between January 2008 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in

the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### COUNT FORTY-TWO
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTG))

429. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

430. In or about and between January 2009 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendants BRAYAN JIMÉNEZ, RAFAEL SALGUERO, and HÉCTOR TRUJILLO, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF and FENAFUTG and their constituent organizations, including to deprive FIFA, CONCACAF, and FENAFUTG and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and

184

promises, and for the purpose of executing such scheme and

artifice, to transmit and cause to be transmitted by means of

wire communication in interstate and foreign commerce, writings,

signs, signals, pictures, and sounds, to wit: wire transfers,

telephone calls and email messages, contrary to Title 18, United

States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551
et seq.)

COUNTS FORTY-THREE AND FORTY-FOUR
(Wire Fraud –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTG))

431. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as though fully set forth in

this paragraph.

432. On or about the dates set forth below, within the

Southern District of New York and the Southern District of

Florida, the defendants BRAYAN JIMÉNEZ, RAFAEL SALGUERO, and

HÉCTOR TRUJILLO, together with others, did knowingly and

intentionally devise a scheme and artifice to defraud FIFA,

CONCACAF, and FENAFUTG and their constituent organizations,

including to deprive FIFA, CONCACAF, and FENAFUTG and their

constituent organizations of their respective rights to honest

and faithful services through bribes and kickbacks, and to

obtain money and property by means of materially false and
fraudulent pretenses, representations, and promises.

433. For the purpose of executing such scheme and
artifice, the defendants BRAYAN JIMÉNEZ, RAFAEL SALGUERO, and
HÉCTOR TRUJILLO, together with others, did transmit and cause to
be transmitted, by means of wire communication in interstate and
foreign commerce, writings, signs, signals, pictures, and sounds
as described below:

| Count | Approx. Date | Wire Communication |
|---|---|---|
| FORTY-THREE | March 31, 2011 | Wire transfer of $20,000 from Media World's account at Bank of America in Miami, Florida, to a Citibank correspondent account in New York, New York for credit to an account held in the name of a travel agency at a bank in Guatemala. |
| FORTY-FOUR | January 24, 2014 | Wire transfer of $20,000 from Media World's account at Bank of America in Miami, Florida to an account in the name of FENAFUTG at Banco Industrial in Guatemala City, Guatemala. |

(Title 18, United States Code, Sections 1343, 2 and
3551 et seq.)

COUNTS FORTY-FIVE AND FORTY-SIX
(Wire Fraud –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTG))

434. The allegations contained in paragraphs 1 through
361 are realleged and incorporated as though fully set forth in
this paragraph.

435. On or about the dates set forth below, within the Southern District of Florida, the defendants BRAYAN JIMÉNEZ and HÉCTOR TRUJILLO, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FENAFUTG and their constituent organizations, including to deprive FIFA, CONCACAF, and FENAFUTG and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

436. For the purpose of executing such scheme and artifice, the defendants BRAYAN JIMÉNEZ and HÉCTOR TRUJILLO, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|--------------|--------------------|
| FORTY-FIVE | March 28, 2014 | Wire transfer of $200,000 from Media World's Account at Bank of America in Miami, Florida to an account at JP Morgan Chase Bank in Seattle, Washington in the name of Construction Company A. |
| FORTY-SIX | July 22, 2014 | Wire transfer of $50,000 from Media World's account at Bank of America in Miami, Florida to an account at Banco G&T in Guatemala controlled by Co-Conspirator #19. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT FORTY-SEVEN
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTG))

437. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

438. In or about and between January 2009 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendants BRAYAN JIMÉNEZ, RAFAEL SALGUERO, and HÉCTOR TRUJILLO, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to

188

promote the carrying on of specified unlawful activity, to wit:

wire fraud, contrary to Title 18, United States Code, Section

1343, all contrary to Title 18, United States Code, Section

1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and

3551 et seq.)

COUNT FORTY-EIGHT
(Money Laundering –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTG))

439. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as if fully set forth in this

paragraph.

440. In or about and between March 2011 and the

present, both dates being approximate and inclusive, within the

Southern District of New York, the defendants BRAYAN JIMÉNEZ,

RAFAEL SALGUERO, and HÉCTOR TRUJILLO, together with others, did

knowingly and intentionally transport, transmit, and transfer

monetary instruments and funds, to wit: wire transfers, from

places in the United States to and through places outside the

United States and to places in the United States from and

through places outside the United States, with the intent to

promote the carrying on of specified unlawful activity, to wit:

189

wire fraud, contrary to Title 18, United States Code, Section
1343.

(Title 18, United States Code, Sections 1956(a)(2)(A),
2 and 3551 et seq.)

### COUNT FORTY-NINE
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FEPAFUT))

441. The allegations contained in paragraphs 1 through
361 are realleged and incorporated as if fully set forth in this
paragraph.

442. In or about and between October 2004 and February
2014, both dates being approximate and inclusive, within the
Southern District of Florida, the defendant ARIEL ALVARADO,
together with others, did knowingly and intentionally conspire
to devise a scheme and artifice to defraud FIFA, CONCACAF, and
FEPAFUT and their constituent organizations, including to
deprive FIFA, CONCACAF, and FEPAFUT and their constituent
organizations of their respective rights to honest and faithful
services through bribes and kickbacks, and to obtain money and
property by means of materially false and fraudulent pretenses,
representations, and promises, and for the purpose of executing
such scheme and artifice, to transmit and cause to be
transmitted by means of wire communication in interstate and
foreign commerce, writings, signs, signals, pictures, and

190

sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT FIFTY
### (Wire Fraud –
### UNCAF Region World Cup Qualifiers Schemes (FEPAFUT))

443. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

444. On or about the date set forth below, within the Southern District of Florida, the defendant ARIEL ALVARADO, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FEPAFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FEPAFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

445. For the purpose of executing such scheme and artifice, the defendant ARIEL ALVARADO, together with others, did transmit and cause to be transmitted, by means of wire

191

communication in interstate and foreign commerce, writings,

signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|--------------|---------------------|
| FIFTY | December 13, 2013 | Wire transfer of $15,000 from Traffic USA's account at Citibank in Miami, Florida for credit to an account in the name of Federación Panamena de Futbol at Banco General in Panama City, Panama. |

(Title 18, United States Code, Sections 1343, 2 and

3551 et seq.)

### COUNT FIFTY-ONE
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FEPAFUT))

446. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as if fully set forth in this

paragraph.

447. In or about and between October 2004 and February

2014, both dates being approximate and inclusive, within the

Southern District of Florida, the defendant ARIEL ALVARADO,

together with others, did knowingly and intentionally conspire

to transport, transmit, and transfer monetary instruments and

funds, to wit: wire transfers, from places in the United States

to and through places outside the United States and to places in

the United States from and through places outside the United

States, with the intent to promote the carrying on of specified

unlawful activity, to wit: wire fraud, contrary to Title 18,

United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT FIFTY-TWO
(Money Laundering –
UNCAF Region World Cup Qualifiers Schemes (FEPAFUT))

448. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

449. In or about and between April 2011 and February 2014, both dates being approximate and inclusive, within the Southern District of Florida, the defendant ARIEL ALVARADO, together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful

activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

### COUNT FIFTY-THREE
(Wire Fraud Conspiracy –
UNCAF Region Friendlies Schemes (FESFUT))

450. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

451. In or about and between May 2012 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and FESFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FESFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings,

signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT FIFTY-FOUR
(Wire Fraud – UNCAF Region Friendlies Schemes (FESFUT))

452. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

453. On or about the date set forth below, within the Southern District of New York, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FESFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FESFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

454. For the purpose of executing such scheme and artifice, the defendant REYNALDO VASQUEZ, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

195

| Count | Approx. Date | Wire Communication |
|---|---|---|
| FIFTY-FOUR | October 17, 2014 | Wire transfer of $10,000 from an account in the name of Consulting Company C at Bank of America in Wellington, Florida, to a Bank of America correspondent account in New York, New York, for credit to an account in the name of Mobilia, S.A. at Banco Promerica in El Salvador. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT FIFTY-FIVE
(Money Laundering Conspiracy –
UNCAF Region Friendlies Schemes (FESFUT))

455. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

456. In or about and between May 2012 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18,

United States Code, Section 1343, contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT FIFTY-SIX
### (Money Laundering –
### UNCAF Region Friendlies Schemes (FESFUT))

457. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

458. In or about and between October 2014 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

COUNT FIFTY-SEVEN
(Wire Fraud Conspiracy –
UNCAF Region Friendlies Schemes (FENAFUTG).)

459. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

460. In or about and between October 2014 and April 2015, both dates being approximate and inclusive, within the Southern District of Florida, the defendant BRAYAN JIMÉNEZ, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and FENAFUTG and their constituent organizations, including to deprive FIFA, CONCACAF, and FENAFUTG and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: telephone calls and email messages, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT FIFTY-EIGHT
(Wire Fraud Conspiracy –
UNCAF Region Friendlies Schemes (FEDEFUT))

461. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

462. In or about and between October 2014 and November 2014, both dates being approximate and inclusive, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and FEDEFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FEDEFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS FIFTY-NINE AND SIXTY
(Wire Fraud – UNCAF Region Friendlies Schemes (FEDEFUT))

463. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

464. On or about the dates set forth below, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, FEDEFEUT and their constituent organizations, including to deprive FIFA, CONCACAF, FEDEFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

465. For the purpose of executing such scheme and artifice, the defendant EDUARDO LI, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|--------------|--------------------|
| FIFTY-NINE | October 20, 2014 | Wire transfer of $20,000 from an account in the name of Consulting Company C at Bank of America in Wellington, Florida, to a BCT Bank correspondent account in New York, New York, for credit to an account in the name of LI at BCT Bank in Panama. |
| SIXTY | November 28, 2014 | Wire transfer of $20,000 from an account in the name of Consulting Company C at Bank of America in Wellington, Florida, to a BCT Bank correspondent account in New York, New York, for credit to an account in the name of LI at BCT Bank in Panama. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## COUNT SIXTY-ONE
(Money Laundering Conspiracy –
UNCAF Region Friendlies Schemes (FEDEFUT))

466. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

467. In or about and between October 2014 and November 2014, both dates being approximate and inclusive, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in

201

the United States from and through places outside the United

States, with the intent to promote the carrying on of specified

unlawful activity, to wit: wire fraud, contrary to Title 18,

United States Code, Section 1343, all contrary to Title 18,

United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and

3551 et seq.)

<u>COUNT SIXTY-TWO</u>
(Money Laundering –
UNCAF Region Friendlies Schemes (FEDEFUT))

468. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as if fully set forth in this

paragraph.

469. In or about and between October 2014 and November

2014, both dates being approximate and inclusive, within the

Southern District of New York, the defendant EDUARDO LI,

together with others, did knowingly and intentionally transport,

transmit, and transfer monetary instruments and funds, to wit:

wire transfers, from places in the United States to and through

places outside the United States and to places in the United

States from and through places outside the United States, with

the intent to promote the carrying on of specified unlawful

activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

COUNT SIXTY-THREE
(Wire Fraud Conspiracy –
2011 FIFA Presidential Election Scheme)

470. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

471. In or about and between April 2011 and July 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and CFU and their constituent organizations, including to deprive FIFA, CONCACAF, and CFU and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers,

203

emails and telephone calls, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT SIXTY-FOUR
(Money Laundering Conspiracy –
2011 FIFA Presidential Election Scheme)

472. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

473. In or about and between April 2011 and July 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: United States currency and wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT SIXTY-FIVE
(Wire Fraud Conspiracy –
CONCACAF Media and Marketing Rights Scheme)

474. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

475. In or about and between November 2011 and April 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL SALGUERO, HUGO JINKIS, and MARIANO JINKIS, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONCACAF and their constituent organizations, including to deprive FIFA and CONCACAF, and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and

sounds, to wit: email messages, contrary to Title 18, United
States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551
et seq.)

### COUNTS SIXTY-SIX AND SIXTY-SEVEN
(Wire Fraud – CONCACAF Media and Marketing Rights Scheme)

476. The allegations contained in paragraphs 1 through
361 are realleged and incorporated as though fully set forth in
this paragraph.

477. On or about the dates set forth below, within the
Southern District of New York, the defendants ALFREDO HAWIT,
ARIEL ALVARADO, RAFAEL SALGUERO, HUGO JINKIS, and MARIANO
JINKIS, together with others, did knowingly and intentionally
devise a scheme and artifice to defraud FIFA and CONCACAF, and
their constituent organizations, including to deprive FIFA and
CONCACAF, and their constituent organizations of their
respective rights to honest and faithful services through bribes
and kickbacks, and to obtain money and property by means of
materially false and fraudulent pretenses, representations, and
promises.

478. For the purpose of executing such scheme and
artifice, the defendants ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL
SALGUERO, HUGO JINKIS, and MARIANO JINKIS, together with others,
did transmit and cause to be transmitted, by means of wire

communication in interstate and foreign commerce, writings,

signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|--------------|--------------------|
| SIXTY-SIX | January 12, 2012 | Email message sent via interstate wire transmission by the defendant ARIEL ALVARADO to CONCACAF officials in New York, New York, and copying the defendant ALFREDO HAWIT, attaching a revised agenda for the CONCACAF executive committee meeting in Miami, Florida on January 15, 2012. |
| SIXTY-SEVEN | April 17, 2012 | Email message sent via interstate wire transmission by the defendant ARIEL ALVARADO to CONCACAF officials in New York, New York attaching proposed contract between Full Play and CONCACAF |

(Title 18, United States Code, Sections 1343, 2 and

3551 et seq.)

COUNT SIXTY-EIGHT
(Wire Fraud Conspiracy – CFU World Cup Qualifiers Scheme #2)

479. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as if fully set forth in this

paragraph.

480. In or about and between January 2012 and the

present, both dates being approximate and inclusive, within the

Eastern District of New York and elsewhere, the defendants

COSTAS TAKKAS and AARON DAVIDSON, together with others, did

knowingly and intentionally conspire to devise a scheme and

207

artifice to defraud FIFA, CONCACAF, and CFU and their

constituent organizations, including to deprive FIFA, CONCACAF,

and CFU and their constituent organizations of their respective

rights to honest and faithful services through bribes and

kickbacks, and to obtain money and property by means of

materially false and fraudulent pretenses, representations, and

promises, and for the purpose of executing such scheme and

artifice, to transmit and cause to be transmitted by means of

wire communication in interstate and foreign commerce, writings,

signs, signals, pictures, and sounds, to wit: wire transfers,

contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551

et seq.)

