UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:16-CV-24431-ALTONAGA/McAliley

GOLTV, INC., *et al.*,

                                                                  Plaintiffs,

    -against-

FOX SPORTS LATIN AMERICA, LTD, *et al.*,

                                                               Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF REQUEST FOR PRODUCTION NO. 23
SERVED ON DEFENDANT TORNEOS Y COMPETENCIAS, S.A.**

      Plaintiffs GolTV, Inc. and Global Sports Partners LLP (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their Request for Production No. ("Request") 23 served on Defendant Torneos y Competencieas, S.A. ("Torneos") and in response to both Defendant Torneos'[1] and Intervenor The United States'[2] (the "government") memoranda of law.

**PRELIMINARY STATEMENT**

      As a result of the parties' continuing discussions and meet and confers following the April 24, 2018 hearing, the current dispute concerns a relatively straightforward and limited subset of documents: presentations prepared by Torneos and shown to or provided to the Department of Justice ("DOJ"), including PowerPoint presentations or written submissions, to the extent that they

---

[1] "Torneos MOL" refers to Defendant Torneos' Memorandum of Law in Support of Torneos y Competencias, S.A.'s Objections to Plaintiffs' Request for Production No. 23 (ECF No. 384), filed on May 15, 2018.

[2] "Gov't MOL" refers to the government's Memorandum of Law in Support of Objections to Certain Discovery Requests (ECF No. 385), filed on May 15, 2015.

relate to the three Club Tournaments at issue in this case (*i.e.*, the Copa Libertadores, the Copa Sudamericana, and the Recopa Sudamericana). This category of documents is further limited by the fact that Plaintiffs only seek documents generated between May 27, 2015 and December 13, 2016.

As both Torneos and the government concede, Torneos has already acknowledged criminal culpability as to its role in the alleged conspiracy—the same conduct involving the same Club Tournament rights detailed in the original indictment in *United States v. Webb, et al.*, 15-CR-252, in the United States District Court for the Eastern District of New York (the "Criminal Case"). It is further undisputed that only after the unsealing of the indictment on May 27, 2015, Torneos admitted that it participated in the criminal conduct and entered into a Deferred Prosecution Agreement ("DPA") on December 13, 2016. Second Am. Compl., Ex. B (ECF No. 325). And as the record reflects, Torneos did not voluntarily disclose its misconduct; rather, Torneos only endeavored to barter cooperation with the government for leniency after discovering that it was a subject of the government's investigation.

In light of these concessions, Plaintiffs seek discovery to establish and corroborate Torneos' role and knowledge in the bribery scheme alleged in the Complaint as well as the roles of the other Defendants. While Torneos may have admitted its wrongdoing in the DPA, the other parties have not done so. Given Torneos' admitted role in the wrongdoing, it is only expected that Torneos has knowledge of the participation and roles of others and that it disclosed such evidence to the government through presentations or other written submissions. After all, Torneos prepared these presentations with the objective of trying to minimize the consequences of its crimes.

The requested discovery will thus show that Torneos, along with Defendant Fox Pan American Sports LLC, as the owners of a joint venture, T&T Sports Marketing, Ltd. ("T&T"),

were involved with the payment of bribes and kickbacks to Conmebol officials in exchange for the broadcasting rights to the Club Tournaments. The discovery will also reveal the roles of other Defendants and the mechanics of the fraudulent scheme which enabled Defendants to set up shell companies and engage in a series of sham consulting contracts to mask the illegal nature of the massive bribes being paid to Conmebol officials—the very analysis of "underlying contracts and business records" that Torneos voluntarily provided to the government. Gov't MOL 6.