### COUNTS SIXTY-NINE THROUGH SEVENTY-TWO
(Wire Fraud - CFU World Cup Qualifiers Scheme #2)

481. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as though fully set forth in

this paragraph.

482. On or about the dates set forth below, within the

Southern and Western Districts of New York, the defendant COSTAS

TAKKAS, together with others, did knowingly and intentionally

devise a scheme and artifice to defraud FIFA, CONCACAF, and CFU

and their constituent organizations, including to deprive FIFA,

CONCACAF, and CFU and their constituent organizations of their

respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

483. For the purpose of executing such scheme and artifice, the defendant COSTAS TAKKAS, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|-------------|-------------------|
| SIXTY-NINE | November 13, 2012 | Wire transfer of $1,200,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a correspondent account at HSBC bank in Buffalo, New York, for credit to an account in the name of Front Company A at HSBC bank in Hong Kong. |
| SEVENTY | November 21, 2012 | Wire transfer of $750,000 from Front Company A's account at HSBC bank in Hong Kong, to a correspondent account at Standard Chartered Bank in New York, New York, for credit to an account in the name of Kosson Ventures at Fidelity Bank in the Cayman Islands. |

| SEVENTY-ONE | November 21, 2012 | Wire transfer of $250,000 from Front Company A's account at HSBC bank in Hong Kong, to a correspondent account at Standard Chartered Bank in New York, New York, for credit to an account in the name of Kosson Ventures at Fidelity Bank in the Cayman Islands. |
|---|---|---|
| SEVENTY-TWO | October 28, 2014 | Wire transfer of $80,000 from an account at Multibank in Panama, to a correspondent account at Bank of America in New York, New York, for credit to an account in the name of Individual #3 at Citibank in Florida. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

### COUNT SEVENTY-THREE
(Money Laundering Conspiracy – CFU World Cup Qualifiers Scheme #2)

484. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

485. In or about and between January 2012 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants COSTAS TAKKAS and AARON DAVIDSON, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside

210

the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT SEVENTY-FOUR
(Money Laundering – CFU World Cup Qualifiers Scheme #2)

486. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

487. In or about and between November 2012 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant COSTAS TAKKAS,

211

together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(2)(A), 1956(a)(2)(B)(i), 2 and 3551 et seq.)

COUNT SEVENTY-FIVE
(Money Laundering Conspiracy –
CFU World Cup Qualifiers Scheme #2)

488. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

212

489. In or about and between July 2013 and November 2013, both dates being approximate and inclusive, within the Southern District of Florida, the defendant COSTAS TAKKAS, together with others, did knowingly and intentionally conspire to engage in monetary transactions, to wit: deposits, withdrawals and transfers of funds and monetary instruments, in and affecting interstate and foreign commerce, by, through and to one or more financial institutions, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h), 1957(b), 1957(d)(1) and 3551 et seq.)

COUNT SEVENTY-SIX
(Money Laundering – CFU World Cup Qualifiers Scheme #2)

490. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

491. In or about and between July 2013 and November 2013, both dates being approximate and inclusive, within the Southern District of Florida, the defendant COSTAS TAKKAS, together with others, did knowingly and intentionally engage in monetary transactions, to wit: deposits, withdrawals and

transfers of funds and monetary instruments, in and affecting interstate and foreign commerce, by, through and to one or more financial institutions, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1957(a), 1957(b), 1957(d)(1), 2, and 3551 et seq.)

### COUNT SEVENTY-SEVEN
(Wire Fraud Conspiracy –
CONCACAF Gold Cup/Champions League Scheme)

492. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

493. In or about and between July 2012 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant AARON DAVIDSON, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONCACAF and their constituent organizations, including to deprive FIFA and CONCACAF and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations,

214

and promises, and for the purpose of executing such scheme and
artifice, to transmit and cause to be transmitted by means of
wire communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds, to wit: wire transfers,
contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551
et seq.)

### COUNTS SEVENTY-EIGHT THROUGH EIGHTY
(Wire Fraud – CONCACAF Gold Cup/Champions League Scheme)

494. The allegations contained in paragraphs 1 through
361 are realleged and incorporated as though fully set forth in
this paragraph.

495. On or about the dates set forth below, within the
Southern District of New York, the defendant AARON DAVIDSON,
together with others, did knowingly and intentionally devise a
scheme and artifice to defraud FIFA and CONCACAF and their
constituent organizations, including to deprive FIFA and
CONCACAF and their constituent organizations of their respective
rights to honest and faithful services through bribes and
kickbacks, and to obtain money and property by means of
materially false and fraudulent pretenses, representations, and
promises.

496. For the purpose of executing such scheme and
artifice, the defendant AARON DAVIDSON, together with others,

did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Description |
|-------|-------------|-------------|
| SEVENTY-EIGHT | February 15, 2013 | Wire transfer of $3,000,000 from Traffic USA's account at Citibank in Miami, Florida, to CONCACAF's account at JP Morgan Chase Bank in New York, New York. |
| SEVENTY-NINE | December 4, 2013 | Wire transfer of $1,100,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Soccer Uniform Company A at Capital Bank in Panama City, Panama. |
| EIGHTY | December 20, 2013 | Wire transfer of $3,000,000 from Traffic USA's account at Citibank in Miami, Florida, to CONCACAF's account at JP Morgan Chase Bank in New York, New York. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT EIGHTY-ONE
(Money Laundering Conspiracy –
CONCACAF Gold Cup/Champions League Scheme)

497. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

498. In or about and between July 2012 and the present, both dates being approximate and inclusive, within the

216

Eastern District of New York and elsewhere, the defendant AARON DAVIDSON, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT EIGHTY-TWO
(Money Laundering – CONCACAF Gold Cup/Champions League Scheme)

499. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

500. In or about and between February 2013 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant AARON DAVIDSON, together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the

ownership and the control of the proceeds of said specified

unlawful activity.

(Title 18, United States Code, Sections 1956(a)(2)(A),

1956(a)(2)(B)(i), 2 and 3551 et seq.)

### COUNT EIGHTY-THREE
(Wire Fraud Conspiracy –
CONMEBOL/CONCACAF Copa América Centenario Scheme)

501. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as if fully set forth in this

paragraph.

502. In or about and between April 2010 and the

present, both dates being approximate and inclusive, within the

Eastern District of New York and elsewhere, the defendants JUAN

ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO

POLO DEL NERO, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ,

JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, RICARDO TEIXEIRA, AARON

DAVIDSON, HUGO JINKIS, and MARIANO JINKIS, together with others,

did knowingly and intentionally conspire to devise a scheme and

artifice to defraud FIFA, CONCACAF, and CONMEBOL and their

constituent organizations, including to deprive FIFA, CONCACAF,

and CONMEBOL and their constituent organizations of their

respective rights to honest and faithful services through bribes

and kickbacks, and to obtain money and property by means of

materially false and fraudulent pretenses, representations, and

219

promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT EIGHTY-FOUR
(Money Laundering Conspiracy –
CONMEBOL/CONCACAF Copa América Centenario Scheme)

503. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

504. In or about and between April 2010 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, RICARDO TEIXEIRA, AARON DAVIDSON, HUGO JINKIS, and MARIANO JINKIS, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United

States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT EIGHTY-FIVE
(Unlawful Procurement of Naturalization)

505. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

506. On or about and between March 24, 2005 and July 11, 2006, both dates being approximate and inclusive, within the Central District of California, the defendant EUGENIO FIGUEREDO, together with others, did knowingly and intentionally procure, contrary to law, his naturalization, in that the defendant did knowingly and intentionally make one or more false statements under oath, in a case, proceeding and matter relating to naturalization and citizenship, to wit: the defendant did falsely state that (1) he was only employed by Sunburst Decorative Rock in Irwindale, California and neither worked anywhere else in the previous five years nor ever had any affiliation with any organization or association in the United

States or in any other place; and (2) he had a medical impairment, to wit: dementia, and thus was unable to complete the required English language and civics competency exams.

(Title 18, United States Code, Sections 1425(a), 2, and 3551 et seq.; Title 8, United States Code, Section 1451(e))

## COUNTS EIGHTY-SIX THROUGH NINETY
### (Aiding and Assisting in the Preparation of False and Fraudulent Tax Returns)

507. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

508. On or about the dates set forth below, within the Central District of California, the defendant EUGENIO FIGUEREDO, together with others, did willfully aid and assist in, and procure, counsel and advise the preparation and presentation to the Internal Revenue Service under the internal revenue laws, of the defendant's U.S. Individual Income Tax Returns, Forms 1040 and attached Schedules and Forms, which were false and fraudulent as to material matters, to wit: among other things, the defendant falsely stated the amount of taxable income and failed to report his financial interest in a foreign bank account in the following years:

| Count | Tax Year | Approximate Filing Date |
|-------|----------|-------------------------|
| EIGHTY-SIX | 2009 | March 08, 2010 |
| EIGHTY-SEVEN | 2010 | March 03, 2011 |
| EIGHTY-EIGHT | 2011 | April 06, 2012 |
| EIGHTY-NINE | 2012 | March 22, 2013 |
| NINETY | 2013 | April 01, 2014 |

(Title 26, United States Code, Section 7206(2); Title 18, United States Code, Sections 2, and 3551 et seq.)

COUNT NINETY-ONE
(Obstruction of Justice - DAVIDSON)

509. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

510. In or about and between May 2013 and May 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant AARON DAVIDSON, together with others, did knowingly, intentionally and corruptly obstruct, influence and impede, and attempt to obstruct, influence and impede, an official proceeding, to wit: a Federal Grand Jury investigation in the Eastern District of New York.

(Title 18, United States Code, Sections 1512(c)(2), 2, and 3551 et seq.)

COUNT NINETY-TWO
(Conspiracy to Obstruct Justice - HAWIT)

511. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

512. In or about and between July 2015 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ALFREDO HAWIT, together with others, did knowingly and intentionally conspire to (a) corruptly obstruct, influence and impede one or more official proceedings, to wit: (i) a Federal Grand Jury investigation in the Eastern District of New York and (ii) the criminal prosecution in the United Stated District Court for the Eastern District of New York filed under the caption United States v. Jeffrey Webb et al., 15 CR 252 (RJD); and (b) corruptly persuade one or more persons with intent to (i) influence the testimony of such persons at such official proceedings, (ii) cause or induce such persons to withhold testimony from such official proceedings, and (iii) hinder, delay and prevent the communication to one or more law enforcement officers of the United States, to wit: Special Agents of the Federal Bureau of Investigation, of information relating to the commission or possible commission of one or more

224

federal offenses, contrary to Title 18, United States Code, Sections 1512(b)(1), 1512(b)(2)(A), 1512(b)(3) and 1512(c)(2).

(Title 18, United States Code, Sections 1512(k) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATIONS

### CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

513. The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 1963(a), which requires any person or entity convicted of such offense to forfeit: (a) any interest acquired or maintained in violation of Title 18, United States Code, Section 1962; (b) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendant established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962, and (c) any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962, including but not limited to all right, title and interest in: (a) the real property and premises located at 2116 Adel Drive, Loganville, Georgia 30052;

225

(b) the real property and premises located at 5119 Madeline Place, Stone Mountain, Georgia 30083; (c) the real property and premises located at 7222 Lake Crossing, Stone Mountain, Georgia 30087; (d) the real property and premises located at 104 Ellis Drive, Conyers, Georgia 30012; (e) the real property and premises located at 808 Brickell Key Drive, Apartment No. 1204, Miami, Florida 33131; (f) the real property and premises located at 18067 NW 74th Court, Hialeah, Florida 33015; (g) the real property and premises located at 18061 NW 74th Court, Hialeah, Florida 33015; (h) the real property and premises located at 18055 NW 74th Court, Hialeah, Florida 33015; (i) the real property and premises located at 18049 NW 74th Court, Hialeah, Florida 33015; (j) the real property and premises located at 18043 NW 74th Court, Hialeah, Florida 33015; (k) the real property and premises located at 8540 SW 149th Avenue, Apartment No. 805, Miami, Florida 33193; (l) the real property and premises located at 8660 SW 149th Avenue, Apartment No. 201, Miami, Florida 33193; (m) the real property and premises located at 8660 SW 149th Avenue, Apartment No. 209, Miami, Florida 33193; and (n) the real property and premises located at 1700 Kennedy Causeway, Condominium Unit No. 1607, North Bay Village, Florida 33141.

514. If any of the above-described forfeitable property, as a result of any act or omission of a defendant:

(a)  cannot be located upon the exercise of due diligence;

(b)  has been transferred or sold to, or deposited with, a third party;

(c)  has been placed beyond the jurisdiction of the court;

(d)  has been substantially diminished in value; or

(e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property.