While Torneos elected to disclose its wrongdoing, from May 27, 2015 to December 13, 2016—the effective date of the DPA—there was no expectation that these materials would be kept confidential. Neither Torneos nor the government allege that they entered into a confidentiality agreement prior to the DPA or as a condition of Torneos' cooperation. Even if a confidentiality agreement had been entered into, the fact remains that the requested presentations were voluntarily provided to the government as part of the government's investigation of Torneos. Any argument that the presentations qualify as attorney work product is thus flawed because any such protection has been waived. Torneos' request that the Court nevertheless adopt the selective waiver doctrine—which the majority of appellate courts have rejected—similarly falls flat.

Finally, as Plaintiffs have conveyed to the government, Plaintiffs only seek the factual information contained in the presentations to the extent it involves the Club Tournaments. Plaintiffs, the victims of Defendants' fraud, have no intention of trying to undermine or ascertain the current status and direction of the government's investigation. In fact, Plaintiffs offered the government an opportunity to redact information contained in the presentations to the extent it reveals the government's thoughts and processes. Additionally, the negotiated end date of December 13, 2016 for this request serves to alleviate the government's concern as to any required and ongoing cooperation by Torneos.

For the foregoing reasons, this Court should overrule Torneos' and the government's objections to Plaintiffs' modified Request 23.

**RELEVANT BACKGROUND**

A.  Involvement of Torneos in the Criminal Case

On May 20, 2015, a federal grand jury sitting in the Eastern District of New York returned a 47-count indictment charging 14 individuals including Defendant Alejandro Burzaco, a principal of Torneos, with racketeering conspiracy, wire fraud, and money laundering offenses, among other crimes. The indictment was unsealed on May 27, 2015, following the arrests of some of the charged defendants.

After the indictment publicly identified Torneos, and principally disclosed that Torneos was a subject of investigation in the Criminal Case, Torneos elected to voluntarily admit its role and culpability in the conspiracy scheme. As Torneos admits, Torneos willingly produced presentations and memoranda that were sought as part of the government's investigation. Neither Torneos nor the government asserts that Torneos disclosed information pursuant to a confidentiality agreement or on the condition that such information remain confidential.

Approximately six months following the unsealing of the original indictment, on November 25, 2015, the grand jury returned a 92-count superseding indictment charging 16 additional defendants, including Defendant Juan Ángel Napout, with racketeering conspiracy, wire fraud, and money laundering offenses, among other crimes. *See United States v. Hawit, et al.*, 15-CR-252 (S-1) (PKC). Like the original indictment, the superseding indictment which was unsealed on December 3, 2015, revealed that Torneos and its co-conspirators "secured [the Club Tournament Rights] through the systematic payments of bribes and kickbacks to high-ranking Conmebol officials, including [Defendant Napout]." Compl., Ex. A, at ¶114.

4

On December 13, 2016, Torneos and the government entered into the DPA.  The DPA sets forth a detailed statement of facts describing the involvement of Torneos, its executives (including Defendant Burzaco), and the "shell companies" that it created and/or controlled "off the books" in order to facilitate the payments of bribes and kickbacks in the criminal scheme.  DPA, Attach. B, at ¶13; *see also id*.  Torneos further admits therein that Defendant T&T obtained the rights to the Copa Libertadores as a result of the payments made to the Conmebol officials.  *Id.* at ¶¶36-38.

B.  Modified Request 23

Plaintiffs presently seek presentations prepared by Torneos and provided to the government to the extent they relate to the Club Tournament Rights.  To the extent there is information in the presentations that do not involve the Club Tournaments, Plaintiffs informed Torneos that such information could be redacted.  As Plaintiffs have previously stated, Plaintiffs solely seek information to establish and corroborate Torneos' role in the wrongdoing and to learn the role of the other Defendants, including as to how Defendants operated the bribery scheme in exchange for the broadcasting rights to the Club Tournaments.  Plaintiffs do not intend to undermine the government's ongoing investigation but only seek information that is necessary to prove their case.  This is consistent with Plaintiffs' proposal to the government to redact portions of the presentations that refer to the government's direction or processes of its current, ongoing investigation as well as Plaintiffs' request for documents generated prior to the effective date of the DPA.