(Title 18, United States Code, Sections 1963(a) and 1963(m))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS TWO THROUGH FOUR, SEVEN, NINE, ELEVEN, THIRTEEN
THROUGH FIFTEEN, EIGHTEEN THROUGH TWENTY-THREE, TWENTY-SIX
THROUGH TWENTY-EIGHT, THIRTY-ONE THROUGH THIRTY-FIVE, THIRTY-
EIGHT THROUGH FORTY, FORTY-TWO THROUGH FORTY-SIX, FORTY-NINE,
FIFTY, FIFTY-THREE, FIFTY-FOUR, FIFTY-SEVEN THROUGH SIXTY,
SIXTY-THREE, SIXTY-FIVE THROUGH SEVENTY-TWO, SEVENTY-SEVEN
THROUGH EIGHTY, AND EIGHTY-THREE

515. The United States hereby gives notice to the

defendants charged in Counts Two through Four, Seven, Nine,

Eleven, Thirteen through Fifteen, Eighteen through Twenty-Three,

Twenty-Six through Twenty-Eight, Thirty-One through Thirty-Five,

Thirty-Eight through Forty, Forty-Two through Forty-Six, Forty-

Nine, Fifty, Fifty-Three, Fifty-Four, Fifty-Seven through Sixty,

Sixty-Three, Sixty-Five through Seventy-Two, Seventy-Seven

through Eighty, and Eighty-Three, that, upon their conviction of

any of such offenses, the government will seek forfeiture in

accordance with Title 18, United States Code, Section

981(a)(1)(C) and Title 28, United States Code, Section 2461(c),

which require any person convicted of such offense to forfeit

any and all property, real or personal, which constitutes or is

derived from proceeds traceable to a violation of such offense,

including but not limited to all right, title and interest in:

(a) the real property and premises located at 2116 Adel Drive,

Loganville, Georgia 30052; (b) the real property and premises

located at 5119 Madeline Place, Stone Mountain, Georgia 30083;

(c) the real property and premises located at 7222 Lake

228

Crossing, Stone Mountain, Georgia 30087; (d) the real property
and premises located at 104 Ellis Drive, Conyers, Georgia 30012;
(e) the real property and premises located at 808 Brickell Key
Drive, Apartment No. 1204, Miami, Florida 33131; (f) the real
property and premises located at 18067 NW 74th Court, Hialeah,
Florida 33015; (g) the real property and premises located at
18061 NW 74th Court, Hialeah, Florida 33015; (h) the real
property and premises located at 18055 NW 74th Court, Hialeah,
Florida 33015; (i) the real property and premises located at
18049 NW 74th Court, Hialeah, Florida 33015; (j) the real
property and premises located at 18043 NW 74th Court, Hialeah,
Florida 33015; (k) the real property and premises located at
8540 SW 149th Avenue, Apartment No. 805, Miami, Florida 33193;
(l) the real property and premises located at 8660 SW 149th
Avenue, Apartment No. 201, Miami, Florida 33193; (m) the real
property and premises located at 8660 SW 149th Avenue, Apartment
No. 209, Miami, Florida 33193; and (n) the real property and
premises located at 1700 Kennedy Causeway, Condominium Unit No.
1607, North Bay Village, Florida 33141.

516. If any of the above-described forfeitable
property, as a result of any act or omission of a defendant:

(a) cannot be located upon the exercise of due
diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

### CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS FIVE, SIX, EIGHT, TEN, TWELVE, SIXTEEN, SEVENTEEN, TWENTY-FOUR, TWENTY-FIVE, TWENTY-NINE, THIRTY, THIRTY-SIX, THIRTY-SEVEN, FORTY-ONE, FORTY-SEVEN, FORTY-EIGHT, FIFTY-ONE, FIFTY-TWO, FIFTY-FIVE, FIFTY-SIX, SIXTY-ONE, SIXTY-TWO, SIXTY-FOUR, SEVENTY-THREE THROUGH SEVENTY-SIX, EIGHTY-ONE, EIGHTY-TWO, AND EIGHTY-FOUR

517. The United States hereby gives notice to the defendants charged in Counts Five, Six, Eight, Ten, Twelve, Sixteen, Seventeen, Twenty-Four, Twenty-Five, Twenty-Nine,

Thirty, Thirty-Six, Thirty-Seven, Forty-One, Forty-Seven, Forty-Eight, Fifty-One, Fifty-Two, Fifty-Five, Fifty-Six, Sixty-One, Sixty-Two, Sixty-Four, Seventy-Three through Seventy-Six, Eighty-One, Eighty-Two, and Eighty-Four, that, upon their conviction of any of such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any and all property, real or personal, involved in such offense, or any property traceable to such offense, including but not limited to all right, title and interest in: (a) the real property and premises located at 2116 Adel Drive, Loganville, Georgia 30052; (b) the real property and premises located at 5119 Madeline Place, Stone Mountain, Georgia 30083; (c) the real property and premises located at 7222 Lake Crossing, Stone Mountain, Georgia 30087; (d) the real property and premises located at 104 Ellis Drive, Conyers, Georgia 30012; (e) the real property and premises located at 808 Brickell Key Drive, Apartment No. 1204, Miami, Florida 33131; (f) the real property and premises located at 18067 NW 74th Court, Hialeah, Florida 33015; (g) the real property and premises located at 18061 NW 74th Court, Hialeah, Florida 33015; (h) the real property and premises located at 18055 NW 74th Court, Hialeah, Florida 33015; (i) the real property and premises located at

231

18049 NW 74th Court, Hialeah, Florida 33015; (j) the real

property and premises located at 18043 NW 74th Court, Hialeah,

Florida 33015; (k) the real property and premises located at

8540 SW 149th Avenue, Apartment No. 805, Miami, Florida 33193;

(l) the real property and premises located at 8660 SW 149th

Avenue, Apartment No. 201, Miami, Florida 33193; (m) the real

property and premises located at 8660 SW 149th Avenue, Apartment

No. 209, Miami, Florida 33193; and (n) the real property and

premises located at 1700 Kennedy Causeway, Condominium Unit No.

1607, North Bay Village, Florida 33141.

518. If any of the above-described forfeitable

property, as a result of any act or omission of a defendant:

(a) cannot be located upon the exercise of due

diligence;

(b) has been transferred or sold to, or deposited

with, a third party;

(c) has been placed beyond the jurisdiction of

the court;

(d) has been substantially diminished in value;

or

(e) has been commingled with other property which

cannot be divided without difficulty;

232

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b); Title 21, United States Code, Section 853(p))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT EIGHTY-FIVE

519. The United States hereby gives notice to the defendant EUGENIO FIGUEREDO that, upon his conviction of the offense charged in Count Eighty-Five, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(6), which requires any person convicted of such offense to forfeit: (a) any conveyance, including any vessel, vehicle or aircraft used in the commission of such offense; and (b) any property, real or personal, that constitutes or is derived from proceeds obtained directly or indirectly from the commission of such offense, or that is used to facilitate or intended to be used to facilitate the commission of such offense.

233

520. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(6) and 982(b); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS NINETY-ONE AND NINETY-TWO

521. The United States hereby gives notice to the defendants charged in Counts Ninety-One and Ninety-Two, that, upon their conviction of either of such offenses, the government

will seek forfeiture in accordance with Title 18, United States
Code, Section 981(a)(1)(C) and Title 28, United States Code,
Section 2461(c), which require any person convicted of either of
such offenses to forfeit any and all property, real or personal,
which constitutes or is derived from proceeds traceable to a
violation of such offense.

522. If any of the above-described forfeitable
property, as a result of any act or omission of a defendant:

(a) cannot be located upon the exercise of due
diligence;

(b) has been transferred or sold to, or deposited
with, a third party;

(c) has been placed beyond the jurisdiction of
the court;

(d) has been substantially diminished in value;
or

(e) has been commingled with other property which
cannot be divided without difficulty;
it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), as incorporated by Title 28,
United States Code, Section 2461(c), to seek forfeiture of any

other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. #2015R00747

FORM DBD-34
JUN. 85

No. 15-252 (S-1) (RJD)

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK
### CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL CALLEJAS, BRAYAN
JIMÉNEZ, EDUARDO LI, JULIO ROCHA, RAFAEL SALGUERO, COSTAS
TAKKAS, HÉCTOR TRUJILLO, REYNALDO VASQUEZ, JACK WARNER,
JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS
CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, RAFAEL
ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ, JOSÉ MARIA
MARIN, JOSÉ LUÍS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA,
AARON DAVIDSON, HUGO JINKIS, and MARIANO JINKIS,

Defendants.

# SUPERSEDING INDICTMENT

(T. 8, U.S.C., § 1451(e); T. 18, U.S.C., §§ 981(a)(1)(C), 982(a)(1),
982(a)(6), 982(b), 1343, 1349, 1425(a), 1512(c)(2), 1512(k),
1956(a)(2)(A), 1956(a)(2)(B)(i), 1956(h), 1957(a), 1957(b), 1957(d)(1),
1962(d), 1963, 1963(a), 1963(m), 2, and 3551 et seq.; T. 21, U.S.C., §
853(p); T. 26, U.S.C. § 7206(2); T. 28, U.S.C. § 2461(c))

*A true bill.*

*Robert Heffernan*

_____

*Foreperson*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day.*

*of* _ _ _ _ _ _ _ _ _ _ _ _ *A.D. 20* _ _ _ _ _

_____

*Clerk*

*Bail, $* _____

***Evan M. Norris, Amanda Hector, Darren A. LaVerne, Samuel P. Nitze,
M. Kristin Mace, Paul Tuchmann, Keith D. Edelman, Tanya Hajjar, and
Brian Morris, Assistant U.S. Attorneys (718) 254-7000***

# EXHIBIT B

JDG:EMN/SPN/BDM/JPL
F.#2016R01865

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

       - against -

TORNEOS Y COMPETENCIAS S.A.,

          Defendant.

– – – – – – – – – – – – – – – – – – X

DEFERRED PROSECUTION AGREEMENT

16 CR 634 (PKC)

       The defendant TORNEOS Y COMPETENCIAS S.A. ("TORNEOS" or the "Company"), an Argentinian corporation acting pursuant to authority granted by the Company's Board of Directors in the form of a board resolution (as certified by its Legal Director in the Certificate attached hereto as Attachment A), and the United States Attorney's Office for the Eastern District of New York (the "Office") hereby enter into this Deferred Prosecution Agreement (the "Agreement"). The Office agrees to defer prosecution of TORNEOS pursuant to the terms and conditions described below.

## CRIMINAL INFORMATION

       1.    TORNEOS acknowledges and agrees that the Office will file a criminal information (the "Information") in the United States District Court for the Eastern District of New York charging the Company with wire fraud conspiracy, in violation of Title 18, United States Code, Sections 1349. By executing this Agreement, TORNEOS waives (a) any and all rights it has to have the crime charged in the Information presented to a grand jury and prosecuted by indictment, (b) any and all rights to a speedy trial as set forth in paragraph 31 below, and (c) any and all objections with respect to venue or the statute of limitations to any

charges by the Office arising out of the conduct alleged in the Information or described in the statement of facts, which is attached to this Agreement as Attachment B and incorporated by reference ("Statement of Facts"), that may be later brought as provided in paragraphs 33 and 34 below. This waiver is knowing, voluntary, and made in express reliance on the advice of TORNEOS's counsel.

## ACCEPTANCE OF RESPONSIBILITY

2.  TORNEOS admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as charged in the Information and as set forth in the Statement of Facts. TORNEOS acknowledges that, as a result of the conduct of certain individuals employed by the Company during the time period alleged in the Information, the Company engaged in, and is criminally culpable for, the charged violation of Title 18, United States Code, Section 1349. TORNEOS stipulates that all of the facts alleged in the Information and all of the facts described in the Statement of Facts are true and accurate.

3.  Should the Office pursue the prosecution that is deferred by this Agreement, TORNEOS stipulates to the admissibility of the Statement of Facts in any such prosecution, including any trial, guilty plea, or sentencing proceeding relating thereto, and will not contradict anything in the Statement of Facts at any such proceeding.

4.  TORNEOS accepts responsibility for the conduct described in the Information by entering into this Agreement and by, among other things: (a) continuing the implementation of enhanced internal controls and other remedial measures that the Company has undertaken to date and will continue to undertake, as described in paragraph 7 below; (b) continuing the Company's commitment to full cooperation, described in paragraphs 12

2

through 14 below, with the Office and its law enforcement agency partners, the Federal Bureau of Investigation and the Internal Revenue Service – Criminal Investigation (collectively, the "Investigating Agencies"); (c) agreeing to fulfill all of the financial undertakings the Company has made in this Agreement, including (i) consenting to the forfeiture to the United States of, and forfeiting to the United States, eighty-nine million sixty-two thousand six hundred sixteen dollars and no cents ($89,062,616.00) (the "Total Forfeiture Amount," as described in paragraph 15 below), and (ii) paying a financial penalty in the amount of twenty-three million seven hundred sixty dollars and no cents ($23,760,000.00) (described in paragraph 27 below); and (d) complying in the future with all applicable laws, including federal, state, and foreign anti-bribery and anti-money laundering laws.

## TERM OF THE AGREEMENT

5.  This Agreement is effective for a period beginning on the date on which the Information is filed and ending four (4) years therefrom (the "Term"). TORNEOS agrees, however, that in the event the Office determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement, an extension or extensions of the Term may be imposed by the Office, in its sole discretion, for up to a total additional period of one (1) year, without prejudice to the Office's right to proceed as provided in paragraphs 33 and 34 below. Any extension of the Agreement extends all terms of this Agreement for an equivalent period.

## RELEVANT CONSIDERATIONS

6.  The Office enters into this Agreement based on the individual facts and circumstances presented by this case. The Office has concluded that deferring prosecution is

3

appropriate because deferral will likely meet all of the goals of prosecution. This conclusion is

based on, among others, the following factors:

(a)     TORNEOS did not voluntarily self-disclose the offense conduct to

the Office;

(b)     The seriousness of the offense conduct, including the years-long

involvement in the conduct by officials at the highest level of TORNEOS and the high-dollar

amount of the bribes that certain TORNEOS officials caused to be paid to soccer officials;

(c)     TORNEOS's substantial cooperation in the course of the Office

and the Investigating Agencies' investigation, including the Company's prompt decision, upon

learning of its potential involvement in corrupt conduct, to (i) conduct a diligent, thorough, and

swift internal investigation, which entailed the preservation and review of millions of documents

and the interviews of dozens of witnesses, and (ii) fully cooperate with the Office by identifying

and providing relevant documents to the Office in a timely manner and presenting detailed

factual findings of the Company's internal investigation;

(d)     TORNEOS's promise of continued cooperation;

(e)     TORNEOS's acceptance of responsibility;

(f)     TORNEOS has no prior criminal history;

(g)     TORNEOS's extensive remediation beginning in early June 2015,

including the implementation of a new compliance program; and

(h)     TORNEOS's commitment to continue to enhance its compliance

program and internal controls.