**ARGUMENT**

A.  Plaintiffs' Request for Presentations is Relevant, Proper and Proportional to the Case

Plaintiffs' requested discovery is highly relevant to the elements of Plaintiffs' RICO conspiracy claim.  It is undisputed that the Club Tournaments at issue in this case include the very same Club Tournaments involved in the Criminal Case.  In addition, the requested discovery,

5

which presumably details Torneos' role and knowledge of the conspiracy to fraudulently obtain the broadcasting rights for the Club Tournaments, is probative of the existence of an enterprise and the pattern of criminal activity that Torneos (as well as its co-conspirators, including without limitation, Defendants T&T and Burzaco) engaged in as part of the conspiracy. While the government broadly objects on the ground of relevancy without articulating a basis for its objection or any authority that it can even lodge an objection based on relevancy, Torneos concedes that the presentations contain information that is relevant to Plaintiffs' claims. *See* Torneos MOL 5; Pls.' Am. Notice of Discovery Hearing 5-6, ECF No. 354.

Plaintiffs are entitled to obtain broad discovery "regarding any non-privileged matter that is relevant to [their] claim[s] or defense[s]." Fed. R. Civ. P. 26(b)(1) [hereinafter the "Federal Rules"]. Relevancy is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Kennedy v. McKnight*, No. 17-14041-CIV, 2017 WL 4654446, at *1 (S.D. Fla. Oct. 17, 2017) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 451 (1978)). Courts are required to accord discovery a broad and liberal scope. *Milinazzo v. State Farm Ins. Co.*, 247 F.R.D. 691, 695 (S.D. Fla. 2007); *Rosenbaum v. Becker & Poliakoff, P.A.*, 708 F. Supp. 2d 1304, 1306 (S.D. Fla. 2010) (collecting cases)). Where there is doubt over relevancy, discovery should still be permitted. *See Fair Housing Ctr. of the Greater Palm Beaches, Inc. v. High Point of Delray Beach Condo. Ass'n, Section 1, Inc.*, No. 05-81040, 2006 WL 8066685, at *3 (S.D. Fla. Oct. 23, 2006).

Federal Rule 26 also requires that discovery be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). In determining proportionality, courts consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and

whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* All of these factors support Plaintiffs' discovery. Indeed, Plaintiffs are required to prove that Torneos as well as the other Defendants agreed to participate in the conspiracy as well as their respective roles in effectuating the scheme's end goals. The presentations, which presumably document Torneos' role and knowledge in the alleged conspiracy, as well as the involvement of the other Defendants, thus fall squarely within the realm of relevancy.

In addition, Plaintiffs' request targets a limited subset of documents. Torneos does not argue that the task of producing the documents in response to Plaintiffs' request is so unusual, voluminous or extraordinary that it would unduly burden Torneos. Rather, Torneos contends that because the documents that it relied on in preparing the presentations are expected to be produced, the presentations are duplicative and will provide "minimal" value. Torneos MOL 6.[3] Such a blanket assertion ignores the realities as to why subjects of investigations, here, Torneos, typically prepare presentations for an investigating agency. Such presentations do not simply regurgitate the contents of documents because that would not be useful. Indeed, as a matter of practice, presentations are prepared only after the subject of an investigation has conducted its own internal investigation and is prepared to report its findings. Moreover, when subjects of an investigation prepare presentations in an attempt to avoid criminal prosecution, the presentations serve as a means for the subject to disclose evidence of its wrongdoing as well as evidence of the participation and roles of others. As such, the presentations likely contain helpful, useful and nuanced information that may not be exclusively found in the documents relied upon but are a by-product of Torneos' "diligent, thorough, and swift internal investigation". *Id.* at 3. *See also ADT LLC v.*

---

[3] *See, e.g., Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. Caton*, 136 F.R.D. 682, 684-85 (D. Kan. 1991) ("All discovery requests are a burden on the party who must respond thereto. Unless the task of producing or answering is unusual, undue or extraordinary, the general rule requires the entity answering or producing the documents to bear that burden.").