4

## REMEDIAL MEASURES

7.      TORNEOS has taken extensive remedial measures in response to the conduct that has been discovered in the course of the Office and Investigating Agencies' investigation. TORNEOS represents that these remedial measures have included a number of actions, including those detailed below:

(a)     TORNEOS promptly terminated its entire senior management team, which included the then-President of the Company's Board of Directors (the "Board of Directors" or the "Board"), as well as numerous other employees;

(b)     TORNEOS hired a new leadership team, including a new General Manager, Chief Financial Officer, Legal Director and Chief Compliance Officer, and Compliance Manager, who have established a new "tone at the top" and ensured that a culture of compliance has taken hold at the Company;

(c)     the Board of Directors approved a new compliance department and program – to be overseen and enforced by the Board – based on international best practices, which includes a new code of business conduct, as well as anti-bribery and corruption, anti-money laundering, conflict of interest, and gifts and entertainment policies and procedures;

(d)     TORNEOS has appointed a Chief Compliance Officer, who reports directly to the General Manager and to the President of the Board of Directors, and has hired a Compliance Manager and a Compliance Officer to support the Chief Compliance Officer;

(e)     TORNEOS has provided in-person training on its new code of business conduct and related compliance policies and procedures to all directors and officers, all employees in positions of leadership or trust, all employees in positions that otherwise require

5

such training (e.g., sales, legal, compliance, finance), and all other employees who reasonably pose a fraud or corruption risk to the Company;

(f)     All TORNEOS employees have received the new code of conduct and related compliance policies and have certified that they have read, complied with, and will continue to comply with the Company's policies and procedures;

(g)     TORNEOS has retained an independent third party to manage an anonymous ethics hotline to provide an additional mechanism for Company employees to report concerns of potential misconduct;

(h)     TORNEOS has established a comprehensive risk-based, due diligence regime requiring it to conduct extensive due diligence on all new business partners prior to transacting with them and to conduct or update its diligence on existing business partners;

(i)     TORNEOS has restructured, amended, terminated, and/or consented to the termination of a number of contracts related to the conduct alleged in the Information; and

(j)     TORNEOS has committed to operating with integrity, transparency, and in compliance with all applicable laws in its business dealings, including business with FIFA, CONMEBOL, and CONCACAF and their constituent organizations, including the Asociación del Fútbol Argentino ("AFA").

6

## CORPORATE COMPLIANCE PROGRAM

8.    TORNEOS agrees that it will maintain all policies, procedures, and other remedial measures identified in paragraph 7 so long as this Agreement is in effect. TORNEOS further agrees that, so long as this Agreement is in effect, it will maintain sufficient documentation to demonstrate the functioning of TORNEOS's Corporate Compliance Program, including but not limited to documents in the following categories that relate to compliance with the anti-corruption laws (as defined in Attachment C): written policies and procedures; training materials, including attendance records; certificates of compliance; general internal communications from Company management to groups of employees ('tone at the top' emails); internal presentations, including to the Board of Directors; presentations to third parties; periodic or annual reviews and assessments; confidential reports of potential violations; investigations arising from confidential reporting or other sources; employee discipline actions; and third party due diligence files.

9.    TORNEOS further agrees that the compliance policies and procedures it will adopt and/or maintain during the period of this Agreement will include, but not be limited to, the minimum elements set forth in the Corporate Compliance Program attached to this Agreement as Attachment C and incorporated by reference.

10.    No later than six (6) months after the execution of this Agreement, TORNEOS shall provide written documentation to the Office certifying that its Corporate Compliance Program meets the minimum elements set forth in Attachment C, including without limitation the provision in paragraph 7 thereof requiring the Company to create and maintain an internal audit function.

7

11.     Not later than nine (9) months after the execution of this Agreement, and annually thereafter, TORNEOS shall provide a written report to the Office describing the results of the periodic review and testing it is required to perform pursuant to paragraph 18 of the Corporate Compliance Program.

## CONTINUING OBLIGATION OF COOPERATION

12.     TORNEOS acknowledges and understands that its prior, ongoing, and future cooperation is an important and material factor underlying the Office's decision to enter into this Agreement. TORNEOS therefore agrees to cooperate fully and actively with the Office and the Investigating Agencies regarding any matter about which the Office or the Investigating Agencies may inquire.

13.     During the Term of this Agreement, TORNEOS agrees that its continuing cooperation shall include, but not be limited to, the following:

(a)     completely and truthfully disclosing all documents, materials, and information in its possession about which the Office or the Investigating Agencies may inquire, including but not limited to all information about the Company's activities and those of its affiliates, subsidiaries, officers, employees, and agents;

(b)     assembling, organizing and providing all documents, records, and other evidence in its possession, custody, or control, wherever located, as reasonably may be requested by the Office or the Investigating Agencies;

(c)     proactively and promptly disclosing to the Office all information concerning any criminal wrongdoing or suspected criminal wrongdoing of any kind that has not yet been disclosed to the Office and that is either currently in the Company's possession or

8

which may come into its possession in the future, including conduct of the type described in the Information;

(d)     using its best efforts to make available its present and former officers and employees to provide information and/or testimony as requested by the Office, including sworn testimony before a grand jury or in court proceedings, as well as interviews with law enforcement authorities. Cooperation under this sub-paragraph shall include identification of witnesses who, to the Company's knowledge, may have material information regarding the conduct described in the Information, and providing records that may contain material information regarding such conduct;

(e)     providing testimony or information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of records or physical evidence in any criminal or other proceeding as requested by the Office;

(f)     with respect to any information, testimony, documents, records, or physical evidence provided by the Company, consenting to any and all disclosures of such materials by the Office and the Investigating Agencies as the Office, in its sole discretion, deems appropriate. With respect to any such materials that constitute "matters occurring before the grand jury" within the meaning of Rule 6(e) of the Federal Rules of Criminal Procedure, the Company further consents to (i) any order sought by the Office permitting such disclosures, and (ii) the Office's ex parte or in camera application for such an order; and

(g)     providing active assistance, including assistance by the Company's counsel, in connection with any investigation, criminal prosecution, civil trial, or other legal proceeding brought by the Office.

9

14.     TORNEOS agrees that it will continue to fulfill the cooperation

obligations set forth in paragraph 13 above in connection with any investigation, criminal

prosecution, and/or civil proceeding brought by the Office relating to or arising out of the

conduct set forth in the Information. TORNEOS's obligation to cooperate is not intended to

apply in the event that it is charged as a defendant in a criminal or civil proceeding.

Notwithstanding the foregoing, TORNEOS does not waive any privilege it may have with

respect to any documents now or hereafter subject to the attorney-client privilege, the attorney

work-product doctrine, or other recognized legal privilege.

## FORFEITURE

15.     TORNEOS acknowledges that money and property is subject to forfeiture

as a result of its violations of Title 18, United States Code, Section 1349, as alleged in the

Information, as well as related violations of Title 18, United States Code, Sections 1962(d),

1343, 1349, 1956, and 1957 by other persons and entities. Pursuant to Title 18, United States

Code, Sections 981(a)(1)(A), 981(a)(1)(C), 982(a)(1) and 1963(a), and Title 28, United States

Code, Section 2461(c), TORNEOS consents to the forfeiture of the sum of eighty-nine million

sixty-two thousand six hundred sixteen dollars and no cents ($89,062,616.00), which represents

profits that TORNEOS made from certain contracts obtained through the payment of bribes and

kickbacks (the "Total Forfeiture Amount"), consisting more particularly of (a) a sum certain in

the amount of seventy-one million three hundred forty-four thousand eight hundred ninety-five

dollars and no cents ($71,344,895.00) (the "Sum Certain"), (b) all right, title, and interest in the

property listed in Attachment D, which is attached to this Agreement and incorporated by

reference (the "Forfeited Assets"), (c) certain outstanding and unbilled receivables arising from

10

Case 1:15-cv-04441-GMA Document 7865-2 Filed 02/05/15 Page 353 of 405

the 2015 Copa América tournament owed to Datisa S.A. (the "Datisa Receivables"), which

TORNEOS hereby represents total approximately $50,806,734 (and further represents

approximately $16,935,578 of which its wholly-owned subsidiary Productora de Eventos S.A.

("Productora") holds a beneficial interest in), and (d) certain outstanding and unbilled

receivables arising from the 2015 Copa América tournament owed to Productora (the

"Productora Receivables"), which TORNEOS hereby represents total approximately $782,143,

as: (i) property acquired and maintained by other persons and entities in violation of Title 18,

United States Code, Section 1962, property and contractual rights that afford a source of

influence over the enterprise established, operated, controlled and conducted by other persons

and entities in violation of Title 18, United States Code, Section 1962, and/or property derived

from proceeds obtained, directly and indirectly, from racketeering activity by other persons and

entities, in violation of Title 18, United States Code, Section 1962; (ii) property, real or personal,

involved in a violation by other persons and entities of Title 18, United States Code, Section

1956, or as property traceable to such property; and (iii) property, real or personal, which

constitutes or is derived from proceeds traceable to TORNEOS's violation of Title 18, United

States Code, Section 1349.

      16.    TORNEOS agrees to fully assist the United States in effectuating the

forfeiture of the Total Forfeiture Amount, including payment of the Sum Certain and forfeiture

of the Forfeited Assets, by, among other things, executing any documents necessary to effectuate

the transfer of title to the Forfeited Assets to the United States and assisting the United States in

the defense of any third-party claims to the Forfeited Assets, including but not limited to

promptly providing any information requested by the United States in defense of any such

11

claims. TORNEOS agrees not to file or interpose any claim or to assist others to file or interpose any claim to the Forfeited Assets in any administrative or judicial proceeding, including but not limited to the criminal forfeiture proceedings related to any of the defendants in the case captioned <u>United States v. Webb et al.</u>, 15-CR-252 (PKC) (the "Parallel Cases").

17.     TORNEOS acknowledges that the Office, at its sole discretion, may seek to forfeit the Forfeited Assets and any payments paid towards the Sum Certain through commencement of an administrative or civil forfeiture proceeding. TORNEOS consents to the entry of an administrative declaration of forfeiture as to the Forfeited Assets and any payments towards the Sum Certain, and waives the requirements of 18 U.S.C. § 983 regarding notice of seizure in non-judicial forfeiture matters. TORNEOS further waives the filing of a civil forfeiture complaint as to the Forfeited Assets and any payments towards the Sum Certain in accordance with the procedures set forth in 18 U.S.C. § 983. TORNEOS agrees to execute any documents necessary to effectuate the administrative or civil forfeiture of the Forfeited Assets and any payments towards the Sum Certain, including but not limited to a Stipulation of Settlement and Decree of Forfeiture as to the same in the form set forth in Attachment E, which is attached to this Agreement, incorporated by reference, and may be amended from time to time by the Office in its sole and exclusive discretion.

18.     Upon execution of this Agreement, the value of the Productora BVA Account, the Productora Interaudi Account, and the TyC International Accounts (as each are defined in Attachment D and, with respect to the Productora Interaudi Account, excluding any Productora Receivables transferred or deposited into the account in accordance with paragraph 20 below) shall be credited towards TORNEOS's payment of the Sum Certain. Upon the final

12

Case 1:16-cv-24431-CMA Document 75-2 Entered on FLSD Docket 03/06/2020 Page 354 of 405

forfeiture of the T&T Sports Marketing Account (as defined in Attachment D) to the United

States, one fourth (1/4) of the value thereof (which reflects the share of such account that

TORNEOS hereby represents its wholly-owned subsidiary holds a beneficial interest in) shall be

credited towards TORNEOS's payment of the Sum Certain; provided, however, that in the event

that the Office consents to the release of any funds held in the T&T Sports Marketing Account in

full or partial settlement of any claim filed by any other partner of T&T Sports Marketing (the

"Released T&T Funds"), then one fourth (1/4) of the value of the Released T&T Funds shall also

be credited towards TORNEOS's payment of the Sum Certain. Upon final forfeiture of the

Datisa Account (as defined in Attachment D) to the United States, one-third (1/3) of the value

thereof (excluding any Datisa Receivables transferred or deposited into the account in

accordance with paragraph 20 below and which reflects the share of such account that

TORNEOS hereby represents that Productora holds a beneficial interest in) shall be credited

towards TORNEOS's payment of the Sum Certain; provided, however, that in the event that the

Office consents to the release of any funds held in the Datisa Account (excluding any Datisa

Receivables transferred or deposited into the account in accordance with paragraph 20 below) in

full or partial settlement of any claim filed by any other partner of Datisa (the "Released Datisa

Funds"), then one third (1/3) of the value of the Released Datisa Funds shall also be credited

towards TORNEOS's payment of the Sum Certain. The total amounts credited pursuant to this

paragraph as of the Applicable Due Date (as defined in paragraph 21 below) shall be referred to

herein as the "Credited Accounts Value." The Office shall use reasonable efforts, in its sole and

exclusive discretion, to perfect the forfeiture of the T&T Sports Marketing Account and the

Datisa Account, including litigating any third-party claims to such accounts that are determined

13

by the Office to be without merit; provided, however, that nothing herein shall prevent the resolution of any viable claims to the T&T Sports Marketing Account and the Datisa Account on terms and conditions deemed acceptable to the Office, in its sole and exclusive discretion.

19.  TORNEOS represents that the Productora BVA Account, the Productora Interaudi Account, and the TyC International Accounts are each held free and clear of any and all security interests, mortgages, liens, charges, encumbrances, adverse claims, preferential arrangements or restrictions of any kind (other than those restraints sought or imposed by or behalf of the United States based in whole or in part upon the conduct set forth in the Statement of Facts), and have not been pledged, alienated, hypothecated, or otherwise encumbered. TORNEOS further represents that it is not aware of any person or entity that has or may assert a viable third-party claim to any of the funds held in the Productora BVA Account, the Productora Interaudi Account, or the TyC International Accounts.