*Vivint, Inc.*, No. 17-CV-80432-DMM, 2017 WL 5654769, at *4 (S.D. Fla. Aug. 24, 2017) (ordering that defendant produce quarterly customer reports despite the fact that defendant had provided yearly reports based on publicly available information because "quarterly assessments are likely to capture more nuanced changes in [defendant's] customer base"); *AGA Med. Corp. v. W.L. Gore & Assocs., Inc.*, No. CV 10-3734 (JNE/JSM), 2011 WL 13135783 (D. Minn. Dec. 13, 2011) (holding that underlying documents are not cumulative of an already-produced report submitted to a government agency). Given the fairly small number of documents at issue here, the benefit that Plaintiffs will receive vastly outweighs any purported burden.

In contrast, the cases that Torneos relies on involve circumstances where the burden of discovery substantially outweighs the potential benefit. The *SSL Services* decision Torneos cites, *SSL Servs., LLC v. Citrix Sys., Inc.*, No. 2-08-cv-158-TJW, 2010 WL 547478 (E.D. Tex. Feb 10, 2018), involved a patent dispute whereby the defendant requested that the plaintiff produce damages expert reports prepared by the defendant in a separate, unrelated lawsuit. The defendant asserted that the reports contained analyses that "will influence [the plaintiff's] damages claims and could even . . . lead to reasonable offers of settlement." *Id.* at *3. Weighing the burden of discovery against its likely benefit, the district court concluded that the benefit would be minimal because the analyses come from "different experts, relate to different patents, different financial data, and different plaintiffs." *Id.* Here, however, the requested presentations relate to the *same* misconduct involving the *same* Club Tournament Rights that Torneos has already acknowledged.

Moreover, unlike the *IDS* decision that Torneos relies upon, *IDS Prop. & Cas. Ins. Co. v. Fellows*, No. C15-02031-TSZ, 2017 WL 202128, at *1 (W.D. Wash. Jan. 18, 2017), Plaintiffs' request targets potentially a handful of documents. In *IDS*, the plaintiff requested documents after the discovery deadline that required the defendant to re-review documents in his possession.

8

Because the defendant had already produced over 6,000 documents, the district court determined that a re-review of the documents was unduly burdensome. Here, however, the documents sought by Plaintiffs can be easily identified by Torneos.

Further, Torneos (and the government) cannot claim that the requested documents are "cumulative" or "unduly burdensome" simply because the documents were provided to the government in the course of their investigation of the Club Tournament Rights. That argument, beyond being illogical, assumes that the burden placed on Torneos is substantial. It is not. Contrary to this claim (Torneos MOL 5), *Ft. Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99 (S.D.N.Y. 2013) provides no support for this proposition when the burden is minimal if it exists at all.[4]

### B. Torneos Waived Any Purported Work-Product Protection

Torneos asserts that it prepared the presentations while "under the threat of prosecution" by the government but that the disclosure of such presentations did not waive the work-product protection because Torneos was, in reality, "cooperating with the government." Torneos MOL 10. Torneos cannot have it both ways: "it is simply not fair to allow a party to wield the work-product protection as a sword to cut out the heart of an opposing party's case while simultaneously brandishing it as a shield from disclosure of any Achilles heels." *Stern v. O'Quinn*, 253 F.R.D. 663, 677 (S.D. Fla. 2008).