20.  TORNEOS shall take all steps requested by the Office, in its sole and exclusive discretion, to collect or cause its affiliate Datisa S.A. ("Datisa") to collect the Datisa Receivables, including but not limited to issuing letters of collection, instituting and prosecuting direct and derivative collections actions, locating creditors' assets and perfecting and enforcing judgments against such assets regardless of where such assets may be found, and shall further cause the Datisa Receivables to be directed to the Datisa Account (as defined in Attachment D) or such other account as the Office may direct from time to time in its sole and exclusive discretion.  TORNEOS shall respond within three (3) business days to any and all requests by the Office for information regarding such collection efforts and activities.  TORNEOS shall further take all steps requested by the Office, in its sole and exclusive discretion, to collect or cause

14

Productora to collect the Productora Receivables, such steps including but not limited to issuing

letters of collection, instituting and prosecuting direct and derivative collections actions, locating

creditors' assets and perfecting and enforcing judgments against such assets regardless of where

such assets may be found, and shall further cause the Productora Receivables to be directed to

the Productora Interaudi Account (as defined in Attachment D) or such other account as the

Office may direct from time to time in its sole and exclusive discretion. TORNEOS shall

respond within three (3) business days to any and all requests for information by the Office

regarding such collection efforts and activities.

      21.    TORNEOS shall pay any outstanding balance of the Sum Certain portion

of the Total Forfeiture Amount (the "Outstanding Balance") in full no later than forty-two

months (42) following the date of execution of this Agreement (the "Applicable Due Date");

provided, however, that to the extent that any funds held in either the T&T Sports Marketing

Account or the Datisa Account (excluding any Datisa Receivables transferred or deposited into

the account in accordance with paragraph 20 above) are finally forfeited to the United States or

released in settlement of any claim filed by any other partner of T&T Sports Marketing or

Datisa, respectively, as contemplated in paragraph 18 above following TORNEOS's full

payment of any Outstanding Balance by the Applicable Due Date, then TORNEOS shall be

refunded, out of and up to the amount of such payment, a total of (a) one fourth (1/4) of the sum

of (i) any such funds finally forfeited to the United States from the T&T Sports Marketing

Account following the Applicable Due Date and (ii) any Released T&T Funds that are released

following the Applicable Due Date, and (b) one-third (1/3) of the sum of (i) any such funds

finally forfeited to the United States from the Datisa Account following the Applicable Due Date

15

and (ii) any Released Datisa Funds that are released following the Applicable Due Date. To the extent that the Credited Accounts Value exceeds the Sum Certain, the difference between the Credited Accounts Value and the Sum Certain shall be referred to herein and, for the purposes set forth in paragraph 27 below, as the "Excess Amount."

22. All payments towards the Sum Certain shall be made by certified or bank check, payable to the United States Marshals Service, and delivered by hand or overnight courier on or before the Applicable Due Date to Assistant United States Attorney Brian Morris, United States Attorney's Office, Eastern District of New York, 271 Cadman Plaza East, 7th Floor, Brooklyn, New York 11201, with the criminal docket number noted on the face of the checks. TORNEOS acknowledges that all funds paid by it pursuant to this paragraph, together with the Forfeited Assets, shall be subject to a restitution hold to ensure their availability to satisfy any order of restitution entered in any of the Parallel Cases at sentencing for the benefit of any individuals or entities that qualify as victims under the provisions set forth in 18 U.S.C. §§ 3663 and 3663A. In the event that the Court enters an order of restitution in any of the Parallel Cases for the benefit of any such victim or victims at the time of sentencing, the Office may request remission or restoration by the Attorney General or his or her designee of all funds forfeited pursuant to this paragraph, up to the total amount of the restitution ordered, in accordance with the provisions of 21 U.S.C. § 853(i) and 28 C.F.R. Part 9. TORNEOS acknowledges that the decision to grant remission or restoration of such property lies within the sole and exclusive discretion of the Attorney General or his or her designee and that, only if granted, will such property be transferred to the Clerk of Court in full or partial satisfaction of any order of restitution entered in any of the Parallel Cases.

16

Case 1:16-cv-04284-GHW   Document 35-2   Filed 06/15/16   Page 358 of 405

23.     If any payments towards the Sum Certain are not paid on or before the Applicable Due Date, interest shall accrue on any unpaid portion thereof at the judgment rate of interest from that date. If TORNEOS fails to pay any portion of the Sum Certain on or before the Applicable Due Date, TORNEOS consents to the seizure and entry of a summary declaration of forfeiture of any other property of its up to the unpaid balance of the Sum Certain, pursuant to the Federal Debt Collection Procedures Act or any other applicable law.

24.     The failure of TORNEOS to forfeit any monies and/or properties as required under this Agreement, including the failure of the Company to execute any document to accomplish same on timely notice to do so, shall constitute a material breach of this agreement. Upon such a breach, TORNEOS acknowledges that the Office shall be entitled to exercise all of its rights and remedies under this Agreement, including but not limited to subjecting TORNEOS to prosecution as specified in paragraphs 33 and 34 below.

25.     TORNEOS knowingly and voluntarily waives its right to any required notice concerning the forfeiture of the monies and/or properties forfeited hereunder, including notice set forth in an indictment or information. In addition, TORNEOS knowingly and voluntarily waives its right, if any, to a jury trial on the forfeiture of said monies and/or properties, and waives all constitutional, legal and equitable defenses to the forfeiture of said monies and/or properties, including, but not limited to, any defenses based on principles of double jeopardy, the Ex Post Facto Clause of the Constitution, the statute of limitations, venue or any defense under the Eighth Amendment, including a claim of excessive fines.

17

26.     TORNEOS agrees that the payment of the Sum Certain and the forfeiture of the Forfeited Assets, the Datisa Receivables, and the Productora Receivables shall not be considered a fine or penalty or a payment on any income taxes or civil penalties that may be due.

## FINANCIAL PENALTY

27.     In addition to the forfeiture obligations set forth in paragraphs 15 through 26 above, and as a further result of the conduct described in the Information and the Statement of Facts, TORNEOS agrees to pay the sum of twenty-three million seven hundred sixty dollars and no cents ($23,760,000.00) to the United States Treasury as a financial penalty (the "Penalty Amount"). TORNEOS agrees to pay the Penalty Amount according to the following schedule: the first payment in the amount of five million dollars and no cents ($5,000,000.00) within 30 days of the date of the execution of this Agreement; the second payment in the amount of six million two hundred sixty thousand dollars and no cents ($6,260,000.00) within one year of the date of the execution of this Agreement; the third payment in the amount of six million two hundred fifty thousand dollars and no cents ($6,250,000.00) within two years of the execution of this Agreement; and the fourth payment in the amount of six million two hundred fifty thousand dollars and no cents ($6,250,000.00) less the Excess Amount (as defined in paragraph 21 above), if any, within 42 months of the execution of this Agreement.

28.     The Office and TORNEOS agree that, consistent with the factors set forth in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3572(a), the Penalty Amount is an appropriate penalty in this case. The Penalty Amount takes into account, among other considerations, the policy statement set forth in U.S.S.G. § 8C4.1 and the application note thereto. The Office and TORNEOS agree that the Penalty Amount is appropriate given the facts and circumstances of

18

this case, including the nature and seriousness of the Company's conduct and the pervasiveness

of the wrongdoing at the Company, as set forth in the Information, and, in mitigation of a higher

penalty, among other factors, (a) TORNEOS's diligent, thorough, and swift cooperation, and (b)

TORNEOS's provision of substantial assistance in the investigation and prosecution of crimes

committed by individuals, including individuals not directly affiliated with the Company, and

other entities.

          29.    TORNEOS agrees that it will not, in connection with the financial penalty

described in paragraph 27 above, seek, obtain or accept any reimbursement or other payments or

credits from any insurer of the Company or of any of its divisions or subsidiaries. TORNEOS

also agrees that it will not seek, obtain or accept any tax deduction in connection with the

financial penalty described in paragraph 27 above.

CONDITIONAL RELEASE FROM LIABILITY

          30.    Subject to paragraphs 33 and 34 below, the Office agrees, except as

provided in this Agreement, that it will not bring any criminal or civil case against TORNEOS or

any of its current or former subsidiaries relating to any of the conduct described in either the

Statement of Facts or the Information filed pursuant to this Agreement, or any other heretofore

disclosed criminal activity engaged in by the Company in connection with the acquisition and/or

exploitation of soccer-related rights. This Agreement does not provide any protection against

prosecution for any prior but undisclosed conduct by TORNEOS or any future conduct by

TORNEOS. In addition, this Agreement does not provide any protection against prosecution of

19

any individuals, regardless of their affiliation with TORNEOS. The Office, however, may use

any information related to the conduct described in the Statement of Facts against TORNEOS:

      (a)    in a prosecution for perjury or obstruction of justice;

      (b)    in a prosecution for making a false statement;

      (c)    in a prosecution or other proceeding relating to any crime of

violence; or

      (d)    in a prosecution or other proceeding relating to a violation of any

provision of Title 26 of the United States Code.

## DEFERRAL OF PROSECUTION

      31.    In consideration of TORNEOS's remedial actions to date and its

commitment to: (a) accept and acknowledge responsibility for its conduct; (b) continue its

cooperation with the Office and the Investigating Agencies as described in paragraphs 12

through 14 above; (c) consent to forfeiture as set forth in paragraphs 15 through 27 above; (d)

make the payment of a financial penalty to the United States as set forth in paragraphs 27

through 29 above; (e) comply in the future with all applicable laws, including all applicable

federal, state, and foreign anti-bribery and anti-money laundering laws; and (f) otherwise comply

with all of the terms of this Agreement, the Office shall, at the time it files the Information,

simultaneously file a joint motion with TORNEOS pursuant to Title 18, United States Code,

Section 3161(h)(2), to defer the prosecution of the Company for the conduct set forth in the

Statement of Facts and the Information, and for the conduct that the Company disclosed to the

Office prior to the signing of this Agreement, for a period of 48 months and to obtain an

exclusion of time under the Speedy Trial Act to allow the Company to demonstrate good conduct

20

and compliance with the terms of this Agreement. By executing this Agreement and joining in said motion, TORNEOS expressly waives all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Sections 3161 et seq., Rule 48(b) of the Federal Rules of Criminal Procedure, and any other applicable statutes or rules, including the Local Rules of the United States District Court for the Eastern District of New York, for the period during which this Agreement is in effect. This waiver is knowing, voluntary, and made in express reliance on the advice of TORNEOS's counsel.

32.      The Office agrees that, if TORNEOS remains in compliance with all of its obligations under this Agreement, this Agreement shall expire at the conclusion of the Term and the Office will, within six (6) months of the expiration of this Agreement, move the Court pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure to dismiss the Information with prejudice.

## BREACH OF THE AGREEMENT

33.      TORNEOS understands and agrees that should the Office, in its sole discretion, determine that the Company has deliberately given false, incomplete, or misleading information under this Agreement, has otherwise deliberately violated any provisions of this Agreement or has committed, or attempted to commit, any crime other than those set forth in the Information or otherwise previously disclosed to the Office, then the Company will be subject to prosecution for any crimes of which the Office has knowledge and jurisdiction to prosecute, including prosecution relating to the conduct set forth in the Information and the Statement of Facts. Any such prosecution may be premised on any information provided by or on behalf of TORNEOS to the Office or to the Investigating Agencies at any time. Moreover, TORNEOS

21

agrees that any such prosecution relating to the allegations in the Information that is not time-barred by the applicable statute of limitations as of the date of the execution of this Agreement may be commenced against the Company, notwithstanding the expiration of any applicable statute of limitations between the date of the execution of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, TORNEOS agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, TORNEOS agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Office is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations. By this Agreement, TORNEOS expressly intends to and does waive any defense or claim to relief under any statute of limitations to the extent such a defense or claim is foreclosed by the terms of this Agreement. This waiver is knowing, voluntary, and made in express reliance on the advice of TORNEOS's counsel. Moreover, the commission of an additional crime by TORNEOS shall constitute a breach of this Agreement.

34. Furthermore, it is agreed that if the Office, in its sole discretion, determines that TORNEOS has committed any crime or otherwise violated any provision of the Agreement:

(a) this Agreement and the Statement of Facts are admissible in any future court proceedings by the Office against TORNEOS as an admission by the Company; all statements made by or on behalf of TORNEOS or any of its officers, directors, employees, or

22

Case 1:16-cv-24081-CMA Document 78-2 Filed on FLSD Docket 02/07/2023 Page 364 of 405

agents to the Office or the Investigating Agencies, including its admission that the facts alleged

in the Information and set forth in the Statement of Facts are true and accurate, and/or any

testimony given by TORNEOS or any of its officers, directors, employees, or agents before a

grand jury or elsewhere, whether before or after the date of execution of this Agreement, and any

leads derived from such statements or testimony, shall be admissible in evidence in any and all

criminal proceedings brought by the Office against TORNEOS; and

        (b)     TORNEOS shall not assert any claim under the United States

Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal

Rules of Evidence, or any other statute or federal rule that statements made by or on behalf of the

Company before or after the date of execution of this Agreement, or any leads derived therefrom,

should be suppressed. However, nothing in this Agreement shall constitute a waiver of any

Confrontation Clause rights under the Sixth Amendment to the United States Constitution that

TORNEOS may have.

## PUBLIC STATEMENTS BY COMPANY

        35.     TORNEOS agrees that it shall not, through its present or future attorneys,

board of directors, agents, or employees, make any public statement, in litigation or otherwise,

contradicting the facts set forth in the Statement of Facts or alleged in the Information, its

admission that those facts established the elements of offenses charged in the Information, and

its acceptance of responsibility for the acts of its officers, directors, employees, and agents as

described in the Information. Any such contradictory statement by TORNEOS or its present or

future attorneys, officers, directors, employees, or agents shall constitute a breach of this

Agreement and the Company thereafter shall be subject to prosecution as specified in paragraphs

23

33 and 34 above. The decision whether any such contradictory statement will be imputed to TORNEOS for the purpose of determining whether the Company has breached this Agreement shall be at the sole discretion of the Office. If the Office determines that TORNEOS has committed a knowing, intentional, and material breach of any provision of this Agreement, the Office shall provide written notice of the alleged breach to TORNEOS, through its counsel, David B. Massey, Esq. and Lee S. Richards, III, Esq., Richards Kibbe & Orbe LLP, 200 Liberty Street, New York, New York 10281-1003, or to any successor counsel that TORNEOS may designate. Upon receipt of notification by the Office of any such contradictory statement, TORNEOS may avoid a finding of a breach of this Agreement by publicly repudiating such statement within five (5) business days after receipt of notice by the Office. TORNEOS shall be permitted to raise defenses and assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of TORNEOS in the course of any criminal, regulatory, governmental, or civil investigation or case initiated against such individual, unless such individual is speaking on behalf of the Company.