Torneos does not (and cannot) evade the plain language set forth in Federal Rule 26(b)(3)

---

[4] In *Ft. Worth*, a securities fraud class action suit, the plaintiffs requested "any communications with or documents provided to any government body or agency in connection with the investigation" of the defendant's residential mortgage-backed securities ("RMBS") business irrespective as to whether the documents involved or related to the particular loans and offerings involved in the suit. *Id.* at 110. The district court ultimately concluded that the plaintiffs were entitled to documents relating to investigations "involving the specific transactions and offerings at issue in the case" including subpoenas issued by the government in connection with any investigation relating to RMBS for a nine-year time period. *Id.*

which provides that "a party may not discover documents and tangible things that are prepared *in anticipation of litigation*. . . ." Fed. R. Civ. P. 26(b)(3) (emphasis added). To qualify for work-product protection, the proceeding for which the documents are prepared must be adversarial in nature to be characterized as "litigation". *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 268 F.R.D. 114, 117 (D.D.C. 2010); *Abdallah v. Coca-Cola Co.*, No. Al:98CV3679RWS, 2000 WL 33249254, at *5 (N.D. Ga. Jan. 25, 2000) ("A document may be considered to have been prepared in anticipation of litigation even if the litigation that caused its preparation was an investigation by a government agency, and not a traditional civil suit."). Here, Torneos admits, and Plaintiffs do not dispute, that Torneos knowingly prepared the presentations between May 27, 2015 and December 13, 2016, under the "specter" of criminal prosecution. Torneos MOL 10.

Torneos, however, waived the work-product protection over the presentations when it elected to voluntarily produce the presentations to the government. Because the work-product protection "is designed to protect an attorney's mental processes from discovery by *adverse* parties," the protection is "waived when protected materials are disclosed in a way that 'substantially increases the opportunity for potential adversaries to obtain the information.'" *U.S. Sec. & Exch. Comm'n v. Herrera*, 324 F.R.D. 258, 262-63 (S.D. Fla. 2017) (Goodman, Mag.) (internal citations omitted). The relevant inquiry is thus not *whether* confidential communications are disclosed, but *to whom* the disclosure is made. *Id.* at 262.

This is not a case in which Torneos complied with a "benign request to assist the [government] in performing its routine regulatory duties." *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 234 (2d Cir. 1993). The determinative fact in analyzing the adversarial nature of the relationship is that Torneos admits that it was the subject of the government's investigation, and the DPA is evidence of that. *Id.* Torneos nonetheless disclosed the presentations to the very party

10

investigating its misconduct *prior* to entering into the DPA.[5]  Additionally, the fact that Torneos "cooperated voluntarily does not transform the relationship from adversarial to friendly," *id.*, particularly, since the "specter" of criminal prosecution loomed over Torneos until it entered into the DPA.  Torneos MOL 10.

In that regard, Torneos' reliance on *Brown v. NCL Bahamas, Ltd.*, 155 F. Supp 3d 1335, 1339 (S.D. Fla. 2015) (Goodman, Mag.) fails on its own concession.  In *Brown*, the defendant, a cruise ship operator, handed over a copy of a witness statement to port police.  The statement was drafted by a passenger that perpetrated an on-board sexual assault on another passenger.  The court concluded that the disclosure did not constitute waiver because there was nothing in the record to suggest that the defendant was in an adversarial relationship with the port police.  Specifically, the court found that "there is no evidence to suggest that [the defendant] disclosed the document in order *to escape or limit criminal prosecution*."  *Id*. at 1341 (emphasis added).  Conversely, Torneos concedes that "Counsel prepared [and produced] the Presentations" "in order to avoid criminal prosecution."  Torneos MOL 11.  This admission alone underscores the inapplicability of this case.

Likewise, Torneos' citation to *Stern v. Quinn*, 253 F.R.D. 663 (S.D. Fla. 2008) is to no avail.  In *Stern*, the court held that the defendants did not waive work-product protection when they disclosed information to the FBI and Florida Attorney General in an effort to persuade them

---

[5] Torneos and the government do not appear to allege that the parties exchanged information pursuant to a confidentiality agreement or that the DPA constitutes a post hoc confidentiality agreement. Assuming *arguendo* that these arguments were in fact made, a confidentiality agreement "does not provide a basis for a court to enable parties to agree to a selective waiver of privilege." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012) ("The only justification behind enforcing such agreements would be to encourage cooperation with the government.  But Congress has declined to adopt even this limited form of selective waiver. *See* Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence, 154 Cong. Rec. H. 7817 (2008) . . . (noting that Rule 502 'does not provide a basis for a court to enable parties to agree to a selective waiver of the privilege, such as to a federal agency conducting an investigation').").