36.     TORNEOS agrees that if it or any of its subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the

24

Office and the Company and (b) whether the Office has any objection to the release or proposed statements.

37.     The Office agrees, if requested to do so, to bring to the attention of other law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to such authorities, the Office is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

## SALE, MERGER, OR OTHER CHANGE IN CORPORATE FORM

38.     Except as may otherwise be agreed by the parties in connection with a particular transaction, TORNEOS agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct set forth in the Information or Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The Company shall obtain approval from the Office at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form, including dissolution, in order to give the Office an opportunity to determine if such change in corporate form would impact the terms or obligations of the Agreement.

25

## LIMITATIONS ON BINDING EFFECT OF AGREEMENT

39.     This Agreement is binding on TORNEOS and the Office but specifically

does not bind any federal, state, or local law enforcement or regulatory agency, although the

Office will bring the cooperation of the Company and its compliance with its other obligations

under this Agreement to the attention of such agencies and authorities if requested to do so by

the Company.

## PUBLIC FILING

40.     TORNEOS and the Office agree that, upon the filing of the Information in

accordance with paragraph 1 above, this Agreement (including its attachments) shall be publicly

filed in the United States District Court for the Eastern District of New York.

## COMPLETE AGREEMENT

41.     This Agreement, including its attachments, sets forth all the terms of the

agreement between the Company and the Offices.  No amendments, modifications or additions

to this Agreement shall be valid unless they are in writing and signed by the Offices, the

attorneys for the Company and a duly authorized representative of the Company.

AGREED:

FOR TORNEOS Y COMPETENCIAS S.A.

Ignacio Juan Galarza
General Manager
Torneos y Competencias S.A.

David B. Massey, Esq.
Lee S. Richards, III, Esq.
Jeffrey A. Lehtman, Esq.
Maria E. Lapetina, Esq.
Richards Kibbe & Orbe LLP
Counsel to the Company

Date: _12 / 13 / 16_

FOR THE UNITED STATES ATTORNEY'S OFFICE:

ROBERT L. CAPERS
United States Attorney
Eastern District of New York

Evan M. Norris
Samuel P. Nitze
Brian D. Morris
M. Kristin Mace
Assistant United States Attorneys

James D. Gatta
Chief, Criminal Division

Date: _12 / 13 / 2016_

27

ATTACHMENT A

## FORM OF CERTIFICATE RELATING TO CORPORATE RESOLUTIONS

I, Pedro Castro Nevares, in my capacity as Legal Director of Torneos y

Competencias S.A. (hereinafter, the "Company"), a *sociedad anónima* duly organized and

existing under the laws of Argentina and having its principal place of business at calle Balcarce

510, Autonomous City of Buenos Aires, Argentina, hereby CERTIFY that on December 12,

2016, the Board of Directors of the Company, in the presence of the members of the Company's

Supervisory Commission and having been advised of its rights, possible defenses, the Sentencing

Guidelines provisions, and the consequences of entering into a Deferred Prosecution Agreement

with the United States Attorney's Office for the Eastern District of New York (the "Office"),

unanimously RESOLVED:

1. That the Company: (a) consents to the filing of the one-count Information

charging the Company with violation of 18 U.S.C. § 1349; (b) knowingly waives indictment on

such charges and enters into a deferred prosecution agreement with the Office (the

"Agreement"); (c) agrees to accept a monetary penalty against the Company totaling

$23,760,000 and to pay such monetary penalty with respect to the conduct described in the

Information in the manner described in the Agreement; and (d) consents to the forfeiture to the

United States of, and forfeits to the United States, $89,062,616.00 in the manner described in the

Agreement;

2. That the Company accept the terms and conditions of the Agreement,

including, but not limited to: (a) a knowing waiver of its rights to a speedy trial pursuant to the

Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161,

A-1

and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of the Deferred Prosecution Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts of any objection with respect to venue, and consent to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.    That the General Manager of the Company, Ignacio Juan Galarza, is authorized, empowered, and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the General Manager of the Company, Ignacio Juan Galarza, may approve;

4.    That the General Manager of the Company, Ignacio Juan Galarza, is authorized, empowered, and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms, or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions;

A-2

5.      That all of the actions of the General Manager of the Company, Ignacio Juan Galarza, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are severally ratified, confirmed, approved, and adopted as actions on behalf of the Company; and

6.      That U.S. counsel for the Company, David B. Massey and Lee S. Richards, III, of Richards Kibbe & Orbe LLP, be authorized, empowered, and directed to appear before the United States District Court for the Eastern District of New York and to waive on the Company's behalf the Company's right to indictment by a grand jury as to the matter referred to in the Agreement (the "Matter"); to represent and affirm that the Company's waiver of its right to indictment by a grand jury and consent to proceed by Information in the Matter is knowing and voluntary; to enter a plea of not-guilty to the Information to be filed in accordance with the terms of the Agreement; and to move to defer the prosecution of the Company for the conduct set forth in the Information for a period of 48 months and to obtain an exclusion of time under the Speedy Trial Act to allow the Company to demonstrate good conduct and compliance with the terms of the Agreement.

A-3

Case 1:16-cv-02431-GBD-JWP Document 78-5 Filed 10/11/21 Page 373 of 405

I further CERTIFY that (a) the above is an accurate translation of resolutions adopted originally in

the Spanish language, and (b) such resolutions have not been since amended or revoked and remain

in full force and effect as of the date hereof.

IN WITNESS WHEREOF, this CERTIFICATE is executed and delivered in Buenos Aires,
Argentina, on December 12, 2016.

TORNEOS Y COMPETENCIAS S.A.

By: 

Name: Pedro Castro Nevares
Title:   Legal Director

A-4

ATTACHMENT B

STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the

Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office

for the Eastern District of New York (the "Office") and the defendant TORNEOS Y

COMPETENCIAS S.A. ("TORNEOS" or the "Company"). TORNEOS hereby agrees and

stipulates that the following information is true and accurate. Certain of the facts herein are

based on information obtained from third parties by the Office through their investigation and

described to TORNEOS. TORNEOS admits, accepts, and acknowledges that it is responsible for

the acts of its officers, directors, employees, and agents as set forth below. Should the Office

pursue the prosecution that is deferred by the Agreement, TORNEOS agrees that it will neither

contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The

Office's evidence establishes the following facts during the relevant time frame and proves

beyond a reasonable doubt the charges set forth in the Criminal Information filed in the United

States District Court for the Eastern District of New York pursuant to the Agreement:

BACKGROUND

A.    FIFA

1.    The Fédération Internationale de Football Association ("FIFA") was

the international body governing organized soccer, commonly known outside the United

States as football. FIFA was an entity registered under Swiss law and headquartered in

Zurich, Switzerland. FIFA comprised as many as 209 member associations, each

representing organized soccer in a particular nation or territory, including the United States

B-1

and four of its overseas territories. At various times, FIFA maintained offices both in Zurich

and elsewhere in the world, including in the United States, where FIFA maintained a

development office since at least 2011.

        2.      FIFA's purpose was, among other things, to develop and promote the

game of soccer globally by organizing international competitions and creating and enforcing

rules that govern FIFA's member confederations and associations. FIFA financed its efforts

in significant part by commercializing the media and marketing rights associated with the

World Cup, the sport's premier event.

        3.      FIFA first instituted a written code of ethics in October 2004, which

code was revised in 2006 and again in 2009 (generally, the "code of ethics"). The code of

ethics governed the conduct of soccer "officials," expressly defined by FIFA's statues to

include, among others, all board members, committee members and administrators of FIFA

as well as FIFA's continental confederations and member associations. Among other things,

the code of ethics provided that soccer officials were prohibited from accepting bribes or

cash gifts and from otherwise abusing their positions for personal gain. The code of ethics

further provided, from its inception, that soccer officials owed certain duties to FIFA and its

confederations and member associations, including a duty of absolute loyalty. By 2009, the

code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to

FIFA and its constituent confederations, member associations, leagues and clubs.

        B.      The Continental Confederations

        4.      Each of FIFA's member associations also was a member of one of the

six continental confederations recognized by FIFA: the Confederation of North, Central

American and Caribbean Association Football ("CONCACAF"), the Confederación

Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de

Football, the Confédération Africaine de Football, the Asian Football Confederation, and the

Oceania Football Confederation. Under FIFA's statutes, no national soccer association could

become a member of FIFA without first joining one of the six continental confederations.

Member associations were required to pay to FIFA annual dues, known as subscriptions.

      5.     In addition to providing representatives who helped to govern FIFA,

the six continental confederations worked closely with FIFA and one another to organize

international soccer competitions and carry out FIFA directives on a regional basis. The

leaders and representatives of the confederations conducted business with one another, as

well as with the leaders and associates of FIFA, throughout the year at locations around the

world, including in the United States.

      6.     CONCACAF was a continental soccer confederation incorporated as a

non-profit corporation in Nassau, Bahamas. CONCACAF comprised as many as 41 member

associations, representing organized soccer in North America, Central America, the

Caribbean, and three South American countries. The United States and two of its overseas

territories, Puerto Rico and the United States Virgin Islands, were members of CONCACAF.

From approximately 1990 to 2012, CONCACAF's principal administrative office was

located in New York, New York, where the former general secretary was based (until the end

of 2011) and where CONCACAF regularly conducted business. Beginning in 2012,

CONCACAF's principal administrative office was located in Miami, Florida, where the new

general secretary was based. CONCACAF also conducted business at various times

B-3

throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation. In June 2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

   7. CONMEBOL was a continental soccer confederation domiciled and headquartered in Paraguay. CONMEBOL comprised as many as 10 member associations, representing organized soccer in South America. Among other tournaments, CONMEBOL organized the Copa América, featuring the men's national teams of its 10 members and two non-CONMEBOL national teams that were invited to participate, as well as tournaments featuring the top men's club teams, including the Copa Libertadores. Since 1993, the United States has participated in the Copa América as an invitee four times. Most recently, the United States hosted and participated in the 2016 Copa América Centenario, a special edition of the Copa América organized jointly by CONMEBOL and CONCACAF to commemorate its centennial. In December 2013, CONMEBOL adopted a code of ethics that, among other things, prohibited bribery and corruption.

   C. Regional Federations and National Associations

   8. In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations.

   9. The national associations promoted, organized, and governed soccer, often including club-level soccer, within individual nations. The national association of the United States, the United States Soccer Federation, was based in Chicago, Illinois. The

B-4

national association of Argentina, the Asociación del Fútbol Argentino ("AFA"), was a national member association of CONMEBOL and was based in Buenos Aires, Argentina.

10. The national associations, also often referred to as "federations," worked together to organize exhibition soccer matches between national teams, known as "friendlies," which also took place on the club level. Friendlies took place in venues throughout the United States, including the Eastern District of New York, as well as in other venues worldwide.

D. The Sports Marketing Companies

11. FIFA, the continental confederations, the regional federations, and the national member associations often entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events, including the World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies, and other events, as well as other rights associated with the sport. Often operating in coordination with affiliated consultants and intermediaries, these sports marketing companies, including multinational corporations with headquarters, offices, or affiliates located in the United States, often acquired an array of media and marketing rights, including television and radio broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights, and ticketing rights. These sports marketing companies often sold these rights to, among others, television and radio broadcast networks, sponsors, and sub-licensees, including those located in the United States.

12. The revenue generated by the commercialization of the media and marketing rights associated with soccer constituted an essential source of revenue for FIFA,

B-5

other governing bodies, and the sports marketing companies. Over time, the United States became an increasingly important and lucrative market for the commercialization of these rights.

## THE DEFENDANT

13.     TORNEOS was a sports media and marketing business headquartered in Argentina with a number of subsidiaries and affiliates, including, among others, T&T Sports Marketing Ltd., domiciled in the Cayman Islands, TyC International B.V., domiciled in the Netherlands, and Productora de Eventos S.A., domiciled in Uruguay.  In addition, Alejandro Burzaco, Torneos Executive #1, Torneos Executive #2, Torneos Executive #3 (all three of whom are defined below), and others created and/or controlled shell companies off the books of TORNEOS, including FPT Sports S.A. and Arco Business and Developments Ltd., among others (collectively, the "Off-the-Books Companies"), to effect certain transactions with and on behalf of TORNEOS, including as described in paragraphs 34 through 42 below.

## RELEVANT INDIVIDUALS AND ENTITIES

14.     At various times, Banker #1 and Banker #2 worked as client advisors in the private banking sector at prominent banking institutions based in Switzerland.  The identities of Banker #1 and Banker #2 are known to the Office and the Company.

15.     At various times, Luis Bedoya was a high-ranking official of FIFA, CONMEBOL, and the Federación Colombiana de Fútbol, the Colombian soccer federation, one of FIFA's national member associations.

16.     At various times, Broadcasting Company Executive #1 was a high-ranking executive of Broadcasting Company Affiliate A, an affiliate of a major broadcasting

B-6

company headquartered in Latin America, which obtained from FIFA rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup in certain territories in Latin America. The identities of Broadcasting Company Executive #1 and Broadcasting Company Affiliate A are known to the Office and the Company.

17.     At various times, Broadcasting Company Executive #2 and Broadcasting Company Executive #3 were high-ranking executives of Broadcasting Company Affiliate B, an affiliate of a major broadcasting company headquartered in the United States, which was, through another affiliate, part of a group of investors in an affiliate of the TORNEOS that owned the exclusive worldwide broadcasting rights to the CONMEBOL Copa Libertadores.  The identities of Broadcasting Company Executive #2, Broadcasting Company Executive #3, and Broadcasting Company Affiliate B are known to the Office and the Company.

18.     At various times, Broadcasting Company Executive #4 was a high-ranking executive of Broadcasting Company Affiliate C, which was among the investors in an affiliate of TORNEOS that owned the exclusive worldwide broadcasting rights to the CONMEBOL Copa Libertadores.  Broadcasting Company Affiliate C was owned, at times in part and at times wholly, by Broadcasting Company Affiliate B.  The identities of Broadcasting Company Executive #4 and Broadcasting Company Affiliate C are known to the Office and the Company.