11

to *start* criminal prosecution. In contrast, Torneos disclosed the presentations *after* it was publicly announced that Torneos was a subject of the government's investigation.

Torneos also fails to distinguish *Herrera* from the facts of this case. In *Herrera*, the defendants moved to compel a law firm that represented their previous employer in connection with a SEC investigation to produce materials and presentations provided to the SEC. 324 F.R.D. at 263-65. Because the SEC had investigated the company for "alleged misstatements in its financial reports" and "eventually imposed a $6.5 million civil penalty against it," *id.* at 263, Judge Goodman concluded that the law firm waived work product over the materials disclosed to the SEC during the course of the agency's investigation. *Id*. at 263-64. Like *Herrera*, the government investigated Torneos for its involvement in facilitating the payment of bribes to Conmebol officials and as part of the DPA, Torneos agreed to pay over $23 million as a financial penalty. DPA ¶27. Critically, Torneos disclosed the presentations during the course of the government's investigation (*i.e.*, *after* the unsealing of the indictment and *prior* to entering into the DPA).

Such disclosure indisputably results in a clear waiver of work-product protection. *See, e.g.*, *Herrera*, 324 F.R.D. at 263-65 (citing *In re Initial Pub. Offering Sec. Litig.*, 249 F.R.D. 457, 465-67 (S.D.N.Y. 2008) for the proposition "that company waived work-product protection by disclosure of memoranda to the SEC, which was investigating the possibility of the company's wrongdoing, to limit liability for that wrongdoing"; *United States v. Bergonzi*, 216 F.R.D. 487, 497-98 (N.D. Cal. 2003) for the proposition "that the company waived work-product protection by the disclosure to SEC because SEC had issued a Wells letter to the company"; *see also In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179 (10th Cir. 2006) (collecting cases on waiver of work-product privilege in disclosures to investigating agencies); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 306-07 (6th Cir. 2002) (not permitting selective waiver of

12

work-product material to government agencies and noting that "[a]ttorney and client both know the material in question was prepared in anticipation of litigation; the subsequent decision on whether or not to 'show your hand' is quintessential litigation strategy.")); *Pensacola Firefighters' Relief Pension Fund Bd. of Trustees v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 265 F.R.D. 589, 596-97 (N.D. Fla. 2010) ("a party may not waive the attorney-client privilege for its own benefit to a third party government agency, then hide behind the privilege in civil litigation") (collecting cases).

C. Torneos Did Not Share a "Common Interest" with the Government

Torneos also attempts to distinguish *Herrera* because in that case the producing party "affirmatively told the court that 'it does not contend that it and the SEC shared a common interest.'" Torneos MOL 13 (internal quotations omitted). Impliedly, Torneos contends that it shared a "common interest" with the government prior to entering into the DPA and therefore disclosure of the presentations to the government did not waive work-product privilege. But this argument is routinely rejected by courts.

Rather than a separate privilege, the "common interest" or "joint defense" rule "is an exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other." *In re Pac. Pictures Corp.*, 679 F.3d at 1129 (9th Cir. 2012). "[A] shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception." *Id.*; *see also In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990) (collecting cases).

Although Torneos and the government may have had a "common interest" in the investigation of the alleged conspiracy, the "common interest" is not like the interest shared by "allied lawyers and clients who are working together in prosecuting or defending a lawsuit."