19.     At various times, Alejandro Burzaco was the General Manager, President of the Board of Directors, and legal representative of TORNEOS and a principal of TORNEOS's subsidiaries and affiliates, as well as the Off-the-Books Companies.

20.     At various times, Datisa S.A. ("Datisa") was a Uruguayan company
formed in 2013 by Productora de Eventos S.A., a subsidiary of TORNEOS, Traffic (defined
below), and Sports Marketing Company A (defined below) that held the exclusive worldwide
commercial rights to the 2015, 2019 and 2023 editions of the Copa América and the 2016
Copa América Centenario.

21.     At various times, Rafael Esquivel was a high-ranking official of
CONMEBOL and the Federación Venezolana de Fútbol, the Venezuelan soccer federation,
one of FIFA's national member associations.

22.     At various times, José Hawilla was the founder and owner of the
Traffic Group, a multinational sports marketing company based in São Paulo, Brazil. The
Traffic Group comprised, among other entities, Traffic Assessoria e Comunicações S/C
Ltda., Traffic Sports International, Inc., Traffic Sports USA, Inc., Traffic Sports Europe
B.V., and Continental Sports International, Inc. (referred to collectively herein as "Traffic"
or the "Traffic Group").

23.     At various times, Sergio Jadue was a high-ranking official of
CONMEBOL and the Asociación Nacional de Fútbol Profesional de Chile, the Chilean
soccer federation, one of FIFA's national member associations, and a member of FIFA's
associations committee.

24.     At various times, José Margulies was a controlling principal of Valente
Corp. ("Valente") and Somerton Ltd ("Somerton") (together, the "Margulies
Intermediaries"), South American companies registered in Panama and Turks and Caicos,
respectively, that were involved in the broadcasting of soccer matches. At various times,

B-8

Margulies used accounts in the names of Valente and Somerton that were held at United

States financial institutions to make illicit payments on behalf of multiple members of the

conspiracy, including TORNEOS and certain of its subsidiaries and affiliates and the Off-

the-Books Companies.

25.     At various times, the following individuals, whose identities are known

to the Office and the Company, were high-ranking soccer officials of FIFA and/or one or

more of FIFA's constituent bodies:

> · Soccer Official #1 was a high-ranking official of FIFA, CONMEBOL, and AFA.
>
> · Soccer Official #2 was a high-ranking official of a national member association of CONMEBOL and an official of FIFA.
>
> · Soccer Official #3 was a high-ranking official of CONMEBOL and a national member association of CONMEBOL.
>
> · Soccer Official #4 was a high-ranking official of CONMEBOL and a national member association of CONMEBOL.
>
> · Soccer Official #5 was a high-ranking official of FIFA and a national member association of CONMEBOL.
>
> · Soccer Official #6 was a high-ranking official of CONMEBOL.
>
> · Soccer Official #7 was a high-ranking official of FIFA, CONMEBOL, and a national member association of CONMEBOL.
>
> · Soccer Official #8 was a high-ranking official of FIFA and CONMEBOL.
>
> · Soccer Official #9 was an official of FIFA and a high-ranking official of a national member association of CONMEBOL.
>
> · Soccer Official #10 was a high-ranking official of CONMEBOL and a national member association of CONMEBOL.

- Soccer Official #11 was a high-ranking official of FIFA, CONMEBOL, and a national member association of CONMEBOL.

- Soccer Official #12 was an official of FIFA and a high-ranking official of CONMEBOL.

- Soccer Official #13 was a high-ranking official of FIFA and a national member association of CONMEBOL.

26.     At various times, Sports Marketing Executive #1 and Sports Marketing Executive #2 were the controlling principals of Sports Marketing Company A, a sports media and marketing business with its principal offices in Argentina. Sports Marketing Company A had a number of subsidiaries and affiliates, all of which are referred to collectively below as "Sports Marketing Company A." The identities of Sports Marketing Executive #1, Sports Marketing Executive #2, and Sports Marketing Company A are known to the Office and the Company.

27.     At various times, the following individuals, whose identities are known to the Office and the Company, were high-ranking executives of TORNEOS:

- Torneos Executive #1 was a co-founder, director, and principal of TORNEOS until in or about March 2010.

- Torneos Executive #2 worked in administration and finance for TORNEOS until in or about June 2015.

- Torneos Executive #3 worked in the legal department of TORNEOS until in or about June 2015.

28.     At various times, Jeffrey Webb was the president of the Cayman Island Football Association, a member of the Caribbean Football Union ("CFU") executive committee, the chairman of CFU's normalization committee, the president of CONCACAF,

and a FIFA vice president and executive committee member. Webb also served on multiple FIFA standing committees, including the finance committee and the organizing committee for the World Cup.

\* \* \* \*

29. Luis Bedoya, Rafael Esquivel, Sergio Jadue, Jeffrey Webb, Soccer Official #1, Soccer Official #2, Soccer Official #3, Soccer Official #4, Soccer Official #5, Soccer Official #6, Soccer Official #7, Soccer Official #8, Soccer Official #9, Soccer Official #10, Soccer Official #11, Soccer Official #12, and Soccer Official #13 were bound by fiduciary duties to each of their respective soccer governing bodies.

## THE SCHEME

A. Overview

30. Beginning in or about the 1990s and continuing until in or about May 2015, the defendant TORNEOS and its co-conspirators, including the above-referenced soccer officials, devised a scheme and artifice to deprive FIFA and its constituent organizations of their respective rights to the honest and faithful services of certain of their leaders through the systematic payment of bribes and kickbacks. Specifically, TORNEOS, at the direction and through the conduct of its employees, including Alejandro Burzaco, Torneos Executive #1, Torneos Executive #2, and Torneos Executive #3, agreed to pay and did pay bribes and kickbacks to certain officials of FIFA, CONMEBOL, CONCACAF, and AFA in exchange for the officials' provision of support and assistance to TORNEOS in its efforts to obtain, maintain, and exploit lucrative media and marketing rights to various soccer tournaments and matches.

B-11

31.     Over the course of the scheme, TORNEOS agreed to pay and caused to be paid, directly and indirectly, tens of millions of dollars in bribe and kickback payments to Soccer Official #1 in exchange for, among other things, Soccer Official #1's provision of support and assistance to TORNEOS in its efforts to obtain, maintain, and exploit the media and marketing rights to various soccer tournaments and matches. TORNEOS and Soccer Official #1 developed a close relationship of mutual support, maintained and promoted through the payment of bribes and kickbacks to Soccer Official #1, that contributed to the common benefit of TORNEOS and its co-conspirators.

32.     In furtherance of the scheme and to effect its objects, TORNEOS agreed to pay and caused to be paid, directly and indirectly, bribes and kickbacks to Soccer Official #1 and other soccer officials, including Luis Bedoya, Rafael Esquivel, Sergio Jadue, Jeffrey Webb, Soccer Official #2, Soccer Official #3, Soccer Official #4, Soccer Official #5, Soccer Official #6, Soccer Official #7, Soccer Official #8, Soccer Official #9, Soccer Official #10, Soccer Official #11, Soccer Official #12, and Soccer Official #13. TORNEOS agreed to pay these officials and did cause them to be paid in exchange for their official support of TORNEOS in its efforts to obtain, maintain, and exploit media and marketing rights to various soccer tournaments and matches, including, among other tournaments and matches, the FIFA World Cup, CONMEBOL Copa América, CONMEBOL/CONCACAF Copa América Centenario, CONMEBOL Copa Libertadores, CONMEBOL Copa Sudamericana, CONMEBOL Recopa Sudamericana, and international friendlies featuring the Argentinian men's national soccer team.

B-12

B.    Conduct in Furtherance of the Conspiracy

33.    By way of example, set forth below are further details regarding certain

conduct undertaken TORNEOS and its co-conspirators in furtherance of the scheme and to

effect its objects.

i.    FIFA World Cup Rights

34.    In or about and between 2010 and 2013, TORNEOS's wholly-owned

subsidiary TyC International B.V. obtained the rights to broadcast the 2018, 2022, 2026, and

2030 editions of the World Cup to audiences in Argentina, Uruguay, and Paraguay through a

series of contracts with the Off-the-Books Companies and Broadcasting Company Affiliate

A, which had secured the rights to broadcast the tournaments in these and other territories

directly from FIFA. TORNEOS, through Alejandro Burzaco and others, and at times with

the assistance of one or more representatives of Broadcasting Company Affiliate A,

including Broadcasting Company Executive #1, agreed to pay and did pay millions of dollars

in bribe and kickback payments to Soccer Official #1 – a high-ranking FIFA official who

exercised enormous influence within the association – in order to secure his support for

Broadcasting Company Affiliate A's acquisition of rights to broadcast the 2018, 2022, 2026,

and 2030 editions of the World Cup in certain territories, and the subsequent purchase and

exploitation of certain of those rights by TyC International B.V.

35.    Among other things, Soccer Official #1 agreed to use and did use his

influence to push FIFA to sell the rights to broadcast the 2026 and 2030 editions of the

World Cup in certain Latin American territories to Broadcasting Company Affiliate A in

2013, earlier than anticipated and long before the selection of host countries for those editions of the tournament.

ii.   CONMEBOL Copa Libertadores Rights

36.   Beginning in or about 1999 and continuing through in or about May 2015, T&T Sports Marketing Ltd. ("T&T"), an affiliate of TORNEOS, acquired the exclusive worldwide broadcasting rights to each edition of the Copa Libertadores, an annual tournament organized by CONMEBOL featuring the confederation's top men's club teams, through a series of contracts between T&T and CONMEBOL. T&T eventually acquired the rights to two less prominent tournaments, the Copa Sudamericana and Recopa Sudamericana, also through a series of contracts between T&T and CONMEBOL. T&T was owned in part by TORNEOS and in part by partners in the venture, including, for a brief period, Traffic, and, later, a group of investors that included Broadcasting Company Affiliate B. Broadcasting Company Affiliate B invested in T&T through its ownership interest in Broadcasting Company Affiliate C.

37.   Beginning at least as early as in or about 2000 and continuing through in or about May 2015, TORNEOS, through Torneos Executive #1 and, later, Alejandro Burzaco and others, and at times with the agreement and support of representatives of Broadcasting Company Affiliate B and Broadcasting Company Affiliate C, including Broadcasting Company Executive #2, Broadcasting Company Executive #3, and Broadcasting Company Executive #4, agreed to pay and caused to be paid annual six-figure and, in some instances, seven-figure bribe and kickback payments to, variously, Luis

Bedoya, Rafael Esquivel, Sergio Jadue, Soccer Official #1, Soccer Official #2, Soccer

Official #3, Soccer Official #4, Soccer Official #5, Soccer Official #6, Soccer Official #7,

Soccer Official #8, Soccer Official #9, Soccer Official #10, Soccer Official #11, Soccer

Official #12, and Soccer Official #13 in exchange for the officials' support of T&T as the

holder of the broadcasting rights to the Copa Libertadores.

38.     TORNEOS, through Alejandro Burzaco and others, at times relied on

Sports Marketing Executive #1, Sports Marketing Executive #2, Sports Marketing Company

A, and the Off-the-Books Companies to facilitate the payment of bribes and kickbacks to

certain of the co-conspirator soccer officials in connection with the Copa Libertadores.

TORNEOS also relied on José Margulies and the Margulies Intermediaries, among other

intermediaries, to facilitate the payment of bribes and kickbacks to CONMEBOL officials in

connection with the Copa Libertadores.

> iii.     CONMEBOL Copa América and CONMEBOL/CONCACAF
> Copa América Centenario Rights

39.     In or about May 2013, Productora de Eventos S.A., a subsidiary of

TORNEOS, Traffic, and Sports Marketing Company A formed Datisa, a new company in

which each entity held a one-third interest. Datisa subsequently entered into a $317.5 million

contract with CONMEBOL to obtain the exclusive worldwide rights to the 2015, 2019, and

2023 editions of the Copa América and the 2016 Copa América Centenario.

40.     Following negotiations between CONMEBOL and CONCACAF, it

was determined that the men's national teams of six CONCACAF member associations,

including the U.S. national team, would participate in the Copa América Centenario with the

10 CONMEBOL men's national teams. It was further determined that the tournament would be hosted by the United States in recognition of the growth of the market for soccer in North America. Datisa subsequently entered into a $35 million contract with CONCACAF, in its capacity as the co-organizer of the Copa América Centenario, to acquire CONCACAF's media rights to the tournament.

41.    In connection with the acquisition of the media rights to the Copa América and the Copa América Centenario, TORNEOS, through Alejandro Burzaco, and TORNEOS's partners in Datisa agreed to pay and caused to be paid tens of millions of dollars in bribes to various soccer officials, including Luis Bedoya, Rafael Esquivel, Sergio Jadue, Jeffrey Webb, Soccer Official #1, Soccer Official #2, Soccer Official #3, Soccer Official #4, Soccer Official #5, Soccer Official #7, Soccer Official #8, Soccer Official #9, Soccer Official #10, Soccer Official #11, Soccer Official #12, and Soccer Official #13. The Datisa partners agreed to make these payments at various times over the life of the contracts.

42.    TORNEOS's subsidiary Productora de Eventos S.A. and its Datisa partners relied on the Off-the-Books Companies, José Margulies, and the Margulies Intermediaries, among others, to facilitate the payment of bribes and kickbacks to CONMEBOL officials from and through accounts controlled by the Datisa shareholders in connection with the Copa América and Copa América Centenario tournaments.

* * * *

43.    TORNEOS and its co-conspirators used the wire facilities of the United States to facilitate and effect certain payments in furtherance of the criminal scheme, including in connection with each of the tournaments referenced in paragraphs 34 through 42

B-16

above, and to communicate with co-conspirators and others in furtherance of the criminal

scheme. Such use of United States wire facilities included, among other things, the use of

the bank accounts of TORNEOS's subsidiaries and affiliates held at United States financial

institutions to transfer tens of millions of dollars in payments related to contracts secured

through bribery, as well as the use of the bank accounts of co-conspirators, including the

Margulies Intermediaries, held at United States financial institutions to transfer millions of

dollars in bribe payments. TORNEOS and its co-conspirators also relied, in part, on the

growing market for soccer in the United States to generate profits from the scheme, and

conducted meetings in furtherance of the scheme in the United States.