13

*Bergonzi*, 216 F.R.D. at 496.  Indeed, Torneos and the government "did not have a *true* common goal, as it could not have been [Torneos'] goal to impose liability onto itself, a consideration always maintained by the [g]overnment."  *Id.* (citing *McMorgan & Co. v. First Cal. Mortg. Co.*, 931 F.Supp. 703 (N.D. Cal. 1996) (determining no common interest between the plaintiff and the Department of Labor ("DOL") despite the fact that they both shared the common interest of protecting the participants and beneficiaries of pension funds, because the evidence suggested that the plaintiff was the target of DOL investigation)).

### D.  The Requested Discovery Is Not Subject to the Qualified Law Enforcement Privilege

As the government admits, the law enforcement privilege is not absolute.  *White v. City of Ft. Lauderdale*, No. 08-60771-CIV, 2009 WL 1298353, at *3 (S.D. Fla. May 8, 2009).  In examining the applicability of the privilege, courts are "mindful of the fundamental tenet of the federal discovery rules which is to provide liberal pretrial discovery . . . [t]hus the evidentiary privilege is to be *narrowly* construed."  *Sirmans v. City of S. Miami*, 86 F.R.D. 492, 495 (S.D. Fla. 1980) (emphasis added).  In light of these considerations, the government's argument that the requested discovery is subject to the law enforcement privilege fails for several reasons.

*First*, to assert the law enforcement privilege, a claimant must satisfy three requirements: "(1) the head of the department having *control* over the documents must raise a formal claim of privilege; (2) the department head must assert the privilege based on his or her actual personal consideration of the documents; and (3) the claimant must make a detailed specification of the information for which the privilege is claimed, with an explanation why this information properly falls within the scope of the privilege."  *Khan v. United States*, No. 13-24366-CIV, 2016 WL 10647138, at *7 (S.D. Fla. Jan. 15, 2016) (citing *In re Polypropylene Carpet Antitrust Litig.*, 181 F.R.D. 680, 687 (N.D. Ga. 1998)) (emphasis added).  The government is unable to satisfy the first

14

element as it fails to allege how it maintains "control" over the requested discovery.

The requested discovery is being sought from Torneos. Torneos, not the government, prepared the presentations based on its internal investigation. Through various meet and confers, it has become apparent that both Torneos and the government possess the requested discovery. As such, it is undisputed that Torneos maintains possession and "control" over these presentations.

The underlying purpose of the law enforcement privilege further supports this construction because the very purpose of the privilege is to protect the government's—not Torneos'—law enforcement techniques, procedures and processes. *See White*, 2009 WL 1298353, at *3. Nearly every case relied upon by both the government and Torneos involves a scenario where the requesting party is seeking documents *directly* from the government as opposed to the producing party (here, Torneos). *See, e.g.*, *Application of Eisenberg*, 654 F.2d 1107, 1111 (5th Cir. 1980) (denying petitioner's request to depose an agent of the metropolitan police service who had conducted surveillance on the petitioner in connection with a grand jury investigation); *Brown v. Thompson*, 430 F.2d 1214, 1215 (5th Cir. 1970) (denying civil plaintiff's request to police and highway patrol for internal files and records as to a homicide investigation); *Campbell v. Eastland*, 307 F.2d 478 (5th Cir. 1962) (denying civil plaintiff's request for records from the Director of Internal Revenue because the plaintiff, who had been indicted for tax evasion, could not "subvert the civil rules into a device for obtaining pre-trial discovery against the government").

*Second*, the government's reliance on *State Comp. Ins. v. Drobot*, No. SA-CV-130956, 2016 WL 3546583 (C.D. Cal. Feb 29, 2016) ignores the fact that Torneos provided the information to the government under the "specter" of criminal prosecution. Notwithstanding the government's attempt to characterize the presentations as evidence of Torneos' "cooperation", the government and Torneos did not enter into a DPA until December 13, 2016. As such, prior to the effective

date of the DPA, any information prepared and collected by Torneos was provided to the government—its adversary.