44.    TORNEOS and its co-conspirators engaged in conduct designed to

prevent the detection of their illegal activities, to conceal the location and ownership of

proceeds of those activities, and to promote the carrying on of those activities. The conduct

engaged in by various members of the conspiracy included, among other things: the use of

"consulting services" agreements, sham invoices and payment instructions, and other similar

types of records to create an appearance of legitimacy for illicit payments; the use of various

mechanisms, including trusted intermediaries (including the Margulies Intermediaries),

bankers (including Banker #1 and Banker #2), and currency dealers, to make and facilitate

the making of illicit payments; the creation and use of shell companies; and the use of cash.

45.    No disclosure of any of the foregoing bribery and kickback schemes

was made to FIFA, CONMEBOL, or CONCACAF, including without limitation to their

respective executive committees, congresses, or constituent organizations.

B-17

## ATTACHMENT C

### CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with all applicable federal, state, and foreign anti-bribery and anti-money laundering laws, TORNEOS Y COMPETENCIAS S.A. ("TORNEOS" or the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, TORNEOS agrees to adopt new or to modify its existing internal controls, compliance code, policies, and procedures in order to ensure that it maintains: (a) a system of internal accounting controls designed to ensure that the Company makes and keeps fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that includes policies and procedures designed to detect and deter violations of anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of TORNEOS's existing internal controls, compliance code, policies, and procedures:

### High-Level Commitment

1.     TORNEOS will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of anti-corruption laws (as defined in paragraph 2 below) and to its compliance code.

C-1

## Policies and Procedures

2.      TORNEOS will develop and promulgate clearly articulated and visible corporate policies against violations of all applicable federal, state, and foreign anti-bribery and anti-money laundering laws, including without limitation federal racketeering, mail and wire fraud, and anti-money laundering statutes, the Travel Act, the Foreign Corrupt Practices Act, state commercial bribery statutes, and the analogues of such laws in foreign jurisdictions in which the Company conducts business ("anti-corruption laws"), which policies shall be memorialized in a written compliance code.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company. These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in foreign jurisdictions, including, but not limited to, agents and intermediaries, consultants, representatives, distributors, sponsors, vendors, broadcasters, contractors, suppliers, consortia, and joint venture partners (collectively, "agents and business partners"). The Company shall notify all employees that compliance with

C-2

the policies and procedures is the duty of individuals at all levels of the Company.  Such policies

and procedures shall address:

> (a)   gifts;
>
> (b)   hospitality, entertainment, and expenses, including in connection
>       with soccer matches and tournaments and meetings of officials
>       responsible for soccer governance;
>
> (c)   customer, client, employee, and vendor travel;
>
> (d)   facilitation payments, finders' fees, commissions, and other
>       incentive payments; and
>
> (e)   solicitation and extortion.

4.    The Company will ensure that it has a system of financial and accounting

procedures, including a system of internal controls, reasonably designed to ensure the

maintenance of fair and accurate books, records, and accounts.  This system should be designed

to provide reasonable assurances that:

> (a)   all payments made by the Company and its subsidiaries are made
>       in exchange for legitimate services and at a reasonable market
>       price;
>
> (b)   transactions are executed in accordance with management's
>       general or specific authorization;
>
> (c)   transactions are recorded as necessary to permit preparation of
>       financial statements in conformity with generally accepted

C-3

accounting principles or any other criteria applicable to such

statements, and to maintain accountability for assets;

(d)     access to assets is permitted only in accordance with

management's general or specific authorization; and

(e)     the recorded accountability for assets is compared with the existing

assets at reasonable intervals and appropriate action is taken with

respect to any differences.

### Periodic Risk-Based Review

5.     The Company will develop these compliance policies and procedures on

the basis of a periodic risk assessment addressing the individual circumstances of the Company,

in particular the bribery risks facing the Company, including, but not limited to, the geographical

bases of its operations, interactions with various types and levels of government officials,

involvement in joint venture arrangements, the importance of marketing rights acquisition and

production licenses and permits to the Company's business, and the broad, international scope of

the Company's target markets.

6.     The Company shall review its anti-corruption compliance policies and

procedures no less than annually and update them as appropriate to ensure their continued

effectiveness, taking into account relevant developments in the field and evolving international

and industry standards.

### Proper Oversight and Independence

7.     The Company will assign responsibility to one or more senior corporate

executives of the Company for the implementation and oversight of the Company's anti-

corruption compliance code, policies, and procedures. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including (a) the Supervisory Commission ("Syndics"), which is an independent committee appointed by the Company's shareholders under Argentine Corporate Law for the purpose of, among other things, overseeing the management of the Company, examining periodically all books and records of the Company, ensuring the Company's compliance with Argentine law, the Company's by-laws, and the shareholders' resolutions, and investigating any shareholder claims; (b) internal audit; (c) the Company's Board of Directors; or (d) any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy. The Company will create and maintain an internal audit function.

Training and Guidance

8. The Company will implement mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b)

C-5

corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

        9.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

Internal Reporting and Investigation

      10.      The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

      11.      The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

### Enforcement and Discipline

12.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance code, policies, and procedures by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

### Third-Party Relationships

14.     The Company will institute comprehensive risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners – including existing agents and business partners – prior to transacting with them, including:

> (a)     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

C-7

       (b)    informing agents and business partners of the Company's

commitment to abiding by anti-corruption laws, and of the

Company's anti-corruption compliance code, policies, and

procedures;

       (c)    seeking a reciprocal commitment from agents and business

partners; and

       (d)    refresh and update its diligence on existing agents and business

partners.

    15.    Where necessary and appropriate, the Company will include standard

provisions in agreements, contracts, and renewals thereof with all agents and business partners

that are reasonably calculated to prevent violations of the anti-corruption laws, which may,

depending upon the circumstances, include: (a) anti-corruption representations and undertakings

relating to compliance with anti-corruption laws; (b) rights to conduct audits of the books and

records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to

terminate an agent or business partner as a result of any breach of the anti-corruption laws, the

Company's compliance code, policies, or procedures, or the representations and undertakings

related to such matters.

Mergers and Acquisitions

    16.    The Company will develop and implement policies and procedures for

mergers and acquisitions requiring that the Company conduct appropriate risk-based due

C-8

diligence on potential new business entities, including appropriate anti-corruption due diligence by legal, accounting, and compliance personnel.

17.    The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

(a)    train the directors, officers, employees, agents, and business partners consistent with paragraph 8 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

(b)    where warranted, conduct a bribery-specific audit of all newly acquired or merged businesses as quickly as practicable.

Monitoring and Testing

18.    The Company will conduct periodic reviews and testing of its anti-corruption compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption code, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.

Case 1:15-cv-24494-CMA Document 1-8385-21 Entered on FLSD Docket 03/06/2020 Page 399 of 405

## ATTACHMENT D

ANY AND ALL FUNDS ON DEPOSIT IN BANCO BILBAO VIZCAYA ARGENTARIA ACCOUNT NUMBER 7584831 HELD IN THE NAME OF PRODUCTORA DE EVENTOS S.A., AND ALL PROCEEDS TRACEABLE THERETO (the "Productora BVA Account");

ANY AND ALL FUNDS ON DEPOSIT IN INTERAUDI BANK ACCOUNT NUMBER 723621 HELD IN THE NAME OF PRODUCTORA DE EVENTOS S.A., AND ALL PROCEEDS TRACEABLE THERETO (the "Productora Interaudi Account");

ANY AND ALL FUNDS ON DEPOSIT IN ABN AMRO ACCOUNTS NUMBER 242069819; 585885842; 249059746; and 585918023 HELD IN THE NAME OF TYC INTERNATIONAL B.V., AND ALL PROCEEDS TRACEABLE THERETO (the "TyC International Accounts");

ANY AND ALL FUNDS ON DEPOSIT IN INTERAUDI BANK ACCOUNT NUMBER 724093 HELD IN THE NAME OF T&T SPORTS MARKETING LTD., AND ALL PROCEEDS TRACEABLE THERETO (the "T&T Sports Marketing Account"); and

ANY AND ALL FUNDS ON DEPOSIT IN BANK HAPOALIM ACCOUNT NUMBER CH040828170441801000U AND/OR CUSTOMER NUMBER 7044180 HELD IN

THE NAME OF DATISA S.A., AND ALL PROCEEDS TRACEABLE THERETO (the "Datisa Account").

D-1

# ATTACHMENT E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    -against-

TORNEOS Y COMPETENCIAS, S.A.,

    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      STIPULATION OF
      SETTLEMENT AND
      DECREE OF FORFEITURE

WHEREAS, on or about December 13, 2016, the United States of America, by the

United States Attorney's Office for the Eastern District of New York (the "United States"), and

TORNEOS Y COMPETENCIAS S.A. ("TORNEOS"), by its General Manager, Ignacio Juan

Galarza, and counsel, David B. Massey, Esq., Lee S. Richards, III, Esq., Jeffrey A. Lehtman, Esq.,

Maria E. Lapetina, Esq., Richards Kibbe & Orbe LLP, entered into a deferred-prosecution

agreement (the "Agreement") whereby the United States agreed to defer prosecution of

TORNEOS in connection with conduct described in a criminal information filed in the United

States District Court for the Eastern District of New York charging the Company with wire fraud

conspiracy, in violation of Title 18, United States Code, Sections 1349;

WHEREAS, as part of its obligations under the Agreement, TORNEOS has

agreed, inter alia, to forfeit the sum of _____

($_____.__) (the "Forfeited Amount") to the United States;

E-1

WHEREAS, TORNEOS has agreed to waive the filing of a civil forfeiture complaint as to the Forfeited Amount in accordance with the procedures set forth in 18 U.S.C. § 983; and

WHEREAS, the United States and TORNEOS desire to resolve this matter upon the below mutually agreeable terms and conditions.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between the undersigned parties as follows:

1.      [Name, General Manager, Torneos] and the undersigned attorney represent that they are authorized to enter into this Stipulation of Settlement and to execute this and all other documents necessary to effectuate the settlement of this action on behalf of TORNEOS.

2.      Upon the entry of this Stipulation of Settlement and Decree of Forfeiture, TORNEOS hereby consents to the forfeiture of the Forfeited Amount to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(a), 981(a)(1)(C) and 982(a)(1), and 28 U.S.C. § 2461(c), which represents profits that TORONEOS made from certain contracts obtained through the conduct of certain of its directors, officers and employees as described in the Information as property, real or personal, constituting or derived from proceeds traceable to a violation of 18 U.S.C. § 1349, or any property traceable to such property.

3.      TORNEOS shall pay the Forfeited Amount by certified or bank check, payable to "United States Marshals Service," and said check shall be delivered to Assistant United States Attorney Brian D. Morris, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, 7th Floor, Brooklyn, New York 11201, by hand delivery or by

E-2

express, overnight delivery on or before the Applicable Due Date as that term is defined in the Agreement. TORNEOS agrees that the Forfeited Amount does not constitute a fine, penalty, or payment of any taxes that may be due or owing.

4. In connection with the forfeiture set forth in Paragraph 2, above, TORNEOS agrees to release, remise and forever discharge plaintiff, the United States of America and its agencies, agents, officers, and employees, past and present, for all claims or causes of action which TORNEOS and its agents, assigns, representatives, and successors ever had, now have, or hereafter may have against the plaintiff and its agencies, agents, officers, and employees, past and present, for or on account of the commencement of this action, the settlement of this action, and the seizure and forfeiture of the Forfeited Amount.

5. TORNEOS waives its right, if any, to use the instant action or its settlement as a basis for any statutory or constitutional defense in any other civil, criminal or administrative action, including, without limitation, venue, defenses based upon the Double Jeopardy Clause of the Fifth Amendment and the Excessive Fines Clause of the Eighth Amendment.

6. The parties agree that each party shall bear its own costs and attorney's fees, and TORNEOS further agrees to waive any and all rights it has, if any, to recover attorney's fees and/or interest under the Equal Access to Justice Act, the Civil Asset Forfeiture Reform Act, or any other legal or statutory authority with respect to the forfeiture of the Forfeited Amount.

7. The United States will publish notice of this seizure and of its intent to forfeit the Forfeited Amount on the government's official website, www.forfeiture.gov, consistent with the custom and practice in this judicial district.

E-3

8. Upon completion of publication and provided that no third party claims are filed with respect to the Forfeited Amount, the Forfeited Amount shall be forfeited to the United States.

9. At that time, the Department of Justice, United States Federal Bureau of Investigation, the United States Marshals Service, and their duly authorized agents and/or contractors shall be authorized to dispose of the Forfeited Amount in accordance with all laws and regulations.

10. The District Court shall retain jurisdiction over this action to enforce the terms of this Stipulation of Settlement and Decree of Forfeiture.

11. This Stipulation and Decree sets forth the entire, final agreement of the parties and may not be modified orally.

12.     The Clerk of the Court shall forward four (4) certified copies of this

Stipulation and Decree of Forfeiture to FSA Senior Law Clerk William K. Helwagen, Esq., and

then is directed to close this case.

Dated:  Brooklyn, New York
                           , 201_

> ROBERT L. CAPERS
> United States Attorney
> Eastern District of New York
> *Attorney for United States*
> 271-A Cadman Plaza East
> Brooklyn, New York 11201

By:     _____

> Brian D. Morris
> Assistant United States Attorney
> (718) 254-6512

Dated: _____, _____
 _____, 201__

_____

[NAME], Esq.
[FIRM]
*Attorney for Torneos Y Campetencias S.A.*
[STREET]
[CITY/STATE/COUNTRY]
(PHONE NUMBER)

AGREED AND CONSENTED TO:

Dated: _____, _____
 _____, 201__

_____

[NAME]
[TITLE]
TORNEOS Y COMPETENCIAS S.A.

On the _____ day of _____, in the year of 201__, _____, known to me, the undersigned or provided to me on the basis of satisfactory evidence to be the individual whose name is subscribed to above, personally appeared before me and acknowledged to me that he executed the foregoing document.

_____
Notary Public

SO ORDERED:

_____
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

_____
Dated:

E-6