While *Drobot* provides that "cooperators in the government's investigation and others in close-working relationships with the government may be covered in the law enforcement privilege," the holding does not extend to *subjects* of the government's investigation. *Id.* at *6. Similarly, the case law relied upon by *Drobot* does not provide that subjects of an investigation may qualify as individuals with "close-working relationships" with the government. *See id.* (citing *In re Dep't of Investigation of City of N.Y.*, 856 F.2d 481, 485 (2d Cir. 1988) (finding that privilege covered a non-governmental agency with a close-working relationship with the U.S. Attorney's Office that was an "integral part" of the government's investigation). Accordingly, the government fails to show how the law enforcement privilege can be extended to materials prepared and collected by Torneos—a subject of the government's investigation.

*Third*, even if the Court were to accept the government's argument that the presentations are protected under the law enforcement privilege, the information contained therein that purportedly reflects the government's processes is a consequence of the government's decision to disclose such information to Torneos. To put it simply: to the extent the law enforcement privilege applies, the government has decidedly waived the privilege as to the contents in the presentations by knowingly disclosing such information to a subject of its own investigation. *In re Polypropylene Carpet Antitrust Litig.*, 181 F.R.D. at 689 (N.D. Ga. 1998) (citing *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1126 (7th Cir. 1997) (finding that the "[law enforcement] privilege can be waived and, once waived, is lost")). Similar to the reasons underlying the rejection of the selective waiver doctrine, such as, fairness and consistency, the government cannot engage "in conduct that would give it an unearned advantage." *Dellwood Farms*, 128 F.3d at 1126.

16

Again, to the extent that the information in the presentations reflects the government's thoughts and processes, such information was intentionally disclosed by the government to Torneos. While it is surprising that the government would divulge highly sensitive and confidential information to Torneos as to the status and direction of its investigation absent a confidentiality agreement and prior to entering into a DPA with Torneos, the government elected to make that disclosure.

*Finally*, as Plaintiffs have repeatedly reiterated to Torneos and the government, Plaintiffs have no intention of "prying" into the government's current status and direction of its investigation or to interfere with Torneos' ongoing cooperation which is a condition of the DPA. Plaintiffs only seek the factual information contained in the presentations which reflects Torneos' role and knowledge in the alleged conspiracy. This is further evidenced by Plaintiffs' limited request seeking documents generated prior to December 13, 2016—the effective date of the DPA. Plaintiffs are thus amenable to providing the government an opportunity to redact information to the extent it reflects the government's "inquiries, thought processes, and focuses" in its ongoing investigation.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court overrule the objections to Request 23.

| | |
|---|---|
| Dated:  May 29, 2018 | /s/ *Julissa Reynoso* |
| Peter H. Levitt (FBN 650978)<br>Stephen B. Gillman (FBN 196734) | Seth C. Farber (*pro hac vice*)<br>Julissa Reynoso (*pro hac vice*)<br>George Mastoris (*pro hac vice*)<br>Marcelo Blackburn (*pro hac vice*)<br>Cristina I. Calvar (FBN 114201)<br>Michael A. Fernández (*pro hac vice*)<br>Lauren Duxstad (*pro hac vice*)<br>Ariel Flint (*pro hac vice*) |
| SHUTTS & BOWEN LLP<br>200 South Biscayne Boulevard<br>Suite 4100<br>Miami, FL 33131<br>Tel.:  (305) 358-6300<br>Fax:  (305) 381-9982<br>plevitt@shutts.com<br>sgillman@shutts.com | WINSTON & STRAWN LLP<br>200 Park Avenue<br>New York, NY 10166-4193<br>Tel.:  (212) 294-6700<br>Fax:  (212) 294-4700<br>sfarber@winston.com<br>jreynoso@winston.com<br>gmastoris@winston.com<br>mblackburn@winston.com<br>ccalvar@winston.com<br>mafernandez@winston.com<br>lduxstad@winston.com<br>aflint@winston.com |

*Counsel for Plaintiffs GolTV, Inc. and Global Sports Partners LLP*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of May, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record.

/s/ Cristina I. Calvar